**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>   v.<br><br>ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, and THOMAS E. LONG,<br><br>       Defendants. | **Case No.**<br><br>**COMPLAINT -- CLASS ACTION**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Allegheny County Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by Energy Transfer LP ("Energy Transfer" or the "Partnership") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the Partnership; (iii) analyst reports concerning the Partnership and its subsidiaries; (iv) transcripts of Energy Transfer's investor conference calls; and (v) other public information regarding the Partnership.

<u>**NATURE OF THE ACTION**</u>

1.  Plaintiff brings this securities class action (the "Action") against Energy Transfer and certain of the Partnership's senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who purchased or otherwise acquired Energy Transfer common units between February 25, 2017 and November 11, 2019, inclusive (the "Class Period").

2.      Founded in 2002, Energy Transfer operates, through its subsidiaries, as a Dallas, Texas-based natural gas and energy transportation and storage company and operates some of the largest oil and gas pipelines in the United States.   The Partnership owns and operates approximately 12,200 miles of interstate natural gas pipelines and multiple natural gas storage facilities across the United States.

3.      Energy Transfer's projects include the Mariner East pipeline, a multibillion-dollar, 350-mile pipeline that carries highly volatile natural gas liquids across 17 Pennsylvania counties, including Allegheny County and four counties in this District:  Lancaster County, Berks County, Chester County, and Delaware County.  According to the Partnership's SEC filings, the Mariner East pipeline transports natural gas liquids ("NGLs") from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus Hook Industrial Complex on the Delaware River in Delaware County, where they are processed, stored and distributed to local, domestic and waterborne markets.

4.      The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.

5.      Energy Transfer obtained approval to construct the second phase of the project, referred to as Mariner East 2, on February 13, 2017, after the Pennsylvania Department of Environmental Protection ("PaDEP") approved water-crossing and sedimentation permits for the Mariner East 2 pipeline, which would transport natural-gas liquids across Pennsylvania to a terminal in Marcus Hook.  According to news sources, the permits were believed to be the final regulatory hurdle to begin construction of the pipeline.

6.     Throughout the Class Period, Defendants repeatedly assured investors that Energy Transfer had lawfully obtained valid permits to begin construction on Mariner East 2.  In addition, Energy Transfer represented through each of the Partnership's publicly filed Forms 10-K and Forms 10-Q throughout the Class Period, that Energy Transfer executives were bound by and adhered to the Partnership's Code of Ethics.  The Partnership's Code of Ethics explicitly forbids executives from "authorizing payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group."   Sensitive Payments include "payments to government officials or employees," "commercial bribes or kickbacks," and "corporate political contributions."

7.     Unknown to the investing public, Defendants, acting either independently or in concert with the Pennsylvania Governor Tom Wolf's administration, made use of coercion, bribery, and/or other illicit means of forcing PaDEP to approve the construction permits that were critical to the development of Mariner East 2.

8.     On November 12, 2019, the *Associated Press* published a report titled, "FBI eyes how Pennsylvania approved pipeline," which reported that Energy Transfer's Mariner East pipeline project was under investigation by the Federal Bureau of Investigation ("FBI").  Citing interviews with current and former state employees, the *Associated Press* reported that the FBI's investigation "involves the permitting of the pipeline, whether [Pennsylvania Governor Tom] Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."

9.     On this news, Energy Transfer's unit price fell $0.81 per share, or 6.77%, over the following two trading sessions, closing at $11.16 per share on November 13, 2019.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Partnership's common units, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) and 28 U.S.C. § 1391(b).  Defendants conduct business in this District and the majority of Defendants' actions and misconduct occurred within this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Energy Transfer common units at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Energy Transfer is a Delaware corporation with principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225.  Energy Transfer

4

common units trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."

17.     Defendant Kelcy L. Warren ("Warren") has served as Energy Transfer's Chief Executive Officer at all relevant times.  Warren also serves as Energy Transfer's Chairman of the Board.

18.     Defendant John W. McReynolds ("McReynolds") served as Energy Transfer's President from March 2005 to October 2018.

19.     Defendant Thomas E. Long ("Long") has served as Energy Transfer's Chief Financial Officer at all relevant times.

20.     Defendants Warren, McReynolds, and Long are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Energy Transfer's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Energy Transfer's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Energy Transfer, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Energy Transfer is a Dallas, Texas-based energy services partnership that was founded in 2002.  Energy Transfer, through its subsidiaries, operates inter/intrastate natural gas, NGLs, and crude and refined oil transportation and storage as well as fractional services.  The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018.  Energy Transfer operates as a subsidiary of LE GP, LLC.

