# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of others similarly situated, : : : : Plaintiffs, : v. : : ENERGY TRANSFER LP, KELCY L. : WARREN, JOHN W. MCREYNOLDS, and : THOMAS E. LONG, : : Defendants. : | CIVIL ACTION No. 20-200 |

**McHUGH, J.**                                                                                                         **FEBRUARY 18, 2020**

## MEMORANDUM OPINION

      This is a putative class action filed against Energy Transfer LP and two of its senior executives for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act—as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA")—and SEC Rule 10b-5. Presently pending before the Court are competing Motions for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel. One Motion was filed by a collection of retirement and pension funds, consisting of the Allegheny County Employees' Retirement System, the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge, the Denver Public Employees Retirement Plan, the IAM National Pension Fund, and the Iowa Public Employees' Retirement System (collectively, the "Institutional Investor Group"). The other Motion was filed by the Public Employees Retirement Association of New Mexico ("New Mexico"). Both parties argue that they are the "most adequate plaintiff" as that term is used in the PSLRA and defined in the case law, and this is a case where the parties rely on the same authorities but use them to reach opposite conclusions. After considering the factual and

legal arguments raised by the parties, this Court will appoint the Institutional Investor Group as Lead Plaintiff and approve Lead Plaintiff's selection of the law firms of Barrack, Rodos & Bacine and Bernstein Litowitz Berger and Grossmann LLP as Lead Counsel.

**I.      Factual Background**

Energy Transfer is a Dallas-based energy transportation and storage company that operates some of the largest oil and gas pipelines in the United States. Compl. ¶ 2, ECF 1. Among its projects is the Mariner East pipeline. Mariner East is a multibillion-dollar, 350-mile pipeline that carries "highly volatile natural gas liquids" from the Marcellus and Utica Shales areas in western Pennsylvania, West Virginia, and eastern Ohio across Pennsylvania to, among other places, Energy Transfer's Marcus Hook Industrial Complex on the Delaware River. *Id*. ¶ 3. There the gas liquid is processed, stored, and distributed to domestic and international markets. *Id*.

The first phase of the project, Mariner East 1, consisted of interstate and intrastate propane and ethane service which commenced operations in late 2014 and early 2016, respectively. The second phase of the project, named Mariner East 2, proposed transporting natural-gas liquids across Pennsylvania to a terminal in Marcus Hook, just outside Philadelphia. According to Plaintiffs, Energy Transfer had a difficult time securing approval for the second phase because of permit application deficiencies and public concern over the environmental impact of the project. Nevertheless, the Pennsylvania Department of Environmental Protection approved the second phase of the project in early February 2017. *Id.* ¶ 24. Energy Transfer began construction on Mariner East 2 quickly thereafter, and the project became operational in December 2018. *Id.* ¶ 25.

In November 2019, the Associated Press reported that the FBI had begun a "corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction

on a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania." *Id.* ¶ 44 (citing Marc Levy, *FBI eyes how Pennsylvania approved pipeline*, Associated Press (Nov. 12, 2019)). In the main, the FBI seems to have been examining whether Governor Wolf's administration inappropriately pushed its staff to approve construction permits for the pipeline, and whether those staff received anything of value in return. *Id.* ¶ 44. Over the two trading days following the A.P.'s report, the share price of Energy Transfer fell nearly 7 percent.

Lawsuits followed swiftly, first in the Northern District of Texas and then in this District. In the Complaint filed in this District, Plaintiffs assert violations of the federal securities laws arising from Energy Transfer's allegedly false or misleading statements about, among other things, its role in obtaining permits for the Mariner East pipeline, as well as its compliance with its internal Code of Business Conduct and Ethics. The Complaint charges that Energy Transfer and certain of its senior executives failed to disclose that the permits received to commence work on the Mariner East pipeline project in Pennsylvania were secured through bribes or other improprieties, which would have increased the risk that Energy Transfer or certain of its employees would be subject to government or regulatory action. *Id.* ¶ 43.

## II. Procedural Posture

The first securities class action related to the events described above was filed on November 20, 2019, in the Northern District of Texas. *See William D. Reinhardt v. Energy Transfer LP, et al.*, 19-2771 (N.D. Tex.). Like this action, the *Reinhardt* action asserted claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5 on behalf of investors who purchased or otherwise acquired Energy Transfer securities from February 25, 2017, through November 11, 2019.

