# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and And On Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 2:20-cv-00200-GAM |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, and THOMAS E. LONG, | ) ) ) ) | |
| Defendants. | ) ) | |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO TRANSFER

Jeffrey W. Golan
Robert A. Hoffman
Jeffrey A. Barrack
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

John C. Browne
Adam H. Wierzbowski
Michael Mathai
Matthew Hough
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND .......................................................................................... 7

ARGUMENT ............................................................................................. 9

    I.     Defendants Have Failed to Satisfy Their Heavy Burden
            Under 28 U.S.C. § 1404(a) ................................................................... 9

          A.     Private Interest Factors Support Litigating this Action in this District .... 11

                 1.     The Plaintiff's and Defendants' Forum Preferences..................... 11

                 2.     Where the Claim Arose................................................................ 13

                 3.     Convenience of the Parties and Witnesses, and Location of
                        Documents .................................................................................. 15

          B.     Public Interest Factors Also Support Litigating this Action in this
               District................................................................................................ 23

    II.    The "First-Filed Rule" Does Not Support Transferring this Action to Texas ...... 25

CONCLUSION........................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*AMVEST Capital Corp. v. Banco Central, S.A.,*
    628 F. Supp. 1258 (S.D.N.Y. 1986) ................................................................................ 12

*Blass v. Capital Int'l Security Grp.,*
    No. 99-CV-5738 (FB), 2001 WL 301137 (E.D.N.Y. Mar. 23, 2001) ............................ 19

*Boston Scientific Corp. v. Johnson & Johnson Inc.,*
    532 F. Supp. 2d 648 (D. Del. 2008) ......................................................................... *passim*

*Catanese v. Unilever,*
    774 F. Supp. 2d 684 (D.N.J. 2011) ................................................................................ 29

*Century Indem. Co. v. Certain Underwriters at Lloyd's,*
    No. 09-94, 2010 WL 92531 (E.D. Pa. Jan. 11, 2010) .................................................... 26

*CertainTeed Corp. v. Nichiha USA, Inc.,*
    No. 09-3932, 2009 WL 3540796 (E.D. Pa. Oct. 29, 2009) ............................................ 26

*Chavez v. Dole Food Co.,*
    836 F.3d 205 (3d Cir. 2016) ........................................................................................... 25

*City of Pontiac Gen. Employees' Ret. System v. Wal-Mart Stores, Inc.,*
    No. 3-12-0457, 2012 WL 12543462 (M.D. Tenn. July 25, 2012) ................................... 30

*Complaint of Bankers Tr. Co. v. Chatterjee,*
    636 F.2d 37 (3d Cir. 1980) ............................................................................................. 26

*E.E.O.C. v. Univ. of Pennsylvania,*
    850 F.2d 969 (3d Cir. 1988) ........................................................................................... 26

*Eliminator Custom Boats v. Am. Marine Holdings, LLC,*
    No. EDCV 06-15-VAP(SGL), 2006 WL 4941830 (C.D. Cal. Aug. 31, 2006) ............... 23

*Flotsam of California, Inc. v. Huntington Beach Conference and Visitors Bureau,*
    No. C 06-7028 MMC, 2007 WL 1152682 (N.D. Cal. Apr. 18, 2007) ...................... 15, 24

*Gielata v. Heckmann,*
    No. 10-378-LPS-MPT, 2010 WL 3940815 (D. Del. Oct. 6, 2010),
    *adopted in In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT,
    2011 WL 1219230 (D. Del. Mar. 31, 2011) ...................................................... 11, 18, 21

**Cases**                                                                                      **Page(s)**

*Goggins v. Alliance Capital Mgmt., L.P.*,
    279 F. Supp. 2d 228 (S.D.N.Y. 2003) ........................................................................ 12, 31

*Grider v. Keystone Health Plan Cent., Inc.*,
    500 F.3d 322 (3d Cir. 2007) .................................................................................... 26, 27

*Huellemeier v. Teva Pharm. Indus. Ltd.*,
    No. 1:17-cv-485, 2017 WL 5523149 (S.D. Ohio, Nov. 17, 2017) ................................... 30

*In re Glob. Cash Access Holdings, Inc. Sec. Litig.*,
    No. 08 Cv. 3516 (SWK), 2008 WL 4344531 (S.D.N.Y. Sept. 18, 2008) ....................... 21

*In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT,
    2011 WL 1219230 (D. Del. Mar. 31, 2011) ........................................................... 11, 21

*In re Nematron Corp. Sec. Litig.*,
    30 F. Supp. 2d 397 (S.D.N.Y. 1998) ........................................................................... 20

*Intel Corp. v. Broadcom Corp.*,
    167 F. Supp. 2d 692 (D. Del. 2001) ............................................................................. 13

*Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*,
    797 F. Supp. 2d 472 (D. Del. 2011) ....................................................................... 10, 13

*Job Haines Home for the Aged v. Young*,
    936 F. Supp. 223 (D.N.J. 1996) .................................................................................. 20

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995) ............................................................... 10, 11, 16, 24

*Kondo v. Anthelio Health Care Sols., Inc.*,
    No. 15-cv-03244-DMR, 2015 WL 7710301 (N.D. Cal. Nov. 30, 2015) ........................ 18

*Levitt v. State of Maryland Deposit Ins. Fund Corp.*,
    643 F. Supp. 1485 (E.D.N.Y. 1986) ............................................................................ 11

*Michel v. Haralson*,
    586 F. Supp. 169 (E.D. Pa. 1983) ............................................................................... 12

*New Century Fin., Inc. v. Oledix Techs., LLC*,
    No. H-13-0391, 2013 WL 3245954 (S.D. Tex. June 25, 2013) ..................................... 15

*Oleg Cassini, Inc. v. Serta, Inc.*,
    No. 11 Civ. 8751 (PAE), 2012 WL 844284 (S.D.N.Y. Mar. 13, 2012) ..................... 27, 28

**Cases**                                                                                    **Page(s)**

*Palagano v. NVIDIA Corp.*,
    No. 15-1248, 2015 WL 5025469 (E.D. Pa. Aug. 25, 2015) ...................................... 27, 29

*Panavision Int'l., L.P. v. Toeppen*,
    141 F.3d 1316 (9th Cir. 1998) ................................................................... 18

*Polin v. Conductron Corp.*,
    340 F. Supp. 602 (E.D. Pa. 1972) ............................................................... 19

*Praxair, Inc. v. ATMI, Inc.*,
    No. Civ. 03-1158-SLR, 2004 WL 883395 (D. Del. Apr. 20, 2004) ................................ 13

*Samsung Elecs. Co. v. Rambus, Inv.*,
    386 F. Supp. 2d 708 (E.D. Va. 2005) ............................................................ 15

*Sec. Inv'r Prot. Corp. v. Vigman*,
    764 F.2d 1309 (9th Cir. 1985) .................................................................. 12

*Security Police & Fire Professionals of America Ret. Fund v. Pfizer*,
    No. 10-3105 (SDW), 2011 WL 13250484 (D.N.J. Apr. 5, 2011),
    *aff'd*, 2011 WL 5080803 (D.N.J. Oct. 25, 2011) ......................................... 11, 16

*Shutte v. Armco Steel Corp.*,
    431 F.2d 22 (3d Cir. 1970)..................................................................... 10

*Sovereign Bank, F.S.B. v. Rochester Cmty. Sav. Bank*,
    907 F. Supp. 123 (E.D. Pa. 1995) ............................................................... 12

*Stein v. Immelt*,
    No. 3:09-CV-808 (RNC), 2010 WL 598925 (D. Conn. Feb. 18, 2010) ........................... 31

*The Phoenix Ins. Co. Ltd. v. Teva Pharm. Indus. Ltd.*,
    381 F. Supp.3d 416 (E.D. Pa. 2019) ............................................................. 30

*Villari Brandes & Kline, PC v. Plaintfield Specialty Holdings II, Inc.*,
    No 09-2552, 2009 WL 1845236 (E.D. Pa. June 26, 2009)........................................ 27, 30

*Yang v. Odom*,
    409 F. Supp. 2d 599 (D.N.J. 2006) .............................................................. 31

Other Authorities

15 WRIGHT, MILLER & COOPER § 3847 ............................................................. 10

28 U.S.C. § 1404(a) ...................................................................... *passim*

Court-appointed Lead Plaintiff, consisting of the Allegheny County Employees' Retirement System ("Allegheny County"), Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge, Denver Employees Retirement Plan, IAM National Pension Fund, and Iowa Public Employees' Retirement System (collectively, "Lead Plaintiff"), respectfully submits this opposition to the motion filed by Defendants to transfer this action to the United States District Court for the Northern District of Texas, Dallas Division.

