# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, THOMAS E. LONG, MARSHALL MCCREA, MATTHEW S. RAMSEY, MICHAEL J. HENNIGAN, and JOSEPH MCGINN,<br><br>               Defendants. | **Case No. 2:20-cv-00200-GAM**<br><br>**OPERATIVE CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE ...................................................................... 12

III.    PARTIES ........................................................................................................ 13

        A.      Lead Plaintiffs ................................................................................... 13

        B.      Defendants ......................................................................................... 14

IV.     SUMMARY OF THE FRAUD ...................................................................... 16

        A.      Energy Transfer Embarked on the Simultaneous Construction of Several
                Pipeline Projects Through Pennsylvania ............................................ 16

        B.      Energy Transfer Was Motivated to Rush Through the DEP's Approval of
                the ME2 Permits to Avoid Public Criticism of the Pipeline's Serious,
                Undisclosed Risks to Human Life ...................................................... 18

        C.      Energy Transfer Obtained the ME2 Permits Through Intimidation and
                Coercion of Government Officials Despite the Applications Being Facially
                Deficient .......................................................................................... 21

                1.      2015:  Energy Transfer Begins the Permitting Process for ME2 ............. 24

                2.      March-May 2016:  After DEP Secretary Quigley Warned Sunoco
                        that DEP Would Deny the ME2 Permits, the Governor "Ushered
                        [Him] Out" ............................................................................ 26

                3.      Energy Transfer's Permits for ME2 Were Riddled with
                        Deficiencies ............................................................................ 28

                4.      The Pennsylvania DEP Was Statutorily Required to Deny
                        Deficient Permits ..................................................................... 31

                5.      The Governor's Office Exerted Undue Pressure on the DEP to
                        Approve the Permits, Which Sailed Through Despite the
                        Deficiencies ............................................................................ 34

        D.      Energy Transfer Ruins Lisa Drive, Bribes Government Officials to
                Intimidate Local Residents and Creates the "Frankenpipe" (Which Causes
                Delay and Reduces the ME2 Throughput) ............................................ 42

1.      August 2017:  As a Result of Litigation, Energy Transfer Is Forced to Re-Evaluate the Risk Profiles of 63 HDD Sites, Including Sites in the Vicinity of Lisa Drive .................................................................... 44

2.      November 2017:  An Outside Consultant Tells Sunoco to Stop Using HDD in the Exton Area Near Lisa Drive, Yet Sunoco Proceeds and Causes Dangerous Sinkholes .............................................. 49

3.      2017 Through 2019:  Energy Transfer Bribes Pennsylvania State Constables to Intimidate Homeowners on Lisa Drive and Throughout Pennsylvania .......................................................................... 56

4.      2018:  Energy Transfer Cobbles Together a Nearly 100-Year-Old, 12-Inch Pipe with the 20-Inch ME2 Pipe to Create a "Frankenpipe" Through the Pipeline Route Near the Lisa Drive Sinkholes .................... 58

5.      December 2018:  Chester County Launches an Investigation of Energy Transfer ....................................................................................... 63

6.      December 2019:  DA Hogan Files Criminal Charges Against Energy Transfer's Security Chief for Bribing Pennsylvania State Constables to Intimidate Homeowners .................................................... 65

E.      Energy Transfer's Revolution Pipeline Explodes, Rendering the Revolution Pipeline Inoperative to this Day ........................................................ 76

1.      Energy Transfer Commits Hundreds of Permit Violations When Constructing the Revolution Pipeline ...................................................... 80

2.      September 2018:  Energy Transfer's Egregious Misconduct Causes the Revolution Pipeline to Explode ......................................................... 87

3.      Energy Transfer's Response to the Revolution Explosion Worsens Investors' Losses .................................................................................... 90

4.      Energy Transfer's Post Explosion Misconduct and Misrepresentations .................................................................................. 93

F.      Energy Transfer's Reckless Pipeline Construction Resulted in Scores of Additional Violations, Regulatory Scrutiny and Consent Orders ........................ 99

1.      July 2017:  Sunoco Enters Into a Consent Order for Its Repeated ME2 Permit Violations that Polluted Drinking Water .............................. 99

2.      Energy Transfer Destroys the Loyalhanna and Raystown Lakes ............. 99

3.      December 2017:  DEP Issues a Consent Order to Energy Transfer ....... 104

4.     January-February 2018:  DEP Temporarily Suspends Construction
       of ME2, and Issues a $12.6 Million Fine ................................................. 104

5.     April 2018:  The DEP Orders Energy Transfer to Pay $355,000 for
       Multiple Violations of Pennsylvania Law ............................................... 109

6.     March-May 2018:  The Public Utility Commission Orders a
       Temporary Shutdown of ME1 and a Judge Halts ME2 Work ............... 110

7.     August 2018:  The DEP Fines Energy Transfer $147,000 for
       Contaminating Private Water Supplies ................................................... 112

8.     August 2019:  The DEP Fines Energy Transfer $318,000 for More
       Than 100 Violations of Pennsylvania Law ............................................. 112

G.     November 2019:  The FBI Launches Its Investigation into the
       Pennsylvania Governor's Office Related to the Permitting Process ................. 113

H.     Despite Energy Transfer's Prior Claims of Purported Pipeline Completion,
       The Intended ME2 Pipeline Remains Unfinished to this Day ........................... 113

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
       AND OMISSIONS ..................................................................................................... 115

A.     Energy Transfer Misstated Revolution's and ME2's Completion Timelines
       and ME2's Throughput, and Hid Contrary Undisclosed Facts .......................... 116

B.     Energy Transfer Falsely Claimed It Was Constructing Its Pipelines Safely
       and Preserving and Protecting the Environment ................................................. 134

C.     Energy Transfer Hid Its Violations of Criminal Statutes and Misstated Its
       Compliance with Its Code of Business Conduct and Ethics .............................. 142

VI.    LOSS CAUSATION – THE TRUTH IS REVEALED TO INVESTORS .................... 148

A.     August 9-13, 2018:  Energy Transfer Discloses that the Problems with the
       Pipeline Require It to Cobble Together Old and New Pipe, Which Will
       Reduce Throughput and Delay Completion of the ME2 Pipeline ..................... 149

B.     October 27-29, 2018:  The DEP Orders Energy Transfer to Stop Work on
       the Revolution Pipeline ...................................................................................... 154

C.     December 19-21, 2018:  Chester County Launches an Investigation Into
       Energy Transfer .................................................................................................. 157

D.     August 8-12, 2019:  Chester County Charges the Constables Hired by
       Energy Transfer with Bribery ............................................................................ 159

E.      November 12-13, 2019:  The *Associated Press* Discloses the FBI's
        Investigation into Energy Transfer's Alleged Bribery of Pennsylvania
        Officials ................................................................................................... 162

F.      December 3, 2019:  Chester County Charges Energy Transfer's Security
        Supervisor with Bribery ...................................................................... 164

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER ....................................... 168

A.      Senior Energy Transfer and Sunoco Executives Were Personally Involved
        in Pressuring the Governor's Office and DEP to Grant the Pipeline
        Permits ................................................................................................. 169

B.      Energy Transfer Bribed Pennsylvania Constables to Intimidate Residents
        and Minimize Protests .......................................................................... 169

C.      Energy Transfer Executives Knew in Early 2018 that Placing ME2 in
        Service in 2018 Was Impossible without Cutting Corners ................... 172

D.      The Pipeline Project Was the Largest Infrastructure Project in the History
        of Pennsylvania, Necessarily Drew the Attention of Energy Transfer's
        Senior Executives, and Was the Subject of Intense Investor and Press
        Scrutiny Throughout the Class Period ................................................. 174

E.      The Pipeline Projects Were the Subject of Intense Regulatory Scrutiny,
        and the Announcement of Each Investigation Further Placed Defendants
        on Notice of the Problems with the Pipelines ...................................... 176

F.      Defendant McCrea Had Personal Knowledge of the Revolution Failures
        that Contributed to the Subsequent Explosion .................................... 178

G.      The Revolution Pipeline Explosion and the Sinkholes on Lisa Drive Put
        Energy Transfer on Notice of the Serious Risks Associated with
        Constructing the Pipeline Projects in Pennsylvania ............................ 178

H.      Energy Transfer CEO Warren Admitted to Knowing About Energy
        Transfer's Failures Related to the Pipeline Projects in Pennsylvania ................. 180

I.      Energy Transfer CFO Long Assured Investors Each Quarter that Energy
        Transfer Was Committed to Safely and Responsibly Bringing ME2 into
        Service and Admitted to Energy Transfer Making Mistakes .............................. 181

J.      Energy Transfer Knew That Pennsylvania's Geology Provided Challenges
        But Rushed Forward On Construction Through Known Areas of Risky
        Terrain Such As Lisa Drive In Order To Complete The Pipeline ...................... 182

K.      Defendants Held Themselves Out as Knowledgeable Concerning the
        Topics About Which They Spoke ........................................................ 182

VIII.   PRESUMPTION OF RELIANCE ................................................................. 183

IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................... 184

X.   CLASS ACTION ALLEGATIONS ................................................................. 184

XI.   CAUSES OF ACTION ................................................................................. 185

COUNT I ................................................................................................. 185

COUNT II ............................................................................................... 189

XII.   PRAYER FOR RELIEF ............................................................................... 190

XIII.   DEMAND FOR TRIAL BY JURY ................................................................. 190

The Court-appointed Lead Plaintiff, which is comprised of Allegheny County Employees' Retirement System, Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge, Denver Employees Retirement Plan, IAM National Pension Fund, and Iowa Public Employees' Retirement System (collectively, "Lead Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.

Lead Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by Energy Transfer LP ("Energy Transfer" or the "Partnership") and Sunoco Logistics Partners LP ("Sunoco") (collectively with Energy Transfer, the "Energy Transfer Companies") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by the Energy Transfer Companies; (iii) media and analyst reports concerning the Energy Transfer Companies, their subsidiaries, and their pipeline projects; (iv) transcripts of the Energy Transfer Companies' investor conference calls; (v) communications with former employees of the Energy Transfer Companies and their contractors, as well as other witnesses; (vi) court and regulatory filings; (vii) communications between the Energy Transfer Companies and the Pennsylvania Department of Environmental Protection ("DEP") and the Pennsylvania Public Utility Commission ("PUC"); and (viii) other public and non-public information regarding the Energy Transfer Companies.

## I.  INTRODUCTION

1.      Lead Plaintiffs bring this securities class action against Energy Transfer and certain of the Partnership's senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who purchased or otherwise acquired Energy Transfer common units between February 25, 2017 and December 2, 2019, inclusive (the "Class Period").

2.      Energy Transfer is a natural gas and energy transportation and storage company that operates some of the largest oil and natural gas pipelines in the United States, including the Dakota Access pipeline, the Rover pipeline, and the Mariner East pipeline system.   The Partnership's operations include approximately 12,500 miles of interstate natural gas pipelines and multiple natural gas storage facilities.

3.      This case concerns Energy Transfer's scheme to construct some of the most dangerous pipelines in the United States—the Revolution, Mariner East 2 ("ME2") and Mariner East 2X ("ME2X") pipelines (collectively, the "Pipeline Projects")—while violating critical rules and regulations designed to make the construction and operation of such pipelines safe and to ensure that citizens' best interests are promoted by public officials.   Energy Transfer concealed from investors the serious risks posed by its approach to constructing the Pipeline Projects, its misconduct in obtaining the pipeline permits and intimidating residents as it constructed them, and the fact that it experienced such significant obstacles in constructing the Pipeline Projects that Energy Transfer's claimed in-service dates and throughputs were unachievable and materially misleading when issued.   Defendants' scheme involved Energy Transfer pressuring Pennsylvania government officials to approve the permits for the ME2 pipeline, knowingly disregarding the risk of drilling in Pennsylvania's mine-riddled and limestone-filled geology when it constructed the Pipeline Projects in landslide-prone and sinkhole-prone areas, and hiring and deploying Pennsylvania constables—in uniform—to intimidate residents who were concerned about the consequences of pipeline construction.   This unbridled scheme to complete the Energy Transfer pipelines has destroyed communities, created a serious, looming threat to human life, and in fact delayed the completion of the Pipeline Projects and resulted in reduced ME2 throughput.

4.     Many of the risks to human life and well-being created by the Partnership's approach to constructing the Pipeline Projects have materialized.  Most spectacularly, in September 2018, the Revolution pipeline exploded in a "geyser" of fire, displacing families and incinerating its surroundings.  But problems from construction of the Pipeline Projects were far from isolated:  during the Class Period, ME2's drilling destroyed several lakes, caused numerous sinkholes that ruined neighborhoods, and caused hundreds of "frac-outs"—instances where drilling fluids leaked out and threatened private property and the Commonwealth's water resources. These rampant problems led to harsh regulatory scrutiny, scores of violations and Consent Orders against the Energy Transfer Companies, millions of dollars in fines and penalties, and added delay and costs.

5.     Throughout the Class Period, Energy Transfer hid its misconduct from investors by repeatedly claiming that the Partnership and its subsidiaries had only the safety and well-being of the local Pennsylvania communities at heart, and that it abided by a strict Code of Business Conduct and Ethics (the "Code" or "Code of Conduct").  The Code explicitly forbade executives from "authorizing payment" for "Sensitive Payments"—which included "payments to government[] officials or employees" and "commercial bribes or kickbacks"—"whether lawful or unlawful, designed to secure special treatment for the Partnership Group."

6.     But Energy Transfer hid from investors that, among other things, it had resorted to backroom meetings with regulators to secure the approval of ME2, and that it bribed uniformed Pennsylvania constables to intimidate concerned citizens—instead suggesting that the Partnership was committed to fully complying with the important regulations governing their construction.

7.     Energy Transfer's false and misleading representations on these topics were of critical importance to investors, because the Pipeline Projects are a particularly dangerous "triple

threat" whose risks needed to be managed in order to timely and profitably bring the Pipeline Projects online. The Pipeline Projects are not typical suburban pipelines, carrying gas to heat residential homes and local businesses. When fully completed, they will carry highly-explosive natural-gas liquids ("NGLs")—compressed ethane, butane, and propane. NGLs are not only highly explosive, but also odorless and colorless—with the result that, if a leak were to occur, landowners could not naturally detect it before a minor spark caused a potentially catastrophic explosion. ME2 and ME2X will carry large amounts of NGLs 350 miles, from the Marcellus shale gas fields in western Pennsylvania all the way to the Marcus Hook port approximately 20 miles southwest of Philadelphia. From Marcus Hook, the chemicals will be transported to Scotland and Scandinavia, formed into pellets and made into plastic.

8.      Constructing a pipeline in 21st century Pennsylvania on time and with the planned throughput presented a host of serious challenges and risks. Those included the challenging geology of Pennsylvania, which, in many areas, contains mine voids and other features rendering it especially prone to landslides and sinkholes. Energy Transfer's plan to use Horizontal Directional Drilling ("HDD") to drill under or through challenging geological or high-density residential areas required thorough consideration of numerous safety- and environment-related factors, including ground stability, drinking water aquifers, and residents' private wells—and its proposal to construct an NGL pipeline in the first instance necessitated a careful plan to mitigate the serious, life-threatening risks posed by NGL pipelines and the process of their construction.

9.      When Energy Transfer and Sunoco first applied to the DEP for the permits to construct ME2, the application was riddled with errors and deficiencies that, by statute, should have led to the permits' immediate rejection. As John Quigley, the former Secretary of the DEP told Lead Plaintiffs' Counsel, during his tenure from January 2016 through May 2016, Sunoco

"wasn't even close to submitting a complete application" despite constant communications between the DEP and Sunoco about how to do so.  During a March 2016 meeting between Quigley and Sunoco's President Mark Hennigan, the former Secretary read Hennigan the "riot act" and told Hennigan that Sunoco was going to have to start over because the application was "so woefully inadequate."  In Quigley's words, "They weren't even close to a permit."

10.     Indeed, Sunoco and Energy Transfer failed to conduct basic analysis and testing of the risks associated with building an NGL pipeline through various regions of Pennsylvania, including densely-populated regions such as the Philadelphia suburbs in Delaware and Chester Counties.  Absent from Energy Transfer's permit applications was any recognition that the predicted fatal impacts of accidental releases from the ME2 pipeline could extend up to 2,135 feet from the location of an incident.  The most dangerous points of the pipeline are above-ground valve stations, where the risk of a fatal event is approximately equal to the risk of being killed in a motor vehicle accident.  Furthermore, the risk of fatal accidents along ME2's path increases where ME2 is co-located along the other Energy Transfer pipelines Mariner East 1 ("ME1") and ME2X (collectively with ME1 and ME2, the "Mariner East System"). Energy Transfer's failure to recognize and take into account these clear risks meant that its construction of the Pipeline Projects would be unsafe, and that it would in fact take longer to construct the Pipeline Projects in compliance with the law than the timelines Defendants repeatedly gave investors.

11.     In addition, constructing ME2 in Pennsylvania required Energy Transfer to thoroughly investigate and understand the complex and diverse geology of the land through which ME2 would run.  Energy Transfer did not perform this work.  Instead, Energy Transfer, which is more familiar with constructing pipelines in the comparatively homogenous and less-challenging terrain of other states, recklessly pushed forward with ME2 as if it too were being constructed like

Energy Transfer's pipelines elsewhere.  This was an easily avoidable mistake, especially since it is well-known that Pennsylvania's terrain and geology are full of varying rock and soil formations, including limestone that is particularly prone to sinkholes and other structural disasters.  The result is that, once Energy Transfer began constructing the Pipeline Projects, it caused landslides and sinkholes that resulted in serious delays of the Pipeline Projects and eliminated Energy Transfer's ability to bring the Pipeline Projects online with the claimed initial throughput.

12.     For a company planning to employ HDD through large swaths of Pennsylvania's sub-surface rock formations, including those underneath streams, lakes, and reservoirs, understanding Pennsylvania's geology was critical to preventing catastrophes, such as sinkholes, or contamination of the Commonwealth's water supplies.  In its rush to push through the permit applications, Energy Transfer failed to conduct an adequate investigation, and, accordingly, encountered scores of geological obstacles that have, contrary to Defendants' claims to investors, significantly delayed the in-service dates of the pipelines and resulted in *ad hoc* measures that have drastically cut the ME2 pipeline's throughput.

13.     Against the backdrop of the deficiencies in Energy Transfer's permit application and preparation, following Quigley's March 2016 exchange with Sunoco, Quigley was terminated as DEP Secretary in May 2016.  Quigley subsequently heard that "despite continuing deficiencies, the governor's office ordered my successor to issue the permit, and he capitulated."  Energy Transfer obtained approval to construct ME2 on February 13, 2017, days before announcing Energy Transfer's annual financial results.  The permits were the final regulatory hurdle to begin construction of ME2.

14.     Throughout the Class Period, Defendants repeatedly falsely assured investors that Energy Transfer acted in accordance with its Code of Conduct and that it had lawfully obtained

valid permits to begin construction on ME2.  In reality, unbeknownst to investors, Defendants, acting either independently or in concert with Pennsylvania Governor Tom Wolf's administration, made use of coercion, bribery, and/or other illicit means of forcing the DEP to approve the construction permits that were critical to the development of ME2.  Energy Transfer then proceeded to disregard warnings about dangerous drilling locations and instead built the Pipeline Projects through locations prone to landslides and dangerous sinkholes, which caused significant and costly delays.  To manage the public outcry from a pipeline explosion and sinkholes, Energy Transfer had an "unwritten policy" to hire government officials—Pennsylvania constables—to act as security around Energy Transfer pipeline construction sites.  This constituted bribery under the Pennsylvania criminal statutes and has resulted in several criminal prosecutions, including against Energy Transfer's chief of security for the Pipeline Projects.

15.     Energy Transfer falsely told investors that it was on track to complete the Revolution and ME2 pipelines by specific, hard deadlines and that, when complete, ME2 would have a throughput of 275,000 to 450,000 barrels per day ("bls/d").  For example:

- On May 4, 2017, Defendant Long stated that "Our Revolution project is still on schedule to be in service in the fourth quarter of 2017";

- On February 22, 2018, Long stated that construction on Revolution was "mechanically complete" and that it will go into full service once Rover and Mariner East 2 are in service, and Defendant McCrea added that "sometime in the second quarter [of 2018], we'll have Mariner on and ready to take barrels from Revolution";

- On May 10, 2018, Defendant Ramsey stated that Mariner East 2 would enter service in "mid to late" third quarter 2018; and

- During investor presentations that Defendants made from May 31, 2017 up until August 14, 2018, Energy Transfer touted ME2's "initial capacity" as being 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day.

16.     These claims were highly material to investors, as the in-service dates and throughput of the pipelines would determine when Energy Transfer could reduce its billions of dollars in capital spending devoted to constructing the pipelines, when Energy Transfer could begin transporting NGLs through the pipelines, and at what throughputs.  But, in truth, as a result of the Energy Transfer Companies' repeated regulatory violations and reckless construction mishaps and catastrophes, reaching those deadlines and claimed throughput levels was impossible at the time those claims were made.  As of the date of this Complaint, the Revolution pipeline is still not in service, the full ME2 pipeline remains under construction, and the Partnership brought parts of ME2 in-service only at a reduced throughput of approximately 100,000 barrels per day by combining sections of the planned 20-inch ME2 pipe with the smaller pipe of another, almost 100-year old pipeline.

17.     Defendants also falsely and misleadingly claimed that the Energy Transfer Companies were constructing the Pipeline Projects safely and responsibly.  For instance:

- On November 8, 2017, Long assured investors that Energy Transfer was "very focused on safely and responsibly bringing our projects into service, including . . . the Mariner East [projects]";

- On February 22, 2018, Long reiterated that Energy Transfer "remain[s] committed to working closely with . . . PA DEP and other regulatory agencies and are focused on safely and responsibly bringing Phase 2 of . . . ME2 . . . into service"; and

- On January 26, 2018, *StateImpact* quoted Sunoco spokesperson Jeff Shields as saying that Sunoco goes "above and beyond" state and federal safety regulations, and is building the pipeline under "stringent" environmental regulations.

18.     However, Energy Transfer experienced scores of safety violations, construction problems, and other setbacks during its construction of the Pipeline Projects, including the explosion of the Revolution pipeline, and it engaged in an utter disregard for the well-being of the Pennsylvania residents most directly and negatively impacted by its construction of the Pipeline

Projects, including by illegally and improperly hiring Pennsylvania constables to intimidate them into silence.

19.     Defendants used all of the foregoing materially false and misleading statements to mislead investors, hide the truth from the market, and artificially inflate the trading price of Energy Transfer's publicly-traded units.  The truth about Energy Transfer's dangerous and deficient construction practices, and bribery of government officials, emerged through a series of partial corrective disclosures that caused significant financial harm to unwitting Energy Transfer investors, like Lead Plaintiffs, who, along with other class members, collectively lost billions of dollars as a result of the Defendants' deception.

20.     On August 10, 2018, Energy Transfer disclosed to the market the shocking revelation that, because of the challenges Energy Transfer experienced in constructing ME2 via the original planned route, in order to complete the ME2 pipeline, Energy Transfer would temporarily cobble together portions of a nearly 100-year-old, 12-inch pipeline with the brand-new 20-inch pipeline that formed the ME2.  After the disclosure of this so-called "Frankenpipe" structure initially confused Wall Street analysts, and after the Defendants initially refused to provide investors with any further elaboration of the ramifications of the Frankenpipe, some analysts privately pressed Energy Transfer for answers on how this would impact the ME2 pipeline's throughput – a critical metric for the pipeline's economic value proposition, and therefore of utmost concern to investors.  Only in response to these further inquiries did the market learn that the use of the Frankenpipe would significantly reduce ME2's throughput (from the claimed 275,000 to 450,000 bls/d to only approximately 100,000 bls/d on ME2's initial in-service date), and that the full completion of ME2 would be further delayed.

21.     Then, on September 10, 2018, a portion of Energy Transfer's Revolution pipeline dramatically exploded in Beaver County, Pennsylvania—destroying one home, scorching three acres of land, forcing residents to flee, and knocking out power for over 1,500 people.  According to Energy Transfer's own investigation, the Revolution explosion was caused by a landslide in an area that Energy Transfer knew ahead of time was prone to them.  After the explosion, on October 29, 2018, as a result of Energy Transfer's failures to comply with mandatory requirements in the construction of the Revolution pipeline, the DEP ordered Energy Transfer to halt work on the Revolution pipeline until the damage caused by the explosion had been remedied.  As of June 1, 2020—nearly two years later—Revolution is still not operational.

22.     On December 19, 2018, the Chester County District Attorney Tom Hogan ("DA Hogan") announced that he had launched a criminal investigation into the construction of the Mariner East System and its owners in light of "sinkholes created by the pipeline drilling, contaminated well water," and "subtle and not-so-subtle bullying of Chester County citizens."  The press release quoted DA Hogan as saying:

> We expected the state regulators and the governor to step in and assure the safety of Pennsylvanians.  They have not.  So now the Chester County District Attorney's Office will demand that every aspect of these pipelines be constructed safely, or we will bring into play all of the tools of the criminal justice system.

23.     The press release further explained that the construction of the Mariner East System had caused "significant sinkholes in . . . residents' back-yards" and "contamination of well water" in Chester County, and cited the Revolution explosion in Beaver County as "chang[ing] speculation into tangible danger and destruction."  The Chester County District Attorney further explained that the investigation would cover past and future conduct, and that "[p]otential charges [could] include causing or risking a catastrophe, criminal mischief, environmental crimes, and corrupt organizations."

24.     On August 8, 2019, DA Hogan announced that his office was charging Pennsylvania Constables hired by Energy Transfer to guard pipeline construction sites with bribery.  As press reports elaborated, two constables were arrested "after prosecutors say they improperly used their elected positions for personal profit while working security on the Mariner East Pipeline."  The investigators said Chester County residents had reported that armed security guards identified themselves as state constables on their property.  At the time of the arrests, Chester County District Attorney Chief of Staff Charles Gaza said, "We cannot have elected law enforcement officials hiring themselves out and using their public positions for person[al] profit," because "[i]t undermines the integrity and independence of law enforcement and our government."

25.     On November 12, 2019, *The Associated Press* broke the news that the Federal Bureau of Investigation ("FBI") was undertaking a corruption investigation into how Pennsylvania Governor Wolf's administration came to issue the permits for the construction of the ME2 pipeline. As the *AP* reported, "FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits" and "[t]he focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."

26.     Then, on December 3, 2019, DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for ME2 and ME2X.  In the press release accompanying the announcement of the charges, DA Hogan stated:

> This is a pretty simple case.  State Constables sold their badges and official authority.  Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens.  And the defendants attempted to conceal their activity through a maze of companies and payments.

27.     The press release continued:

Energy Transfer decided they needed security for the pipeline.  However, rather than simply hiring a private security firm, Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline.  Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act. Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.

28.     Each of the foregoing partial corrective disclosures of Energy Transfer's true misconduct and fraud on its investors caused the price of Energy Transfer's units to fall.  As a result of Defendants' wrongful acts and omissions, and the sharp declines in the market value of the units when the truth was revealed, Lead Plaintiffs and other Class members have suffered significant damages.

## II.   JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

31.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) and 28 U.S.C. § 1391(b).  Defendants conduct business in this District and the majority of Defendants' actions and misconduct occurred within this District.

32.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.     PARTIES

A.     Lead Plaintiffs

33.     The Allegheny County Employees' Retirement System ("Allegheny County") is a single-employer defined benefit, contributory retirement benefit plan covering substantially all employees of the County of Allegheny, Pennsylvania.  As of December 31, 2018, Allegheny County managed approximately $880 million in assets on behalf of approximately 12,300 participants.

34.     The Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge") is a defined benefit fund that operates for the benefit of employees of the City of Baton Rouge, as well as its firefighters and police officers.  As of December 31, 2018, Baton Rouge managed over $1 billion in assets on behalf of approximately 7,000 participants.

35.     The Denver Employees Retirement Plan ("Denver") is a defined-benefit pension plan that provides retirement benefits for employees of the City and County of Denver, Colorado and the Denver Health and Hospital Authority.  As of December 31, 2018, Denver managed assets of more than $2.1 billion on behalf of over 22,500 members.

36.     The International Association of Machinists and Aerospace Workers National Pension Fund ("IAMNPF") is a defined-benefit pension plan that provides retirement, disability, and survivor benefits to members of the International Association of Machinists and Aerospace

Workers and their families, and has done so for over 55 years.  IAMNPF oversees approximately $13 billion in assets on behalf of approximately 100,000 active participants.

37.     The Iowa Public Employees' Retirement System ("Iowa") is a multiple employer pension fund that provides retirement benefits for public employees in the State of Iowa.  As of June 30, 2019, Iowa managed assets of $34 billion on behalf of over 368,000 members.

38.     Lead Plaintiffs, as set forth in their prior filings with the Court and in the attached Addendum, acquired Energy Transfer common units at artificially inflated prices during the Class Period and were damaged upon the revelation of the true facts through a series of partial corrective disclosures.

**B.     Defendants**

39.     Defendant Energy Transfer is a Dallas, Texas-based energy services partnership founded in 2002 with its principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225.  Energy Transfer, through its subsidiaries, operates interstate and intrastate natural gas, NGL, and crude and refined oil transportation and storage as well as fractional services.  The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018.  Energy Transfer operates as a subsidiary of LE GP, LLC.  Energy Transfer common units trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."

40.     Defendant Kelcy L. Warren ("Warren") has served as the sole Chairman and Chief Executive Officer ("CEO") of Energy Transfer's general partner, and the Chairman and CEO of Energy Transfer Operating, L.P.'s ("ETO") general partner, since August 2007.

41.     Defendant John W. McReynolds ("McReynolds") served as Energy Transfer's President from March 2005 to October 2018, and has served as a Special Advisor to Energy Transfer from October and as an Energy Transfer Director from August 2005.  He previous served

as Energy Transfer's Chief Financial Officer ("CFO") from August 2005 to June 2013, and as a Director of ETO's general partner from August 2001 through May 2010.

42.     Defendant Thomas E. Long ("Long") has served as the CFO of Energy Transfer's general partner from February 2016, and as a Director of Energy Transfer's general partner since April 2019.  at all relevant times, and as an Energy Transfer Director since April 2019. He also serves as CFO of ETO.

43.     Defendant Marshall ("Mackie") McCrea ("McCrea") has served as the President and Chief Commercial Officer ("CCO") of Energy Transfer's general partner since October 2018. Prior to that, he served as the Group COO and CCO for the Energy Transfer family from November 2015. McCrea has served as Director of Energy Transfer's general partner since December 2009.

44.     Defendant Matthew S. Ramsey ("Ramsey") has served as the COO of Energy Transfer's general partner since October 2018, as a Director of Energy Transfer's general partner since July 2012, and as President, COO, and a Director of ETO's general partner since November 2015.

45.     Defendant Michael J. Hennigan ("Hennigan") served as Sunoco's President and CEO from 2012 to approximately April 2017, at which point he became Energy Transfer's President, Crude, Liquids and Refined Products. On May 30, 2017, Energy Transfer announced that Hennigan would depart the Partnership effective June 16, 2017.

46.     Defendant Joseph McGinn ("McGinn") served as Sunoco's Senior Manager for Public Affairs from April 2013 to April 2017, Energy Transfer's Senior Director of Public Affairs from April 2017 to October 2017, and Energy Transfer's Vice President of Public Affairs from May 2019 to the present.

47.     Defendants Warren, McReynolds, Long, McCrea, and Ramsey are sometimes referred to herein as the "Speaking Defendants."

48.     Defendants Warren, McReynolds, Long, McCrea, Ramsey, Hennigan, and McGinn are sometimes referred to herein as the "Individual Defendants."

49.     The Individual Defendants possessed the power and authority to control the contents of Energy Transfer's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Energy Transfer's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Energy Transfer Companies, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.    SUMMARY OF THE FRAUD

### A.    Energy Transfer Embarked on the Simultaneous Construction of Several Pipeline Projects Through Pennsylvania

50.     The Mariner East pipeline is a multibillion-dollar pipeline project designed to transport highly volatile NGLs from the Marcellus and Utica Shales in western Pennsylvania, West Virginia and eastern Ohio to destinations in Pennsylvania, including the Partnership's Marcus Hook Industrial Complex on the Delaware River.  There, the NGLs are processed, stored and distributed to local, domestic and waterborne markets.  The Mariner East System crosses 17 counties of the Commonwealth.

51.     The first phase of the project, ME1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively.  ME1 is currently in service for propane and ethane transportation, storage and terminalling.  ME1 has an approximate capacity of 70,000 bls/d.

52.     The second phase of the project, ME2, is an NGL pipeline that was slated to have a maximum capacity of 450,000 bls/d based on a 20-inch pipe diameter.  Upon the initial announcement of Energy Transfer's plans to construct ME2, Energy Transfer stated that ME2 would be in-service by the end of 2016.  To date, although (as discussed further below) Energy Transfer has brought into service an ad hoc combination of ME2's 20-inch diameter pipe and an older, 12-inch diameter pipeline, the true 20-inch "ME2" – as Energy Transfer had repeatedly presented it to investors – remains under construction.

53.     Energy Transfer also planned for an optional expansion to ME2, known as ME2X.  Depending on the number of commitments Energy Transfer received during its open season process before it began constructing ME2, Energy Transfer had made plans to construct ME2X as an additional 16-inch pipeline alongside ME2 to provide the Mariner East System with an added capacity of 250,000 bls/d.

54.     Energy Transfer also planned to augment the Mariner East System by constructing the "Revolution Project," an expansion to the existing Revolution pipeline that would connect it to the Mariner East System, enabling Energy Transfer to transport additional NGL volumes out of the Marcellus Utica region.  Prior to the Revolution explosion in September 2018, this expansion would have had the potential to substantially increase the product flows to Marcus Hook.  The existing Revolution pipeline consisted of 20 miles of 16" pipes.  The new project would add 110 miles of 20", 24" and 30" pipes.

55.     Below is a map reflecting the planned locations of the Energy Transfer pipelines in the Commonwealth of Pennsylvania:



**B.     Energy Transfer Was Motivated to Rush Through the DEP's Approval of the ME2 Permits to Avoid Public Criticism of the Pipeline's Serious, Undisclosed Risks to Human Life**

56.     Within the category of NGLs, there are many different varieties including propane, butane, and ethane.  ME2 principally carries ethane.  Ethane is a colorless odorless gas that is principally used to produce ethylene, which the petrochemical industry uses to manufacture a wide range of products, most of which are converted into plastics.  Additional end-uses for ethylene include detergent and anti-freeze.  At room temperature, ethane is an extremely flammable gas, which forms an explosive mixture when mixed with air.

57.     Within the blast zone of a leak, ringing a doorbell, making a phone call, opening a garage door, turning lights on, or running an engine could ignite a fatal explosion.  Given these properties, in the event of a leak in an NGL pipeline, the Partnership instructs local residents to "leave the area by foot immediately and attempt to stay upwind," but there is no guidance for people to determine when and whether they are in a safe area.

58.     The ethane that ME2 carries across Pennsylvania is not used for domestic energy generation.  Rather, Energy Transfer brings it to Marcus Hook to export to Europe, mostly to Scotland, Norway and Sweden.  Sunoco's Marcus Hook terminal was the United States' first export facility for ethane to Europe, beginning in 2016.  Under a 15-year contract, new purpose-built tankers move the ethane from Marcus Hook to Scotland and Norway for use in INEOS Olefins & Polymers Europe petrochemical plants.  Ethane exports from Marcus Hook also travel to Borealis Group's petrochemical "cracker" at Stenungsund, Sweden.

59.     Before constructing the pipelines to carry ethane to Marcus Hook, and in order to ensure that it could bring the Pipeline Projects online and with the claimed throughput under Energy Transfer's claimed schedule, it was incumbent on Energy Transfer to have performed a proper assessment of the risk of its construction, including its risk to human life, but which it failed to perform.  Concerned citizens in Delaware and Chester Counties, however, did commission a risk assessment with the assistance of the Clean Air Council and Quest Consultants, Inc. ("Quest")[1] and released their findings on October 19, 2018 (the "Citizens' Risk Assessment").

60.     The purpose of the Citizens' Risk Assessment was to investigate the risks to the public associated with ME2 and related to the release of NGLs.  The Citizens' Risk Assessment is

---

[1] Quest is an engineering consulting company based in Norman, Oklahoma.  Formed in 1989, Quest specializes in consequence and risk analysis for hazardous materials.

a quantitative risk analysis, which means that it assessed the quantitative measures of the consequences of pipeline release events in combination with the probability that those events will happen to produce numeric measures of risk.  In the Citizens' Risk Assessment, risk is expressed as the location-specific individual risk of fatality due to accidental releases from the Mariner East pipelines, with an emphasis on three specific sites in Delaware and Chester Counties along the Mariner East route.[2]

61.     Numerous key findings in the Citizens' Risk Assessment demonstrate that the Mariner East System posed significant risks to human life.  First, the predicted fatal impacts of accidental pipeline release events were found to extend up to 2,135 feet from the pipelines. Second, due to the equipment present, and the above-ground placement of this equipment, the pipeline valve stations represent the highest risk locations, where the risk is approximately equal to being fatally involved in a motor vehicle accident.  This risk level at these valve stations was found to be in excess of the tolerable limit when compared to international criteria.  Third, the risk was found to be elevated were the Mariner East pipelines are co-located along the pipelines' route, which is about 10% as likely as being involved in a motor vehicle accident.

