**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, THOMAS E. LONG, MARSHALL MCCREA, MATTHEW S. RAMSEY, MICHAEL J. HENNIGAN, and JOSEPH MCGINN<br><br>                    Defendants. | Case No. 2:20-cv-00200-GAM |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANTS' MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     SUMMARY OF RELEVANT FACTUAL ALLEGATIONS ........................... 3

        A.      Energy Transfer. .................................................................................... 3

        B.      The Mariner East Pipeline Project. ....................................................... 3

        C.      Allegations Related To The Purportedly Illegal Hiring Of Constables To
                Provide Security And Dismissal Of Criminal Charges. ........................ 5

        D.      Announcement Of Investigation Into Governor Wolf's Administration. ............. 5

III.    LEGAL STANDARDS .................................................................................... 6

IV.     ARGUMENT ................................................................................................... 7

        A.      Plaintiffs have not pled an actionable misrepresentation ...................... 7

                1.      Category A: Statements Regarding The Expected Capacity And In-
                        Service Dates Of ME2 (Statements 1–13). ................................. 8

                        a.      Statement Regarding Energy Transfer's Expectation For
                                ME2's In-Service Date (Statement 1) ............................. 8

                        b.      Later-Revised Statements Regarding Energy Transfer's
                                Expectation For ME2's In-Service Date (Statements 2–8) .......... 11

                        c.      Expectations Regarding ME2's Capacity (Statements 9–
                                13). ....................................................................... 12

                2.      Category B: Factual Statements Regarding The Construction Of
                        ME2 (Statements 14–20). ........................................................ 14

                3.      Category C: Statements Regarding The Completion Of
                        Construction On The Revolution Pipeline (Statements 21–26)............. 16

                4.      Category D: Aspirational Statements And Company Commitments
                        To Safety And Legal Compliance  (Statements 27–44). ................ 17

                        a.      Aspirational Puffery About Energy Transfer's "Focus"
                                "Commitments" And "Priorities" (Statements 27–37). ........... 18

                        b.      Statements Regarding Energy Transfer's Code Of Business
                                Conduct And Ethics (Statements 38–41). ...................... 20

                        c.      Paraphrases About Safety (Statements 42–43). ................ 21

                        d.      Opinion Regarding Lisa Drive (Statement 44). ................ 23

                5.      Category E: Statements About Legal Compliance (Statements 45–
                        57). ........................................................................... 24

                        a.      Opinion Statements About Permits (Statements 45–47). ........... 25

                        b.      Statements About Hired Security (Statements 48–54). ............ 28

i

        c.     Other Statements About Legal Compliance (Statements 55–57). ....................................................................................... 29

  B.     Plaintiffs fail to satisfy the PSLRA's high standards for pleading scienter. ........ 31

      1.     Plaintiffs fail to plead scienter as to any Speaking Defendant. ................ 32

             a.     Plaintiffs' minimal allegations specific to the Speaking Defendants fail. ........................................................... 33

             b.     Plaintiffs' vague group allegations do not plead scienter as to the Speaking Defendants. ...................................... 36

      2.     Plaintiffs have not alleged scienter for any of Energy Transfer's spokespersons for the same reasons. ........................................ 44

      3.     Plaintiffs fail to plead scienter as to Energy Transfer because they fail to allege scienter as to any Speaking Defendant and cannot rely on the corporate scienter doctrine. ............................................ 44

  C.     Plaintiffs fail to plead loss causation as to most of the statements at issue. ........ 47

      1.     Plaintiffs' loss causation theories are replete with timing problems. ...... 48

      2.     Mere reports of an investigation are insufficient to plead loss causation for claims based on illegally obtaining permits. ...................... 51

      3.     Criminal charges relating to hiring constables were dismissed and thus cannot support loss causation. ........................................ 51

  D.     Plaintiffs' § 20(a) claim fails. ............................................................. 52

V.    CONCLUSION ................................................................................. 54

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) ........................................................................... 47

*Anderson v. Abbott Labs.*,
   140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Labs.*,
   269 F.3d 806 (7th Cir. 2001) ......................................................................... 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................ 52, 53

*Bailey v. Kirsch*,
   438 F. Supp. 3d 399 (E.D. Pa. 2020) .................................................................. 3

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013) ........................................................................... 52

*Bondali v. Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) ................................................................. 7, 20

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ...................................................................... 14, 15

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ........................................................................... 40

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
   2019 WL 2865452 (D.N.J. July 3, 2019) ............................................................. 45

*Christian v. BT Group, PLC*,
   2018 WL 3647213 (D.N.J. Aug. 1, 2018) ............................................................. 45

*City Capital Assocs. v. Interco, Inc.*,
   696 F. Supp. 1551 (D. Del. 1988) ..................................................................... 28

*City of Monroe Emps. Re. Sys. v. Bridgestone*,
   399 F.3d 651 (6th Cir. 2005) ...................................................................... 18, 46

*City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ....................................................................... 25, 29

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   442 F. App'x 672 (3d Cir. 2011) ................................................................... 45, 46

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (D. Del. 2009) ............................................................... 20, 21

*City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*,
   713 F. Supp. 2d 378 (D. Del. 2010) ............................................................... 33, 36

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................... 47, 48

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................................ 19

*Ellis v. Montgomery Cty.*,
  267 F. Supp. 3d 510  (E.D. Pa. 2017) ................................................................ 24

*Emps. Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) .................................................................. 18, 19, 22

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019) .................................................................. 10, 11, 38

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F.3d 278 (5th Cir. 2006) .................................................................................. 9

*Galati v. Commerce Bancorp, Inc.*,
  220 F. App'x 97 (3d Cir. 2007) ...................................................................... 18, 25

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019) ........................................................................... 27, 28

*Gordon v. Diagnostek, Inc.*,
  812 F. Supp. 57 (E.D. Pa. 1993) ......................................................................... 52

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ........................................................................... 31, 37

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019) ................................................................ 20

*Hysong v. Encore Energy Partners LP*,
  2011 WL 5509100 (D. Del. Nov. 10, 2011) ........................................................ 14

*Ieradi v. Mylan Labs., Inc.*,
  230 F.3d 594 (3d Cir. 2000) ................................................................................... 5

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ........................................................................... 10, 11

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999), *overruled in part on other grounds*, *Tellabs, Inc. v.
  Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499,
  168 L. Ed. 2d 179 (2007) ............................................................................. passim

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ................................................................................ 18

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ................................................................... 8

*In re Azurix Corp. Sec. Litig.*,
  198 F. Supp. 2d 862 (S.D. Tex. 2002), *aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332
  F.3d 854 (5th Cir. 2003) ...................................................................................... 16

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ........................................................... 21, 27

*In re Boston Tech. Inc. Sec. Litig.*,
   8 F. Supp. 2d 43 (D. Mass. 1998) ........................................................................... 7

*In re BP p.l.c. Sec. Litig.*,
   852 F. Supp. 2d 767 (S.D. Tex. 2012) ................................................................... 20

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) ............................................................ 20, 21

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ........................................................................... 3, 17

*In re CDNOW, Inc. Sec. Litig.*,
   138 F. Supp. 2d 624 (E.D. Pa. 2001) ................................................................... 52

*In re China Valves Tech. Sec. Litig.*,
   2012 WL 4039852 (S.D.N.Y. Sept. 12, 2012) ...................................................... 50

*In re Congoleum Corp.*,
   426 F.3d 675 (3d Cir. 2005) ................................................................................. 29

*In re Donald J. Trump Casino Sec. Litig. (Taj Mahal Litig.)*,
   7 F.3d 357 (3d Cir. 1993) ..................................................................................... 10

*In re DVI, Inc. Sec. Litig.*,
   2010 WL 3522090 (E.D. Pa. Sep. 3, 2010), *aff'd*, 639 F.3d 623 (3d Cir. 2011) .............. 48, 51

*In re Facebook Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ............................................................ 26, 29

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) .................................................................. 27

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
   2015 WL 6039690 (D. Del. Oct. 15, 2015) .......................................................... 22

*In re Galena Biopharma, Inc. Sec. Litig.*,
   2019 WL 5957859 (D.N.J. Nov. 12, 2019) .......................................................... 28

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2015 WL 4469143 (D.N.J. July 22, 2015) ............................................................ 35

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   2018 WL 4252537 (E.D. Pa. Sept. 5, 2018) ......................................................... 46

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ...................................................................... 40

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) .................................................................. 25

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) .................................................................. 27

*In re KBR, Inc. Sec. Litig.*,
   2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) ..................................................... 25

*In re Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3rd Cir. 2005) ...................................................................... 12, 49

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ................................................................. 3, 13, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...................................................................... 12, 50

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015), *aff'd sub nom. Klein v. PetroChina Co.*,
   No. 15-2528 (2d Cir. Mar. 21, 2016) ................................................................ 21

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   245 F. Supp. 3d 870 (S.D. Tex. 2017), *aff'd sub nom. Police & Fire Ret. Sys. of City of
   Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019) .................... 19, 36

*In re Plains All Am. Pipeline, LP Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) ......................................................... 37, 38

*In re Tellium, Inc. Sec. Litig*,
   2005 WL 2090254 (D.N.J. Aug 26, 2005) ............................................................ 50

*In re The Great Atl. & Pac. Tea Co., Sec. Litig.*,
   103 Fed. App'x 465 (3d Cir. 2004) .................................................................. 31

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ............................................................ 20

*In re Tyson Foods, Inc. Sec. Litig.*,
   155 Fed. App'x 53 (3d Cir. 2005) ............................................................. 31, 44

*In re United Am. Healthcare Corp. Sec. Litig.*,
   2007 WL 313491 (E.D. Mich. Jan. 30, 2007) ....................................................... 28

*In re Vale S.A. Sec. Litig.*,
   2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ........................................................ 18

*In re Wilmington Tr. Sec. Litig.*,
   852 F. Supp. 2d 477 (D. Del. 2012) ................................................................. 7

*In re Yukos Oil Co. Sec. Litig.*,
   2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ........................................................ 27

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ......................................................... 6, 30, 42, 52

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ................................................................................ 22

*Jaroslawicz v. M&T Bank Corp.*,
   962 F.3d 701 (3d Cir. 2020) ..................................................................... 8, 12

*Jones v. Perez*,
   550 Fed. App'x 24 (2d Cir. 2013) ................................................................. 38

*Katyle v. Penn Nat. Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ................................................................ 11, 49

*Kennilworth Partners LP v. Cendant Corp.*,
   59 F. Supp. 2d 417 (D.N.J. 1999) ................................................................ 34

*Kumar v. Kulicke & Soffa Indus., Inc.*,
   2019 WL 5081896 (E.D. Pa. Oct. 9, 2019) .................................. 39, 46

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................................ 19

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   2017 WL 633148 (D. Ariz. Feb. 16, 2017).................................. 26

*Magruder v. Halliburton Co.*,
   359 F. Supp. 3d 452 (N.D. Tex. 2018) .................................................. 8

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................ 45

*Martin v. GNC Holdings, Inc.*,
   2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
   *aff'd*, 757 F. App'x 151 (3d Cir. 2018)................................ 18, 51

*Martin v. GNC Holdings, Inc.*,
   757 F. App'x 151 (3d Cir. Dec. 11, 2018)................................ 43

*McDonald v. Kinder-Morgan, Inc.*,
   287 F.3d 992 (10th Cir. 2002) ................................................................ 15

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .......................................... 12, 50, 51

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................ 53

*Montgomery Cty. v. Microvote Corp.*,
   2001 WL 722150 (E.D. Pa. June 25, 2001).................................. 5

*OFI Asset Mgmt. v. Cooper Tire & Rubber Co.*,
   834 F.3d 481 (3d Cir. 2016) .................................................. 1, 6, 14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)................................................................ passim

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018) .................................. 19, 20

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ................................................................ 36

*Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*,
   2009 WL 4250061 (D.N.J. Nov. 25, 2009) .................................. 36

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)................................ 50

*Pelletier v. Endo Int'l PLC*,
   439 F. Supp. 3d 450 (E.D. Pa. 2020) ........................................................ 6, 28, 30

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
   777 F. App'x 726 (5th Cir. 2019) ...................................................................... 20

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ................................................................................ 19

*Rabin v. NASDAQ OMX PHLX LLC*,
   182 F. Supp. 3d 220 (E.D. Pa. 2016), *aff'd*, 712 F. App'x 188 (3d Cir. 2017) ................. 6, 42

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ........................................................ 33, 43, 44, 45

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ..................................................................... 20, 21

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .................................................................. 13, 38, 39

*Schiro v. Cemex, S.A.B. de C.V.*,
   438 F. Supp. 3d 194 (S.D.N.Y. 2020) ............................................................... 27

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018) ............................................................... 52

*Selkridge v. United of Omaha Life Ins. Co.*,
   360 F.3d 155 (3rd Cir. 2004) ........................................................................... 50

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ....................................................................... 31, 44

*Steamfitters Local 449 Pension Fund v. Alter*,
   2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ............................................... 53, 54

*Stein v. Tangoe, Inc.*,
   2014 WL 12767210 (D. Conn. Sept. 30, 2014) ................................................. 12

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*,
   396 F. Supp. 3d 413 (E.D. Pa. 2019) .................................................. 38, 41, 42, 46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................... passim

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ............................................................................ 13

*Tuchman v. DSC Commc'ns Corp.*,
   14 F.3d 1061 (5th Cir. 1994) ........................................................................... 17

*Utesch v. Lannett Co., Inc.*,
   316 F. Supp. 3d 895 (E.D. Pa. 2018) ............................................................... 43

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ................................................... 21

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir. 1997) ............................................................. 13, 21

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ................................................................. 6, 7

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ............................................................. passim

*Witriol v. Conexant Sys., Inc.*,
  2006 WL 3511155 (D.N.J. Dec. 4, 2006) ............................................... 37

**Statutes**

15 U.S.C. § 78j(b) ............................................................................... passim

15 U.S.C. § 78t ................................................................. 6, 52, 53, 54

15 U.S.C. § 78u–4(b)(1) ............................................................... 7, 30

15 U.S.C. § 78u–4(b)(2)(A) ................................................................ 7

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................... 6

Fed. R. Civ. P. 8 .................................................................................... 52

Fed. R. Civ. P. 9(b) ............................................................... 6, 9, 26, 27

## I.      INTRODUCTION

This is a securities fraud action.  It arose after a news article was published on November 12, 2019, stating that the FBI had begun an investigation into the conduct of Governor Tom Wolf's administration related to the approval of construction permits for the "Mariner East" pipeline project planned by Defendant Energy Transfer, L.P.  After this story broke, Plaintiffs—along with several other Energy Transfer investors that vied with them for Lead Plaintiff status—raced to the courthouse to contend that this announcement somehow showed that Energy Transfer and several of its key executives committed securities fraud.  Since then, however, no person or entity related to Energy Transfer has been named a target of this investigation, no charges have arisen from this investigation, and Governor Wolf has vehemently denied any suggestion of wrongdoing.  There is thus no basis to suggest that anyone at Energy Transfer engaged in any wrongdoing related to the subject of the investigation, let alone to turn this lifeless investigation into a securities fraud lawsuit.