23.     Energy Transfer's projects include the Mariner East pipeline, a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania.  According to the Partnership's SEC filings, the Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.

24.     On February 13, 2017, the PaDEP approved water-crossing and sedimentation permits for the second phase of the Mariner East project, Mariner East 2, which would transport natural-gas liquids across Pennsylvania to a terminal in Marcus Hook.  According to news sources, reporting on the proposed second phase of this project, Energy Transfer had experienced challenges achieving approval of these permit applications in the past due to numerous deficiencies and public concern over the environmental impact of the projects.  As such, the speed at which the Mariner East 2 permits were approved was surprising.

25.     Shortly thereafter, the Partnership began construction on Mariner East 2, which ultimately became operational in December 2018.

### Materially False and Misleading Statements Issued During the Class Period

26.     The Class Period begins on February 25, 2017.  On February 24, 2017, during after-market hours, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Partnership's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  With respect to the Partnership's corporate governance, the 2016 10-K touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board" (emphasis added).

27.     The 2016 10-K also noted that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Partnership's] website."

28.     The Code of Business Conduct and Ethics (the "Code") found on Energy Transfer's website stated, in relevant part:

> ***It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.*** It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

(Emphasis added.)

29.     The Code defines a "Sensitive Payment" as "both receipt and disbursements whether or not illegal," and includes:

a) ***receipts from or payments to governmental officials or employees***;
b) commercial bribes or kickbacks;
c) amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;
d) corporate political contributions; and
e) payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

(Emphasis added.)

30.     In a section of the Code titled, "Payments and Gifts to Government Officials," the Code emphasizes that gifts or other items of value must not be provided to government officials in connection with Partnership business without written approval, stating:

Compliance with the Partnership's Anti-Corruption Policy and the U.S. Foreign Corrupt Practices Act and other anti-corruption laws is required. What is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign).  There are strict laws that govern providing gifts, including meals, entertainment, transportation and lodging, to certain government (U.S. or foreign) officials, employees and consultants.  Because of the sensitive nature of these relationships, you should not provide gifts or anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department.

31.     In a section of the Code titled, "Ethical Behavior," the Code states, in relevant part:

Every Employee is expected to act with honesty and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment. Each Employee is required to adhere to the highest ethical standards in fulfilling our responsibilities to, and on behalf of the Partnership Group and its investors. Each Employee is required to deal fairly and honestly with other employees, customers, vendors and third parties.

32.     The 2016 10-K also assured investors that Energy Transfer had, presumably in a lawful manner, obtained all applicable permits and other authorizations for the Partnership's various properties used for conducting its business, and that such permits were valid.  Specifically, the 2016

8

10-K stated, in relevant part, "[w]e believe that we have satisfactory title to or valid rights to use all of our material properties" and that "that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business."

33.     With respect to the Mariner East pipeline, the 2016 10-K stated, in relevant part:

*NGL Pipelines*

Sunoco Logistics owns approximately 900 miles of NGLs pipelines, primarily related to the Mariner systems in the northeast and southwest United States.

- The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the third quarter of 2017.

* * *

*NGLs Terminals*

* * *

- *Marcus Hook Industrial Complex.* In 2013, Sunoco Logistics acquired Sunoco, Inc.'s Marcus Hook Industrial Complex. . . .  In addition to providing NGLs storage and terminalling services to both affiliates and third-party customers, the Marcus Hook Industrial Complex currently serves as an off-take outlet for the Mariner East 1 pipeline, and will provide similar off-take capabilities for the Mariner East 2 pipeline when it commences operations.

34.     Appended as exhibits to the 2016 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants McReynolds and Long certified that "[t]he [2016 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

35.     On February 23, 2018, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Partnership's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K").   The 2017 10-K, as with the 2016 10-K, touted the existence of the Code and its purported applicability to the Partnership's directors, officers and employees.   The 2017 10-K also contained representations substantively identical to those quoted in ¶ 33 above with respect to Energy Transfer's purportedly valid permits obtained for properties used in connection with its business.