Upon filing, counsel for plaintiff provided notice of the pending *Reinhardt* action, as the PSLRA mandates. 15 U.S.C. § 78u-4(a)(3)(A)(i). In that notice, counsel for plaintiff also notified class members that any investor who purchased Energy Transfer common units during the class period could, no later than January 21, 2020, seek appointment as lead plaintiff. *Id.* § 78u-4(a)(3)(A)(i)(II) (noting that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class").

On January 10, 2020, Allegheny County filed this action. Allegheny County's Complaint is substantially similar to the *Reinhardt* complaint. It asserts the same violations of the securities laws on behalf of the same class of investors who were harmed by the same alleged fraudulent course of conduct. Like counsel in the *Reinhardt* action, on the same day Allegheny County filed suit, its counsel published notice apprising investors of the filing of the complaint and confirming that the deadline for seeking appointment as lead plaintiff in this action remained January 21, 2020. On January 15, 2020, the plaintiff in the *Reinhardt* action voluntarily dismissed his complaint. *See William D. Reinhardt v. Energy Transfer LP, et al.*, 19-2771 (N.D. Tex.), ECF 8. There are now no other securities class actions pending, either in this Court or elsewhere, arising from the misconduct alleged in this case.

On January 21, 2020, four entities filed motions seeking appointment of lead plaintiff in this action. ECFs 2, 3, 4, 6. Two subsequently conceded that they did not possess the "largest financial interest in the relief sought by the class," as required by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), and notified the Court that they would not oppose the appointment of another lead plaintiff. The choice now is between two entities—the Institutional Investor Group,

4

comprised of five public employee pension funds, and New Mexico. Each argues that it is the "most adequate plaintiff" under the PSLRA.

## III. Discussion

### A. Standard for deciding lead plaintiff in PSLRA class actions

The PSLRA directs the Court to appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *Id.* § 78u-4(a)(3)(B)(i). The statute creates a rebuttable presumption that the "most adequate plaintiff" is the "person or group of persons" that (1) has either filed the Complaint or moved the Court to be appointed lead plaintiff; (2) has the largest financial interest in the relief sought by the class as determined by the Court; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically with respect to typicality and adequacy. *Id.* § 78u-4(a)(3)(B)(iii)(I); *In re Cendant Corp. Litigation*, 264 F.3d 201, 222 (3d Cir. 2001). Rival candidates for lead plaintiff may rebut this presumption by coming forward with "proof" that the plaintiff with the largest financial interest (1) "will not fairly and adequately protect the interests of the class," or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II). After reviewing the parties' submissions, I am persuaded that the Institutional Investor Group has the largest financial interest at stake and that it further satisfies the requirements of Rule 23. I will analyze each element of the inquiry in turn.

### B. The Institutional Investor Group has the largest financial interest of the movants

*Cendant* is the controlling case in this Circuit and a leading case nationally. In *Cendant*, the Third Circuit articulated three factors district courts must consider in determining which movant has the largest financial interest in the case: "(1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs

5

during the class period; and (3) the approximate losses suffered by the plaintiffs." *Id*. at 262. All three factors support selecting the Institutional Investor Group as lead plaintiff.

In determining each proposed lead plaintiff's financial interest in the litigation, courts have identified the third *Cendant* factor—the amount of losses suffered by the prospective lead plaintiff—as the most critical. *See id*.; *Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 412-413 (E.D. Pa. 2019) (Rufe, J.); *Kanefsky v. Honeywell Int'l Inc.*, 2019 WL 936662, at *1 (D.N.J. Feb. 26, 2019) (collecting cases); *West Palm Beach Police Pension Fund v. DFC Global Corp.*, 2014 WL 1395059, at *5 (E.D. Pa. Apr. 10, 2014) (Schiller, J.); *see also In re Petrobras Securities Litigation*, 104 F. Supp. 3d 618, 621-22 (S.D.N.Y. 2015) (Rakoff, J.). Here, the Institutional Investor Group seeks to aggregate its members' individual losses for purpose of the determination of its total loss. Taken together, the members of the Institutional Investor Group suffered losses on the order of $24 million, calculated on a "last-in-first-out," or "LIFO," basis, giving the Institutional Investor Group the largest financial interest by a wide margin. Ex. I to Hoffman Decl., ECF 4-12. New Mexico, on the other hand, suffered approximately $12 million in aggregate LIFO losses, giving it the second largest financial interest. Ex. C to Stengel Decl., ECF 6-5.[1]