## PRELIMINARY STATEMENT

Defendants' transfer motion stems from an overly simplistic view that the proper venue for this case is mandated by the location of the corporate defendant's headquarters and neglects that the primary evidence that will be used to establish the Defendants' violations of the federal securities laws is located within the Commonwealth of Pennsylvania. Of course, Energy Transfer LP ("Energy Transfer" or the "Company") and its senior executives are in Dallas. But Defendants' public statements were issued throughout the United States (not only from Dallas), while this case stems from actions that took place in Pennsylvania, not in Texas. It revolves around the Mariner East pipelines, which Energy Transfer's subsidiary, Sunoco Logistics Partners L.P. and its affiliates (hereafter, "Sunoco"), owns and operates.[1] The pipelines run from one end of Pennsylvania to the other, through seventeen counties from Washington County on the Commonwealth's western border to Delaware County on its eastern border. The pipelines end at Sunoco's refinery and the export terminal in Marcus Hook, PA, about twenty miles south of the

---

[1] Sunoco, a Pennsylvania-based company, first became affiliated with Energy Transfer in 2012, and Energy Transfer subsequently acquired Sunoco in a merger that closed on April 28, 2017. *See* Sunoco Logistics Partners and Energy Transfer Partners Announce Successful Completion of Merger, April 28, 2017 (Ex. 1 to Declaration of Jeffrey W. Golan ("Golan Decl."), filed concurrently with this Opposition).

Eastern District of Pennsylvania Courthouse in Philadelphia.   The pipelines' tracks are approximately shown in the map below.



The case stems from the actions that Energy Transfer and its agents allegedly took in order to gain the permits and other approvals to build and begin operations of the Mariner East 2 pipeline in Pennsylvania.  The Mariner East project required Energy Transfer to obtain: (a) Chapter 105, Water Obstruction and Encroachment Permits that Energy Transfer sought and was granted in 17 separate regions within Pennsylvania; (b) Chapter 102, Erosion and Sediment Control Permits that Energy Transfer sought under a General Permit and which were granted by three regions of the Pennsylvania Department of Environmental Protection ("PA DEP"); (c) National Pollutant Discharge Elimination System ("NPDES") Permits for Hydrostatic Test Water Discharges (PAG-10) that were submitted to and granted by the PA DEP Southwest and South-Central regional offices, which also provided that discharges in the Southeast would be under the purview of an existing permit with the Delaware County Regional Water Authority ("DELCORA"); and (d) Air

Quality Permits that were sought and granted in each PA DEP region.[2]  Approvals to operate were

also required from the Pennsylvania Public Utility Commission ("PA PUC"), the entity responsible

for overseeing the safety of the Mariner East pipelines.[3]

The genesis of the present action was a report issued on November 12, 2019 by the

Associated Press on its website, "AP Exclusive: ***FBI Eyes How Pennsylvania Approved***

***Pipeline***."[4]  The report, which AP issued from its Harrisburg, Pa office, broke the story on a

corruption investigation that the Federal Bureau of Investigation ("FBI") is conducting into how

---

[2] Golan Decl., Ex. 2, "Mariner East 2 Pipeline – Frequently Asked Questions," at 1 (accessible at: https://www.dep.pa.gov/Business/ProgramIntegration/Pennsylvania-Pipeline-Portal/Pages/Mariner-East-II.aspx).  The FAQs further noted, *inter alia,* that matters related to pipeline safety or structural integrity were regulated by the Pennsylvania Public Utility Commission ("PA PUC"); the PA DEP has continuing inspection, compliance and enforcement responsibilities after permits are issued; and the PA DEP had resolved appeals taken by the Clean Air Council, Mountain Watershed Association, and Delaware Riverkeepers Network from 20 permits issued to Sunoco for the Mariner East 2 pipeline project. *Id.* at 3-4.  *See also* Golan Decl., Exs. 3, "PA DEP Information Sheet: Sunoco Pennsylvania Pipeline Project / Mariner East II," Feb. 2017 (accessible at http://crawler.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/PPP%20Information%20Sheet1.pdf); and 4, print-out of PA DEP Mariner East Pipeline II webpage (accessible at https://www.dep.pa.gov/Business/ProgramIntegration/Pennsylvania-Pipeline-Portal/Pages/Mariner-East-II.aspx), which includes Project Overview Information; Compliance and Enforcement Information; Approved Permits; Historic Applications and Public Participation Information; Press Releases (including releases for PA DEP penalties for violations); Consent Assessments of Civil Penalties; and various other primary source materials relating to the development and permitting of the Mariner East pipelines in Pennsylvania.

[3] *See, e.g.,* Golan Decl., Exs. 5, "PUC Update on Investigation Involving Mariner East 1 Pipeline," Jan. 24, 2019 (accessible at: http://www.puc.pa.gov/about_puc/press_releases.aspx?ShowPR=4153), 6, "Sunoco Settles Mariner East 1 Case with Pennsylvania PUC," April 5, 2019 (accessible at https://pgjonline.com/new/2019/04-apr/sunoco-settles-mariner-east-1-case-with-pennsylvania-puc), and 7, "Pa. senator ousted from battle waged before the PUC over Mariner East II pipeline," PennLive.com, posted Sept. 19, 2019 (accessible at: https://www.pennlive.com/news/2019/09/pa-senator-ousted-from-battle-waged-before-the-puc-over-mariner-east-ii-pipeline.html).

[4] Golan Decl., Ex. 8 (accessible at: https://www.usnews.com/news/us/articles/2019-11-12/ap-exclusive-fbi-eyes-how-pennsylvania-approved-pipeline).  Emphasis in this Memorandum of Law is added by bolded, italicized type-face unless otherwise indicated.

the Pennsylvania Governor's administration came to issue permits for construction "on a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania." The AP report – consistent with Energy Transfer's own statements concerning the pipelines – described the nearly $3 billion project as "one of the largest construction projects, if not the largest, in Pennsylvania history." The AP report further stated:

> FBI agents have interviewed *current and former state employees* in recent weeks about the Mariner East project and the construction permits, *according to three people who have direct knowledge of the agents' line of questioning*.

> All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.

> *The focus of the agents' questions involves the permitting of the pipeline, whether [Governor] Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return*, those people say.

The AP report noted that the roughly 300-mile Mariner East 1 pipeline was originally built in the 1930s to transfer gasoline westward from Marcus Hook. However, it was renovated and, "in 2014, began carrying natural gas liquids eastward to the refinery from southwestern Pennsylvania's drilling fields." The article chronicled that construction permit applications were submitted in 2015 for two wider pipelines, the 350-mile long Mariner East 2 and 2x, that had been designed for the same purpose, but stretching slightly farther westward. It continued: "Both were projected to be open in 2017. But Mariner East began operating in late December, and Mariner East 2X could be complete in 2020."[5]

---

[5] As noted in the AP report, the Mariner East 1 and Mariner East 2 and 2X pipelines "run past houses, parks and schools in southeastern Pennsylvania, and have been met with protests by alarmed neighbors worried that one leak could ignite a deadline explosion," and that "[s]inkholes along the pipelines' route have opened on lawns and construction has contaminated streams and private water wells." The AP report further referred to investigations that Chester County's District Attorney opened in December 2018, and an investigation that was opened by Pennsylvania's Attorney General on a referral from Delaware County's District Attorney.

The AP issued its report of the FBI investigation less than three months after Pennsylvania's Governor held a meeting in late August 2019 with anti-pipeline activists at a pipeline construction site in East Goshen Township, Chester County, and said that his Administration was not going to stop construction or operations of Sunoco's Mariner East pipelines.[6]

While Defendants allude in their motion to the existence of corporate documents and executives in Texas, the motion is not supported by any declarations, by any affidavits, or by any exhibits other than two complaints that were filed in Texas.  An individual investor, William D. Reinhardt, filed the earlier of the two complaints (Exhibit B to Defendants' Motion) on November 20, 2019 in the U.S. District Court for the Northern District of Texas, asserting federal securities law claims similar to the claims that Allegheny County later asserted in the complaint it filed in this Court on January 10, 2020.  However, Reinhardt dismissed his securities case in Texas without prejudice on January 15, 2020, and that case is no longer pending in the Northern District of Texas.[7]  As a result, *there are no other securities class actions, either in Texas or elsewhere, against the Defendants arising from the misconduct complained of in this case*.

The other complaint that Defendants attached as Exhibit A to their Motion, on which Defendants rely for their "first-filed" case argument, is a Verified Unitholder Derivative Complaint.[8]  Notably, while the federal securities class action filed by Allegheny County in this

---

[6] *See* Golan Decl., Ex. 9, "Wolf tells pipeline activists he won't shut down Mariner East," StateImpact Pennsylvania, Aug. 22, 2019 (updated Aug. 26, 2019) (accessible at: https://stateimpact.npr.org/pennsylvania/2019/08/22/wolf-tells-pipeline-activists-he-wont-shut-down-mariner-east/).

[7] *See* Notice of Dismissal filed in *William D. Reinhardt v. Energy Transfer LP, et al.*, 3:19-cv-2771-K (N.D. Tex.) (Docket No. 8).

[8] *Giusseppe Bettiol, derivatively on behalf of Energy Transfer LP v. LE GP, LLC, et al.,* Case No. 3:19-cv-02890-X (N.D. Tex., Dec. 7, 2019) (hereafter, the "Texas Derivative Action").  Not mentioned in Defendants' motion to transfer is a similar derivative action that was filed and is

District seeks to recover damages *from Energy Transfer*, among others, on behalf of purchasers of Energy Transfer units over a class period from February 25, 2017 through November 11, 2019 (the last trading day before the issuance of the AP report), based on alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), the Texas Derivative Action seeks a recovery *on behalf of Energy Transfer* for damages allegedly sustained *by Energy Transfer* based on common law claims for breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.[9]  Moreover, the Texas Derivative Action will be allowed to proceed only if the court finds that the plaintiff sufficiently alleged the futility of a pre-suit demand with respect to the Energy Transfer board members named as defendants in that complaint, an issue that is not at all germane to the federal securities law claims asserted here.