62.     The Energy Transfer Companies were motivated to bring the Pipeline Projects online as quickly as possible because the commitments from third parties for the transport of NGLs were based on bringing the pipelines online by specified dates.  For example, when asked during the August 9, 2017 Energy Transfer earnings call about the timing of bringing ME2 online, the status of contractual commitments, and the type of return Energy Transfer expected to generate, Defendant Ramsey responded, "we do expect to have it in service sometime in the fourth quarter

_____

[2] The three areas of focus in the Citizens' Risk Assessment are:  Glenwood Elementary School (Media, PA), the Chester County Library (Exton, PA), and the Delaware-Chester County line.

. . . .  But it's kind of hard to bring new customers on until you get a project that's been in the works for many years in service. So we are in great shape the day we bring it on, on initial revenues. And we are highly confident that we will bring on significantly more commitments and more volumes <u>after we bring the pipeline in service</u>."  Similarly, on Energy Transfer's November 8, 2017 investor call, Defendant McCrea said "Once we get them in service, we couldn't be more excited about the returns. . . . <u>Mariner needs to come online</u>."

### C.   Energy Transfer Obtained the ME2 Permits Through Intimidation and Coercion of Government Officials Despite the Applications Being Facially Deficient

63.    During the Class Period, Energy Transfer assured investors that it adhered to exacting ethical standards in its dealings with regulators and government officials, which the Partnership codified in its Code of Conduct.  Energy Transfer touted the Code in its SEC filings, including the Form 10-K that the Partnership filed with the SEC on February 24, 2017 (the "2016 10-K"), and referred investors to the Partnership's website, where Energy Transfer published the Code throughout the Class Period.

64.    Indeed, Energy Transfer represented that the Code identified requirements, not aspirations. For example, the Code explained that "[i]n all instances, the <u>policies</u> of the Company <u>require</u> that the business of the Partnership Group be conducted in a lawful and ethical manner. Every Employee"—which the Code defined as including "the officers and members of the Board of Directors of the Company"—"acting on behalf of the Partnership Group <u>must</u> adhere to these <u>policies</u>."

65.    The Code detailed the Partnership's supposedly stringent policies prohibiting attempts to bribe or influence government officials. It set forth the Partnership's commitment that each of its employees was "<u>required</u>" to adhere to the Partnership's Anti-Corruption Policy, the U.S. Foreign Corrupt Practices Act, other anti-corruption laws, and "the highest ethical standards

in fulfilling . . . responsibilities to, and on behalf of [Energy Transfer] and its investors." The Code specifically drew attention to the heightened ethical ramifications of the Partnership's dealings with government officials and regulators, explaining that "[w]hat is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign)," and stating that its employees "should not provide . . . anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department." Energy Transfer's Code further explained: "Employees must respect and obey the laws of the cities, states and countries in which the Partnership Group operates."

66.     The Code also specifically set forth Energy Transfer's strict policies prohibiting payments or use of Partnership funds to "secure special treatment for the Partnership Group" or for anything other than a "legitimate business purpose." These policies were broad in scope, applying regardless of whether conduct was technically "lawful or unlawful" or was conducted by the Partnership, individuals, or third parties employed by the Partnership. The Partnership also broadly defined payments that were to be treated as sensitive under the policy as including (among other things) "receipts from or payments to governmental officials or employees" and "corporate political contributions," and it prohibited attempts to "disguise" sensitive payments in "any . . . manner."

67.     The Code also set forth detailed reporting requirements for Partnership officers and directors with respect to Code violations. Specifically, the Code stated:

> Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit

Committee, and if appropriate, to the Board of Directors. . . . All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports. . . . Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action[.]

68.     In addition to the Code, Energy Transfer adopted specific policies applicable to its highest executives – its CEO and CFO, *i.e.* Defendants Warren and Long during the Class Period. Specifically, Energy Transfer maintained a Code of Ethics for Senior Financial Officers (the "Code of Ethics"), which required its CEO and CFO to:

- "Act with honesty and integrity";

- "Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the [SEC] and in other public communications, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times";

- "Not violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies";

- "Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared"; and

- "Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public filings and communications, disagreements on accounting matters and violations of any part of this Code."

69.     In the 2016 10-K and subsequent filings, Energy Transfer also represented that "we believe we have valid rights to use all of our material properties" and that Energy Transfer had "obtained or made all required material . . . filings with[] the various state and local government and regulatory authorities which relate to . . . the operations of our business."

70.     However, unbeknownst to investors, these representations were materially false and misleading when made.  Energy Transfer secured the necessary permits for construction of ME2 from the DEP through coercion and pressure on government officials.  As the *Associated*

*Press* reported on November 12, 2019, the FBI launched an investigation into Energy Transfer and the Pennsylvania Governor's office over allegations that Governor Wolf and his staff had exerted improper control over the DEP's supposedly independent decision to approve the required ME2 permits.

71.     In addition, as discussed in further detail below, Energy Transfer bribed Pennsylvania constables to act as security and employ intimidating tactics around Energy Transfer pipeline sites, particularly those sites where significant construction-related problems had already occurred.  As DA Hogan alleged in the criminal complaints against the Constables and Energy Transfer's security chief Frank Recknagel, Pennsylvania constables are government officials and Energy Transfer's payments to them in connection with construction of the Mariner East pipelines constituted bribery in violation of Pennsylvania law.

### 1.      2015:  Energy Transfer Begins the Permitting Process for ME2

72.     On March 2, 2015, Energy Transfer announced that it expected ME2 to commence operations in the fourth quarter of 2016. However, unlike ME1, which involved converting a 1930s-era gasoline pipeline for use in transporting NGLs, ME2 was more complex and time-consuming greenfield construction.   ME2 would span approximately 350 miles across 17 Pennsylvania counties, and cross 570 wetlands and more than 1,200 streams.  ME2 was also slated to cut through approximately 2,700 properties.

73.     Given the enormous scope of the project and the potential for significant environmental impact and safety risk from ME2's construction and operation, the Partnership was required to go through an extensive regulatory review process prior to beginning construction.  Of particular importance, the project required extensive reviews and subsequent permitting by the Pennsylvania DEP, focused on several key Pennsylvania environmental regulations.

74.     Key permit requirements included, among other things, those related to Pennsylvania Code Chapter 102 ("Chapter 102"), which focuses on "earth disturbances associated with oil and gas exploration, production, processing or treatment operations or transmission facilities when earth disturbance is five acres or greater," and those related to Pennsylvania Code Chapter 105 ("Chapter 105"), which concerns "activities located in, along, across or projecting into a watercourse, floodway or body of water, including wetlands."

75.     To gain permit approval, the Partnership was required to explain how it would avoid polluting water crossings along ME2's path.  Energy Transfer planned to conduct much of the pipeline construction using "Horizontal Directional Drilling," or "HDD."  HDD is a method for laying underground pipelines by drilling an underground channel for the pipeline.  HDD is used as an alternative to digging trenches on the ground's surface.[3]

76.     However, HDD creates certain unique risks.  Among other things, the pressurized drilling fluids used in HDD can seep through the ground, rising to the surface or contaminating underground water supplies—a phenomenon known as an "inadvertent return" or a "frac-out." Accordingly, as part of the permitting process, the DEP asked Sunoco to evaluate the risks of HDD as part of its Chapter 105 permit proposal.

77.     Energy Transfer submitted its initial Chapter 102 and Chapter 105 applications for ME2 in the summer of 2015.

---

[3]  The HDD method involves three stages.  First, a pilot bore drills a borehole along the planned route.  Then, the drill bit is replaced by a "reamer," which enlarges the borehole diameter by excavating soil.  Finally, the pipe is pulled back through the enlarged hole.  "Drilling mud"—a mixture of water, clay, and chemicals—is used at each of these stages to keep drilling tools cool and lubricated, to remove drilled material, to support the drilling hole, and to lubricate the pipe as it is pulled through the drilled hole.

    2.      **March-May 2016:  After DEP Secretary Quigley Warned Sunoco that DEP Would Deny the ME2 Permits, the Governor "Ushered [Him] Out"**

78.    The Energy Transfer Companies obtained the permits for ME2 by exerting undue influence on the DEP, including by causing the ouster of former DEP Secretary John Quigley after he indicated to Sunoco that he would likely deny the initial applications.

79.    In March 2016, due to an overwhelming number of deficiencies in the permit application, as former DEP Secretary Quigley later wrote on Twitter, he "told Sunoco senior leadership that their continued inability to complete their permit application appeared to be willful and had to be immediately remedied or the application would be denied.  I was ushered out of DEP two months later."  Indeed, Secretary Quigley "resigned" from his position on May 20, 2016, shortly after the meeting with Sunoco.  Quigley's January 17, 2020 Tweet is reproduced below:



John Quigley (@JohnHQuigley)
1/17/20, 19:16
In March, 2016, as DEP Secretary, I told Sunoco senior leadership that their continued inability to complete their permit application appeared to be willful and had to be immediately remedied or the application would be denied. I was ushered out of DEP two months later.

80.    According to Quigley, prior to his May 2016 departure from the DEP, he had engaged in an extensive back and forth with Sunoco – specifically Sunoco's President and CEO Michael Hennigan – about the pipeline permits.  From January through May 2016, Sunoco "wasn't even close to submitting a complete application" despite constant communications between the DEP and Sunoco about how to remedy the deficiencies.

81.    In March 2016, after learning of additional deficiencies and observing Sunoco's unwillingness to submit a complete and adequate application (including failing to identify all the wetlands and stream crossings for the pipeline), Quigley called for a meeting with Sunoco CEO Hennigan, Tetra Tech Inc. (Sunoco's engineer contractor), as well as their project manager. Quigley discussed the plethora of deficiencies in Sunoco's permit application and "read them the

riot act." Quigley told them that if they did not get their act together, he would send the application

back, and they would have to start all over again.

82.     During the March 2016 meeting, Quigley told Hennigan: "Mike, I'm going to give

this to you in technical terms – your consultant sucks, and your project manager is no day at the

beach." He informed Hennigan that Sunoco was going to have to start over because the application

was "so woefully inadequate." In Quigley's words, "They weren't even close to a permit, and I

was going to essentially reject what they were submitting and say, 'Okay, you have to start over.'"

83.     Quigley feels sure that, in light of that pushback on Hennigan, Hennigan then went

to "cry" to the governor, leading to Quigley's subsequent termination as DEP Secretary because

he "wouldn't roll over and issue a permit."

84.     Quigley also stated that the Governor's special assistant, Yesenia Bane, whose

husband was a gas-industry lobbyist while she worked at the Governor's office, came into his

office and asked why Quigley could not simply approve the permit. Quigley responded, "I'm

going to forget you asked that question because you just crossed a whole bunch of lines." Quigley

said that the true reason he did not last as Secretary of the DEP was because he did his job and ran

the agency by the book.

85.     After Quigley's termination, he heard that "despite continuing deficiencies, the

Governor's office ordered my successor to issue the permit, and he capitulated." Quigley added

that "I played everything by the book, and basically everybody was mad at me." As Quigley

added, at least "I can look at myself in the mirror."

86.     According to Quigley, everything that the DEP warned about on Quigley's watch

and detailed in multiple voluminous deficiency letters, such as the potential for frac-outs and

ground water contaminations, came to pass.  He stressed that this is not a surprise to anyone who knows anything about the project, yet "the Wolf administration decided to look the other way."

87.     Former DEP employees told Quigley that, in the time between his departure and the issuance of the ME2 permits, the DEP had prepared an approximately 70-page deficiency letter to the Energy Transfer Companies that simply disappeared right before the DEP issued the permit. Quigley stated that, in this case, the agency went counter to its mission and violated state and federal laws.  The end result was that the DEP issued the ME2 permits just when Sunoco needed them the most: days before the Energy Transfer Companies were set to release their annual financial results to investors on February 24, 2017.  Sunoco instructed the DEP and the Governor's office that the Energy Transfer Companies needed the permits by February 2017, and it received them then.  Quigley said, "It was an inside job, and it was the Governor's office ordering my successor."  "It was unconscionable, in my opinion."

### 3.     Energy Transfer's Permits for ME2 Were Riddled with Deficiencies

88.     By June 2016—after Quigley's termination—the DEP deemed Energy Transfer's initial 20 proposals administratively complete.  The DEP accepted public comments concerning the Chapter 105 permit applications from June 25, 2016 through August 24, 2016, and concerning the Chapter 102 permit applications from August 6, 2016 through September 6, 2016. The DEP also held five public hearings across affected regions around this time.  In total, 29,835 persons provided comments on the Company's proposals.

89.     Many public comments highlighted the numerous deficiencies in the permit applications.  One commenter explained that independent experts had identified wetland and stream crossings that Sunoco had failed to count in its applications, writing:  "DEP can't measure damage to streams and wetlands it doesn't know exist."  The commenter concluded: "It is apparent from Sunoco's applications that Mariner East 2 would prove disastrous to Pennsylvania's

environment. . . .  Sunoco has a bad track record for leaks in its pipelines for violations of state laws, which makes this application all the more concerning."

90.    Indeed, Sunoco had a starkly negative track record for safety and environmental violations.  As *Philadelphia* Magazine later reported on July 6, 2019:

> Between 2002 and the end of 2017, pipelines affiliated with the company across the country experienced a leak or an accident every 11 days on average, according to an analysis of federal pipeline data compiled by environmental advocacy organizations Greenpeace USA and Waterkeeper Alliance.  In an evaluation by NPR affiliate *StateImpact Pennsylvania*, the same federal data showed that Sunoco Pipeline is responsible for the industry's second-highest number of incidents reported to inspectors over the past 12 years.

91.    Another commenter echoed concerns about Sunoco's history of environmental violations.   The commenter cited statistics from the Pipeline Hazardous Materials Safety Administration ("PHMSA") showing that Sunoco had nearly 300 spills in the previous ten years, had been the focus of federal enforcement actions for failing to report numerous incidents, and had failed to identify root causes of a pipeline accident which caused that same type of problem to recur in subsequent years.  The commenter also wrote that Sunoco had been "cited in 2015 for at least 42 violations by PA DEP for work done on the Mariner East project over the span of one year," concluding: "I recommend not approving chapter 102 and 105 permits due to inherent risks. Residents of Pennsylvania receive NO benefits from this project, only more potential harm to the environment and properties."

92.    On September 6, 2016, the DEP issued 20 detailed technical deficiency letters, outlining hundreds of substantive problems with the Chapter 102 and Chapter 105 permit applications for ME2.  As *StateImpact Pennsylvania*—a collaboration among several National Public Radio stations reporting on local issues in Pennsylvania—reported on September 15, 2016:

> Pennsylvania's Department of Environmental Protection has rejected Sunoco Logistics current proposal to protect waterways and wetlands at risk of damage by

construction of the company's Mariner East 2 pipeline. . . . DEP's critiques of the permit applications come after a year of working with agency staff to resolve problems with the company's initial proposals.  And yet, more than a year since Sunoco first applied for the permits, DEP has documented hundreds of issues remaining in each of the 17 counties along the pipeline route. . . .

The Chapter 105 deficiency letters sent to Sunoco and posted on DEP's website September 6, outline an incredibly long list of problems with the company's proposals including: a lack of construction details for water crossings, no analyses for how water quality standards for each crossing will be maintained or how the area will be restored after construction, no mention of nearby drinking water wells and contact information for those responsible for them, no project wide cumulative impacts analysis, no secondary impact analysis, no explanation of how threatened or endangered species will be protected, no evidence of consultation with or approval from the Pennsylvania Historical and Museum Commission for protecting cultural heritage sites, and no emergency plans in the case of a pipeline rupture.

Some of the deficiencies listed by DEP are bizarre, or just plain sloppy.  In the 21-page deficiency letter for Delaware County, signed by DEP's chief of dams and waterways John Hohenstein, the agency questions why the permit application indicated construction of an 8-inch pipeline, and why in one section Sunoco states that a second pipeline will be built within the next 5 years.

According to an information sheet on Sunoco's own website, the Mariner East 2 project comprises a 20-inch diameter line, and possibly another 16-inch line, both of which were scheduled to be completed and shipping gas by the first half of 2017.

In the 37-page deficiency letter outlining the problems with the Chapter 105 permits in Huntingdon County written by DEP's civil engineer manager Edward Munzie, DEP questions how one section of the application describes Sunoco's potential second Mariner East 2 pipeline as 16-inches in diameter, and another part of the application states it could be up to 20 inches. Munzie asks: "Which is correct?"

The letters also question the credentials and authority of the Sunoco representative who signed off on the proposals, Matthew Gordon, and point to different titles he uses in different parts of the permit applications. The applications require an engineer's seal and certification.

93.    *StateImpact* further reported:

Environmentalists and pipeline safety advocates say the extensive deficiency letters show the company has not taken environmental protection or safety seriously.

"It's a giant incomplete series of applications," said Alex Bomstein, an attorney with the Clean Air Council, which has also filed a lawsuit challenging the authority of the pipeline company to take land through eminent domain. "The level of these deficiencies surprised even me." . . .

The Clean Air Council coordinated with several groups to submit public comments on the applications to DEP.  Lynda Farrell, with the Pipeline Safety Coalition, an organization that also submitted public comments, praised the agency for their work outlining the deficiencies of the permit applications. But she questions why the public had a limited comment period, while companies like Sunoco get to revise their applications until they get the approval to start construction.

"At what point do you say no?" asked Farrell. "This company shouldn't be permitted to drive a tricycle across the state let alone a major pipeline."

94.     On November 11, 2016, *The Philadelphia Inquirer* reported that former DEP Secretary Quigley had explained: "There are huge permit delays on this project, and they have been caused by Sunoco's consultant, by their lack of efforts, by their lack of attention to compliance."   The article further reported that, according to Quigley, Energy Transfer "had complained about the permitting process to Gov. Wolf and legislators in an effort to force the state to 'rubber-stamp'" the pipeline project, and quoted him as explaining: "They ran to the governor's office . . . to get DEP to rubber-stamp the permits, and that's a fool's errand."

### 4.     The Pennsylvania DEP Was Statutorily Required to Deny Deficient Permits

95.     As set forth above, because construction of ME2 had the potential to disrupt the Commonwealth's soil and water resources, it required the DEP's extensive regulatory review before the DEP issued the permits and construction could commence.

96.     These statutory provisions make clear that the DEP lacked the discretion to issue permits for incomplete applications.  For example, Chapter 102 states: "An application or NOI for a permit is not complete until the necessary information and requirements under The Clean Streams Law (35 P.S. § § 691.1—691.1001) and [Chapter 102] <u>have been satisfied</u> by the applicant."  25 PA Code § 102.6(c)(1).  Chapter 102 provides that, when the DEP determines that an application is incomplete, "it will notify the applicant in writing," and the "applicant shall have

60 days to provide the information necessary to complete the application . . . or the Department . . . will consider the application to be withdrawn by the applicant." *Id.* §102.6(c)(2).

97.     Chapter 105 provides a virtually identical mandatory process for handling the review and approval of applications.[4] Section 105.21 of Chapter 105 further provides, in relevant part:

**Criteria for permit issuance and denial.**

(a)  In addition to the other requirements of this chapter, a permit application <u>will not be approved</u> unless the applicant <u>demonstrates</u> that the following conditions are met:

(1) <u>The application is complete and accurate</u>.

(2) <u>The proposed project or action complies with the standards and criteria of this title</u> and with other laws administered by the Department, the Fish and Boat Commission and river basin commissions created by interstate compact.

(3)  The proposed project or action will adequately protect public health, safety and the environment.

(4)  The proposed project or action is consistent with the environmental rights and values secured by Pa. Const. Art. I, § 27 and with the duties of

---

[4] 25 PA Code § 105.13a provides:

**Complete applications.**

(a)  An application for a permit is complete <u>when the necessary information is provided</u> and requirements under the act and this chapter <u>have been satisfied</u> by the applicant.

(b)  When the Department determines that an application is incomplete or contains insufficient information, it will notify the applicant in writing. The applicant shall have 60 days from the date of the Department's letter to complete the application or the Department will consider the application to be withdrawn. Requests for a specific extension shall be submitted by the applicant in writing. The applicant will be notified in writing when an application is considered withdrawn. If the applicant chooses to reapply for a permit, a new complete application and fee will be required.

the Commonwealth as trustee to conserve and maintain public natural resources of this Commonwealth.

(5)  The applicant has not been found to be in continuing violation of this title or other laws administered by the Department, the Fish and Boat Commission, or a river basin commission created by interstate compact, including, but not limited to, a violation of an adjudication and order, agreement, consent order or decree, whether or not the applicant's violation resulted in an order or civil penalty assessment.

*Id.* § 105.21(a)(1)-(5).

98.     As these provisions make clear, it was necessary for the Partnership to submit a complete and accurate application demonstrating that ME2 met applicable requirements (including those of Chapters 102 and 105) <u>before</u> the DEP could properly approve Chapter 102 and 105 permits.

99.     Energy Transfer originally had until November 2016 to address the deficiencies listed in the 20 DEP technical deficiency letters sent in September 2016, but sought an extension of its response deadline to December 2016.  On December 5, 2016, Energy Transfer submitted updated application materials for each of the 20 Chapter 102 and Chapter 105 permits it sought for ME2.  The DEP declined to seek additional public comment with respect to the Partnership's updated applications, despite requests from civil society organizations, including the Pennsylvania Sierra Club.

100.    Around this time, the DEP's Office of Oil and Gas Management issued an internal review of its Chapter 102 permit review process.  The *Pittsburgh Post-Gazette* reported on the internal review, explaining:

In a cutting conclusion in the report, the department's oil and gas office said it "cannot rely on licensed professionals to submit technically sound, legally defensible application materials in the very first submission."  It recommended that the agency drop a practice "previously expected by industry" of "unquestioning reliance" on such applications prepared by industry consultants.

101.    The article also quoted DEP Deputy Secretary Scott Perry as stating: "The department's position is that we won't issue permits that have technical deficiencies.  Period."

### 5.    The Governor's Office Exerted Undue Pressure on the DEP to Approve the Permits, Which Sailed Through Despite the Deficiencies

102.    As *StateImpact Pennsylvania* later reported on January 26, 2018, Governor Wolf's administration was deeply involved with the DEP's review of the ME2 permits.  Indeed, as the deadline by which the Energy Transfer Companies were set to release their fiscal year 2016 annual financial results quickly approached, the Governor's office became increasingly involved in pressuring the DEP to issue the ME2 permits.  In particular, Governor Wolf's special assistant, Yesenia Bane, the spouse of an oil and gas industry lobbyist, exchanged a series of text messages with DEP Secretary Patrick McDonnell (who replaced Quigley in May 2016) that, according to *StateImpact*, "raise[d] questions about the role the Governor's office played in the permitting process."

103.    For example, in December 2016, Bane planned to attend meetings concerning Sunoco with McDonnell, and repeatedly sought updates on other meetings with Sunoco.  On December 15, 2016, McDonnell's office held a meeting with senior Energy Transfer and Sunoco officials, Joe McGinn (Energy Transfer's Vice President of Public Affairs) and Mike Hennigan (Sunoco's President and CEO).  On the meeting invitation, Yesenia Bane is listed as the contact:

```
From:          Reim, Heather
               </o=cwopa/ou=harrisburg/cn=recipients/cn=hreim> on behalf of
               McDonnell, Patrick
               </o=cwopa/ou=harrisburg/cn=recipients/cn=pmcdonnell>
To:            Reim, Heather
               <unknown.address@unknowncompany.com>; Bane, Yesenia
               <unknown.address@unknowncompany.com>
Cc:
Bcc:
Subject:       Meeting w Sunoco
Date:          Mon Dec 12 2016 04:08:12 EST
Attachments:
```

```
StartTime: Thu Dec 15 13:00:00 Eastern Standard Time 2016
EndTime: Thu Dec 15 14:00:00 Eastern Standard Time 2016
Location:
Invitees:
Recurring: No
ShowReminder: No
Accepted: No

Contact:  Yesenia.

Attendees:
Joe McGinn
Michael Hennigan
```

104.    As discussed below, this meeting occurred just weeks before the DEP suddenly granted the ME2 permits and allowed the pipeline to move forward.  Recognizing that the DEP would likely grant the permits, at the time of the December 2016 meeting, Energy Transfer and Sunoco stopped working on the permit applications and started mobilizing the work instead.

105.    On January 12, 2017, at 11:00 a.m., DEP Secretary McConnell had a "Follow up Call" with Mike Hennigan, as reflected by his calendar entries:

Follow up Call w Mike Hennigan
Dial:  ▮▮▮▮▮   Passcode:  ▮▮▮▮▮   McDonnell, Patrick

106.    Then, on Wednesday, January 25, 2017, Bane asked McDonnell not to send deficiency letters to Sunoco before Bane and McDonnell updated the Governor and his Chief of Staff, Mary Isenhour.  Bane wrote: "Please no deficiency letter to Sunoco until we can get you to update mary/Gov."  McDonnell agreed, responding: "Understood.  I really want to talk thru the permitting office too."  Later that day, Bane again wrote to McDonnell, asking for intelligence on

the DEP's permit review so she should give the Governor advance notice: "I need the list of issues with Sunoco this afternoon so I can give the gov a heads up."

107.   Two days later, on January 27, 2017, Bane asked: "Where are we in scheduling a mtg on Monday with Sunoco?"  She then took the lead on scheduling such a meeting, telling McDonnell: "Put a hold for 1pm and 5pm for a mtg with Sunoco.  Let me know which is best for you sooner than later."

108.   On January 30, 2017, DEP officials in charge of approving the ME2 permits held an internal meeting.  According to the DEP Program Manager in the Southeast Regional Office ("SRO"), Dominic Rocco ("Rocco"), during this meeting a high ranking DEP official instructed DEP staff to "keep emails to a minimum," and that "if something can be handled by phone[,] do so."[5]  In a deposition of Rocco taken on October 26, 2017, Rocco acknowledged that he had taken the notes shown in the image below on the January 30, 2017, and acknowledged that the "sensitivity" around the ME2 permits could have played a part in the below directive.



109.   Then, on February 1, 2017, Bane and McDonnell appeared to discuss scheduling of another call related to ME2, as well as McDonnell's willingness to regularly speak to Mike Hennigan, Sunoco's President and CEO:

> BANE:  I need to know in 10 mins [i]f the call is being pushed back so I can let the gov know

---

[5] Rocco was designated by the DEP as the "department's corporate designee for answering . . . questions relating to technical deficiencies," as related to the SRO, in a litigation between the Clean Air Council, the Delaware Riverkeeper Network, and the Mountain Watershed Association, Inc. and the DEP pertaining to the DEP's issuance of the ME2 permits.

McDONNELL:  I say we keep the call.  <u>We can let him know the commitment to get things done</u>.

BANE:  okay. Letting the gov know

McDONNELL:  If I need to talk to Mike 5 times a day for the next week, that's what we'll do.

BANE:  Gov is aware but will not say any thing.  <u>This needs to be done by 1pm the latest.  6pm is not acceptable</u>

110.    Later on February 1, 2017, Bane sought further updates from McDonnell, citing pressure from Joe McGinn, Energy Transfer's Vice President of Public Affairs: "Where are we? McGinn is asking for a call."  Bane also asked for a list of the deficiency items that would be sent to Sunoco, writing: "Can I get a copy of the list once it has been sent to Sunoco? Thanks."  That evening, Bane asked McDonnell: "Are there any items that can remain flexible for field adjustments?"

111.    The following day, Bane and McDonnell continued to discuss developments, including a meeting occurring that day.  Bane explained: "I told Sunoco I am not going to attend. I do think moving forward, documents like yesterday's should be reviewed by you prior to sharing with the company to avoid issues like last night."  Bane later texted McGinn, "I heard the mt[g] went well today.  Please thank your staff for me for all their work."  Bane also appeared to reference a February 1, 2017 meeting McDonnell had with an activist, saying "We need to talk" and "Have a moment to talk?  We have a press inquiry re: a mtg you had yesterday with activist."  Then, on February 9, Bane asked: "Can we touch base on ME2 at some point today?"  She also stated: "We need to have the comment responses done tomorrow," to which McGinn replied: "It will be in as good a shape as we can make it."

112.    In response to the later public disclosure of the text messages, as reported in a January 26, 2018 article in *StateImpact*, Joe Minott, executive director of the Clean Air Council,

explained that the texts showed involvement of the Governor's office in the permitting process at a level going "way beyond" merely staying abreast of developments, explaining:  "You have the governor's staff meeting with Sunoco and DEP, you have the governor's staff telling DEP not to move forward in taking actions until Governor's Office is fully informed."

113.    In that article, Sunoco publicly denied that the messages suggested anything untoward.  As *StateImpact* reported:

> Sunoco spokesman Jeff Shields characterizes the texts as the normal exchange of information between government and company officials — "Nothing more than that."  He has said the company goes "above and beyond" state and federal safety regulations, and is building the pipeline under "stringent" environmental regulations.

114.    An earlier December 10, 2016 *StateImpact* article had explained Bane's potential conflicts of interest.  The article explained that Bane's husband had served as a lobbyist with Buchanan Ingersoll & Rooney in Harrisburg, PA, working for several oil and gas companies, and that he had joined EQT—a gas drilling company—as a senior government relations manager in November 2016.  The article further discussed how Bane, who had been "heavily involved in Marcellus Shale issues," had participated in "dozens of formal meetings on oil and gas issues, as well as informal dinners, lunches, and coffee meet-ups with industry representatives," including "meetings involv[ing] her husband's clients' projects."

115.    On January 27, January 30, and February 1, 2017, the DEP provided further technical deficiency letters to the Energy Transfer Companies.  Drafts of these letters show they outlined a long list of continuing, severe problems with the Partnership's ME2 proposal.  In response, the Energy Transfer Companies provided revised, yet still deficient, application materials on February 6, 2017.  That same day, DEP Secretary McDonnell met with opponents of the ME2 project, including concerned citizens and civil society organization leaders, who again

unsuccessfully sought to persuade the DEP to hold a further public comment period with respect to the pipeline.  In reflecting on the failed meeting, a spokesperson for one of the groups explained: "I think that whatever has been decided has been decided.  It seems that we the public are up against lobbying from the industry and pressure from the Governor's office."  In response to these and similar allegations that the Governor's office was influencing permitting decisions, a spokesperson for Governor Wolf "told *StateImpact* that the decision on Sunoco's permit applications lies squarely with the DEP."

116.    Just one week later, on February 13, 2017, the DEP approved Chapter 102 and Chapter 105 permits for ME2.  The speed at which the DEP approved the ME2 permits—considering the significance and volume of the issues identified in the January and February 2017 technical deficiency letters—was shocking.

117.    *StateImpact Pennsylvania* reported that "[c]ritics of the pipeline project are skeptical that the hundreds of deficiencies detailed previously by the agency could have been corrected in such a short period of time," and explained that state lawmakers had called meetings with DEP personnel to understand "how, or whether, Sunoco had corrected hundreds of deficiencies in its application."

118.    However, the DEP's hands were tied: the last DEP secretary, who had told the Energy Transfer Companies that he intended to deny their ME2 permits, had been ousted, and the pressure from the Energy Transfer Companies and the Governor's office sent a crystal clear message that these permits needed to be approved, without delay and regardless of the deficiencies. Thus, rather than require that the applications address the deficiencies prior to approving them, the DEP granted the permits, but subjected them to a list of "special conditions" (the "Special Conditions").  The Special Conditions, listed in each of the Energy Transfer Companies' 17

Chapter 105 permits, contained substantial lists of terms and construction methods the Energy
Transfer Companies agreed to abide by throughout their construction of ME2.

119.    The DEP's swift approval of the permits immediately deepened concerns about the
Governor's office's role in the permitting process.  Shortly after the DEP issued the permits in
February 2017, *StateImpact* reported the comments of an anonymous former DEP official, who
explained that "he did not understand what the 'minimum standards' or 'special conditions' might
be, and had never known a situation where permits were issued despite the existence of
deficiencies."  The official further explained that "the permits were issued because of pressure
from Gov. Tom Wolf's office to approve the documents in time to allow Sunoco to meet its
construction schedule."  Civil society organizations raised the same concern about pressure from
the Governor's office driving the permit approval, and Pennsylvania state lawmakers held a
meeting with DEP Secretary McDonnell to discuss the permit approval process.

120.    On April 8, 2019, *The Guardian* reported on the ongoing investigation and concerns
about the ME2 permitting process, explaining:

> Emails, text messages and regulatory records show that the secretary of
> Pennsylvania's department of environmental protection (DEP), Patrick McDonnell,
> directed staff to cut short their environmental review even as numerous
> shortcomings remained in the project's permit application. The department also
> appeared to be under pressure from Wolf's office at the time.

121.    The article further revealed that, shortly after Bane had texted Secretary McDonnell
asking him not to send a deficiency letter to Sunoco without sending it to the Governor's office
first, McDonnell wrote to DEP staff members who were involved in the pipeline review, stating:
"Govs office needs a list of the outstanding issues ASAP."

122.    The article also explained:

A DEP senior official who was involved in the Mariner East 2 project, John
Stefanko, noted in a later legal deposition that McDonnell had directed staff "that

we needed to make a decision by February 10th", although the review had been scheduled to persist for at least several additional months.

The article also revealed that Governor Wolf had "received substantial donations from companies with a financial stake in Mariner East 2, including $20,000 toward his 2018 re-election campaign from the gas producer EQT Corporation"—John Bane's company, which had a shipping contract for ME2—and that, "[d]uring [Wolf's] 2014 campaign, he received $1.5m in campaign contributions from organizations, individuals and [PAC]s tied to the oil and gas industry." However, as shown above, Bane continued to be extensively involved on behalf of the Governor's office in the time period prior to and up to the issuances of the permits for construction of the ME2 pipeline on February 13, 2017.

123.    Scrutiny of Bane's conflict of interest continued.  On December 10, 2016, after reviewing Bane's 2016 daily schedule, which it had obtained via a Right-to-Know request, *StateImpact* reported that Bane had "been heavily involved in Marcellus Shale issues, including new drilling regulations [and] pipeline projects," was "frequently involved in matters related to her husband's clients and their business interests," and had "traveled around the state to tour some of the facilities operated by her husband's clients."  The article further reported that she had taken part in a meeting in June 2016 concerning a gas pipeline project run by Williams—at the time, one of John Bane's clients, and a company Energy Transfer had agreed to acquire in late 2015—and had served on a panel at the Shale Insight conference in September 2016, where she explained that Governor Wolf was open to lobbying New York's Governor, Andrew Cuomo, "to grant regulatory approvals to the Constitution pipeline—another controversial project of her husband's then-client, Williams."  In January 2017—shortly after *StateImpact*'s December 2016 article was published—Bane's duties were changed and she ceased handling environmental issues.

124.     Workers along the ME2 project heard discussions of Governor Wolf's involvement in securing permit approvals.  For instance, FE-1,[6] who worked on the ME2 project at OPP, PPP1 West and East, and PPP2, said it was often discussed on the project with management that Governor Wolf and his administration played a "big role" in ensuring the ME2 project permits were approved.  FE-1 said he attended meetings where project managers and construction managers would discuss Governor Wolf and his administration's role in the permit approval process, both in the meetings and inside conversations.

**D.     Energy Transfer Ruins Lisa Drive, Bribes Government Officials to Intimidate Local Residents and Creates the "Frankenpipe" (Which Causes Delay and Reduces the ME2 Throughput)**

125.     Throughout the Class Period, Energy Transfer repeatedly claimed that it was constructing its pipelines, including ME2, pursuant to the highest safety and regulatory standards. For example:

- During Energy Transfer's November 8, 2017 investor call, CFO Long stated that Energy Transfer was "very focused on safely and responsibly bringing our projects into service, including . . . the Mariner East [projects]";

- During Energy Transfer's February 22, 2018 conference call, Long reiterated that Energy Transfer "remain[s] committed to working closely with . . . PA DEP and other regulatory agencies and are focused on safely and responsibly bringing Phase 2 of . . . ME2 . . . into service";

- In early 2018, Energy Transfer and Sunoco took out a full-page advertisement in a Harrisburg newspaper touting their efforts to ensure the safety of ME2.  In particular, Energy Transfer and Sunoco claimed that they will "operate our pipeline with the highest level of safety at all times" and highlighted their commitment to "paying extra attention to safety"; and

- On July 6, 2019, *Philadelphia* Magazine quoted Energy Transfer spokesperson Lisa Dillinger as claiming that Energy Transfer goes "above and beyond what is required to ensure the safety of our lines."

---

[6] FE-1 was a corrosion specialist at Natural Energy Field Services, LLC from March 2017 until March 2018.