In apparent recognition of this reality, after being named Lead Plaintiffs in this action, Plaintiffs filed an amended complaint (D.E. 43) (the "Complaint") in which the investigation that gave rise to this action plays only a minor role.  Instead, the nearly 200-page, 500-paragraph Complaint embarks on a "post hoc scouring of countless pages of documents for a stray and inartfully phrased comment that can be argued to be technically false," despite the Third Circuit's admonition that this practice "seems like just the sort of litigation maneuver the [Private Securities Litigation Reform Act of 1995 ("PSLRA")] was meant to eliminate."  *OFI Asset Mgmt. v. Cooper Tire & Rubber Co.*, 834 F.3d 481, 499 (3d Cir. 2016).  Indeed, the Complaint plods through nearly every news article and public statement ever made concerning Mariner East, trawling for statements that might conceivably support securities fraud claims.  As a result of these efforts,

Plaintiffs challenge 57 statements that they group into three broad categories: (1) estimates of the Mariner East pipelines' completion timeline and initial capacity; (2) statements about Energy Transfer's commitment to safe and legal operations; and (3) statements about Energy Transfer's compliance with Pennsylvania law. Each category, however, fails to identify a single materially misleading misstatement upon which a securities fraud claim may be based:

- *First*, the estimates regarding the completion timeline and initial capacity of the Mariner East pipelines are just that—estimates. Indeed, far from guaranteeing that its projections would come true, Energy Transfer expressly warned investors that they may not and timely updated them when intervening events led to changes in the estimates. Estimates, like all opinion statements, are only actionable under the federal securities laws in rare and extraordinary circumstances. Such circumstances have not been pled here. Instead, Plaintiffs at most point to "facts cutting the other way" from the estimates, which is insufficient under the securities laws.

- *Second*, Energy Transfer's statements of its commitment to safety and legal operations are immaterial as a matter of law, as numerous securities fraud cases have held in dismissing strikingly similar statements of corporate aspiration and commitment. And, even if they were material, these statements would not be actionable because Plaintiffs have not alleged that Energy Transfer did not have these "commitments." Rather, they have merely suggested that Energy Transfer did not live up to them, which does not suffice under the securities laws.

- *Third*, the statements about Energy Transfer's compliance with Pennsylvania law are not actionable because, among other things, Plaintiffs have not sufficiently alleged that Defendants violated Pennsylvania law. They make two failed attempts to do so. First, they point to the alleged FBI investigation. But Energy Transfer is not a target of any such investigation, and no charges have been brought concerning it against any party. Second, they point to an investigation by the Chester County District Attorney that led to charges against an Energy Transfer employee relating to the hiring of off-duty law enforcement officers to provide security for the pipeline project. But Energy Transfer only represented that it did not believe it had broken the law—a belief that was proven correct after the charges against its employee were dismissed for lack of evidence.

Plaintiffs' failure to sufficiently allege an actionable misstatement dooms the entire Complaint. But this is not the Complaint's only dispositive failing: Plaintiffs also fail to plead that any Defendant acted with the requisite scienter and do not satisfy the requirements for pleading loss causation. Defendants respectfully request that the Court dismiss the Complaint with prejudice.

## II.    SUMMARY OF RELEVANT FACTUAL ALLEGATIONS[1]

### A.    Energy Transfer.

Defendants in this action are Energy Transfer and seven individuals who had positions at Energy Transfer or one of its affiliated entities.  ¶¶ 39–46.[2]  "Energy Transfer is a natural gas and energy transportation and storage company that operates some of the largest oil and natural gas pipelines in the United States, including the Dakota Access pipeline, the Rover pipeline, and the Mariner East pipeline system. The Partnership's operations include approximately 12,500 miles of interstate natural gas pipelines and multiple natural gas storage facilities."  ¶ 2.[3]

### B.    The Mariner East Pipeline Project.

Plaintiffs' claims relate to the Mariner East pipelines, which make up approximately 350 miles (or 2.8%) of Energy Transfer's 12,500-mile pipeline network and are located in Pennsylvania.  ¶¶ 3, 50–55, 72.  The Mariner East pipelines are made up of three parts and are controlled and operated by certain of Energy Transfer's Sunoco subsidiaries, including Sunoco Logistics Partners, LP ("Sunoco Logistics Partners").

The first part of the project, called "Mariner East 1" or "ME1," consisted of the improvement and refitting of an existing pipeline that traversed Pennsylvania.  ¶¶ 51, 55.  ME1 is now complete and in service with an approximate capacity of 70,000 barrels per day.  ¶ 51.

The second part of the project, called "Mariner East 2" or "ME2," is an additional pipeline

---

[1] This section is based upon relevant allegations from the Complaint and matters appropriate for judicial notice, such as documents relied upon in the Complaint and documents filed with the SEC.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); *see also Bailey v. Kirsch*, 438 F. Supp. 3d 399, 399 n.1, & n.4 (E.D. Pa. 2020) (taking judicial notice of criminal docket); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (court may consider a document "explicitly relied upon in the complaint").

[2] The "Individual Defendants" are Kelcy L. Warren, John W. McReynolds, Thomas E. Long, Marshall McCrea, Matthew Ramsey, Michael J. Hennigan, and Joseph McGinn.  ¶ 48.  Warren, McReynolds, Long, McCrea, and Ramsey are the "Speaking Defendants."  ¶ 47.

[3] Energy Transfer has numerous subsidiaries, including several Sunoco entities that sit multiple levels below Energy Transfer.  *See* Ex. 1 at 2, Energy Transfer L.P., Form 10-K (filed February 23, 2018).

that runs primarily alongside ME1 and adds to its capacity.  ¶ 52.  Sunoco Logistics Partners allegedly worked on obtaining the permits, which were granted to Sunoco Pipeline, L.P. on February 13, 2017. ¶ 131.  Shortly thereafter, Energy Transfer announced that it expected ME2 to come in service in late 2017, at which point it was expected to add 275,000 barrels per day to ME1's capacity.  ¶ 332.  However, ME2 later faced a series of regulatory challenges, some of which stemmed from political controversy relating to the pipeline, *e.g.*:

- On July 25, 2017, the Pennsylvania Environmental Hearing Board ("EHB") halted horizontal drilling operations on the pipeline for two weeks.  ¶ 134.  In response, the plans for ME2 were re-evaluated.  ¶ 345.

- On May 21, 2018, after a complaint filed by Senator Dinniman, Judge Barnes ordered Sunoco to discontinue construction of ME2 in certain areas.  ¶¶ 316, 319.

- On June 14, 2018, the Pennsylvania Public Utility Commission ("PUC") upheld part of Senator Dinniman's complaint, calling for a shutdown of ME2 in West Whiteland. ¶¶ 179–80.

As a result of these and other unexpected incidents, the in-service date of ME2 was ultimately delayed from late 2017 until late 2018.[4]  Moreover, to overcome regulatory hurdles and place ME2 in service at this time, Energy Transfer announced on July 3, 2018, that it would employ an existing 12-inch pipeline on a portion of ME2's route, while construction of new pipe on that portion of ME2's route continued.  ¶ 358.  The use of the 12-inch pipe reduced ME2's initial capacity below 275,000 barrels per day.  ¶ 406.

Finally, Energy Transfer has also planned an expansion of ME2, known as "Mariner East 2X" or "ME2X."  ¶ 53.  ME2X runs alongside ME2 and, once in service, will expand the capacity of the Mariner East pipeline system by an additional 250,000 barrels per day.  *Id.*

---

[4] *See* Ex. 1 at 13, Energy Transfer L.P., Form 10-K (filed February 23, 2018).

**C.     Allegations Related To The Purportedly Illegal Hiring Of Constables To Provide Security And Dismissal Of Criminal Charges.**

During Mariner East's construction, elected constables were allegedly hired to serve as security, which was purportedly illegal under Pennsylvania law.  ¶¶ 189–90, 205.  The Complaint inconsistently alleges that Energy Transfer, Sunoco and/or construction subcontractors hired them. *E.g.*, ¶¶ 205–07.  One Energy Transfer employee—Frank Recknagel, the purported "head of security for the Mariner East pipeline"—was named in a criminal complaint in December 2019. ¶ 186.  Neither Energy Transfer nor any of its officers, directors or subsidiaries were ever accused of wrongdoing.  Ultimately, a state court judge dismissed all charges against Recknagel because "there was not enough evidence to move the case forward."[5]

**D.     Announcement Of Investigation Into Governor Wolf's Administration.**

In November 2019, news outlets reported that federal agents were investigating Governor Wolf's administration for the issuance of permits necessary to build ME2.  ¶¶ 423–24.  While the Complaint pleads that the press reported that "the FBI launched an investigation into Energy Transfer and the Pennsylvania Governor's office," ¶ 70, neither of the articles mentions Energy Transfer, Sunoco, or their employees as targets of the investigation.[6]  No charges have been filed as a result of the investigation.

---

[5] *See* Ex. 2 at 2, Susan Phillips, *Charges Dismissed in Alleged Mariner East Buy-a-Badge Scheme*, STATEIMPACT PENNSYLVANIA (July 2, 2020); *see also* Ex. 3 at 1, Docket for *Pennsylvania v. Recknagel*, MJ-15403-CR-0000445-2019 (indicating that all counts were dismissed and the case is closed). The Court should take judicial notice of this fact.  *See Montgomery Cty. v. Microvote Corp.*, 2001 WL 722150, at *1 (E.D. Pa. June 25, 2001) (taking judicial notice of results of legal proceeding printed in newspaper); *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 (3d Cir. 2000) (taking judicial notice of newspaper article).

[6] *See* Ex. 4, Marc Levy, *FBI Eyes How Pennsylvania Approved Pipeline*, ASSOCIATED PRESS (Nov. 12, 2019); Ex. 5, Andrew Maykuth & Jeremy Roebuck, *FBI Now Investigating the Way in which Pennsylvania Approved Mariner East Pipeline*, PHILADELPHIA INQUIRER (Nov. 12, 2019).

### III.   LEGAL STANDARDS

Plaintiffs' entire Complaint depends on their § 10(b) claim.  Their only other cause of action, which is under § 20(a), is a secondary-liability claim that requires showing primary liability under § 10(b) to be viable.  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  "To state a misrepresentation claim under 10(b), a plaintiff must show: (1) *a material misrepresentation (or omission)*; (2) *scienter, i.e.*, a wrongful state of mind; (3) *a connection with the purchase or sale of a security*; (4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) *economic loss*; and (6) '*loss causation*,' *i.e.*, a causal connection between the material misrepresentation and the loss."[7]

To survive a Rule 12(b)(6) motion to dismiss, "[a] securities fraud complaint must do much more than a typical complaint."  *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 460 (E.D. Pa. 2020).  Claims under § 10(b) are subject to both Federal Rule of Civil Procedure 9(b)'s requirement to plead fraud with particularity[8] and the PSLRA's additional "[e]xacting pleading requirements."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

The PSLRA "imposes two heightened pleading requirements" on Exchange Act claims.  *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017).  "First, 'the complaint must specify each allegedly misleading statement, why the statement is misleading, and if an allegation is made on information and belief, all facts supporting that belief with particularity.'"  *Id.*  Thus, it "is *not* the law that a 10b–5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time."  *In re Boston Tech. Inc. Sec.*

---

[7] *Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 241 (E.D. Pa. 2016) (emphasis in original) (citation omitted), *aff'd*, 712 F. App'x 188 (3d Cir. 2017).

[8] Rule 9(b) "requires plaintiffs to plead the who, what, when, where and how [of the alleged wrongdoing]:  the first paragraph of any newspaper story."  *Cooper Tire & Rubber*, 834 F.3d at 490.

*Litig.*, 8 F. Supp. 2d 43, 55–56 (D. Mass. 1998) (emphasis added).  Instead, a complaint must withstand an exacting "statement-by-statement analysis of objective falsity."  *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015).[9]  "Second, the complaint must 'with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Globus*, 869 F.3d at 240–41 (quoting 15 U.S.C. § 78u–4(b)(2)(A)).  A "strong inference" of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

## IV.   ARGUMENT

### A.      Plaintiffs have not pled an actionable misrepresentation.

Plaintiffs' claims should be dismissed because, despite labeling 57 statements "materially false and misleading," Plaintiffs have not sufficiently alleged a single actionably misleading statement.  *See* 15 U.S.C. § 78u–4(b)(1).

Because securities fraud claims depend on a statement-by-statement analysis, Defendants have created Appendix A, which numbers each allegedly misleading statement and organizes the statements into various categories.  While the Complaint splits these statements into three broad categories, Defendants have further organized the statements into five categories and various subcategories to streamline their arguments.  References herein to "Statement _" are references to the statements as numbered in Appendix A.  As explained below, Plaintiffs have not sufficiently alleged that a single one of these statements is actionable.

---

[9] *See also In re Wilmington Tr. Sec. Litig.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012) ("[T]he PSLRA requires plaintiffs to address the way in which each individual statement is false or misleading.").

1.      **Category A: Statements Regarding The Expected Capacity And In-Service Dates Of ME2 (Statements 1–13).**

Category A consists of 13 forward-looking statements about the expected capacity and in-service dates of ME2.  *See* Statements 1–13.  Statements such as these "that 'express expectations about the future rather than presently existing, objective facts' are [] statements of opinion."  *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018).  As the Supreme Court has recognized, "[r]easonable investors do not understand [opinion] statements as guarantees, and [the federal securities laws] therefore do[] not treat them that way."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015).  Instead, to allege that an opinion statement was materially misleading, a plaintiff must—at a minimum—identify "particular (and material) facts" that were not disclosed and "that cannot be squared" with the statement of opinion (the "*Omnicare* standard").  *Id.* at 1330, 1332.  "That is no small task for an investor."  *See id.* at 1332; *see also Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 (3d Cir. 2020) (describing the *Omnicare* standard as a "rigorous benchmark").  As explained below, Plaintiffs cannot show that any of the Category A statements are actionable under *Omnicare*.

a.      **Statement Regarding Energy Transfer's Expectation For ME2's In-Service Date (Statement 1).**

First, Plaintiffs take issue with a statement made on May 10, 2018, expressing Energy Transfer's expectation that ME2 would enter service in the "mid to late" third quarter of 2018.  *See* Statement 1.  As an initial matter, this statement is not actionable because Plaintiffs never allege when ME2 did enter service, let alone that that date was materially later than the "mid to late" third quarter of 2018 date provided in Statement 1.[10]

---

[10] Put differently, Statement 1 cannot be actionable because Plaintiffs have not alleged that Plaintiffs were harmed by it.  *See, e.g., Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 469 (N.D. Tex. 2018) (dismissing complaint as to statements for which Plaintiffs "identify no corrective disclosure at all").