36.     Appended as exhibits to the 2017 10-K were signed SOX certifications, wherein Defendants McReynolds and Long certified that "[t]he [2017 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

37.     On May 3, 2018, Energy Transfer issued a press release, entitled "Mariner East 1 Released for Service by Pennsylvania Public Utility Commission," that touted the benefits provided by the Mariner East pipeline, its importance to the Pennsylvania local community, and the Partnership's resolution of recent regulatory hurdles that had stalled use of the pipeline. Specifically, that press release stated, in relevant part:

> Energy Transfer . . . received a unanimous vote from the Pennsylvania Public Utility Commission (PUC) to resume operations of its Mariner East 1 pipeline.

> SPLP has worked diligently with the PUC's I&E Division and their outside experts on the matter for several weeks and is pleased that all investigations concur regarding the safety and integrity of the pipeline.
>
> . . .
>
> Mariner East 1 is part of a larger public utility system including the Mariner East 2 and Mariner East 2X pipelines, which are currently under construction.  Mariner East 2 mainline construction is 98% complete and 93% of the HDDs are either complete, in-progress or have been released for restart.

38.     On December 29, 2018, Energy Transfer issued a press release, entitled "Energy Transfer Announces Mariner East 2 Pipeline Is in Service," which also generally touted the benefits provided by the Mariner East pipeline, its importance to the Pennsylvania local community, and the pipeline's availability for interstate and intrastate service.

39.     On February 22, 2019, Energy Transfer filed an Annual Report on Form 10-K with the SEC, reporting the Partnership's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K").  The 2018 10-K, as with the 2016 10-K and 2017 10-K, touted the existence of the Code and its purported applicability to the Partnership's directors, officers and employees.  The 2018 10-K also contained representations substantively identical to those quoted in ¶ 33 above with respect to Energy Transfer's purportedly valid permits obtained for properties used in connection with its business, except that the 2018 10-K addressed the Partnership's properties generally, without reference to subsidiaries.

40.     With respect to the Mariner East pipeline, Energy Transfer touted 670 miles of liquids pipeline and a pipeline throughput capacity of 345 MBbls/d.  In further discussing the Mariner East pipeline and its history, the 2018 10-K contained representations substantively identical to those quoted in ¶ 34 above, again removing references to its subsidiaries' ownership of relevant properties, and adding that service for the Mariner East 2 began in December 2018.

41.     Appended as exhibits to the 2018 10-K were signed SOX certifications, wherein Defendants Warren and Long certified that "[t]he [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

42.     Finally, on April 23, 2019, Energy Transfer issued a press release, entitled "Energy Transfer Announces Mariner East 1 Pipeline Is Back in Service," which, as with the other press releases discussed herein, generally touted the benefits provided by the Mariner East pipeline and the Partnership's resolution of recent regulatory hurdles that had stalled use of the pipeline. Specifically, that press release stated, that Energy Transfer "worked closely with the Pennsylvania Public Utility Commission Bureau of Investigation and Enforcement (BI&E) throughout an extensive three-month investigation, through which Energy Transfer confirmed the integrity of the pipeline in the area of West Whiteland Township, Chester County, PA.  The investigation also confirmed that at no time was Mariner East 1 ever destabilized in this area."

43.     The statements referenced in ¶¶ 27-42 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that (i) the construction permits issued in connection with the Mariner East Pipeline were obtained by the Partnership through the use of coercion, bribery, or other improper methods; (ii) the use of such improper methods increased the risk that the Partnership would be subjected to government or regulatory investigations and/or litigation, thereby depreciating the Partnership's unit value; and

(iii) as a result, the Partnership's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

44.     On November 12, 2019, the *Associated Press* published an article entitled "FBI eyes how Pennsylvania approved pipeline." The *Associated Press* article reported:

> The FBI has begun a corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction on a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania, The Associated Press has learned.

> FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning.

> All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.

> The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say.

45.     On this news, Energy Transfer's unit price fell $0.81 per share, or 6.77%, over the following two trading sessions, closing at $11.16 per share on November 13, 2019.

46.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Partnership's common units, Plaintiff and other Class members have suffered significant losses and damages.

## LOSS CAUSATION

47.     During the Class Period, as detailed in this complaint, Defendants made materially false and misleading statements and omissions, including statements regarding Energy Transfer's Mariner East 2 pipeline, and engaged in a scheme to deceive the market. This artificially inflated the price of Energy Transfer common units and operated as a fraud or deceit on the Class. Later,

when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this complaint materialized and were disclosed to the market, the price of Energy Transfer common units fell precipitously.  As a result of their acquisition of Energy Transfer common units during the Class Period—and Defendants' material misstatements and omissions—Plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Energy Transfer common units during the Class Period (the "Class"); and were damaged by the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Partnership, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Energy Transfer common units were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Energy Transfer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Energy Transfer has over 2.5 billion common units outstanding, owned by at least hundreds or thousands of investors.