---

[1] There are two primary accounting methods that are used to compute damages in securities action: LIFO ("last in, first out") and FIFO ("first in, first out"). The Institutional Investor Group and New Mexico have provided loss calculations under both methods. Ex. I to Hoffman Decl., ECF 4-12; Ex. C to Stengel Decl., ECF 6-5. Although the Third Circuit has not directed district courts to use one methodology over the other, courts have expressed preference for LIFO, as "it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." *In re eSpeed, Inc. Secs. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005); *see also West Palm Beach Police Pension Fund v. DFC Global Corp.*, 2014 WL 1395059, at *6 (E.D. Pa. Apr. 10, 2014). Looking at the LIFO figures provided, the Institutional Investor Group has suffered $24,448,615 in losses while New Mexico has suffered $12,166,191 in losses. Because the figures for the Institutional Investor Group are nearly double New Mexico's, the third *Cendant* factor weighs in favor of the Institutional Investor Group. The Institutional Investor Group would prevail on that factor even in the Court were to use the FIFO accounting method. Ex. I to Hoffman Decl., ECF 4-12 (citing FIFO loss as $27,723,421); ECF 6, at 5 (citing FIFO loss as $13,556,641).

The PSLRA expressly permits the Court to appoint a "group of persons" to serve as lead plaintiff. Nevertheless, as New Mexico vociferously contends, some courts are skeptical of group arrangements when that arrangement is the product of an artificial grouping designed merely to qualify as lead plaintiff under the PSLRA. ECF 10, at 4-5; ECF 14, at 1. New Mexico argues that permitting the Institutional Investor Group to serve as lead plaintiff would frustrate the purpose of the PSLRA's lead plaintiff provision. ECF 10, at 6-7 (noting that "one of the primary purposes of Congress in enacting the PSLRA was to create a streamlined, efficient lead plaintiff and lead counsel structure and in doing so, to replace dysfunctional, lawyer-driven securities class action litigation"). To New Mexico, the Institutional Investor Group is nothing more than "a lawyer-driven artifice," and appointing it as lead plaintiff would ensure that the lawyers, and not the parties, would be the true drivers of the litigation. ECF 10, at 17. New Mexico also contends that selecting what it deems "disparate unrelated funds" to be lead plaintiff would create problems of coordination, risk duplication of effort, and reduce the incentive of any individual group member to carry out its lead plaintiff duties to the fullest extent. ECF 10, at 17-25.

Courts must investigate proposed lead plaintiff "groups" to determine that the composite entities are able to function as a cohesive and independent unit to protect and advance the interests of the class. Indeed, even *Cendant*, the leading case in this area of the law, observes that if a court were to determine that the movant "group" with the largest losses had been artificially created by lawyers, it could conclude that the members of that "group" could not be counted on to monitor lead counsel in a sufficient manner. *In re Cendant*, 264 F.3d at 267.

But New Mexico's interpretation of *Cendant* does not withstand scrutiny. The *Cendant* Court made clear that it "disagree[s] with those courts that have held that the [PSLRA]

7

invariably precludes a group of 'unrelated individuals' from serving as a lead plaintiff." *In re Cendant*, 264 F.3d at 266. It went on to emphasize that the "statute contains no requirement mandating that the members of a proper group be 'related' in some manner; it requires only that any such group 'fairly and adequately protect the interests of the class.'" *Id.* The opinion certainly allows for district courts to examine prior relationships between the members of a group, among making other considerations, before selecting the lead plaintiff. But it could not have been clearer that the key question remained "whether that group would fairly and adequately protect the interests of the class." *Id.* at 266-67. In other words, "it is this test"—adequacy—"not one of relatedness, with which courts should be concerned." *Id.* at 267.[2] As explained more fully below, the Institutional Investor Group satisfies the PSLRA's adequacy requirement.