As for Defendants' assertion that there are similarities between the allegations in Allegheny County's complaint and the Texas Derivative Action complaint, that is because both complaints drew heavily upon the allegations in the earlier filed *Reinhardt v. Energy Transfer* securities class action complaint that has been dismissed.  But Defendants' own brief accentuates the connections that this Action, as well as the Texas Derivative Action, have to Pennsylvania.  In just the excerpts from Allegheny County's complaint and from the Texas Derivative Action complaint cited at pages 2-5 of Defendants' brief, they include *17 combined references* to Pennsylvania, the Mariner East project, the Mariner East pipelines' terminal in Marcus Hook, the PA DEP, permits that were

---

currently pending in the Eastern District of Pennsylvania, *Harris v. Warren, et al.,* No. 2:20-cv-00364-GAM (E.D. Pa., filed Jan. 21, 2020).

[9] *See* Chart Comparing Allegheny County Action and Texas Derivative Action, attached as Ex. 10 to Golan Decl., for a structural comparison of the two Actions.  *See also* notes 28 & 29, at pages 27-29, below.

issued in Pennsylvania, and the Pennsylvania Governor's administration – 8 references from Allegheny County's complaint, and 9 references from the Texas Derivative Action complaint.

For these reasons, as more fully described below, Defendants' motion to transfer should be denied and this Action should proceed in this jurisdiction, where Allegheny County, an employees' retirement system serving Pennsylvania workers and their families, chose to bring it and where Lead Plaintiff seeks to litigate it.

## **BACKGROUND**

Energy Transfer is a natural gas and energy transportation company that, through its subsidiaries, operates some of the largest oil and gas pipelines in the United States.  The Partnership owns and operates approximately 12,200 miles of interstate natural gas pipelines and multiple natural gas storage facilities across the United States.  ¶ 2.[10]  Energy Transfer's projects include the Mariner East pipeline, a multibillion-dollar, 350-mile pipeline that carries highly volatile natural gas liquids across 17 counties in the Commonwealth of Pennsylvania.  ¶ 3.  The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.  ¶ 4.

Energy Transfer obtained approval to construct the second phase of the project, referred to as Mariner East 2, on February 13, 2017, after the PA DEP approved permits allowing for the transport of natural-gas liquids across Pennsylvania to a terminal in Marcus Hook.  According to news sources reporting on the proposed second phase of this project, Energy Transfer had

---

[10]  Citations in the form of ¶ __ are to the complaint filed by Allegheny County in the above-captioned Action.

experienced challenges achieving approval of these permit applications in the past due to numerous deficiencies and public concerns over the project's environmental and safety impacts.  As such, the speed at which PA DEP approved the Mariner East 2 permits was surprising.   ¶ 24.  Construction on Mariner East 2 commenced shortly after the PA DEP issued the permits and the pipeline became operational in December 2018.  ¶ 25.

In its complaint filed on January 10, 2020, Allegheny County asserted violations of the federal securities laws arising from Defendants' allegedly false or misleading statements primarily concerning the permitting process for the Mariner East pipeline and Energy Transfer's resolution of regulatory hurdles in connection therewith, as well as the Partnership's purported compliance with its Code of Business Conduct and Ethics.[11]  Specifically, the complaint charged Energy Transfer and three of its senior executives with violations of the Exchange Act, and alleged that the Defendants made false and/or misleading statements concerning and/or failed to disclose that: (1) the Partnership obtained construction permits for the Mariner East pipeline through the use of coercion, bribery or other improper methods; (2) the use of such improper methods increased the risk that the Partnership would be subjected to government or regulatory investigations and/or litigation, thereby depreciating the Partnership's unit value; and (3) as a result, the Partnership's public statements were materially false and misleading at all relevant times.  ¶ 43.

The complaint referred expressly to the AP report of November 12, 2019, "FBI Eyes How Pennsylvania Approved Pipeline," summarized above.  Citing interviews with current and former Commonwealth employees, the AP reported that the FBI's investigation "involves the permitting of the pipeline, whether [Pennsylvania Governor Tom] Wolf and his administration forced

---

[11]  Lead Plaintiff anticipates filing a more comprehensive Operative Complaint on or before May 15, 2020, the deadline set in this Court's Case Scheduling Order Number 1, entered March 5, 2020 (Docket No. 21).

environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return." ¶¶ 8, 44; *see also* Golan Decl., Ex. 8.  On this news, Energy Transfer's unit price fell $0.81 per unit, or over 6.77%, over the following two trading sessions, closing at $11.16 per unit on November 13, 2019.  ¶¶ 9, 45.

Based on these facts, the complaint alleged that the Defendants violated §§ 10(b) and 20(a) of the Exchange Act by disseminating false and misleading material information to the investing public concerning the Mariner East pipelines.  As a result of Defendants' alleged wrongful acts and omissions, and the decline in the market value of the Company's common units upon revelation of the truth, Lead Plaintiff and the members of the proposed Class suffered significant losses and damages.

## **ARGUMENT**

The public interest and the interests of the parties are best served by the litigation of this Action in this District.  Defendants, apparently preferring to avoid this Court, seek a venue transfer based on (a) the filing of the Texas Derivative Action in the Northern District of Texas and (b) the fact that the Company has its headquarters in Dallas.  Neither of these purported reasons satisfies the heavy burden placed on a party seeking to disturb the choice made by Allegheny County in filing this Action in this District and Lead Plaintiff's preference to maintain the Action here.

## I.    **Defendants Have Failed to Satisfy Their Heavy Burden Under 28 U.S.C. § 1404(a)**

The federal transfer statute, 28 U.S.C. § 1404(a), states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The statute gives this Court "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and

fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 883 (3d Cir. 1995).

Defendants bear the burden of establishing "the need for transfer." *Id.* at 879.  The burden is a "heavy one." *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.,* 797 F. Supp. 2d 472, 477 (D. Del. 2011); *see also id.* at 478-87 (denying transfer after considering all factors and finding that defendants "failed to satisfy their burden of showing that the balance of convenience factors and interests of justice weigh strongly in favor of transfer").  As the Third Circuit stated in *Jumara*, "the plaintiff's choice of venue should not be lightly disturbed."  55 F.3d at 879.  Thus, "***unless the balance of convenience of the parties is strongly in favor of defendants, the plaintiff's choice of forum should prevail***." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *see also Boston Scientific Corp. v. Johnson & Johnson Inc.,* 532 F. Supp. 2d 648, 654 (D. Del. 2008) ("The burden of establishing the need to transfer rests with the movant 'to establish that the balance of convenience of the parties and witnesses ***strongly favors*** the defendants.'").

In *Jumara,* the Court of Appeals stated:

> In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."

55 F.3d at 879 (citing 15 WRIGHT, MILLER & COOPER § 3847).  The Court of Appeals identified a series of "private interest" and "public interest" factors governing venue transfer motions.  *Id*.  As detailed below, both the private interest factors and the public interest factors support maintaining this case in this District.

### A.      The Private Interest Factors Support Litigating this Action in this District

Although emphasizing that "there is no definitive formula or list of factors to consider," *Jumara*, 55 F.3d at 879, the Third Circuit identified the following private interests that a court may consider on a motion to transfer: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses – but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records (similarly limited to the extent that the files could not be produced in the alternative forum)."  *Id.* (citations omitted); *see also Boston Scientific,* 532 F. Supp. 2d at 654 (denying motion to transfer); *Gielata v. Heckmann,* No. 10-378-LPS-MPT, 2010 WL 3940815, at *2 (D. Del. Oct. 6, 2010) (hereafter, "*Heckmann*"), *adopted in In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT, 2011 WL 1219230 (D. Del. Mar. 31, 2011) (adopting Report and Recommendation and denying motion to transfer); *Security Police & Fire Professionals of America Ret. Fund v. Pfizer,* No. 10-3105 (SDW), 2011 WL 13250484, at *3 (D.N.J. Apr. 5, 2011) (denying transfer), *aff'd,* 2011 WL 5080803 (D.N.J. Oct. 25, 2011).

### 1.      The Plaintiff's and Defendants' Forum Preferences

Here, the plaintiff's choice of forum is this Court.  "The deference afforded plaintiff's choice of forum will apply so long as plaintiff has selected the forum for some legitimate reason." *Boston Scientific*, 532 F. Supp. 2d at 654.  More specifically, the plaintiff's choice is generally accorded more deference where there is a "material connection or significant contact between the forum state and the underlying events allegedly underlying the claim," *Levitt v. State of Maryland Deposit Ins. Fund Corp.*, 643 F. Supp. 1485, 1493 (E.D.N.Y. 1986), or where the plaintiff is a

resident of the forum district.  *AMVEST Capital Corp. v. Banco Central, S.A.,* 628 F. Supp. 1258 (S.D.N.Y. 1986).