126.    While supposedly adhering to the "highest level of safety at all times," Energy Transfer also promised investors that once it placed ME2 in-service, the pipeline would have an initial carrying capacity of 275,000 barrels of NGLs per day ("bls/d").  For example:

- In Energy Transfer's Annual Report, filed on Form 10-K with the SEC on February 24, 2017, Energy Transfer claimed that ME2 would be in service in the third quarter of 2017 and, at that time, would "expand the total takeaway capacity" of the Mariner East System from 70,000 bls/d to "345,000 []bls/d," an increase of <u>275,000 bls/d</u>;

- On May 31, 2017, Energy Transfer presented at the 2017 MLPA Investor Conference held in Orlando, Florida.  At the conference, Energy Transfer claimed that ME2 would be in service "<u>by the end of Q3 2017</u>," and would have an "initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day"; and

- During investor presentations Defendants held from May 31, 2017 up until August 14, 2018, 13 in total, Energy Transfer touted ME2's "<u>initial capacity</u>" as being <u>275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day</u>.

127.    These claims were materially false and misleading because Energy Transfer did not construct the Pipeline Projects safely or in compliance with the law.  Furthermore, the Partnership's reckless disregard for known risks in the construction of the Pipeline Projects, which created harm to residents and the environment, regulatory scrutiny, and resulting delay, rendered Defendants' claims of throughput and the Pipeline Projects' completion dates materially false and misleading when made because those claims lacked any reasonable basis in fact.

128.    Energy Transfer began construction on ME2 almost immediately following issuance of the permits, and within months, serious problems began to arise with the project.  By May 3, 2017, the DEP received notice of a frac-out that released drilling fluid consisting of bentonite clay and water, as well as drilling cuttings of subsoils and groundwater ("Drilling Pollutants"), in Delaware County. All told, the DEP issued at least 36 notices of violation in

connection with the Company's construction activities in 2017, and a further 55 notices throughout 2018.

129. Energy Transfer's disregard for constructing a safe and environmentally responsible pipeline ensured that Energy Transfer would not be able to meet its claimed ME2 and ME2X in-service dates, or achieve the claimed throughout for the pipelines. Indeed, as Energy Transfer wreaked havoc on Commonwealth land, the consequences of Energy Transfer's deficiencies and lack of due diligence, which rendered the claimed in-service date for ME2 unattainable, became more and more apparent to Defendants—yet they continued to conceal this fact from investors.

130. Specifically, Defendants failed to disclose, *inter alia*, that (i) from the start of the Pipeline Projects' construction, Energy Transfer experienced significant setbacks building the Pipeline Projects; (ii) Energy Transfer needed to complete the Pipeline Projects by the end of 2018 to prevent customers from voiding their commitment contracts with Energy Transfer; (iii) Energy Transfer would be unable to complete the Pipeline Projects by the end of 2018—including with the stated initial carrying capacity and pipeline specifications—without constructing an unsafe and environmentally destructive pipeline; (iv) Defendants expected, or were reckless in not expecting, increased scrutiny and consequences from the DEP due to their increased "corner-cutting," including by violating Pennsylvania law and the Special Conditions to their construction permits; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

> **1. August 2017: As a Result of Litigation, Energy Transfer Is Forced to Re-Evaluate the Risk Profiles of 63 HDD Sites, Including Sites in the Vicinity of Lisa Drive**

131. On February 13, 2017—the same day that the DEP approved Sunoco's ME2 permit applications and granted Sunoco its Chapter 102 and 105 ME2 and ME2X permits—the Clean Air

Council ("CAC"), the Delaware Riverkeeper Network ("DRN"), and the Mountain Watershed Association, Inc. ("MWA") (collectively, the "Environmental Advocates"), filed before the Environmental Hearing Board ("EHB") an appeal of the DEP's issuance of these permits. The Environmental Advocates alleged that the DEP had issued the ME2 permits despite not having finished the required technical review of them, and despite the applications being incomplete, internally inconsistent, and in stark violation of the law.

132. On February 14, 2017, the Environmental Advocates filed before the EHB a Petition for Supersedeas requesting that the EHB enjoin Sunoco from constructing ME2 and ME2X while the EHB reviewed the legality of the DEP's issuance of the permits. The Environmental Advocates argued that the DEP approved Sunoco's permits despite the fact that Sunoco's applications contained hundreds of unresolved deficiencies documented in submissions that spanned over 500 pages. The Environmental Advocates further alleged that the current plans for the Mariner East System were not safe and did not adequately protect the environment.

133. While this litigation was ongoing, on June 10, 2017, Sunoco caused a frac-out causing approximately 40 gallons of Drilling Pollutants to seep into the ground near the 187-year old Mingo Presbyterian Church. After Sunoco attempted to vacuum the spill, the next day, another 100-gallon frac-out occurred at the same work site. In its initial report to the DEP, Sunoco claimed the spills were likely related to conditions below the surface caused by "historic deep underground coal mining in the area," a condition that Sunoco should have been aware of before conducting HDD operations. Subsequently, Tetra Tech, the same contractor that had prepared its HDD Inadvertent Return Assessment, Preparedness, Prevention and Contingency Plan (the "HDD IR Plan"), was asked to reevaluate the design of drills in the area, and it determined the risk of further spills was inherent to drilling in that spot.

134.     After months of litigation, on July 25, 2017, the EHB issued an order in favor of the Environmental Advocates, and temporarily enjoined Sunoco from conducting HDD operations at 55 different work sites across Pennsylvania.  After hearing extensive argument over the dangers HDD poses to Commonwealth residents, and the lack of diligence Sunoco conducted prior to receiving its HDD permits, Judge Labuskes determined that "the permits that are the subject of this appeal are hereby superseded effective immediately to the extent they authorize the Permittee to conduct horizontal directional drilling."

135.     FE-1 recalled that, in the fall of 2017, Energy Transfer failed to obtain permits before conducting HDD.  FE-1 said he got into arguments with construction managers who insisted on pulling the drill and moving on to sites they did not yet have permits for.  According to FE-1, the Company claimed they knew the permits would come in and decided to start early and hope they did not get caught.

136.     On July 27, 2018, the DEP reached a settlement with the Environmental Advocates. Pursuant to the agreement, the DEP paid the Environmental Advocates $27,500 and agreed to implement new policies aimed at enhancing public participation around pipeline projects.  Among other things, the DEP pledged to post more information online, including non-privileged, non-confidential materials received from companies seeking pipeline permits, as well as technical deficiency letters issued to pipeline companies, and final decision documents.

137.     Commenting on the settlement, Energy Transfer spokesperson Lisa Dillinger stated that "From the outset, Sunoco has maintained that the permits were properly and lawfully issued by PADEP and fully protective of the environment."

138.     On August 10, 2017, the EHB entered a Stipulated Order (the "August 2017 Order"), which resulted from a negotiated agreement between the Environmental Advocates,

Sunoco, and the DEP.  Pursuant to the August 2017 Order, Sunoco agreed to perform a "re-evaluation" of the safety of constructing HDD operations at 41 different work sites, plus an additional 22 HDD sites at which Sunoco had already caused a frac-out to occur during the installation of ME2 and ME2X (collectively, the "HDD Re-evaluation Sites").  In addition, Sunoco agreed to add to the list of HDD Re-evaluation Sites any site where a frac-out occurs in the future during the installation of ME2 or ME2X.

139.    In re-evaluating the 63 HDD Re-evaluation Sites, Sunoco agreed to (i) re-examine the geology at each site using information and data gathered during its HDD operations at these and other sites during construction of ME2 thus far; (ii) consider data that is specific to the needs of each HDD being reevaluated, including at a specific HDD: geologic strength at profile depth, overburden strength, HDD depth, entry angle, pipe stress radius, open cut alternatives, a re-route analysis for all HDDs and analyses of well production zones; (iii) conduct additional geotechnical evaluations at each site using additional field drilling and sampling, seismic surveys, ground penetrating radar; and electromagnetic surveys/electrical resistivity tomography; and (iv) provide the DEP with an explanation for why Sunoco elected not to use certain geotechnical evaluations, if applicable.

140.    Sunoco was ordered to submit a report for each of the HDD Re-evaluation Sites that detailed the findings and presented the results of its studies on each of these sites.  To create this report, Sunoco's professional geologist needed to sign and seal each report, and each report was required to "specify all actions to be taken by Sunoco to eliminate, reduce, or control the release of [frac-outs] of HDD drilling fluids to the surface of the ground or impact to water supplies at that location during HDD operations."

141.    In addition, Sunoco agreed to revise its HDD IR Plan.[7]  Notably, despite Sunoco being required to have a professional licensed geologist present at each HDD site to monitor the pressure in the HDD bore as well as the amount of liquid that was being recirculated in the drilling process, the DEP had noted that the process was not working as intended for, on at least two occasions, the geologists reported that they were instructed not to talk to the drillers.

142.    Also according to the HDD IR Plan, the Energy Transfer Companies are required to notify the DEP immediately after each frac-out (i.e., inadvertent return) occurs, and after each separate loss of circulation of drilling fluids occurs.

143.    After re-evaluating the 63 HDD Re-evaluation Sites, Sunoco submitted reassessments for 27 of them, all of which were originally designated as "low risk" sites. Surprisingly, Sunoco came to entirely contrary conclusions at many of these sites when compared to Sunoco's original "evaluations."  For instance, when Sunoco first submitted its site evaluations to the DEP in September 2016, Sunoco labeled 11 of the 143 HDD sites as having a "medium" risk of a frac-out, based on the presence of gravel or other geological complexities near a wetland or drinking water reservoir, with none of the sites having a "high" risk.  Later, many of the 27 reassessed sites were identified as posing "a high risk" or "an increased risk," or as "susceptible to the inadvertent return of drilling fluids."  Nearly all the reassessed waterway crossings required a redesign and new DEP approvals.  Most were realigned to send the pipeline deeper underground, and several were converted into open trenches or conventional bores that are more intrusive on the surface but pose fewer risks to water supplies at some sites.[8]

---

[7]  The HDD IR Plan was first filed by Sunoco in connection with the permit applications in December 2016.

[8]  Notably, Sunoco's new designs were still not effective at preventing frac-outs.  Since November 2018, Sunoco had caused at least 10 frac-outs at the reassessed sites alone, including one site where

2.  **November 2017:  An Outside Consultant Tells Sunoco to Stop Using HDD in the Exton Area Near Lisa Drive, Yet Sunoco Proceeds and Causes Dangerous Sinkholes**

144.    Among the 63 re-evaluated HDD sites was an HDD site located off Swedesford Road in West Whiteland Township (HDD Site #S3-0381, Permit ID #PA-CH-0219) (the "Swedesford Site").  The Swedesford Site is located approximately one-half of a mile from Energy Transfer's HDD site located near Lisa Drive, also in West Whiteland Township (HDD Site #S3-0400, Permit ID #PA-CH-0256) (the "Lisa Drive Site").  On August 8, 2017, Energy Transfer submitted to the DEP a Void Mitigation Plan for Karst Terrain and Underground Mining (the "Void Mitigation Plan").  In this plan, Energy Transfer labeled the Swedesford Site as posing a "low risk" of encountering subsurface voids, while labeling the Lisa Drive Site as posing a "<u>very low risk</u>."

145.    Contrary to these assessments, however, and through Energy Transfer's re-evaluation of the Swedesford Site, Energy Transfer contracted with Groundwater & Environmental Services, Inc. ("GES") to conduct an HDD Hydrogeologic Re-Evaluation Report (the "West Whiteland Township Report").  In the report, dated October 16, 2017, GES <u>specifically</u> warned Energy Transfer that "the alignment of HDD S3-0381 passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally <u>known for karst development</u>."  GES then warned that "carbonate rocks (Ledger and Conestoga Formations) are <u>prone to sinkhole development and solution openings, and should be thoroughly investigated before construction</u>."

---

a 30,000-gallon spill of Drilling Pollutants reached a wetland in Berks County.  Sunoco had said a redesign of its plans at that site was unnecessary.

146.   In connection with GES's evaluation, Energy Transfer contractor Tetra Tech similarly alerted Energy Transfer to the severe risk of sinkholes, as demonstrated in the map provided below:



147.   As further demonstrated below, almost half of the HDD path (indicated by the red oval in the figure below) at the Lisa Drive Site travels through carbonate rock, which is comprised of limestone and dolostone rock (indicated by the yellow shaded area).



148.    Despite these warnings, and despite assurances from COO Marshall McCrea on November 8, 2017, that Energy Transfer is "doing everything we can to work with PA DEP and to get all the HDDs completed and on time," Sunoco continued HDD construction in the Exton area.  But just days later, on November 11, 2017, the Energy Transfer Companies' drilling of the ME2 pipeline in the sinkhole-prone karst topography of Chester County caused a 500-gallon frac-out and sinkholes to appear at the Lisa Drive Site.

149.    According to Lisa Drive residents, as stated in a putative class action filed on March 15, 2018, Energy Transfer's HDD operations caused "geysers of drilling fluids" to be released in the area, spewing "contaminants across the land of Plaintiffs and members of the Class."

150.    After an investigation conducted three days later, the DEP concluded that Energy Transfer had indeed caused these frac-outs to occur and that Energy Transfer had, again, failed to promptly alert the DEP as was required under the Special Conditions in the ME2 Permits.

151.    Given the violations and frac-outs at the Lisa Drive Site, the DEP issued a Notice of Violation to Energy Transfer on November 16, 2017.  The DEP specifically referenced Energy Transfer's "history of incidents" at this site, detailing the numerous frac-outs that Energy Transfer had caused, and reminded Energy Transfer that pursuant to the HDD IR Plan and the Special Conditions listed in each Energy Transfer's permits, the Partnership was required to "immediately" notify the DEP following any frac-out.

152.    Although the DEP learned of the incident at Lisa Drive, Energy Transfer apparently did not inform the DEP of it, or provide the DEP with a full disclosure of the event.  Indeed, the November 2017 Notice specifically stated that the DEP "is very concerned with Energy Transfer's continued failure to provide the required notifications for these incidents."

153.    The November 2017 Notice also required Energy Transfer to respond to multiple other requirements ordered in previous notices of violation, including providing the now late "incident reports" for frac-outs that occurred in August 2017, and confirming whether there were other unreported frac-outs at this site during the past months.  The request to provide a list of additional frac-outs was particularly troublesome given that Energy Transfer was already legally required to report all frac-outs "immediately," and that each of the 28 Notices of Violations Energy Transfer had received thus far had instructed Energy Transfer to alert the DEP to any frac-out the Partnership caused.

154.    Shortly after the initial five sinkholes appeared, multiple additional sinkholes appeared which "caused and continue to cause damage to structures and other improvements" to

the Plaintiffs' properties, such as "cracking in the walls, chimneys and driveways of their homes."

As discussed further below, along with the problems that GES brought to Sunoco's attention in

November 2017, the Lisa Drive sinkholes, and the serious risk to Energy Transfer's ability to drill

the ME2 pipeline that they posed, as discussed further below, (i) Energy Transfer instituted a

scheme to illegally bribe state constables to patrol Lisa Drive and intimidate its residents, and (ii)

Defendants became even more aware that Energy Transfer would not be able to complete the ME2

pipeline with the original full 20-inch pipe and in the timeframe promised by Energy Transfer.

155.    The damage caused by these sinkholes forced public water utility company Aqua

America ("Aqua") to perform emergency remediations at multiple points on the pipeline path to

prepare for a potential collapse of their water lines.  Such a consequence is particularly troubling

since Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior

Director Matthew Gordon[9] on July 17, 2017, explicitly warning Energy Transfer of the damage

HDD operations could cause in this area.  According to Crockett's email:

> Aqua Pennsylvania (Aqua) requests that Energy Transfer Partners (ETP) to avoid
> the use of horizontal direction drilling (HDD) near our Hillside Drive wells in
> Exton, PA.  Based on aquifer testing jointly performed by ETP and Aqua, it appears
> that HDD will have adverse impacts on our public water supply wells at this
> location, resulting in permanent loss of these wells.   ETP should evaluate
> alternative pipe installation techniques to avoid HDD impacts on these wells.

156.    Despite (a) warnings from Energy Transfer's own consultants, (b) acknowledging

that the Lisa Drive Site borders a known limestone formation by a matter of feet, (c) that the Lisa

Drive Site is atop a karst formation (that may include limestone), and (d) that the Lisa Drive Site

is at a fault location where to formations converge, Energy Transfer spokesperson Jeff Shields

---

[9]   After Energy Transfer's acquisition of Sunoco in early 2017, ME2 representative Matthew
Gordon   changed   his   email   address   from   mlgordon@sunocologistics.com   to
matthew.gordon@energytransfer.com

responded to allegations that Energy Transfer was putting Lisa Drive residents at risk with its HDD operations by denying that the karst rock formations at the Lisa Drive Site caused the frac-outs and sinkholes.  He falsely claimed that "professional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception," and that "construction through this area is safe.  There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."  Shields' assertion was materially false and misleading because Energy Transfer was aware that, at the very least, the first third of the HDD path at the Lisa Drive Site traversed known limestone formations, which dramatically increased the risk of causing frac-outs and sinkholes.  As shown in the map above, the HDD path at the Lisa Drive Site overlaps substantially with a known limestone formation, and Energy Transfer had been aware of this fact since at least the start of the Class Period.

157.    Four months later, on March 2, 2018, Energy Transfer began testing ME2 again to assess its structural integrity.  However, as reported by the Lisa Drive Plaintiffs, Energy Transfer's testing resulted in "additional damage to the underground structures and four additional sinkholes developed on the property of Plaintiffs and members of the Class."   In a rush to suppress the resulting sinkholes, and "without the permission of the [DEP] or the [PUC]," Energy Transfer "pumped 8 or more cement trucks full of cement grout into several of the sinkholes" and "DEP and PUC immediately applied for a stop work order which was granted against [Energy Transfer]."

158.    The damage caused by Energy Transfer's latest sinkholes was severe.  According to the Lisa Drive Plaintiffs:

> Since the appearance of the sinkholes, Sunoco workers have inundated the area. The neighborhood is besieged by men in pickup trucks from Texas, New York, Arkansas, and other faraway places.  The neighborhood is being dug up by backhoes in an emergency effort to discover the full extent of the disaster wrought by Sunoco.  The underground has been so altered by Sunoco's [s]inkholes that DEP and PUC are concerned about imminent and catastrophic hazard to Plaintiffs and

members of the Class arising from the damage to the existing natural gas pipeline[, *i.e.*, ME1]. Sunoco has installed multiple seismic monitors throughout the neighborhood, including on the property of plaintiffs, because of regulators['] concerns that the pipeline will shift and explode.

159. Then, on January 20, 2019, Energy Transfer caused yet another sinkhole to appear on Lisa Drive. According to a press release issued by the PUC on January 21, 2019:

On January 20, 2019, at approximately 4:40 p.m., the PUC's Pipeline Safety Division was notified by Sunoco Pipeline LP, a/k/a Energy Transfer Partners (SPLP), that a new subsidence feature [*i.e.*, sinkhole] had formed near Lisa Drive, in Chester County, exposing the ME1 pipeline. [The PUC's Independent Bureau of Investigation and Enforcement ("I&E")] immediately dispatched a safety engineer to the site. I&E's geophysical consultant, ARM, was also asked to send a representative to the site. To ensure public safety, at approximately 6:30 pm on January 20, 2019, I&E proposed to SPLP that this section of the ME1 pipeline be shut down pending further investigation. At approximately 7:30 p.m. on January 20, 2019, SPLP initiated the stoppage of product transportation through this section of ME1. The shutdown was completed at approximately 12:06 a.m. on January 21, 2019. As a result of this shutdown, there is no product flowing through an approximately 7-mile long section of pipeline, between valves located at Boot and Exton, both in Chester County.

160. As reported the next day by local news service *CBS Philly*, Energy Transfer appeared to deny responsibility for the newly developed sinkhole. According to *CBS Philly*, "Sunoco is blaming recent heavy rains for a sinkhole that opened up, exposing a pipeline in West Whiteland Township." However, simply put, well designed pipelines should be able to remain safe even with heavier than average rainfalls.

161. Ultimately, as a result of Energy Transfer's seemingly unending assault on Lisa Drive, Energy Transfer determined that it was in the Partnership's best interest to purchase two of the most severely affected homes for $400,000 each.

### 3. 2017 Through 2019:  Energy Transfer Bribes Pennsylvania State Constables to Intimidate Homeowners on Lisa Drive and Throughout Pennsylvania

162.    To control the site of the Lisa Drive sinkholes and other Energy Transfer Companies' sites, Energy Transfer bribed Pennsylvania state constables to act as security at ME2 drilling locations, including at Lisa Drive.

163.    As referenced above, throughout the Class Period, Energy Transfer repeatedly falsely claimed that the Partnership adhered to all laws, that it was against the Partnerships' Code of Conduct to issue "Sensitive Payments," such as bribes, to any government official to receive special treatment for the Partnership's business, and that, despite DA Hogan's investigation, Energy Transfer had acted lawfully.  For example:

- On February 24, 2017, Energy Transfer touted in the 2016 10-K that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board," which forbade (i) "Sensitive Payments," such as "commercial bribes or kickbacks," and (ii) "<u>provid[ing] gifts or anything of value to government officials</u> . . . <u>in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department</u>";

- On February 23, 2018, Energy Transfer touted in its Annual Report filed on Form 10-K with the SEC (the "2017 10-K"), the same assurances that the Partnership's executives are forbidden from (i) offering "Sensitive Payments," such as "commercial bribes or kickbacks" to governmental officials; and (ii) "<u>provid[ing] gifts or anything of value to government officials</u> . . . <u>in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department</u>";

- On December 19, 2018, in response to the opening of DA Hogan's criminal investigation, Energy Transfer released a public statement claiming that the Partnership "vehemently den[ies] any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release," and that the Partnership is "confident that we have not acted to violate <u>any criminal laws in the Commonwealth of Pennsylvania</u>";

- On January 4, 2019, Energy Transfer spokesperson Lisa Dillinger stated on behalf of the Partnership that "<u>Energy Transfer has not engaged in any form of criminal activity</u>";

- On January 22, 2019, Energy Transfer claimed, in response to accusations of bribery of Pennsylvania constables to intimidate homeowners, that the Partnership had "engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property";

- On March 20, 2019, in response to a criminal investigation into Energy Transfer's construction of the Pipeline Projects, Energy Transfer claimed that "[s]afety is our priority," that there was "no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines," and that the Partnership was "confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania"; and

- On July 6, 2019, *Philadelphia* Magazine reported that Energy Transfer claimed that the Partnership remains "confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania."

164.    The statements referenced in ¶ 163 above were materially false and misleading when made, and they failed to disclose material facts necessary to make them not misleading. Specifically, as described in more detail below, Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that (i) Energy Transfer had an "unwritten policy" to bribe Pennsylvania State Constables to act as private security for the Pipeline Projects; (ii) Energy Transfer bribed the Constables to display their badges and firearms at construction worksites and bully citizens so as to hide from citizens and investors the Partnership's unlawful construction practices; (iii) Energy Transfer created a series of shell corporations to hide its payments to the Constables; and (iv) as a result, Defendants' public statements were materially false and misleading when made.

165.    The earliest reports of constables on landowners' property near the ME2 route date back to 2017.  According to internal Energy Transfer documents, Energy Transfer's desire to have armed constables in uniform to provide security began at least as early as August 17, 2017.  That day, Frank Recknagel – the Energy Transfer security manager for the Mariner East project—wrote a text message about a site in Elverson, Chester County (which is approximately 30 minutes

northwest from Lisa Drive by car).  In the text message, Recknagel wrote that he was "<u>working on a plan to have a licensed armed/un[i]formed PA State Constable provide coverage at this specific area</u>."

166.  A few months later, on November 30, 2017, when Bobbie Ripley, a TigerSwan employee, suggested it might be easier to use off duty police officers to provide security for ME2, Recknagel wrote in an email that it was Energy Transfer's "<u>unwritten policy</u>" to use "On Duty" law enforcement, sheriffs, or Constables to provide armed security.  Additionally, according to the criminal complaint that DA Hogan later filed, after residents of Lisa Drive expressed concerns about the presence of armed security personnel in close proximity to their homes and children, an <u>executive-level Energy Transfer supervisor</u> instructed Recknagel, on April 12, 2018, to make security personnel available to meet with local parents near Lisa Drive in West Whiteland Township.

167.  Before and after the Energy Transfer-directed meeting between the Constables and residents, the West Whiteland Township Police filed several police reports indicating contact with Constables.  For example, while responding to trespassing complaints on March 5 and 24, 2018, West Whiteland Township police spoke to Constable Kareem Johnson, who stated that he was <u>hired by Sunoco</u>.  Similarly, on May 7, 2018, West Whiteland Police responded to a disturbance on Lisa Drive and the filed report states that the police officers spoke to Constable Tyrai Anderson from Dauphin County, who told the officers that he was "hired as a deterrent and to monitor the Lisa Drive location."

### 4.  2018:  Energy Transfer Cobbles Together a Nearly 100-Year-Old, 12-Inch Pipe with the 20-Inch ME2 Pipe to Create a "Frankenpipe" Through the Pipeline Route Near the Lisa Drive Sinkholes

168.  The success of Energy Transfer's ME2 pipeline depended on the Company's ability to bring the pipeline online and carry the amount of NGLs that Energy Transfer told investors it

could carry.  During the Class Period, due to Energy Transfer's failure to timely disclose the frac-outs, water contaminations, regulatory violations, fines, and shutdowns; Energy Transfer's inability to conduct HDD in Exton, PA (as GSE warned Sunoco in November 2017); and the Lisa Drive sinkholes (which started in November 2017), Energy Transfer misled investors about the width of the pipe in the ME2 pipeline, when it would be brought online, and its throughput.

169.    Specifically, during <u>numerous</u> investor presentations Defendants held from May 31, 2017 up until August 14, 2018, <u>twelve in total</u>, Energy Transfer touted ME2's "<u>initial capacity</u>" as being <u>275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day</u>.

170.    In light of the problems at Lisa Drive, and other locations, as well as generalized issues with Energy Transfer's use of HDD, and unbeknownst to investors, Energy Transfer knew internally that it could not complete the planned ME2 on schedule with 20-inch pipe.  Instead, Energy Transfer realized that, in order to purportedly meet its 2018 in-service agreements, it needed to bring "ME2" online by cobbling together the new ME2 20-inch pipe with 12-inch pipe from another, much older pipeline.  Even as news of this need to jury-rig the old pipeline and attach it to ME2 became public, Energy Transfer hid from investors the material negative impact this would have on the throughput of the ME2 pipeline and the amount of NGLs it would carry when it came online.

171.    Specifically, on July 3, 2018, the press reported that Energy Transfer and Sunoco were planning to pump NGLs through an existing 12-inch pipeline that was being used to flow petroleum products in some sections of Delaware and Chester counties, where the new Mariner East pipelines were still under construction.  The Partnership said it would use a portion of the older line from Wallace Township to Middletown Township so that it could supply NGLs to its

customers while construction proceeded. The article reported that Energy Transfer had already filed a request for this change with the PHMSA.

172.    Vicki Granado, a spokesperson for Energy Transfer Partners, said: "We have identified an existing pipeline that will underline(allow us to meet our customer obligations) to get natural gas liquids to the Marcus Hook Industrial Complex while work on the Mariner East system continues."  She added that "A minimum amount of work will be required to change this line from a refined products line to a[n] NGL pipeline – e.g., connection pipeline and five new mainline valves, which can be done quickly and safely."  These comments from Ms. Granado stood in stark contrast to the fact that, days earlier, on June 19, 2018, a resident of Darby County reported that this same line spilled over 33,500 gallons of gasoline into a Darby Creek.

173.    Prior to this July 3, 2018 announcement, Sunoco had already quietly informed townships, including West Whiteland and East Goshen Townships, that it planned to repurpose the old pipeline because Sunoco was under pressure from its clients to deliver the promised NGLs, which were then at least 18 months behind the original schedule because of repeated regulatory and technical delays during construction.

174.    Rick Smith, manager of East Goshen Township in Chester County, said Sunoco was looking to use the existing pipeline because the multibillion-dollar ME2 and ME2X lines were held up in some places, and Sunoco was anxious to fulfill orders.

175.    In West Whiteland Township, also in Chester County, construction was on hold pending a safety inspection ordered by the PUC on June 14, 2018.  West Whiteland Township manager Mimi Gleason said Sunoco told her that using the 12-inch line would "take a little bit of the timing pressure off for getting Mariner 2 and 2X online."

176.    Gleason said the 12-inch line runs parallel to the existing Mariner East 1, which was already pumping NGLs across the state, and to the ME2 route, which runs for about 3 1/2 miles through the township.  She said the older line had been shut down for "quite a while" in West Whiteland.  She added that she did not know the exact age of the older line but estimated that it was about the same age as Mariner East 1, which was built in the 1930s.

177.    West Goshen Township hired Accufacts, Inc. ("Accufacts") to evaluate Sunoco's proposal to repurpose the 12-inch pipeline.  Accufacts' analysis explained that the repurposed 12-inch pipeline would join the ME2 between Fairview Road in Wallace Township and Glen Riddle Junction in Middletown Township. Plotting these addresses in mapping software shows that Lisa Drive in West Whiteland Township, Chester County—the site of the numerous frac-outs and sinkholes discussed above, and Sunoco's constable-hiring scheme, all of which came to a head in November 2017 through April 2018—is directly in-between them, suggesting that the purpose of using the old pipeline (instead of drilling ME2) was to bypass an area that Energy Transfer and Sunoco had already long known were plagued by geological risks and construction problems:



178.    Eric Friedman, a member of Del-Chesco United for Public Safety, a campaign group in Delaware and Chester counties, said that the reuse of the old pipeline raised new questions about the project's safety, and he accused Sunoco of cutting corners to appease its clients.  He said, "I do believe that Sunoco is very much feeling the heat from its investors as a result of its inability to execute and continued accidents."

179.    Don Vymazal, head of government relations for state Senator Andy Dinniman (D-Chester County), said his office heard from several townships that they had been approached by Sunoco about reuse of the old pipeline, after Dinniman's outspoken opposition to the project. Sunoco's new plan raised questions about whether the 12-inch line is the same as the 12-inch line

that Sunoco said leaked gasoline into Darby Creek near Philadelphia in 2018.  "If it's the same line, it's concerning, to say the least, to put a product in there that's very volatile," Vymazal said. As *StateImpact Pennsylvania* reported months later, on September 4, 2018, the 12-inch line Sunoco proposed to use was, in fact, the line that had leaked 33,000 gallons of gasoline into Darby Creek.

180.    On June 14, 2018, the PUC upheld part of a complaint by Dinniman, calling for a shutdown of Mariner East in West Whiteland on the grounds that the project was a threat to public safety.  The PUC said Sunoco had informed it of its plans for the 12-inch line but declined to provide further details.  "PUC was already notified by Sunoco because it is a public utility," said PUC spokesperson David Hixson.

181.    As discussed in further detail below in Section VI.A, Energy Transfer hid from investors the true impact of using the 12-inch pipe with ME2 until August 2018.  Specifically, after Energy Transfer disclosed the need to delay the full ME2 completion date and the repurposing of the old pipeline on its August 2018 earnings call, it was pressed for answers on how this would impact the performance of ME2. Only after being asked by analysts about such impact did Energy Transfer disclose, on August 10, 2018, that its *ad hoc* cobbling-together of old and new pipelines would result in a 65% reduction in ME2's initial throughput when brought online.  This shocking disclosure caused a 5.5% decline in the price of Energy Transfer's partnership units.

### 5.    December 2018:  Chester County Launches an Investigation of Energy Transfer

182.    Regulatory scrutiny continued to increase.  On December 19, 2018, the Chester County District Attorney's office issued a press release announcing that it had opened a criminal investigation into the construction of the Mariner East pipelines and its owners in light of "sinkholes created by the pipeline drilling, contaminated well water," and "subtle and not-so-subtle

bullying of Chester County citizens."  The press release quoted District Attorney Tom Hogan as saying:

> We expected the state regulators and the governor to step in and assure the safety of Pennsylvanians.  They have not.  So now the Chester County District Attorney's Office will demand that every aspect of the pipelines be constructed safely, or we will bring into play all of the tools of the criminal justice system.

The press release further explained that the construction of the Mariner East pipelines had caused "significant sinkholes in . . . residents' back-yards" and "contamination of well water" in Chester County, and cited the Revolution Explosion in Beaver County (discussed in detail below) as "chang[ing] speculation into tangible danger and destruction."  The Chester County District Attorney further explained that the investigation would cover past and future conduct, and that "[p]otential charges [could] include causing or risking a catastrophe, criminal mischief, environmental crimes, and corrupt organizations."

183.    In response to news of District Attorney Hogan's investigation, Energy Transfer released a statement in which it "vehemently den[ied] any such wrongdoing" and asserted that there were "many factual inaccuracies contained in the District Attorney's press release." Nonetheless, Energy Transfer stated that it "look[ed] forward to opening a dialogue with the district attorney's office in the hope that [it could] bring this matter to an appropriate resolution." It further claimed: "The safety of all those who live and work along our pipeline is our first priority, and this project was planned and implemented based on that fact."

184.    Within weeks, the Chester County District Attorney's investigation became even more significant.  Despite engaging in talks with Sunoco, on January 4, 2019, the District Attorney announced that it had named to the investigation Seth Weber, a former federal prosecutor who had "prosecuted many complex environmental cases as well as political corruption . . . cases during a 26-year career as an Assistant U.S. Attorney for the Eastern District of Pennsylvania."  District

Attorney Hogan explained that Weber's appointment "certainly sends a message that we are taking it very seriously, and that somebody who has experience in this field is taking it very seriously." That same day, *StateImpact* reported on Energy Transfer's statement that the investigation was "meritless," and quoted Energy Transfer spokesperson Lisa Dillinger as saying that District Attorney Hogan would "not be able to avoid the inescapable conclusion that <u>Energy Transfer has not engaged in any form of criminal activity</u>, and the issues referenced have already each been thoroughly investigated, reviewed, and ultimately resolved by the appropriate government agencies."

185.     On March 5, 2019, Phil Heron of the website *Daily Times* reported that he had received a grand jury summons in Chester County, and that the jury selection process involved questions concerning the Mariner East project and Energy Transfer.  That same day, *StateImpact* reported on the empaneling of the grand jury, quoting a staff attorney from the Clean Air Council who explained that empaneling a grand jury was "a very serious commitment of the D.A.'s time" and was unlikely to be "a decision that [was] made lightly."

### 6.     December 2019:  DA Hogan Files Criminal Charges Against Energy Transfer's Security Chief for Bribing Pennsylvania State Constables to Intimidate Homeowners

186.     On December 3, 2019, DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for the Mariner East pipeline, Frank Recknagel, in connection with his direction of a "buy-a-badge" scheme for security services along the ME2 pipeline project.  In the press release accompanying the announcement of charges, DA Hogan stated:

> This is a pretty simple case.  State Constables sold their badges and official authority.  <u>Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens</u>.  And the defendants attempted to conceal their activity through a maze of companies and payments.

187.     The press release continued:

Energy Transfer decided they needed security for the pipeline.  However, rather
than simply hiring a private security firm, Energy Transfer decided to recruit and
hire armed Pennsylvania Constables to act as a private security force for the
pipeline.  Pennsylvania Constables are elected officials, who are permitted to carry
out enumerated official duties, and are governed by the Pennsylvania Ethics Act.
Pennsylvania State Constables are not permitted to use their official position or
badges for private security jobs.

188.     The charges accuse Energy Transfer of engaging in a "buy-a-badge" program to

circumvent Pennsylvania state laws by hiring Pennsylvania State Constables ("Constables") to

provide security for construction sites along ME2, while donning their badges, wearing their

official uniforms, and bearing firearms.   The charges in the criminal complaint are against

Recknagel, the Energy Transfer security chief, and four other individuals: Nikolas McKinnon of

Stafford, Virginia, a senior security adviser for TigerSwan LLC ("TigerSwan"), an international

security firm; Michael Boffo of Jacksonville, Florida, a site security manager for TigerSwan;

James Murphy of Harrisburg, Pennsylvania, operator of Raven Knights LLC ("Raven Knights"),

a Harrisburg-based security firm; and Richard Lester of Linglestown, Pennsylvania, registered

owner of Raven Knights.   The charges in the criminal complaint include: (i) Bribery; (ii)

Conspiracy; (iii) Dealing in proceeds of unlawful activity; (iv) violations of the Pennsylvania

Constable Act; and (v) violations of the Pennsylvania Ethics Act.

189.     The Chester County District Attorney's Office's investigation revealed that

Recknagel orchestrated the scheme to bribe the Constables.   As discussed below, Recknagel

implemented Energy Transfer's "unwritten policy" to use government officials—State

Constables—to secure the Energy Transfer construction sites and intimidate residents and potential

protestors.

190.    As DA Hogan's press release and the criminal complaint highlighted, Pennsylvania

Constables are elected public officials.  Constables are authorized under Pennsylvania law to serve

arrest warrants and various forms of civil process, transporting criminal defendants for court,

serving as courtroom security, preserving the peace at polling places during elections, and other

duties.  For the foregoing, Constables are paid by the Pennsylvania courts as codified by statute.