In addition, Plaintiffs also fail to allege—as they must under the *Omnicare* standard—facts existing at the time Statement 1 was made "that cannot be squared" with the opinion it expresses about the expected in-service date for ME2. *Omnicare*, 135 S. Ct. at 1330. Plaintiffs point to a list of purported problems with the ME2 project, *see* ¶ 359, but beyond conclusory assertions, Plaintiffs fail to explain why these purported issues could not "be squared" with Energy Transfer's opinion that ME2 would be in service in Q3 2018. *Id.* Most notably, the issues Plaintiffs identify all date back to at least 2017—months before Statement 1 was made—and Plaintiffs do not provide any allegations suggesting that these issues *were not taken into account* when predicting an in-service date as of May 2018. ¶ 359. To the contrary, the Complaint itself shows that Energy Transfer had initially projected a much earlier in-service date. *E.g.,* Statement 2 (projecting that ME2 would be in-service "by the end of Q3 2017"). By the time Statement 1 was made, Energy Transfer had revised this initial projection in an announcement to investors—perhaps, in part, because of the difficulties Plaintiffs identify in ¶ 359. *E.g.,* Statement 6 (informing investors that Energy Transfer had revised its estimate "to target placing ME2 into service by the end of the second quarter of 2018"). Further, at least one of the purported issues—that Energy Transfer initially "failed to conduct the planning and study necessary to construct, and bring in service, the ME2 pipeline at the claimed time with the claimed throughput," ¶ 359, is not entitled to a presumption of truth under normal pleading standards, let alone Rule 9(b) and the PSLRA,[11] because the Complaint fails to identify what planning and study had not been done. And another of the purported issues, that Defendants "had obtained the ME2 permits impermissibly"—in addition to being insufficiently pled[12]—has no bearing on a projected in-service date.

---

[11] *See, e.g., Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289 (5th Cir. 2006).

[12] *See infra* § IV.A.5.a.

Moreover, even if Plaintiffs had alleged facts sufficient to show that it would be difficult for Energy Transfer to meet its late-2018 projected in-service date for ME2 at the time Statement 1 was made, that would not be enough to render the statement actionable. After all, "[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Omnicare*, 135 S. Ct. at 1329. Instead, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Id.*

Further, statements "are only actionable if, 'when read in light of all the information then available to the market . . . , [they] conveyed a false or misleading impression.'" *Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 (3d Cir. 2019) (citation omitted). This includes cautionary statements available to investors. Indeed, under this Circuit's "bespeaks causation" doctrine, "meaningfully cautionary statements can render the alleged omissions or misrepresentations of forward-looking statements immaterial as a matter of law." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004).[13] Here, at all relevant times, Energy Transfer had informed its investors of certain risk factors relevant to any forward-looking statements made about Energy Transfer or its operations. For example, in its 10-K filed with the SEC on February 23, 2018— less than three months before Statement 1 was made—Energy Transfer warned investors:

> Construction of new pipeline[s] . . . involves numerous regulatory, environmental, political and legal uncertainties beyond ETP's control . . . . ***If ETP undertakes these projects, they may not be completed on schedule*** or at all or at the budgeted cost. A variety of factors outside ETP's control, such as weather, natural disasters and difficulties in obtaining permits and rights-of-way or other

---

[13] *See also In re Donald J. Trump Casino Sec. Litig. (Taj Mahal Litig.)*, 7 F.3d 357, 364 (3d Cir. 1993) ("'[B]espeaks caution' is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law.").

> regulatory approvals, as well as performance by third-party
> contractors may result in increased costs or delays in construction.[14]
>
> ***Federal and state legislative and regulatory initiatives*** relating to
> pipeline safety that require the use of new or more stringent safety
> controls or result in more stringent enforcement of applicable legal
> requirements ***could subject us to*** increased capital costs,
> ***operational delays*** and costs of operation.[15]

Because such "cautionary statements relate directly to the claim on which plaintiffs allegedly

relied," Plaintiffs' "allegations regarding the forward-looking statements must also succumb to the

motion to dismiss." *Adams Golf*, 381 F.3d at 279; *see also StoneMor*, 927 F.3d at 716–17 (holding

that disclosures in SEC filings "would alert reasonable investors to the real business risks facing"

a company and thus "rendered immaterial" alleged misstatements).

> **b.      Later-Revised Statements Regarding Energy Transfer's
> Expectation For ME2's In-Service Date (Statements 2–8).**

In addition, Plaintiffs take issue with statements that pre-date Statement 1 and give earlier

expected in-service dates for ME2 than the date stated in Statement 1.  *See* Statements 2–8.  These

statements are not actionable because, long before any purported corrective disclosure (the first of

which allegedly occurred on August 9, 2018), Energy Transfer revised these expectations via,

among other things, Statement 1.  Thus, the fact that ME2 was no longer expected to be in service

on the schedule expressed in Statements 2 through 8 was known to the market long before any

purported corrective disclosure.  This severs any link between these statements and Plaintiffs'

purported losses, rendering Statements 2 through 8 non-actionable.  *See, e.g.*, *Katyle v. Penn Nat.*

*Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) ("Corrective disclosures must present facts to the

---

[14] *See* Ex. 1, at 50–51, Energy Transfer L.P., Form 10-K (filed February 23, 2018).

[15] *Id.* at 59.

market that are new, that is, publicly revealed for the first time[.]").[16]

Further, as with Statement 1, Plaintiffs must do more than show that Energy Transfer ultimately missed the estimated timeline expressed by Statements 2 through 8. *Jaroslawicz*, 962 F.3d at 717 (not sufficient to allege that "opinions turned out to be wrong"). They must show that the statements were materially misleading when made under the *Omnicare* standard. *Id.* Plaintiffs fail to do so. Instead, Plaintiffs merely repeat the list of purported issues with ME2. *See, e.g.*, ¶ 344. But, as with Statement 1, stripped of conclusory assertions about how these problems made the announced timeline "impossible," Plaintiffs fail to show that the various statements could not "be squared" with the timeline expressed by Statements 2 through 8. Moreover, Statements 2 through 8 are also immaterial and should be dismissed under the "bespeaks caution" doctrine for the same reasons that apply to Statement 1.[17]

### c.    Expectations Regarding ME2's Capacity (Statements 9–13).

Plaintiffs challenge several statements in Energy Transfer presentations expressing its expectation that ME2 would have an "[i]nitial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day." Statements 9–13. Plaintiffs contend that in "mid to late June 2018"—after the last of these statements was made on June 19, 2018—Sunoco notified PHMSA

---

[16] *See also Stein v. Tangoe, Inc.*, 2014 WL 12767210, at *22 (D. Conn. Sept. 30, 2014) ("[S]ince the use of the transaction as an accounting method to 'remove losses from Omnicom's books was known to the market a year before,' the alleged corrective disclosure did not reveal any new facts to the market, and, therefore, could not be a corrective disclosure for loss causation purposes.") (discussing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010)); *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) ("Because a corrective disclosure 'obviously must disclose new information,' the fact that the sources used in the Einhorn Presentation were already public is fatal to the Investors' claim of loss causation."); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3rd Cir. 2005) (holding that *The Wall Street Journal*'s analysis of previously available information was not a corrective disclosure even when the analysis conducted somewhat complex mathematical calculations on the figures reported in the company's public filings).

[17] *See supra* § IV.A.1.a. Specifically, Statements 2 through 8 were made in the context of substantively identical risk disclosures, as those discussed above with respect to Statement 1 that were included in Energy Transfer's Form 10-Ks filed on February 29, 2016, and February 24, 2017. *See* Ex. 6 at 49–50, 53, Energy Transfer L.P., Form 10-K (filed February 29, 2016); Ex. 7 at 48, 57, Energy Transfer L.P., Form 10-K (filed February 24, 2017).

that it was intending to use a pre-existing, smaller pipeline that would result in a lower initial capacity. ¶ 440.  But the fact that Energy Transfer later decided to change course in this manner does not adequately allege that Energy Transfer's earlier statements were fraudulent; it simply reflects that Energy Transfer's plans changed.  *See NAHC*, 306 F.3d at 1330 ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) (statement must be "incorrect at the time of its publication").[18]  Indeed, to hold otherwise would have far-reaching and adverse effects on investors, as it would lock corporations in—on pain of securities fraud liability—to once-contemplated plans even where a change in course would be advisable.

In an attempt to avoid this result, Plaintiffs make the conclusory assertion that using the originally planned pipe with its greater capacity was "impossible" when Statements 9 through 13 were made.  ¶ 359.  But the facts alleged—the same laundry list of operational challenges that Plaintiffs contend undermine Statement 1—suggest only operational challenges, not impossibility. *Id.*  Such operational challenges constitute, at most, facts "cutting the other way" from the expectations expressed by Statements 9 through 13.  *Omnicare*, 135 S. Ct. at 1328–29.  They are not sufficient to render the statements actionably misleading.  *Id.*; *see also Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements."); *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) ("Plaintiffs' case essentially boils down to an allegation that the

---

[18] Statement 13 also includes a projection of Mariner East 2's in-service date, which is substantively identical to that contained in Statement 1 and fails for the same reasons.  *See supra* § IV.A.1.a.  Statements 9, 10, and 13 contain projections for the in-service date of Mariner East 2 that pre-date Statement 1 and fail for the same reasons as those addressed *supra* at § IV.A.1.b.

statements were misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections. But *Omnicare* imposes no such disclosure requirements on issuers.").

### 2. Category B: Factual Statements Regarding The Construction Of ME2 (Statements 14–20).

Plaintiffs next take issue with statements regarding ME2's construction, but they do not adequately allege these statements were actionably misleading. *See* Statements 14–20.

First, Plaintiffs claim that Defendants defrauded the market by stating on July 3, 2018, and August 9, 2018, that the Company would "utilize a section of an existing pipeline in the affected area for initial in-service" and "the utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted." *See* Statements 14, 17, 18. Plaintiffs nowhere contend that these statements were untrue or inaccurate. *Id.*[19] Instead, Plaintiffs contend these statements omitted additional information—specifically the amount by which using the existing pipeline would reduce ME2's projected capacity. ¶ 365. But "§ 10(b) and Rule 10b–5 do not impose liability for 'statements that are simply incomplete,' only those that are 'misleading or untrue.'" *Cooper Tire & Rubber*, 834 F.3d at 503 (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007)).[20] Plaintiffs do not allege why the omission of an exact capacity makes statements about using the 12-inch pipes misleading. And there is no actionable claim where, as here, the omitted information does not alter the "truthfulness or accuracy of the fact" stated.

---

[19] The portion of Statement 14 that states that the "work that will be required to change this line from a refined products line to a NGL pipeline . . . can be done quickly and safely" is immaterial puffery. *See, infra,* § IV.A.4.a. Moreover, Plaintiffs do not allege any facts suggesting it was untrue.

[20] *See also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (A "complaint must specify the reason or reasons why the statements . . . were misleading or untrue, not simply why the statements were incomplete."); *Hysong v. Encore Energy Partners LP*, 2011 WL 5509100, at *8 (D. Del. Nov. 10, 2011).

*McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002).[21]

Next, Plaintiffs contest Defendants' statement on August 9, 2018, that Energy Transfer had "16 HDD's to complete" in order to bring ME2 into service and that "all of those have been approved by [the Pennsylvania Department of Environmental Protection]" with "no more drilling re-evaluation reports required by DEP." *See* Statements 15 and 16. Plaintiffs take issue with these assertions because, at the time they were made, Energy Transfer had purportedly not submitted HDD re-evaluation reports for nine other sites. ¶¶ 361–63. But beyond a conclusory assertion that four of these other sites[22] "pertained to ME2," Plaintiffs provide no facts showing that these re-evaluations were necessary to bring ME2 into service. ¶ 361. Indeed, since Plaintiffs concede both that Energy Transfer still has not submitted re-evaluation reports for at least one of those sites, *see* ¶ 361 n.15, and that ME2 is now in service, it is clear based on the pleadings that submitting such re-evaluations was not necessary to bring ME2 into service.[23] Thus, Plaintiffs' contentions about re-evaluations do not render Statements 15 and 16 materially misleading.

Finally, Plaintiffs also take issue with two stray comments on Energy Transfer's November 8, 2017 earnings call that characterize Energy Transfer's interactions with the Pennsylvania Department of Environmental Protection ("PADEP"). First, Marshall McCrea states that "with Matt Ramsey and his team we're doing everything we can to work with PADEP and to get all the HDDs completed and on time." Statement 19. Second, Matt Ramsey states "[s]ometimes the

---

[21] There are strong public policy considerations supporting this principle. *See Brody*, 280 F.3d at 1006 ("[A] completeness rule such as [Plaintiffs] suggest could implicate nearly all public statements [by securities issuers]."). Here, the fact that ME2's throughput capacity would be reduced does not alter the truth of the fact (1) that Energy Transfer would use a section of existing pipe or (2) that the capacity provided by this existing pipe would be sufficient to move the volumes that Energy Transfer had contracted.

[22] The five other sites allegedly related to ME2X. *See* ¶ 362. Thus, those re-evaluations are irrelevant to Statements 15 and 16, each of which relate only to ME2.

[23] As with any pipeline project, Energy Transfer would continue to improve ME2 placing it in service. But this was known to any reasonable investor and is far from sufficient to render these statements materially misleading.

PADEP uses their full-time allotment to respond back to us, that slows us down." Statement 20. As an initial matter, Statement 19 is too vague to be either actionable or material. *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 888 (S.D. Tex. 2002) ("[Azurix] is working hard ... to maximize the returns on our existing businesses" held immaterial), *aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003). And, in any event, Plaintiffs fail to allege facts about Energy Transfer's actual relationship with PADEP that undermine either Statement 19 or 20. Accordingly, these Statements, as with the rest of the Statements in Category B, are not actionable and Plaintiffs' claims based on them should be dismissed.[24]

### 3. Category C: Statements Regarding The Completion Of Construction On The Revolution Pipeline (Statements 21–26).

Next, Plaintiffs take issue with certain statements projecting the date upon which construction of Energy Transfer's Revolution pipeline would be complete. *See* Statements 21–26.

Statement 25 is a February 2018 announcement that Energy Transfer's "Revolution project, construction is mechanically complete, and [Revolution] will go into full service once Rover and Mariner East are in service." Statement 25.[25] This statement was entirely accurate. Plaintiffs do not—and cannot—deny that Revolution was mechanically complete as of February 22, 2018, and ready to be put into full service once Energy Transfer's Rover and ME2 pipelines— which connect to Revolution—were put in service. Allegations that Revolution was *subsequently* shut down in September 2018 due to an explosion do not suggest that Statement 25 was misleading at the time this statement was made. *See NAHC*, 306 F.3d at 1330 ("To be actionable, a statement

---

[24] Statements 15 and 17 also reiterate the projected in-service date provided in Statement 1. These portions of these statements are not actionable for the same reasons Statement 1 is not actionable. *See supra* § IV.A.1.a.