51.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

      (a)     Whether Defendants violated the Exchange Act;

      (b)     Whether Defendants omitted and/or misrepresented material facts;

      (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

      (e)     Whether Defendants' misconduct impacted the price of Energy Transfer common units;

      (f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

      (g)     The extent of damages sustained by Class members and the appropriate measure of damages.

52.     Plaintiff suffered damages as a result of the violations of the federal securities laws alleged herein that will ensure Plaintiff's vigorous prosecution of the Class' claims.

53.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

54.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint.  Many of the specific statements described in this complaint were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Energy Transfer who knew that the statement was false or misleading when made.

## PRESUMPTION OF RELIANCE

57.     At all relevant times, the market for Energy Transfer's common units was an efficient market for the following reasons, among others:

(a)     Energy Transfer common units met the requirements for listing and was listed and actively traded on the NYSE stock market, a highly efficient and automated market;

(b)     Energy Transfer filed periodic public reports with the SEC and NYSE;

(c)     Energy Transfer regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Energy Transfer was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.     As a result of the foregoing, the market for Energy Transfer common units promptly digested current information regarding Energy Transfer from all publicly available sources and reflected that information in the price of Energy Transfer common units.   Under these circumstances, all purchasers of Energy Transfer common units during the Class Period suffered similar injuries through their purchase of Energy Transfer common units at artificially inflated prices, and the presumption of reliance applies.

59.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Energy Transfer's

business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Energy Transfer's Mariner East pipeline, as alleged above, that requirement is satisfied here.

## CAUSES OF ACTION

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Energy Transfer common units; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Energy Transfer common units and options at artificially inflated prices.  In furtherance of this

unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Energy Transfer common units.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Energy Transfer's finances and business prospects.

64.     By virtue of their positions at Energy Transfer, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Energy Transfer, the Individual Defendants had knowledge of the details of Energy Transfer's internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Energy Transfer.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Energy Transfer's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Energy Transfer common units was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Energy Transfer's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Energy Transfer common units at artificially inflated prices and relied upon the price of the common units, the integrity of the market for the common units and/or upon statements disseminated by Defendants, and were damaged thereby.

67.     During the Class Period, Energy Transfer common units were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Energy Transfer common units at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common units, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Energy Transfer common units was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Energy Transfer

common units declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Partnership's common units during the Class Period, upon the disclosure that the Partnership had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

70.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of Energy Transfer, and conducted and participated, directly and indirectly, in the conduct of Energy Transfer's business affairs.  Because of their senior positions, they knew the adverse non-public information about Energy Transfer's misstatement of income and expenses and false financial statements.

72.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Energy Transfer's financial condition and results of operations, and to correct promptly any public statements issued by Energy Transfer which had become materially false or misleading.

73.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Energy Transfer disseminated in the marketplace during the Class Period concerning Energy Transfer's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Energy Transfer to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Energy Transfer within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Energy Transfer common units.

74.     Each of the Individual Defendants, therefore, acted as a controlling person of Energy Transfer.  By reason of their senior management positions and/or being directors of Energy Transfer, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Energy Transfer to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Energy Transfer and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Energy Transfer.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against Energy Transfer and the Individual Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 10, 2020

Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

Robert B. Weiser (Bar #81575)
James M. Ficaro (Bar #308198)
22 Cassatt Avenue
Berwyn, PA 19312
Tel: (610) 225-2677
Fax: (610) 408-8062
rw@weiserlawfirm.com
jmf@weiserlawfirm.com

*Liaison Counsel for Plaintiff*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Hannah Ross
Avi Josefson
Michael D. Blatchley
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

Fax: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT TO
## <u>THE FEDERAL SECURITIES LAWS</u>

I, John K. Weinstein, on behalf of Allegheny County Employees' Retirement System ("ACERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Treasurer of Allegheny County.  I am fully authorized to enter into and execute this Certification on behalf of ACERS.  I have reviewed the complaint and authorize its filing.

2. ACERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. ACERS is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. ACERS's transactions in the Energy Transfer LP securities that are the subject of this action are set forth in the chart attached hereto.

5. ACERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Allegheny County Employees' Retirement System v. Karyopharm Therapeutics Inc.,*
No. 19-cv-11597 (D. Mass.)