*Cendant*'s progeny make doubly clear that composite groups that lack pre-existing relationships can be chosen as lead plaintiff, and serve in that function well. In *West Palm Beach*, the Court observed that "[t]he Third Circuit issued a clear pronouncement in *Cendant* that a group of unrelated investors can serve as lead plaintiff." *West Palm Beach Police Pension Fund v. DFC Global Corp.*, 2014 WL 1395059, at *7 (E.D. Pa. Apr. 10, 2014). From that observation, the Court concluded that the PSLRA permits—but does not mandate—the aggregation of losses of a group of unrelated institutional investors seeking to be appointed lead plaintiff. *Id.* Accordingly, the "wisest course of action is to employ a case-by-case approach

---

[2] *Cendant* is not wholly unsupportive of New Mexico's position. The *Cendant* Court cautioned that if "a [district] court were to determine that the movant 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on *this* history, that the members of that 'group' could not be counted on to monitor counsel in a sufficient manner." *Id.* at 267 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001)) (emphasis added). In its filings, New Mexico seizes upon this language to argue that the entities comprising the Institutional Investor Group lack pre-existing relationships among each other. But *Cendant* was clear that the PSLRA does not mandate that individuals or entities be related in order to form a lead plaintiff group and, as I mentioned, it expressly disagreed with other courts that had arrived at the opposite conclusion. *Id.* at 266.

8

given the unique facts of each litigation" to determine whether groups can aggregate their losses to achieve the status of lead plaintiff. *Id*.

In employing that case-by-case approach, the *West Palm Beach* Court concluded that "[t]he circumstances here warrant aggregation of the losses of the members of the Institutional Investor Group." *Id*. In that case, the individual members of the group submitted a joint declaration stating they asked their lawyers to "seek out like-minded investors and determined, after conferring with each other, to seek joint appointment as Lead Plaintiff." *Id.* (quoting motion of group for appointment of lead plaintiff). The group held a conference call to discuss the merits of the case and the benefits of proceeding jointly. *Id.* They established litigation oversight and communication procedures. *Id.* They delineated the duties and obligations of the group if it were to be appointed lead plaintiff. *Id.* And the group agreed to be fully responsible for providing fair and adequate representation and overseeing counsel and "espoused its commitment to prosecuting this litigation vigorously and efficiently." *Id.*

Those circumstances match these circumstances in every way that matters. For one, the Institutional Investor Group that was appointed lead plaintiff in *West Palm Beach* was represented by the same two law firms that seek to represent the Institutional Investor Group in this case. The Institutional Investor Group in this case likewise has submitted a joint declaration in which it describes each member as "like-minded institutional investors that suffered substantial losses on their respective investments in Energy Transfer securities during the Class Period." Ex. H to Hoffman Decl., ¶ 8, ECF 4-11. The Institutional Investor Group noted that "it would be in its and other class members' best interests to jointly seek appointment with [the other investors]." The group held a conference call "to discuss our respective funds' losses arising from defendants' alleged misconduct, the claims against Energy Transfer, and the

9

procedures and protocols we would follow in jointly prosecuting the case." *Id.* ¶ 11. During that call, the Institutional Investor Group also discussed

> the benefits the Class would receive from the leadership of committed institutions; our desire to maximize the recovery for the Class; our interests in prosecuting the case in a collaborative fashion; the measures we would employ to ensure that representatives of the Institutional Investor Group could discuss the prosecution of this matter either with or without counsel; and ensuring that investors' claims will be efficiently and zealously prosecuted through our oversight of our proposed Lead Counsel, Barrack, Rodos & Bacine and Bernstein Litowitz.

*Id.* As in *West Palm Beach*, the Institutional Investor Group here has established litigation oversight and communication procedures. *Id.* ¶ 14. It has entered into a "Joint Prosecution Agreement to govern counsels' activities in this litigation." *Id.* ¶ 17. It has "instructed our proposed Lead Counsel to keep contemporaneous time records to be provided to [the group] upon request." *Id.*

I have no reason to doubt the veracity of the Institutional Investor Group's Joint Declaration, which the group made under penalty of perjury. Testimony under oath, to which we attach the penalty of perjury, must be accorded substantial weight. And because the PSLRA does not mandate that courts permit discovery before appointing a lead plaintiff, declarative testimony often forms a substantial basis upon which a court rules. *See, e.g.*, *Strougo v. Lannett Co.*, 2018 WL 6271802, at *3-4 (E.D. Pa. Nov. 30, 2019); *Tomaszewski*, 383 F. Supp. 3d at 416.