The present Action satisfies both of those conditions.  Not only did Allegheny County bring this Action in its home state of Pennsylvania, but the genesis of this case stems from the alleged wrongful conduct that Energy Transfer and its agents performed in Pennsylvania in order to obtain permits from the PA DEP and approvals from the PA PUC for the development, construction and operation of the Mariner East pipelines located in Pennsylvania.[12]  For these reasons, Allegheny County's and Lead Plaintiff's choice to litigate this case in this District is entitled to considerable weight.

Defendants prefer to have the claims asserted in this Action litigated in the Northern District of Texas since that is where Energy Transfer maintains its headquarters, which was the place from which the Company and the Individual Defendants issued public statements at issue in

---

[12] There is a split among the courts in terms of the relative weight that the plaintiff's choice of forum should receive when the plaintiff is seeking to represent a class and bringing claims under the federal securities laws.  While some courts have found that less weight is given to a plaintiff's choice in a class action, *see, e.g., Goggins v. Alliance Capital Mgmt., L.P.*, 279 F. Supp. 2d 228, 232 (S.D.N.Y. 2003), others have held that a movant's burden is heightened when a plaintiff is pursuing claims based on the federal securities laws.  *See, e.g., Sovereign Bank, F.S.B. v. Rochester Cmty. Sav. Bank*, 907 F. Supp. 123, 126 (E.D. Pa. 1995) ("[T]he presumption in favor of plaintiff's choice of forum is even stronger in cases brought under the Exchange Act's liberal venue provision, since it represents an affirmative congressional policy choice to allow plaintiffs in securities cases the widest possible choice of forums in which to sue."); *Michel v. Haralson*, 586 F. Supp. 169, 172 (E.D. Pa. 1983) (indicating that plaintiff's choice is entitled to "even greater weight" where the case at issue concerns an Exchange Act claim).  As the U.S. Court of Appeals for the Ninth Circuit put it: "Without question, the intent of the venue and jurisdiction provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum . . . and **unless the balance of factors is strongly in favor of the defendants, the plaintiff's choice of forum should rarely be disturbed**."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985).  Whatever standard this Court chooses to apply, it remains the law that the plaintiff's choice of forum "is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer."  *Boston Scientific,* 532 F. Supp. 2d at 654 (citation omitted).

this case.  However, Defendants' venue preference is entitled to little weight because Energy Transfer is a partnership that has grown via acquisitions throughout the United States, including its acquisition of Pennsylvania-based Sunoco Logistics, and has maintained and developed the Mariner East pipelines that reach from one end of Pennsylvania to the other, which forms the heart of this Action.  *See* ¶¶ 2-8, 23-25, 33, 37-38, 40, 42-45, 47.  As the court stated in *Intellectual Ventures v. Checkpoint*:

> Unless the defendant "is truly regional in character" — that is, it operates essentially exclusively in a region that does not include Delaware — transfer is almost always inappropriate. … When transfer is sought by a defendant with operations on a national or international scale, that defendant "must prove that litigating in Delaware would pose a unique or unusual burden on [its] operations."

797 F. Supp. 2d at 477 (citations omitted); *accord Praxair, Inc. v. ATMI, Inc*., No. Civ. 03-1158-SLR, 2004 WL 883395, at *1 (D. Del. Apr. 20, 2004) ("courts should only transfer venue if the defendant is truly regional in character").  Moreover, as the court stated in denying the transfer motion in *Intel Corp. v. Broadcom Corp.,* 167 F. Supp. 2d 692, 706 (D. Del. 2001) (citation omitted): "the conveniences of modern travel and communication technology have made it more difficult to argue that litigating in a particular forum is inconvenient for the parties and witnesses. Therefore, to meet its burden [the defendant] must 'establish that litigating this case in [the plaintiff's choice of forum] will pose a "unique or unusual burden" on [its] business operations.'" Defendants have made no such showing here.

### 2.   Where the Claim Arose

This Action arises from alleged coercion and other misconduct that took place in the Commonwealth of Pennsylvania.  This is shown by the paragraphs cited above from the Allegheny County complaint and even in the portions of the two complaints that Defendants themselves cite in their transfer motion brief, which ***specifically allege wrongdoing that took place in***

*Pennsylvania, including wrongdoing involving Pennsylvania public officials*. *See* Def. Br. at 2-5 (identifying eight specific references in Allegheny County's complaint to the Mariner East pipeline, the Pennsylvania Governor's administration, the PA DEP, and the pipelines' terminal in Marcus Hook, and nine specific references in the Texas Derivative Action complaint to these same topics). It is further shown in the materials cited in the Golan Declaration.

This Court should reject Defendants' effort to reframe and unduly narrow the allegations of the Allegheny County complaint as involving only statements that Defendants made from Energy Transfer's headquarters in Dallas, Texas. In fact, Defendants issued numerous materially false and misleading statements to investors during industry conferences held throughout the United States, including in New York City, Las Vegas, Orlando, Park City, Utah, the Napa Valley, and Philadelphia.[13] And while, of course, the Defendants also issued public statements from the Company's headquarters in the form of press releases and SEC filings, what made those statements (and others to be included in the Operative Complaint) false and materially misleading were actions that were allegedly taken in Pennsylvania, involving the Mariner East pipelines located in

---

[13] During the Class Period, Energy Transfer executives made statements to investors at the following investor conferences in the following cities throughout the United States: (i) May 31, 2017 MLPA Investor Conference (Orlando, FL); (ii) June 27, 2017 J.P. Morgan Energy Equity Conference (New York, NY); (iii) August 16, 2017 Citi One-on-One MLP Conference (Las Vegas, NV); (iv) September 6, 2017 Barclays CEO Energy-Power Conference (New York, NY); (v) November 29, 2017 Jefferies 2017 Energy Conference (Houston, TX); (vi) December 6, 2017 Wells Fargo Pipeline, MLP and Utility Symposium (New York, NY); (vii) January 9, 2018 UBS Midstream & MLP Conference (Park City, UT); (viii) February 28, 2018 Morgan Stanley Midstream Energy Conference (New York, NY); (ix) April 9, 2018: Mizuho Energy Summit (Napa Valley, CA); (x) May 24, 2018 MLPA Investor Conference (Orlando, FL); (xi) June 19, 2018 J.P. Morgan Energy Equity Conference (New York, NY); (xii) August 2, 2018 Energy Transfer Equity LP to Acquire Energy Transfer Partners LP in Simplification Transaction (Philadelphia, PA); (xiii) August 15, 2018 Citi One-on-One MLP / Midstream Infrastructure Conference (Las Vegas, NV); (xiv) September 5, 2018 Barclays CEO Energy-Power Conference (New York, NY); and (xv) December 5, 2018: 2018 Wells Fargo Midstream & Utility Symposium (New York, NY).

Pennsylvania, and relating to Commonwealth and local permitting requirements.  Thus, this factor also supports maintaining this Action in this District.

3.     **Convenience of the Parties and Witnesses, and Location of Documents**

Defendants postulate, without providing any factual basis in a supporting declaration or affidavit, that "because Energy Transfer's headquarters are located in the Northern District of Texas, the relevant witnesses and records are likely located in that district."  Def. Br. at 14. However, Defendants fail to make the important distinction between party witnesses and non-party witnesses.  When examining the relative conveniences of two proposed fora, "it is the convenience of non-party witnesses, rather than that of employee witnesses, … that is the more important factor and is accorded greater weight."  *New Century Fin., Inc. v. Oledix Techs., LLC,* No. H-13-0391, 2013 WL 3245954, at *6 (S.D. Tex. June 25, 2013) (denying transfer motion).  This is because "[p]arty witnesses are the parties themselves and those closely aligned with a party, and they are presumed to be more willing to testify in a different forum, while there is no such presumption as to non-party witnesses."  *Samsung Elecs. Co. v. Rambus, Inv.*, 386 F. Supp. 2d 708, 718 (E.D. Va. 2005) (citation omitted).[14]

Here, as shown below and in the exhibits included in the Golan Declaration, there are many witnesses in Pennsylvania who would be severely inconvenienced by having this case go forward in Texas and who would be beyond the reach of that court to compel their appearance at trial.  The AP report stated that FBI agents "have interviewed ***current and former state employees*** in recent weeks about the Mariner East project and the construction permits, ***according to three people who***

---

[14]  *See also Flotsam of California, Inc. v. Huntington Beach Conference and Visitors Bureau,* No. C 06-7028 MMC, 2007 WL 1152682, at *3 (N.D. Cal. Apr. 18, 2007) (denying defendant's motion to transfer and stating that the convenience of third-party witnesses "often is the most significant factor").

15

*have direct knowledge of the agents' line of questioning*."  Golan Decl., Ex. 8.  The current state employees are clearly situated in Pennsylvania, and the former state employees and the three people "with direct knowledge of the agents' line of questioning" are also most likely situated in Pennsylvania.  The AP report also stated that the "*focus of the agents' questions involves the permitting of the pipeline, whether [Governor] Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return*."  This further indicates the existence of others, within Pennsylvania, with direct knowledge of the alleged wrongful actions.  Having failed to consider non-party witnesses and without identifying any of their own witnesses who would be reluctant to testify in this District, Defendants' argument is insufficient and should be rejected.  *See Boston Scientific,* 532 F. Supp. 2d at 655; *Sec. P&F Professionals,* 2011 WL 13250484, at *4 (denying transfer and citing *Jumara*, 55 F.3d at 879, for the factor that the convenience of witnesses should be considered "only to the extent that the witnesses may actually be unavailable for trial in one of the fora").