Under Pennsylvania law, Constables are also authorized to arrest, without warrant, any person that

they see engaged in the commission of unlawful activity "tending to imperil the personal security

or endanger the property" of "citizens."  44 Pa. Stat. and Cons. Stat. Ann. § 7158 (West).  They

do not, however, receive compensation for those services.  Constables are prohibited from holding

private detective licenses in Pennsylvania to avoid the appearance of misusing their public

authority for private interests.  In addition, Constables are prohibited from representing themselves

as officers of the court when not performing judicial duties.  As the Pennsylvania statute provides:

"While a constable or deputy constable is performing duties other than judicial duties, regardless

of whether or not he is certified under this subchapter, he shall not in any manner hold himself out

to be active as an agent, employee or representative of any court, magisterial district judge or

judge." 44 Pa. Stat. and Cons. Stat. Ann. § 7142 (West).  Indeed, the Pennsylvania Ethics Act

prohibits Constables from using their office for their own private pecuniary benefit.

191.    Under Pennsylvania law, "Bribery" is defined as offering or giving anything of

monetary value to a public official in exchange for the use of that official's position.  *See* 18 Pa.

Stat. and Cons. Stat. Ann. § 4701 (West).  A person charged with Bribery may not defend his

conduct if he was not permitted to take the action in his official capacity that he was paid to

undertake, regardless of if he did not actually hold the office yet or because the act paid for

exceeded his jurisdiction.  *See id.*  The Pennsylvania Bribery statute also bans <u>offering any benefit
to a public servant to violate a known legal duty</u>.  *See id.*

192.     According to the criminal complaint, rather than hire a private security firm for the
Mariner East project, Energy Transfer decided to recruit and hire armed Pennsylvania State
Constables, since Energy Transfer expected the Constables' badges and firearms would carry more
influence than a private security guard's uniform.   The criminal complaint described the
Constables working at ME2 construction sites in Chester County as wearing their official attire,
while armed and displaying their Constable badges.  Indeed, when in uniform, Constables appear
to be no different than municipal law enforcement officers, as shown by this photograph of armed
Pennsylvania constables in uniform:[10]



_____

[10] Photo taken from Patriot-News, *What is a Pa. State Constable and can they carry a firearm?*,
Jan.            5,            2019,            *available            at*
https://www.pennlive.com/news/2016/01/what_is_a_pa_state_constable_a.html (last visited May
28, 2020).

193.   The criminal complaint states that at least one constable was working outside of his home jurisdiction while two others unwittingly approached Chester County Detective Ben Martin ("Detective Martin") to intimidate him at a site in West Whiteland Township, while Martin was on duty investigating Energy Transfer's illegal use of constables in January 2019.

194.   DA Hogan's team began investigating the underlying claims in the complaint nearly a year before the criminal complaint became public, assigning Detective Martin to investigate concerns related to the construction and safety of ME2 on December 5, 2018.  DA Hogan's office had received multiple reports from Chester County residents that Drilling Pollutants from ME2 were contaminating groundwater sources for private wells, that sinkholes had been opening along the path of the pipeline, and that many residents were concerned about a possible leak or explosion and the potential for catastrophic loss of life.  In a January 22, 2019 press release, DA Hogan's office officially announced the investigation into the improper use of Constables for private security in connection with the Mariner East System.  The press release stated, "We want to know who hired these Constables and authorized them to act like they have some type of legal authority in Chester County."

195.   According to the criminal complaint, on January 2, 2019, Detective Martin interviewed Thomas Allen ("Allen"), a resident of Lisa Drive in West Whiteland Township. Energy Transfer held an easement to construct and operate ME2 on Mr. Allen's property and had been engaged in construction activities there for many months prior to his interview with Detective Martin.  Allen told Detective Martin that he had seen armed individuals on his property, one of whom Sunoco subcontractor Bob Reilly informed Allen was a Pennsylvania State Constable.  The photos below show just how close the ME2 construction site was to Mr. Allen's house (and by extension, so were the illegally-hired armed constables):

- 69 -



196.    Two days later, on January 4, 2019, Detective Martin interviewed State Senator Andy Dinniman who told him about several reports from his constituents that Energy Transfer had employed armed security guards on ME2 who displayed their badges and identified themselves as Pennsylvania state constables.  Senator Dinniman told Detective Martin that residents reported being intimidated by armed men showing their badges while restricting residents' movements on their own properties.

197.    On January 21, 2019, Detective Martin went to Lisa Drive in West Whiteland Township—where Allen lives—following the occurrence of the sinkholes in that neighborhood that exposed the ME1 pipeline, discussed above.  As he was parked in a legal parking area on a public street at approximately 10:30 a.m., a security guard who identified himself as Pennsylvania state constable Mike Robel ("Robel") approached Detective Martin.  Robel was a Constable from Northumberland – not Chester – County, Pennsylvania.   Robel, wearing what the complaint describes as "a patrol style duty belt with a firearm" and a visible Pennsylvania State Constable badge, told Detective Martin that he could not remain in the spot and that he would have to move his vehicle.  According to Detective Martin, <u>Robel told him that he was employed by Sunoco.</u>

Detective Martin identified himself as a Chester County Detective and told Robel that he would move when he was finished with what he was doing.  Martin subsequently confirmed that Robel was a constable from Northumberland County after he ran a search on the Constable at the DA's office.

198.    Later that day, at around 2 p.m., Detective Martin engaged with Robel again on Lisa Drive.  Robel told the detective that he worked as a subcontractor for Sunoco for James Murphy (of Raven Knights) and that he was being paid by Sunoco, not the state courts, because "Sunoco wanted certified Constables in uniform as private security for the project."  Robel's statements to Detective Martin underscore that it was Energy Transfer's policy to have these armed constables present on Lisa Drive and at other sites along the pipeline, in violation of Pennsylvania law, and that Energy Transfer directly managed security for the project.

199.    According to the criminal complaint, McKinnon conveyed incident reports from the Constables to Recknagel and generally "kept him apprised of Constable activity."

200.    During the course of his investigation, Detective Martin interviewed several Constables who worked for Energy Transfer along the ME2 pipeline route in Chester County.  On March 13, 2019, Detective Martin interviewed Constable Tyrone Harley, Jr., from West Caln Township, Chester County, PA.  Harley told Detective Martin that James Murphy of Raven Knights, a retired Pennsylvania State Trooper he knew through the Masonic Lodge, recruited him to work security for the Mariner East project.  Harley told Detective Martin that he reported to Mike Boffo of TigerSwan and used WhatsApp to communicate about his work on Mariner East. Harley told Detective Martin he received $25 per hour for his work in paper checks.

201.    On April 8, 2019, Detective Martin interviewed Constable Paul Norris of West Pikeland Township, Chester County, PA.  Norris told Detective Martin that he heard about the

security detail work from Constable Kareem Johnson, when they were at firearms qualification in April 2018.  Norris asked Johnson to pass his contact information along to the people "running the job."  Norris received a call to join the security team a few weeks later "from a security supervisor" and he faxed all of his credentials and qualifications to James Murphy of Raven Knights.  Norris did not wear his Constable badge or uniform while working on the Mariner East project but he did display his firearm.  Norris told Detective Martin that Mike Robel worked nearby his post and always told people he was a constable and wore his full uniform and displayed a firearm.  Norris also said that Mike Boffo had established a suite of rooms at the Fairfield Inn in Lionville, PA and ran much of the security operations out of that location; further, Norris said Boffo would occasionally leave checks with the night clerk at the Fairfield Inn when he did not deliver them personally to the sites, where he would ride around and check on security personnel.  In June 2018, Boffo and others hosted a mandatory training on the use of body cameras at the Fairfield Inn in June 2018, which Johnson, Harley, and Norris attended along with other Constables.  On June 1, 2018, Bobbie Ripley sent an email to Frank Recknagel informing him that the Constables would be attending the body camera training.  Harley said Boffo provided him with a body camera to use for his security detail on Lisa Drive.

202.   During a later interview of Constable Kareem Johnson by Detective Martin, Johnson said that he became aware of the security work on the Mariner East pipeline when he overheard Tyrone Harley talking about it and expressed his interest.  When Johnson called the number Harley provided, he spoke to whom he believes was Nikolas McKinnon from TigerSwan.  Shortly thereafter, Johnson went to the Fairfield Inn in Lionville and met with Mike Boffo and Bobbie Ripley from TigerSwan, to whom he provided his credentials and certifications.  During

this meeting, <u>Johnson was wearing his uniform and he was told to do so when he was working</u> <u>security on the Mariner East project</u>.

203.    On August 8, 2019, Chester County law enforcement officials arrested Constables Mike Robel and Kareem Johnson and charged them with Bribery, Official Oppression, and Ethics Act violations.    In response to the arrest, Energy Transfer spokesperson Lisa Coleman misleadingly claimed in an email statement:

> <u>Constables Johnson and Robel were not Sunoco or Energy Transfer employees</u>. They were employed by Raven Knights, who provided security services and personnel.  We have a code of conduct for all of [our] contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that.

Yet, contrary to the misleading assertions in the Energy Transfer statement, <u>documents obtained</u> <u>by the Chester County DA's office show that the Constables were hired at the direction of Energy</u> <u>Transfer employees,</u> such as Recknagel, and that <u>payment to law enforcement for their authority</u> <u>is a company policy</u>.

204.    Following further investigation throughout 2019, on December 3, 2019, DA Hogan's office issued a Chester County criminal complaint, which charged that Recknagel, the Energy Transfer security director, schemed to hide payments to state constables in order to allow Energy Transfer to have armed, uniformed government officials providing security at Energy Transfer locations <u>while attempting to hide Energy Transfer's hiring of the Constables</u>.  In a press release about the complaint, DA Hogan said:

> This is a pretty simple case.   <u>State constables sold their badges and official</u> <u>authority. Energy Transfer bought those badges and authority, then used them as a</u> <u>weapon to intimidate citizens</u>.   <u>And the defendants attempted to conceal their</u> <u>activity through a maze of companies and payments</u>.  Meanwhile, new sinkholes are popping up along the Mariner East pipeline.  And still, the governor remains asleep at the wheel.

205.    The criminal complaint alleges that Energy Transfer and its wholly-owned subsidiary Sunoco illegally hired 19 constables to guard ME2.   According to the criminal complaint, Sunoco hired TigerSwan to oversee security on the Mariner East projects and the contracts governing TigerSwan's obligations indicate that subcontractors providing security services report to TigerSwan personnel for daily operations.

206.    Energy Transfer and TigerSwan have a long history of working closely together on high-profile Energy Transfer pipeline projects.  Energy Transfer had previously used TigerSwan to provide security for the controversial Dakota Access pipeline project in North Dakota and, at the time Sunoco entered into the Mariner East contract with the security firm, TigerSwan was litigating a case brought by the North Dakota Private Investigation and Security Board related to allegations of unlicensed security work in that state.  In North Dakota, TigerSwan faced scrutiny after *The Intercept* published leaked documents[11] detailing TigerSwan's invasive surveillance practices, which involved infiltrators, aerial monitoring, and a close collaboration with local law enforcement to thwart lawful protests near the Standing Rock reservation.[12]  The documents reveal that both of the TigerSwan contractors charged in Pennsylvania—McKinnon and Boffo— previously worked on Energy Transfer's Dakota Access pipeline.  Similarly, the Louisiana security board accused TigerSwan of registering a new security company in the state in an attempt to

---

[11]  Alleen Brown, Will Parrish, Alice Speri, THE INTERCEPT, *Leaked Documents Reveal Counterterrorism Tactics Used to "Defeat Pipeline Insurgencies*," *available at* https://theintercept.com/2017/05/27/leaked-documents-reveal-security-firms-counterterrorism-tactics-at-standing-rock-to-defeat-pipeline-insurgencies/ (last visited at May 29, 2020).

[12]  Alleen Brown, THE INTERCEPT, *Pipeline Giant Energy Transfer and Its Private Security Contractors Face Bribery Charges in Pennsylvania* (Dec. 8, 2019), *available at* https://theintercept.com/2019/12/08/energy-transfer-tigerswan-bribery-conspiracy-charges/   (last visited May 29, 2020).

circumvent a previous license denial for security work related to Energy Transfer's Bayou Bridge oil pipeline.

207.    According to the criminal complaint, Raven Knights, controlled by former Pennsylvania state troopers Murphy and Lester and at the direction of Energy Transfer, hired the constables and paid them "in a fashion calculated to avoid legally-mandated reporting requirements."    The structure of the payments also served to obscure Energy Transfer's supervision of the constables.    According to the complaint, the Raven Knights bank account used to pay the constables was fed by deposits from TigerSwan and two Energy Transfer construction subcontractors.

208.    As alleged in the criminal complaint, Energy Transfer paid the constables a total of $804,590 between September 2017 and February 2019, "for the purposes of bribing Pennsylvania State Constables to use the authority of their office."    Recknagel arranged for these payments to be made in more than 23 separate transactions through subcontractors that had no operational control over the Constables.    DA Hogan's investigation revealed that TigerSwan and Raven Knights employees communicated extensively with Recknagel (i.e., Energy Transfer) regarding the payments to Constables, including an October 8, 2018 quarterly breakdown of spending for security at Lisa Drive in West Whiteland Township.    These communications also detailed the Constables' hiring, schedules, credentials, training and duties.    The emails specifically differentiated, according to the criminal complaint, between security and Constables assigned to the construction sites when addressing personnel and budgetary considerations.

209.    DA Hogan and his team found that every step of Energy Transfer's payments to the State Constables was "hidden and cloaked":

> Recknagel hid payments to the State Constables.  Recknagel, acting for Energy Transfer, arranged for uninvolved subcontractors to send payments to the security

firms for eventual payment to the Constables.  <u>In other words, Recknagel used a shell game to hide payments to the Constables</u>.  For instance, Energy Transfer sent payments to a subcontractor who was completely uninvolved in pipeline security.  The subcontractor sent payments to Raven Knights.  Raven Knights then paid the Constables, hiding the connection between Energy Transfer and the Constables.  To make the transactions even more difficult to track, the Constables failed to report the payments on their Pennsylvania Ethics Statements, which is a legal requirement.  <u>Every step of the payments was hidden and cloaked</u>.

Energy Transfer could have simply hired a reputable private security firm and paid the security guards directly.  Instead, <u>Recknagel and Energy Transfer wanted the power of the badge to enforce their corporate will and engaged in illegal activity to make it happen, then hid the payments in a byzantine process to avoid detection of their role</u>.

Ominously, DA Hogan added in the press release, "These types of investigations are complex and time consuming.  <u>We are working our way up a chain of corruption, which has both corporate and political ramifications</u>.  Other law enforcement entities are also investigating.  It will be interesting to see where the evidence leads."

### E.  Energy Transfer's Revolution Pipeline Explodes, Rendering the Revolution Pipeline Inoperative to this Day

210.   Despite Energy Transfer's claims that it was doing everything in its power to ensure the timely and safe construction of the Pipeline Projects, Defendants' actions with respect to the Revolution pipeline made clear that Defendants acted with severe recklessness when constructing the Revolution pipeline and had no intention of adhering to Pennsylvania law.

211.   Like Energy Transfer's brazen disregard for Pennsylvania law during its construction of ME2, Energy Transfer, through its subsidiary ETC Northeast Pipeline LLC, exhibited the same disregard for the law in its construction of the Revolution pipeline.  The Project consists of a pipeline that transports gas drilled by Energy Transfer customers to a cryogenic gas processing plant that would have processed and separated liquid natural gas into methane and various other NGLs (the "Revolution Plant").  Compressed NGLs from the Revolution Plant were

then to be sent through either ME2 or Energy Transfer's Rover pipeline.  Construction on the Revolution began on March 14, 2017, and it was originally planned to be completed by mid-2017.

212.    However, Energy Transfer's pipeline construction tactics forced the Partnership to significantly delay Revolution's in-service date.  In fact, in early 2017, due to Energy Transfer's failure to fulfill its timing performance obligations, at least one Energy Transfer customer, EdgeMarc Energy Holdings, LLC ("EdgeMarc"), abandoned its commitment to transport natural gas through the Revolution.  In order to lure customers back to Revolution, Energy Transfer engaged in a campaign of misrepresentations to its customers, promising concrete in-service dates, and said that if they missed those dates customers could freely exit their contracts.  EdgeMarc, as well as Energy Transfer customer PennEnergy Resources, LLC ("PennEnergy"), both entered into contracts with Energy Transfer under the express condition that Energy Transfer would place a safe, legal, and structurally sound pipeline "in-service" by October 1, 2018 (pursuant to PennEnergy's contract), and by January 1, 2019 (pursuant to EdgeMarc's contract).  Thus, timing was of the utmost importance for Energy Transfer, and motivated Energy Transfer to cut corners and engage in unsafe construction tactics.

213.    Defendant Marshal "Mackie" McCrea, was personally responsible for managing the construction of the Revolution pipeline, as well as managing Energy Transfer's contracts with EdgeMarc and PennEnergy.  According to Alan Vaina, ETC Senior VP of Business Development, McCrea was the actual decision maker for ETC and the individual who had "final sign off" of the events that ultimately led to the explosion of the Revolution (the "Revolution Explosion").

214.    Corroborating Mr. Vaina's statements, Adam Arthur, ETC Senior Director of Business Development, confirmed during a deposition conducted on August 8, 2019, that all ETC decisions were made by Mr. McCrea, including decisions relating to the construction of the

Revolution.  Mr. Arthur further described that Mr. McCrea saw him as his "right hand guy" and that Mr. Arthur's responsibilities were to be Mr. McCrea's eyes and ears with respect to the Revolution project and to provide Mr. McCrea frequent updates.

215.   Throughout the Class Period, in addition to concealing its callous disregard for the risks of constructing the Revolution pipeline in a landslide-prone area of Pennsylvania, Energy Transfer repeatedly made false representations to its investors that the Revolution and ME2 pipelines would be in-service more than a year earlier than possible.  For example:

- On Energy Transfer's May 4, 2017 earnings call with investors, Defendant Long stated that "Our Revolution project is still on schedule to be in service in the fourth quarter of 2017";

- On Energy Transfer's August 9, 2017 earnings call, Long stated that "On our Revolution project, construction is scheduled to be completed in the fourth quarter of 2017" and McCrea stated that "it will be up and ready for service in the fourth quarter";

- On the Partnership's November 8, 2017 earnings call, Long pushed the date out slightly, stating at that time that "On our Revolution project[, c]onstruction is scheduled to be completed in the first quarter of 2018";

- On Energy Transfer's February 22, 2018 earnings call, Long claimed that "On our Revolution project, construction is mechanically complete, and we will go into full service once Rover and Mariner East 2 are in service" and McCrea added that "Revolution, as you know, that is built to feed Rover, and it's built to feed Mariner. . .  And we're very hopeful that we'll have Rover complete.  We're very close on that soon and that sometime in the second quarter, we'll have Mariner on and ready to take barrels from Revolution";

- On May 10, 2018, during Energy Transfer's first quarter 2018 investor call, Defendant Ramsey stated that Mariner East 2 would enter service in "mid to late" third quarter 2018; and

- On August 9, 2018, Defendant Long stated that "we continue to expect to place ME2 in service by the end of this quarter [third quarter 2018]."

216.   In stark contrast to these representations, Energy Transfer had been conducting daily inspections of the Revolution during the months leading up to its explosion in September 2018, which demonstrated that Revolution had exhibited repeated surface failures along the

pipeline route, and areas where the ground around the pipeline was sinking, meaning that Defendants were either aware, or were reckless in not knowing, that the projected completion dates for the Revolution were impossible to meet.  Defendants were also aware, or recklessly disregarded, that the amount of work remaining to be performed on ME2, including the use of the repurposed old pipeline and undertaking HDD in unsuitable areas, would not allow for Energy Transfer to meet the claimed in-service dates for the full ME2 pipeline.

217.    Defendants were also aware that they had broken numerous environmental and safety laws and regulations in order to meet the claimed in-service dates.  Accordingly, even if the Revolution were somehow placed in-service by the third quarter of 2018, Energy Transfer would likely have had to pay massive civil penalties, and even be prevented from operating the Revolution, once the DEP discovered Energy Transfer's egregious misconduct.

218.    Then, as discussed in more detail below, on September 10, 2018, the Revolution exploded in a horrific display of the real threat the Pipeline Projects posed to Pennsylvania citizens after Energy Transfer had failed to act in compliance with state environmental, safety and criminal laws, as well as with its own Code of Conduct.

219.    Accordingly, the statements referenced in ¶ 215 were materially false and misleading, as they failed to disclose material facts necessary to make them not misleading. Specifically, as discussed below, Defendants willfully or recklessly failed to disclose, *inter alia*, that (i) in January 2016, Energy Transfer hired an engineering consulting firm to evaluate the safety of the Revolution's planned pipeline path; (ii) the consulting firm warned Energy Transfer that the Revolution's path was highly dangerous and crossed terrain that was known to have landslides; (iii) Energy Transfer faced severe pressure to complete the Pipeline Projects by the end of 2018 to prevent customers from voiding their commitment contracts with Energy Transfer; (iv)

Energy Transfer would be unable to complete the Pipeline Projects by the end of 2018 without constructing the Revolution along its originally planned path as securing additional easements to construct the Revolution along a safer path would be too time-consuming; (v) Energy Transfer would cut additional corners and construct an unsafe and environmentally destructive pipeline in order to meet the 2018 in-service date; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

220.    As discussed below, Energy Transfer's misconduct relating to the Revolution project caused significant harm to investors, including by (i) causing the DEP to issue an order on October 29, 2018 requiring Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline," (ii) causing the Chester County District Attorney to open a criminal investigation into Energy Transfer's apparent misconduct, and (iii) providing a basis for Energy Transfer's customers to void their contracts for taking product from the Revolution pipeline.

**1.    Energy Transfer Commits Hundreds of Permit Violations When Constructing the Revolution Pipeline**

221.    In order to begin construction on the Revolution pipeline, Energy Transfer applied for and received numerous permits issued by multiple counties, regulatory bodies, and the DEP. These include, most importantly, Erosion and Sedimentation Control General Permit authorizations (the "ESCG Permits")—which provide that each instance of non-compliance with these permits constitutes a violation of the Clean Streams Law and the 2012 Oil and Gas Act— and general permits pursuant to the Dam Safety Act ("Encroachment Permits") which provide for limited "encroachments" on specified waters.  The ESCG Permits also require that Energy Transfer operate and install Revolution using the best management practices ("BMP") so as to

minimize accelerated erosion and sedimentation, and to manage stormwater, moving earth to install the pipeline, and ensure the area around the pipeline was properly stabilized.

222.    In January 2016, Energy Transfer hired Terracon Consultants, Inc. ("Terracon"), a geological engineering consultant, to conduct an investigation into the area surrounding the Revolution route.  After an extensive investigation into the surrounding geology, Terracon issued a Geohazard Evaluation Report (the "Hazard Report") which "provide[d] guidance for field construction personnel to evaluate and mitigate potential geohazards encountered in the field." The Hazard Report dictated that "[k]nowledge of anticipated hazards, careful observation, discussion, and mitigation are <u>essential elements</u> of the construction process to ensure safety, successful project completion, and long-term integrity of the proposed pipelines."

223.    Terracon's Hazard Report notified Energy Transfer of significant risks associated with building the Revolution along the path projected by Energy Transfer.  For instance, the Hazard Report detailed that the proposed Revolution path would <u>"encounter primarily shale bedrock," which ranks as a ten out of ten on Terracon's hazard scale due to its "high potential for geological hazards."</u>  The Hazard Report further detailed that much of the terrain consists of a high frequency of "steep slopes, deeply weathered rock, and remnants from both surface and underground mining activities" and that, as such, Terracon "<u>anticipated that identification and mitigation of both landslide and subsidence geohazards will be challenging and require careful observation and mitigation</u>."

224.    Terracon also conducted four "scan line reviews," *i.e.*, field reconnaissance of certain segments of the Revolution path, including one segment that was less than 500 feet from the ultimate site of the September 2018 explosion on the Revolution pipeline (the "Explosion Site").  At this site, Terracon observed and reported that this particular area showed multiple signs

of landslide susceptibility, including evidence of "rotational slip," "hummocky topography," and "fallen and leaning trees."  As shown in the diagram below, rotational slips occur when large areas of land move down a slope, often caused by the added weight of absorbing heavy rainwater. Hummocky topography describes the highly irregular and wavy ground found near the bottom of a rotational slip, and can occur as a result of a past landslide.  As shown below, both are common predictors of future landslides.



Saturated soil slips
along a curved surface

Rotational slip plane

Hummocky topography

225.    Because of these steep slopes, Terracon explained that <u>"[r]emoval of vegetation and/or restriction of natural drainage may result in increased landslide susceptibility,"</u> as vegetation is important for absorbing rainfall, and, as such, "[w]ater control and drainage are important considerations during all phases of construction."

226.    Despite Terracon's <u>explicit</u> warnings, Energy Transfer nevertheless built the Revolution pipeline along Energy Transfer's originally projected path along this steep terrain that was prone to landslides, subsequently <u>removed vegetation</u>, and otherwise ignored all warnings and failed to undertake necessary precautions to ensure the pipeline's viability.

227.   Energy Transfer not only disregarded its own expert's recommendations when constructing the Revolution pipeline, but Energy Transfer committed hundreds of violations of its construction permits.

228.   Energy Transfer's ESCG Permits required the implementation of certain Erosion and Sediment Control Plans ("E&S Plans") and Post-Construction Stormwater Management Plans ("PCSM Plans") "to minimize the potential for accelerated erosion and sedimentation from earth moving activities associated with the construction of the Revolution Pipeline."  Energy Transfer's E&S Plans contemplated the use of various BMPs, including compost filter socks, waterbars, stabilized road entrances, erosion control blankets, and seeding.  The ESCG Permits required Energy Transfer to conduct inspections of the BMPs "on a weekly basis and after each stormwater event . . . to ensure effective and efficient operation."

229.   Energy Transfer's E&S Plans also stated that "[c]onstruction activities in areas susceptible to slope failures should be investigated and evaluated by a licensed Geotechnical Engineer in order to address any stability issues."

230.   In January 2017, the DEP, along with various other regulatory bodies, issued responses to Energy Transfer's E&S Plans, citing to dozens of technical deficiencies including, *inter alia*, missing or undersized BMPs, gaps in protection, and BMPs oriented in a way that would cause discharges back to the work area or toward dwellings.

231.   It was not long before Energy Transfer's E&S Plan failures became fully realized on the Revolution.  Beginning as early as May 2017 — during active pipeline construction — DEP inspections of the pipeline in Smith and Robinson townships identified violations of the Clean Streams Law by virtue of Energy Transfer's failure to properly implement BMPs, including silt fences "over half-way full" and sediment being brushed into roadside ditches.  Energy Transfer's

violations of the Clean Streams Laws and its permits continued into the fall and winter of 2017 and 2018. From November 2017 to March 2018, the DEP inspected a single section of the pipeline at least ten times, resulting in over a dozen violations of the Clean Streams Law, and ultimately resulting in a Consent Order and Agreement, issued in June 2018 ("June 2018 Order").

232.    As detailed in the June 2018 Order, Energy Transfer had violated Pennsylvania's Dam Safety and Encroachments Act, Clean Streams Law, dam safety and water management regulations, and erosion and sediment control regulations. The DEP also cited Energy Transfer for allowing so-called spoiled material to slide downslope into Raccoon Creek (a location in close proximity to the eventual Revolution Explosion Site) and the complete failure to install BMPs to contain the spoiled material. Energy Transfer's actions resulted in a "significant loss of the streambank" at Raccoon Creek, spanning over 290 feet. Energy Transfer agreed to pay a $145,250 civil penalty and to implement certain restoration plans to resolve the violations. In total, at least 39 different sections of the pipeline experienced significant soil stability issues, including landslides, slope failures, and ground cracks. Further, as a subsequent report by one of Energy Transfer's own consultants confirmed, at least 18 sections of the pipeline exhibited signs of historic, deep-seated landsliding, several of which were crossing the pipeline alignment.

233.    While Energy Transfer informed investors of the existence of the June 2018 Order, Energy Transfer failed to inform investors of the specific findings contained within the June 2018 Order, and instead continued to represent to investors that there were no delays with the Revolution.

234.    The slips subject to the June 2018 Order occurred a little more than half a mile downslope from the eventual Explosion Site. The June 2018 Order required restoration and monitoring of the stream restoration for a period of five years. Simultaneously with the negotiation

of the June 2018 Order, Energy Transfer was cited for numerous violations of the Clean Streams Law at a different section of the pipeline in Independence Township. From May 3, 2018 to May 29, 2018, Energy Transfer was inspected three times and cited for at least 15 violations of the Clean Streams Law at a section of the pipeline off of Newmann Road and Route 30 in Independence Township, including failure to implement and maintain effective BMPs, failure to provide temporary stabilization of the area in question, and failure to comply with its permit conditions. Although the DEP was focused on the pipeline sections at issue in the May 2018 inspections and the June 2018 Order, these issues proved to be only the proverbial tip of the iceberg.

235.    Energy Transfer's issues with soil stability went well beyond the Explosion Site. In February 2018, a landslide occurred in the pipeline right-of-way near Penny Hollow Road in Beaver County, Pennsylvania. The landslide occurred in an area mapped as a "known landslide feature" and described as "soil and rock susceptible to landsliding." Energy Transfer characterized the landslide as "major" as the landslide reportedly damaged trees and gouged out the land down to a nearby perennial stream. Energy Transfer's geotechnical consultant recommended mechanical stabilization using a "soldier pile retaining wall" or a "soil nail wall."

236.    In April 2018, another landslide occurred near Highway 151 in Independence Township. As with the Penny Hollow landslide, the Highway 151 landslide occurred in an area mapped as a "known landslide feature" and described as a "cove underlain by clay layer." Energy Transfer's geotechnical consultant concluded that the landslide was triggered "due to stockpiling of material upslope during the earthwork within the temporary construction easement area and likely in coincidence with heavy and/or extended rainfall." The landslide area was reportedly "poorly drained and noticeably saturated with numerous depressions and sumps." Energy Transfer

was notified by the landowner, citing to the Partnership's failure to "adequately [manage] this condition" resulting in a "tenuous and potentially dangerous situation."  Again, Energy Transfer did not alert investors to these landslides, despite a potentially significant settlement being negotiated with one of the property owners.

237.   Also in April 2018, during construction of the Revolution pipeline, an internal Energy Transfer report stated that "[a] slip that developed from the unrestored right of way near station 1115+00 went down the slope of the right of way under the power transmission line all the way down to Raccoon Creek. . . . The slip broke off at the edge of the right of way very close to the ditch line and there is a significant and very steep drop off on the edge of the ditch-line which will make it difficult to restore properly."

238.   This "slip" occurred approximately 30 feet from the landslide at the eventual Explosion Site.  Energy Transfer was in the process of attempting to stabilize the area by drying out saturated soil, moving that soil back uphill, and installing underdrains without a permit at locations in this saturated zone as determined by persons in the field.  The DEP later found that neither an engineer nor any other geotechnical expert was consulted by field staff when this work was performed.

239.   On or about June 1, 2018, Energy Transfer reported to the DEP that the Revolution pipeline was "mechanically complete and ready to be placed into commercial service."

240.   However, stability and soil movement issues at the eventual Explosion Site itself continued during the summer of 2018.  An Environmental Inspection Daily Report, a daily report prepared by ETC contractors Primoris Services Corporation and the Hanging H Company, dated July 30, 2018, indicated that crews at the eventual Explosion Site were still dealing with "multiple slip areas."  Daily inspection reports in the seven to ten days prior to the Revolution Explosion

show that Energy Transfer failed in its belated attempts to stabilize the Explosion Site by installing curtain drains and erosion matting, mixing calcimite into Explosion Site soil, and re-seeding the slope near the explosion site.

241.    In fact, Energy Transfer was even aware that the area of the Revolution Explosion had been described—prior to the explosion—as "dangerous and unstable" by the U.S. Army Corps of Engineers, and that data published by the U.S. Geological Survey, a scientific agency of the U.S. government, designates the area in Western Pennsylvania where the Revolution Explosion occurred as one of the areas in the United States with a high incidence of landslides.

242.    Despite the countless warnings Energy Transfer received about building the Revolution on such hazardous topography, as described above, Energy Transfer nevertheless selected this dangerous route as a way to expedite the construction process, and minimize costs, through the use of existing right of ways.

### 2.    September 2018:  Energy Transfer's Egregious Misconduct Causes the Revolution Pipeline to Explode

243.    On September 9, 2018, Energy Transfer began the multi-day commissioning process needed to be completed before the Revolution could be placed in-service.  This process included "purging" all the air from inside the pipeline, and "packing" the pipeline with enough gas to raise pressure inside the pipeline to the desired level.  Energy Transfer never completed the commissioning process.

244.    At approximately 4:56 a.m. on September 10, 2018, Energy Transfer's reckless pipeline construction practices resulted in the rupturing of the Revolution and a massive explosion in connection with a landslide that occurred near Ivy Lane in Center Township, approximately 25 miles outside of Pittsburgh.

245.    The Explosion's aftermath was terrifying.   The noise of the explosion was deafening.  Residents reported that the roar from the geyser of fire was so loud that they thought a plane was headed straight for their homes.  Callers dialing 911 reported potential plane crashes, meteorites, and power plant explosions.  However, of the 800 calls that came into Beaver County 911 that morning, only a handful of callers correctly identified that the Revolution had ruptured and exploded.  No one at the fire department or at the township even knew there was gas inside the Revolution at the time.  In fact, Energy Transfer had still been moving dirt <u>days</u> before the blast occurred.

246.    Energy Transfer narrowly avoided killing a family as they slept, forced townspeople to flee their homes before dawn, downed six high-voltage electricity towers, knocking the power out for 1,500 residents, and scorched approximately 3 acres of land.  The damage caused by the Revolution Explosion is exhibited below in before-and-after photos of the same property:





247.    Within hours after the explosion, the Red Cross was setting up an evacuation shelter

in the fire hall at the Center Township Volunteer Fire Department.  Energy Transfer also set up an

information table at the fire hall.  There, a resident closest to the explosion site—the resident whose house had been engulfed in flames minutes after the explosion—was furious:  he had notified Energy Transfer that the hillside at the Explosion Site had a slip <u>a few days earlier</u>, and was told it had been fixed.

248.    In a letter Energy Transfer sent to residents of Ivy Lane the next day, Energy Transfer claimed that "[o]ur first priority continues to be the safety of those who live in this community."   Despite this stated goal, Energy Transfer admitted in the letter that Energy Transfer's "initial site assessment" revealed that a landslide occurred, and Energy Transfer explained that the Partnership was well aware that "this type of land movement has been occurring throughout the state due to the unprecedented amount of rainfall."   However, the rainfall in the Pittsburgh area was nothing exceptional.

### 3.    Energy Transfer's Response to the Revolution Explosion Worsens Investors' Losses

249.    In the immediate hours after the Revolution Explosion, Energy Transfer's response to its customers encapsulated its overall attitude towards the construction of both ME2 and the Revolution.  Despite not having conducted any investigation into the cause of the explosion, and despite having direct knowledge that Energy Transfer had committed <u>hundreds</u> of violations of the very ESCG Permits and BMPs that were enacted to prevent atrocities such as this, Energy Transfer was fast at work on the morning of the explosion fabricating another lie to protect the Partnership's bottom line.  On the afternoon of September 10, 2018, ETC sent two letters to customers EdgeMarc and PennEnergy: the first inexplicably stated that the Revolution had been placed in-service <u>one day earlier</u>, on September 9, 2018, despite the fact that Energy Transfer had never even finished the commissioning and packing process needed before the Revolution could even be placed online;

and the second claimed that "an event of Force Majeure occurred" on the Revolution, rendering Energy Transfer unable to accept gas from its customers.

250. *First*, Defendants were well aware that they had fraudulently claimed the Revolution was in-service prior to the Revolution Explosion, as the Revolution Plant—the end point of the Revolution—had yet to receive a single molecule of gas. Instead, Energy Transfer was still in the commissioning phase when the Revolution exploded.

251. *Second*, pursuant to Energy Transfer's contracts with EdgeMarc and PennEnergy, Energy Transfer is prohibited from claiming an event of Force Majeure when the event was not "beyond the reasonable control" of Energy Transfer. However, neither the storm that precipitated the landslide nor the resulting explosion and fire was a Force Majeure. Simply put, properly engineered natural gas pipeline systems are designed and constructed to account for location-specific slope and soil conditions and historical weather data, and are made to withstand heavy, but by no means unprecedented, rainstorms. Indeed, the greater Pittsburgh area has experienced single-day September rainfalls greater to or close to the level seen on September 10, 2018 on five occasions since 2004.

252. Energy Transfer's permitting documents confirm that Energy Transfer knew, since 2015, that the area near the Revolution Explosion "included a 'slip' landslide area" with "dangerous and unstable hillslope terrain." And from November 2017 through February 2018, the Beaver County Conservation District, acting under delegated authority from the DEP, cited Energy Transfer at least six times for failing to implement and maintain appropriate practices to minimize the risk of accelerated erosion and sedimentation along the Revolution. As graphically seen below, the path selected for the Revolution pipeline exhibited these known risks, but Energy Transfer

nevertheless sought to place it there so that Defendants would not be forced to further delay the project.



253.    Following the Revolution Explosion and Energy Transfer's issuance of the fabricated "in-service" and Force Majeure letters, both PennEnergy and EdgeMarc, customers that represented a significant portion of Energy Transfer's previous Revolution volume commitments, immediately contested Energy Transfer's claims, and maintained that Energy Transfer had now, effectively, failed to put the Revolution in-service by the end of 2018.