[25] Statement 26 is substantively identical to Statement 25 and fails for the same reasons.

or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

The other statements in Category C are predictions of when the Revolution would be complete, all of which predate Statement 25.[26]  Because Statement 25 was issued more than five months before any corrective disclosure in this case, Plaintiffs cannot purport to be damaged by these statements.[27]  Additionally, Plaintiffs have not alleged any facts sufficient to render these statements of expectation misleading under the *Omnicare* standard.  Plaintiffs allege that "the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary," ¶ 352, but this says nothing about *when* Revolution's construction would be complete, and investors cannot use the securities laws to take issue with alleged mismanagement.[28]

### 4.   Category D: Aspirational Statements And Company Commitments To Safety And Legal Compliance (Statements 27–44).

Next, Plaintiffs contend that several subcategories of statements relating to Energy Transfer's commitment to safe and legal operations were actionably misleading.  *See* Statements 27–44.  Plaintiffs' claims based upon each of these statements should be dismissed because, among other reasons, securities fraud cannot be premised on aspirational statements, "commitments" to virtuous practices, puffery, "corporate cheerleading," or non-specific statements of positivity.[29]

---

[26] The portions of Statements 7 and 8 that address the timeline for the Revolution pipeline likewise predate Statement 25 and fail for the same reasons as these other statements.

[27] *See supra* n.16 and surrounding text.

[28] *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994).

[29] *See, e.g.*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (holding that "vague and general statements of optimism . . . even if arguably misleading, do not give rise to a federal securities claim because they are not material"), *overruled in part on other grounds*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); *Burlington*, 114 F.3d at 1428 ("Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts."). Relatedly, "statements not subject to verification by proof," such as those lacking "a standard against which a reasonable investor

> a.     Aspirational Puffery About Energy Transfer's "Focus" "Commitments" And "Priorities" (Statements 27–37).

First, with Statements 27 through 37, Plaintiffs take issue with a laundry list of statements in which Energy Transfer states what it is "'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are." *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017).  For example, Statement 28 is a remark that Sunoco was "commit[ed] to the highest levels of construction expertise and [] dedicat[ed] to preserving and protecting the environment in which we conduct our work."[30]  These statements are immaterial as a matter of law.  Numerous courts have found strikingly similar statements concerning a company's focus, commitment, aspiration, or priority to be immaterial and non-actionable puffery, including:

- "[W]e continue to adhere to a disciplined pricing policy," "[w]e have a very strong amount of 'pricing discipline,'" "[we] continue to maintain discipline and rigor in everything we do," Aetna's priority is "to exhibit commitment to disciplined pricing," "[w]e also continue as a priority to exhibit commitment to discipline pricing." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 275–76 (3d Cir. 2010).

- "Our emphasis on gold cards—and targeting of better quality customers—helps us maintain an enviable credit quality profile." *Advanta*, 180 F.3d at 537.

- Statements that a company's "number one priority is to protect the customer" and that it was an "industry leader" that maintains "high standards" and "sets the [industry] standard." *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *8 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).

- Chipotle is "committed to serving safe, high quality food to [its] customers," and

---

could expect them to be pegged," are immaterial puffery.  *City of Monroe Emps. Re. Sys. v. Bridgestone*, 399 F.3d 651, 671 (6th Cir. 2005); *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) (finding statements touting "'dramatic deposit growth,' 'strong performance,' and 'unique business model'" to be immaterial puffery); *Emps. Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901–2 (5th Cir. 2018).

[30] The other statements in this subcategory are similarly vague and aspirational.  *See, e.g.*, Statement 27 ("[We] remain very focused on safely and responsibly bringing our projects into service"); Statement 31 ("At Energy Transfer and Sunoco Pipeline, we pledge to the communities we cross and the customers we serve that we will operate our pipeline with the highest level of safety at all times."); Statement 34 ("It is our priority to maintain and operate our assets to the highest safety standards not just because it makes good business sense, but because it is the right thing to do.").

its "food safety programs are also designed to ensure that [Chipotle] compl[ies] with applicable federal, state and local food safety regulations." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018).[31]

The same result should be reached here.[32]   Indeed, this result is particularly appropriate here because the risk of safety incidents was well-known, and expressly disclosed, to investors.[33]   As a result, no reasonable investor would have been misled by Energy Transfer's vague statements of its commitment to safety into believing that Energy Transfer was guaranteeing that safety incidents would never occur.  *See Advanta*, 180 F.3d at 539 ("We are skeptical that plaintiffs or any other reasonable investors would make investment decisions based on the positive portrayals.").[34]

Moreover, Plaintiffs do not—and cannot—allege that Energy Transfer did not have the commitments or priorities expressed by Statements 27 through 37.  Instead, Plaintiffs take issue with Energy Transfer's execution on living up to these high ideals.  That is not sufficient to render

---

[31] *See also, e.g., Whole Foods*, 905 F.3d at 897 (Whole Foods "always strive[s] for transparency and accuracy in everything [it] do[es]" and it "take[s] pride in setting higher standards for quality" and "continu[es] to raise the bar even higher on [its] standards of transparency" and "seek[s] to be a deeply responsible company in the communities where [it] do[es] business around the world, providing ethically sourced, high-quality products and transparent information to [its] customers."); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("[S]trong credit culture and underwriting integrity remain paramount at [the company]."); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 900 (S.D. Tex. 2017) ("*Plains I*"), *aff'd sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019) (Oil company's "commitment to [Environmental, Health and Safety] excellence goes beyond just operating our facilities in a responsible manner, but reflects the vision and dedication shared by our management team and our employees"; company was "committed to public safety, protection of the environment and operation of our facilities in a prudent and safe manner.").

[32] The fact that these vague and aspirational statements concerned subjects—such as safety and manufacturing excellence—that are important, does not render aspirations about these subjects material.  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("Plaintiffs conflate the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation. While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material."); *Whole Foods*, 905 F.3d at 902 (adopting and applying *IBEW*).

[33] *See, e.g., See* Ex. 1 at 62, Energy Transfer L.P., Form 10-K (filed Feb. 23, 2018) ("Some of ETP's operations involve risks of personal injury, property damage and environmental damage, which could curtail its operations and otherwise materially adversely affect its cash flow.").

[34] *See also Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 550 (W.D. Pa. 2019) (finding that similarly aspirational "statements could not dupe the market. Instead, they are the kind of hazy statement of optimism that has been found to be inactionable puffery"); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen.").

Energy Transfer's mere statement that they had these aspirations misleading.  *See Arconic*, 395 F.

Supp. 3d at 550 ("All that Plaintiffs have shown is that Arconic might not have fully lived up to

its aspirations. This does not form the basis for a securities law violation.").[35]

> **b.   Statements Regarding Energy Transfer's Code Of Business Conduct And Ethics (Statements 38–41).**

Statements 38 through 41 fail for similar reasons.  Statement 41 is a collection of provisions

from Energy Transfer's Code of Business Conduct and Ethics ("Code of Conduct"), a ubiquitous

type of document in corporate America that explains how employees should govern themselves as

agents of the company.[36]  "Plaintiffs' position [that provisions of a code may be actionable under

the federal securities laws] has been soundly rejected by those courts that have considered it."  *City*

*of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009); *see*

*also In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017) (Code of Conduct

provisions are "a particularly inapt candidate to serve as the basis for § 10(b) liability").

Every court of appeals to consider the issue has found Code of Conduct provisions to be

inactionable.[37]  This is because, "[a] code of conduct is inherently aspirational.  Such a code

expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors,

---

[35] *See also In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 813–14 (S.D. Tex. 2012) (company statements about "safety as the [company's] number one priority" could not be rendered false by various operational decisions and safety incidents; "[e]ven the very specific facts Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether . . . safety was truly being 'prioritized' as '# 1' or the 'highest priority'"); *Chipotle*, 294 F. Supp. 3d at 232 ("These allegations do not conflict with Defendants' statements regarding the food-safety programs and procedures that Chipotle had in place, but merely quibble with Chipotle's execution of those programs and procedures.").

[36] *See* Ex. 8 at 3, ENERGY TRANSFER LP, SEVENTH AMENDED & RESTATED CODE OF BUSINESS CONDUCT AND ETHICS.

[37] *See Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) ("Statements in a corporate code of conduct are 'generalized positive goals rather than specific promises.'"); *Bondali*, 620 F. App'x at 490 (explaining that "a code of conduct is a declaration of corporate aspirations" and "not a guarantee that a corporation will adhere to everything set forth in its code"); *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017); *see also, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *11 (D.N.J. Dec. 6, 2018).

and officers always adhere to its aspirations." *Retail Wholesale*, 845 F.3d at 1276 (internal citation and quotation marks omitted). In other words, "[t]here is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct." *Braskem*, 246 F. Supp. 3d at 756.[38] Here, the Code of Conduct provisions identified in Statement 38 merely recite prohibitions and procedures, they do not factually represent compliance with these prohibitions and procedures.[39] Accordingly, Statement 38 is not actionable under the securities laws. *Id.*

Statements 39 through 41 are also inactionable. These statements simply acknowledge the existence of the Code of Conduct,[40] and the fact that it is available to investors on Energy Transfer's website. These assertions were undisputedly accurate. Moreover, it is well-established that merely noting the existence of a Code of Conduct or Code of Ethics does not require disclosure of any or all violations of that code.[41]

### c.   Paraphrases About Safety (Statements 42–43).

Plaintiffs' claims based on Statements 42 and 43 should be dismissed for multiple reasons. These statements regard the non-existence of "health risks" following the Revolution explosion

---

[38] *See also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015) (dismissing claim regarding defendant's compliance with its code of ethics because "[a]lthough the Company's codes of ethics prohibit[ed] bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them"), *aff'd sub nom. Klein v. PetroChina Co.*, No. 15-2528 (2d Cir. Mar. 21, 2016).

[39] Plaintiffs insinuate that because Energy Transfer's Code of Conduct was written in mandatory terms, it makes it different from other codes of conduct. *See* ¶ 387. Not so. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 658 (S.D.N.Y. 2017) (holding that "despite [a code of conduct's] relatively forceful wording, it remains an aspirational and hortatory statement").

[40] Or, in the case of Statement 41, a similar code of conduct for third party contractors.

[41] *See Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *3, 11 (S.D.N.Y. Mar. 28, 2017) (dismissing statements from a code of conduct despite being referenced in annual SEC filings); *City of Roseville*, 686 F. Supp. 2d at 415 (granting motion to dismiss similar statements and calling it "untenable" to hold that "any company with a code of ethics . . . be required to disclose all violations of that code or face liability under federal securities law"). Statement 39 is also inactionable due to a timing issue. It was made in February 2017, but the earliest alleged violation of the Code occurred in November 2017. ¶¶ 166, 382; *Weiner*, 129 F.3d at 317.

and whether accidents have been "drastically reduced" since Sunoco and Energy Transfer Partners merged.  Statements 42–43.  First, such assertions are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision."  *Whole Foods*, 905 F.3d at 901–02.  Accordingly, Statements 42 and 43 are immaterial and inactionable puffery.  *Id.*

In addition, Statements 42 and 43 are paraphrases of purported statements from Energy Transfer spokespeople—not direct quotations.  Such paraphrases "cannot be reconciled with the standard articulated in *Janus*,[42] i.e., that statements attributable to [a defendant] are those which the [defendant] has 'ultimate authority over . . ., including its content and whether and how to communicate it.'" *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015) (quoting *Janus*, 564 U.S. at 142–43) (such statements are inactionable because "the author of the article [and not any defendant] had control over which portions of the interview to use and how to present any information received from [the defendants].").

Moreover, Plaintiffs do not plead any facts suggesting that Statements 42 and 43 were false or misleading.  With respect to Statement 42, there are no allegations that residents faced "environmental health risks" in the "aftermath of the [Revolution] explosion."  *Compare* Statement 38 *with* ¶ 381.  And, with respect to Statement 43, there are no allegations regarding the relative number of accidents Sunoco Pipeline faced before and after its integration with Energy Transfer or the amount the company "spent . . . on assets in 2017."  *Compare* Statement 42 *with* ¶ 381. Instead, Plaintiffs merely point to their familiar laundry list of problems that arose during the project—which have no bearing on the substance of Statement 42 or 43—in a conclusory attempt

---

[42] *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) (securities fraud liability extends only to the "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement….").

to allege that these statements (along with scores of other statements lumped together with them) were "materially false and misleading." *Id.* This falls far short of meeting Plaintiffs' burden to allege falsity with particularity for each statement at issue.

### d.  Opinion Regarding Lisa Drive (Statement 44).

Next, Plaintiffs take issue with an email sent by Sunoco spokesman Jeff Shields to a reporter regarding "the specific geology directly below Lisa Drive," a small cul-de-sac in Chester County.[43]  According to the reporter's article, Shields' email stated:  "There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area."  Statement 44.  Plaintiffs contend that this statement was false based on the map below:



---

[43] Ex. 9, Claire Sasko, "*I'm Terrified": Life on the Front Lines of the Sunoco Pipeline*, PHILLYMAG (Mar. 22, 2018).

¶ 355.  Notably, this map fails to even label Lisa Drive.  Judicially noticeable records, however, indicate that Lisa Drive consists of the approximately 400-foot-long cul-de-sac at the end of Michele Drive.[44]  As a careful analysis of the map with this location in mind reveals, the area "directly below Lisa Drive" is south of the area that the map labels as containing limestone and dolostone.  *See* ¶ 355.  Thus, Shields's statement that "there is some karst north of this area, but it does not impact this area [*i.e.*, the area directly below Lisa Drive]" was entirely accurate and, therefore, not actionable.  Statement 44.

The portion of Statement 44 in which Shields states that "[c]onstruction through this area is safe" is immaterial as a matter of law for several reasons.  First, it describes the safety of construction of one 400-*foot* stretch of pipeline, among 12,500 *miles* of pipeline owned and operated by Energy Transfer.  ¶ 2.  Second, the statement is not pegged to any measurable standard, is "too vague to be actionable," and would be treated by investors as mere "corporate cheerleading."[45]

### 5. Category E: Statements About Legal Compliance (Statements 45–57).

In the final category of alleged misrepresentations, Plaintiffs contest three subcategories of comments about Energy Transfer's legal compliance.  *See* Statements 45–57.  Plaintiffs fail to sufficiently allege that any of these statements are actionably false or misleading.[46]

---

[44]  *See* Ex. 10, Lisa Dr., West Whiteland Township, PA 19380, Google Maps. https://goo.gl/maps/t88W1ZyvFVzuvP5s8.  The Court should take judicial notice of the geographical fact. *See Ellis v. Montgomery Cty.*, 267 F. Supp. 3d 510, 520 (E.D. Pa. 2017) ("Google Maps (maps.google.com) . . . has been regularly relied upon for judicial notice by courts within the Third Circuit.").