6. ACERS will not accept any payment for serving as a representative party on behalf of the Class beyond ACERS's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __8__ day of January, 2020.

_____
John K. Weinstein
*Treasurer of Allegheny County, on behalf of*
*Allegheny County Employees' Retirement System*

**Allegheny County Employees' Retirement System**
**Transactions in Energy Transfer LP**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/20/2017 | 41,856 | 16.8956 |
| Purchase | 12/21/2017 | 41,820 | 16.9362 |
| Purchase | 1/8/2018 | 455 | 17.3432 |
| Purchase | 1/9/2018 | 1,154 | 17.2615 |
| Purchase | 1/10/2018 | 430 | 17.3775 |
| Purchase | 1/23/2018 | 84,888 | 18.4850 |
| Purchase | 1/23/2018 | 37,106 | 19.1015 |
| Purchase | 2/27/2018 | 616 | 16.1550 |
| Purchase | 3/2/2018 | 1,430 | 15.6300 |
| Purchase | 3/15/2018 | 5,452 | 14.3712 |
| Purchase | 3/27/2018 | 1,005 | 14.2142 |
| Purchase | 3/28/2018 | 1,005 | 14.3592 |
| Purchase | 4/3/2018 | 1,580 | 14.0238 |
| Purchase | 4/16/2018 | 154 | 14.9450 |
| Purchase | 4/30/2018 | 1,132 | 15.6900 |
| Purchase | 5/25/2018 | 188 | 16.7150 |
| Purchase | 8/16/2018 | 2,604 | 17.2932 |
| Purchase | 8/16/2018 | 2,701 | 17.3979 |
| Purchase | 8/21/2018 | 907 | 18.2850 |
| Merger shares | 10/19/2018 | 261,879 | |
| Purchase | 11/15/2018 | 28 | 14.7650 |
| Purchase | 11/19/2018 | 5,002 | 14.9296 |
| Purchase | 12/24/2018 | 403 | 12.0650 |
| Purchase | 1/29/2019 | 714 | 14.3749 |
| Purchase | 2/19/2019 | 912 | 15.3995 |
| Purchase | 7/10/2019 | 1,913 | 14.6600 |
| Purchase | 7/10/2019 | 5,474 | 14.7194 |
| Purchase | 9/25/2019 | 1,059 | 13.1650 |
| Purchase | 10/2/2019 | 3,672 | 12.7795 |
| Purchase | 10/3/2019 | 3,802 | 12.7647 |
| Purchase | 10/10/2019 | 908 | 12.3734 |
| Purchase | 11/11/2019 | 704 | 12.0096 |
| | | | |
| Sale | 2/7/2018 | (803) | 17.1837 |
| Sale | 2/15/2018 | (31) | 17.4552 |
| Sale | 5/21/2018 | (1,254) | 17.0751 |
| Sale | 5/23/2018 | (911) | 17.1837 |
| Sale | 5/23/2018 | (1,940) | 17.1372 |

**Allegheny County Employees' Retirement System**
**Transactions in Energy Transfer LP**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 5/23/2018 | (912) | 17.1716 |
| Sale | 5/23/2018 | (739) | 17.1650 |
| Sale | 7/3/2018 | (572) | 17.4850 |
| Sale | 7/12/2018 | (1,504) | 17.3677 |
| Sale | 7/13/2018 | (1,214) | 17.2751 |
| Sale | 7/13/2018 | (919) | 17.3100 |
| Sale | 7/16/2018 | (582) | 17.0212 |
| Sale | 7/17/2018 | (3,678) | 16.9882 |
| Sale | 7/17/2018 | (3,310) | 17.0122 |
| Sale | 7/18/2018 | (3,678) | 17.3053 |
| Sale | 7/18/2018 | (809) | 17.3245 |
| Sale | 7/19/2018 | (2,738) | 17.5807 |
| Sale | 7/19/2018 | (1,471) | 17.5725 |
| Sale | 9/4/2018 | (1,158) | 17.5850 |
| Sale | 9/11/2018 | (272) | 17.7338 |
| Sale | 9/12/2018 | (263) | 17.7480 |
| Sale | 9/13/2018 | (263) | 17.5674 |
| Sale | 9/17/2018 | (364) | 17.4250 |
| Sale | 9/19/2018 | (156) | 17.5565 |
| Sale | 10/1/2018 | (531) | 17.5850 |
| Sale | 10/2/2018 | (75) | 18.0071 |
| Sale | 10/3/2018 | (71) | 17.9269 |
| Sale | 10/5/2018 | (1,047) | 17.5700 |
| Sale | 10/12/2018 | (710) | 16.8750 |
| Sale | 10/17/2018 | (204) | 17.0326 |
| Sale | 10/17/2018 | (12,705) | 16.9932 |
| Sale | 11/5/2018 | (100) | 15.9173 |
| Sale | 11/14/2018 | (599) | 15.2200 |
| Sale | 12/3/2018 | (483) | 15.0201 |
| Sale | 1/3/2019 | (136) | 13.3550 |
| Sale | 1/7/2019 | (11,725) | 14.5140 |
| Sale | 1/8/2019 | (3,673) | 14.5313 |
| Sale | 1/10/2019 | (2,916) | 14.9850 |
| Sale | 1/14/2019 | (245) | 14.8750 |
| Sale | 1/15/2019 | (102) | 14.8502 |
| Sale | 1/24/2019 | (42) | 14.2581 |
| Sale | 1/25/2019 | (250) | 14.2454 |
| Sale | 2/1/2019 | (714) | 15.0000 |