Even if its members are unrelated in the sense New Mexico alleges, the Institutional Investor Group may move together to be appointed lead plaintiff and, in doing so, may aggregate their losses. The cases cited above in support of this proposition are representative of numerous other decisions reached by federal district courts allowing unrelated investors to aggregate losses and serve as lead plaintiff groups, which I see no need to "string cite." Because the Court

10

aggregates losses here, the Institutional Investor Group has the largest financial stake in this litigation, thus satisfying the third *Cendant* factor.

The remaining two *Cendant* factors—the number of shares that the movant purchased during the putative class period, and the total net funds expended by the plaintiffs during the class period—also favor selecting the Institutional Investor Group as lead plaintiff. The Institutional Investor Group collectively purchased 8,722,995 shares of Energy Transfer stock during the putative class period, while New Mexico purchased roughly a third of that number, at 2,959,365. ECF 9, at 4 (Institutional Investor Group); ECF 6, at 5 (New Mexico). The total net funds expended by the Institutional Investor Group during the period was $103,145,535, while that number for New Mexico was $42,836,907. ECF 9, at 4 (Institutional Investor Group); ECF 6, at 5 (New Mexico). Thus, all three of the *Cendant* factors weigh squarely in favor of the Institutional Investor Group.[3] Provided the Institutional Investor Group can make the typicality and adequacy inquiry—which I discuss in the next section—it shall be deemed the presumptive lead plaintiff.

### C. The Institutional Investor Group otherwise satisfies requirements of Rule 23

Because the Institutional Investor Group has shown that it has the largest financial interest in the relief sought in this action, I must now examine whether it otherwise satisfies the requirements of Rule 23. For the purposes of examining a motion for the appointment of lead

---

[3] Even if I were not to aggregate the losses of the individual members of the Institutional Investor Group, the largest member of the group, the IAM National Pension Fund, also would prevail over New Mexico with respect to the *Cendant* factors regarding the number of shares purchased and the net funds expended. IAM National Pension Fund bought 3,949,674 shares during the putative class period and expended a net total of $53,733,020. ECF 9, at 4. New Mexico attempts to blunt the force of this observation by relying upon *In re Vicuron Pharm., Inc. Sec. Litig.*, 225 F.R.D. 508, 511 (E.D. Pa. 2004) (Bartle, J.), where the Court chose to weigh the largest financial loss factor more heavily than the other two *Cendant* factors. *Vicuron*'s holding is not fundamentally inconsistent with my own. Moreover, the largest financial loss factor weighs in favor of the Group since I have aggregated its members' losses. New Mexico seeks to characterize the Group's argument on this point as a disingenuous shift in position. I do not find that characterization accurate.

plaintiff, the Rule 23 analysis "should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy." *In re Cendant*, 264 F.3d at 263. Indeed, "the statutory structure and the legislative history suggest that the court's initial inquiry as to whether the movant with the largest losses satisfies the typicality and adequacy requirements need not be extensive." *Id.* at 264. As I explain, the Institutional Investor Group has demonstrated that it satisfies both prongs of Rule 23.

*1. The Institutional Investor Group is a collection of typical plaintiffs.* The typicality requirement demands that the court "consider whether the circumstances of the movant with the largest losses are markedly different or the legal theory upon which the claims of that movant are based differ from that upon which the claims of other class members will perforce be based." *Id.* at 265 (cleaned up).[4] The Institutional Investor Group easily satisfies the typicality requirement. The claims of the Group are representative of the claims of the class. The Institutional Investor Group alleges it was injured by artificially inflated Energy Transfer stock prices that resulted from materially false statements or omissions by senior executives and the subsequent decline in value of its stock holdings once the alleged misrepresentations were exposed. That legal theory is shared by New Mexico and other members of the class, ECF 6-1, at 5-7, and is a prototypical legal theory for this type of litigation. *See, e.g.*, *Pelletier v. Endo International PLC*, 316 F. Supp. 3d 846 (E.D. Pa 2018). The Institutional Investor Group consequently satisfies the typicality requirement.