Moreover, a review of records from Energy Transfer's permit applications with the PA DEP and hearings before the PA PUC concerning the Mariner East pipelines identify many Company employees and others situated in Pennsylvania who may have knowledge of the alleged wrongdoing that took place in Pennsylvania.[15]  For instance, during the four days of hearings that took place from May 7 to May 10, 2018 in *Clean Air Council, et al. v. Commonwealth of Pennsylvania Department of Environmental Protection and Sunoco Partners Marketing & Terminals, L.P.,* EHB Docket No. 2016-073-L, before the Commonwealth of Pennsylvania Environmental Hearing Board ("EHB"), which concerned certain aspects of Energy Transfer's

---

[15] *See generally,* Golan Decl. ¶¶ 3-4.

Marcus Hook facility, there was testimony from Jed Werner, from Energy Transfer Partners' location in Sinking Springs, PA; Joseph Becker and Jonathan Hunt, from Energy Transfer's location in Marcus Hook, PA; Harry Alexander, from Energy Transfer's location in Newtown Square, PA; and George Eckert, Janine Tulloch-Read, and James Rebarchak, all from the PA DEP location in Norristown, PA.

Other proceedings relating to the permits granted by the PA DEP on February 13, 2017, which were the subject of an appeal in *Clean Air Council, et al. v. Commonwealth of Pennsylvania, Department of Environmental Protection and Sunoco Pipeline L.P.,* EHB Docket No. 2017-009-L, identify other Pennsylvania residents with relevant information, including: Domenic Rocco, the Program Manager for Waterways and Wetlands Program at PA DEP; Scott R. Williamson, an Environmental Program Manager at PA DEP; John J. Stefanko, who served as a Deputy Secretary for Programs at the PA DEP from October 2015 until February 2017, and is currently the Deputy Secretary for the Office of Active and Abandoned Mine Operations at PA DEP; Matthew Gordon, Senior Director of Operations at Energy Transfer, in its Sinking Springs, PA location; and Yeseñia Bane, formerly Deputy Chief of Staff to the Governor and currently President of Bane Strategies in Harrisburg, PA.

While Lead Plaintiff cannot know, at this point, whether any of these individuals have direct knowledge of the claimed wrongdoing in this case, they certainly are knowledgeable about the permitting process and hearings that took place in connection with the permitting process, including the documents stemming from actions taken in Pennsylvania that are identified below, among many others.

The location of documents similarly does not support a transfer of this action. Many courts have recognized that while this factor might have been significant years ago, producing documents

from one forum into another is no longer difficult with the advent of electronic databases and the like. *See Boston Scientific,* 532 F. Supp. 2d at 655 ("J&J does not suggest that its documents cannot be produced in Delaware, especially in this age where document production is typically done electronically."); *Heckmann,* 2010 WL 3940815, at *2-3 (citing *Jumara* for principle that location of books and records is important only "to the extent that these documents will not be accessible in one of the fora" and noting that it is the "defendant's responsibility to prove that litigating in the plaintiff's forum 'would pose a unique or unusual burden on its operations'"); *see also Kondo v. Anthelio Health Care Sols., Inc.*, No. 15-cv-03244-DMR, 2015 WL 7710301, at *5 (N.D. Cal. Nov. 30, 2015) (recognizing that the location of documents and witnesses is "no longer weighed heavily given the modern advances in communication and transportation") (quoting *Panavision Int'l., L.P. v. Toeppen,* 141 F.3d 1316, 1323-24 (9th Cir. 1998)).

While Defendants concentrate on their own convenience in having this Action transferred to Texas, claiming that the Individual Defendants and documents relating to their public statements would be found in Texas, they make no showing whatsoever that the documents pertinent to the underlying misconduct alleged in this Action would also be in Texas. To the contrary, given the extensive proceedings that took place before the PA DEP and the PA PUC, the many issues that were raised at the time concerning the permits granted by the PA DEP and the speed with which they were granted,[16] and the allegations of the coercion and improper influences that were

---

[16] *See* Golan Decl., Exs. 11, "DEP approved Mariner East 2 permits despite deficiencies, documents show," StateImpact Pennsylvania, March 10, 2017 (accessible at: https://stateimpact.npr.org/pennsylvania/2017/03/10/dep-approved-mariner-east-2-permits-despite-deficiencies-documents-show/); and 12, "DEP staffers warned superiors of dangers to private water wells from pipeline construction," StateImpact Pennsylvania, July 20, 2017 (accessible at: https://stateimpact.npr.org/pennsylvania/2017/07/20/dep-staffers-warned-superiors-of-dangers-to-private-water-wells-from-pipeline-construction/); *see also* Golan Decl., Exs. 13, PA DEP letter to Matthew L. Gordon, Sunoco Pipeline, L.P., February 13, 2017 (Letter enclosing State Water Obstruction and Encroachment Permit); 14, PA DEP Proposed Timeline;

performed and exerted by or on behalf of Energy Transfer relating to the Mariner East 2 pipeline project, it is more likely that Company and other records pertinent to the underlying claims in this Action would be found here, in Pennsylvania, just as witnesses from inside and outside the Company are situated in Pennsylvania.[17]

Defendants contend that litigating in this forum is inconvenient for them, but they maintain substantial operations and conduct regular business here. Energy Transfer not only acquired a Pennsylvania-based company, Sunoco Logistics and its affiliates, but also owns and operates a massive project in Pennsylvania, the Mariner East 1, 2 and 2X pipelines, as well as the terminal facility in Marcus Hook, PA. Moreover, in order to obtain and keep the regulatory approvals for

---

and 15, "Mariner East 2: Texts raise questions about Wolf administration role in permitting process," StateImpact Pennsylvania, Jan. 26, 2018 (accessible at: https://stateimpact.npr.org/pennsylvania/2018/01/26/mariner-east-2-texts-raise-questions-about-wolf-administration-role-in-permitting-process/).

[17] The cases cited by Defendants do not compel a different result. For instance, *Polin v. Conductron Corp.*, 340 F. Supp. 602, 605-07 (E.D. Pa. 1972), was a case decided nearly 50 years ago before documents were produced as ESI and cloud-based platforms were available. There, the court transferred a case with derivative claims and class claims arising from a merger of Conductron and McDonnell Douglas based on the facts that (a) both companies were headquartered in the Eastern District of Missouri, (b) of the 90 non-party witnesses identified as trial witnesses by defendants, 75 lived in the St. Louis area, and (c) there were a large number of documents relevant to the case, almost all of which were located in the St. Louis area. Given the era of the case and these findings, the court found a "severe burden and expense … would be placed on the defendants for photocopying or making the originals available in Philadelphia for further discovery or trial." And in *Blass v. Capital Int'l Security Grp.*, No. 99-CV-5738 (FB), 2001 WL 301137 (E.D.N.Y. Mar. 23, 2001), the court ordered the transfer of a putative class action to the Middle District of Florida, where the corporate defendant had its principal place of business, because, *inter alia,* (a) defendants had identified a number of non-party witnesses who would be called to testify about the company's business and disclosure practices, most of whom were located in Florida, including witnesses who could be unable or unwilling to attend a trial held in New York; (b) plaintiff had not identified any non-party witnesses; (c) the company did not have any physical facilities or employees outside of Florida; (d) the locus of the operative facts was found to be in Florida; and (e) because all of the company's operations were in Florida, a transfer would facilitate discovery.

Lead Plaintiff distinguishes the other cases cited by Defendants in the section below pertaining to "first-filed cases," many of which also discussed § 1404 venue transfer factors.

the pipeline project, Energy Transfer entered into numerous agreements, including court and commission-approved settlements, that require continuing compliance with the agreements' terms and conditions, which are to be performed in Pennsylvania and in this District, as well as satisfying its disclosure obligations to Commonwealth and County officials and to landowners and community members who live and work in areas impacted by the pipelines.[18]

Further, although Defendants argue that defending this case in Texas would be more convenient for them than defending the case in Pennsylvania, they fail to present the type of evidentiary basis required to support their argument. As noted in *In re Nematron Corp. Sec. Litig.,* 30 F. Supp. 2d 397, 400 (S.D.N.Y. 1998), a case cited by Defendants: "[I]n considering the motion for transfer, a court should not disturb a plaintiff's choice of forum 'unless the defendants make ***a clear and convincing showing*** that the balance of convenience favors defendants' choice.'" (citation omitted). *Nematron* and two other cases cited by Defendants establish that such a clear and convincing showing cannot be made absent the submission of affidavits that provide an evidentiary basis for the transfer motion. *See id.* at 400 (a movant "'must support the transfer application ***with an affidavit containing detailed factual statements*** …, including the potential principal witnesses expected to be called and a general statement of the substance of their testimony'"); *Job Haines Home for the Aged v. Young,* 936 F. Supp. 223, 228 (D.N.J. 1996) (the court should consider "whether the moving party ***submitted adequate data or record*** to facilitate an appropriate analyses"); *Blass,* 2001 WL 301137, at *4 ("the moving party ***must support its***

---

[18] *See, e.g.,* Golan Decl., Exs. 16, Corrected Stipulated Order, in *Clean Air Council, et al. v. Commonwealth of Pennsylvania, Dept. of Environmental Protection,* EHB Docket No. 2017-009-1 (Pa. EHB, dated Aug. 17, 2017), and 17, Stipulation of Settlement, in *Clean Air Council, et al. v. Commonwealth of Pennsylvania, Dept. of Environmental Protection,* EHB Docket No. 2017-009-1 (Pa. EHB, dated July 26, 2018). *See also* Golan Decl., Ex.13, PA DEP letter of February 13, 2017, Special Conditions in Water Obstruction and Encroachment Permit, at 4-15 (identifying extensive compliance requirements and deficiencies to be remediated).