254.    After the Revolution Explosion, Energy Transfer hired Terracon to conduct a post explosion investigation.  Although the investigation uncovered evidence pointing to a bad weld as a leading cause of the explosion, Terracon concluded that the slope on which the Revolution was built is "generally too steep to be permanently stabilized using solely earthwork measures and that stabilization of the slope will require mechanical means such as retaining structures/walls, piles, ground anchors, etc.," the same recommendations Terracon provided in its initial Hazard Report.

### 4. Energy Transfer's Post Explosion Misconduct and Misrepresentations

255. Following the Revolution Explosion, on October 29, 2018, the DEP issued an order requiring Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline" (the "October 2018 Order"). Energy Transfer was also ordered to submit a detailed plan of how Energy Transfer would repair the damage caused by the Revolution Explosion.

256. On this day, the price of Energy Transfer units dropped precipitously, falling from $15.46 per unit to $14.84 per unit, a $0.62 drop, or 4%.

257. On October 30, 2018, the DEP issued a press release commenting on the October 2018 Order, which stated, in pertinent part, that the DEP's "inspections discovered violations including <u>unreported landslides</u>, impacts to aquatic resources, <u>construction activities occurring in unpermitted areas</u>, and several sections of the pipeline that <u>required the installation of additional measures to prevent accelerated erosion</u>."

258. Nevertheless, despite the DEP's shutdown of the Revolution, and despite the fact that EdgeMarc and PennEnergy both contested Energy Transfer's assertion that Revolution ever entered service, during a presentation at the RBC Capital Markets Midstream Conference held on November 13, 2018, Defendants told Energy Transfer investors that the Revolution would still be operational in 2018, and that "Multiple customers committed to [the Revolution], which include volume commitments and a large acreage dedication." Energy Transfer reiterated these exact representations at the December 5, 2018, Wells Fargo Midstream & Utility Symposium.

259. On November 26, 2018, after the DEP informed Energy Transfer that its erosion control plans were incomplete and inadequate, Energy Transfer appealed the DEP's order to the state Environmental Hearing Board calling it "arbitrary, capricious, unreasonable, an abuse of

discretion, not supported by substantial evidence, unduly burdensome, contrary to fact and law, and otherwise improper."

260.    On December 3, 2018, Energy Transfer, pursuant to the October 2018 Order, issued its Stabilization Plan, Landslide Plan, and Updated ESC Plan.  Between March 1, 2019 and December 9, 2019, Energy Transfer submitted six revisions to this plan, five of which were rejected and met with deficiency letters.

261.    For several months after the blast, DEP inspectors visited areas along the right of way in Beaver County, ticking off continuing problems with land slips, soil flowing into streams and acid mine water along the right of way, which inspectors deduced was cut through old reclaimed surface mines.  Between the explosion and the first week of January 2019, the DEP performed 46 inspections of the pipeline.  All of them noted continuing violations.

262.    Even with notice of the violations, on or about January 8, 2019, Energy Transfer informed EdgeMarc that the Revolution was expected to receive regulatory approval by mid-February, and that the Revolution would be repaired and operational by May 1, 2019.  However, when EdgeMarc independently contacted Pennsylvania regulators and requested their estimate of when the pending regulatory issues would be resolved, EdgeMarc was told that "the clock [wasn't] even ticking yet" and that no timetable had been set or conveyed to Energy Transfer.

263.    On January 9, 2019, the DEP notified Energy Transfer that it had "failed to comply with the [October] 2018 Order" (the "January 2019 Notice").  According to the January 2019 Notice, Energy Transfer had, for four months after the explosion, "[f]ailed to install flagging, markers, or signs at the site," failed to "cease sediment laden discharges into Commonwealth waters" and failed to "temporarily stabilize disturbed areas."

264.    Ultimately, on February 8, 2019, Energy Transfer's brazen non-compliance led to the DEP's issuance of a letter to Energy Transfer admonishing the Partnership for failing to remedy the Explosion Site.  According to the letter, and a notice posted on the DEP's website that day titled "[DEP] Issues Hold on All Energy Transfer Clean Water Permit Approvals and Modifications Due to Non-Compliance," the DEP determined that Energy Transfer had "failed to comply with the Department's October [] 2018 [] Order, as well as [ESCG] Permit authorizations . . . issued for construction of the Revolution Pipeline."  The DEP stated that the permit hold will continue until Energy Transfer "demonstrates to the satisfaction of the [DEP] that its unlawful conduct has been corrected."

265.    According to the notice, the DEP reported that "[m]ultiple inspections by DEP staff, most recently in January 2019, found that [Energy Transfer] had not fulfilled the terms of the order and was not progressing toward compliance."  As a result, the DEP issued a permit hold suspending all reviews of clean water permit applications and amendments for Energy Transfer and its affiliates, which would continue until Energy Transfer "demonstrates to the satisfaction of the Department that its unlawful conduct has been corrected."

266.    On a February 21, 2019, earnings call with investors, Energy Transfer Chairman and CEO, Kelcy Warren, admitted that Energy Transfer's conduct constructing the Revolution and ME2 has been reprehensible, stating:

> We made some mistakes and specifically, now we'd like to talk about Pennsylvania, and we're going to take our medicine and fix those mistakes and complete good projects from this point forward, not insinuate that everything we've done has been bad, it's just we've made some mistake[s] that we're not proud of. So you'll see that improve, and when we don't make those mistakes again that our costs are going to improve and the predictability of those costs are likewise going to improve.

267.    Despite the DEP's crystal-clear message that Revolution would not be placed in-service until Energy Transfer remedied the damage caused by the Revolution Explosion, and despite the fact that EdgeMarc and PennEnergy were both engaged in active litigations against Energy Transfer disputing their contractual commitments to Energy Transfer, the Partnership reiterated that the Revolution had become in-service in 2018, and that the Partnership had secured "multiple customer[] commitment[s]" in three other investor presentations following the Revolution Explosion:  the 2019 Goldman Sachs Global Energy Conference held on January 8, 2019, the 2019 UBS Midstream, MLP & Utilities Conference held on January 15, 2019, and the March 2019 Investor Presentation held on March 27, 2019.  These statements were false and/or misleading as they failed to disclose that, given the growing evidence that the Revolution Explosion was the direct result of Energy Transfer's failure to build a structurally sound pipeline, Energy Transfer customers were disputing their contractual commitments to Energy Transfer.

268.    On December 13, 2019, more than 15 months after the Explosion, the DEP issued a letter that "conditionally" approved Energy Transfer's Plan.

269.    Between the date of the Explosion and the DEP's approval of Energy Transfer's plan, the DEP found that "at least [19] distinct sections of the Revolution Pipeline were not temporarily or permanently stabilized, which resulted in numerous slides within and outside of the" permitted area, and that Energy Transfer had caused "at least 352 separate occurrences of accelerated erosion and sedimentation," and had discharged sediment laden water on "at least 540 different occasions" into various creeks, streams and other bodies of water.  In addition, "at least 868 BMPs were not properly implemented or maintained," and "at least 1,359 BMPs were either not installed or installed improperly, contrary to the ESCGPs."  Moreover, "on at least 244 occasions, [Energy Transfer] did not submit corrective action reports after BMP failures."

270.    The above non-compliance resulted in the total elimination of at least 23 streams and 17 wetland areas, and the shortening or altering of 120 streams and 70 wetlands.

271.    On January 3, 2020—exactly two years after Judge Barnes issued the January 2018 Order admonishing Energy Transfer for its "willful and egregious" violations of Pennsylvania law during its construction of ME2—the DEP issued an Order that similarly admonished Energy Transfer for willful and egregious violations of Pennsylvania law during its planning for and construction of the Revolution (the "January 2020 Order"). In the Order, the DEP made numerous findings of Energy Transfer's appalling conduct, and ordered Energy Transfer to pay a $30.6 million fine, the largest the DEP has ever issued. According to Secretary McDonnell, "ETC's lack of oversight during construction of the Revolution Pipeline and their failure to comply with DEP's October 2018 compliance order demanded serious accountability. Their inaction led directly to this unprecedented civil penalty."

272.    The January 2020 Order held that Energy Transfer had "from the commencement of construction on March 14, 2017 to September 10, 2018, [] failed to inform the people that performed construction work on the Revolution Pipeline of the ESCGP Geohazard Requirements, the Construction Sequence, or any other part of the Narrative of the ESCGP."

273.    On April 27, 2020, the *Pittsburgh Post-Gazette* reported that Energy Transfer is "already negotiating a new settlement to address a slew of violations found since" the January 2020 Order. Specifically, Energy Transfer had committed 596 new environmental violations since the January 2020 Order was issued, including causing "masses of rock and soil [to] slough[] downhill, spill[] over barriers, knock[] out trees and fill[] in streams." In addition, Energy Transfer has still has not begun fixing the actual pipeline, since it cannot start that work until it first

demonstrates to the DEP that it has erosion under control at the Revolution Explosion site.  In February, an inspector arrived at a worksite along the Revolution and found it "actively moving."

274.    Energy Transfer's construction of the Revolution is, by far, the worst performance on environmental health and safety measures of any oil and gas operator in Pennsylvania. According to the *Pittsburgh Post-Gazette*, while inspections of the Revolution pipeline have accounted for less than 1% of the 8,200 evaluations of well sites and pipelines the DEP has conducted since January 1, 2020, the Revolution has accounted for 19% of the violations.  Between the day of the Revolution Explosion and the January 2020 Order, Energy Transfer has accumulated approximately 8½ violations per inspection relating to the Revolution.  And since January 1, 2020, Energy Transfer has increased this rate to nearly 10 violations per inspection.

275.    Pursuant to the January 2020 Order, Energy Transfer is required to pay $20,000 for each day of non-compliance.  According to DEP spokesperson Lauren Fraley, Energy Transfer "has not followed its approved Temporary Stabilization Plan, and the department has not hindered [Energy Transfer] from accessing these areas to implement the approved plans.  The vast majority of the violations have been the result of [Energy Transfer]'s failure to maintain and repair erosion and sedimentation control devices."

276.    According to spokesperson Fraley, the DEP "has issued letters reminding [Energy Transfer] of its stipulated penalty obligations."  As of May 1, 2020, Energy Transfer owes the DEP nearly $2.5 million but the DEP has yet to receive any of these funds.

277.    The Revolution pipeline has remained out of service since the September 1, 2018 Explosion.  The PUC and the Pennsylvania Attorney General still have open investigations into Energy Transfer's Revolution Pipeline Explosion.  The U.S. Department of Justice is also still investigating the cause of the explosion.

**F.     Energy Transfer's Reckless Pipeline Construction Resulted in Scores of Additional Violations, Regulatory Scrutiny and Consent Orders**

278.    Energy Transfer's problems with pipeline construction were not limited to Lisa Drive and Revolution. To the contrary, throughout the Class Period, Energy Transfer engaged in widespread misconduct contrary to its public statements, which caused significant delay in the construction of the Pipeline Projects.

**1.     July 2017:  Sunoco Enters Into a Consent Order for Its Repeated ME2 Permit Violations that Polluted Drinking Water**

279.    Energy Transfer and Sunoco's reckless construction of ME2 polluted countless public and private drinking water supplies.  For example,  between July 6 and July 10, 2017, 14 different homeowners in the vicinity of the "Shoen Road Drill Area" in West Whiteland Township, Chester County reported water pressure depletion and water supply pollution to the DEP.

280.    On July 24, 2017, Sunoco entered into a Consent Order and Agreement with the DEP.  Pursuant to the Order, the DEP "determined that Sunoco's activities adversely impacted the well water of the 14 homeowners . . . by its drilling activities at the Shoen Road Drill Area, including causing cloudy water, turbid water, and discolored water" and that "Sunoco failed to immediately notify the Department of adverse impacts to private water supplies . . . as required" by Sunoco's permit. The DEP also found that Sunoco's pollution of these water supplies constituted a violation of Pennsylvania's Clean Streams Law, the 2012 Oil and Gas Act, and the Dam Safety & Encroachments Act, and ordered Sunoco to halt HDD activities and implement a contingency plan to address any adverse impacts on private water supplies as a result of the pollution event.

**2.     Energy Transfer Destroys the Loyalhanna and Raystown Lakes**

281.    For a portion of its ME2 construction in Loyalhanna Township, Westmoreland County, Sunoco utilized HDD in order to install the pipeline under Loyalhanna Lake.  Prior to

Sunoco's construction, the Pennsylvania Fish and Boat Commission conducted a fish survey of Loyalhanna Lake in 2014 and concluded that it had fair to very good populations of gamefish.

282.    On May 13, 2017, Sunoco caused a frac-out to occur under Loyalhanna Lake. Sunoco caused eight more frac-outs to occur over the next two months.

283.    On June 1, 2017, the Westmoreland County Conservation District ("WCCD") inspected the area around Loyalhanna Lake to evaluate Sunoco's compliance with its Chapter 102 Permits and The Clean Streams Law, Act of June 22, 1937.  Upon inspection, the WCCD determined that Sunoco had failed to implement effective Best Management Practices ("BMPs"), in violation of the Chapter 102 Permits and Pennsylvania law, and notified Sunoco.

284.    Less than a week later, on June 6, 2017, Sunoco caused two more frac-outs to occur at Loyalhanna Lake.  These were followed by two more frac-outs on July 16 and 17, 2017.

285.    In light of Sunoco's repeated failures to safely and responsibly operate its HDD activities, the WCCD conducted a follow-up inspection of the Loyalhanna Lake site on July 27, 2017, whereupon the WCCD again determined that Sunoco had failed to maintain effective BMPs, violating Pennsylvania law and Sunoco's Chapter 102 permits, and that Sunoco caused pollution to 'waters of the Commonwealth'" in violation of The Clean Streams Law.

286.    On September 7, 2017, the WCCD conducted yet another inspection of the Loyalhanna Lake site to determine whether Sunoco had remedied its construction practices so as to comply with its Chapter 102 Permits and Pennsylvania law—and found that Sunoco had still failed to maintain effective BMPs and had failed to clean the polluted water in Loyalhanna Lake.

287.    Ultimately, on December 15, 2017, the DEP fined Energy Transfer $79,000 for Sunoco's repeated violations in connection with HDD activities at Loyalhanna Lake (the "December 2017 Order").  In addition, Sunoco was ordered to conduct a clean-up program,

including submitting regular progress reports to the DEP, conduct multiple studies to properly determine the size of the affected area, and fund a program to help repopulate dead fish. The DEP found that it was Sunoco's "failure on each occasion to take necessary measures to prevent pollutants from reaching waters of the Commonwealth."

288.    But even as Sunoco was negotiating with the DEP over the contents of the December 2017 Order, its HDD activities were polluting and destroying another lake.

289.    On December 11, 2017, during construction at an HDD site near Raystown Lake, located in Huntingdon County (the "Raystown Lake HDD Site"), Sunoco reported a loss of circulation ("LOC") of approximately 2,000 gallons of Drilling Pollutants from its HDD drilling circulation. The 2,000 gallons of Drilling Pollutants discharged into Raystown Branch Juanita River. A little over a week later, on December 20, 2017, Sunoco reported that another frac-out had occurred to the ground surface at the Raystown Lake HDD site.

290.    But these events were just the tip of the iceberg. Between the December 11 LOC and the December 20, 2017 frac-out, Sunoco experienced almost daily Drilling Pollutant LOCs— amounting to almost a million gallons of Drilling Pollutants. According to Sunoco's HDD IR Plan in effect at the time, Sunoco was required to immediately report each instance of an LOC to the DEP upon its occurrence. Instead, Sunoco only timely reported the first 2,000 gallon LOC on December 11, 2017, and the December 20, 2017 frac-out; it did not report the other December 2017 LOCs until March 5, 2018. Almost a full year later, after conducting a post-hoc evaluation of the LOCs Sunoco caused at the Raystown Lake HDD Site, Sunoco submitted a report to the DEP on December 6, 2018 concluding that at least some of the one million gallons of Drilling Pollutants from the December 2017 LOCs had polluted the bottom of Raystown Lake.

291.    On February 18, 2019, Sunoco submitted a detailed follow-up report to the DEP which indicated that, during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprised a total of <u>two million gallons</u> of Drilling Pollutants lost.  As with the December LOCs, the HDD IR Plan in effect had obligated Sunoco to immediately report 30 of the 39 LOCs to the DEP.  However, Sunoco only timely provided the DEP with notification of one of the 30 LOCs, and reported the remainder in February 2019—in many instances <u>nearly two years late</u>.

292.    On July 16, 2019, Sunoco submitted a report to the DEP which provided a fuller analysis of Sunoco's destruction of Raystown Lake. The report showed that, between April and December 2017, Sunoco had failed to report approximately <u>3 million gallons</u> of Drilling Pollutants LOCs, which had polluted approximately 8 acres of the lake bottom of Raystown Lake.

293.    The chart below details instances when Sunoco failed to timely report LOCs at the Raystown Lake HDD site:

| **Date of LOC** | **Amount (Gallons)** | **Date Reported** | **Delay (Days)** |
|---|---|---|---|
| April 9, 2017 | 2,750 | February 18, 2019 | 680 |
| April 10, 2017 | Unreported | February 18, 2019 | 679 |
| April 11, 2017 | 120,700 | February 18, 2019 | 678 |
| April 12, 2017 | 112,900 | February 18, 2019 | 677 |
| April 14, 2017 | 108,400 | February 18, 2019 | 675 |
| April 19, 2017 | 163,500 | February 18, 2019 | 670 |
| April 30, 2017 | 61,850 | February 18, 2019 | 659 |
| September 23, 2017 | < 350 | February 18, 2019 | 513 |
| September 30, 2017 | 200 | February 18, 2019 | 506 |
| October 2, 2017 | 18,300 | February 18, 2019 | 504 |
| October 6, 2017 | Unreported | February 18, 2019 | 500 |
| October 7, 2017 | 73,000 | February 18, 2019 | 499 |

| Date of LOC | Amount (Gallons) | Date Reported | Delay (Days) |
|---|---|---|---|
| October 9, 2017 | 24,500 | February 18, 2019 | 497 |
| October 12, 2017 | Unreported | February 18, 2019 | 494 |
| October 13, 2017 | 61,500 | February 18, 2019 | 493 |
| October 14, 2017 | 102,000 | February 18, 2019 | 492 |
| October 16, 2017 | 123,000 | February 18, 2019 | 490 |
| October 17, 2017 | 113,000 | February 18, 2019 | 489 |
| October 18, 2017 | 127,000 | February 18, 2019 | 488 |
| October 19, 2017 | 112,000 | February 18, 2019 | 487 |
| October 20, 2017 | 55,000 | February 18, 2019 | 486 |
| October 21, 2017 | 89,000 | February 18, 2019 | 485 |
| October 23, 2017 - October 26, 2017 | 330,000 | February 18, 2019 | 480 |
| October 28, 2017 - October 30, 2017 | Unreported | February 18, 2019 | 476 |
| December 12, 2017 | 11,800 | March 5, 2018 | 83 |
| December 13, 2017 | 98,000 | March 5, 2018 | 82 |
| December 14, 2017 | 170,400 | March 5, 2018 | 81 |
| December 15, 2017 | 55,700 | March 5, 2018 | 80 |
| December 16, 2017 | 160,800 | March 5, 2018 | 79 |
| December 18, 2017 | 291,800 | March 5, 2018 | 77 |
| December 19, 2017 | 71,000 | March 5, 2018 | 76 |
| December 20, 2017 | 88,700 | March 5, 2018 | 75 |

294.    On January 3, 2020, the DEP issued a Consent Agreement and Order relating to Sunoco's destruction of Raystown Lake.  Pursuant to the Order, Sunoco was required to pay a $1.95 million fine, conduct a 110-acre cleanup of the bottom of Raystown Lake, and submit a Fish Habitat Improvement Plan to the DEP by February 1, 2020.

### 3.  December 2017:  DEP Issues a Consent Order to Energy Transfer

295.    On December 21, 2017, the DEP fined Sunoco $44,000 for multiple violations of Pennsylvania law and the ME2 permits stemming from the Energy Transfer Companies' failure to implement and maintain erosion and sedimentation control BMPs in Lebanon County.  The discovery of these violations occurred as a result of a site inspection by the Lebanon County Conservation District.  According to the DEP's website, Energy Transfer's "construction activities resulted in accelerated erosion and sedimentation at three sites in Lebanon County in violation of its permits and the Clean Streams Law.   In each instance, Sunoco was required to install appropriate measures to effectively minimize the erosion and sedimentation issues at those sites," but failed to do so.

### 4.  January-February 2018:  DEP Temporarily Suspends Construction of ME2, and Issues a $12.6 Million Fine

296.    Among other things, Energy Transfer also egregiously violated permits obtained for sites located in (i) New Morgan Borough, Berks County ("Berks Site 1"); (ii) Spring Township, Berks County ("Berks Site 2"); (iii) Brecknock Township, Berks County ("Berks Site 3"); (iv) New Morgan Borough and Caernarvon Township, Berks County ("Berks Site 4"); (v) Woodbury Township, Blair County ("Blair Site"); (vi) Silver Spring Township, Cumberland County ("Cumberland Site"); (vii) Lower Swatara Township, Dauphin County ("Dauphin Site"); (viii) Toboyne Township, Perry County ("Perry Bridge Site"); (ix) Tell Township, Huntingdon County ("Huntingdon Site"); and (x) Nottingham Township, Washington County ("Washington Site").

297.    On November 8, 2017, during Energy Transfer's third quarter 2017 earnings call, Defendant Ramsey sought to assure investors that recent reports of Energy Transfer's tumultuous relationship with the DEP were false and that progress on ME2 was proceeding apace, claiming

Energy Transfer is "working closely with those guys" to resolve any issues.  Defendant McCrea, reinforced this sentiment, stating that "with Matt Ramsey and his team we're doing everything we can to work with PA DEP and to get all the HDDs completed and on time . . . .  [W]e are going to do everything we can to bring it online and in service sometime in the second quarter."

298.    Also on this call, Ramsey sought to blame any delays to the in-service dates of ME2 and ME2X on bureaucratic postponements by the DEP, claiming that the DEP as "us[ing] their full-time allotment to respond back to us, [which] slows us down."

299.    Given the recent delays to ME2, Energy Transfer executives were feeling the pressure to get ME2 online as quickly as possible.  Thus, on the call McCrea heavily stressed the importance of bringing ME2 online:

> Once we get them in service, we couldn't be more excited about the returns. The way we talk about and the way we think we see it now out in the industry is that, Mariner needs to come online. There is a tremendous amount of barrels that are there now and are going to be there in the future. And they're looking for a home. But we've got to get the project completed. . . . We think Marcus Hook will be the best export and the largest in the country over the next 2 to 3 years with growth. . . . So we just need to get [on]line.

300.    At around the same time Ramsey and McCrea were making these statements to investors, Energy Transfer was violating its permits in a mad dash to get ME2 in service.  On November 11, 2017, the DEP received a third-party notice that there had been a frac-out at Berks Site 1, which caused Drilling Pollutants to pollute Hay Creek, a Class A wild trout water per the Fish and Boat Commission, and an Exceptional Value Water ("EV Water") under relevant Pennsylvania law.  Clean-up and containment of this frac-out lasted for over a week.

301.    After investigating for two days, the Berks County Conservation District ("BCCD") concluded that Energy Transfer's HDD activities had caused the frac-out.  Remarkably,

Energy Transfer's permits <u>did not authorize the Partnership to use HDD activities at Berks Site 1</u>. Accordingly, the DEP issued a Notice of Violation for that location.

302.     Moreover, in violation of Special Condition 20.xx of Sunoco's Berks County permit, Sunoco was forbidden from performing any in-stream work at this site each year between October 1 and April 1 without prior written approval from the Pennsylvania Fish & Board Commission ("FBC").[13]  Defendants were well aware of this restriction as, in July 2016, Sunoco had applied for a waiver of it, <u>which had been denied</u>.  This special condition was explicitly listed in Sunoco's Berks County permit, as well as on the site map of the authorized work area, as shown below.



303.     As a result of Sunoco's flagrant violations of unilaterally switching from open bore trenching to HDD operations at Berks Site 1, not notifying the DEP when a frac-out occurred, and

---

[13]  A similar requirement is found in each of Energy Transfer's 16 other Chapter 102 permits.

performing in-stream work there during a restricted period, the BCCD conducted an inspection of Berks Site 2. They found that, as at Berks Site 1, Sunoco had been conducting HDD operations at Berks Site 2 in direct violation of their permits, which permitted only trenching, and had been conducting in-stream work during the October 1 to April 1 restriction period.

304.    On November 21, 2017, the DEP issued a Notice of Violation to Sunoco, notifying it that its HDD operations were not authorized at Berks Site 2. Noticing a pattern of flagrant violations, the DEP ordered Sunoco to provide the DEP with a list of worksites along ME2 in which Sunoco had unilaterally switched its waterway crossing method to HDD without receiving any authorization from the DEP.

305.    On November 28, 2017, Sunoco submitted a written response to the November 21 Notice of Violation (the "November 28 Response"), which identified seven locations where Sunoco had unilaterally "field changed" the pipeline crossing method from an open bore trenching to HDD without first obtaining a permit modification or any other authorization from the DEP: Berks Sites 1-4, the Blair Site, the Dauphin Site, and the Washington Site.

306.    However, the DEP soon learned that these were not the only sites where Sunoco had failed to seek necessary permits and authorizations. On December 5, 2017, the DEP responded to a third-party complaint that Sunoco had built a bridge at the Perry Bridge Area. Sunoco was required to obtain a Chapter 105 permit from the DEP before constructing this bridge, but instead contracted with a third-party company to build it without ever notifying the DEP.

307.    Sunoco's repeated malfeasance led the DEP to request a meeting with Sunoco to discuss why this bridge was not included in Sunoco's November 28 Response. At the meeting on December 6, 2017, Sunoco stated that it was aware of no other instances in which Sunoco was violating its permits, and agreed to *ex post* apply for a permit to construct the Perry Bridge, as well

as provide Perry County and the DEP with a detailed analysis for the regulators to evaluate the bridge's safety metrics.

308.  But on December 18, 2017, Sunoco notified the DEP that Sunoco had received two complaints from residents near the Cumberland Site that their water had become contaminated and cloudy.  Two days later, the Cumberland County Conservation District ("CCCD") conducted an investigation into Sunoco's activities at the Cumberland Site and concluded that (i) Sunoco's HDD operations had contaminated residents' water supplies; (ii) Sunoco was not permitted to conduct HDD activities at the Cumberland Site; and (iii) Sunoco had unilaterally elected to use HDD at this site without obtaining a permit modification or any other authorization from the DEP.

309.  On January 3, 2018, faced with Sunoco's repeated and blatant violations, as well as Sunoco's disregard of the many prior agreements Sunoco and the DEP had reached concerning those violations, the DEP was forced to take its most drastic measure yet: halting entirely all of Sunoco's construction on ME2 and ME2X.  As DEP Secretary McDonnell stated in a press release that day: "Until Sunoco can demonstrate that the permit conditions can and will be followed, DEP has no alternative but to suspend the permits."

310.  In the DEP's January 3, 2018 order (the "January 2018 Order"), the DEP admonished Sunoco for its blatant disregard of Pennsylvania laws:

> Sunoco's unlawful conduct . . . demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder.  Suspension of the permits . . . is necessary to correct the egregious and willful violations described herein. Other enforcement procedures, penalties and remedies available to the Department under the Clean Streams Law and the Dam Safety and Encroachments Act would not be adequate to effect prompt or effective correction of the conditions or violations demonstrated by Sunoco's lack of ability or intention to comply.

311.  Pursuant to the January 2018 Order, Sunoco was forced to "immediately suspend all work" on ME2 "unless expressly authorized by the [DEP] in writing."  The DEP requested, yet

again, that Sunoco provide a detailed report "documenting any other unpermitted changes made to the method for installation of the pipeline," demonstrating that the DEP and the public clearly could not trust Sunoco's word that it would adhere to the permits issued to the Partnership.  As later stated by Secretary McDonnell, "A permit suspension is one of the most significant penalties DEP can levy."

312.    Sunoco spokesperson Jeff Shields downplayed the significance of the January 2018 Order, claiming that Sunoco "intend[s] to expeditiously submit these reports and we are confident that we will be reauthorized to commence work on this project promptly.  We also reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work."

313.    On February 8, 2018, Sunoco agreed to pay a $12.6 million fine to continue construction on ME2.  The civil penalty is one of the largest in DEP history and included continued monitoring of ME2 and ME2X.

### 5.    April 2018:  The DEP Orders Energy Transfer to Pay $355,000 for Multiple Violations of Pennsylvania Law

314.    Just over two months later, on April 27, 2018, the DEP fined Energy Transfer a further $355,000 for multiple violations of Pennsylvania law and the Special Conditions in the ME2 permits stemming from 69 separate occasions of frac-outs caused by Energy Transfer's HDD activities throughout the state.  According to the DEP's website:

> Sunoco's construction activities resulted in an unpermitted discharge of drilling fluids to wetlands, wild trout streams, and High-Quality Waters at a number of locations in Allegheny, Blair, Cambria, Cumberland, Dauphin, Huntingdon, Indiana, Lancaster, and Washington Counties in violation of its permits and the Clean Streams Law.  In each instance, [Energy Transfer] was required to halt operations, remediate the impacts, and submit proposed modifications to its construction methodologies to DEP for approval.  [Energy Transfer] was allowed to resume operations only after DEP reviewed and approved Sunoco's proposed modifications.  This penalty is in addition to the $12.6 million penalty levied against the company in February and covers separate violations.

### 6.    March-May 2018:  The Public Utility Commission Orders a Temporary Shutdown of ME1 and a Judge Halts ME2 Work

315.    Following closely on the heels of the DEP settlement, Energy Transfer yet again ran afoul of its permit obligations and Pennsylvania regulations.  On March 7, 2018, the Chairman of the PUC, Gladys Brown, granted an emergency request filed by the PUC's Bureau of Investigation and Enforcement, ordering Energy Transfer to temporarily shut down ME1.  Citing concerns about the "integrity of the pipeline" in light of sinkholes that were developing in Chester County, some of which had exposed the ME1 pipe, Chairman Brown ordered Sunoco to inspect ME1 in the vicinity of the sinkholes, and also to study geologic conditions and submit findings to the PUC.  As *StateImpact* reported at the time, the order provided that "Sunoco [would] not be allowed to resume operation of the pipeline until it meets all safety requirements set down by PUC inspectors."  Energy Transfer completed corrective action in the last week of April 2018, and, on May 3, the PUC permitted Energy Transfer to restart flows on ME1.  That return to status quo proved to be short-lived.

316.    On April 25, 2018, Pennsylvania State Senator Andrew Dinniman filed a formal complaint against Sunoco before the PUC. Citing provisions of the Pennsylvania Public Utility Code and PUC regulations relating to public safety with respect to public utilities, Senator Dinniman brought claims related to Sunoco's drilling operations in West Whiteland Township in Chester County, and sought, among other things, an injunction prohibiting construction of ME2 and ME2X within 50 feet of any "private dwelling, industrial building or place of public assembly" in West Whiteland Township.

317.    Senator Dinniman's complaint detailed Sunoco's lengthy history of accidents and malfeasance in Chester County and around the state.  It described how, between just April 25, 2017 and June 17, 2017, Sunoco's drilling had resulted in at least 61 frac-outs, and how Sunoco's

repeated failures to timely advise the DEP about frac-outs had led to the suspension of construction work on ME2.  It also detailed how, in connection with Sunoco's ME2 construction efforts, numerous sinkholes had developed in West Whiteland Township in late 2017 and early 2018, which not only threatened nearby land and structures, but risked the integrity of ME1.  In addition, the complaint set forth how the PUC's Bureau of Investigation and Enforcement had sought and received an emergency order prohibiting operation of ME1 in March 2018, which the PUC promptly granted.

318.    At the same time as he filed his formal complaint, Senator Dinniman also requested an emergency injunction seeking an order preventing Sunoco from constructing ME2 and ME2X or operating ME1, and requiring Sunoco to conduct geological tests and a public risk assessment, disclose risks to the public, and better train first responders.

319.    On May 21, 2018, Judge Barnes granted Senator Dinniman's emergency petition. In a lengthy and thorough order (the "May 2018 Order"), Judge Barnes detailed Sunoco's extensive history of leaks, water contamination, frac-outs, and other issues, as well as numerous risks and open questions about Sunoco's construction operations.  For example, the May 2018 Order explained that Sunoco's operation of ME1 raised serious concerns about its adherence to safety protocols, stating that "Sunoco failed to identify leaks on its pipeline and failed to report the leak or spill to proper authorities when they occurred," and explaining that those failures "appear[] to be on the surface a failure to follow proper protocol and safety procedure designed to protect the public." The May 2018 Order discussed one incident where it "took approximately 90 minutes to shut the pipeline down" following a leak, during which time "nearly 1,000 liquid gallons of a natural gas liquids mixture"—a "dangerous quantity of hazardous gas"—was released.

320.    Similarly, Judge Barnes discussed how Sunoco's drilling operations had affected water resources, explaining that "Sunoco is putting West Whiteland Township's water supplies at risk by failing to adequately identify, document and avoid drilling through well or aquifer locations underground."  Noting that "[i]n the 350-mile pipeline route, Sunoco only identified 22 private wells in its water permit applications," Judge Barnes explained that "[a]t least fourteen wells [had] been adversely affected in West Whiteland Twp alone."

321.    Judge Barnes also explained: "[C]redible testimony . . . shows <u>Sunoco is operating in an unsafe manner, not . . . designed to protect the destruction of aquifers and private wells</u>."

322.    Judge Barnes concluded: "Sunoco has made <u>deliberate managerial decisions to proceed in what appears to be a rushed manner in an apparent prioritization of profit over the best engineering practices available in our time that might best ensure public safety</u>."

### 7.    August 2018:  The DEP Fines Energy Transfer $147,000 for Contaminating Private Water Supplies

323.    On August 2, 2018, the DEP fined Energy Transfer another $147,000 for its multiple violations of Pennsylvania law and the Special Conditions appended to the ME2 permits. This fine stemmed from 15 citizen complaints of contaminated private water supplies in Chester County, and two complaints of contaminated water supplies in Berks and Lebanon counties, all of which were caused by Sunoco's HDD activities.  As before, in these instances, Energy Transfer "was required to address [the] impacts" of its HDD activities and "immediately notify DEP" of them, but failed to do so.

### 8.    August 2019:  The DEP Fines Energy Transfer $318,000 for More Than 100 Violations of Pennsylvania Law

324.    On August 20, 2019, the DEP fined Energy Transfer $240,000 for over 100 violations of Pennsylvania law and the Special Conditions to the ME2 permits stemming from

approximately 40 separate frac-outs in Berks, Blair, Cambria, Cumberland, Delaware, Huntingdon, Lebanon, Perry, Washington, and Westmoreland counties.

325.    The next day, the DEP fined Energy Transfer an additional $78,000 for similar violations stemming from Sunoco's failure to implement and maintain erosion and sedimentation control BMPs in Cumberland County, as required by its permits.

### G.    November 2019:  The FBI Launches Its Investigation into the Pennsylvania Governor's Office Related to the Permitting Process

326.    At the same time that DA Hogan's team was investigating Energy Transfer's illegal hiring of Pennsylvania State Constables, the FBI was investigating another suspicious aspect of ME2: Governor Wolf's administration's rush-approval of the ME2 permits.  As reported by the *Associated Press* on November 12, 2019, "FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning" but wished to remain anonymous "because they could not speak publicly about the investigation."  The *Associated Press* report relayed, "The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say."

### H.    Despite Energy Transfer's Prior Claims of Purported Pipeline Completion, The Intended ME2 Pipeline Remains Unfinished to this Day

327.    During the Class Period, Energy Transfer repeatedly represented that its work on the ME2 pipeline was significantly complete.  For example:

- On Energy Transfer's August 9, 2018, earnings call, Defendant Long stated: "100% of HDDs are completed, or in process, in line with our approved HDD plan with no more drilling re-evaluation reports required from DEP"; and

- On the same August 9, 2018, earnings call, Defendant Ramsey stated: "99% of the mainline construction is complete, the 1% that remains on mainline construction is associated with the HDD's that we are completing right now.  So we have 16

HDD's to complete, <u>all those have been approved by PA DEP</u> and they're either drilling ahead or they're in the stage where we're going back to PA DEP with – when we have an inadvertent return.  But they've all been approved so we don't have to have any changes approved by PA DEP going forward like that.  All the road bores are finished. And as Tom said in the early remarks, 80% of the line has been hydro tested.  <u>So we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year.</u>"

328.    Each of these claims was materially false and misleading when made.  As detailed below, the foregoing statements about the HDD-related work that Energy Transfer was required to complete were false and materially misleading given that Energy Transfer had not yet even submitted reevaluations for many of the HDD sites. Indeed, the Partnership acknowledged as recently as March 2020 that there remained significant work left to be done on the ME2 and ME2X pipelines.  In March 2020, Energy Transfer detailed just a portion of the remaining work on ME2 that required completion as part of a request for a waiver from Governor Wolf's March 19, 2020 Order suspending non-essential work in Pennsylvania due to the COVID-19 outbreak.