[45]  *Supra* n.31 (collecting cites).

[46]  Though the Code of Conduct statements discussed *supra* at § IV.A.4.b, are not actionable, they also fail for the reasons that the statements in this section fail.  Plaintiffs rely on the same allegations to contradict the Code of Conduct statements as they do the statements in this section.  *See* ¶ 399.  Thus, the Court can dismiss the Code of Conduct statements for lack of falsity as well.

### a.      Opinion Statements About Permits (Statements 45–47).

First, Plaintiffs contest several statements about permits.  *See* Statements 45–47.
Statements 45 and 46 are general statements taken from Energy Transfer's 10-K that say only that
Energy Transfer possessed the permits for Mariner East (or was "in the process of obtaining" the
permits).  These statements are entirely accurate—as the Complaint itself concedes.[47]

Plaintiffs suggest that these statements were actionably misleading because "the
construction permits issued in connection with the Mariner East pipeline were obtained by the
Partnership through the use of coercion, bribery or other improper methods."  ¶ 399.  But even if
Plaintiffs could adequately plead that Energy Transfer employed such "improper methods" (and
they certainly cannot, as explained later in this section)[48] that would have no bearing on Energy
Transfer's mere assertion that it ***possessed*** these permits.  In other words, Statements 45 and 46
"are not misleading because they do not suggest that the undisclosed improper activity alleged by
Plaintiff[s] was not occurring."  *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012).[49]  After all, "disclosure is not a rite of confession," and
"companies do not have a duty to 'disclose uncharged, unadjudicated wrongdoing.'"  *City of
Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

---

[47] *Compare* Statement 45 ("We believe that we have satisfactory title to or valid rights to use all of our material
properties."  And, "we believe that we have, or are in the process of obtaining, all required . . . permits . . . which relate
to our properties or the operations of our business."), *with* ¶¶ 13, 70, 71, 78, 87, 104, 116, 119, 124, 128, 131, 221
("***Energy Transfer secured the necessary permits*** for construction of ME2 from the PADEP . . ."; "***the PADEP*** . . .
***granted Sunoco its*** . . . ME2X ***permits*** . . ."; "to begin construction on the Revolution pipeline, ***Energy Transfer***
applied for and ***received permits*** issued by multiple counties, regulatory bodies, and the DEP." (emphasis added)).

[48] *See infra* § IV.A.5.c.

[49] *See also Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) ("[N]one of the statements recited
by plaintiffs 'put into play' the integrity of Commerce Bank's practices with respect to government deposits."); *In re
KBR, Inc. Sec. Litig.*, 2018 WL 4208681, at *5 (S.D. Tex. Aug. 31, 2018) ("More precisely, the statements of revenue
and net income do not put the circumstances surrounding the awards of the contracts 'in play' . . . but instead merely
report the facts that some of the reported revenue and income came from 'increased progress,' or 'increased activity
on' 'projects in Azerbaijan,' . . . reports that Plaintiffs do not contend were false.").

Next, Statement 47 is apparently drawn from a news article regarding a "settlement" between various environmental groups and the PADEP. ¶¶ 137, 373, 391. In the article, Energy Transfer spokesperson Lisa Dillinger is quoted as stating: "From the outset, Sunoco has maintained that the permits were properly and lawfully issued by PADEP and fully protective of the environment." *Id*. The statement is exactly the type of nonspecific message that courts find "too vague to be actionable."[50] Indeed, such a finding is particularly appropriate here given that, according to the article from which it is drawn, Statement 47 is an excerpt of a purported email from an Energy Transfer spokesperson stripped of both the question that prompted the email and the remaining context contained in the email. *See* ¶ 391.

Moreover, Statements 45 through 47 are each statements of belief and fail as a matter of law under the *Omnicare* standard. As to Statements 45 and 46, Plaintiffs do not even attempt to undermine Energy Transfer's statements of "belief" that it "ha[s], or [was] in the process of obtaining, all required . . . permits . . . ." Statements 45–46. As to Statement 47, Plaintiffs have fallen short of alleging with particularity facts known to Energy Transfer when Statement 47 was made in July 2018 that "cannot be squared" with Energy Transfer's opinion that "the permits were properly and lawfully issued by PADEP . . . ." Statement 47. Plaintiffs contend that Energy Transfer engaged in "bribery, coercion, or other improper means" to obtain the permits. ¶ 399. But "when a complaint claims that statements were rendered false or misleading through the non-disclosure of illegal activity, the facts of the underlying illegal acts must also be pleaded with particularity, in accordance with the heightened pleading requirement of Rule 9(b)   and the

---

[50] *In re Facebook Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) (finding statement that "[w]e've worked hard to make sure that we comply with [the FTC order]" inactionable despite alleged noncompliance); *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *23 (D. Ariz. Feb. 16, 2017) ("Courts often hold that statements regarding general legal compliance are too vague to be actionable misrepresentations or omissions."). The portion of the statement noting that the permits are "fully protective of the environment" is immaterial puffery. *See supra* n.29.

PSLRA."[51]  In the context of alleged bribery, "[b]lanket allegations that payments were made []

standing alone, do not satisfy Rule 9(b)'s requirement to plead the who, what, when, where, and

how of the alleged transactions." *Banco Bradesco*, 277 F. Supp. 3d at 632.

Here, the Complaint falls far short of adequately pleading any illegal activity by Energy

Transfer.  Plaintiffs allege facts only about the inner workings of the PADEP and the Pennsylvania

state government: the apparent "termination" of the PADEP Secretary by the Pennsylvania

Governor (¶¶ 78–87), communications and meetings during the approval process (¶¶ 103–13,

115), the PADEP's "swift" approval of the permits despite unidentified "deficiencies" (¶¶ 118–

19), and the involvement of Governor Wolf's special assistant, Yesenia Bane, who allegedly is

"the spouse of an oil and gas lobbyist" (¶ 102) and purportedly had a "conflict of interest."  ¶¶ 114,

123.  Plaintiffs say nothing about who, when, where, or how ***anyone*** affiliated with Energy

Transfer engaged in any bribery or coercion towards any government official.  Plaintiffs' vague

insinuations are not enough to meet their pleading burden.  *Schiro v. Cemex, S.A.B. de C.V.*, 438

F. Supp. 3d 194, 199 (S.D.N.Y. 2020) (dismissing 10(b) claim premised on purported bribery

where complaint contained "no factual allegations of exactly who made the payments, to whom

the payments were made, when the payments were made, or how the payments were made").

The only facts that Plaintiffs have pled supporting their theory that the permits were

obtained impermissibly are vague "concerns" voiced in news articles and by individuals (several

of whom are unidentified) about the Wolf administration's process (¶¶ 119–24) and the

announcement of an FBI ***investigation*** into the ***Wolf administration***.  ¶¶ 423–24.  However, none

of these "concerns" identify any impropriety by anyone affiliated with Energy Transfer, and the

---

[51] *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006).

articles state that the FBI is investigating Governor Tom Wolf's administration, not Energy Transfer.[52]  Plaintiffs have not—and cannot—allege that this investigation resulted in any charges being filed against anyone—much less against Energy Transfer.

### b.    Statements About Hired Security (Statements 48–54).

Next, Plaintiffs challenge statements in which Energy Transfer spokespeople expressed confidence that Energy Transfer acted lawfully following the announcement that various District Attorneys had filed charges relating to the hiring of off-duty constables to provide security on ME2.  *See* Statements 48–54; *e.g.*, Statement 48 ("We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania and we are committed to aggressively defending ourselves against these baseless allegations.").

Such denials of liability are immaterial as a matter of law.[53]  To hold otherwise would have far-reaching and untenable implications.  It would force companies into a dilemma whenever they are accused of any type of misconduct: admit guilt immediately or face potential liability not only for the underlying charges but for securities fraud as well.[54]  Unsurprisingly, the securities laws do not force issuers into this dilemma.  *See, e.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *13 (D.N.J. Nov. 12, 2019) ("Plaintiffs seem to contend that a company must also

---

[52] *See* Ex. 4, Marc Levy, *FBI Eyes How Pennsylvania Approved Pipeline*, ASSOCIATED PRESS (Nov. 12, 2019); Ex. 5, Andrew Maykuth & Jeremy Roebuck, *FBI Now Investigating the Way in which Pennsylvania Approved Mariner East Pipeline*, PHILADELPHIA INQUIRER (Nov. 12, 2019).

[53] *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 906 (N.D. Ill. 2001) ("Abbott's maintenance of its innocence is not fraud. SEC rules do not create a duty to confess contested charges . . . .  Investors can evaluate this sort of posturing for what it is worth."), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *12 (E.D. Mich. Jan. 30, 2007) ("UAHC informed investors that it had been paying Senator Ford for consulting work and of its opinion that these payments were legal.  'Investors can evaluate this sort of posturing for what it is worth.'" (quoting *Abbott*, 140 F. Supp. 2d at 907)).

[54] *See City Capital Assocs. v. Interco, Inc.*, 696 F. Supp. 1551 (D. Del. 1988) (A party "should not be placed in a position of being forced to either admit liability, while he or she disputes it, or violate the securities laws by failing to disclose the alleged and disputed violation."); *Pelletier*, 439 F. Supp. 3d at 465 ("[I]t is simply not conceivable that the Defendants would admit [a criminal offense], or that they would be required to violate their right against self-incrimination to avoid liability under the Securities Laws."); *Gamm*, 944 F.3d at 464–65.

make a *mea culpa* when disclosing the investigation and its potential legal implications. Such a position does not find support in the law [because] . . . '[d]isclosure is not a rite of confession'." (quoting *City of Pontiac*, 752 F.3d at 184)). "[C]ompanies are not required to engage in 'self flagellation' by disclosing unproven allegations." *Facebook*, 405 F. Supp. 3d at 836.

Moreover, even if Statements 48 through 54 were material, they are not actionably misleading. Plaintiffs' suggestion that they are is based on their contention that Energy Transfer purportedly engaged in illegal action to hire elected constables to serve as security on its ME2 project. *See* ¶ 399. But far from being actionably misleading under the *Omnicare* standard, Energy Transfer's opinions regarding this matter have proven entirely accurate: All charges brought against an Energy Transfer employee related to these statements have ***been dismissed because of insufficient evidence***.[55] Plaintiffs' claims based on Statements 48 through 54 should be dismissed.

### c. Other Statements About Legal Compliance (Statements 55–57).

Finally, Plaintiffs identify several statements in which Energy Transfer spokespersons made statements about Energy Transfer's legal compliance with regard to smaller facets of the Mariner East project. *See* Statements 55–57. As an initial matter, these statements are not material, as they deal with discrete issues that Plaintiffs have not shown are significant enough to evaluate an investment decision in a multi-billion dollar company. And, moreover, Plaintiffs' claims regarding them are not sufficiently pled under the PSLRA.

Statement 55 is taken from a November 2018 article about several very specific orders issued by PADEP related to the Revolution pipeline. *See* ¶ 378. Apparently in response to a

---

[55] *See* Ex. 2 at 2, Susan Phillips, *Charges Dismissed in Alleged Mariner East Buy-a-Badge Scheme*, STATEIMPACT (July 2, 2020); *see also* Ex. 3 at 1, Docket for *Pennsylvania v. Recknagel*, MJ-15403-CR-0000445-2019 (indicating that all counts were dismissed and the case is closed). The Court should take judicial notice of the public record dismissing all charges against Frank Recknagel at the pleading stage. *In re Congoleum Corp.*, 426 F.3d 675, 679, n.2 (3d Cir. 2005). No charges were ever brought against Energy Transfer itself.

question about these orders, "Energy Transfer spokeswoman Alexis Daniel said in an email . . . 'We have been and will continue to comply with their orders.'"[56]   Plaintiffs underline this statement in their Complaint, but provide no reason to think that Energy Transfer had been or ever did violate these orders.  Statement 55 is, accordingly, not actionably false or misleading.  *Pelletier*, 439 F. Supp. 3d at 462 ("[T]he PSLRA requires that 'the complaint . . . specify . . . the reason or reasons why the statement is misleading . . . .'" (quoting 15 U.S.C. § 78u–4(b)(1))).

So too with Statement 56.  In that statement, which concerns "one instance, when Sunoco initiated a horizontal underground drilling operation on a site that was permitted for trenching," Energy Transfer spokeswoman Lisa Dillinger states "[t]hat was rectified about eight months ago." ¶ 377.  In conclusory fashion, Plaintiffs state that this remark was "misleading[]."  *Id.*  But Plaintiffs never suggest that this "one instance" was not rectified "about eight months ago."  In fact, Plaintiffs do not ever allege where, when, or what this "one instance" was.  *Pelletier*, 439 F. Supp. 3d at 462 ("[S]ecurities fraud plaintiffs must 'plead the who, what, when, where and how' of the alleged fraud." (quoting *Avaya*, 564 F.3d at 253)).

Finally, Plaintiffs contest Statement 57.  There, Energy Transfer spokeswoman Lisa Dillinger apparently wrote an email in response to a petition filed by seven residents of Delaware and Chester Counties seeking to halt construction, saying, "We do not believe the claim is valid . . . . The integrity of our Mariner East 1 and Mariner East 2 pipelines has been verified in the last few months by the PUC and PHMSA through numerous tests and data collection along the routes." ¶ 379.  Plaintiffs again offer the conclusory allegation that this was "misleading."  ¶ 381.  But Plaintiffs never allege that such tests, data collection, or other verification did not occur.  Nor do

---

[56] *See* Ex. 11 at 3, Gideon Bradshaw, *DEP Orders Halt to Pipeline Work after Explosion*, Observer-Reporter (Nov. 1, 2018).

Plaintiffs allege facts that would undermine the opinion expressed in Statement 57 about the legal validity of the residents' claims.[57]  The statement is also not actionable.

### B.    Plaintiffs fail to satisfy the PSLRA's high standards for pleading scienter.

Independently of their failure to plead falsity, Plaintiffs' § 10(b) claims should be dismissed for failing to satisfy the PSLRA's high standards for pleading scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319, and cannot be shown through "simple, or even inexcusable negligence." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).  Instead, Plaintiffs must plead with particularity facts sufficient to establish at least "recklessness," which is "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id*.  "As with the other allegations of fraud, the facts that give rise to a strong inference of scienter must be alleged with particularity, meaning that plaintiffs must plead 'the who, what, where, when, and how: the first paragraph of any newspaper story.'" *In re The Great Atl. & Pac. Tea Co., Sec. Litig.*, 103 Fed. App'x 465, 469 (3d Cir. 2004) (citation omitted).