**Allegheny County Employees' Retirement System**
**Transactions in Energy Transfer LP**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 2/1/2019 | (749) | 14.9947 |
| Sale | 2/5/2019 | (141) | 15.1800 |
| Sale | 2/5/2019 | (174) | 15.1600 |
| Sale | 2/7/2019 | (1,214) | 14.2687 |
| Sale | 2/12/2019 | (48) | 14.5733 |
| Sale | 2/13/2019 | (6,343) | 14.7264 |
| Sale | 2/14/2019 | (763) | 14.8349 |
| Sale | 2/19/2019 | (64) | 15.3206 |
| Sale | 2/19/2019 | (529) | 15.2550 |
| Sale | 2/19/2019 | (156) | 15.2500 |
| Sale | 2/19/2019 | (1,040) | 15.4000 |
| Sale | 2/20/2019 | (641) | 15.5600 |
| Sale | 2/21/2019 | (561) | 15.6100 |
| Sale | 2/25/2019 | (1,128) | 15.4627 |
| Sale | 2/28/2019 | (423) | 14.9000 |
| Sale | 3/11/2019 | (2,037) | 15.2057 |
| Sale | 3/14/2019 | (717) | 15.2500 |
| Sale | 3/18/2019 | (297) | 15.2300 |
| Sale | 4/1/2019 | (1,345) | 15.6287 |
| Sale | 4/2/2019 | (362) | 15.6600 |
| Sale | 4/3/2019 | (791) | 15.6100 |
| Sale | 4/4/2019 | (1,098) | 15.5500 |
| Sale | 4/5/2019 | (2,513) | 15.6017 |
| Sale | 4/8/2019 | (557) | 15.8000 |
| Sale | 4/10/2019 | (241) | 15.4600 |
| Sale | 4/11/2019 | (266) | 15.5000 |
| Sale | 4/15/2019 | (288) | 15.5400 |
| Sale | 4/16/2019 | (1,090) | 15.5073 |
| Sale | 4/22/2019 | (481) | 15.5000 |
| Sale | 4/26/2019 | (80) | 15.2900 |
| Sale | 5/2/2019 | (481) | 15.1950 |
| Sale | 5/3/2019 | (413) | 15.3111 |
| Sale | 5/6/2019 | (112) | 15.1602 |
| Sale | 5/10/2019 | (572) | 15.1900 |
| Sale | 5/14/2019 | (1,151) | 14.9100 |
| Sale | 6/12/2019 | (51) | 14.3651 |
| Sale | 6/24/2019 | (1,513) | 14.3450 |
| Sale | 6/26/2019 | (257) | 14.1834 |

**Allegheny County Employees' Retirement System**
**Transactions in Energy Transfer LP**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 6/28/2019 | (365) | 13.9450 |
| Sale | 7/2/2019 | (497) | 14.1050 |
| Sale | 7/10/2019 | (293) | 14.8038 |
| Sale | 7/11/2019 | (243) | 14.8764 |
| Sale | 7/12/2019 | (225) | 14.8741 |
| Sale | 7/15/2019 | (682) | 14.8816 |
| Sale | 7/16/2019 | (500) | 14.9727 |
| Sale | 11/8/2019 | (2,004) | 12.1500 |