*2. The Institutional Investor Group will adequately represent the class.* When assessing a movant's adequacy to be lead plaintiff, "courts should consider whether it has the ability and

---

[4] This opinion uses (cleaned up) to indicate that extraneous, non-substantive information—such as brackets, internal quotation marks, alterations, and citations—has been omitted from quotations. *See, e.g.*, *United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018); *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

12

incentive to represent the claims of the class vigorously, whether it has obtained adequate counsel, and whether there is a conflict between the movant's claims and those asserted on behalf of the class." *In re Cendant*, 264 F.3d at 265 (cleaned up). Like typicality, the Institutional Investor Group easily makes a *prima facie* showing of adequacy.

In their first sworn Joint Declaration, each member of the Institutional Investor Group describes its prior experience with PSLRA class actions, along with articulating their ongoing coordination with and oversight of counsel in the present action. Ex. H to Hoffman Decl., ECF 4-11. Their chosen counsel has experience litigating and succeeding in PSLRA class actions. Indeed, the Institutional Investor Group's chosen counsel was appointed lead counsel in both *Cendant* and *West Palm Beach*, as well as in other securities class actions. *In re Cendant*, 264 F.3d at 223-24; *West Palm Beach Police Pension Fund*, 2014 WL 1395059, at *11. In *West Palm Beach*, the court noted the "millions of dollars [the firms] have secured for class members in settlements in complex securities actions," that the firms "were involved in the *Cendant* litigation, which courts in this District, including this one in this matter, liberally quote from when faced with competing motions for appointment as lead plaintiff," and that "[t]his is not Barrack Rodos and Bernstein Litowitz's first rodeo." *Id.* The court there concluded "that these firms have the resources, knowledge, and drive to vigorously and efficiently prosecute this litigation and protect the interests of the class," thereafter appointing them lead counsel. Additionally, there is no apparent basis for a conflict between the Institutional Investor Group's claims and the claims of other class members.

*Cendant* cautioned that when a group of persons or entities moves to serve as lead plaintiff in PSLRA class actions, "the court should disqualify that movant on the grounds that it will not fairly and adequately represent the interests of the class" if "the manner in which it is

13

constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff." *Id.* at 266. But as I discussed at length above, the constitution of the Institutional Investor Group in no way suggests that it would be unable to fulfill the task of lead plaintiff.

Finally, I consider the size of the Institutional Investor Group. The *Cendant* Court acknowledged that groups may grow too large to effectively manage litigation and operate as a single unit. *Id*. at 267. But it endorsed the position offered by the Securities Exchange Commission as an *amicus* "that courts should generally presume that groups with more than five members are too large to work effectively." *Id.* The Institutional Investor Group contains five members and, as such, does not run afoul of *Cendant*'s recommended upper limit. Consequently, it has made a successful preliminary showing of adequacy and typicality, and that it is the most adequate lead plaintiff for the present action.

### D. New Mexico has not rebutted the presumption of the Institutional Investor Group being adequate lead plaintiff

Under the PSLRA, once a court determines which prospective lead plaintiff is most adequate, another movant has the opportunity to present evidence in rebuttal. "The presumption 'may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.'" *Id*. at 268 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)).[5] Neither New

---

[5] The Third Circuit noted the seeming circularity of the first prong of the rebuttal analysis, as a court should have already found that the lead plaintiff would fairly and adequately protect the interests of the class before reaching this stage of the analysis. *In re Cendant*, 264 F.3d at 263 ("The statute thus simultaneously appears to make 'typicality' and 'adequacy' both part of the threshold identification of the presumptive lead plaintiff *and* the sole means of rebutting the lead plaintiff presumption."). The Court resolved that conceptual tension by holding that, in conducting its own prior inquiry regarding Rule 23, a court must only determine whether a movant has made a *prima facie* showing. This *prima facie* showing can then be rebutted by the presentation of proof from another putative class member.

Mexico nor any other putative class member has presented proof that the Institutional Investor Group will not fairly or adequately protect the interests of the class, nor has any argued that the Group is subject to any unique defenses in the underlying action.