*application with affidavits containing detailed factual statements relevant to the factors*, …, that the court should consider on a motion to transfer").  Here, other than submitting two earlier-filed complaints, Defendants have not submitted any sort of "detailed factual" declaration or affidavit that would provide this Court with an evidentiary basis upon which to decide their motion to transfer.  Having failed to do so, Defendants' motion should be denied on this basis alone.[19]

Finally, litigating this matter in the Eastern District of Pennsylvania would not be unfair to Defendants.  In *Heckmann*, the Magistrate Judge found that the corporate defendant had "no ground to complain about [the plaintiff's] forum preference because, by incorporating in Delaware, it chose to avail itself of the protections and benefits of Delaware law and, thereby, expose itself to litigation here."  2010 WL 3940815, at *3; *see also In re Heckmann*, 2011 WL 1219230 (adopting Report and Recommendation, and denying motion to transfer).  Here, Energy Transfer developed a major source of its business operations by associating with and then acquiring Sunoco, by developing its $3 billion Mariner East project, and by expanding its Marcus Hook export facilities.  From 2012 to the present, Energy Transfer commenced and participated in extensive regulatory and court proceedings in Pennsylvania, and responded to the hundreds of violations and deficiencies that were identified along the way, including (a) seeking the permits and approvals necessary to develop, build and operate the Mariner East 2 and 2X pipelines from the PA DEP and the PA PUC, and (b) invoking the Commonwealth's eminent domain powers to take tracts of land for the pipelines.[20]

---

[19] To the extent that Defendants attempt to supplement the record in connection with their reply brief, the Court should reject any such belated effort.  *See In re Glob. Cash Access Holdings, Inc. Sec. Litig.,* No. 08 Cv. 3516 (SWK), 2008 WL 4344531, at *4 (S.D.N.Y. Sept. 18, 2008) ("Nor will this Court consider the witness list and descriptions set forth for the first time in the defendants' reply brief.") (also cited by Defendants).

[20] *See* Golan Decl., Exs. 2-4, 6, 11-13, 16-17, *supra*.  For materials relating to Energy Transfer's use of the Commonwealth's eminent domain power to take properties, *see In re Sunoco Pipeline,*

Indeed, maintaining this Action in this District would simply be a continuation of a string of cases and investigations pending against Energy Transfer in this area.  In addition to the FBI investigation taking place in Pennsylvania, there are myriad, other serious actions that have been commenced against Energy Transfer within the Eastern District of Pennsylvania.  These include:

➢ Criminal charges brought by the Chester County District Attorney stemming from Energy Transfer's use of public constables in Pennsylvania to serve as private security guards at the pipeline properties.[21]  In that case, the head of security for the pipelines' operator, Energy Transfer Partners, and four security contractors are charged with bribery, conspiracy, and related offenses, including that they paid 19 constables more than $230,000 over two years "to improperly patrol the pipeline route while wearing their uniforms and badges and carrying their firearms to act 'as a deterrent.'"  *Id.*;

➢ The Chester County DA sought to halt construction of the Mariner East 2 pipeline on two county-owned properties, which threatened to, at the least, postpone and make more expensive Energy Transfer's construction plans.[22];

➢ Pennsylvania's Attorney General announced on March 13, 2019, that his office commenced an investigation into the pipeline, as a joint investigation with the Delaware County District Attorney, and allegations of criminal misconduct.[23]; and

---

*L.P.*, 143 A.3d 1000 (Pa. Commw. Ct., July 14, 2016), *appeal denied, In re Condemnation By Sunoco Pipeline, L.P. of Permanent*, 164 A.3d 485 (Pa. 2016); *see also* Golan Decl., Exs. 18, "Whose gas is it anyway?," StateImpact Pennsylvania, Aug. 4, 2016 (accessible at: https://stateimpact.npr.org/pennsylvania/2016/08/04/whose-gas-is-it-anyway/), 19, "Invoking power of eminent domain, gas industry runs roughshod over private property," StateImpact Pennsylvania, May 10, 2016 (accessible at: https://stateimpact.npr.org/pennsylvania/2016/05/10/39687/), and 20, "Split Pa. court hands property owners a loss in fight against land seizures for Sunoco pipeline," Pennsylvania Real-Time News, posted July 14, 2016 (updated Jan. 5, 2019) (accessible at: https://www.pennlive.com/news/2016/07/split_pa_court_hands_property.html) (reporting that the Commonwealth Court affirmed a finding that Sunoco was a "public utility corporation" recognized by the PA PUC, and that it had the power to condemn land for the Mariner East 2 pipeline).

[21] Golan Decl., Ex. 21, "Mariner East Pipeline Employees, Contractors Illegally Paid State Constables In 'Buy-A-Badge' Scheme, DA Says," Philadelphia Inquirer, Dec. 3, 2019 (accessible at: https://www.inquirer.com/news/mariner-east-pipeline-workers-state-constables-chester-county-tom-hogan-20191203.html).

[22] Golan Decl., Ex. 22, "Chester County appeal denied in Mariner East 2 pipeline case," Reading Eagle, Feb. 19, 2020 (accessible at: https://www.readingeagle.com/news/chester-county-appeal-denied-in-mariner-east-pipeline-case/article_27bd7cde-5353-11ea-b056-63a6ab05d00f.html).

[23] Golan Decl., Ex. 23, "Pa. attorney general launches investigation into Mariner East II pipeline," Pennsylvania Real-Time News, March 13, 2019 (accessible at:

➢ Various public advocacy, environmental and safety groups, and landowners have sued based on alleged environmental and safety violations that the Company is causing in Pennsylvania, which appear relevant to the public corruption allegations against the Company because that made the permitting process in Pennsylvania longer and more complicated for Energy Transfer.[24]

In sum, as shown above, each of the private interest factors supports denying the transfer motion and allowing this Action to be maintained in this District.  And, in any case, Defendants' attempt to shift their perceived inconveniences onto Lead Plaintiff "is not a proper basis for transfer."  *Eliminator Custom Boats v. Am. Marine Holdings, LLC*, No. EDCV 06-15-VAP(SGL), 2006 WL 4941830, at *15 (C.D. Cal. Aug. 31, 2006).

### B.    The Public Interest Factors Also Support Litigating this Action in this District

The public interest factors also favor allowing this Action to proceed in this District, and certainly do not assist Defendants in meeting their heavy burden of establishing a need to transfer this case.  The "public interest" factors governing a venue transfer motion include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from

---

https://www.pennlive.com/news/2019/03/pa-attorney-general-launches-investigation-into-mariner-east-ii-pipeline.html).

[24] *See, e.g.,* Golan Decl., Ex. 24, "Pennsylvania halts permits for Mariner East 2 pipeline company," Philly Voice, Feb. 8, 2019 (accessible at https://www.phillyvoice.com/pennsylvania-halts-permits-mariner-east-2-pipeline-company/); 25, "New sinkhole opens up along Mariner East 2 pipeline in Delaware County," Philly Voice, Sept. 14, 2019 (accessible at: https://www.phillyvoice.com/new-sinkhole-opens-along-mariner-east-2-pipeline-delaware-county/); 26, "In court, seven people who live near Mariner East pipelines will urge a regulator to stop the project for good.  It might be their last chance," StateImpact Pennsylvania, Oct. 21, 2019 (accessible at: https://stateimpact.npr.org/pennsylvania/2019/10/21/in-court-seven-people-who-live-near-mariner-east-pipelines-will-urge-a-regulator-to-stop-the-project-for-good-it-might-be-their-last-chance/); and 27, "Work resumes on Mariner East pipeline," Fox29.com, Jan. 24, 2020 (accessible at: https://www.fox29.com/news/work-resumes-on-mariner-east-pipeline).  *See also* Golan Decl., Ex. 28, "Mariner East opponent heads to appeals court to obtain PUC risk assessment," WHYY.org, July 30, 2019 (accessible at: https://whyy.org/articles/mariner-east-opponent-heads-to-appeals-court-to-obtain-puc-risk-assessment/).

court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Jumara,* 55 F.3d at 879-80 (citations omitted); *see also Boston Scientific,* 532 F. Supp. 2d at 654.[25]

In terms of the ease and ability to present this case for trial, as shown above there are significant witnesses not associated with any of the parties who may be compelled to appear at the trial of this Action in Philadelphia, but could not be compelled to appear at a trial in Dallas. Further, presenting this case in the Eastern District of Pennsylvania would entail far less expense to the Class than presenting it in the Northern District of Texas, in part because the two law firms selected by Lead Plaintiff to serve as its counsel have their respective offices in Philadelphia and New York City.   Transfers should not be granted when the result would "merely shift" inconveniences from the defendant to the plaintiff.  *See Flotsam,* 2007 WL 1152682, at *2.  And, in any case, if deposition testimony is sought from the Individual Defendants or other Energy Transfer personnel regularly located in Texas, Lead Counsel will agree to conduct such depositions in Texas rather than requiring the witnesses to travel to Pennsylvania for their depositions.