329.    Energy Transfer's March 2020 waiver requests set forth a laundry list of drilling and construction projects that the Energy Transfer Companies still needed to complete on the ME2/2X pipeline.  The existence of this large number of still incomplete projects demonstrates that Defendants' prior completion dates were wholly unrealistic.  The still-remaining projects included:

- 46 horizontal directional drill ("HDD") locations across the Commonwealth of Pennsylvania, which included:

    o   HDD that was at only the first, pilot stage at (i) Milford Road/Little Conestoga Road in Chester County; and (ii) Bow Tree/Matlack Stratsburg Road in Chester County.  At both locations, groundwater was surfacing through the HDD borehole;

    o   HDD that was at 54% of the final ream stage at Arch Bishop/South Chester Road in Chester County.  Groundwater was also surfacing at this location;

    o   HDD at Creek T-307 in Lebanon County; and

        o   HDD at Whitehouse Lane in Dauphin County.

- Three in-progress HDDs on property owned by the U.S. Army Corps of Engineers, specifically Loyalhanna Lake in Loyalhanna Township, Westmoreland County (discussed above in Section IV.F.2); Livermore Road in Derry Township, Westmoreland County; and Raystown Lake in Penn Township, Huntingdon County (discussed above in Section IV.F.2);

- Construction activity at a road bore underway at Pottstown Pike, located in West Whiteland Township, Chester County; and the open cut of a portion of Appalachian Drive, located in Middlesex Township, Cumberland County; and

- Four work locations on the ME2/2X pipeline project where open excavation trenches/pits still existed, which included:  Piney Creek (Blair County); Delmont Terminal (Westmoreland County); Beckersville Terminal (Berks County); and Chestnut Hill (Berks County).

330.    FE-1, who worked on the project until March 2018, said the ME2 project was never close to 90% complete while he was there, based upon the number of drills.  FE-1 relayed that even just considering the drills left on the 20-inch line, the pipeline could not have been over 80% complete.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

331.    During the Class Period, Defendants made a series of materially false and misleading statements and omissions during Energy Transfer's conference calls with investors, in the Partnership's SEC filings and press releases, and in the press in response to significant negative developments with the Pipeline Projects.   Defendants' false and misleading statements and omissions generally fall into three categories: (i) misleading statements and omissions related to Revolution's and ME2's completion timelines, ME2's throughput, and the status of completion for ME2 in light of contrary undisclosed material facts; (ii) misleading statements and omissions about Energy Transfer's purported commitment to safety and responsible construction practices on its Pipeline Projects; and (iii) misleading statements and omissions relating to Energy Transfer's purported compliance with its own code of business conduct and ethics.

**A.     Energy Transfer Misstated Revolution's and ME2's Completion Timelines
and ME2's Throughput, and Hid Contrary Undisclosed Facts**

332.    On February 24, 2017, Energy Transfer filed the 2016 10-K.  The 2016 Form 10-K
was signed by Defendants McReynolds, Long, Warren, McCrea and Ramsey.  With respect to the
Mariner East pipeline, Energy Transfer falsely claimed that ME2 would be in service in the third
quarter of 2017 and, at that time, ME2 would have a "total takeaway capacity" of <u>345,000 barrels</u>
<u>per day</u>.  The 2016 10-K stated, in relevant part, "Mariner East 2 will expand the total takeaway
capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is
expected to commence operations in the third quarter of 2017."

333.    This claim was materially false and misleading when made.  Defendants knew, or
recklessly disregarded, that constructing an entirely new ME2 pipeline that would be in service to
carry 345,000 barrels of NGLs per day across the Commonwealth of Pennsylvania by the third
quarter of 2017 was impossible.  This is because, undisclosed to investors, *inter alia*, the Energy
Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed
to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline
at the claimed time and with the stated throughput.

334.    On Energy Transfer's May 4, 2017 earnings call with investors, Defendant Long
stated that "Our Revolution project is still on schedule to be <u>in service in the fourth quarter of</u>
<u>2017</u>." The May 4, 2017 call was also attended by Defendants Warren, McCrea, and Hennigan.

335.    This claim was materially false and misleading when made.  Defendants knew, or
recklessly disregarded, that completing the Revolution project, and bringing it in service (which
depended on bringing the ME2 pipeline in service) by the fourth quarter of 2017 was impossible.
This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had
obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning

and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time and with the stated throughput; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of <u>two million gallons</u> of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (iv) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; and (v) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

336.   On May 31, 2017, Energy Transfer presented at the 2017 MLPA Investor Conference held in Orlando, Florida.  At the conference, Energy Transfer executives touted in a presentation the Company's "strong distributable cash flow expected from growth projects <u>coming online in 2017</u>" and listed ME2, ME2X, and the Revolution pipelines as such Energy Transfer "growth projects."   Further at the 2017 MLPA Investor Conference, Energy Transfer's presentation falsely claimed that ME2 would be in service "<u>by the end of Q3 2017</u>" and the Revolution pipeline would be "<u>in-service Q4 2017</u>."

337.   These claims were materially false and misleading when made.  Defendants knew, or recklessly disregarded, that bringing ME2 in service by the end of the third quarter of 2017 was impossible; and that completing the Revolution project, and bringing it in service (which depended on bringing the ME2 pipeline in service) by the fourth quarter of 2017 was impossible.  This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study

necessary to construct, and bring in service, the ME2 pipeline at the claimed time and with the stated throughput; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of <u>two million gallons</u> of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (iv) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; and (v) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

338.   On June 27, 2017, Energy Transfer presented at the 2017 J.P. Morgan Equity Conference held in New York City.  At the conference, Energy Transfer executives touted the Company's "strong distributable cash flow expected from growth projects <u>coming online in 2017</u>" and listed ME2 and the Revolution pipelines as Energy Transfer "growth projects."  Further at the 2017 J.P. Morgan Equity Conference, Energy Transfer claimed that ME2 would be in service "<u>by the end of Q3 2017</u>," and the Revolution pipeline would be "<u>in-service Q4 2017</u>."  In addition, Energy Transfer claimed that ME2 would have the <u>initial</u> capacity to transport approximately <u>275,000 barrels per day</u>, "<u>with upside of up to 450,000 barrels per day</u>," by the end of Q3 2017. At the 2017 J.P. Morgan Energy Conference held on June 27, 2017, Energy Transfer also falsely claimed that the Revolution Project would be completed by the end of 2017.

339.   These claims were materially false and misleading when made.  Defendants knew, or recklessly disregarded, that bringing ME2 in service by the end of the third quarter of 2017 was impossible; and that completing the Revolution project, and bringing it in service (which depended

on bringing the ME2 pipeline in service) by the fourth quarter of 2017 was impossible.  This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time and with the stated throughput; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of <u>two million gallons</u> of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (iv) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; and (v) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

340.    Moreover, during every investor presentation that Defendants held from May 31, 2017 to August 14, 2018, Energy Transfer touted ME2's "<u>initial capacity</u>" as being <u>275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day</u>. Specifically, in each of the below presentations, Energy Transfer represented an "[i]nitial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day":

- August 16, 2017:  Citi One-on-One MPL Conference;

- September 6, 2017:  Barclays CEO Energy-Power Conference;

- November 15, 2017:  RBC Capital Markets Midstream Conference;

- November 29, 2017:  Jefferies 2017 Energy Conference;

- December 6, 2017:  Wells Fargo Pipeline, MLP and Utility Symposium;

- January 9, 2017:  UBS Midstream & MLP Conference;

- February 28, 2018:  Morgan Stanley Midstream Energy Conference;

- April 9, 2018:  Mizuho Energy Summit;

- May 24, 2018:  2018 MLP & Energy Infrastructure Conference; and

- June 19, 2018:  J.P. Morgan 2018 Energy Conference.

341.    These claims were materially false and misleading when made.  Defendants knew, or recklessly disregarded, that bringing ME2 in service with an initial capacity of 275,000 barrels of NGLs per day was impossible.  This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time and with the stated throughput; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of two million gallons of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior Director Matthew Gordon explicitly warning Energy Transfer of the damage HDD operations could cause in the Exton, PA area and asked Energy Transfer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA" because "it appears that HDD will have adverse impacts on our public water supply wells at this location, resulting in permanent loss of these wells" but Energy Transfer internally decided to continue using HDD in Exton; and (iv) starting in November 2017, Energy Transfer caused catastrophic sinkholes in the area of Lisa Drive that would require Energy Transfer to repurpose and cobble together pipe from an old pipeline instead of laying new ME2 pipe through sinkhole-prone karst geology.

342.    Each presentation that Energy Transfer made after it announced in August 2018 the need to cobble together the makeshift pipeline has changed the language to claim that ME2 will

only have a capacity of 275,000 barrels per day "upon full completion" and entirely omitted the upside potential.

343. On August 9, 2017, Energy Transfer announced its financial results for the second quarter of 2017. During an earnings conference call held that same day, (i) Defendant Ramsey falsely claimed that ME2 would be online "sometime in the fourth quarter" of 2017, (ii) CFO Long stated that "On our Revolution project, construction is scheduled to be completed in <u>the fourth quarter of 2017</u>"; and (iii) in response to a question from an analyst about the status of the Revolution pipeline, Defendant McCrea stated that Revolution "<u>will be up and ready for service in the fourth quarter.</u>" The August 9, 2017 call was also attended by Defendant Warren.

344. These claims were materially false and misleading when made. Defendants knew, or recklessly disregarded, that bringing ME2 and Revolution in service (or "ready for service") in the fourth quarter of 2017 was impossible. This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of <u>two million gallons</u> of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior Director Matthew Gordon explicitly warning Energy Transfer of the damage HDD operations could cause in the Exton, PA area and asked Energy Transfer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA" because "it appears that HDD will have adverse impacts on our public water supply wells at this location, resulting in permanent loss of these

wells" but Energy Transfer internally decided to continue using HDD in Exton; (iv) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (v) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; (vi) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay; and (vii) as discussed below, just three months later, Energy Transfer was forced to admit that construction on the Revolution project would not be completed before the first quarter of 2018.

345.    On November 8, 2017, Energy Transfer held an earnings call to discuss the Partnership's third quarter 2017 financial results.  During this call, CFO Long disclosed that Energy Transfer would have to significantly delay the in-service date of ME2, and that the delay was associated with the West Goshen valve location.  Specifically, Long claimed:

> Regarding construction activity in <u>West Goshen</u>, the Pennsylvania Public Utilities Commission issued an order last week that resulted in suspension of our underground drilling efforts.  The focus of this order was related to a valve that was proposed to be installed in this township.  We are evaluating the relocation or elimination of this valve, as well as other alternatives that we believe will allow us to move forward with this portion of the project in the near future.

> Additionally, we continue to work with the Pennsylvania Department of Environmental Protection to secure approvals in order to move our remaining HDDs forward.  As a result of these delays, we believe that <u>this will push our in-service timing for ME2 to the second quarter of 2018</u>.

> <u>On our Revolution project. Construction is scheduled to be completed in the first quarter of 2018</u>, and we'll be waiting to go into full-service once Rover and ME2 are in service.

346.    On this same call, Defendants McCrea further attempted to reassure investors by claiming that Energy Transfer is "doing everything we can to work with PA DEP and to get all the HDDs completed and on time."  Similarly, Defendant Ramsey sought to assure investors that

Energy Transfer was doing everything in its power to comply with the DEP's requests by blaming any delays to the in-service dates of ME2 and ME2X on bureaucratic postponements by the DEP, claiming that the DEP as "us[ing] their full-time allotment to respond back to us, [which] slows us down." Defendant Warren also attended the November 8, 2017 conference call.

347.    These claims were materially false and misleading when made.  Defendants knew, or recklessly disregarded, that bringing ME2 in service in the second quarter of 2018, and completing construction on the Revolution project in the first quarter of 2018, was impossible. This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of two million gallons of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior Director Matthew Gordon explicitly warning Energy Transfer of the damage HDD operations could cause in the Exton, PA area and asked Energy Transfer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA" because "it appears that HDD will have adverse impacts on our public water supply wells at this location, resulting in permanent loss of these wells" but Energy Transfer internally decided to continue using HDD in Exton; (iv) in GES's report dated October 16, 2017, GES warned Energy Transfer that "the alignment of HDD S3-0381 [in Exton, PA] passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally known for karst development," and warned that "carbonate rocks (Ledger and Conestoga Formations) are prone to sinkhole

development and solution openings, and should be thoroughly investigated before construction"
but Energy Transfer had failed to thoroughly investigate those conditions; (v) the Energy Transfer
Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate
best practices or protective measures, despite repeated warnings to the contrary; (vi) the Energy
Transfer Companies engaged in unilateral unauthorized changes to HDD; and (vii) the Energy
Transfer Companies engaged in other additional misconduct that violated its permits and would
lead to regulatory scrutiny and delay.

348.    On February 22, 2018, Energy Transfer released its financial results for the fourth
quarter and full year 2017.  During a conference call held that same day, Long stated: "Now
moving on to Mariner East 2 and 2X.  We continue to make progress on the construction of this
project, with 94% of mainline construction complete and 83% of HDDs completed or underway.
At this time, we continue to target placing ME2 into service by the end of the second quarter of
2018."

349.    During Energy Transfer's February 22, 2018 call, Defendant Ramsey elaborated on
ME2's progress, stating that:

> I think we have a good working relationship with PA DEP.  We have a weekly
> meeting with them, where we look at the gating items.  We are still under court
> order deadlines that we have to adhere to and they have to adhere to.  But I think
> our progress is good, and so I don't see a change in the time line from what we've
> given you before.

350.    Also during this call, Long falsely claimed that "On our Revolution project,
construction is mechanically complete, and we will go into full service once Rover and Mariner
East 2 are in service" and McCrea added that "Revolution, as you know, that is built to feed Rover,
and it's built to feed Mariner. . . .  We're very close on that soon and that sometime in the second
quarter, we'll have Mariner on and ready to take barrels from Revolution." McCrea added that,

"And so we know and we understand we've got to get Mariner on.  We've got to get Rover to the finish line.  We're very close to both of those . . . "  Defendants Warren and McCrea also attended the February 22, 2018 conference call.

351.    Similarly, on or about June 1, 2018, Energy Transfer reported to the DEP that the Revolution pipeline was "mechanically complete and ready to be placed into commercial service."

352.    These claims were materially false and misleading when made.  Defendants knew, or recklessly disregarded, that bringing ME2 in service in the second quarter of 2018, and completing construction on the Revolution project in the first quarter of 2018, was impossible. This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of two million gallons of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior Director Matthew Gordon explicitly warning Energy Transfer of the damage HDD operations could cause in the Exton, PA area and asked Energy Transfer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA" because "it appears that HDD will have adverse impacts on our public water supply wells at this location, resulting in permanent loss of these wells" but Energy Transfer internally decided to continue using HDD in Exton; (iv) in GES's report dated October 16, 2017, GES warned Energy Transfer that "the alignment of HDD S3-0381 [in Exton, PA] passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally known for karst development,"

- 125 -

and warned that "carbonate rocks (Ledger and Conestoga Formations) are <u>prone to sinkhole development and solution openings, and should be thoroughly investigated before construction</u>" but Energy Transfer failed to thoroughly investigate those conditions; (v) Energy Transfer caused catastrophic sinkholes at the Lisa Drive site that were related to issues so serious that they would delay completion of ME2 and required Energy Transfer to pivot to re-purposing an older pipeline in the area in and surrounding Exton PA, where Lisa Drive was located, and result in decreased throughput for the claimed "ME2" line; (vi) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary; (vii) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; (viii) FE-1 said the ME2 project was never close to 90% complete prior to March 2018, and considering the drills left on the 20-inch line, the pipeline could not have been over 80% complete; and (ix) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

353.    On February 23, 2018, Energy Transfer filed the 2017 10-K.  Energy Transfer claimed that ME2 would be in service in the second quarter of 2018 and, at that time, ME2 would have a "total takeaway capacity" of <u>345,000 barrels per day</u>.  The 2017 10-K stated, in relevant part, that ME2 "will expand the total takeaway capacity to 345 MBbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the second quarter of 2018."

354.    These claims were materially false and misleading when made.  Defendants knew, or recklessly disregarded, that bringing ME2 in service in the second quarter of 2018, and at the claimed throughput, was impossible.  This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer

had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of two million gallons of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior Director Matthew Gordon explicitly warning Energy Transfer of the damage HDD operations could cause in the Exton, PA area and asked Energy Transfer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA" because "it appears that HDD will have adverse impacts on our public water supply wells at this location, resulting in permanent loss of these wells" but Energy Transfer internally decided to continue using HDD in Exton; (iv) in GES's report dated October 16, 2017, GES warned Energy Transfer that "the alignment of HDD S3-0381 [in Exton, PA] passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally known for karst development," and warned that "carbonate rocks (Ledger and Conestoga Formations) are prone to sinkhole development and solution openings, and should be thoroughly investigated before construction" but Energy Transfer failed to thoroughly investigate those conditions; (v) Energy Transfer caused catastrophic sinkholes at the Lisa Drive site that were related to issues so serious that they would delay completion of ME2 and required Energy Transfer to pivot to re-purposing an older pipeline in the area in and surrounding Exton PA, where Lisa Drive was located, and result in decreased throughput for the claimed "ME2" line; (vi) the Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; and (vii) the Energy Transfer Companies engaged in other additional misconduct that violated its permits and would lead to regulatory scrutiny and delay.

355.    On March 22, 2018, Energy Transfer spokesperson Jeff Shields responded to allegations that Energy Transfer was putting Lisa Drive residents at risk with its HDD operations by denying that the karst rock formations at the Lisa Drive Site caused the frac-outs and sinkholes. He falsely claimed that "professional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception," and that "construction through this area is safe.  There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."   Shields' assertion was materially false and misleading because Energy Transfer was aware that, at the very least, the first third of the HDD path at the Lisa Drive Site traversed known limestone formations, which dramatically increased the risk of causing frac-outs and sinkholes.  As shown in the map below, the HDD path at the Lisa Drive Site overlaps substantially with a known limestone formation, and Energy Transfer had been aware of this fact since at least the start of the Class Period.  The existence of this challenging formation increased the risk of HDD drilling at the Lisa Drive site and necessitated delay in ME2's construction, and the use of the 12-inch pipe, in order to work around it.



356.    On May 10, 2018, Energy Transfer held a conference call to discuss its financial results for the first quarter of 2018.  During this call, Ramsey claimed that ME2 would enter service in "mid to late" third quarter 2018.  Defendants Warren, Long, and McCrea also attended the conference call.

357.    On June 19, 2018, Energy Transfer presented at the 2018 J.P. Morgan Energy Conference, held in New York.  Through the presentation materials, Energy Transfer touted its ME2 growth project, highlighting that ME2 would be "in-service in Q3 2018" and would have an "initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."

358.    On July 3, 2018, Vicki Granado, an Energy Transfer spokesperson, said: "We have identified an existing pipeline that will allow us to meet our customer obligations to get natural gas liquids to the Marcus Hook Industrial Complex while work on the Mariner East system

continues." She added that "A minimum amount of work will be required to change this line from a refined products line to a NGL pipeline – e.g., connection pipeline and five new mainline valves, which can be done quickly and safely." These comments from Ms. Granada stood in stark contrast to the fact that, days earlier, on June 19, 2018, a resident of Darby County reported that this same line spilled over 33,500 gallons of gasoline into a Darby Creek.

359.    These claims were materially false and misleading when made. Defendants knew, or recklessly disregarded, that bringing ME2 in service in the third quarter of 2018, and at the claimed throughput, was impossible. This is because, undisclosed to investors, *inter alia*, (i) the Energy Transfer Companies had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time with the claimed throughput; (ii) during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco had caused LOCs to occur on 39 separate days, comprising a total of <u>two million gallons</u> of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone); (iii) on July 17, 2017, Aqua's Chief Environmental Officer, Chris Crockett, emailed Energy Transfer ME2 Senior Director Matthew Gordon explicitly warning Energy Transfer of the damage HDD operations could cause in the Exton, PA area and asked Energy Transfer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA" because "it appears that HDD will have adverse impacts on our public water supply wells at this location, resulting in permanent loss of these wells" but Energy Transfer internally decided to continue using HDD in Exton; (iv) in GES's report dated October 16, 2017, GES warned Energy Transfer that "the alignment of HDD S3-0381 [in Exton, PA] passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally <u>known for karst development</u>," and warned that "carbonate rocks

- 130 -

(Ledger and Conestoga Formations) are <u>prone to sinkhole development and solution openings, and should be thoroughly investigated before construction</u>" but Energy Transfer failed to thoroughly investigate those conditions; (v) Energy Transfer caused catastrophic sinkholes at the Lisa Drive site that were related to issues so serious that they would delay completion of ME2 and required Energy Transfer to pivot to re-purposing an older pipeline in the area in and surrounding Exton PA, where Lisa Drive was located, and result in decreased throughput for the claimed "ME2" line. Indeed, just two weeks later on July 3, 2018, the press reported that Energy Transfer had already applied to the PHMSA and spoken with multiple township managers in Pennsylvania concerning Energy Transfer's plan to re-purpose an old 12-inch pipeline and combine it with parts of the ME2 pipeline.

360.    During a conference call with investors held on August 9, 2018, Energy Transfer yet again delayed the in-service date for ME2, now falling to the end of the third quarter of 2018. However, CFO Long continued to mislead investors by claiming that "100% of HDDs are completed, or in process, in line with our approved HDD plan <u>with no more drilling re-evaluation reports required from DEP</u>."    Expanding on Long's statement about the work left to be done on HDDs, Defendant Ramsey also stated the following during the August 9, 2018 earnings call:

> Let me expand on that a little bit.  On ME2, I guess it's the, obviously, the first issue with use of the 12-inch line through there.  We have, kind of repeating what was said in the earlier remarks, 99% of the mainline construction is complete, the 1% that remains on mainline construction is associated with the HDD's that we are completing right now.  So we have 16 HDD's to complete, <u>all those have been approved by PA DEP</u> and they're either drilling ahead or they're in the stage where we're going back to PA DEP with – when we have an inadvertent return. <u>But they've all been approved so we don't have to have any changes approved by PA DEP going forward like that</u>. All the road bores are finished. And as Tom said in the early remarks, 80% of the line has been hydro tested. <u>So we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year</u>.

Defendants Warren and McCrea also attended the August 9, 2018 conference call.

361.    The statements referenced in ¶ 360 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, Defendants willfully or recklessly knew and failed to disclose, *inter alia*, pursuant to the August 2017 Order, Energy Transfer was required to submit HDD re-evaluation reports for, among others, 22 enumerated HDD sites, all of which were listed in Exhibit 3 of the August 2017 Order.[14]   However, as of August 9, 2018, Energy Transfer had yet to submit four of the 22 re-evaluation reports, all of which pertained to ME2.[15]   Defendants failed to disclose, as well, that, pursuant to the August 2017 Order, for HDD sites at which Energy Transfer planned to construct both ME2 and ME2X in the same location, if Energy Transfer experienced a frac-out during the construction of either ME2 or ME2X, the Partnership was required to submit re-evaluation reports for that HDD site before commencing HDD operations on the other pipeline.

362.    Moreover, between the August 2017 Order and Energy Transfer's August 9, 2018 earnings call, frac-outs had occurred at five separate HDD sites during construction of ME2X,[16] yet Energy Transfer had not yet submitted re-evaluation reports before beginning construction on

---

[14]        *See*    August    2017    Order,    Exhibit    3. http://ehb.courtapps.com/efile/documentViewer.php?documentID=38636. (requiring Energy Transfer to "perform a re-evaluation of the HDDs listed on Exhibit '3.' These HDDs constitute drills for which an inadvertent return ('IR') occurred during the installation of one pipe (20" or 16" diameter) and where a second pipe will hereafter be installed in the same right-of-way ('ROW'). In addition, [Energy Transfer] will perform a re-evaluation of HDDs for which an IR occurs in the future during the installation of one pipe where a second pipe will thereafter be installed in the same ROW").

[15]    These sites were HDD Site #S3-0290, S3-0300, S3-0631, and S3-0670.  Energy Transfer eventually submitted re-evaluation reports for these sites in 2019 on May 28, June 20, and June 6, respectively, and has yet to submit a re-evaluation report for site S3-0670.

[16]    It should be noted that, for varying reasons, Energy Transfer constructed portions of ME2X before constructing portions of ME2.

ME2.[17]  Significantly, the frac-outs that Energy Transfer caused had all occurred at these sites in late 2017, meaning Energy Transfer executives were on notice that re-evaluation reports for these sites were required.

363.    Thus, Defendants knowingly or recklessly disregarded and failed to disclose that the DEP had <u>not</u> granted drilling re-evaluation approvals for <u>at least</u> nine HDD sites because Energy Transfer had still not submitted HDD re-evaluation reports for these sites.  In fact, the DEP did not issue approval for HDD construction on these sites until January 2020, <u>at the earliest</u>, and the DEP has still yet to receive Energy Transfer's re-evaluation report for HDD Site #S3-0670.

364.    On the August 9, 2018 earnings call, Long also stated that "[t]he Pennsylvania PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteland Township.  <u>To avoid any delays in the ME2 project schedule, we will utilize a section of an existing pipeline in the affected area for initial in-service</u>.  This plan does not require any new permits and we have made all applicable regulatory notification."  He added;

> As a result, <u>we continue to expect to place ME2 in service by the end of this quarter.  This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments</u>.

When asked by an analyst to clarify how Energy Transfer could logistically jury-rig an existing section of a 12-inch pipeline and the current 20-inch ME2 pipeline together, Energy Transfer executives provided little clarification.  For example, Defendant McCrea explained that "<u>the utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted</u>," but conspicuously refused to comment on the total capacity of ME2 with this 12-inch workaround.

---

[17]   These sites were HDD Site #S3-0320, S3-0331, S3-0471, S3-0500, and S3-0560.  Energy Transfer eventually submitted re-evaluation reports for these sites in 2019 on June 19, June 25, September 26, September 19, and October 10, respectively.

365.    The statements in the foregoing paragraph from the August 9, 2018 earnings call were materially false and misleading when made because they failed to disclose that Energy Transfer's use of the 12-inch pipe workaround for ME2 would in fact result in a 65% reduction in the previously-claimed throughput for ME2.  When Defendants finally revealed that fact to investors, just the next day, the price of ME2 units fell sharply.

**B.    Energy Transfer Falsely Claimed It Was Constructing Its Pipelines Safely and Preserving and Protecting the Environment**

366.    During Energy Transfer's November 8, 2017 earnings call to discuss the Partnership's third quarter 2017 financial results, CFO Long assured investors that Energy Transfer was "<u>very focused on safely and responsibly bringing our projects into service</u>, including . . . the Mariner East [projects]."

367.    In a statement published January 3, 2018 in numerous media outlets, including *The Philadelphia Inquirer*, in response to news that the DEP had halted construction of the ME2 pipeline on grounds that it was necessary "to correct . . . egregious and willful violations" including unauthorized HDD activities and failures to notify the DEP of frac-outs, Sunoco spokesperson Jeff Shields stated: "<u>We . . . reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work</u>."

368.    On February 8, 2018, news outlets including *Reuters* and *StateImpact Pennsylvania* reported that the DEP had allowed Sunoco to resume work on ME2 after Sunoco agreed to pay a $12.6 million fine for violations.  Articles quoted Sunoco spokesperson Shields as stating that Sunoco was "<u>committed to fully complying with the DEP order, which includes following all permit requirements</u>," and that: "<u>Safety is paramount for any energy infrastructure project that we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment</u>."

369.    Contrary to their claims, the Energy Transfer Companies had no intention of altering their conduct to better protect the environment and the safety of Commonwealth residents.  As depicted in the chart below, the Energy Transfer Companies' destructive pipeline practices continued to cause frac-outs at approximately the <u>same rate</u> as before the Energy Transfer Companies made the statements in ¶¶ 367-68.



370.    During Energy Transfer's February 22, 2018 conference call, Long reiterated that Energy Transfer "remain[s] committed to working closely with . . . PA DEP and other regulatory agencies and are focused on <u>safely and responsibly</u> bringing Phase 2 of . . . ME2 . . . into service." Defendants Warren, McCrea, and Ramsey also attended the February 22, 2018 conference call.

371.    On March 22, 2018, spokesperson Jeff Shields denied that the karst rock formations at the Lisa Drive Site caused the frac-outs and sinkholes and falsely claimed that "professional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X

are no exception," and that "construction through this area is safe.  There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."

372.    In early 2018, Energy Transfer and Sunoco took out a full-page advertisement in a Harrisburg newspaper falsely touting their efforts to ensure the safety of ME2.  In particular, Energy Transfer and Sunoco claimed that they "will operate our pipeline with the highest level of safety at all times" and highlighted: "We're paying extra attention to safety."  The full text of the advertisement is reprinted below:

**Mariner East Going Above and Beyond**

Energy Transfer and Sunoco Pipeline are Committed to the Long-Term Integrity and Safe Operation of the Mariner East 2 Pipeline.

At Energy Transfer and Sunoco Pipeline, we pledge to the communities we cross and the customers we serve that we will operate our pipeline with highest level of safety at all times.

Safety is what we do – providing the same and reliable transportation of energy resources.

Mariner East 2 exceeds federal safety regulations in many areas:
–   It starts in the pipe mill, where our inspectors oversee the manufacture of the pipe to our strict standards, then inspect the pipe when it arrives in the construction site.
–   Before and after the pipeline is buried, and again once it is in operation, we put our pipelines through rigorous testing above and beyond what is required by federal safety regulations. Then we monitor them 24/7, 365 days a year.
–   We employ heavier pipe wall thickness than required by the U.S. Department of Transportation. The higher quality of pipe reduces the risk of damage from sources such as excavating equipment or ground movement.
–   We bury the pipeline deeper underground than required in most cases – at least 4 feet and up to 200 feet.[18]

---

[18] Sunoco did not in fact bury its pipe at the purported depths it told third parties.  For example, on May 21, 2018, the ME2 pipeline was struck by an Aqua crew installing a water main outside homes in Middletown, Delaware County, along Lenni Road, a suburban street that is crossed by the pipeline route.  The contactor hit the pipeline at 6.2 feet below the surface but had been informed by Sunoco that the pipe was buried 9 feet deep, according to a report filed with Pennsylvania One Call System Inc., a nonprofit that notifies utilities about existing underground infrastructure before they excavate.

- We inspect 100% of pipeline welds by X-ray; rather than the 10% required.
- We patrol our Mariner East pipelines more frequently than required by ground and air.

In addition:
- We team with local emergency responders along the route to provide information and training on emergency pipeline response. We have trained more than 2,000 emergency responders and public officials.
- State and federal regulators spent more than 100 inspection days during 2017 on the Mariner East project, more inspection days than on any other pipeline in Pennsylvania.

We're paying extra attention to safety, because that's what you deserve – safe, clean, reliable energy and a stronger economy for Pennsylvania.

373.    On July 27, 2018, *StateImpact Pennsylvania* reported that the DEP had reached a settlement with Clean Air Council, Delaware Riverkeeper Network, and Mountain Watershed Association concerning the permits DEP had issued to Energy Transfer in connection with the construction of ME2.  The article quoted Energy Transfer spokesperson Lisa Dillinger as saying: "From the outset, Sunoco has maintained that the permits were . . . fully protective of the environment."

374.    On September 10, 2018, in the wake of the Revolution pipeline explosion, the *Pittsburgh Post-Gazette* reported on a September 9, 2018 Energy Transfer news conference:

Energy Transfer spokeswoman Vicki Granado said the company would join the PUC in the investigation beginning Tuesday.  "Our obligation to homeowners is 100 percent — that people continue to be safe and secure," Ms. Granado said at a news conference at the Center municipal building Monday night.  Ms. Granado said she couldn't recall a similar incident involving Energy Transfer, which has 83,000 miles of pipeline throughout the United States.

She said there were no environmental health risks to residents in the aftermath of the explosion.  The Revolution pipeline had been in the commissioning phase — a kind of dress rehearsal — since Sept. 3, according to Ms. Granado.  It wasn't yet operating commercially, but gas was running through the pipe during the trial period, just as it would during normal operations, she said.

Ms. Granado didn't know how much pressure was in the line before it burst; it is designed to operate at a maximum pressure of 1,440 pounds per square inch.

- 137 -

Recent rain has ETC and its regulators focused on erosion control, Ms. Granado said, when asked about past landslides. "It's something definitely that is being actively managed."

375.    Similarly, in a letter Energy Transfer sent to residents of Ivy Lane on September 10, 2018, Energy Transfer claimed that "[o]ur first priority continues to be the safety of those who live in this community." Despite this stated goal, Energy Transfer admitted in the letter that Energy Transfer's "initial site assessment" revealed that a landslide occurred, and Energy Transfer explained that the Partnership was well aware that "this type of land movement has been occurring throughout the state due to the unprecedented amount of rainfall."

376.    On September 25, 2018, *StateImpact Pennsylvania* published an article regarding incidents, fines and shutdowns at the ME2 pipeline. It quoted Energy Transfer spokesperson Lisa Dillinger as making the following materially misleading claims:

> Lisa Dillinger, a spokeswoman for Sunoco's parent, Energy Transfer Partners, said . . . that since Sunoco Pipeline's integration with ETP on May 1, 2017, accidents have been "drastically reduced," and that the company spent $429 million on assets in 2017.
>
> "It is our priority to maintain and operate our assets to the highest safety standards, not just because it makes good business sense, but because it is the right thing to do," she said.

377.    On October 21, 2018, the *Pittsburgh Post-Gazette* reported that, in April 2018, after the ME2 pipeline construction had been stopped and restarted, and Energy Transfer fined $12.6 million for "willful and egregious violations," DEP Secretary McDonnell said in an interview with the *Post-Gazette* that this project "had some of the toughest conditions of any permit" and that "The reality is that [Energy Transfer was] not meeting those permit obligations." The *Post-Gazette* added that, as of the prior week, the ME2 project had more than 70 permit violations, according to the DEP. When asked about such noncompliance, Ms. Dillinger noted only one instance, when Sunoco initiated a horizontal underground drilling operation on a site that was permitted for

trenching.  "That was rectified about eight months ago," she misleadingly said.  She added the materially false and misleading claim that "We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work."

378.   On November 1, 2018, after the DEP ordered a halt to construction on the Revolution pipeline, Energy Transfer spokesperson Alexis Daniel wrote in an email quoted by the *Observer-Reporter* that, "We have been and will continue to comply with their orders," adding that the safety of the surrounding area is "our first priority."

379.   On November 21, 2018, Energy Transfer issued a false and misleading statement through spokesperson Lisa Dillinger in an email responding to a November 19, 2019 petition filed by seven residents of Delaware and Chester Counties requesting that the Pennsylvania Public Utility Commission halt construction of the Mariner East pipeline, which passed close to their residences.  The residents were concerned that Energy Transfer was not prepared to respond to any leaks or other accidents, saying in their petition, "The [highly volatile liquids] Sunoco proposes to transport, with limited exceptions, are intended for use by the petrochemical industry, not the public, and a route that favors high-consequence areas represents an unnecessary and unacceptable risk to public safety."  In response to the residents' petition and concerns regarding the safety of the Mariner East pipeline and the Partnership's commitment to ensure such safety, according to *S&P Global Market Intelligence*, Dillinger misleadingly wrote on behalf of Energy Transfer, "We do not believe the claim is valid . . . The integrity of our Mariner East 1 and Mariner East 2 pipelines has been verified in the last few months by the PUC and PHMSA [the federal Pipeline and Hazardous Materials Safety Administration] through numerous tests and data collection along the routes."

380.    On December 19, 2018, after it was announced that DA Hogan had opened a criminal investigation into Energy Transfer's construction of its pipelines in Pennsylvania, Energy Transfer released a statement that included the following materially false and misleading claim of safety:

> The safety of all those who live and work along our pipeline is our first priority and this project was planned and implemented based on that fact.