To determine whether scienter has been alleged with respect to a statement at issue, the Court should only "look to the state of mind of the individual corporate official or officials who ma[d]e or issue[d] the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *see also In re Tyson Foods, Inc. Sec. Litig.*, 155 Fed. App'x 53, 57 (3d Cir. 2005) (following *Southland*); *infra* § IV.B.2.  In other words, "scienter must be pleaded in regards to 'each act or omission' sufficient to support a

---

[57] *See also supra* n.53 (noting that such protestations of innocence in response to claims are not actionable).

strong inference that 'the defendant' acted with the required state of mind." *Winer*, 503 F.3d at 335. Plaintiffs fatally violate this principle in three distinct ways: (1) they challenge several representations without identifying the speaker of those statements,[58] (2) they allege very little as to the states of mind of the Speaking Defendants who made many of the statements,[59] and (3) they allege nothing as to the states of mind of the non-Defendant spokespeople who allegedly made the remaining statements.[60] Instead, Plaintiffs rely primarily on impermissible "group pleading" allegations, which fail under the PSLRA for multiple reasons.[61] Viewing the Complaint as a whole, the facts alleged support a far stronger non-culpable inference that the Defendants did the best they could to complete a highly regulated, risky, and politically unpopular pipeline construction project safely and efficiently, keeping the public informed as events unfolded and circumstances changed. This does not sufficiently allege scienter as to any Defendant. *See Tellabs*, 551 U.S. at 314 (to sufficiently allege scienter as to a defendant, the facts alleged must support an inference of scienter as to that defendant that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent").

### 1. Plaintiffs fail to plead scienter as to any Speaking Defendant.

Plaintiffs' contentions about the state of mind of the Speaking Defendants fall woefully short of the PSLRA's requirement to plead a strong inference of scienter. Indeed, the Complaint conspicuously lacks the type of fact-specific allegations that courts often point to as supporting a strong inference of scienter. For instance, Plaintiffs do not specify a single document that a Speaking Defendant received, a single meeting that a Speaking Defendant attended, or a single

---

[58] *See* Statements 2, 3, 10, 11, 12, 13, 26, 31, 33, 38, 41, and 53.

[59] *See infra* § IV.B.1.

[60] *See infra* § IV.B.2.

[61] *See infra* § IV.B.3.

private conversation concerning any relevant topic.  There are no confidential witness allegations from former Energy Transfer employees who were in a position to know what the Speaking Defendants were told and when.  And there are no motive allegations, such as allegations of suspicious stock sales, specific to any Speaking Defendant.[62]

Instead, Plaintiffs rely almost entirely on vague allegations about the purported knowledge of "Defendants" or "Energy Transfer" as a whole.  This is impermissible and insufficient to allege scienter as to any of the Speaking Defendants.  That is, "Plaintiffs are essentially attempting to establish scienter through a form of 'group pleading,' [even though] such non-specific allegations have been rejected by [the Third Circuit] Court of Appeals as falling short of the PSLRA's particularity requirement."  *See City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 397 (D. Del. 2010) ("*City of Roseville II*").  Accordingly, as further explained below, Plaintiffs fail to plead scienter as to any statements made or approved by the Speaking Defendants and each of the Speaking Defendants should be dismissed from this case.

### a.    Plaintiffs' minimal allegations specific to the Speaking Defendants fail.

Plaintiffs plead almost no allegations about the state of mind of any of particular Speaking Defendant, and what few specific allegations they do make do not support an inference—let alone a strong inference—of scienter as to any Speaking Defendant:

### i.    McReynolds.

Plaintiffs make no particularized allegations relevant to McReynolds' state of mind.  The Complaint's only allegations about him describe his employment with Energy Transfer and the mere fact that he signed certain SEC filings.  ¶¶ 41, 332, 382, 390.  Plaintiffs cannot rely on

---

[62] *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245–46 (3d Cir. 2013) (absence of individual motive weighs against inference of scienter).

McReynolds' mere position at the company (¶ 460) to plead scienter because it shows nothing about what he actually knew or should have known.  *See, e.g.*, *Advanta*, 180 F.3d at 539 ("blanket statements that defendants must have been aware of the impending losses by virtue of their positions within the company" fail to plead scienter); *Kennilworth Partners LP v. Cendant Corp.*, 59 F. Supp. 2d 417, 428 (D.N.J. 1999) ("The plaintiffs also allege scienter to the CUC directors because they signed the Cendant Form 10-K and had access to facts in their roles as directors or officers of Cendant or CUC . . . . These arguments have also been rejected by the courts.").

### ii.     McCrea.

The Complaint likewise falls woefully short of alleging facts with particularity sufficient to allege scienter on behalf of McCrea.  It alleges McCrea made statements about proceeding quickly, while Sunoco was simultaneously violating permits.  ¶ 300.  But all this shows is that McCrea's statements and Sunoco's violations were happening at the same time, not that McCrea knew anything about the violations.  Otherwise, Plaintiffs only allege that McCrea should have known things because he was COO and had "final sign off" on the Revolution pipeline.  ¶¶ 460, 464.  This is insufficient to allege scienter because Plaintiffs allege no specific information that was provided to McCrea that should have alerted him to problems.  ¶¶ 213–14, 460; *see Advanta*, 180 F.3d at 539 (pleading a defendants' position at the company is not enough).

### iii.     Ramsey.

As with McCrea, Plaintiffs allege that Ramsey made statements about proceeding quickly at the same time Sunoco was violating permits, which likewise does not show that he knew about the violations.  ¶ 300.  Plaintiffs' only other allegation about Ramsey is that he was present at investor presentations where the company allegedly discussed the importance of the pipeline projects, but that does not show that he spoke with an actionable state of mind. ¶ 449.

###### iv.     Long.

Plaintiffs allege that, in 2019, Long stated that "we've made mistakes."  ¶¶ 468–70.  This does not support scienter as of the time Long made any challenged statements, all of which occurred in 2017 or 2018.  *Winer*, 503 F.3d at 331–32 (fraud by hindsight allegations do not support a strong inference of scienter).  The mere fact that Long spoke publicly about details of the project and admitted mistakes after they had happened, does not suggest that he knew—*at the time of those statements*—about problems or any contradictory information.  *See Advanta*, 180 F.3d at 538 ("Rule 10b-5 liability does not attach merely because '[a]t one time the firm bathes itself in a favorable light' but '[l]ater the firm discloses that things are less rosy.'"); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *19 (D.N.J. July 22, 2015) ("Hindsight statements . . . are insufficient to give rise to a strong inference of scienter.").

Plaintiffs' allegation that Long "dodged" an analyst question during a November 8, 2018 earnings call also does not show scienter.  ¶ 448.  An analyst asked ". . . on ME2, you said the line is 100% complete.  So you won't be using the workaround that you've talked about?" and Long responded "As far as go-arounds, I'm not sure what you're referring to other than – what?  Yes, so the bottom line is what we've said is we're in service with Mariner East 2 soon . . ."  *Id.* Plaintiffs characterize Long's response to the question as an attempt to "conceal the true impact that the makeshift pipeline would have on the Partnership's bottom line," but the term "bottom line" as used by Long clearly had no reference to Energy Transfer's financial bottom line.  Nothing about Long's response suggests—let alone pleads with particularity—that he was attempting to defraud the market.  The far more reasonable inference is that Long was confused by the analyst's question and got interrupted when trying to answer, not that he spoke with scienter in connection with the alleged misrepresentations (which do not include this Q&A exchange).

### v.     Warren.

Plaintiffs allege that Warren also admitted in 2019 that mistakes had been made previously, which does not support scienter as of the time of challenged statements for the same reasons they do not plead scienter as to Long. ¶¶ 465–67; *Winer*, 503 F.3d at 331–32.  In addition, Plaintiffs suggest that because Warren spoke on certain matters related to ME2, that he must have known all facts "relating to the ME2 pipeline." ¶¶ 465–66.  This is far from sufficient to plead scienter under the PSLRA.   Indeed, if a plaintiff could bootstrap the mere making of a public statement concerning a matter into a sufficient allegation of scienter, the scienter element of § 10(b) claims would be eviscerated since, by definition, all speakers have made public statements.

### b.     Plaintiffs' vague group allegations do not plead scienter as to the Speaking Defendants.

In addition to these insufficient allegations of scienter on behalf of the Speaking Defendants, Plaintiffs make various other general allegations that lump together all "Defendants," "Individual Defendants," "Energy Transfer" as a whole, or other groups of individuals. These allegations should be disregarded by the Court because "the PSLRA prohibits group pleading of scienter, so the plaintiff must specify scienter with respect to each defendant." *Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*, 2009 WL 4250061, at *7 (D.N.J. Nov. 25, 2009) (citing *Winer*, 503 F.3d at 335); *see also City of Roseville II*, 713 F. Supp. 2d at 397 ("[T]he PSLRA requires plaintiffs to plead particularized facts with regard to scienter, including 'the role of each defendant.'").[63] Moreover, the allegations attributed vaguely to these groups lack the particularity required by the PSLRA and would fail to support scienter in any event.

---

[63] *See also Owens v. Jastrow*, 789 F.3d 529, 538 (5th Cir. 2015) ("It is appropriate to disregard the group-pleaded allegations and determine whether the remaining, properly pleaded allegations raise a strong inference of scienter."); *Plains I*, 245 F. Supp. 3d at 908 ("[T]he complaint relies on group-pleading allegations that 'the company' or 'the defendants' were aware of [countervailing facts]. That is not sufficient.").

i.     **Allegations about regulatory issues, construction issues and other purported "red flags" do not plead scienter with respect to any statement at issue.**

First, Plaintiffs try to support scienter by suggesting that the pipeline was subject to intense regulatory scrutiny, so each announcement of an investigation put "Defendants" on notice of "problems" with the pipelines.  ¶¶ 454–59; *see also* ¶ 381.  These allegations fail to establish scienter because Plaintiffs allege no specifics about who knew about these issues, how or when they learned of them, or what they knew about them.  *See GSC Partners*, 368 F.3d at 239 (Plaintiffs "must support their allegations [of scienter] with the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue.").[64]   Indeed, while this failure alone is fatal, Plaintiffs' allegations here fall especially short of the mark for two reasons.  First, they rely heavily on field-level reports—such as a "Hazard Report," "scan line reviews," a "Hydrogeologic Re-Evaluation Report," and "daily inspections" of a single pipeline—which would not likely have risen to the attention of the top-level personnel like the Speaking Defendants.  Second, Plaintiffs also rely largely on the announcement of investigations *after* statements were made to speculate about what Defendants "must have known" *before* the statements were made.  *See* ¶ 454–55.  Such sheer speculation falls far short of the PSLRA's requirement of pleading scienter with particularity.

Moreover, even if the purported problems had been known by relevant personnel, they would be irrelevant to scienter because they do not undermine any of the statements at issue.  *See Winer*, 503 F.3d at 332 ("Winer failed to adequately plead scienter by failing to link the declarant

---

[64] *See also Witriol v. Conexant Sys., Inc.*, 2006 WL 3511155, at *4 (D.N.J. Dec. 4, 2006)("Plaintiffs' allegations of scienter do not go farther than to say 'they must have known' because of their positions in the company. The Third Circuit rejected the 'they must have known' theory in *Advanta* [.]"); *In re Plains All Am. Pipeline, LP Sec. Litig.*, 307 F. Supp. 3d 583, 642 (S.D. Tex. 2018) ("*Plains II*") ("To avoid dismissal . . . , the plaintiffs must make specific allegations about which corporate officer learned what facts, from what source, on what date.").

of the challenged statement with facts that might contradict his statement."). Many of the "problems" Plaintiffs point to have nothing to do with the statements at issue.[65] Instead, Plaintiffs apparently are suggesting that because the Mariner East project faced problems and difficulties, everything said about the project must have been fraud. This is not the law. *Ronconi*, 253 F.3d at 434 ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements."). In addition, that Energy Transfer operates in a heavily regulated and dangerous industry is well-known to investors and challenges by local groups and the investigations and public scrutiny Plaintiffs cite were well-publicized and disclosed to investors by Energy Transfer. *See, e.g.*, ¶ 462 (noting that press reports regarding problems at Lisa Drive were "duly reported" in the press); Statements 5, 19–20 (reporting issues leading to the delay of ME2's in-service date).[66] Plaintiffs cannot allege scienter simply by suggesting that the Company "may have been caught by the risk inherent in its business strategy." *StoneMor*, 927 F.3d at 718. After all, "misguided optimism"—even in a risky industry—"is not a cause of action, and does not support an inference of fraud." *Jones v. Perez*, 550 Fed. App'x 24, 26 (2d Cir. 2013).

### ii. Allegations about capacity and completion timing of the pipeline projects do not plead scienter.

With respect to the statements at issue concerning when, how and with what capacity the pipeline projects would be completed,[67] Plaintiffs again plead nothing to show that any Speaking

---

[65] For example, several of the alleged red flags relate to the Revolution explosion, including consultant reports about possible geological issues near the explosion site, a resident reporting a hillside slip, and daily inspections showing surface failures along the pipeline route. ¶ 381. But Plaintiffs admit that the pipeline was inspected daily and that Energy Transfer believed the hillside slip was fixed. *Id.* None of these issues caused the explosion, which was caused by a "bad weld." ¶ 254. And, even if they had, purported problems with the Revolution pipeline would not undermine any statement at issue. *See, e.g., supra* § IV.A.3.

[66] *See supra* § IV.A.1.a (discussing relevant risk disclosures). The public disclosure of these facts "significantly detract[s] from any inference of scienter." *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 472 (E.D. Pa. 2019).

[67] Statements 1–26.

Defendant, or executive officer making a statement on behalf of Energy Transfer, knew or was reckless in not knowing at the time of their statements that the pipeline projects would not be completed at the times they estimated, or in the manner anticipated or with the capacity they stated. Plaintiffs vaguely plead that it would be "impossible" for the pipelines to meet those goals simply because they later ran into problems, which Plaintiffs attribute to a nebulous failure to do necessary planning and unsubstantiated malfeasance at the permit stage.  ¶ 443.  But "[c]alling executives bad managers, or bad forecasters, does not plead fraud, except where it can be shown that they knew or were deliberately reckless in disregarding the misleading nature of their forecasts." *Ronconi*, 253 F.3d at 437.  Plaintiffs do not come close to meeting that standard here as they do not allege who knew what about "corner cutting," *id*., or even what corners were being cut.[68]

Instead, Plaintiffs speculate that Energy Transfer had developed plans to use a 12-inch pipe in "early 2018" because the West Whiteland Township Manager said she was informed by Sunoco about the 12-inch pipe by early "July 2018."  ¶¶ 446–49.   This is pure speculation and is unsupported by the actual facts alleged. *Kumar v. Kulicke & Soffa Indus., Inc.*, 2019 WL 5081896, at *11 (E.D. Pa. Oct. 9, 2019) (a plaintiff cannot plead scienter with speculation).  The Complaint alleges no facts to show that any of the Speaking Defendants—much less the ones who spoke about throughput capacity—knew that ME2 would ultimately have reduced throughput at the time they stated made a larger initial capacity estimate.  ¶¶ 445–49.  As a result, Plaintiffs' allegations about the 12-inch pipeline amount to mere fraud-by-hindsight, which does not support a strong inference of scienter because they do not show anything about the Speaking Defendants' states of mind at the time they made the challenged statements.  *Winer*, 503 F.3d at 331–32.