New Mexico focuses almost exclusively on its contention that the Institutional Investor Group should be disqualified because it is a collection of unrelated funds created by lawyers to aggregate losses that would be insufficient individually. ECF 14, at 1, 11. But this ignores *Cendant's* core holding that the overarching consideration is adequacy, not relatedness. Moreover, I find merit in the Group's contention that the aggregation of highly sophisticated institutional investors is materially different from an alliance of large numbers of small investors connected by lawyers. *See, e.g.*, *In Re Advanced Tissue Sciences Securities Litig.*, 184 F.R.D. 346, 352 (S.D. Cal. 1998) (seeking to aggregate a group of more than 250 unrelated investors); *Chill v. Green Tea Financial Corp.*, 181 F.R.D. 398, 408 (D. Minn. 1998) (seeking to aggregate a group of approximately 300 investors). Indeed, New Mexico has recognized just such a distinction in arguments before other federal courts where it sought approval for smaller groups of investors with which it had joined to serve as lead plaintiff. ECF 9, at 10-11; ECF 11-2, at 10. And the firm that New Mexico seeks to appoint here has itself partnered with other firms in co-representation of lead plaintiffs. *See* ECF 11-2, New Mexico's Opp. Br. in *In re Cardinal Health Inc. Securities Litig.*, 226 F.R.D. 298 (S.D. Ohio 2005).

New Mexico's argument depends heavily upon inference, and the inferences are often strained. For example, it seizes upon language in one of the declarations by representatives of the Group stating that they "were advised" of positions taken by New Mexico in its briefing. ECF 14, at 5. It points to this as evidence of inordinate control by counsel. Suffice it to say I find nothing sinister in a lawyer summarizing for a client the substance of opposing briefs.

15

Likewise, New Mexico argues that the Group's choice to select Barrack, Rodos & Bacine and Bernstein Litowitz Berger and Grossmann LLP as co-lead counsel represents a "failure" of "decisiveness" by refusing to appoint one firm over the other. ECF 14, at 7. New Mexico's position overlooks the fact that the two firms have worked together in complex securities litigation for three decades. *See, e.g.*, *In re American Integrity Securities Litigation*, 1989 WL 89316 (E.D. Pa. Aug. 8, 1989). Against that backdrop, New Mexico's criticism of their choice as counsel rings hollow.

In the final analysis, the presumption that the Institutional Investor Group's is the most adequate plaintiff is controlling.

### E. Appointment of lead counsel

The PSLRA vests authority in the lead plaintiff to select and retain counsel, subject to the Court's approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). Nevertheless, the Court will not disturb the Lead Plaintiff's choice of counsel unless it is "necessary to protect the interests of the class." *In re Cendant*, 264 F.3d at 273. The court should generally employ a deferential standard in reviewing the Lead Plaintiff's choices for counsel. *See id.* at 274.

Here, the Institutional Investor Group has selected Barrack, Rodos & Bacine and Bernstein Litowitz Berger and Grossmann LLP as Lead Counsel as co-lead counsel. While New Mexico raises concerns about the appointment of multiple law firms in these actions, courts have not taken issue with two firms sharing lead counsel responsibilities when they are assured of their competency and experience. *See, e.g.*, *id.* at 223-24 (appointing the same two firms in this case as lead counsel); *Chao Sun v. Han*, 2015 WL 2364937, at *5 (D.N.J. May 14, 2015); *Rabin v. John Doe Market Makers*, 254 F. Supp. 3d 754, 761 (E.D. Pa. 2015).

Both Barrack, Rodos & Bacine and Bernstein Litowitz Berger and Grossmann LLP have substantial experience litigating complex securities class actions, and seem well positioned to do

so here. With respect to co-counsel, I expect that there will be no duplication of attorneys' services, and that the use of co-lead counsel will not in any way lead to an increase in attorneys' fees or expenses.

**IV.     Conclusion**

For the reasons set forth above, the Institutional Investor Group's Motion for Appointment of Lead Plaintiff will be granted, and New Mexico's will be denied. An appropriate Order follows.

<u>     /s/ Gerald Austin McHugh            </u>
Gerald Austin McHugh
United States District Judge