The relative congestion of the two fora also supports maintaining this Action in this District.  First, as of September 30, 2019, the last judicial reporting period, whereas each Judge on average in the Eastern District of Pennsylvania had 379 pending cases, each Judge on average in the Northern District of Texas had 1,349 pending cases – over three times as many.  Similarly, as of the same reporting period date, while the Eastern District of Pennsylvania had 1,512 civil cases over three years old (21.9% of all civil cases), the Northern District of Texas had 8,845 civil cases

---

[25] Here, because this Action involves claims brought under the federal securities laws against a seemingly solvent corporate defendant, the enforceability of a judgment, public policies of the fora, and familiarity of the trial judge with state law factors are not applicable.

over three years old (62.5% of all civil cases).[26]  Thus, as in *Boston Scientific,* where the court denied the defendant's motion to transfer, Lead Plaintiff in this Action "seeks a timely resolution of its claims and, on this record, there is no indication that transfer will facilitate that end."  532 F. Supp. 2d at 656.

Finally, there is a strong local interest in this District in deciding the claims in this case. While courts nationwide may have a generalized interest in ensuring that companies comply with the federal securities laws, in this case the underlying misconduct stems from alleged coercion and public corruption that took place within Pennsylvania, potentially involving the Governor's administration and the Commonwealth's agencies.  Indeed, there is clearly a definite local interest in matters dealing with the Mariner East pipeline projects, as seen, *inter alia,* by the many articles cited just in this opposition to the transfer motion, as well as the investigations and charges that the Chester County District Attorney and the State Attorney General have commenced with regard to other aspects of the Mariner East projects – all of which further supports maintaining this Action in this District.

## II.  The "First-Filed Rule" Does Not Support Transferring this Action to Texas

Defendants further base their transfer motion on the fact that there was a derivative case complaint filed in the Northern District of Texas on December 7, 2019, while Allegheny County filed its securities class action complaint about a month later, on January 10, 2020.  Third Circuit law holds the "first-filed rule" is a "comity-based doctrine" that applies to situations in which "*duplicative lawsuits* are filed successively in two different federal courts."  *Chavez v. Dole Food Co.*, 836 F.3d 205, 210 (3d Cir. 2016).  The rule was designed so that the party "who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual

---

[26] *See* Golan Decl., Ex. 29 (U.S. District Court – Judicial Caseload Profiles).

system permits, be free from the vexation of subsequent litigation over the same subject matter."

*Id.* at 216 (citation omitted).  However, application of the rule "is discretionary."  *Id.* at 210.  As

the Third Circuit stated in *E.E.O.C. v. Univ. of Pennsylvania,* 850 F.2d 969, 971-72 (3d Cir. 1988)

(citations omitted):

> The first-filed rule encourages sound judicial administration and promotes comity
> among federal courts of equal rank.  It gives a court "the power" to enjoin the
> subsequent prosecution of proceedings ***involving the same parties and the same
> issues*** already before another district court. … That authority, however, is not a
> mandate directing wooden application of the rule without regard to rare or
> extraordinary circumstances, inequitable conduct, bad faith, or forum shopping.
> ***District courts have always had discretion to retain jurisdiction given appropriate
> circumstances justifying departure from the first-filed rule***.[27]

Two lines of authority have developed in the Third Circuit concerning the "first-filed rule."

One line of cases, citing to the Third Circuit's decisions in *Grider v. Keystone Health Plan Cent.,*

*Inc.,* 500 F.3d 322 (3d Cir. 2007) and *Complaint of Bankers Tr. Co. v. Chatterjee,* 636 F.2d 37 (3d

Cir. 1980), require practically identical claims between identical parties from the same

circumstances for the rule to apply.  *See, e.g., Century Indem. Co. v. Certain Underwriters at*

*Lloyd's,* No. 09-94, 2010 WL 92531, at *3 (E.D. Pa. Jan. 11, 2010); *CertainTeed Corp. v. Nichiha*

*USA, Inc.,* No. 09-3932, 2009 WL 3540796, at *3-4 (E.D. Pa. Oct. 29, 2009).  In *Chatterjee,* the

Court stated that the first-filed rule requires that "only truly duplicative proceedings be avoided.

When the claims, parties or requested relief differ, deference may not be appropriate."  636 F.2d

at 40.  In *Grider,* the Court stated that for the rule to apply, the second-filed case "must be truly

duplicative … that is … materially on all fours with the [first-filed case]."  It continued: "The

---

[27] In *EEOC v. Univ. of Pennsylvania,* the defendant asserted that a district court "must always
exercise its discretion by dismissing the second-filed action" and that the first-filed rule "is a firm
legal principle requiring dismissal of the second-filed suit without regard to the circumstances of
the case."  To that argument, the Court stated: ***"We disagree."***  *Id.* at 976.

issues must have such an identity that a determination in one action leaves little nothing to be determined in the other."  500 F.3d at 333 n.6.  Clearly, under this line of authority, given that the parties do not align in this Action and in the Texas Derivative Action, the causes of action do not align, a ruling in Lead Plaintiff's favor on the federal securities claims in this Action will not determine the outcome on the common law claims asserted in the Texas Derivative Action, and the existence of a demand futility defense that can be raised in the Texas Derivative Action but not in this Action, the first-filed rule would not apply.

The second line of cases have adopted a more flexible approach, finding that the rule may apply to cases that are substantially similar to one another.  *See, e.g., Palagano v. NVIDIA Corp.*, No. 15-1248, 2015 WL 5025469, at *2 (E.D. Pa. Aug. 25, 2015) (collecting cases).  This line of cases does not require that the two cases be "mirror image cases where the parties and the issues perfectly align."  *Id.*  Rather, they allow for transfers "where the subject matter of the later filed case substantially overlaps with that of the earlier one."  *Id.* (*quoting Villari Brandes & Kline, PC v. Plaintfield Specialty Holdings II, Inc.*, No 09-2552, 2009 WL 1845236, at *6 (E.D. Pa. June 26, 2009)).  But even when a more flexible approach is utilized, in this Circuit and elsewhere, for the rule to apply, "the 'claims, parties, and available relief' must not 'significantly differ between the actions.'"  *Oleg Cassini, Inc. v. Serta, Inc.*, No. 11 Civ. 8751 (PAE), 2012 WL 844284, at *3 (S.D.N.Y. Mar. 13, 2012).  Moreover, under this approach, while the issues need not be identical and the named parties need not be entirely the same, for the first-filed rule to apply, the parties must "represent the same interests."  *Id.*[28]

---

[28] There are very significant differences between this Action and the Texas Derivative Action, which was brought in the wake of the federal securities class case initially filed in the Northern District of Texas and drew heavily from the allegations in that initial federal securities class complaint.  *See generally* Golan Decl., Ex. 10, Chart Comparing Allegheny County Action and Texas Derivative Action.

*[footnote continued on next page]*

Accordingly, even under this second, more flexible approach that some courts have utilized, this Action is not a "second-filed case" that should be transferred to the District in which the Texas Derivative Action was filed. A comparison of this case with the cases cited by Defendants demonstrates this point. For instance, in *Palagano*, the court found that the plaintiff's lawsuit "states substantially similar claims, and arises from the exact same conduct, as the 12 other lawsuits consolidated in the Northern District of California," that all of the cases were brought on behalf of purchasers of the same NVIDIA product, that the same questions of law and fact were at

---

First, the plaintiffs in the two actions do not "represent the same interests." Lead Plaintiff here represents purchasers of Energy Transfer units and seeks to recover damages ***from Energy Transfer***, while in the Texas Derivative Action the plaintiff is a unitholder who brought the case as a derivative action and seeks damages ***on behalf of Energy Transfer***. Notably, one of the elements of the damages the derivative plaintiff will seek on behalf of the Company are for any fees or judgment ***that the Company incurs from this Action***, thus clearly establishing that this Action should proceed first and as the primary case.

Second, in recognition of the ordering of the two cases, the parties in the Texas Derivative Action – including the three Individual Defendants named as well in this Action – have stipulated that the plaintiff in the Texas Derivative Action will not be required to file his operative complaint until 45 days ***after the filing of Lead Plaintiff's operative complaint in this Action***. *See* Golan Decl., Ex. 30, Stipulation [and Proposed Order], filed Feb. 10, 2020, in the Texas Derivative Action, which defines *Allegheny County v. Energy Transfer* as the "Class Action" and provides in paragraph 1 (page 2), that "Within 45 days of the filing or designation of an Operative Complaint in the Class Action, Bettoil shall file an amended Complaint in this Action or a stipulation indicating that he does not intend to file such an amended Complaint."