381.    The statements referenced in ¶¶ 370-80 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that (i) the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate protective measures, despite repeated warnings to the contrary; (ii) Energy Transfer had constructed its pipelines by causing hundreds of inadvertent returns of hundreds of thousands of gallons of Drilling Pollutants without timely informing regulators of those problems or LOCs; (iii) Energy Transfer Companies engaged in unilateral unauthorized changes to HDD; (iv) Energy Transfer Companies knowingly sought to short-circuit important safety-related regulatory oversight, and engaged in other additional misconduct that violated applicable laws and rules and would lead to serious environmental risks; and (v) the foregoing undisclosed facts meant that statements concerning the Energy Transfer Companies' focus on and commitment to safe and responsible planning and construction of the Pipeline Projects and compliance with applicable laws, rules, and regulations concerning environmental safety were materially false and misleading when made.  The Energy Transfer Companies were aware of, or recklessly disregarded, and failed to disclose, numerous red flags of safety and environmental risks and violations, including, *inter alia*:

- Terracon's <u>January 2016</u> Hazard Report notified Energy Transfer of significant risks associated with building the Revolution pipeline along the path projected by Energy Transfer, including that (i) the Hazard Report detailed that the proposed Revolution path would "encounter primarily shale bedrock," which ranks as a ten out of ten on Terracon's hazard scale due to its "high potential for geological hazards"; and (ii) the Hazard Report detailed that much of the terrain consists of a high frequency of "steep slopes, deeply weathered rock, and remnants from both surface and underground mining activities" and that, as such, Terracon "anticipated that identification and mitigation of both landslide and subsidence geohazards <u>will be challenging</u> and require careful observation and mitigation";

- In <u>January 2016</u>, Terracon also conducted four "scan line reviews," i.e., field reconnaissance of certain segments of the Revolution path, including one segment that was less than 500 feet from the ultimate site of the September 2018 explosion on the Revolution pipeline.  At this site, Terracon observed and reported that this particular area showed <u>multiple signs of landslide susceptibility</u>, including evidence of "rotational slip," "hummocky topography," and "fallen and leaning trees";

- <u>Between April 9, 2017 and October 30, 2017,</u> during the construction of ME2 at the Raystown Lake HDD Site Sunoco had caused LOCs to occur on 39 separate days, comprising a total of <u>two million gallons</u> of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone), and Energy Transfer significantly delayed disclosure of these events to the DEP;

- FE-1 recalled that, <u>in the fall of 2017,</u> Energy Transfer failed to obtain permits before conducting HDD, and that he got into arguments with construction managers who insisted on moving on to sites they did not yet have permits for;

- In GES's HDD Hydrogeologic Re-Evaluation Report, dated <u>October 16, 2017,</u> GES specifically warned Energy Transfer that "the alignment of HDD S3-0381 passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally known for karst development," and warned that "carbonate rocks (Ledger and Conestoga Formations) are <u>prone to sinkhole development and solution openings</u>, and should be thoroughly investigated before construction," yet Energy Transfer failed to do so;

- As the press reported only months later, on September 4, 2018, the 12-inch line Sunoco proposed to use in the so-called "Frankenpipe" was, in fact, the line that had leaked 33,000 gallons of gasoline into Darby Creek <u>on June 19, 2018</u>;

- Energy Transfer had conducted daily inspections of the Revolution pipeline during <u>the months leading up to its September 2018 explosion</u>, which demonstrated that Revolution had exhibited repeated surface failures along the pipeline route, and areas where the ground around the pipeline was sinking;

- <u>Days before the September 2018 Revolution explosion,</u> a resident closest to the explosion site—whose house was later engulfed in flames minutes after the

explosion—had notified Energy Transfer that the hillside at the Explosion Site had a slip and was told it had been fixed; and

- In the period before October 2018, despite Sunoco being required to have a professional licensed geologist present at each HDD site to monitor the pressure in the HDD bore as well as the amount of liquid that was being recirculated in the drilling process, the DEP found that the process was not working as intended for, on at least two occasions, the geologists reported they were instructed not to talk to the drillers.

**C.     Energy Transfer Hid Its Violations of Criminal Statutes and Misstated Its Compliance with Its Code of Business Conduct and Ethics**

382.    The Class Period begins on February 25, 2017.  On February 24, 2017, after the close of the market, Energy Transfer filed the 2016 10-K with the SEC, which was signed by Defendants Warren, Long, McReynolds, McCrea and Ramsey. With respect to the Partnership's corporate governance, the 2016 10-K touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."  The 2016 10-K added that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Partnership's] website."

383.    The Code of Conduct found on Energy Transfer's website stated, in relevant part:

It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.  It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

384.    The Code defines a "Sensitive Payment" as "both receipt and disbursements whether or not illegal," and includes:

a)      receipts from or payments to governmental officials or employees;

b)      commercial bribes or kickbacks;

c)      amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;

d)      corporate political contributions; and

e)      payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

385.    In a section of the Code titled, "Payments and Gifts to Government Officials," the Code emphasizes that gifts or other items of value must not be provided to government officials in connection with Partnership business without written approval, stating:

> Compliance with the Partnership's Anti-Corruption Policy and the U.S. Foreign Corrupt Practices Act and other anti-corruption laws is required.   What is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign).  There are strict laws that govern providing gifts, including meals, entertainment, transportation and lodging, to certain government (U.S. or foreign) officials, employees and consultants.  Because of the sensitive nature of these relationships, you should not provide gifts or anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department.

386.    In a section of the Code titled, "Ethical Behavior," the Code states, in relevant part:

> Every Employee is expected to act with honesty and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment. Each Employee is required to adhere to the highest ethical standards in fulfilling our responsibilities to, and on behalf of the Partnership Group and its investors. Each Employee is required to deal fairly and honestly with other employees, customers, vendors and third parties.

387.    Significantly, Energy Transfer represented that the Code identified requirements, not aspirations. For example, the Code explained that "[i]n all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical

manner.  Every Employee"—which the Code defined as including "the officers and members of the Board of Directors of the Company"—"acting on behalf of the Partnership Group must adhere to these policies."

388.    In addition to requiring that Partnership officers and directors not violate the Code, Code also set forth detailed reporting requirements for Partnership officers and directors with respect to Code violations. Specifically, the Code stated:

> Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors. . . . All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports. . . . Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action[.]

389.    The 2016 10-K also assured investors that Energy Transfer had obtained all applicable permits and other authorizations for the Partnership's various properties used for conducting its business, and that such permits were valid.  Specifically, the 2016 10-K stated, in relevant part, "[w]e believe that we have satisfactory title to or valid rights to use all of our material properties" and that "<u>we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business</u>."

390.    On February 23, 2018, Energy Transfer filed its 2017 10-K, which was signed by Defendants Warren, Long, McCrea, McReynolds and Ramsey.  The 2017 10-K, as with the 2016 10-K, touted that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics

applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."  The 2017 10-K added that "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Partnership's] website."  The 2017 10-K also contained representations substantively identical to those quoted in ¶ 389 above.

391.    On July 27, 2018, *StateImpact Pennsylvania* reported that the DEP had reached a settlement with Clean Air Council, Delaware Riverkeeper Network, and Mountain Watershed Association concerning the permits DEP had issued to Energy Transfer in connection with the construction of ME2. The article quoted Energy Transfer spokesperson Lisa Dillinger as saying: "From the outset, Sunoco has maintained that the permits were properly and lawfully issued by [the DEP]."

392.    On December 19, 2018, after reports of sinkholes appearing within feet of residential homes, Chester County District Attorney Tom Hogan announced that his office would "bring into play all of the tools of the criminal justice system" against Energy Transfer for its part in causing these problems.  Hogan explained that, over the past two years, his office has seen "these pipelines rip through the heart of Chester County" and has heard reports of "not-so-subtle bullying of Chester County citizens by big corporate interests."  D.A. Hogan continued, "We expected state regulators and [] Governor [Wolf] to step in and assure the safety of Pennsylvanians. They have not."  After DA Hogan's announcement, Energy Transfer released the following materially false and misleading statement that included the following claim of its purported compliance with the law:

> We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines.  We vehemently deny any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release.  We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is

readily available on the PUC and DEP websites.  <u>We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania</u> and we are committed to aggressively defending ourselves against these <u>baseless allegations</u>.  We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.

393.    On January 4, 2019, after DA Hogan announced that it had named to the investigation former federal prosecutor Seth Weber, DA Hogan explained that Weber's appointment "certainly sends a message that we are taking it very seriously, and that somebody who has experience in this field is taking it very seriously."  That same day, *StateImpact* reported on Energy Transfer's statement that the investigation was "meritless," and quoted Energy Transfer spokesperson Lisa Dillinger as saying that District Attorney Hogan would "not be able to avoid the inescapable conclusion that <u>Energy Transfer has not engaged in any form of criminal activity</u>, and the issues referenced have already each been thoroughly investigated, reviewed, and ultimately resolved by the appropriate government agencies."

394.    On January 22, 2019, after DA Hogan accused Sunoco of hiring armed constables to protect the scene of a sinkhole along one of its controversial pipelines in Chester County, west of Philadelphia, *NBC Philadelphia* reported the following materially false and misleading response from Energy Transfer:

> "<u>We have engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property</u> as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property," company spokeswoman Lisa Dillinger said in a statement.  "I will decline to discuss any further details of <u>our security efforts</u>, beyond that we do use security on our projects as needed to ensure the safety of our employees, our assets and those who live in the area."

395.    This statement was materially false and misleading for the reasons set forth below in ¶ 399, as well as for asserting that it was the residents of Lisa Drive who requested Energy Transfer illegally bribe state constables to patrol their backyards.  As *Philadelphia* Magazine reported, one resident of Lisa Drive, "[T.J.] Allen says his once quaint property has been turned

upside down and plagued by sinkholes, intrusive workers, and <u>mysterious security guards from out of state</u>.  He's terrified for his life and ready to flee disaster at a moment's notice — and he's not alone."

396.    On March 20, 2019, after Delaware County District Attorney Katayoun Copeland and the Pennsylvania state Attorney General's office joined to launch a probe into allegations of criminal misconduct by Energy Transfer, Sunoco Logistics Partners, and related corporate entities, involving pipeline construction and related activities for the Mariner East 1, 2, and 2X pipelines, the *Chester Spirit* reported the following materially false and misleading response from Energy Transfer:

> "Safety is our priority.  <u>There's no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines</u>," Energy Transfer spokeswoman Lisa Dillinger told The SPIRIT.   "We have worked closely with commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information that is readily available on the PUC and DEP websites and <u>we are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania</u> and are committed to aggressively defending ourselves," Dillinger said. "We look forward to opening dialogue with the attorney general's and district attorney's offices in the hopes that we can bring this matter to an appropriate resolution," Dillinger said.

397.    On July 6, 2019, *Philadelphia* Magazine reported that Energy Transfer's Dillinger claimed that Energy Transfer remains "<u>confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania</u> and are committed to aggressively defending ourselves."

398.    On August 8, 2019, after DA Hogan announced criminal charges against the elected state constables who were hired to provide security near sinkholes along the Mariner East pipelines, news outlets, including *Phillymag.com*, reported Energy Transfer's materially false and misleading denial of any wrongdoing or connection to the constables:

> In its own statement, Energy Transfer stressed that <u>constables Johnson and Robel "were not Sunoco or Energy Transfer employees."</u>  "They were employed by Raven

Knights, who provided security services and personnel," the Energy Transfer statement continued. "<u>We have a code of conduct for all of contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that.</u>"

399.    The statements referenced in ¶¶ 382-94, 396-98 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading.    Specifically, Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that (i) the construction permits issued in connection with the Mariner East pipeline were obtained by the Partnership through the use of coercion, bribery, or other improper methods; (ii) Energy Transfer had an unwritten policy to bribe government officials – Pennsylvania constables – to act as security at pipeline sites in Pennsylvania and intimidate residents and the press and potential protesters, and used shell corporations to hide the payments from Energy Transfer to the constables; (iii) the use of such improper methods increased the risk that the Partnership would be subjected to government or regulatory investigations and/or litigation, thereby depreciating the Partnership's unit value; and (iv) the foregoing undisclosed facts meant that Defendants' statements concerning its compliance with anti-bribery policies and principles, its receipt of properly-issued and legitimate permits, and its denials concerning its improper and illegal hiring of constables to perform security services in connection with ME2 construction were materially false and misleading when made.

## VI.    LOSS CAUSATION – THE TRUTH IS REVEALED TO INVESTORS

400.    Defendants' materially false and misleading statements, and failure to disclose material facts necessary to prevent their statements from being misleading, caused the prices of the Partnership's units to be artificially high during the Class Period. The truth about Energy Transfer's misconduct surrounding the Pipeline Projects and its false and misleading statements

concerning progress on pipeline construction emerged to the market through a series of partial corrective disclosures beginning on August 9, 2018. Each of these partial corrective disclosures partially removed artificial inflation in the price of Partnership units. As such, Defendants' wrongful conduct alleged herein directly and proximately caused the economic losses suffered by Lead Plaintiffs and the Class.

   A.   **August 9-13, 2018:  Energy Transfer Discloses that the Problems with the Pipeline Require It to Cobble Together Old and New Pipe, Which Will Reduce Throughput and Delay Completion of the ME2 Pipeline**

401.    During a conference call with investors held at approximately 9AM Eastern time on Thursday, August 9, 2018, CFO Long announced that Energy Transfer would only be able to meet its prior projections of having "ME2" in-service by the end of the third quarter by routing it through much older, 12-inch-diameter pipeline in certain areas where the PUC had halted construction. In other words, Energy Transfer could only bring ME2 into service on time by jury-rigging ME2 pipeline using a pre-existing, smaller-diameter pipe—*i.e.*, not by actually completing ME2 after all.  In Long's words:

> We continue to make progress on the construction of ME2 with 99% of mainline construction complete and 80% of hydro testing complete.  In addition, 100% of HDDs are completed, or in process, in line with our approved HDD plan with no more drilling re-evaluation reports required from DEP.  The Pennsylvania PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteman Township.  <u>To avoid any delays in the ME2 project schedule, we will utilize a section of an existing pipeline in the affected area for initial in-service</u>.  This plan does not require any new permits and we have made all applicable regulatory notification.

> As a result, we continue to expect to place ME2 in service by the end of this quarter. <u>This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments</u>.  Construction of ME-2X also continues and we expect the pipe to be online in mid-2019.

402.    Similarly, at the August 9, 2018 earnings call, after acknowledging that Energy Transfer would be using 12-inch pipe to allow the Company to put the ME2 pipeline in service,

Energy Transfer's Matthew Ramsey represented that the "1%" of the pipeline still to be constructed related solely to 16 HDD's still to be completed, and that "we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year."

403.    Although disclosing that the ME2 pipeline would not consist entirely of 20" diameter pipe, and therefore the pipeline's throughput would be reduced, Energy Transfer and its executives continued to mislead investors by (a) as alleged previously, continuing to state that the pipeline would be in-service by the end of the third quarter, (b) as alleged previously, misrepresenting the actual state of affairs concerning the HDD-related work that Energy Transfer was required to complete, and (c) failing to disclose that creating such a cobbled-together "Frankenpipe" would significantly reduce the throughput of the ME2 pipeline since the rate at which NGLs could flow through ME2 would necessarily be limited to the flow rate at its smallest width.  When asked by an analyst to clarify how Energy Transfer could logistically combine an existing section of an older, 12-inch pipeline with its new, 20-inch ME2 pipeline, Energy Transfer executives obfuscated the issue.  McCrea claimed that "the utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted." And, when asked by an analyst "what is the capacity in the interim solution, using the 12-inch line in some areas?" McCrea responded, "We really haven't shared capacities.  We can look at maybe doing that in the future. . ."

404.    As at least one analyst later remarked, Energy Transfer's initial partial disclosure of the jury-rigged pipeline was "confusing," with Energy Transfer being extremely tight-lipped about the ramifications of such a makeshift solution on its ever-fleeting deadline projections and throughput capabilities.  Due to Energy Transfer's misleading and opaque description of its work on the ME2 pipeline, analysts pressed Energy Transfer for more information.

405.   On Friday, August 10, 2018, an analyst from Wolfe Research, LLC released a report that provided further clarification of Energy Transfer's disclosure, based on a private discussion between Energy Transfer and Wolfe Research.  In this report, Wolfe criticized Energy Transfer for its "confusing" discussion of ME2 on the second quarter 2018 earnings call, and called Energy Transfer's "transparency and disclosure on this project" "very low."  Specifically, Wolfe wrote that:

> **<u>Mariner East is messier than expected</u> but consistent with our conservative modeling**.  Discussion of ME 2 on the call was confusing.  We talked to the company afterward.  The "interim solution" with re-purposing of pipes is large enough to satisfy contracts plus some walk-up volumes.  We estimate this could provide $150M - $250M of EBITDA starting in Q4.  However, <u>ME 2 may not reach full capacity (previously disclosed as 275 mbd) until 4Q19 (one year delay).  Due to construction / regulatory issues, the company is using a hodgepodge of different sized pipes that will then be re-worked / upsized over time.  A final connection involving a small amount of ME 2 / ME 2x capacity won't be completed until 4Q20.</u>

406.   Similarly, that same day, an analyst from Wells Fargo Securities, LLC, reported on Energy Transfer's statements about the jury-rigged pipeline "confuse[d] the market," and explained that, according to its analysis and calculations, <u>ME2 would only have an initial capacity of 100 million barrels per day</u>, a nearly 65% reduction in the capacity represented just two months earlier during Energy Transfer's 2018 J.P. Morgan Energy Conference.  Wells Fargo also then estimated the total cost of the ME2 project to be $6 billion (as compared to the $3 billion figure that Energy Transfer earlier represented as the cost).  The report stated that Wells Fargo shared its analysis of the timing of the Mariner East projects with Energy Transfer, and Energy Transfer apparently did not challenge or object to these figures during that non-public call, because Wells Fargo published them.  In the words of the report:

> During the [August 9, 2018 earnings] call, management provided an updated timeline for ME2 and ME2X, which seemed to confuse the market. We followed up with the company post the earnings call to gain clarity and present our

understanding below. Importantly, ME2X is, by and large, NOT being delayed to 2020 but is still scheduled to (mostly) come into service in Q3'19.

Timing

Energy Transfer plans to utilize different diameter NGL pipelines in various segments of Mariner East 2's pipeline route in an effort to bring capacity into service as quickly as possible. Eventually, ME 2 will consist of one 20-inch pipeline and ME 2X will consist of one 16-inch pipeline (ME1 is an 8 inch line). However, in the interim, smaller diameter pipes (e.g. an existing 12-inch refined products line and a greater amount of smaller 16-inch lines rather than 20-inch) will be used to allow capacity to be brought online faster. Based on our understanding, partial ME 2 service will begin in Q3'18 (we estimate roughly 100 MBbls/d of capacity), almost full ME 2 / ME 2X service will begin in late Q3'19 (we estimate roughly 475 MBbls/d of capacity), and full ME 2 / ME 2X service will begin in Q3'20 (full 525 MBbls/d of capacity). In our previous model, we had assumed full ME 2 service by the end of Q4'18 and full ME2X service by the end of Q3'19.

Below, we have presented our revised timeline for ME 2 / ME2X completion based on quarterly EBITDA projections.



Exhibit 1. Mariner East 2 / 2X Quarterly EBITDA Schedule

| ($MM, except per unit data) | Historical | FY2018E | FY2019E | FY2020E |
|---|---|---|---|---|
| Mariner East 2/2X capex | $3,425 | $1,325 | $1,025 | $225 |
| Mariner East 2/2X capex (cumulative) | $3,425 | $4,750 | $5,775 | $6,000 |
| Mariner East 2/2X EBITDA | - | $51 | $259 | $490 |
| Blended EBITDA multiple | - | NM | 22.3x | 12.2x |

Source: Wells Fargo Securities, LLC estimates

407.     The above Wells Fargo report illustration shows how the reduction in throughput, and delayed "almost full" and "full service" of ME2, as a result of the events that led to the need to implement the "Frankenpipe" solution, would have a material negative impact on Energy Transfer's quarterly Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") attributable to ME2 and ME2X going forward.

408.     News of the makeshift pipe solution and the delayed completion of the actual ME2 pipeline caused Energy Transfer's unit price to plummet, falling from a closing price of $18.45 per unit on August 8, 2018, to a closing price of $17.41 per unit on Monday, August 13, 2018, a 5.6% price decline. The portion of the decline that occurred on August 13 was statistically significant at the 99% confidence level.[19]

409.     However, as set forth above, the full implications of Defendants' misconduct remained hidden from investors, including because of Defendants' additional false and misleading statements and omissions, which soothed market concerns about the project and its progress.

---

[19] On October 18, 2018, *StateImpact* further reported that:

> Sunoco said Tuesday that the Mariner East 2 pipeline, planned as a cross-state 20-inch line, will initially consist of joined-up sections of 12-, 16- and 20-inch pipe. The hybrid pipe is expected to be in service "shortly," and will carry natural gas liquids until the 20- and 16-inch pipes are completed, the company said.  It said last week that the 20-inch and 16-inch pipes are scheduled for completion by the end of 2020.   Asked by StateImpact whether the company now considers the hybrid pipeline to be Mariner East 2, spokeswoman Vicki Granado said: "At this time, yes. This is a temporary solution to get ME2 into service."

> Lisa Dillinger, Sunoco spokeswoman:  "As we continue to finish constructing both ME2 and ME2X, we will be able to put the next segment into service by the end of Q3 2019, continuing to use a combination of 12-, 16- and 20-inch pipe.  Then we will be able to complete both pipelines, fully 20-inch and fully 16-inch, in Q4 2020."

**B.      October 27-29, 2018:  The DEP Orders Energy Transfer to Stop Work on the Revolution Pipeline**

410.    On Saturday, October 27, 2018, the *Associated Press* re-published and disseminated an exposé, initially written by the *Pittsburgh Post-Gazette*, which revealed how Energy Transfer had misstated, and failed to disclose, the risks that Pennsylvania's geology, and long history of sub-surface mining, posed to Energy Transfer's pipeline construction.  The article, "Pipeline ruptures bring new scrutiny to Pennsylvania geology," reported on how Energy Transfer's misstatements, and rush to construct its pipelines, resulted in numerous tragedies and setbacks for Pennsylvania residents negatively impacted by the pipeline.  As the article reported:

> . . . In this part of Pennsylvania [Washington County], subsidence is commonly associated with coal mining:  When coal is removed from the earth, it leaves voids in its wake.  Some collapse right away, sinking the surface above.  Some take time to yield the space to other rocks.  The movement underground can crack foundations on the surface, damage roads and, yes, break pipelines.
>
> Landslides are another category of subsidence that can wreak the same havoc.
>
> With a soaking spring and summer, western Pennsylvania has had its share of them in recent months, including the Sept. 10 slip that ruptured a newly activated natural gas pipeline in Beaver County.  The pipeline was built by Energy Transfer Partners.
>
> The resulting explosion burned down a home and brought a new level of alarm to residents near the yet-unfinished Mariner East 2 pipeline - a path that stretches 303 miles across picturesque hills underlain by hundreds of miles of old mines.
>
> <u>Before construction began, Sunoco, which merged with Texas-based Energy Transfer Partners last year, told Pennsylvania regulators that the chances of its drills running into voids was either "low" or "very low."</u>
>
> The schematic for the horizontal drilling planned to go under [a local family's (the Seamans')] home shows the entire area sits on top of the old Pittsburgh Coal Co.'s Cincinnati Mine.
>
> Opened in 1835, the mine was notorious for one of the worst explosions in the history of the industry, which killed 96 miners and one rescuer in 1913.
>
> Sunoco's drilling work near the couple's Washington County home began May 27, 2017.  The first signs of trouble showed up within the first week.

Drilling mud came out of the ground in three unexpected places: two near a travel-trailer sales parking lot and one just outside the Seamans' home, flowing into a culvert that emptied into the high-quality stream known as Froman Run.

Sunoco stopped drilling, placed filter socks and straw bales around the spills then carried on.

On June 10, about 40 gallons of drilling mud oozed out of the ground outside Mingo Presbyterian Church, a 187-year-old building with a bright red roof next to the Seamans' place. A pumper truck was called in to vacuum the spill.

The next day, some 100 gallons of muddy water showed up in an old pump house behind the Seamans' home.

Sunoco dispatched vacuum trucks and stationed someone from the company to sit outside the couple's kitchen window 24 hours a day for weeks, monitoring the old water well to ensure a quick response to subsequent mud spills.

**Deep underground coal mining**

In its initial report to the state Department of Environmental Protection, Sunoco said the spills were likely related to conditions below the surface caused by "historic deep underground coal mining in the area."

When Tetra Tech, the same contractor that had prepared the original spill response plan, was asked to reevaluate the design of drills in the area, <u>it determined the risk of further spills was inherent to drilling in that spot. It was bound to happen.</u>

"In response to a better understanding of the subsurface geology and degree of fracturing," Sunoco said, it decided to abandon attempts to install the pipeline through horizontal directional drilling - a method of tunneling under obstacles - and to instead use a combination of trenches and shallower, shorter bores.

That's when Sunoco cut down the trees on the steep slope in the Seamans' backyard and dug a trench that has remained empty since this summer, save for a large hole filled with muddy water.

The homeowners, meanwhile, wondered: If a pipeline is ever laid there, will it be vulnerable to landslides?

**Rethinking pipeline failures**

So far, spills and mishaps at Sunoco's horizontal drilling sites for the Mariner East 2 pipeline have been examined by regulators from an environmental perspective – Did the spill pollute a creek? Did it foul drinking water or cause erosion?

Those things draw fines and require the company to rethink its processes.

But the earth's reaction to the pipeline can also be considered from the lens of safety: If the underground rock and soil shifted easily when prodded, will they do so again when a pipeline is installed, pressurized and filled with a highly volatile liquid?

These concerns have been articulated most forcefully by residents in a Philadelphia suburb in Chester County, where attempts to bore underground opened up sinkholes in people's backyards.

What if the ground moves again, they asked Sunoco when its officials were put on the stand at an administrative hearing earlier this year.

State Sen. Andy Dinniman, a Democrat from Chester County who has been the leading political voice against Sunoco, suggested that laying pipelines in karst geology - which exists where limestone has eroded underground and left voids behind - could be unsafe.

John Zurcher, a pipeline safety expert hired by Sunoco to testify at the May 10 hearing, disagreed.

Of all the thousands of miles of transmission lines in Pennsylvania, he said, "I know of no incidents that any one of those pipeline companies have had with subsidence or anything else due to these formations."

Zurcher said he consulted a database of pipeline incidents maintained by the Pipeline & Hazardous Materials Safety Administration before making his claim.

<u>"There's never been a failure of a pipeline in one of these areas caused by geology or a sinkhole or even mining subsidence that we have here in Pennsylvania."</u>

**Checking the records**

<u>The PHMSA records, which date back several decades, show more than a dozen such incidents across the country, including in Pennsylvania.</u> . . .

In the same testimony in which he said that subsidence has never broken a pipeline in this region, Zurcher, who worked as a safety manager at Columbia Gas Transmission from 1997 until 2003, noted seven protective measures that Sunoco had included in its permit to mitigate the risk of earth movement on Mariner East 2.

For example, for areas where there is a risk of subsidence from karst or mining activity, Sunoco's experts suggested keeping the pipe somewhat loose in the bore - not cementing it tightly against the hole.

**Mines for miles**

Mine-related subsidence has foiled Sunoco's Mariner East 2 drilling plans in several other sites in western Pennsylvania. . . .

411.    Just two days later, on Monday, October 29, 2018, following inspections the prior week that revealed "unreported landslides and erosion off the [Revolution] pipeline's construction sites into nearby streams," the Pennsylvania DEP issued an Order and letter requiring ETC Northeast Pipeline to immediately cease construction of Energy Transfer's Revolution pipeline. The shutdown resulted from Energy Transfer's "failure to implement or maintain effective erosion or sediment control best management practices (E&S BMP), as required by 15 PA Code Chapter 102, that minimize the potential for accelerated erosion and sedimentation" and the "failure to provide temporary stabilization, as required by 25 PA Code Chapter 102, upon temporary cessation of earth disturbance activities."  Energy Transfer was given until November 9, 2018 "to provide a detailed plan for controlling erosion along [the Revolution pipeline's] route."

412.    In response to these disclosures, Energy Transfer's unit price fell by 4%, from a closing price of $15.46 on Friday, October 26, 2018 to a closing price of $14.84 on Monday, October 29, 2018, a decline that is statistically significant at the 95% confidence level.

**C.     December 19-21, 2018:  Chester County Launches an Investigation Into Energy Transfer**

413.    On December 19, 2018, following numerous reports of sinkholes appearing within feet of residences in Chester County, the District Attorney for Chester County, Tom Hogan, announced that his office would "bring into play all of the tools of the criminal justice system" against Energy Transfer for its part in causing the sinkholes.  Hogan explained that, over the past two years, his office had seen "these pipelines rip through the heart of Chester County" and heard reports of "not-so-subtle bullying of Chester County citizens by big corporate interests."  D.A.

Hogan continued, "We expected state regulators and [] Governor [Wolf] to step in and assure the safety of Pennsylvanians. They have not."

414.    Hogan also cited the September 2018 explosion and fire in Beaver County in the western part of the state on the Revolution Pipeline that feeds into the Rover pipeline, both of which are owned by Energy Transfer. Specifically, *KYW News Radio* reported on December 19, 2018:

> "We have seen some things that have happened here in Chester County that have drawn our specific attention for law enforcement," Chester County DA Tom Hogan said Wednesday [December 19].
>
> Hogan says over Thanksgiving he visited homes in West Whiteland affected by construction of the pipelines.
>
> "And I could see the terrible damage that had been done to their property, and I could see the fear on their faces about what was going on, and at that point I realized we needed to step in and do something," he said.
>
> He says they've asked Sunoco and its parent company Energy Transfer LP to preserve all documents relating to sink holes and well water contamination in the county and also to an explosion along a natural gas pipeline in Beaver County.
>
> "We have seen these incidents happen and, quite frankly, we were waiting for the governor or the (Public Utilities Commission) to step in and ensure the safety of this pipeline and they chose not to do so," Hogan said.
>
> The construction projects have been slapped with fines, and the PUC has suspended permits over prior violations. And Hogan says he realizes his jurisdiction only goes so far, but he says his office can make sure they comply with all criminal laws.
>
> "We also hope by letting the company know that we are overseeing this, that we are investigating, that we do have eyes on what is going on, that they will behave appropriately," he said.
>
> The Mariner East pipeline ships natural gas from Western Pennsylvania to Marcus Hook in Delaware County and bisects Chester County.
>
> "We've gone from hypothetical risk to actual harms," Hogan said. "We want to make sure that anything that happens here in Chester County, people understand they could be liable."

415.   *Reuters* picked up the story of DA Hogan's investigation of Energy Transfer, and further reported on and disseminated it at 3:35 p.m on December 20, 2018, just before market close, in an article entitled "Pennsylvania Prosecutor Opens Criminal Investigation of Mariner East Pipe."

416.   The news of DA Hogan's investigation caused the price of Energy Transfer units to fall by $0.70 per unit, or approximately 5.4%, from a closing price of $12.94 per unit on December 18, 2018, to a closing price of $12.24 per unit on December 21, 2018.  The unit price decline on December 21, 2018, after the late-evening *Reuters* report, of 4.67% is statistically significant at the 99% confidence level.

417.   In response to news of DA Hogan's investigation, Energy Transfer continued to mislead the market by releasing a statement claiming that:

> We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines.  We vehemently deny any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release.  We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is readily available on the PUC and DEP websites.  We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania and we are committed to aggressively defending ourselves against these baseless allegations.  We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.

**D.     August 8-12, 2019:  Chester County Charges the Constables Hired by Energy Transfer with Bribery**

418.   After the close of the market on August 8, 2019, following months of investigation, DA Hogan arrested and charged two Pennsylvania Constables – Kareem Johnson and Mike Robel – in connection with their work as private security guards in connection with the construction of the Mariner East pipeline project on Lisa Drive in West Whiteland Township, Pennsylvania.  News

of the arrests broke after the close of markets on August 8, 2019, on the local evening news,

including on *3 CBS Philly*.  As *3 CBS Philly* reported:

> Two Pennsylvania constables have been arrested after prosecutors say they improperly used their elected positions for personal profit while working security on the Mariner East Pipeline.  The Chester County District Attorney's Office announced the arrests of 47-year-old Kareem Johnson, a constable in Coatesville, and 58-year-old Michael Robel, a constable in Northumberland County, on Thursday.
>
> Prosecutors say Johnson and Robel were hired by a Harrisburg-based company called Raven Knights as private security guards along the construction area of the Mariner East Pipeline in Chester.
>
> The Chester County District Attorney's Office opened a criminal investigation in connection to the Mariner East Pipeline project in December 2018.  Investigators say Chester County residents reported that armed security guards identified themselves as state constables on their property. . . .
>
> "We cannot have elected law enforcement officials hiring themselves out and using their public positions for person[al] profit," Chester County District Attorney Chief of Staff Charles Gaza said.  "It undermines the integrity and independence of law enforcement and our government."
>
> Johnson and Robel have been charged with official oppression, Ethics Act violations and other related offenses. . . .
>
> "There is a troubling aspect to this investigation that bears note," Chester County District Attorney Tom Hogan said.  "The Pennsylvania Department of Environmental Protection is charged with protecting Pennsylvania residents.  However[,] DEP . . . has retained criminal defense lawyers to represent them in this investigation and have insisted that all communications go through those lawyers.
>
> "Imagine if the West Chester Police Department was investigating a burglary with the DAO [District Attorney's Office] but retained criminal defense lawyers to represent the police department and would only communicate with the DAO through the defense lawyers.  In almost 30 years working in the criminal justice system, I have never seen a state or federal agency retain criminal defense lawyers to communicate with the prosecutors that the agencies were supposed to be helping."

419.    According to a report in *State Impact Pennsylvania* and *WHYY* published before

the start of trading on August 9, 2019, Johnson and Robel received $36,785 and $27,995,

respectively, from Energy Transfer for their illegal work providing private security at the Mariner

East pipeline project between 2018 and 2019.  Neither man reported their Energy Transfer-funded

illegal income for tax purposes.  The charges brought against Johnson and Robel carried a

maximum sentence of 24 years in prison.

420.    With respect to the specific charges against Johnson and Robel, *StateImpact* and

*WHYY* further reported:

> DA Thomas Hogan said Michael Robel, 58, of Shamokin in Northumberland
> County and Kareem Johnson, 47, of Coatesville in Chester County also violated
> laws on bribery when they worked for Raven Knights, a Harrisburg company that
> was hired by Sunoco to provide security for pipeline construction.
>
> As state constables, the defendants are elected officials who are authorized for tasks
> including transporting criminal defendants, serving arrest warrants, and in limited
> circumstances making arrests, Hogan said in a news release.
>
> But he said they are not allowed to hire themselves out as security guards while
> working as constables, and must declare any income of $1,300 or more. . . .
>
> According to the complaint, Johnson's activities included instructing a freelance
> journalist not to step into the street at Lisa Drive, where sinkholes opened up during
> pipeline construction starting in late 2017.
>
> The complaint against Robel said he told a plain-clothes detective not to park on a
> part of Lisa Drive near where Sunoco was working.  Robel was wearing a firearm
> and displayed a state constable badge, the complaint said. . . .
>
> The charges include "official oppression," meaning that the defendants were using
> their status as constables to keep people away from public property where they had
> a right to be present, [Hogan's chief of staff, Charles] Gaza said. . . .
>
> "Right now, we're not charging anyone above the constables with being complicit
> in this," Gaza said in an interview.

421.    On Friday, August 9, 2019, in response to the news of the arrests, the price of

Energy Transfer units fell $0.13, or approximately 1%, to close at $13.90 after closing at $14.03

on August 8, 2019.  The negative market reaction continued on Monday, August 12, 2019, as the

price of Energy Transfer units fell by over 3.7% in a statistically significant amount at the 99%

confidence level, to close at $13.38 per unit.  As *News Bites* reported on August 12, 2019, the price

of Energy Transfer units had "<u>sunk [] 4.6% over the past two days</u>" on higher than average trading volume.

422.    Following the Robel and Johnson arrests, Energy Transfer released a statement falsely denying any association with the Constables.  Energy Transfer spokesperson Lisa Coleman misleadingly claimed that the two men "<u>were not Sunoco or Energy Transfer employees</u>.  They were employed by Raven Knights, who provided security services and personnel."  Coleman then claimed, "We have a code of conduct for all of our contractors and third-party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that."  However, as detailed herein, as would later be revealed to investors, contrary to Energy Transfer's statements, there was an "unwritten policy" at Energy Transfer to hire government officials such as constables to provide security for pipeline projects, in direct violation of Energy Transfer's code of conduct, and Energy Transfer undertook extensive measures in an attempt to conceal that the Company was making the payments to the constables.

E.    **November 12-13, 2019:  The** *Associated Press* **Discloses the FBI's Investigation into Energy Transfer's Alleged Bribery of Pennsylvania Officials**

423.    On November 12, 2019, toward the end of the trading day, the truth was further revealed when the *Associated Press* published an article entitled "FBI eyes how Pennsylvania approved pipeline."  The article reported:

> The FBI has begun a corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction on a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania, *The Associated Press* has learned.
>
> FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning.

All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.

The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say.

424.    The same day, the *Philadelphia Enquirer* further reported on the investigation, adding that:

The FBI is investigating how Gov. Tom Wolf's administration issued construction permits for the $5.1 billion Mariner East project, the latest official inquiry into the contentious cross-state pipeline project that carries highly volatile gas liquids to a Delaware River export terminal.

The federal probe has been running for at least six months and started in response to similar inquiries launched in the last year by the district attorneys of Delaware and Chester Counties as well as state Attorney General Josh Shapiro, according to three sources who spoke on the condition of anonymity because they were not authorized to publicly discuss the case.

The FBI's investigation, first reported by *The Associated Press*, has focused on whether Wolf administration officials forced staff of the Pennsylvania Department of Environmental Protection to ignore shortcomings and approve the pipeline's construction permits, according to the sources, who include current and former Wolf administration officials.  A fourth source described the investigation as being in its preliminary stages. . . .