---

[68] Plaintiffs suggest that there was wrongdoing in the permit process, but, as noted above, this is not adequately pled. *See supra* § IV.A.5.a.  Moreover, the only individual defendants even suggested to be involved in the permit process were McGinn and Hennigan, who did not make or approve any of the challenged statements.  ¶¶ 45–46, 436–37.

### iii. Allegations about purported illegality do not plead scienter.

Next, Plaintiffs suggest that "Defendants" engaged in illegal conduct in two different spheres in hopes of pleading scienter: the permit process and hiring of constables. Both fail to plead scienter as to the Speaking Defendants.

*First*, Plaintiffs allege nothing to show what any Speaking Defendant knew or should have known about the purportedly illegal permit process. ¶¶ 436–37. The only allegations about the permit process concern McGinn and Hennigan, who did not make or approve any of the challenged statements. ¶¶ 45–46, 436–37. There are no allegations that any Speaking Defendant knew or should have known anything improper about the permit process.

Regardless, the Complaint's allegations about the permit process do not show wrongdoing, just repeated contacts to get permits approved, which is entirely legal. ¶¶ 436–37 (merely suggesting that McGinn and Hennigan applied "pressure"); *see also* ¶ 115 ("It seems that we the public are up against ***lobbying*** from the industry . . . ." (emphasis added)). Indeed, given that Plaintiffs allege there were deficiencies in the permit applications, heavy contact between Sunoco and PADEP actually supports the competing inference that Energy Transfer was working diligently to fix the deficiencies. Plaintiffs cannot adequately plead that these communications were somehow nefarious based on statements from former PADEP Secretary John Quigley because Quigley left PADEP in May 2016, and so has no first-hand knowledge of the permit process after that time. ¶ 80. All he offers is his opinion, speculation, and rumors from after his departure from PADEP, which he apparently heard from other unidentified ***former*** PADEP employees. ¶¶ 79–97. These are not sufficient under the PSLRA. *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149–50 (3d Cir. 2004); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 361 (D.N.J. 2007).

Nor can Plaintiffs plead scienter based upon the conclusory assertion that Energy Transfer sought to have Quigley removed from his position as head of PADEP.  ¶ 443.  As an initial matter, Plaintiffs do not allege who at Energy Transfer was involved or supposedly knew about this effort, let alone had any improper role in it.  Indeed, Plaintiffs allege no particularized facts whatsoever to support the allegation that Energy Transfer was involved with Quigley's removal at all, offering instead nothing more than pure speculation based on the fact that Quigley identified many deficiencies in the permit applications for the pipelines and resigned shortly afterwards.  ¶ 79.[69] Regardless, Plaintiffs do not allege that Quigley had any interactions with the Speaking Defendants, so there is no basis to infer anything about the Speaking Defendants' states of mind based on allegations from or about Quigley.

To the extent Plaintiffs also try to plead scienter as to the permit process by referencing the reported FBI investigation, that also fails.  Not only has Energy Transfer not been identified as a target in that investigation, Plaintiffs allege nothing about the knowledge or recklessness of the Speaking Defendants in connection with the investigation.   And the mere existence of an investigation is insufficient to plead scienter.  *Universal Health Services*, 396 F. Supp. 3d at 469–70 ("[I]t is well-established that an 'investigation that has not resulted in charges or any finding of wrongdoing does not support an inference of scienter.'").

*Second,* as to the purportedly illegal hiring of constables, Plaintiffs rely on the criminal charges brought against Frank Recknagel, alleged to be Energy Transfer's head of security for Mariner East.  ¶¶ 438–42.  However, Recknagel made no challenged statements, and Plaintiffs do

---

[69] Indeed, Plaintiffs' accusation is contradicted by a *Philadelphia Inquirer* article incorporated by reference in the Complaint, which reports that Quigley "was forced to resign in May after he sent a private email encouraging environmental activists to lobby for gas-drilling regulations."  *See* Ex. 12 at 3, Andrew Maykuth, *Former DEP Chief Says Sunoco Logistics, Not Regulators, Caused Pipeline Delays*, PHILADELPHIA INQUIRER (Nov. 11, 2016).

not allege any interactions between him and any Speaking Defendant to suggest they knew or recklessly disregarded facts about illegal hiring of constables.  Moreover, on June 26, 2020, the judge dismissed all charges against Recknagel.[70]  If a mere investigation of criminal misconduct is insufficient to plead scienter, so too are criminal charges that were dismissed as a matter of law. *Cf. Universal Health Services*, 396 F. Supp. 3d at 469.

### iv.     The Complaint's other vague allegations fail.

Although the Complaint offers a variety of other allegations, none of them strengthens an inference of scienter because they are speculation or generalized statements without the factual support required by the PSLRA.  *See Rabin*, 182 F. Supp. 3d at 246–47 (outlining high pleading standards of PSLRA for scienter).

*First*, Plaintiffs allege that Energy Transfer was motivated to have ME2 in service by the end of 2018 to prevent customers from terminating contracts without penalty, but that could apply to almost any construction project.  ¶ 443.  It does not show anything about what the Speaking Defendants knew or were reckless in not knowing.  Nor does it show a motive to defraud.  It merely shows a motive to complete the project expeditiously, which is irrelevant to scienter.[71]

*Second*, Plaintiffs suggest that, despite their inability to make particularized allegations about any Speaking Defendants' knowledge, "[t]he Executive Defendants" can "be presumed to know about the reckless and risky construction of the Pipeline Projects" because of the "critical nature of the Pipeline Projects to Energy Transfer."  ¶ 450.  Not so.  "[A]bsent some additional allegation of specific information conveyed to management and related to the fraud," such

---

[70] *See supra* § II.C.

[71] Regardless, general corporate motives do not contribute to an inference of scienter.  *Avaya*, 564 F.3d at 278  ("[W]e no longer make an independent search for scienter on the basis of motive and opportunity allegations alone" and refusing to infer scienter based on general motive to "improve the lot" of the company.).

generalized allegations about the importance of the matter to the company "does not support a finding of scienter." *Martin*, 757 F. App'x at 155.[72]   Moreover, here, Plaintiffs suggest that the statements at issue were rendered false by various purported discrete operational details.   A plaintiff does not allege sufficient particularized facts sufficient to allege knowledge of discrete operational details simply by alleging that the *entire projects* to which the details were related were important to the company.[73]

*Third*, Plaintiffs suggest that "Defendants'" "attempts to minimize and downplay" purported misconduct related to the Revolution explosion and sinkholes on Lisa Drive supports "Defendants'" scienter.   *See* ¶¶ 461–64; *see also* ¶ 458 (contending that a spokesperson's denial of misconduct supports scienter).   But scienter cannot be pled by means of a Catch-22, by which the mere suggestion of inculpability is sufficient to establish culpability.

*Finally*, Plaintiffs' conclusory allegations about "Energy Transfer's" knowledge of Pennsylvania's geology (¶ 471) and the Speaking Defendants holding themselves out as being knowledgeable (¶ 472) fall far short of the PSLRA's requirement of pleading with particularity what the Speaking Defendants knew and when.   Indeed, Plaintiffs' contention that the Speaking Defendants "held themselves out as knowledgeable" is based on the mere fact that they made the statements at issue.   ¶ 472.   If this were enough to sufficiently allege scienter, scienter would always be found in every situation, which is clearly not the law.

---

[72] *See also Rahman*, 736 F.3d at 247 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegations of specific information conveyed to management and related to fraud.").

[73] *See, e.g., Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 906 (E.D. Pa. 2018) ("It is one thing to say that, due to the Generic Drugs' importance, Bedrosian and Galvan were aware of the Generic Drugs' price increases. It is another to infer that, due to these price increases, Bedrosian and Galvan must have known the reason for the increases was due to a price-fixing conspiracy with other major pharmaceutical companies.").

2.    **Plaintiffs have not alleged scienter for any of Energy Transfer's spokespersons for the same reasons.**

In addition to statements made by the Speaking Defendants, Plaintiffs challenge over a dozen statements attributed to various non-defendant spokespeople.[74] But Plaintiffs do not allege anything about any spokesperson's state of mind. Accordingly, Plaintiffs have not established that any spokesperson made a statement at issue with scienter. Similarly, Plaintiffs have alleged statements without attributing them to any individual, let alone discussing how any alleged speaker had the requisite scienter.[75] Those statements should also be dismissed.

3.    **Plaintiffs fail to plead scienter as to Energy Transfer because they fail to allege scienter as to any Speaking Defendant and cannot rely on the corporate scienter doctrine.**

Since the Complaint fails to allege that any of the persons that made the statements at issue had scienter, Plaintiffs can only hope to avoid dismissal of the entirety of their complaint on scienter grounds if they are able to plead scienter as to Energy Transfer under the doctrine of corporate scienter, under which a plaintiff may "plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman*, 736 F.3d at 246.

The Third Circuit has not issued a published opinion accepting or rejecting the doctrine of corporate scienter. However, in an unpublished opinion, it rejected the doctrine. *Tyson*, 155 F. App'x at 57 (following *Southland*, 365 F.3d at 366). Likewise, here, this Court should reject the doctrine and hold that, because "there is no primary liability on the part of any of the individual [defendants]," Energy Transfer can "not itself be primarily liable under the facts of this case." *Tyson*, 155 Fed. Appx. at 57.

---

[74] *See* Statements 14, 32, 34–36, 42–44, 47–56.

[75] *See* Statements 2–3, 10–13, 26, 31, 33, 37–38, 41, 53.

But, "even if . . . it were possible to plead [corporate scienter], the facts alleged here would not survive a motion to dismiss." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676–77 (3d Cir. 2011). The Third Circuit has made clear that, even if it were to adopt the doctrine of corporate scienter, it would only apply in certain "extraordinary" circumstances which are not present here. *See id.* For example, the court stated:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Id.* at 676 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). Plaintiffs have not alleged such "extraordinary" circumstances here for at least four reasons. *Id.*

*First*, the vague and group pled allegations addressed above referring to "Energy Transfer's" and "Defendants'" purported knowledge do not support scienter, let alone rise to the "extraordinary" level required for corporate scienter.[76]

*Second*, the Complaint makes numerous allegations about supposed knowledge of Energy Transfer's Sunoco subsidiaries, who are not named as defendants.[77] However, the Third Circuit will not impute a subsidiary's scienter to the parent.[78] And, in any event, the allegations about Sunoco are similar to Plaintiffs' group-pled allegations against all "Defendants."[79] They do not contradict any of the statements at issue, let alone contradict them to the "extraordinary" extent

---

[76] *See supra* § IV.B.1.b.

[77] *See, e.g.*, ¶¶ 89–92, 137–43, 279–95, 301–04, 306–07, 309–13, 315–22.

[78] *See, e.g.*, *Rahman*, 736 F.3d at 245–46 (refusing to impute knowledge of subsidiary to parent); *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *12 (D.N.J. July 3, 2019) (rejecting plaintiffs' argument that parent corporation "must have known" about subsidiary's misrepresentations); *Christian v. BT Group, PLC*, 2018 WL 3647213, at *8 (D.N.J. Aug. 1, 2018) (declining to impute scienter of a subsidiary or its executives to the parent, especially when subsidiary represented only a small piece of the parent's overall business).

[79] *See supra* § IV.B.1.b.

necessary to justify application of corporate scienter. *City of Roseville*, 442 F. App'x at 676. Accordingly, none of Plaintiffs' numerous allegations about Sunoco entities could support a strong inference of scienter as to Energy Transfer**.**

*Third*, allegations about McGinn and Hennigan concerning purported bribery in connection with permits also could not suffice to show scienter. ¶¶ 436–37. McGinn and Hennigan did not make any statements,[80] and the allegations about the permit process would be too vague and generalized to show scienter even if they had. And the allegations regarding permits certainly fail to rise to the "extraordinary" level necessary to impute knowledge of improper conduct to Energy Transfer under a corporate scienter doctrine.

*Finally*, allegations about Frank Recknagel cannot support corporate scienter. Plaintiffs do not plead that Recknagel's conduct contradicts any statement at issue. Indeed, this is particularly clear in light of the recent dismissal of all charges against him.[81] And Plaintiffs certainly do not show that his conduct rises to the "extraordinary" level necessary to impute knowledge of wrongdoing to Energy Transfer under a corporate scienter doctrine.

In short, "even if the Third Circuit was among the circuit courts that expressly recognized the doctrine of corporate scienter, the facts of this case are distinguishable and a 'far cry' from those pled in [cases applying the corporate scienter doctrine], or in the hypothetical put forward by the Seventh Circuit in *Tellabs*." *Kumar*, 2019 WL 5081896, at *11; *see also Universal Health Servs.*, 396 F. Supp. 3d at 476 (rejecting corporate scienter absent "particularized allegations of a company-wide scheme or a widespread cover-up that rise to the level of the coverup in *Bridgestone*

---

[80] *See supra* § IV.B.1.b.iii

[81] *See In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2018 WL 4252537, at *7 (E.D. Pa. Sept. 5, 2018) (holding that failure to plead scienter on behalf of any defendant who made statements meant plaintiffs failed to plead scienter as to the company; refusing to consider state of mind of former management because the complaint "does not present such high level, stark, or rampant wrongdoing that this Court is moved to apply the doctrine of corporate scienter").

or the hypothetical posed by the Seventh Circuit"). Because Plaintiffs could not plead corporate scienter even if the doctrine were viable, they have not pled scienter as to Energy Transfer.

\* \* \*

In sum, taking all of Plaintiffs' scienter allegations holistically, they do not support a strong inference that Defendants' statements about the pipeline projects were made with intent to defraud investors. *Tellabs*, 551 U.S. at 326. The far stronger inference is the non-culpable one that Energy Transfer and its executives kept investors regularly and accurately informed about the pipeline projects being run by its subsidiaries, including when unfortunate obstacles were encountered along the way. The pipeline projects may be politically unpopular in some areas of Pennsylvania and may have encountered challenges that Energy Transfer had warned investors could happen, but that does not reflect an intent to defraud investors.

### C.     Plaintiffs fail to plead loss causation as to most of the statements at issue.

Even if Plaintiffs had sufficiently pled falsity and scienter as to any of the statements at issue—and, as explained above, they have not—their claims regarding many of the statements would still require dismissal because Plaintiffs fail to plead loss causation. Loss causation is the "causal connection between the material misrepresentation and the loss." *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To plead loss causation, a plaintiff must allege facts sufficient to show that a defendant's alleged misrepresentations "proximately caused the plaintiff's economic loss." *Id.* at 342. Specifically, plaintiffs must "allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quotation altered and internal citations omitted); *see also In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa.