Third, there is no threat of inconsistent verdicts between the two cases, since the federal securities claims at issue here are not part of the Texas Derivative Action plaintiff's case. Indeed, as shown by the damages the Texas Derivative Action plaintiff seeks and the ordering of the cases that the parties in that Action themselves have agreed upon, the Texas Derivative Action will wait to see if Lead Plaintiff in this Action proves the federal securities violations alleged here. If Lead Plaintiff does that, then the Texas Derivative Action plaintiff will claim, on behalf of Energy Transfer, damages for any fees and judgment that the Company may be required to pay in this Action. But the Texas Derivative Plaintiffs also asserts other damages claims.

None of this requires a transfer of this Action to the Northern District of Texas. To the contrary, Defendants' seeking to transfer this Action to Texas on the basis of the Texas Derivative Action is a textbook example of their seeking to have the tail wag the dog.

issue in all of the cases, and that the plaintiff's counsel in the later-filed case "was unable to articulate any compelling distinctions or differences."  2015 WL 5025469, at *4.

In *Catanese v. Unilever,* 774 F. Supp. 2d 684, 687 (D.N.J. 2011), the court transferred the later-filed action, but only after finding that "the overlapping subject matter of these two actions cannot be denied with a straight face."  It found that both actions named Unilever as the corporate defendant, both identified Unilever's Breyers ice cream brand as the target product, and both asserted claims on behalf of a nationwide class of consumers who purchased Breyers ice cream containing alkalized cocoa.  *Id.*  Further, both complaints alleged that the plaintiffs relied upon Breyers' misrepresentations concerning the same type of ice cream that they bought; both brought claims for consumer fraud and unjust enrichment; and both sought similar relief, including disgorgement of profits, an injunction and damages.  *Id.*[29]

Defendants' other cited cases arose from fact patterns vastly different from this Action.  In *Villari Brandes & Kline,* the plaintiff in the case filed in this District **admitted that it filed its lawsuit to stop an earlier lawsuit that had been filed in Michigan,** stating expressly in its opposition to the motion to transfer that "Villari's Complaint and Plainfield's Michigan First Amended Complaint **involve precisely the same issue.**"  2009 WL 1845236, at *6.

---

[29] In contrast, here, (a) Lead Plaintiff asserts federal securities law claims while the Texas Derivative Action plaintiff asserts breach of fiduciary duty and other common law claims; (b) Lead Plaintiff seeks a recovery on behalf of a class of purchasers of Energy Transfer stock, while the Texas Derivative Action plaintiff seeks a recovery on behalf of the Company; (c) Lead Plaintiffs is proceeding against Energy Transfer, while the Texas Derivative Action plaintiff seeks to proceed on behalf of Energy Transfer; (d) Lead Plaintiff asserts reliance on the claimed misrepresentations in Energy Transfer's SEC filings and other public statements, while the Texas Derivative Action plaintiff makes no claim on behalf of Energy Transfer that it relied to its detriment on its own public statements; (e) Lead Plaintiff has class allegations, presumption of reliance, and market efficiency issues to litigate, which are not at issue in the Texas Derivative Action; and (f) the Texas Derivative Action plaintiff made derivative and demand futility allegations that are not at issue in this Action.  *See also* Golan Decl., Ex. 10.

In *The Phoenix Ins. Co. Ltd. v. Teva Pharm. Indus. Ltd.,* 381 F. Supp.3d 416 (E.D. Pa. 2019) and *Huellemeier v. Teva Pharm. Indus. Ltd.,* No. 1:17-cv-485, 2017 WL 5523149 (S.D. Ohio, Nov. 17, 2017), the complaints were filed on behalf of purchasers of Teva securities ***after many other similar cases, also brought on behalf of purchasers of Teva securities, had been transferred to the District of Connecticut, where a lead plaintiff had already been appointed in a consolidated class action brought under the PSLRA and the court had already issued certain rulings***.  The court found that the consolidated class case "encompasses most of the defendants and allegations present in this action"; "the claims in both actions are nearly identical," and that "plaintiffs in both cases rely upon nearly identical theories of liability."  *Phoenix Ins. Co.,* 381 F. Supp.3d at 421-22.  Judge Diamond also noted that transfer of later-filed cases "permits courts to consolidate similar cases by transferring later-filed cases for consolidation with the first-filed case."  *Id.* at 419.  Here, of course, Lead Plaintiff and the plaintiff in the Texas Derivative Action are not similarly situated; they are not relying on "nearly identical theories of liability," they are not asserting "nearly identical" claims; and under no circumstances could Lead Plaintiff's federal securities class action be consolidated with the derivative case pending in the Northern District of Texas.[30]

---

[30] Other cases cited by Defendants are similarly distinguishable.  In *City of Pontiac Gen. Employees' Ret. System v. Wal-Mart Stores, Inc.*, No. 3-12-0457, 2012 WL 12543462, at *1-2 (M.D. Tenn. July 25, 2012), the plaintiff was headquartered in Michigan but brought its case in Tennessee, where "neither Plaintiff, Defendant, nor the alleged misconduct ha[d] any substantial connection."  As the court found, the proposed transferee forum "bears a much stronger connection to the events underlying this action than does Tennessee, which has no greater connection than any other district in which any potential class member resides."  The plaintiff had identified no witnesses who lived in Tennessee, and the court found that it was not in the public interest to empanel a jury in Tennessee "to hear a case having no connection to this district."

In *Yang v. Odom,* 409 F. Supp. 2d 599 (D.N.J. 2006), the court granted a transfer motion based on the facts, *inter alia,* that (a) there were three other class actions that were pending in the Northern District of Georgia, and plaintiffs admitted that their claims were substantially identical to the claims in those cases; (b) those cases were far along in their proceedings, having gone through

Finally, in *Goggins v. Alliance Capital,* 279 F. Supp. 2d at 230-34, while a later-filed securities class case was transferred to a district with earlier-filed derivative case complaints, (a) the plaintiffs in the later-filed case did not reside where they filed their case; (b) there were already six cases consolidated in the district with the earlier-filed cases; (c) there had been other cases previously transferred to that district; (d) as part of pre-transfer discovery, the defendants provided a list of 14 individuals who could have relevant knowledge concerning plaintiffs' claims, including six that resided in the district to which the transfer was sought and only one in the forum of the later-filed case; (e) the derivative case also alleged violations of federal securities laws, similar to the later-filed securities fraud case; and (f) plaintiffs conceded that all of the likely witnesses were either parties or employees of parties, so that service of process would not pose a problem in either venue. Here, in contrast, there are no securities law claims asserted in the Texas Derivative Action; Defendants have not provided any list of individuals who may have relevant knowledge concerning Lead Plaintiff's claims; there are witnesses in Pennsylvania who ***are not*** parties or employees of parties; and no other cases have previously been identified as similar to the Texas Derivative Action and transferred to the Northern District of Texas.

---

class certification and summary judgment phases; (c) the plaintiffs in *Yang* had filed their case in New Jersey, fearing that their claims might be time-barred if brought in Georgia; (d) none of the plaintiffs were residents of New Jersey; (e) while most of the 61 witnesses identified by defendants lived in Georgia, only one potential witnesses lived in New Jersey, and none of the others lived within a 100-mile radius of New Jersey; and (f) the Judge in the cases pending in Georgia was already very familiar with the facts and legal questions underlying the lawsuit.

And in *Stein v. Immelt,* No. 3:09-CV-808 (RNC), 2010 WL 598925 (D. Conn. Feb. 18, 2010), the court transferred a derivative action involving General Electric Co. ("GE") to the Southern District of New York, the district in which seven earlier-filed securities class actions had already been consolidated and a lead plaintiff had been appointed. Among other factors, the court found that 24 of the 26 individual defendants in the derivative case were also defendants in the consolidated class action; the cases were all based on press releases, public filings, a website statement and other materials disseminated in connection with an offering of GE stock; there was no indication that any nonparty witness was beyond the 100 mile radius of either court's subpoena power; and the substantive law that governed the claims in the derivative case was the law of New York.

Thus, none of the Defendants' cited cases supports their "first-filed case" argument, and this Action should not be transferred to the Northern District of Texas as a "later-filed" case.

## CONCLUSION

For the reasons stated above, Lead Plaintiff respectfully requests that the Court deny Defendants' Motion to Transfer, and maintain this Action in this District, where Allegheny County chose to file it and where Lead Plaintiff seeks to have it litigated.

Dated:  March 20, 2020

Respectfully submitted,

**BARRACK, RODOS & BACINE**

By: */s/ Jeffrey W. Golan*
Jeffrey W. Golan
Robert A. Hoffman
Jeffrey A. Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jbarrack@barrack.com

John C. Browne (*pro hac vice* pending)
Adam W. Wierzbowski (*pro hac vice* pending)
Michael Mathai (*pro hac vice* pending)
Matthew Hough (*pro hac vice* pending)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
adam@blbglaw.com
michael.mathai@blbglaw.com
matthew.hough@blbglaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

32