Chester County District Attorney Thomas P. Hogan, who launched the first criminal probe of the pipeline's construction last year, said Tuesday he has three prosecutors forging ahead.  He welcomed news of the FBI's involvement.  "It doesn't impact our investigation, which has been going full steam ahead," he said.  "However, it's always good to see federal authorities bringing their resources to the table in an investigation of this complexity and magnitude."

425.    This news stunned the market, and the price of Energy Transfer's units fell sharply on unusually high trading volume in response to disclosures of the FBI's investigation, including the fact of the investigation and its length and severity.  On November 12, 2019, as news outlets were still working to widely disseminate the news of the FBI investigation, Energy Transfer's unit price fell by 2.6% to close at $11.66.  Then, on November 13, 2019, the price fell a further 4.3%,

to close at $11.16. Both of these price declines were statistically significant at the 99% confidence level.

426. As SNL Energy's *Daily Gas Report* reported on November 14, 2019:

Energy Transfer LP shares saw their <u>highest volume of trading since April 2016 as investors reacted to reports that the FBI is investigating Pennsylvania's permitting of subsidiary Sunoco Pipeline LP's Mariner East family of NGL pipelines</u>.

More than 55.6 million Energy Transfer units traded hands Nov. 13, with the stock price down nearly 4.3% to $11.16 per share.

FBI agents interviewed current or former state employees about the construction permits granted to Sunoco and whether Gov. Tom Wolf or members of his administration pressured environmental regulators to move the permits along, *The Associated Press* reported Nov. 12. The agents are also trying to find out whether Wolf or his administration gained anything in return for approving the permits, the report said.

The Mariner East 2 pipeline project, which has had a string of problems with construction, is operating at a reduced capacity, moving NGLs to a shipping terminal in Marcus Hook, Pa., for export for producers. The line takes NGLs from Ohio, West Virginia and western Pennsylvania to Marcus Hook, on the Delaware River near Philadelphia.

Mariner East 1 was shut down for three months earlier in the year after a sinkhole was found in a community in Chester County.

## F. December 3, 2019: Chester County Charges Energy Transfer's Security Supervisor with Bribery

427. On December 3, 2019, Chester County DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for the Mariner East pipeline. In the press release accompanying the announcement of charges, DA Hogan stated:

<u>This is a pretty simple case</u>. <u>State Constables sold their badges and official authority</u>. <u>Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens</u>. And the defendants attempted to conceal their activity through a maze of companies and payments.

428. The press release continued:

Energy Transfer decided they needed security for the pipeline. However, rather than simply hiring a private security firm, <u>Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline. Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act. Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.</u>

429.    As discussed above, the charges accused Energy Transfer of engaging in a "buy-a-badge" program to circumvent Pennsylvania state laws to hire Pennsylvania Constables to provide security for construction sites along the ME2 pipeline's route, while donning their badges, wearing their official uniforms, and bearing firearms. The charges in the criminal complaint are against Energy Transfer security chief Frank Recknagel and four other individuals: Nikolas McKinnon of Stafford, Virginia, a senior security adviser for TigerSwan LLC ("TigerSwan"), an international security firm; Michael Boffo of Jacksonville, Florida, a site security manager for TigerSwan; James Murphy of Harrisburg, Pennsylvania, operator of Raven Knights LLC ("Raven Knights"), a Harrisburg-based security firm; and Richard Lester of Linglestown, Pennsylvania, registered owner of Raven Knights. The charges in the criminal complaint are serious, and include: (i) Bribery; (ii) Conspiracy; (iii) Dealing in proceeds of unlawful activity; (iv) violations of the Pennsylvania Constable Act; and (v) violations of the Pennsylvania Ethics Act.

430.    The District Attorney's Office's investigation revealed that Recknagel, an Energy Transfer security supervisor, orchestrated the scheme to bribe the Constables. As discussed above, Recknagel implemented Energy Transfer's "unwritten policy" to use constables for security. While Energy Transfer tried to blunt the impact of the revelation by denying the merit of the charges, the Partnership's explanation was itself revealed to be transparently misleading. As the *Philadelphia Inquirer* reported on December 3, 2019:

> Vicki A. Granado, a spokesperson for Energy Transfer Partners, said . . . local law enforcement officials did not object to <u>the company's plan to hire constables</u> when it was discussed with them. Later Tuesday, West Whiteland Township police said

they were unaware that the company had hired constables for security.  <u>Energy Transfer, they said, told them the company had hired a private security firm.</u>

431.    In response to the news of the charges against Recknagel, the price of Energy Transfer units fell by 2.0%, from a closing price of $11.63 on December 2, 2019 to a closing price of $11.40 on December 3, 2019.

*        *        *        *        *        *        *

432.    The disclosures that corrected the market price of Energy Transfer units and reduced the artificial inflation caused by Defendants' materially false and misleading statements are summarized in the following chart, which identifies each corrective disclosure event, the price declines in Energy Transfer units resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date:

| **Date** | **Corrective Event** | **Closing Unit Price** | **Unit Price % Change** | **S&P 500 Total Returns Index Price % Change** |
|---|---|---|---|---|
| August 9-13, 2018 | Energy Transfer reveals that it will not complete ME2 on time, and will instead seek to achieve reduced flows on the pipeline by joining 20" ME2 pipes to 12" older, existing pipes, thereby creating "Frankenpipe" | $17.41 | **-5.6%** | -1.1% |

| **Date** | **Corrective Event** | **Closing Unit Price** | **Unit Price % Change** | **S&P 500 Total Returns Index Price % Change** |
|---|---|---|---|---|
| October 27-29, 2018 | The *Associated Press* reported on Energy Transfer's failure to disclose key risks associated with Pennsylvania geology, and the Pennsylvania DEP ordered Energy Transfer to cease work on the Revolution Pipeline due to landslides and sinkholes | $14.84 | **-4.0%** | -0.7% |
| December 19-21, 2018 | Chester County D.A. Tom Hogan announces investigation into Energy Transfer, and *Reuters* disseminates it to the market | $12.24 | **-5.4%** | -1.6% |
| August 8-12, 2019 | Chester County charges constables Energy Transfer hired with bribery | $13.38 | **-4.6%** | -1.8% |
| November 12-13, 2019 | *Associated Press* reveals FBI corruption investigation into Wolf administration's role in connection with DEP permitting process for ME2 | $11.16 | **-6.8%** | +0.2% |

| **Date** | **Corrective Event** | **Closing Unit Price** | **Unit Price % Change** | **S&P 500 Total Returns Index Price % Change** |
|---|---|---|---|---|
| December 3, 2019 | Chester County DA Hogan files criminal bribery and conspiracy charges against Energy Transfer's head of security in connection with hiring constables for pipeline security | $11.40 | **-2.0%** | -0.7% |

433.    Accordingly, as a result of their purchases of Energy Transfer units, Lead Plaintiffs and other members of the Class suffered economic loss and damages.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

434.    The facts set forth above, when viewed holistically and together with the other allegations in this Complaint, support a strong inference that each of the Defendants knew or were severely reckless in not knowing that each of the misrepresentations and omissions alleged herein were materially false and misleading at the time they were made.

435.    At all relevant times, each of the Defendants knew or recklessly disregarded that their statements and omissions concerning their efforts to safely and legally construct the Pipeline Projects, and the Company's intention to cooperate with the DEP to ensure an on-time in-service date for the Pipeline Projects at the claimed throughput, were or would be misleading to investors at the time they were made.  In addition to the facts discussed above, the following facts further support a strong inference of the Defendants' scienter.

A.      **Senior Energy Transfer and Sunoco Executives Were Personally Involved in Pressuring the Governor's Office and DEP to Grant the Pipeline Permits**

436.    Defendants McGinn and Hennigan were directly and personally involved in applying pressure to Pennsylvania government officials to approve Energy Transfer's Chapter 102 and 105 permit applications for ME2.  As set forth above in Section IV.C, internal documents and records obtained via right-to-know requests issued to government officials show that, between the DEP's issuance of numerous detailed technical deficiency letters concerning the Partnership's permit applications in September 2016 and the DEP's surprisingly quick issuance of permits in February 2017, McGinn and Hennigan repeatedly contacted and pressured senior officials from Governor Wolf's office and the DEP, including Yesenia Bane, Governor Wolf's special assistant, and Patrick McDonnell, the head of the DEP. These contacts included numerous in-person meetings and phone calls between December 2016 and February 2017.

437.    Evidence shows that McGinn and Hennigan applied intense pressure on the Governor's office and the DEP to secure approval of the permits.  For example, Sunoco's pressure became so severe that it resulted in the termination of former DEP Secretary Quigley after he expressed grave concern over the sufficiency of the Energy Transfer Companies' permit applications, and the pressure being exerted by the Governor's office.  In addition, in a text message exchange from February 1, 2017, Bane asked McDonnell "Where are we? McGinn is asking for a call."  Likewise, that same day, McDonnell explained to Bane that the DEP had a "commitment to get things done," stating: "If I need to talk to Mike 5 times a day for the next week, that's what we'll do."

B.      **Energy Transfer Bribed Pennsylvania Constables to Intimidate Residents and Minimize Protests**

438.    On November 30, 2017, when a representative from Energy Transfer's security vendor suggested to Energy Transfer that it might be easier to use <u>off-duty</u> police officers to

provide security for the Mariner East project, Recknagel wrote in an email that it was Energy Transfer's "unwritten policy" to use "on duty" law enforcement, sheriffs, or Constables to provide armed security.  In addition, according to the criminal complaint filed against Recknagel, on April 12, 2018, after residents expressed concern about the presence of armed security personnel in close proximity to their homes and children, a still-unidentified executive-level Energy Transfer supervisor instructed Recknagel – an Energy Transfer employee – to make security personnel available to meet with local parents near Lisa Drive in West Whiteland Township.

439.    On August 8, 2019, two of the constables that provided security for Energy Transfer on Lisa Drive in West Whiteland Township were arrested by the Chester County District Attorney's office and criminally charged.  In spite of the clear laws forbidding Pennsylvania State Constables from using their public titles for private enrichment, Energy Transfer devised a web of financial transactions to hide its employment of these Constables, whom the Commonwealth of Pennsylvania has now criminally charged for their work on the Mariner East pipeline project. Energy Transfer knew that it was illegal to hire these constables to provide security, hired them in any event, and then tried (and failed) to cover its tracks by shielding the payments and not reporting any taxes on the wages paid to the constables.

440.    In this regard, and further demonstrating Defendants' knowledge of this bribery, Defendants went to extreme measures to manufacture a complex chain of shell entities to shuffle and obscure the payments to the constables that Energy Transfer (through Sunoco) hired and supervised.  Following months of investigation into Defendants' constable bribing, DA Hogan's office issued a Chester County criminal complaint which revealed that "the defendants attempted to conceal their activity through a maze of companies and payments."  Indeed, according to DA Hogan, Energy Transfer "used a shell game to hide payments to the Constables. . . . Every step of

the payments was hidden and cloaked.  Energy Transfer could have simply hired a reputable private security firm and paid the security guards directly.  Instead, Recknagel and Energy Transfer wanted the power of the badge to enforce their corporate will and engaged in illegal activity to make it happen, then hid the payments in a byzantine process to avoid detection of their role."

441.   Energy Transfer intentionally, knowingly and falsely attempted to distance their relation from these constables through its statement that "Constables Johnson and Robel were not Sunoco or Energy Transfer employees.  They were employed by Raven Knights, who provided security services and personnel.  We have a code of conduct for all contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that."  Yet, contrary to these misleading assertions, documents obtained by the Chester County DA's office show that the Constables were hired at the direction of Energy Transfer employees, such as Recknagel, and that payment to law enforcement for their authority is a company policy.

442.   Energy Transfer's Code of Ethics stated that its employees "should not provide…anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department."  Accordingly, the Constables were either paid with the express authorization of Energy Transfer's Chief Compliance Officer or the Company's Legal Department, or such payments were in direct violation of this specific provision of the Company's own Code of Ethics and this statement was materially and knowingly false when made given the Partnership's "unwritten policy."

C.     **Energy Transfer Executives Knew in Early 2018 that Placing ME2 in Service in 2018 Was Impossible without Cutting Corners**

443.    The success of ME2 depended on Energy Transfer and Sunoco bringing the pipeline online in an expeditious manner, and carrying the amount of NGLs that Energy Transfer and Sunoco promised investors and customers it would carry.  As revealed through documents produced in lawsuits that stemmed from the Revolution Explosion, multiple customer contracts had "drop-dead" dates such that Energy Transfer needed to place ME2 and the Revolution pipeline in service by the end of 2018 to prevent its customers from terminating their contracts without penalty.  Knowing this, Energy Transfer raced to get the Pipeline Projects into service as fast as possible, which led Energy Transfer to cut corners to save time.  Energy Transfer first sought to accomplish this goal by seeking to have John Quigley removed from his position as the head of the DEP in May 2016, and thereafter by using the influence of Governor Wolf's administration to pressure the DEP into granting permits by early February 2017 for the construction of ME2 notwithstanding hundreds of deficiencies that would otherwise have doomed the applications as of that time.  Further, once the permits were issued by the DEP in February 2017, Energy Transfer and Sunoco consistently cut corners in its planning and construction of the ME2 and Revolution pipelines, and quickly began racking up dozens of notices of violations for their increasing number of frac-outs, sinkholes, inadvertent returns, and well and water contaminations.  Indeed, Judge Barnes swiftly condemned Energy Transfer's corner-cutting when the Judge issued the January 2018 Order suspending all construction on ME2 and ME2X.

444.    With full knowledge of the DEP's monitoring of the Energy Transfer Companies' compliance with Pennsylvania law and their permits, and that Energy Transfer's misconduct had also drawn the close scrutiny of the Environmental Advocates, abutting landowners, and State

Senator Dinniman, Energy Transfer knew that it would not be able to meet its 2018 deadlines without having to cut more corners.

445.     Accordingly, in January 2018, Energy Transfer should have either delayed ME2's in-service date until after 2018, and, in turn, notified Energy Transfer investors of the significant potential customer backlash, or disclosed that the Partnership would be forced to jury-rig a 1930s-era pipeline to create a makeshift ME2, a purportedly new pipeline, which would have a significantly reduced maximum throughput.  Instead of pursuing either course of action, Defendants hid the truth from investors.

446.     Considering the time it would have taken to develop plans for this "work-around," Defendants developed these plans in early 2018.  Energy Transfer certainly knew by June 2018 that it would pursue the makeshift pipeline as West Whiteland Township Manager Mimi Gleason said that Sunoco had already informed her by early July 2018 that Energy Transfer and Sunoco would be piecing together ME2 with the existing 12-inch line in order to "take a little bit of the timing pressure off for getting Mariner 2 and 2X online."

447.     The fact that the Energy Transfer Companies knew that they needed to re-purpose the 12-inch pipeline well before mid-June 2018 is also demonstrated by the discussion of the timing of Sunoco's notification of that change to PHMSA.  As the West Whiteland Township's website discusses, by mid to late June 2018, Sunoco had already "advised Pipeline and Hazardous Materials Safety Administration (PHSMA) that they intend to use the existing 12" line to transport Natural Gas Liquids (NGLs).  This line is currently used to transport other petroleum products." The website continued: "They need to give PHSMA a 60 day notice so they intend start transporting NGLs in mid to late August" – i.e., Sunoco made the notification to PHMSA in mid to late June 2018.  According to the website, "[t]his will reduce the pressure to complete the

Mariner East 2 and Mariner East 2X pipelines."  Sunoco's notification to PHMSA necessarily involved internal discussion of the work and approvals necessary to make the change, as well as the preparation of any such submission to PHMSA, which would necessarily take a significant amount of time before Sunoco actually notified PHMSA.

448.    Further evidencing Defendants' scienter, Energy Transfer continued to conceal the true impact that the makeshift pipeline would have on the Partnership's bottom line.  For instance, on November 8, 2018, during the Partnership's third quarter 2018 earnings conference call, CFO Long dodged a question by an analyst from Bank of America Merrill Lynch in the below exchange:

> Question:  And then just on ME2, you said the line is 100% complete.  So you won't be using the workaround that you've talked about?

> Answer:  Yes. Well, what we said is that ME2 will be in service this quarter, and we're pushing hard as everybody knows.  As far as go-arounds, I'm not sure what you're referring to other than -- what?  Yes, so the bottom line is what we've said is we're in service with Mariner East 2 soon, we're in service with 2X (inaudible) by the third quarter of next year, and we couldn't be more excited to bring it on soon and also to grow our business as soon as we can.

449.    Energy Transfer executives were highly attuned to the importance of the throughput of Energy Transfer's Pipeline Projects as the Partnership touted the pipelines' throughputs in every investor presentation from the start of the Class Period through the date that Energy Transfer disclosed the makeshift pipeline to investors.  The attendees at those investor presentations included, but were not limited to, Defendants Warren, Long, McCrea, Ramsey, and Hennigan (Sunoco's President and CEO).

**D.    The Pipeline Project Was the Largest Infrastructure Project in the History of Pennsylvania, Necessarily Drew the Attention of Energy Transfer's Senior Executives, and Was the Subject of Intense Investor and Press Scrutiny Throughout the Class Period**

450.    Also supporting a strong inference of Defendants' scienter is the critical nature of the Pipeline Projects to Energy Transfer – including their size, safety risks, and functionality.  The

Executive Defendants – Energy Transfer's Class Period CEO and CFO – can be presumed to know the truth about the reckless and risky construction of the Pipeline Projects.

451.    The Pipeline Projects were enormous investments for Energy Transfer, and represented a historic construction project in Pennsylvania.  As stated on Energy Transfer's website marinerpipelinefacts.com, "Mariner East 1 & 2 represented the largest investment of private money in Pennsylvania history."  Energy Transfer listed the Pipeline Projects as "growth projects" for Energy Transfer in all 22 investor presentations held during the Class Period, discussed ME2 and ME2X during their opening remarks on every earnings conference call during the Class Period, and analysts asked for timing and status updates of the Pipeline Projects on every call.

452.    There is no genuine question that Energy Transfer's financial success and growth relied on the successful construction of the Pipeline Projects.  ME2 and ME2X alone constituted "most" of Energy Transfer's $1 billion in capital expenditure ("CapEx") in the third quarter of 2018, and was the largest component of Energy Transfer's $5 billion CapEx spending in fiscal year 2018.

453.    In addition to the core significance of the Pipeline Projects to Energy Transfer's financial condition and operations, Defendant McCrea admitted the critical nature of the Pipeline Projects to Energy Transfer.  On November 8, 2017, McCrea stated that the Marcus Hook facility, located at the endpoint of the Pipeline Projects, "will be the best export and the largest in the country over the next 2 to 3 years with growth.  We think it will be the premium market around the world, both in Europe and Asia, for propane, ethane and butane and also meet needs along the Eastern Gulf Coast."

### E.     The Pipeline Projects Were the Subject of Intense Regulatory Scrutiny, and the Announcement of Each Investigation Further Placed Defendants on Notice of the Problems with the Pipelines

454.     Also supporting a strong inference of Defendants' scienter is the intense regulatory scrutiny Energy Transfer faced, as well as the multiple criminal investigations opened during the Class Period.  Defendants' misconduct relating to the Pipeline Projects became the subject of the following investigations during the Class Period:

- **December 2018:**  Chester County DA Tom Hogan opened an investigation into Energy Transfer's misconduct, including "subtle and not-so-subtle bullying" of Chester County residents.  News of this investigation reached national media outlets such as *Reuters* and *The Associated Press*.  This investigation, as well as a related set of criminal charges brought by DA Hogan, are still ongoing.

- **March 2019:**  Pennsylvania Attorney General Josh Shapiro and the Delaware County District Attorney's office announced a joint investigation into Energy Transfer and Sunoco for potential criminal misconduct relating to the construction of the Pipeline Projects.  This joint investigation is still ongoing.

- **November 2019:**  Energy Transfer disclosed in a November 9, 2019 Form 10-Q that the U.S. Attorney for the Western District of Pennsylvania issued a federal grand jury subpoena for documents related to the Revolution explosion, and that the Pennsylvania Office of Attorney General has commenced an investigation into the explosion.  These investigations are still ongoing.

- **November 2019:**   *The Associated Press* disclosed that the FBI has been investigating the Pennsylvania Governor's office for potential bribery allegations relating to the issuance of the ME2 permits.  News of this investigation was reported through national media outlets.  This investigation is still ongoing.

455.     Given the serious ramifications of these investigations, it is implausible to suggest that Defendants were not aware of the existence of, or were not intimately familiar with, the allegations pertaining to the above listed investigations.

456.     A strong inference of Defendants' scienter is further supported by the DEP's and the PUC's extensive regulatory actions taken against Energy Transfer, Sunoco and ETC.  Since the start of the Class Period, Defendants have racked up over 100 Notices of Violations stemming

from hundreds of frac-outs and instances of operating at worksites without adhering to the required BMPs.  In total, Defendants' misconduct (i) caused over 3.5 million gallons of Drilling Pollutants to contaminate Pennsylvania land and waterways; (ii) damaged as much as 90 acres of Pennsylvania lakes; (iii) created numerous sinkholes that damaged residents' properties; and (iv) contaminated scores of Pennsylvanian residents' water supplies.  As a result, Defendants were subjected to at least 20 orders and forced to pay over $45 million in fines—including the largest fine ever issued by the DEP.

457.    Accordingly, it is implausible to suggest that Energy Transfer and Sunoco executives were not highly aware of the havoc they wreaked on the Commonwealth, and as such, Defendants knew, or were reckless in not knowing, that Energy Transfer's statements to its investors about the Pipelines' in-service dates, throughput, safety profiles, and compliance with DEP regulations and the Company's own Code of Conduct were materially false and misleading.

458.    In fact, further supporting a strong inference of Defendants' scienter is the Partnership's denial of Judge Barnes' characterizations of Defendants' misconduct constructing ME2.  Shortly after Judge Barnes issued the January 2018 Order condemning Energy Transfer and Sunoco for their "egregious and willful violations" of, and their "lack of ability or intention to comply" with, Pennsylvania law, Sunoco spokesperson Jeff Shields claimed that Energy Transfer and Sunoco "strongly disagree with the [DEP's] legal conclusions that our conduct was willful or egregious," and that "safety is paramount for any energy infrastructure project we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment."

459.    The January 2018 Order described shocking misconduct on Energy Transfer's and Sunoco's part, including conducting HDD operations in areas in which Energy Transfer and

Sunoco did not have permits to operate, constructing a bridge to cross a stream without first obtaining a permit and approval from Pennsylvania regulators to ensure the bridge's safety, and unilaterally "field changing" its construction methods from open bore trenching to HDD without seeking prior approval from the DEP – an action Defendants were not authorized to perform.

  **F.**  **Defendant McCrea Had Personal Knowledge of the Revolution Failures that Contributed to the Subsequent Explosion**

  460. Defendant McCrea was the Chief Commercial Officer and Director of Energy Transfer.  According to two of McCrea's direct reports at ETC – Alan Vaina (Senior VP of Business Development) and Adam Arthur (Senior Director of Business Development) – McCrea was personally responsible for managing the Revolution pipeline, as well as managing Energy Transfer's contracts with its two main customers EdgeMarc and PennEnergy.  In depositions of Vaina and Arthur in a litigation between EdgeMarc and ETC, Vaina and Arthur testified that they had worked very closely with McCrea, that McCrea described Arthur as his "right hand guy," and that McCrea was heavily involved in the oversight of the Revolution.  According to Vaina, McCrea was the decision-maker for ETC and the individual who had "final sign off" of the events relating to the Revolution.

  **G.**  **The Revolution Pipeline Explosion and the Sinkholes on Lisa Drive Put Energy Transfer on Notice of the Serious Risks Associated with Constructing the Pipeline Projects in Pennsylvania**

  461. A strong inference of Defendants' scienter is further supported by their repeated attempts to minimize and downplay their misconduct related to the Revolution explosion and the Lisa Drive sinkholes.  When Energy Transfer and Sunoco's misconduct caused sinkholes to appear near Lisa Drive in Chester County on multiple occasions, Defendants' reaction was to further conceal Energy Transfer's operations from the world, and to hire armed constables to prevent the media and Pennsylvania residents from discovering Defendants' misconduct.

462.     Despite Energy Transfer's efforts, however, the press duly reported on the sinkholes, and Pennsylvania State Senator Andy Dinniman filed a Formal Complaint and Petition for Interim Emergency Relief against Sunoco before the PUC.  The Lisa Drive sinkholes garnered significant media attention and spurred multiple lawsuits from Lisa Drive residents.  In fact, the damage at Lisa Drive had become so severe that Energy Transfer and Sunoco decided to purchase outright two of the damaged properties for $400,000 each in April 2019.  The former owners of both homes are subject to non-disclosure agreements in connection with the sales.

463.     Similarly, Energy Transfer and ETC's destructive and improper construction of the Revolution sparked national attention when the Revolution exploded, causing Center Township residents to flee their homes at 5:00 a.m. and decimating one family's home.  Like the Lisa Drive sinkholes, the Revolution Explosion spurred significant litigation, including litigation between ETC and its customers EdgeMarc and PennEnergy, and resulted in ETC purchasing damaged homes and subjecting the residents to non-disclosure agreements.

464.     As uncovered in a litigation related to the Revolution Explosion, Vaina drafted two fraudulent letters that falsely claimed the Revolution Explosion was caused by an event of Force Majeure, as further discussed in Section IV.E.3 above.  Because both Arthur and Vaina have since admitted that McCrea had the final sign off on all ETC matters relating to the Revolution, including its relationship with EdgeMarc, McCrea was certainly involved in the drafting of the letters to EdgeMarc and the simultaneous cover-up of ETC's role in the Explosion.  In addition to Defendant McCrea, based on the Revolution Pipeline's importance to the Company and to the overall success of the Pipeline Projects, as well as the seriousness of the Revolution Explosion and inquiries about it by regulators and the press, each of the Individual Defendants would also have become aware

of the falsity of the Company's statements concerning the Revolution's planning, construction and prospects, in addition to the Explosion.

> **H.     Energy Transfer CEO Warren Admitted to Knowing About Energy Transfer's Failures Related to the Pipeline Projects in Pennsylvania**

465.    A strong inference of Defendants' scienter is further supported by the fact that CEO Warren spoke in detail about delays to the Pipeline Projects' in-service dates and regulatory disputes and other litigations concerning the Pipeline Projects.  For instance, early on in ME2's construction, during Energy Transfer's third quarter 2017 earnings conference call held on November 8, 2017, Warren elaborated on an issue Energy Transfer and Sunoco were having with respect to the placement of a valve station in West Goshen Township.  Specifically, Warren stated that Energy Transfer was considering whether to relocate the valve outside the city entirely. Warren claimed that the West Goshen Township:

> went and got an administrative law judge to give an adjunctive [sic] relief and then the PUC upheld that.  But I think that there are number of different ways to resolve this issue, involving some land up there, and we feel very, very confident that we will have this issue resolved in a fairly short order, short time period.

466.    In addition, Warren explained to investors how the legal dispute concerning the pump station in West Goshen would not affect the timing of ME2's in-service date.  Specifically, Warren stated that once Energy Transfer "ha[s] this issue resolved in a fairly short order," that the Partnership will "move on to meet that in-service date that we put in front you this morning," *i.e.*, by the end of the second quarter in 2018, as Defendants "fight through a lot of these issues and rarely does a township [] win and get an adjunction [sic]."  These and other statements by Warren support that CEO Warren made himself personally knowledgeable about the true state of affairs relating to the ME2 pipeline, and nevertheless furthered the Company's false narrative that ME2 was on track to be in-service by the end of the second quarter in 2018, when that was not even a possibility given the number of HDDs and other pipeline construction projects that needed to be

completed at that time.  In fact, the valve station at issue in West Goshen was not fully resolved until July 2018, and Energy Transfer delayed ME2's in-service date by two quarters, and then only brought it online by cobbling together the 1930's era 12-inch pipe to bypass the 20-mile stretch in Chester and Delaware counties where ME2's 20-inch pipeline could not be placed by the end of the year 2018.

467.    Further, on a February 21, 2019 earnings call with investors, Warren discussed regulatory and other matters concerning the delay of the Pipeline Projects in response to a question by a UBS Investment Bank analyst about "delays." On that call, Warren admitted that Energy Transfer's conduct in constructing the Pipeline Projects in Pennsylvania had been problematic, stating: "We made some mistakes . . . and we're going to take our medicine and fix those mistakes and complete good projects from this point forward, not insinuate that everything we've done has been bad, it's just we've made some mistake[s] that we're not proud of."

I.    **Energy Transfer CFO Long Assured Investors Each Quarter that Energy Transfer Was Committed to Safely and Responsibly Bringing ME2 into Service and Admitted to Energy Transfer Making Mistakes**

468.    On at least six conference calls throughout the Class Period, CFO Long assured investors that the Partnership was "very focused" on safety and/or on safely and responsibly bringing its projects, including Mariner East, into service.

469.    Similarly, on the February 21, 2019 earnings call, in response to a UBS analyst's question about delays, Long stated: "[W]e've learned all kinds of lessons, and we've made mistakes and we are correcting those mistakes, and we'll not make those mistakes again.  So yes, we've learned a lot.  Every place is not Texas and, so we're making adjustments . . . ."

470.    By admitting to Energy Transfer's mistakes in Pennsylvania and speaking about safety on the earnings calls, including safety of the Mariner East project and associated delays in

construction of the Pipeline Projects, Long presented himself as having sufficient knowledge to make these statements.

**J.    Energy Transfer Knew That Pennsylvania's Geology Provided Challenges But Rushed Forward On Construction Through Known Areas of Risky Terrain Such As Lisa Drive In Order To Complete The Pipeline**

471.    Energy Transfer knew that Pennsylvania's varied geologic profile presented challenges that required nuanced approaches that were different from building pipelines in more homogenous terrain and would likely require the pipeline to follow a less direct route at certain locations.   Nonetheless, in spite of these known geologic issues, which often cause subsidence events, Energy Transfer rushed through the Pipeline Projects and went into areas prior pipelines had avoided.  Two examples suffice for this point.  First, with full knowledge of the geohazards in the area where Energy Transfer planned to construct the Revolution pipeline, the Company pushed forward to obtain permits for and build the pipeline, leading to the Revolution Explosion that occurred during the commissioning phase, before the pipeline even became operational.  Second, on Lisa Drive in West Whiteland Township, where the ME2 pipeline construction caused a subsidence event as discussed above, the builders of the Mariner East 1 line in the 1930s deliberately avoided the same area, which was known to have a risk of sinkholes.  When Energy Transfer proceeded to build ME2 on the same ground Mariner East 1 had avoided, it caused a series of subsidence events and sinkholes.

**K.    Defendants Held Themselves Out as Knowledgeable Concerning the Topics About Which They Spoke**

472.    Throughout the Class Period, Defendants repeatedly held themselves out as knowledgeable about and familiar with the subjects of the false and misleading statements.  For example, during Energy Transfer's earnings call on November 8, 2017, Defendant Long discussed in detail the Pennsylvania PUC's order concerning valve installation in West Goshen Township,

as well as Energy Transfer's work with the DEP to secure approvals for HDD activities for ME2, and ME2 and Revolution Project schedules. Similarly, on March 22, 2018, in discussing events at Lisa Drive, Energy Transfer spokesperson Jeff Shields purported to describe in detail the geography of the area, stating that there was "some karst [a rock structure that contains limestone] north of [Lisa Drive], but it does not impact this area."  And as set forth above, numerous Defendants made specific statements concerning the Pipeline Projects' physical infrastructure, throughput, and expected completion dates. That Defendants presented themselves as possessing knowledge and personally familiarity about these topics supports an inference of scienter.

## VIII.  PRESUMPTION OF RELIANCE

473.    A Class-wide presumption of reliance is appropriate in this case pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)    Energy Transfer's common units were actively traded in an efficient market on the NYSE;

(b)    Energy Transfer's common units traded at high weekly volumes, with an average of over 38 million units traded each week during the Class Period. The average weekly turnover as a percentage of units outstanding was approximately 2.34%, surpassing the 2% threshold level of average weekly trading volume courts have identified as evidence of an efficient market;

(c)    As a regulated issuer, Energy Transfer filed periodic public reports with the SEC;

(d)    Energy Transfer was eligible to file registration statements with the SEC on Form S-3;

(e)    Energy Transfer regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)    The market reacted promptly to public information disseminated by and concerning Energy Transfer;

(g)    Energy Transfer common units were covered by numerous securities analysts employed by major brokerage firms, including Bank of America Merrill Lynch,

Barclays, BMO Capital Markets, Credit Suisse, Deutsche Bank, Goldman Sachs, Jefferies, JPMorgan, Morgan Stanley, Piper Jaffray, Raymond James & Associates, RBC Capital Markets, Sanford C. Bernstein & Co., UBS, and Wells Fargo Securities;

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Energy Transfer common units; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Energy Transfer common units between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

474.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Energy Transfer's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Energy Transfer's Mariner East pipeline, as alleged above, that requirement is satisfied here.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

475.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of the specific statements were not identified as "forward-looking" when made.

## X.     CLASS ACTION ALLEGATIONS

476.     Lead Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Energy Transfer common units during the Class Period, and were damaged by the

revelation of the alleged corrective disclosures (the "Class").  Excluded from the Class are Defendants herein, the officers and directors of the Partnership at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

477.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Energy Transfer common units were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Energy Transfer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

## XI.    CAUSES OF ACTION

### COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Energy Transfer and the Speaking Defendants)

478.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

479.    This Count is asserted against Energy Transfer and the Speaking Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

480.    During the Class Period, Energy Transfer and the Speaking Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and

deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Energy Transfer common units; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Energy Transfer common units at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Speaking Defendants, and each of them, took the actions set forth herein.

481.  Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Speaking Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Energy Transfer common units. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Energy Transfer's finances and business prospects.

482.  By virtue of their positions at Energy Transfer, Energy Transfer and the Speaking Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Energy Transfer and the Speaking Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such

facts were readily available to Defendants.  Said acts and omissions of Energy Transfer and the Speaking Defendants were committed willfully or with reckless disregard for the truth.   In addition, Energy Transfer and each Speaking Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

483.   Information showing that Energy Transfer and the Speaking Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Energy Transfer and the Speaking Defendants' knowledge and control.  As the senior managers and/or directors of Energy Transfer, the Speaking Defendants had knowledge of the details of Energy Transfer's internal affairs.

484.   The Speaking Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Speaking Defendants were able to and did, directly or indirectly, control the content of the statements of Energy Transfer. As officers and/or directors of a publicly-held company, the Speaking Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Energy Transfer's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Energy Transfer common units was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Energy Transfer's business and financial condition which were concealed by Energy Transfer and the Speaking Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Energy Transfer common units at artificially inflated prices and relied upon the price of the common units, the integrity of the market for the common units and/or upon statements disseminated by Energy Transfer and the Speaking Defendants, and were damaged thereby.

485.     During the Class Period, Energy Transfer common units were traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Energy Transfer and the Speaking Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Energy Transfer common units at prices artificially inflated by Energy Transfer's and the Speaking Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common units, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Energy Transfer common units was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Energy Transfer common units declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

486.     By reason of the conduct alleged herein, Energy Transfer and the Speaking Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

487.     As a direct and proximate result of Energy Transfer and the Speaking Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Partnership's common units during the Class Period, upon the disclosure that the Partnership had been disseminating false and misleading statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

488.    Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

489.    During the Class Period, the Individual Defendants participated in the operation and management of Energy Transfer, and conducted and participated, directly and indirectly, in the conduct of Energy Transfer's business affairs.  Because of their senior positions, they knew the adverse non-public information about Energy Transfer's misstatements concerning the Pipelines' in-service dates and throughput, the safety profile of the Pipelines, and the Partnership's failure to abide by affirmative law and its own Code of Conduct.

490.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Energy Transfer's condition and operations, and to correct promptly any public statements issued by Energy Transfer which had become materially false or misleading.

491.    By reason of their senior management positions and/or being directors of Energy Transfer, each of the Individual Defendants exercised control over the general operations of Energy Transfer and possessed the power to control the specific activities, and/or the public reporting of those specific activities, which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain. The Individual Defendants, therefore, were "controlling persons" of Energy Transfer within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated culpably in the unlawful conduct alleged which artificially inflated the market price of Energy Transfer common units. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Energy Transfer.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for judgment against Defendants as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against Energy Transfer and the Individual Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XIII.   DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 15, 2020                      Respectfully submitted,

**BARRACK, RODOS & RACINE**

*/s/ Jeffrey W. Golan*
Jeffrey W. Golan
Robert A. Hoffman
Jeffrey A. Barrack
Meghan J. Talbot
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jbarrack@barrack.com
mtalbot@barrack.com

John C. Browne (*pro hac vice*)
Adam H. Wierzbowski (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
James M. Fee (*pro hac vice*)
Mathew B. Hough (*pro hac vice*)
**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
adam@blbglaw.com
michael.mathai@blbglaw.com
james.fee@blbglaw.com
mathew.hough@blbglaw.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

John D. Zaremba
**ZAREMBA BROWN PLLC**
40 Wall Street
52nd Floor
New York, NY 10005
Telephone:  (212) 380-6700
jzaremba@zarembabrown.com

*Additional Counsel for Lead Plaintiff and the*
*Class*