Sep. 3, 2010), *aff'd*, 639 F.3d 623 (3d Cir. 2011).  Otherwise, any stock losses "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343.

In the loss causation section of the Complaint, Plaintiffs summarize the six purportedly "corrective events" that they claim revealed the "truth" for all of the challenged statements.  *See* ¶ 432.  These purportedly corrective events consist of:

- Disclosures related to the **completion timing and capacity** of the pipeline made on the August 9, 2018 earnings call and in two analyst reports on August 10, 2018, ¶ 432;

- Disclosures related to **safety** and geological issues that purportedly delayed the pipeline project made on October 27, 2018, *id.*; and

- Disclosures about purportedly **illegal conduct** to obtain permits on November 12, 2019, *id.*; and December 3, 2019, *id.*

However, as is explained below, Plaintiffs' efforts to plead loss causation based on these events have several flaws that render them inadequate as to Statements 2 through 12, 15 and 16, 21 through 24, 27 through 57.  Thus, Plaintiffs' claims regarding those Statements must be dismissed.

### 1. Plaintiffs' loss causation theories are replete with timing problems.

Plaintiffs' loss causation allegations are plagued by timing problems.

As discussed above, Statements 2 through 8, 9 through 12, and 21 through 24 were each superseded by subsequent statements—Statements 1, 13, and 25 respectively.[82]  Yet the only corrective disclosure that Plaintiffs identify for those earlier statements occurred months after the statement that supersedes them.  *See id.*; ¶ 432.  The superseding statements thus sever any causal link between the earlier statements and the alleged corrective disclosure, negating any inference

---

[82] *See supra* §§ IV.A.1.b, IV.A.1.c, IV.A.2.

of loss causation.  *See, e.g.*, *Katyle,*, 637 F.3d at 473 ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time[.]").

Plaintiffs contend that Statements 15 and 16 were false because, at the time these statements were made, Energy Transfer had purportedly not submitted HDD re-evaluation reports for nine other sites.  ¶¶ 361–63.  However, none of Plaintiffs' purported "corrective disclosures" are alleged to reveal this purportedly concealed fact.  *See* ¶ 432.  Instead, Plaintiffs suggest that the market learned of a "large number of still incomplete projects" in March 2020—months *after* the last purported corrective disclosure in December 2019.  *See* ¶¶ 328, 432.  Plaintiffs make no allegation regarding the reaction of Energy Transfer's stock price to this purported March 2020 news.  Accordingly, they have not alleged loss causation for Statements 15 and 16.

Statements 36 and 37 are aspirational statements about safety that were made in November and December 2018.  But Plaintiffs allege that the "truth" about safety issues was disclosed in October 2018.  *See* ¶¶ 411, 432.  Statements made after a loss could not have caused the loss.

Statements 27 through 37 and 42 through 44 were all allegedly corrected by an October 27, 2018 *Associated Press* article.  *See* ¶ 432.  But, as Plaintiffs concede, the *Associated Press* article did not break any new information, it was merely "re-publish[ing]" an article "initially written by the *Pittsburgh Post-Gazette*."  ¶ 410.  As Plaintiffs nowhere allege when the *Pittsburgh Post-Gazette* article was published or what the stock price reaction to this publication was "in the period immediately following [this unspecified] disclosure," they have not alleged loss causation. *Merck.*, 432 F.3d at 269.  Moreover, Plaintiffs do not allege how the *Pittsburgh Post-Gazette/Associate Press* revealed any previously-unknown facts concealed by the statements at

issue.[83]  Indeed, the article merely collects previous public disclosures, none of which Plaintiffs allege led to stock drops.[84]  Because "the sources used in the [article] were already public," Plaintiffs cannot allege loss causation.  *Meyer*, 710 F.3d at 1198; *Omnicom*, 597 F.3d at 512 ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").[85]

Finally, Statements 55 through 57 were made in late October and November 2018.  *See* Statements 55–57.  Plaintiffs do not allege that any of the purported corrective disclosures that occurred after these statements were made revealed any facts concealed by these statements.  Nor could they: The purported corrective disclosures that occurred after these statements were made have nothing to do with the subject of Statements 55 through 57.  *See* ¶ 432.  Accordingly, they are insufficient to allege loss causation as to these statements.  *DeLuca*, 433 F. Supp. 2d at 608.

---

[83] *See In re Tellium, Inc. Sec. Litig*, 2005 WL 2090254, at *4 (D.N.J. Aug 26, 2005) ("[L]oss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud."); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 608 (W.D. Pa. 2006) ("Because the previous misrepresentations about the fraudulent scheme were not disclosed in the press release, there could have been no proximate cause between revelation of the truth and the decline in the stock price.").

[84] *See* Ex. 13, Anya Litvak, *Unstable Ground*, PITTSBURGH POST-GAZETTE (Oct. 2018); Ex. 14, Anya Litvak & Laura Legere, *The Lessons of Mariner East 2*, PITTSBURGH POST-GAZETTE (Oct. 2018). For example, the very issues which Plaintiffs contend Statement 44 concealed from investors were specifically disclosed to investors *in the same article* in which Statement 44 was published.  *See* ¶ 395 (quoting a Lisa Drive resident in the same article stating that "his once quaint property has been turned upside down and plagued by sinkholes").

[85] Plaintiffs also allege that on October 29, 2018, "the Pennsylvania PADEP issued an Order and letter requiring ETC Northeast Pipeline to immediately cease construction of Energy Transfer's Revolution pipeline." ¶ 411. It is unclear whether Plaintiffs are alleging loss causation on this basis. *See, e.g.*, ¶ 432 (omitting mention of the Order and letter). But, if they are, this allegation fails because Plaintiffs do not allege when these facts became public. *In re China Valves Tech. Sec. Litig.*, 2012 WL 4039852, at *7, n.81 (S.D.N.Y. Sept. 12, 2012) (loss causation allegation fails where plaintiffs fail to allege publicity). Perhaps Plaintiffs declined to do so because the matter was disclosed in a news article published after the close of trading on October 30, 2018, and Energy Transfer's stock price rose on October 31, 2018. *See* Ex. 15, Reid Frazier, *DEP Orders ETP to Fix Revolution Pipeline Erosion Problems*, STATEIMPACT PENNSYLVANIA (Oct. 30, 2018); *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 162, n.5 (3rd Cir. 2004) (court may take judicial notice of an article's existence without accepting the truth of the statements contained therein).

### 2. Mere reports of an investigation are insufficient to plead loss causation for claims based on illegally obtaining permits.

Plaintiffs also fail to plead loss causation for Statements 38 through 41 and 45 through 47, which are about purportedly illegally obtained permits, because the only purported corrective disclosure on that issue are the press reports in November 2019 of an FBI investigation.[86] ¶ 432. Numerous courts have held that the mere announcement of an investigation cannot be used to allege loss causation because an investigation does not reveal underlying facts.[87]

### 3. Criminal charges relating to hiring constables were dismissed and thus cannot support loss causation.

Plaintiffs also fail to plead loss causation for Statements 48 through 54. Plaintiffs' allegations of falsity for those statements are based on their contention that Energy Transfer engaged in illegal conduct to hire constables,[88] which was purportedly revealed to the public when criminal charges were brought regarding this matter. *See* ¶ 432. But a complaint making "allegations of unproven misconduct . . . is not a corrective disclosure." *GNC Holdings*, 2017 WL 3974002, at *18. Moreover, now that the unproven charges have been dismissed as to the only Energy Transfer employee charged in connection with the matter, it is clear that there was no "truth" to Energy Transfer's alleged illegal conduct revealed by these events. *In re DVI*, 2010 WL 3522090, at *6 (to establish loss causation, corrective disclosure must reveal falsity of prior statements); *GNC Holdings*, 2017 WL 3974002, at *19 (similar).

---

[86] For the same reason, "Chester County D.A. Tom Hogan['s] announce[ment of an] *investigation* into Energy Transfer, which Plaintiffs date December 19-21, 2018, is not sufficient to correct any statements. *See* ¶ 432 ("Chester County D.A. Tom Hogan announces *investigation* into Energy Transfer" (emphasis added)).

[87] *See GNC Holdings*, 2017 WL 3974002, at *18–19 (a complaint alleging unproven misconduct was not a corrective disclosure that suffices to plead loss causation); *Meyer*, 710 F.3d at 1201 ("[T]he commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more.").

[88] *See supra* § IV.A.5.b.

### D.      Plaintiffs' § 20(a) claim fails.

Controlling person claims under § 20(a) require an underlying violation of § 10(b).  *Avaya,* 564 F.3d at 252 ("liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person").  As explained above, Plaintiffs fail to allege an underlying § 10(b) claim, so their § 20(a) claims must likewise be dismissed.

The § 20(a) claims against Hennigan and McGinn must be dismissed for the additional reason that Plaintiffs fail to adequately allege either that they were controlling persons, or that they culpably participated in any fraud.  The Third Circuit has held that "in order for secondary liability to attach under § 20(a), the defendant must have been a culpable participant in the act or acts constituting the violation or cause of action."  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (quotation marks omitted).  Although it has yet to rule on whether plaintiffs need plead culpable liability and with what particularity, *id.* at 485 n.20, courts in this district have required plaintiffs to plead both (1) control over a defendant against whom plaintiffs have sufficiently pleaded liability for an underlying violation of the Exchange Act; and (2) culpable participation in the fraud, which "necessarily requires actual or imputed knowledge of the fraud" *i.e.*, scienter.  *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 907 (E.D. Pa. 2018) (dismissing § 20(a) claims for failure to plead facts showing control).[89]  This Court should hold that culpable participation should be pled with particularity, but regardless, it is an element of 20(a) and thus even under Rule 8 pleading, conclusory allegations do not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained

---

[89] *See also In re CDNOW, Inc. Sec. Litig.,* 138 F. Supp. 2d 624, 644 (E.D. Pa. 2001) ("The heightened pleading standards of the PSLRA apply in so far as 'a plaintiff must plead the particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud.'"); *Gordon v. Diagnostek, Inc.*, 812 F. Supp. 57, 61 (E.D. Pa. 1993) (dismissing § 20(a) claim when "Plaintiffs fail to allege either that Medco held such power over Diagnostek or that it 'culpably participated' in Diagnostek's actions").

in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Here, Plaintiffs have not pled that either Hennigan or McGinn controlled Energy Transfer or any Speaking Defendant. With respect to Hennigan, all Plaintiffs allege is that he worked for Sunoco Logistics Partners until April 2017, when he took a position with Energy Transfer. ¶ 45. As of April 2017, Hennigan's position at Energy Transfer was President, Crude, Liquids and Refined Products, and thus clearly junior to all of the "C-suite" level Speaking Defendants, until his departure from Energy Transfer was announced a mere month later on May 30, 2017, to be effective June 16, 2017. *Id.* There are no facts alleged to suggest Hennigan could have controlled any Speaking Defendant or Energy Transfer in his two-month tenure there. *Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at *12 (E.D. Pa. Sept. 30, 2011) (alleging defendant was President of a "subsidiary is not, without more, sufficient to establish that he was in a position to control the parent company").[90]

Similarly, McGinn worked at Sunoco until taking a position at Energy Transfer in April 2017, at which point he too, as a Senior Director of Public Affairs (¶ 46), was junior to all Speaking Defendants. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007) (dismissing 20(a) claim when unclear how a Vice President could have controlled his peer VPs or his supervisors, or how he could have exercised control over the company). Indeed, contrary to Plaintiffs' misleading allegations elsewhere, ¶ 103, McGinn did not move into his position as a Vice President until May 2019, after all but two of the challenged statements were

---

[90] Even if Plaintiffs had sufficiently alleged a § 20(a) claim as to Hennigan, it could relate only to the two challenged statements made during the brief time he was employed by Energy Transfer. *See* ¶ 334 (May 4, 2017 statement by Long about pipeline beginning service in Q4 2017); ¶ 336 (May 31, 2017 statement at MLPA Investor Conference by unidentified "executives" about projects coming online in 2017).

made.  ¶¶ 46, ¶¶ 397–98 (statements in July and August 2019).  Regardless, McGinn was still junior to all of the Speaking Defendants at that time, and Plaintiffs allege no facts to show that McGinn gained any control over Energy Transfer as a result of that promotion.

With respect to culpable participation, Plaintiffs' allegations rely on McGinn and Hennigan's positions, which are insufficient.  The only facts alleged about McGinn's or Hennigan's conduct concern their participation in frequent communications with the PADEP in order to obtain the permits for Sunoco.  *See* ¶¶ 78–87, 94, 436–37.  These interactions do not show knowledge or participation in fraud, but instead show diligent efforts to work closely with PADEP to prepare a satisfactory permit application.[91]  Accordingly, Plaintiffs' § 20(a) claim must be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed in its entirety and with prejudice.  In the alternative, Defendants request that the Court dismiss from this action all statements and Defendants for which the Court concludes there is no actionable claim.

---

[91] *See supra* § IV.B.1.b.iii; *see also Steamfitters*, 2011 WL 4528385, at *11 ("Although Plaintiff pleads that Carroll knew or should have known of the practices that were allegedly fraudulently misrepresented to the public, pleading *knowledge* of the facts underlying the fraud, or even knowledge of the fraud itself, is simply not enough to establish culpable *participation* in the securities violation by an allegedly controlling person.").

Date: August 14, 2020                    Respectfully submitted,


                                         /s/ Marc J. Sonnenfeld
                                         _____

                                         Marc J. Sonnenfeld (No. 17210)
                                         Karen Pieslak Pohlmann (No. 60079)
                                         Laura H. McNally (No. 310658)
                                         Amanda F. Lashner (No. 314443)
                                         MORGAN, LEWIS & BOCKIUS LLP
                                         1701 Market Street
                                         Philadelphia, PA  19103-2921
                                         Telephone:  215.963.5000
                                         Facsimile:  215.963.5001
                                         marc.sonnenfeld@morganlewis.com
                                         karen.pohlmann@morganlewis.com
                                         laura.mcnally@morganlewis.com
                                         amanda.lashner@morganlewis.com

                                         Michael C. Holmes
                                         Jeffrey S. Johnston
                                         Craig E. Zieminski
                                         Robert Ritchie
                                         VINSON & ELKINS LLP
                                         2001 Ross Ave., Suite 3900
                                         Dallas, TX 75201
                                         Tel: (214) 220-7700
                                         Fax: (214) 999-7923
                                         mholmes@velaw.com
                                         jjohnston@velaw.com
                                         czieminski@velaw.com
                                         rritchie@velaw.com

                                         *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Marc J. Sonnenfeld, hereby certify that on August 14, 2020, true copies of the foregoing Motion to Dismiss, supporting Memorandum of Law, and accompanying Exhibits were served on all counsel of record via the Court's ECF system.

<u>*/s/ Marc J. Sonnenfeld*</u>
Marc J. Sonnenfeld