## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-00200-GAM |
| Plaintiffs, | |
| v. | |
| ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, THOMAS E. LONG, MARSHALL MCCREA, MATTHEW S. RAMSEY, MICHAEL J. HENNIGAN, and JOSEPH MCGINN, | |
| Defendants. | |

## LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE OPERATIVE CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iv

ABBREVIATIONS AND REFERENCES ........................................................................... xii

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF THE FRAUD ....................................................................................2

       A.      Defendants' False Statements Regarding the
           Pipeline Projects' Construction Completion, Throughput,
           and the Partnership's Safety Priority ...................................................................6

              1.      ME2 Pipeline's Undisclosed Deficient
                     Planning and Construction Caused Hundreds
                     of Environmental and Permit Violations, Significant
                     Delays, and 65% Less Throughput than Defendants
                     Promised .........................................................................................8

                     a.      ME2's Problems Across Pennsylvania Destroyed
                              Waterways and Caused Large Sinkholes, Frac-outs,
                              Significant Delays and Safety Violations ...............................8

                     b.      ME2's Massive Problems in Chester County Force Energy
                              Transfer to Cobble Together a "Frankenpipe"
                              with 65% Less Throughput than Promised ...........................12

              2.      Energy Transfer's Undisclosed Deficient Planning and
                     Construction of the Revolution Pipeline Results in an
                     Explosion and Safety Issues So Severe that the Pipeline
                     Could Not Be Completed..................................................................15

                       a.      Planning and Construction Issues on the Revolution Pipeline ...........16

                     b.      The Revolution Explosion and Its Aftermath ......................................18

       B.      Defendants' False Statements Regarding its Code of Conduct ...........................22

              1.      Code Violations Pertaining to ME2's Permitting Process.........................23

              2.      Code Violations Pertaining to Energy Transfer's
                     "Unwritten Policy," its Hiring of Pennsylvania Constables,
                     and its Concealed Payments.......................................................................23

i

III.    ARGUMENT ...........................................................................................26

    A.    The Complaint Sufficiently Pleads the Falsity of
        Defendants' Misstatements and Omissions Regarding
        the Pipeline Projects........................................................................27

        1.    Defendants Concealed That Successful
            Completion of ME2 and Revolution Was
            Impossible from the Beginning of the Class Period ..................29

        2.    Defendants Concealed Extensive Other Evidence During the
            Class Period Reinforcing That Successful Completion of ME2
            and Revolution Was Impossible .................................................32

        3.    Courts Have Upheld Similar Allegations ..................................37

        4.    Defendants' Challenges to Allegations of Material Falsity Fail...............40

            a.    The Challenged Statements Are Not Inactionable Opinions .........41

            b.    Defendants' Statements Are Not Protected
                 Forward-Looking Statements...........................................43

            c.    Defendants' Misstatements and Omissions Were Material..........45

            d.    Plaintiffs' Allegations Do Not Rely on
                 Inactionable Corporate Mismanagement ......................47

    B.    Defendants' Statements Regarding Safety and Legal
        Compliance Are Actionable.............................................................48

        1.    Statements Touting Purported Commitments to
            Safety and Compliance Are Actionable....................................49

        2.    Misrepresentations and Omissions Relating to
            Permitting Process Are Actionable ...........................................52

        3.    Statements Relating to Compliance with DEP
            Permit Requirements Are Actionable ........................................56

        4.    Statements Regarding Purported Commitments
            to Homeowners Are Actionable................................................58

        5.    Energy Transfer's Disclaimers Relating to Safety
            Risks Do Not Shield Defendants from Liability.........................63

C.     Energy Transfer's Statements Regarding Its Code of
Conduct and the Chester County DA's Prosecution Are Actionable ....................64

    1.    Energy Transfer's Use of Pennsylvania Constables
to Intimidate Concerned Citizens Violated Its Code
of Conduct ...................................................................................64

    2.    Defendants' Statements in Response to the Chester
County DA's Investigation Are Actionable ...............................73

D.     Defendants' Motion Ignores the Principles for Construing
the Scienter Allegations of the Complaint ............................................75

    1.    The Complaint Properly Pleads Scienter Against the
Individual Defendants and the Company.....................................75

    2.    Communications with Investors, Analysts and
the Media Further Support Scienter ...........................................82

    3.    Serious Regulatory and Construction Issues and
Other Red Flags, Including Alleged Criminal Violations,
Also Support Scienter .................................................................83

    4.    The Magnitude and Importance of the Pipeline Projects
Invokes the Core Operation Doctrine and
Strengthens the Scienter Allegations .........................................84

E.     The Complaint Adequately Pleads Loss Causation ...............................87

    1.    The Complaint Pleads Investor Losses that
Proximately Resulted from the Correction of
Defendants' Alleged False or Misleading Statements ...............88

    2.    Defendants' Arguments Should Be Rejected ............................89

F.     Plaintiffs Adequately Plead Control Person Claims ...........................100

IV.    CONCLUSION...................................................................................103

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008)..................................................................101, 102

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004)......................................................................................................45

*In re Advance Auto Parts, Inc. Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020) ................................................................................72

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)......................................................................................................51

*AES v. Dow Chem. Co.*,
   2001 WL 34367296 (D. Del. Jan. 19, 2001)...........................................................................46

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) ..................................................................................48, 85

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010)......................................................................................................51

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   2019 WL 3562134 (D.N.J. Aug. 6, 2019) ........................................................................98, 99

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014).........................................................................96

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................................27

*Audet v. Fraser*,
   2017 WL 4542386 (D. Conn. Oct. 11, 2017) ...............................................................100, 102

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................................................61

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................................27

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013)....................................................................................................102

*Bing Li v. Aeterna Zentaris, Inc.*,
    2016 WL 827256 (D.N.J. Mar. 2, 2016) .............................................................102

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) ......................................................................27

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................57

*In re Bradley Pharms., Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) .........................................................87, 88, 98

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................................75

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012) .................................................................58

*In re CenturyLink Sales Practices and Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019) ............................................................70, 71

*City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. California
    v. Toll Bros., Inc.*,
    2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) .......................................................43

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ............................................................................60

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009) ...................................................................72

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2010) ...................................................................76

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2020 WL 3026564 (D.N.J. June 5, 2020) ..................................................... passim

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) .................................................................64

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) .................................................................73

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................87, 88

*In re DVI, Inc. Sec. Litig.*,
    2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) .....................................................87, 98

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
　　553 F.3d 187 (2d Cir. 2009)................................................................................52

*In re Electrobras Sec. Litig.*,
　　245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................ 70, 71-72

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
　　905 F.3d 892 (5th Cir. 2018) ...........................................................................52

*In re Enzymotec Sec. Litig.*,
　　2015 WL 8784065 (D.N.J. Dec. 15, 2015) .......................................................27

*EP Medsys., Inc. v. EchoCath, Inc.*,
　　235 F.3d 865 (3d Cir. 2000)...............................................................................88

*In re Equifax Inc. Sec. Litig.*,
　　357 F. Supp. 3d 1189 (N.D. Ga. 2019) ...............................................................58

*Fan v. StoneMor Partners LP*,
　　927 F.3d 710 (3d Cir. 2019).............................................................................45

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
　　2015 WL 6039690 (D. Del. Oct. 15, 2015) .......................................................62

*Frank v. Dana Corp.*,
　　646 F.3d 954 (6th Cir. 2011) ...........................................................................83

*Freudenberg v. E*Trade Fin. Corp.*,
　　712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................91

*Galati v. Commerce Bancorp, Inc.*,
　　220 F. App'x 97 (3d Cir. 2007) .......................................................................52

*Ganino v. Citizens Utils. Co.*,
　　228 F.3d 154 (2d Cir. 2000).............................................................................96

*Gargiulo v. Isolagen, Inc.*,
　　527 F. Supp. 2d 384 (E.D. Pa. 2007) ............................................44, 79, 81, 88

*In re Gentiva Sec. Litig.*,
　　932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...........................................................84, 98

*Grimm v. Crane Room Grille, Inc.*,
　　2019 WL 2996990 (W.D. Pa. July 9, 2019) .......................................................27

*Hall v. Johnson & Johnson*,
　　2019 WL 7207491 (D.N.J. Dec. 27, 2019).................................................48, 86

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)..............................................................................64

*Hayes v. Gross*,
   982 F.2d 104 (3d Cir. 1992)...............................................................................47

*In re Hertz Global Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018)...............................................................................76

*Holwill v. AbbVie Inc.*,
   2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ............................................55, 70, 72

*Hoxworth v. Blinder, Robinson & Co. Inc.*,
   903 F. 2d 186 (3d Cir. 1990)..............................................................................70

*Hull v. Global Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017) .........................................................198

*Inst. Inv'rs Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..........................................................................26, 75

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) .............................................................79, 81, 88

*Kasper v. AAC Holdings, Inc.*,
   2017 WL 6353294 (M.D. Tenn. Oct. 6, 2017) ....................................................80

*Katz v. Image Innovations Holdings, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008).................................................................102

*Kline v. First W. Gov't Sec., Inc.*,
   24 F.3d 480 (3d Cir. 1994)......................................................................28, 33, 34

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006).................................................................72

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) .............................................................................99

*Martin v. GNC Holdings, Inc.*,
   2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
   *aff'd*, 757 F. App'x 151 (3d Cir. 2018)................................................................99

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D.W. Va. 2012).....................................................49, 50, 63

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..................................................................................26, 54, 61

*McCabe v. Ernst & Young, LLP.*,
  494 F.3d 418 (3d Cir. 2007)........................................................................87

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990).........................................................................63

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..................................................88, 91

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...............................................................99, 103

*In re MGM Mirage Sec. Litig.*,
  2013 WL 5435832 (D. Nev. Sept. 26, 2013) ........................................... passim

*Miller v. Material Sciences Corp.*,
  9 F. Supp. 2d 925 (N.D. Ill. 1998) ..............................................................83

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)........................................................70, 72

*Okla. Firefighters Pension and Ret. Sys. v. Lexmark, Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)............................................................74

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) .....................................................................76, 77

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................... passim

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)..........................................................................96

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001) ..............................................................83

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006)...........................................................97

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)...........................................................72

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline L.P.*,
  777 F. App'x 726 (5th Cir. 2019) .................................................................72

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009)...........................................................98

*In re PTC Therapeutics, Inc. Sec. Litig.*,
　2017 WL 3705801 (D.N.J. Aug. 28, 2017) ....................................................82, 83

*Rahman v. Kid Brands, Inc*,
　736 F.3d 237 (3d Cir. 2013).........................................................................76, 83

*Reese v. BP Exploration*,
　643 F.3d 681 (9th Cir. 2011) .......................................................................57, 58

*Retail Wholesale & Dep't. Store Union Local 338 Ret. Fund v. Hewlett-Packard
Co.*,
　845 F.3d 1268 (9th Cir. 2017) ...........................................................................72

*Richman v. Goldman Sachs Grp., Inc.*,
　868 F. Supp. 2d 261 (S.D.N.Y. 2012)................................................................54

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004)...............................................................................63

*Roofer's Pension Fund v. Papa*,
　2018 WL 3601229 (D.N.J. July 27, 2018)....................................................37, 96

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
　380 F. Supp. 2d 509 (D.N.J. 2005) ...................................................................100

*In re Sanofi-Aventis Sec. Litig.*,
　774 F. Supp. 2d 549 (S.D.N.Y. 2011)................................................................80

*Sapssov v. Health Mgmt. Assocs., Inc.*,
　22 F. Supp. 3d 1210 (M.D. Fla. 2014), *aff'd*, 608 F. App'x 855 (11th Cir.
　2015) ..................................................................................................................99

*In re SCANA Corp. Sec. Litig.*,
　2019 WL 1427443 (D.S.C. Mar. 29, 2019) ............................................... passim

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
　351 F. Supp. 3d 874 (E.D. Pa. 2018) .................................................................37

*Semerenko v. Cendant Corp.*,
　223 F.3d 165 (3d Cir. 2000)........................................................................44, 87

*Shapiro v. UJB Fin. Corp.*,
　964 F.2d 272 (3d Cir. 1992)................................................................48, 61, 72

*In re Signet Jewelers Ltd. Sec. Litig.*,
　2018 WL 6167889 (S.D.N.Y. 2018)...................................................................70

*In re Signet Jewelers Ltd. Sec. Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019)......................................................................71

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) .................................................................................75

*Strougo v. Lannett Co., Inc.*,
   2019 WL 1172992 (E.D. Pa. Mar. 13, 2019).........................................................26

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)............................................................................26, 27

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................98

*Takiguchi v. MRI Int'l, Inc.*,
   47 F. Supp. 3d 1100 (D. Nev. 2014) .....................................................................62

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................................26, 75

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ..............................................................86

*In re Tyson Foods, Inc. Sec. Litig.*,
   155 F. App'x 53 (3d Cir. 2005) .............................................................................76

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................ passim

*Utesch v. Lannett Co., Inc.*,
   385 F. Supp. 3d 408 (E.D. Pa. 2019) ...............................................328, 87, 98, 99

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
   2017 WL 1658822 (D.N.J. Apr. 28, 2017) ............................................................41

*In re ValuJet, Inc. Sec. Litig.*,
   984 F. Supp. 1472 (N.D. Ga. 1997) ......................................................................58

*Vanderhoef v. China Auto Logistics Inc.*,
   2020 WL 5105243 (D.N.J. Aug. 31, 2020) .....................................................87, 91

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997)..................................................................................61

*West Palm Beach Police Pension Fund v. DFC Global Corp.*,
   2015 WL 3755218 (E.D. Pa. June 16, 2015) ............................................43, 46, 86

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).............................................................................64

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)...........................................................................28

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014)......................................................88, 89, 91

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
    2020 WL 3169506 (D.N.J. June 12, 2020) ......................................................98

**STATUTES AND RULES**

17 C.F.R. § 240.10b-5(b) ........................................................................................57

## ABBREVIATIONS AND REFERENCES

**The Parties and Complaint:**

| | |
|---|---|
| Lead Plaintiffs | Allegheny County Employees' Retirement System, Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge, Denver Employees Retirement Plan, IAM National Pension Fund, and Iowa Public Employees' Retirement System |
| Energy Transfer or the Partnership | Energy Transfer LP |
| Individual Defendants | Kelcy L. Warren (Warren), John W. McReynolds (McReynolds), Thomas E. Long (Long), Marshall McCrea (McCrea), Matthew S. Ramsey (Ramsey), Michael J. Hennigan (Hennigan), and Joseph McGinn (McGinn) |
| Speaking Defendants | Warren, McReynolds, Long, McCrea, and Ramsey |
| Complaint | Operative Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 43) (paragraphs cited as ¶ __) |
| Class Period | February 25, 2017 to December 2, 2019, inclusive |

**Defendants' Motion to Dismiss Filings:**

| | |
|---|---|
| Def. Br. | Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 44-2) |
| Def. App. A | Defendants' Appendix A (ECF No. 44-3) "Statements" means the Alleged Misrepresentations in Def. App. A |
| Def. Exh. __ | Exhibits 1 – 15 to Def. Br. (ECF Nos. 44-4 through 44-18) |
| Golan Decl. | Declaration of Jeffrey W. Golan in Support of Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Operative Class Action Complaint for Violation of the Federal Securities Laws, filed October 5, 2020, with Plaintiffs' Exhibit (Pl. Ex. __) |

**Pipeline Projects:**

| | |
|---|---|
| ME1 | Mariner East 1 |
| ME2 | Mariner East 2 |
| ME2X | Mariner East 2X |

| | |
|---|---|
| Mariner East System | ME1, ME2 and ME2X |
| Revolution | Revolution Pipeline |
| Pipeline Projects | Revolution, ME2 and ME2X |

**Regulatory and Investigatory Entities:**

| | |
|---|---|
| DEP | Pennsylvania Department of Environmental Protection |
| EHB | Environmental Hearing Board |
| FBI | Federal Bureau of Investigation |
| PUC | Pennsylvania Public Utility Commission |
| PHMSA | U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration |
| SEC | U.S. Securities and Exchange Commission |
| Exchange Act | Securities Exchange Act of 1934 |

**Other Energy Transfer References:**

| | |
|---|---|
| Code or Code of Conduct | Energy Transfer's Code of Business Conduct and Ethics |
| Code of Ethics | Energy Transfer's Code of Ethics for Senior Financial Officers |
| Sunoco | Sunoco Logistics Partners LP |
| Energy Transfer Companies | Energy Transfer and Sunoco |

**Energy Transfer Customers:**

| | |
|---|---|
| EdgeMarc | EdgeMarc Energy Holdings, LLC |
| PennEnergy | PennEnergy Resources, LLC |

**Other:**

| | |
|---|---|
| bls/d | barrels per day |
| HDD | Horizontal Directional Drilling |
| LOC | loss of circulation |

NYSE                        New York Stock Exchange

NGLs                        Natural gas liquids (compressed ethane, butane, and propane)

Lead Plaintiffs hereby respectfully oppose Energy Transfer's and the Individual Defendants' motion to dismiss the Complaint.

## I.      INTRODUCTION

This securities class action concerns Energy Transfer's scheme to construct some of the most dangerous pipelines in the United States – the Revolution, ME2 and ME2X (the Pipeline Projects) – while hiding from investors the Partnership's repeated violations of critical rules and regulations designed to ensure the pipelines' safety and guarantee that citizens' best interests are promoted by public officials.  ¶ 3.  Energy Transfer pressured Pennsylvania officials to grant the permits for the ME2 projects (despite their woefully inadequate applications), risked Pennsylvania citizens' lives and destroyed neighborhoods through reckless construction of the Pipeline Projects, and hired State constables as paid security to intimidate residents along the Pipeline Projects' route, paying them through a web of veiled payments to hide their employment by Energy Transfer.

To conceal the scheme, and its serious risks to Energy Transfer's business, during the Class Period, Defendants made a series of materially false or misleading statements and omissions to investors.  The misstatements and omissions concerned: (i) ME2 and Revolution's supposed completion status and timelines, and ME2's claimed initial throughput; (ii) Energy Transfer's purported commitment to safety and responsible planning and construction practices; and (iii) Energy Transfer's purported compliance with its own Code of Conduct and Code of Ethics, which expressly prohibited improper payments to government officials.  ¶ 331.

Consistent with express, undisclosed warnings from the Partnership's own hired consultants, Energy Transfer experienced significant obstacles constructing the Pipeline Projects; thus, Defendants' claimed completion dates and throughputs were unachievable and materially misleading when issued.  ¶¶ 3, 332-365.  Indeed, Energy Transfer knowingly disregarded the risk of drilling in Pennsylvania's mine-riddled and limestone-filled geology.  The safety risks created

by the Partnership's approach to planning, seeking permits for, and constructing the Pipeline Projects have materialized. Most spectacularly, in September 2018, the Revolution pipeline exploded in a "geyser" of fire, incinerating its surroundings and displacing families. ¶¶ 4, 210, 243-248. But problems from construction of the Pipeline Projects were far from isolated. During the Class Period, ME2's drilling destroyed lakes, caused numerous sinkholes that ruined neighborhoods, and caused hundreds of "frac-outs" – where drilling fluids leaked out and threatened private property and water sources. These rampant problems, many of which Energy Transfer failed to report to investors, abutting landowners or regulatory entities, led to harsh regulatory scrutiny, nearly 100 Notices of Violations, Consent Orders, tens of millions of dollars in fines and penalties, and added delay and costs. ¶¶ 4, 278-330.

When the truth about the Defendants' false statements were disclosed to the investing public, the prices of Energy Transfer's common units fell sharply, causing significant financial harm to Lead Plaintiffs and the other Energy Transfer investors they represent. ¶¶ 400-432.

## II.    SUMMARY OF THE FRAUD

Energy Transfer designed the Pipeline Projects to carry large amounts of NGLs – highly explosive, odorless and colorless gasses – from the Marcellus shale gas fields in western Pennsylvania to the Marcus Hook port, for export overseas. ¶ 7. The challenging geology of Pennsylvania necessitated a careful plan to mitigate the serious, life-threatening risks posed by the Pipeline Projects' construction, including the use of HDD to drill under or through challenging geological or high-density residential areas. ¶ 8. Employing HDD through large swaths of Pennsylvania's sub-surface rock formations, including underneath lakes and reservoirs, required understanding Pennsylvania's geology to prevent catastrophes, such as sinkholes or water contamination. ¶ 12. Even though Pennsylvania's geology is well-known for its varying rock and soil formations that are prone to sinkholes and other disasters (¶ 11) and that the co-location of

ME2 and ME2X pipelines alongside ME 1 increased these substantial risks (¶¶ 51-53, 55, 59), Energy Transfer failed to perform adequate safety planning.  Energy Transfer's failure to consider these risks caused construction of the Pipeline Projects to be unsafe and to take longer to complete in compliance with the law than what Defendants told investors.  ¶ 10.  Thus, once Energy Transfer began constructing the Pipeline Projects, it ran into serious delays caused by landslides, sinkholes and frac-outs that prevented Energy Transfer from completing the Pipeline Projects on time and with the claimed initial throughput.  ¶¶ 11, 12, 16, 127, 170, 332-365.

When Energy Transfer and Sunoco first applied to the DEP for the permits to construct ME2, as John Quigley, the then-DEP Secretary, told Lead Plaintiffs' Counsel, Sunoco "wasn't even close to submitting a complete application."  ¶ 9.  At a March 2016 meeting, Quigley told Defendant Hennigan that Sunoco's application was "woefully inadequate." ¶ 9.  Shortly thereafter, in May 2016, Quigley was terminated as DEP Secretary.  ¶ 13.[1]  Subsequently, Quigley learned that "despite continuing deficiencies, the governor's office ordered my successor to issue the permit, and he capitulated."  ¶ 13; *see also* ¶ 92 (summarizing DEP deficiency letters issued on September 6, 2016, which outlined hundreds of substantive problems with the permit applications for ME2).  There is compelling support for Quigley's conclusions.

*First*, leading up to the DEP's approval of the ME2 permits on February 13, 2017, Defendants Hennigan and McGinn, DEP Secretary Patrick McDonnell, and Governor Wolf's special assistant Yesenia Bane had private communications, in which the Wolf administration pressured the DEP to award the permits by mid-February (¶¶ 102-115), which included:

> A December 15, 2016 meeting between McDonnell, Hennigan and McGinn (with Bane listed as the contact) that apparently resulted in Energy Transfer and Sunoco discontinuing

---

[1]  Defendants assert that Quigley "resigned" as DEP Secretary for a reason other than his opposition to the deficient ME2 application (Def. Br. at 41 n.69), a factual issue that may not be determined on a motion to dismiss, where well-pleaded facts in the Complaint must be accepted as true and reasonable inferences must be drawn in Plaintiffs' favor.  *See* page 30 below and ¶¶ 78, 82, 83.

work on the applications and instead starting to mobilize the work itself.  ¶ 103;

Bane's January 25, 2017 request that McDonnell <u>not send deficiency letters to Sunoco</u> before Bane and McDonnell updated the Governor and his Chief of Staff, with McDonnell responding: "***Understood***.  I really want to talk thru the permitting office too." ¶ 106;

The January 30, 2017 internal meeting of DEP officials in charge of approving the permits when a high ranking DEP official told staff to "<u>keep emails to a minimum</u>" and that "<u>if something can be handled by phone[,] do so</u>" due to "sensitivity" around ME2.  ¶ 108;

Bane's February 1, 2017 request for further updates from McDonnell, citing pressure from Defendant McGinn: "<u>Where are we? McGinn is asking for a call</u>."  Bane also asked for a list of the deficiency items that would be sent to Sunoco, and asked McDonnell: "<u>Are there any items that can remain flexible for field adjustments</u>?" ¶ 110.[2]

These communications highlight the Wolf administration's active role in the permitting process, as it pressured the DEP to grant the permits on a specific timeline, communicated directly with Energy Transfer representatives, and responded to pressure from Energy Transfer to force approval of its applications.  As a result, the DEP approved the permits on the schedule demanded by the Wolf administration.  As *The Guardian* reported, "[e]mails, text messages and regulatory records show that [McDonnell] directed staff to cut short their environmental review even as numerous shortcomings remained in the project's permit application" and the DEP "appeared to be under pressure from Wolf's office at the time." ¶ 120.

***Second***, the DEP's staff had drafted a 70-page deficiency letter that was never sent to enable issuance of the permits according to the Wolf administration's schedule, before Energy Transfer's release of its 2016 year-end results.  ¶ 87.  *The Guardian* reported that after Bane texted Secretary McDonnell directing him to not release a deficiency letter to Sunoco without sending it

---

[2]  These texts expose the Governor's office's role in the permitting process at a level going "<u>way beyond</u>" merely staying abreast of developments.  ¶ 112.  Causing further suspicion, Bane's husband, John Bane, worked as a lobbyist for oil and gas companies, including a company that Energy Transfer agreed to acquire in late 2015.  He later became the president of EQT, which had business dealings with Energy Transfer relating to the Pipeline Projects.  *See generally* ¶¶ 102, 114, 122, 123.  Nevertheless, even after some of this became public, Yesenia Bane remained the Wolf administration's point person for the DEP and Energy Transfer Companies with respect to the ME2 project.

to the Governor's office first, McDonnell wrote to the DEP staff responsible for the pipeline review: "Govs office needs a list of the outstanding issues ASAP." ¶ 121.  The article explained:

> A DEP senior official who was involved in the Mariner East 2 project, John Stefanko, noted in a later legal deposition that <u>McDonnell had directed staff "that we needed to make a decision by February 10th," although the review had been scheduled to persist for at least several additional months</u>.  ¶ 122.

***Third***, rather than require that the permit applications address hundreds of serious known deficiencies ***prior*** to approving them, the DEP granted the permits subject to certain "special conditions," conforming to Bane's suggestion that remaining items could "remain flexible for field adjustments" (¶ 110).  The "special conditions" contained lists of terms and construction methods the Energy Transfer Companies had to agree to abide by throughout their construction of ME2.  ¶ 118.  However, failing to clear the deficiencies before issuing the permits violated The Clean Streams Law, 25 PA Code § 102, which states that an application is not complete "until the necessary information and requirements under The Clean Streams Law (35 P.S. §§ 691.1—691.1001) and [Chapter 102] <u>have been satisfied</u> by the applicant." ¶ 96; *see also* ¶ 97.  Approving the permits to allow construction to move forward based on "special conditions" was unprecedented.  A former DEP official who spoke to *StateImpact* explained that he "had never known a situation where permits were issued despite the existence of deficiencies."  The official further explained that "<u>the permits were issued because of pressure from Gov. Tom Wolf's office to approve the documents in time to allow Sunoco to meet its construction schedule</u>." ¶ 119.

And ***fourth***, the FBI is undertaking a corruption investigation into the issuance of the ME2 permits.  As the *AP* reported on November 12, 2019, FBI agents interviewed current and former state employees about Mariner East and the permits, focusing their questions on the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return.  ¶ 25.  In

response to that disclosure, the price of Energy Transfer units fell by 2.6% on the first day of the *AP* report and an additional 4.3% the next.  ¶¶ 425, 432.

A.     **Defendants' False Statements Regarding the Pipeline Projects' Construction Completion, Throughput, and the Partnership's Safety Priority**

ME2's planned route cut across approximately 350 miles, 17 Pennsylvania counties, 570 wetlands, 1,200 streams, and 2,700 properties.  ¶ 72.  To gain permit approval, the Partnership needed to explain how it would avoid polluting those water crossings.  Energy Transfer planned to conduct much of the pipeline construction using HDD, a method to lay the pipeline by drilling an underground channel for the pipe, instead of digging trenches through the ground's surface.  ¶ 75 & n.3.  But, when drilling through porous stone like limestone, HDD's pressurized drilling fluids create a risk of seeping through the ground, rising to the surface or contaminating underground water supplies, known as an "inadvertent return" or a "frac-out."  ¶ 76.

After the DEP granted the ME2 construction permits, Energy Transfer repeatedly told investors that the Revolution and ME2 pipelines were on track to be completed by specific deadlines with a throughput of 275,000 to 450,000 bls/d.  ¶ 15.  For example:

- On May 4, 2017, Defendant Long stated that "Our Revolution project is <u>still on schedule to be in service in the fourth quarter of 2017</u>";

- On November 7, 2017, Long claimed that mainline construction of the ME2 pipeline "will be 99% in the ground and buried by the end of this year" and that ME2 would enter service <u>in the second quarter of 2018</u>;

- On February 22, 2018, Long stated that Revolution would go into full service once the ME2 and Rover pipelines were in service; Defendant McCrea added that "<u>sometime in the second quarter [of 2018], we'll have Mariner on and ready to take barrels from Revolution</u>"; and Long also stated "we continue to target placing ME2 into service <u>by the end of the second quarter of 2018</u>;

- On May 10, 2018, Defendant Ramsey stated that ME2 would enter service in "<u>mid to late</u>" third quarter 2018; and

- During investor presentations from May 31, 2017 through August 14, 2018,

Energy Transfer representatives touted ME2's <u>"initial capacity" as being 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day</u>.

Defendants similarly claimed that the Energy Transfer Companies were constructing the Pipeline Projects safely and responsibly. ¶ 17. For instance:

- On November 8, 2017, Long assured investors that Energy Transfer was "<u>very focused on safely and responsibly bringing our projects into service</u>, including . . . the Mariner East [projects]";

- On February 22, 2018, Long reiterated that Energy Transfer "remain[s] committed to working closely with … PA DEP and other regulatory agencies and are focused on <u>safely and responsibly</u> bringing Phase 2 of … ME2 … into service"; and

- On January 26, 2018, Sunoco spokesperson Jeff Shields said that Sunoco goes "above and beyond" state and federal safety regulations, and is building the pipeline under "stringent" environmental regulations.

Defendants' completion, throughput and safety claims were material to investors, as the in-service dates and throughput of the pipelines would determine when Energy Transfer could reduce its billions of dollars in capital spending for pipeline construction,[3] begin transporting NGLs through the pipelines, and at what throughputs. ¶ 16. In truth, as a result of its deficient planning, repeated regulatory violations and other undisclosed construction mishaps, Energy Transfer's ability to reach those deadlines and claimed throughput levels was impossible at the time those claims were made. *Id.* Indeed, Energy Transfer's construction of the Pipeline Projects caused hundreds of safety violations, including the explosion of the Revolution pipeline. ¶ 18. Today, the Revolution pipeline is still not in service, the ME2 pipeline remains under construction, and only parts of ME2 are in-service at a reduced throughput of approximately 100,000 barrels per

---

[3] Energy Transfer initially said that ME2 would require nearly $3 billion in capital expenditures, but by August 2018, an analyst was estimating that the cost had increased to over $6 billion. ¶ 406. Thereafter, the Partnership stated that the Pipeline Projects accounted for most of the $1 billion CapEx budget in the third quarter 2018, and that they were the largest component in the $5 billion budget for 2018. ¶ 452.

day, achieved by combining sections of the planned 20-inch ME2 pipe with a nearly 100-year old 12-inch pipeline.  ¶¶ 16, 168-181, 210-277, 327-330.

> **1.     ME2's Undisclosed Deficient Planning and Construction Caused Hundreds of Environmental and Permit Violations, Significant Delays, and 65% Less Throughput than Defendants Promised**

Energy Transfer's construction of the ME2 pipeline resulted in hundreds of DEP and PUC violations, landslides, sinkholes, LOCs (losses of circulation) and frac-outs.  The DEP issued at least 36 notices of violation in connection with the Pipeline Projects' construction activities in 2017, and 55 more notices in 2018.  ¶ 128.

> **a.  ME2's Problems Across Pennsylvania Destroyed Waterways and Caused Large Sinkholes, Frac-outs, Significant Delays and Safety Violations**

From the outset, Energy Transfer's widespread misconduct caused significant delay in the construction of the ME2 pipeline across Pennsylvania.  ¶¶ 278-325.  Between April 25, 2017 and June 17, 2017, Sunoco's drilling resulted in at least 61 frac-outs.  ¶ 317; *see also* ¶¶ 128 (Delaware County), 133 (Washington County).  In its initial report to the DEP concerning the Washington County frac-outs, Energy Transfer claimed the spills were likely related to conditions related to "historic deep underground coal mining in the area," a condition of which the Partnership should have been aware <u>before</u> conducting HDD operations.  Tetra Tech, an Energy Transfer consultant, determined the risk of further spills <u>was inherent to drilling in that spot</u>.  ¶ 133.[4]

---

[4] On July 25, 2017, in a proceeding initiated by three environmental groups, the EHB issued an order in favor of the Environmental Advocates, and temporarily enjoined Sunoco from conducting HDD operations at 55 different work sites across Pennsylvania.  After hearing extensive argument over the dangers HDD poses to Commonwealth residents, ***and the lack of diligence Sunoco conducted prior to receiving its HDD permits***, Judge Labuskes suspended the permits to the extent they authorized Energy Transfer to conduct HDD.  ¶ 134.  On August 10, 2017, Sunoco entered into a Stipulated Order (the "August 2017 Order"), in which it agreed to perform "re-evaluations" of the safety of constructing HDD operations at 41 different work sites, plus an additional 22 HDD sites ***at which Sunoco had already caused a frac-out to occur*** during the installation of ME2 and ME2X, and to perform re-evaluations at any site where a frac-out might occur in the future.  ¶¶ 138-140.  After re-evaluating the 63 HDD Re-evaluation Sites, Sunoco submitted reassessments for 27 of them, all of which were originally designated as "low risk" sites, and resulted in

In July 2017, Energy Transfer's construction in the vicinity of the "Shoen Road Drill Area" in West Whiteland Township, Chester County caused water pressure depletion and water supply pollution damage for 14 homeowners. ¶ 279. Two weeks later, Energy Transfer, through Sunoco, entered into a Consent Order and Agreement with the DEP, in which the DEP found that the construction activities had adversely impacted the well water of all 14 homeowners, that Sunoco had failed to notify the DEP of this as required by Sunoco's permit, and that Sunoco's pollution of these water supplies constituted violations of Pennsylvania environmental laws. ¶ 280.

ME2 construction, which utilized HDD, also caused significant damage to the Loyalhanna Lake, in Westmoreland County, and to the Raystown Lake in Huntingdon County. On May 13, 2017, Sunoco caused a frac-out under Loyalhanna Lake, with eight more over the next two months. ¶¶ 282, 284. The Westmoreland County Conservation District ("WCCD") determined on June 1, 2017, that Sunoco had failed to implement effective Best Management Practices ("BMPs"), in violation of Pennsylvania law and Sunoco's Chapter 102 Permit. ¶ 283.

The WCCD conducted follow-up inspections in July and September 2017, finding both times that Sunoco again had failed to maintain effective BMPs, violating Pennsylvania law and its permits, and that it had failed to clean the polluted water in Loyalhanna Lake. ¶¶ 285-286. On December 15, 2017, the DEP fined Energy Transfer $79,000 for repeated violations in connection with its HDD activities at Loyalhanna Lake, and found Sunoco "fail[ed] on each occasion to take necessary measures to prevent pollutants from reaching waters of the Commonwealth." ¶ 287.

---

entirely contrary conclusions for many of these sites. When Sunoco first submitted its site evaluations to the DEP in September 2016, Sunoco labeled 11 of the 143 HDD sites as "medium" risk of a frac-out, with none having a "high" risk. Later, many of the 27 reassessed sites were designated as posing "a high risk" or "an increased risk," or as "susceptible to the inadvertent return of drilling fluids." And nearly all the reassessed waterway crossings required a redesign and new DEP approvals. ¶ 143. But Sunoco's new designs were still not effective at preventing frac-outs. Since November 2018, Sunoco has caused at least 10 frac-outs at the reassessed sites alone, including one site where a 30,000-gallon spill of Drilling Pollutants reached a wetland in Berks County. ¶ 143 & n.8.

Energy Transfer's HDD activities similarly impacted Raystown Lake in Huntington County. On December 11, 2017, Sunoco reported an LOC of approximately 2,000 gallons of Drilling Pollutants from its HDD drilling circulation at the Raystown Lake site, and reported another frac-out on December 20, 2017.  ¶¶ 288-289.  In the eight days between these frac-outs, Sunoco also experienced almost daily Drilling Pollutant LOCs, amounting to almost a million gallons of Drilling Pollutants.  While Sunoco was required to immediately report each instance of an LOC to the DEP upon its occurrence, it did not report the other December 2017 LOCs until March 5, 2018, and only belatedly submitted a report to the DEP on December 6, 2018 concluding that at least some of the one million gallons of Drilling Pollutants from the December 2017 LOCs had polluted the bottom of Raystown Lake.  ¶ 290.  In a follow-up report submitted on February 18, 2019, Sunoco admitted that between April 9, 2017 and October 30, 2017, its ME2 construction activities had caused LOCs to occur on 39 separate days, comprising a total of two million gallons of Drilling Pollutants lost.  ¶ 291.  In a fuller analysis submitted on July 16, 2019, Sunoco reported that between April and December 2017, it had failed to report approximately three million gallons of Drilling Pollutants LOCs, which had polluted approximately 8 acres of the bottom of Raystown Lake.  ¶ 292; *see also* ¶ 293 (chart of LOCs by day, amount, dates reported, and reporting delays, which stretched from 75 days to 680 days).  On January 3, 2020, the DEP issued a Consent Agreement and Order relating to Sunoco's destruction of Raystown Lake, pursuant to which Sunoco was required to pay a $1.95 million fine and conduct a 110-acre cleanup.  ¶ 294.

Energy Transfer also violated permits obtained for four sites in Berks County, and one site each in Blair County, Cumberland County, Dauphin County, Perry County, Huntingdon County, and Washington County.  ¶ 296.  These violations included:

1. In November 2017, the Berks County Conservation District ("BCCD") concluded that Energy Transfer's HDD activities had caused a serious frac-out and that Energy Transfer's

permits <u>did not authorize the Partnership to use HDD activities</u> there.  ¶¶ 300-301.

2. On November 28, 2017, Sunoco identified seven locations where Sunoco had unilaterally "field changed" the pipeline crossing method from an open bore trenching to HDD without first obtaining DEP authorization.  ¶ 305.

3. On January 3, 2018, faced with Sunoco's repeated and blatant violations, the DEP halted Sunoco's construction on ME2 and ME2X.  ¶ 309.  In the DEP's January 3, 2018 Order, it stated: "Sunoco's <u>unlawful conduct</u> … demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder.  Suspension of the permits … is necessary to correct the <u>egregious and willful violations</u> described herein."  ¶ 310.[5]  On February 8, 2018, Sunoco agreed to pay a <u>$12.6 million fine</u> – one of the largest in DEP history – to continue construction on ME2.  ¶ 313.

4. On March 7, 2018, the PUC ordered Energy Transfer to temporarily shut down ME1 after sinkholes caused by its ME2 construction exposed the ME1 pipe and prevented Sunoco from resuming operation of the pipeline until it met all the PUC inspectors' safety requirements.  ¶ 315.

5. On April 27, 2018, the DEP fined Energy Transfer $355,000 for multiple violations of Pennsylvania law stemming from <u>69 separate occasions of frac-outs</u> caused by Energy Transfer's HDD activities.  ¶ 314.

6. On May 21, 2018, in an action commenced by State Senator Dinniman, Judge Barnes issued an Order that detailed Sunoco's extensive history of leaks, water contamination, and frac-outs, (¶¶ 319-320), finding "credible testimony … shows <u>Sunoco is operating in an unsafe manner</u>, not … designed to protect the destruction of aquifers and private wells" and that Sunoco had intentionally decided to proceed in "a rushed manner in an apparent prioritization of profit over the best engineering practices available in our time that might best ensure public safety" (¶¶ 321-322).

7. On August 2, 2018, the DEP fined Energy Transfer another $147,000 for its multiple violations of Pennsylvania law and the Special Conditions appended to the ME2 permits. This fine stemmed from 17 complaints of contaminated water supplies caused by Sunoco's HDD activities.  ¶ 323.

8. In August 2019, the DEP fined Energy Transfer $240,000 for <u>over 100 violations</u> related to the ME2 permits in Cumberland, Huntingdon, Lebanon, Perry, Washington, and Westmoreland counties.  ¶¶ 324-325.

---

[5] The Complaint refers to the DEP's January 2018 Order correctly in ¶ 310 as stated above, but inadvertently says elsewhere that the January 2018 Order was issued by Judge Barnes.  *See* ¶¶ 271 and 443.  The pertinent Orders identified in the Complaint should consist of DEP Orders of January 3, 2018 and January 3, 2020 (¶¶ 271 (in part) and 310), and an Order issued by Judge Barnes on May 21, 2018 (¶ 319).

  **b. ME2's Extensive Problems in Chester County Force Energy Transfer to Cobble Together a "Frankenpipe" with 65% Less Throughput than Promised**

Energy Transfer also caused multiple catastrophic sinkholes on Lisa Drive in West Whiteland Township that would further delay completion of ME2 and require Energy Transfer to pivot to re-purposing an older pipeline. ¶¶ 144-161, 168-171. On August 8, 2017, Energy Transfer submitted a "Void Mitigation Plan" to the DEP that labeled the Lisa Drive Site a "<u>very low risk</u>." ¶ 144. However, the "very low risk" designation was contrary to two reports from Energy Transfer's consultants. ¶¶145-146. First, on October 16, 2017, GES issued a report warning that the Lisa Drive HDD site "passes through Ledger Formation and Conestoga Formation limestones and dolomites which are locally <u>known for karst development</u>" and that "carbonate rocks (Ledger and Conestoga Formations) are <u>prone to sinkhole development and solution openings, and should be thoroughly investigated before construction</u>." ¶ 145. Second, Tetra Tech similarly alerted Energy Transfer to the severe risk of sinkholes. ¶ 146.

  Despite these warnings Sunoco continued HDD construction in the area and, on November 11, 2017, Energy Transfer's drilling of the ME2 pipeline caused a 500-gallon frac-out and sinkholes to appear at the Lisa Drive site, with "<u>geysers of drilling fluids</u>" released in the area. ¶¶ 148-149. In response, the DEP issued a Notice of Violation on November 16, 2017, citing Energy Transfer's "<u>history of incidents</u>" near Lisa Drive and detailing the numerous frac-outs. ¶ 151.

  Multiple additional sinkholes also appeared (¶ 154), which forced public water utility company Aqua America to perform emergency remediations at multiple points on the pipeline path to prepare for a potential collapse of their water lines. This is particularly troubling since Aqua's Chief Environmental Officer had emailed Energy Transfer ME2 Senior Director Matthew Gordon five months earlier, on July 17, 2017, explicitly warning Energy Transfer of the damage

HDD operations could cause in this area.   ¶ 155.

Despite (a) warnings from Energy Transfer's consultants and Aqua; (b) acknowledgment that the Lisa Drive Site borders a known limestone formation; (c) knowledge that almost half of the HDD path at the Lisa Drive site travels through carbonate rock; (d) awareness that Lisa Drive is atop a karst formation (that may include limestone), and (e) evidence that Lisa Drive is at a fault location where two formations converge, Energy Transfer spokesperson Jeff Shields responded to allegations that Energy Transfer was putting Lisa Drive residents at risk with its HDD operations by denying that the karst rock formations at the Lisa Drive caused the frac-outs and sinkholes. Instead, Energy Transfer falsely claimed that "construction through this area is safe.  There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area." ¶¶ 156, 355, 371.  Shields' assertion omitted that Energy Transfer was aware that, at the very least, the first third of the HDD path at the Lisa Drive Site traversed known limestone formations, which dramatically increased the risk of frac-outs and sinkholes.  ¶ 156.

Four months after the DEP issued its November 16, 2017 Notice of Violation, four additional sinkholes appeared, when Energy Transfer resumed testing the structural integrity of the ME2 route near Lisa Drive.  ¶ 157.  Nearly a year later, on January 20, 2019, Energy Transfer caused another sinkhole to appear near Lisa Drive, which exposed the ME1 pipeline and led to a shut-down of production transportation through a 7-mile section of the ME1 pipeline.  ¶ 159. Sunoco blamed "recent heavy rains" for the sinkhole, but well-designed pipelines should be able to remain safe even with heavier than average rainfalls.  ¶ 160.  Meanwhile, Energy Transfer executives and spokespersons repeatedly told investors that the ME2 pipeline would be completed by specific dates and with an initial throughput of 275,000 bls/d.  See ¶¶ 332-365.

Yet, due to the stops and starts on the pipeline's construction caused by Energy Transfer's

deficient planning for the construction and its unsafe construction practices manifesting in delays in places like Lisa Drive, Energy Transfer realized that it would have to join the new ME2 20-inch pipe with a nearly century old 12-inch pipe, in order to meet its 2018 in-service agreements.  ¶¶ 20, 170, 177.

On June 15, 2018, Energy Transfer filed an Operator Registry Notification with the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration (PHMSA) for use of the 12-inch pipe to tie into ME2's 20-inch pipe.  ¶ 171; *see also* Golan Decl., Pl. Ex. 1 (the "Notification").[6]  The Notification identified June 15, 2018 as the "[a]nticipated start date of field work activities" for the Frankenpipe, which meant that Energy Transfer had realized the need for the Frankenpipe earlier than June 15, and began planning for it well before that date.  The filing notified the PHMSA that Energy Transfer intended to commence work on June 15, 2018, to reverse the flow within the pre-existing 12-inch pipeline that runs for 23.64 miles through Chester and Delaware Counties, change its use from "refined product service to HVL," and tie that segment into a 20-inch pipeline "currently under construction."  Pl. Ex.1 at pages 1 and 4 of 6.

Despite Defendants' knowledge that Energy Transfer could not complete ME2 on schedule with 20-inch pipe, Defendants continued to falsely tell investors until August 2018 that ME2's initial capacity would be 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day.  *E.g.*, ¶¶ 169, 338, 340.[7]  This included Defendants' false claim

---

[6]  Lead Plaintiffs' Counsel obtained the Notification through a FOIA request to the PHMSA, which provided it on the same day that Defendants filed their motion to dismiss the Complaint.  Notwithstanding that Lead Plaintiffs did not then have this document, the Complaint pleads – based on other credible sources – that Energy Transfer and Sunoco were planning to pump NGLs through an existing 12-inch pipeline, that they had filed a request for this change with the PHMSA, and that they had earlier informed certain townships and public utilities about their plan to repurpose the old pipeline.  ¶¶ 171, 180, 447.

[7]  Defendants take the position that their June 19, 2018 projected completion and throughput statements for ME2 could not have been false given the timing of a July 3, 2018 press report pleaded in the Complaint.  Def. Br. at 13 & Def. App. A at n.4 (Item 10).  However, the Complaint merely avers that the press reported on July 3, 2018 that Energy Transfer <u>had sought approvals</u> for using the smaller pipe.  ¶ 171.  The Complaint

to investors of a 275,000-barrel initial throughput on June 19, 2018—after Energy Transfer had already told the PHMSA of the need for the Frankenpipe. Energy Transfer hid from investors the true impact of the Frankenpipe until August 2018, when it disclosed the need to delay full ME2 completion of the old pipeline on its earnings call. Only after being pressed by analysts did investors learn, on August 10, 2018, that Energy Transfer's ad-hoc cobbling together of the old and new pipelines would result in a 65% reduction in ME2's initial throughput when the ME2 was brought online, from the claimed 275,000 to 450,000 bls/d to only approximately 100,000 bls/d on ME2's initial in-service date, and that the full completion of ME2 would be further delayed. These disclosures caused a 5.6% drop in the price of Energy Transfer units from August 9 to August 13, 2018. ¶¶ 181, 401-408, 432.

### 2. Energy Transfer's Undisclosed Deficient Planning and Construction of the Revolution Pipeline Results in an Explosion and Safety Issues So Severe that the Pipeline Could Not Be Completed

The Revolution project consisted of a pipeline that would transport gas drilled by Energy Transfer customers to a processing plant that would have separated liquid natural gas into methane and various other NGLs (the "Revolution Plant"). Compressed NGLs from the Revolution Plant were then to be sent through either ME2 or Energy Transfer's Rover pipeline. Construction on the Revolution began on March 14, 2017, and Energy Transfer represented that it would be completed by mid-2017. ¶ 211.

---

further alleges, based on statements on West Whiteland Township's website, that Energy Transfer had sent the notice to the PHMSA about the need for the Frankenpipe by mid to late June 2018. ¶ 447. Despite knowing that Energy Transfer sent the notification to the PHMSA by June 15, 2018, Defendants falsely assert in their motion to dismiss that Plaintiffs' allegation that Energy Transfer notified PHMSA in "mid to late June" could only mean it occurred after June 19 (when Defendants made their June 19 statement), but Defendants knew it plainly came beforehand. Since the planning for and decision to use the 12-inch pipe as a tie-in with ME2's 20-inch pipe could not have been instantaneous, not only does the June 15, 2018 Notification show that Energy Transfer's statements of June 19, 2018 were false and misleading, but it provides support for the allegations that the Partnership's statements of April 9, 2018 and May 24, 2019 were false and misleading for the same reason. *See* ¶ 340; Def. App. A, Item 11 & n.1.

In early 2017, Energy Transfer filed notifications that it would not be able to fulfill certain of its timing performance obligations and at least one customer, EdgeMarc, abandoned its commitment to transport natural gas through the Revolution.  ¶ 212.  In order to lure customers back to Revolution, Energy Transfer engaged in a campaign of misrepresentations to its customers, promising concrete in-service dates, and said that if Energy Transfer missed those dates customers could freely exit their contracts.  EdgeMarc and another customer, PennEnergy, entered into contracts with Energy Transfer with the condition that Energy Transfer would place a safe, legal, and structurally sound pipeline "in-service" by October 1, 2018 (PennEnergy's contract) and by January 1, 2019 (EdgeMarc's contract).  Satisfying customer contracts thus motivated Energy Transfer to cut corners and engage in unsafe planning and construction tactics.  ¶ 212.

### a.  Planning and Construction Issues on the Revolution Pipeline

While making statements to its customers and investors about when the pipeline would be in service (and representing that it would be safe and structurally sound), the Partnership concealed highly material information that not only "cut against" these representations but also made it impossible for the pipeline to be constructed safely and on schedule.  For instance:

1. In January 2016, Energy Transfer hired Terracon Consultants to investigate the Revolution route.  ¶ 222.  Terracon's Geohazard Evaluation Report detailed that the proposed Revolution path would "encounter primarily shale bedrock," which ranks as a ten out of ten on Terracon's hazard scale due to its "high potential for geological hazards," and had a high frequency of "steep slopes, deeply weathered rock, and remnants from both surface and underground mining activities."  Terracon "anticipated that identification and mitigation of both landslide and subsidence geohazards will be challenging and require careful observation and mitigation." ¶ 223.[8]

2. Energy Transfer also knew that the area of the Revolution Explosion had been described – prior to the explosion – as "dangerous and unstable" by the U.S. Army Corps of Engineers, and that data published by the U.S. Geological Survey designates

---

[8] Terracon also conducted four "scan line reviews," including one segment that was less than 500 feet from the ultimate site of the September 2018 explosion on the Revolution pipeline (the "Explosion Site"). Terracon reported that this particular area showed multiple signs of landslide susceptibility, including evidence of "rotational slip," "hummocky topography," and "fallen and leaning trees."  ¶ 224.

the area in Western Pennsylvania where the Revolution Explosion occurred as one of the areas in the United States with a <u>high incidence of landslides</u>.  ¶ 241.

3. Energy Transfer's permitting documents confirm that Energy Transfer knew, since 2015, that the area near the Revolution Explosion "included a 'slip' landslide area" with "<u>dangerous and unstable hillslope terrain</u>."  ¶ 252 (text and picture).

Notwithstanding these warnings, Energy Transfer proceeded with construction as planned, removed vegetation, failed to take necessary precautions, and committed hundreds of violations of its construction permits.  ¶¶ 226-227.  Examples of the Partnership's actions, which completely undercut its in-service date and safety representations, include that:

1. Energy Transfer's permits required it to conduct inspections "on a weekly basis and after each stormwater event . . . to ensure effective and efficient operation" (¶ 228) and its approved plans stated that "[c]onstruction activities in areas susceptible to slope failures should be investigated and evaluated by a licensed Geotechnical Engineer in order to address any stability issues." ¶ 229.  But in January 2017, the DEP, along with various other regulatory bodies, cited to dozens of deficiencies including missing or undersized BMPs, gaps in protection, and BMPs oriented in a way that would cause discharges back to the work area or toward dwellings. ¶ 230.

2. From November 2017 to March 2018, the DEP inspected a section of the Revolution pipeline at least ten times, resulting in over a dozen violations of the Clean Streams Law and a June 2018 Consent Order and Agreement ("June 2018 Order").  ¶ 231.  The June 2018 Order found that Energy Transfer had violated Pennsylvania's environmental, dam safety and water management regulations, and erosion and sediment control regulations.  At least 39 different sections of the pipeline experienced significant soil stability issues, including landslides, slope failures, and ground cracks.  As a subsequent report by one of Energy Transfer's own consultants confirmed, at least 18 sections of the pipeline exhibited signs of historic, deep-seated landsliding, several of which were crossing the pipeline alignment.  ¶ 232.

3. In February 2018, a landslide – which Energy Transfer would later classify as "major" – occurred in a right-of-way in Beaver County, Pennsylvania.  The landslide occurred in an area mapped as a "<u>known landslide feature</u>" and described as "<u>soil and rock susceptible to landsliding</u>."  ¶ 235.

4. In April 2018, another landslide occurred in Independence Township.  This one also occurred in an area mapped as a "<u>known landslide feature</u>" and described as a "<u>cove underlain by clay layer</u>."  ¶ 236.

5. Also in April 2018, an internal Energy Transfer report stated that a slip had developed from an unrestored right of way and went down the slope of the right of way under a

17

power transmission line.  The report noted that a "significant and very steep drop off on the edge of the ditch-line … will make it <u>difficult to restore properly</u>."  ¶ 237.  This slip occurred approximately 30 feet from the landslide at the eventual Explosion Site. Energy Transfer attempted to stabilize the area <u>without a permit</u> and, as the DEP later found, <u>neither an engineer nor any other geotechnical expert was consulted by field staff when this work was performed</u>.  ¶ 238.

6.  From May 3, 2018 to May 29, 2018, Energy Transfer was cited for <u>at least 15 violations</u> at a section of the Revolution pipeline in Independence Township, including failure to implement and maintain effective BMPs, failure to provide temporary stabilization of the area in question, and failure to comply with its permit conditions.  ¶ 234.

On or about June 1, 2018, Energy Transfer reported to the DEP that the Revolution pipeline was "mechanically complete and ready to be placed into commercial service," ¶ 239, in line with its prior statements to investors that construction was "mechanically complete" and that Revolution would go into full service once the Partnership's ME2 and Rover pipelines were in service.  *See* ¶¶ 343, 345, 350.  However, stability and soil movement complications at the eventual Explosion Site itself continued during the summer of 2018.  An Environmental Inspection Daily Report dated July 30, 2018 indicated that crews at the eventual Explosion Site were still dealing with "<u>multiple slip areas</u>."  ¶ 240.  Moreover, daily inspection reports in the seven to ten days prior to the September 10, 2018 Revolution Explosion show that Energy Transfer failed in its belated attempts to stabilize the Explosion Site.  ¶ 240.

### b.  The Revolution Explosion and Its Aftermath

On September 9, 2018, Energy Transfer began the multi-day commissioning process that needed to be completed before the Revolution could be placed in-service.  This process included "purging" all the air from inside the pipeline, and "packing" the pipeline with enough gas to raise pressure inside the pipeline to the desired level.  ¶ 243.

Energy Transfer never completed the commissioning process.  At approximately 4:56 a.m. on September 10, 2018, Energy Transfer's deficient pipeline planning and construction practices

18

resulted in the rupturing of the Revolution and a massive explosion in connection with a landslide that occurred in Center Township, approximately 25 miles outside of Pittsburgh.  ¶ 244.  Residents reported that the roar from the geyser of fire was so loud that they thought a plane was headed straight for their homes.  Of the 800 calls that came into Beaver County's 911 center, only a handful of callers correctly identified that the Revolution had ruptured and exploded.  No one at the fire department or at the township even knew there was gas inside the Revolution at the time, and Energy Transfer had still been moving dirt <u>days</u> before the blast occurred.  ¶ 245.  The resident closest to the explosion site, whose house was engulfed in flames by the explosion, had notified Energy Transfer that the hillside at the Explosion Site had a slip a few days earlier, and was told it had been fixed.  ¶ 247.  In a letter Energy Transfer sent to residents the next day, Energy Transfer admitted that its "initial site assessment" revealed that a landslide occurred, but sought to explain that while it knew that "this type of land movement has been occurring throughout the state," Energy Transfer attributed that "to the unprecedented amount of rainfall."  However, the rainfall in the Pittsburgh area was nothing exceptional.  ¶ 248.[9]

Following the Revolution Explosion, on Monday October 29, 2018, the DEP issued an order requiring Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline" (the

---

[9] Energy Transfer hired Terracon to conduct a post-explosion investigation.  The investigation uncovered evidence pointing to a bad weld as a cause of the explosion, but Terracon also concluded that the slope on which the Revolution was built is "<u>generally too steep to be permanently stabilized using solely earthwork measures and that stabilization of the slope will require mechanical means such as retaining structures/walls, piles, ground anchors, etc.</u>"—the same recommendations Terracon provided in its initial Hazard Report that Energy Transfer disregarded.  ¶ 254.  Defendants aver that the explosion was caused by a bad weld.  Def. Br. at 38 n.65.  This is another counter-narrative that depends on the Court deciding a fact question at this stage, and it should accordingly be disregarded on a motion to dismiss.  The decision to place the pipeline in that area was fraught with known risks, as was the decision to start the commissioning process notwithstanding known movements in the substructure just days before.  All of these facts meant that the pipeline could not have been "mechanically complete," *i.e.*, ready to commence operations, on February 22, 2018, when that statement was made to investors (¶ 350), and the Partnership's statements about its commitment to safety were similarly false or misleading.

"October 2018 Order"), ¶ 255, causing a 4.0% drop in the price of Energy Transfer units.  ¶ 256. The DEP's press release commenting on the October 2018 Order stated that the DEP's "inspections discovered violations including <u>unreported landslides</u>, impacts to aquatic resources, <u>construction activities occurring in unpermitted areas</u>, and several sections of the pipeline that required the installation of additional measures to prevent accelerated erosion."  ¶ 257.  Despite the DEP's shutdown of the Revolution, during a presentation held on November 13, 2018, Defendants told Energy Transfer investors that the Revolution would still be operational in 2018, comments that it reiterated at a conference on December 5, 2018.  ¶ 258.[10]

Between the explosion and the first week of January 2019, the DEP performed 46 inspections of the Revolution pipeline.  <u>All of them noted continuing violations</u>.  ¶ 261.  Moreover, after Energy Transfer informed EdgeMarc – falsely – that the Revolution was expected to receive regulatory approval by mid-February 2019 and that it would be repaired and operational by May 1, 2019, EdgeMarc contacted Pennsylvania regulators and was told that "the clock [wasn't] even ticking yet" and no timetable had been set or conveyed to Energy Transfer.  ¶ 262.

On a February 21, 2019 investor call, Energy Transfer Chairman and CEO, Kelcy Warren, admitted to Energy Transfer's reprehensible conduct constructing the Revolution and ME2:

<u>We made some mistakes</u> and specifically, now we'd like to talk about Pennsylvania, and we're going to take our medicine and fix those mistakes and

---

[10] On December 3, 2018, pursuant to the October 2018 Order, Energy Transfer issued its Stabilization Plan, Landslide Plan, and Updated ESC Plan.  Between March 1, 2019 and December 9, 2019, Energy Transfer submitted six revisions, five of which were rejected and met with deficiency letters.  ¶ 260.  On January 9, 2019, the DEP notified Energy Transfer that it had "<u>failed to comply with the [October] 2018 Order</u>" (the "January 2019 Notice").  According to the January 2019 Notice, Energy Transfer had, for <u>four months after the explosion</u>, "[f]ailed to install flagging, markers, or signs at the site," failed to "cease sediment laden discharges into Commonwealth waters," and failed to "temporarily stabilize disturbed areas."  ¶ 263. Ultimately, on February 8, 2019, the DEP sent a letter to Energy Transfer admonishing the Partnership for failing to remediate the Explosion Site.  According to the letter, the DEP determined that Energy Transfer had "<u>failed to comply with the Department's October [] 2018 [] Order, as well as [ESCG] Permit authorizations … issued for construction of the Revolution Pipeline</u>."  The DEP stated that the permit hold would continue until Energy Transfer "demonstrates to the satisfaction of the [DEP] that its <u>unlawful conduct</u> has been corrected."  ¶ 264.

<u>complete good projects from this point forward</u>, not insinuate that everything we've done has been bad, it's just <u>we've made some mistake[s] that we're not proud of</u>.

¶ 266.  The Revolution pipeline remains out of service to this day.

The Partnership's "mistakes" – which presumably referred to both the ME2 and Revolution projects – nevertheless continued.  Between September 2018, when the Explosion occurred, and December 13, 2019, the DEP found that "at least [19] distinct sections of the Revolution Pipeline were not temporarily or permanently stabilized, which resulted in numerous slides within and outside of the" permitted area, that Energy Transfer had caused "at least 352 separate occurrences of accelerated erosion and sedimentation," and that it had discharged sediment laden water on "at least 540 different occasions" into various creeks, streams and other bodies of water.  In addition, "at least 868 BMPs were not properly implemented or maintained," and "at least 1,359 BMPs were either not installed or installed improperly, contrary to the ESCGPs."  ¶ 269.  Moreover, "on at least 244 occasions, [Energy Transfer] did not submit corrective action reports after BMP failures." *Id*.  The non-compliance resulted in the total elimination of at least 23 streams and 17 wetland areas, and the shortening or altering of 120 streams and 70 wetlands.  ¶ 270.

On January 3, 2020 – exactly two years after the DEP issued the January 2018 Order reprimanding Energy Transfer for its "willful and egregious" violations of Pennsylvania law during its construction of ME2 – the DEP issued an Order that admonished Energy Transfer for willful and egregious violations of Pennsylvania law during its planning and construction of the Revolution.  The DEP's Order made numerous findings of Energy Transfer's appalling conduct, and ordered Energy Transfer to pay a $30.6 million fine, the largest the DEP has ever issued.  ¶ 271.[11]

---

[11] Further confirming that placing and constructing the Revolution pipeline along its route rendered Energy Transfer's safety and in-service statements false or misleading when made, the problems with the pipeline continue.  An April 27, 2020 article reported that Energy Transfer had committed <u>596 new environmental</u>

**B.      Defendants' False Statements Regarding Energy Transfer's Code of Conduct**

Throughout the Class Period, Energy Transfer assured investors that it adhered to exacting ethical standards in its dealings with government officials, which the Partnership codified in its Code of Conduct.  Energy Transfer touted the Code in its SEC filings, and referred investors to the Partnership's website, where Energy Transfer published the Code throughout the Class Period. ¶ 63.  It represented that the Code identified requirements, not aspirations:  the Code explained that "[i]n all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner.  Every Employee [defined to include officers] acting on behalf of the Partnership Group must adhere to these policies."  ¶ 64.

The Code focused on the heightened ethical ramifications of the Partnership's dealings with government officials, explaining that "[w]hat is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign)," and stating that its employees "should not provide . . . anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department."  The Code further explained: "Employees must respect and obey the laws of the cities, states and countries in which the Partnership Group operates."  ¶ 65.

The Code specifically set forth Energy Transfer's strict policies prohibiting payments or

---

violations since the January 2020 Order.  Inspections of the Revolution pipeline account for less than 1% of the DEP's 8,200 evaluations of well sites and pipelines since January 1, 2020, but the Revolution accounted for 19% of the violations.  Between the Revolution Explosion and the January 2020 Order, Energy Transfer accumulated approximately 8½ violations per inspection relating to the Revolution.  Since January 1, 2020, this rate increased to nearly 10 violations per inspection.  ¶ 274.  As of May 1, 2020, Energy Transfer owes the DEP nearly $2.5 million, but the DEP has yet to receive these funds.  ¶ 276. Energy Transfer has also still not begun fixing the actual pipeline, since it cannot start that work until it demonstrates to the DEP that it has erosion under control at the Explosion site.  But in February 2020 an inspector arrived at a Revolution worksite and found it "actively moving."  ¶ 273.

use of Partnership funds to "secure special treatment for the Partnership Group." These policies were broad in scope, <u>applying regardless of whether conduct was technically "lawful or unlawful"</u> or was conducted by the Partnership, individuals, or third parties employed by the Partnership. The Partnership also broadly defined "sensitive" payments as including "receipts from or payments to governmental officials or employees" and "corporate political contributions," and it prohibited attempts to "disguise" sensitive payments in "any . . . manner." ¶ 66.[12]

### 1. Code Violations Pertaining to ME2's Permitting Process

Contrary to Defendants' repeated assurances to investors that Energy Transfer acted in accordance with its Code of Conduct and had lawfully obtained valid permits for ME2, and unbeknownst to investors, Defendants, as described above, made use of coercion and other illicit means of forcing the DEP to approve the construction permits that were critical to the development of ME2. Energy Transfer then proceeded to (a) violate DEP Orders and construction requirements, (b) construct the Pipeline Projects notwithstanding explicit warnings and knowledge that their paths were prone to landslides and sinkholes; and (c) misrepresent to investors and regulators the actual status of its construction activities, the pipelines' in-service dates, and their throughput. All of these constituted violations of the Code of Conduct. ¶¶ 14, 399.

### 2. Code Violations Pertaining to Energy Transfer's "Unwritten Policy," Its Hiring of Pennsylvania Constables, and Its Concealed Payments

To deter opposition by homeowners and environmental activists, Energy Transfer had an "unwritten policy" to hire government officials to act as security around its pipeline construction sites. ¶ 166. Here, pursuant to its "unwritten policy," Energy Transfer hired Pennsylvania

---

[12] In addition to the Code, Energy Transfer adopted specific policies applicable to its highest executives – its CEO and CFO, *i.e.* Defendants Warren and Long during the Class Period. Specifically, Energy Transfer maintained a Code of Ethics that required its CEO and CFO, among other things, to "[n]ot violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies." ¶ 68.

Constables to serve as the security force for ME2 while armed and wearing their uniforms and badges.  To disguise its payments to the Pennsylvania Constables that Energy Transfer hired, the Partnership concocted a maze of payments through a series of its contractors and subcontractors. ¶¶ 204, 209. This misconduct violated the Partnership's Code, which forbade payments to Government employees, whether illegal or not, or attempts to conceal such payments.  ¶¶ 163-164.

According to internal Energy Transfer documents, Energy Transfer's desire to have armed constables in uniform to provide security began at least as early as August 17, 2017.  That day, Frank Recknagel, an Energy Transfer employee who managed security for the Mariner East project, wrote a text message about a site in Elverson, Chester County (which is approximately 30 minutes northwest from Lisa Drive by car).  Recknagel's text read that he was "working on a plan to have a licensed armed/un[i]formed PA State Constable provide coverage at this specific area." ¶ 165.  A few months later, on November 30, 2017, when an employee of a security firm responsible for hiring the constables suggested it might be easier to use off duty police officers to provide security for ME2, Recknagel emailed that it was Energy Transfer's "unwritten policy" to use "On Duty" law enforcement, sheriffs, or Constables to provide armed security.  ¶ 166.

Much of Energy Transfer's improper actions in this respect came to light through the investigation conducted by the Chester County District Attorney's office ("Chester County DA"). On December 19, 2018, the Chester County DA announced an ongoing criminal investigation into the construction of the Mariner East System and its owners in light of "sinkholes created by the pipeline drilling, contaminated well water," and "subtle and not-so-subtle bullying of Chester County citizens."  ¶ 22.  In response, Energy Transfer's unit price fell 5.4% from December 19-21, 2018.  ¶ 432.  Nine months later, on August 8, 2019, the Chester County DA announced that his office was charging the Pennsylvania Constables hired by Energy Transfer to guard pipeline

construction sites with bribery.  The Chester County DA's investigators said that Chester County

residents had reported that armed security guards identified themselves as state constables on their

property.  ¶ 24.[13]  The charging document and press release issued by the Chester County DA on

December 3, 2019, stated that State Constables "sold their badges and official authority," and that

Energy Transfer "bought those badges and authority, then used them as a weapon to intimidate

citizens" and that Energy Transfer "attempted to conceal their activity through a maze of

companies and payments."  ¶ 26.  According to the Chester County DA, Energy Transfer "used a

shell game to hide payments to the Constables. …  Every step of the payments was hidden and

cloaked" and "Recknagel and Energy Transfer wanted the power of the badge to enforce their

corporate will and engaged in illegal activity to make it happen, then hid the payments in a

byzantine process to avoid detection of their role."  ¶ 440.  As the Complaint further alleges:

> Energy Transfer intentionally, knowingly and falsely attempted to distance [its]
> relation from these constables through its statement that "Constables Johnson and
> Robel were not Sunoco or Energy Transfer employees.  They were employed by
> Raven Knights, who provided security services and personnel.  We have a code of
> conduct for all contractors and third party vendors that clearly states what are
> acceptable behaviors and business practices, and we expect our contractors and
> their employees to adhere to that."  Yet, contrary to these misleading assertions,
> documents obtained by the Chester County DA's office show that the Constables
> were hired at the direction of Energy Transfer employees, such as Recknagel, and
> that payment to law enforcement for their authority is a company policy.

¶ 441.  These activities violated the Partnership's Code of Conduct, and made Defendants'

statements throughout the Class Period about the Code materially false or misleading.  Indeed, the

---

[13] Defendants assert that the payments made to the Constables were not bribery or illegal based on developments since the filing of the Complaint.  Def. Br. at 29; Def. Exhs. 2 & 3.  First, this says nothing about whether the payments made to the Constables violated the Partnership's Code of Conduct, which expressly prohibits conduct that may not be illegal.  Second, it is not a dispositive ruling that Recknagel's actions did not constitute bribery.  Rather, the charges against Energy Transfer's Recknagel appear to have been dismissed based on the Court's concerns that they were not specific enough in terms of Recknagel's own actions, rather than that they did not adequately allege an illegal bribery scheme.  Third, a later article, "*Constables want pipeline charges thrown out*" (attached to Golan Decl. as Pl. Ex. 2), reports that "no decision had yet been made by [the DA's office] on whether [to] refile the charges against Recknagel."

description of the Code itself was materially misleading because the Partnership had an "<u>unwritten policy</u>" that was directly contrary to the provisions in the Code.  In response to the December 3, 2019 disclosure revealing the falsity of Defendants' prior statements, the price of Energy Transfer units fell by 2.0%.  ¶ 432.

## III.   ARGUMENT

To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege that defendants made a misstatement or omission of material fact with scienter in connection with the purchase or the sale of a security upon which the plaintiff reasonably relied and that plaintiff's reliance was the proximate cause of its injury.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *Inst. Inv'rs Group v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009).  The Complaint adequately pleads each of these elements.

With respect to falsity, a plaintiff "must specify each allegedly misleading statement and the reasons why the statement is misleading." *Avaya*, 564 F.3d at 252 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)).  A statement is false or misleading if it is "factually inaccurate, or additional information is required to clarify it." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *8 (E.D. Pa. Mar. 13, 2019).  An omission can also satisfy this element if a plaintiff alleges "some fact, known to defendants at the time of the statements, the disclosure of which would have made the statement clearer or more correct." *Id.*

Courts must accept all well-pleaded factual allegations in a complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Tellabs*, 551 U.S. at 322; *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281 (3d Cir. 2006) ("At the pleading stage… plaintiffs are entitled to the benefit of all reasonable inferences based on the detailed and specific allegations

in their complaints.").[14]   Further, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).   Accordingly, when allegations have facial plausibility, they are entitled to be credited on a motion to dismiss. *See, e.g., In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015).

A.   **The Complaint Sufficiently Pleads the Falsity of Defendants' Misstatements and Omissions Regarding the Pipeline Projects**

Citing an unpublished Sixth Circuit decision, Defendants assert that each statement in a securities complaint "must withstand an exacting statement-by-statement analysis of objective falsity." Def. Br. at 7 (citing *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015)). Defendants then remove each misstatement from the context necessary for its comprehension. Such cherry-picking is not the standard for assessing pleadings under the PSLRA and is not the law in this District.[15]   In assessing a complaint's allegations of falsity, the test is not whether each

---

[14] Defendants' proposed counter-narratives, noted above, must be disregarded because a motion to dismiss "is not the procedural stage in which the Court can resolve competing facts." *See, e.g., Grimm v. Crane Room Grille, Inc.*, 2019 WL 2996990, at *3 (W.D. Pa. July 9, 2019).

[15] Defendants claim that the purpose of their Def. App. A "is to organize the allegations in the Complaint for the Court." Yet, Def. App. A splits the Complaint's alleged false statements into as many parts as possible to prevent a consideration of their full context. Def. App. A separates the Complaint's false and misleading statements into arbitrary buckets, divides statements made on the same day and in the same disclosure, and often presents these fragments out of chronological order. Defendants concede that while "[c]ertain paragraphs of the Complaint … contain multiple alleged misrepresentations," those paragraphs are "split into multiple statements and organized into different sections" of the chart. Def. App. A at 2, n.3. At least ten other alleged false and misleading statements do not appear in the chart at all, but rather only appear cursorily via footnote. *Id.* at 4, n.4.   By contrast, Plaintiffs' Complaint lays out Defendants' materially false and misleading statements in painstaking detail, both by subject and in chronological order, with each disclosure followed by a detailed explanation of why the statements were false and misleading when made.   ¶¶ 331-399.   Defendants' re-categorization of Plaintiffs' allegations is unnecessary and inappropriate; thus, Def. App. A should be rejected.   Nonetheless, lest Plaintiffs add to the confusion,

alleged misstatement is misleading on its own, but "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 418 (E.D. Pa. 2019) (emphasis in original). Further, "[o]nce a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994)).

Defendants' argument that Plaintiffs have not pled an actionable misrepresentation as to the successful completion of ME2 and Revolution, Def. Br. at 8-17, fails because Plaintiffs have adequately alleged that Defendants made ***all*** of their statements while concealing from investors material information contradicting those statements. This concealed contradictory information included: (1) the known risks the Partnership ignored in constructing the Pipeline Projects, such as the geological features where Energy Transfer planned to use HDD and the likelihood of subsidence events; (2) Energy Transfer's misconduct in obtaining the pipeline permits and intimidation of residents during construction; and (3) the significant obstacles the Partnership faced in constructing the Pipeline Projects. ¶ 3.

Defendants knew at the beginning of the Class Period that the Partnership's reckless disregard for constructing the Pipeline Projects in a safe and environmentally responsible manner made it impossible for Energy Transfer to meet the in-service dates or capacity representations its customers expected. As such, all of Defendants' statements on these matters to Energy Transfer investors lacked a reasonable basis and were therefore materially false and misleading when made. ¶¶ 16, 127. Indeed, throughout 2017 and 2018, the hundreds of violations, innumerable sinkholes

---

Defendants' characterizations of the misrepresentations cited in this Section are in Def. App. A at 1-7, Statements 1-20 (ME2 in-service, throughput and construction) and 21-26 (Revolution completion).

and "frac-outs," and Revolution explosion were the direct result of the Partnership's disregard for risk and safety.  Additionally, the numerous warnings and admonitions from regulators, courts, public utilities, and its own contractors and consultants that Defendants disregarded only served to make the impossibility of the Pipeline Projects more apparent to Defendants.  ¶¶ 3, 129.  Yet, Defendants continued to conceal this information from investors while falsely representing that ME2 and Revolution would be successfully completed by specific, hard deadlines.  ¶ 15.

Having strung investors along for nearly two years with false representations regarding successful completion of ME2 and Revolution despite possessing contradictory information at the beginning of and during the Class Period, Defendants may not explain away their concealment of the Partnership's reckless disregard for safety to avoid liability under the federal securities laws.

### 1.    Defendants Concealed That Successful Completion of ME2 and Revolution Was Impossible from the Beginning of the Class Period

On February 24, 2017, and throughout the Class Period, Defendants falsely told investors that both ME2 and Revolution would be successfully completed, that the Partnership had a good working relationship with the DEP, that construction schedule delays were due to DEP's bureaucratic postponements; nevertheless, Defendants claimed substantial progress on construction and that construction was proceeding safely.  Between February 2017 and August 2018, Defendants told investors that ME2 and Revolution would be completed within specific time frames on no fewer than a dozen occasions and touted the pipelines' capacities more frequently, on earnings calls and at analyst conferences.  ¶¶ 332-365.

Defendants' statements regarding ME2 and Revolution's successful completions were false and misleading because Defendants possessed contradictory information regarding the

hundreds of construction deficiencies during the planning and permitting phases of ME2.[16]  For example, the Partnership was required to explain how it would avoid polluting water crossings along ME2's path in order to obtain permits.  Given that Energy Transfer planned to conduct much of its construction using HDD, the DEP asked Sunoco to evaluate the risks of HDD as part of its permit proposal.   ¶¶ 8, 75-76.   Rather than honestly disclose the HDD drilling risks in Pennsylvania's mine-riddled and limestone-filled geology, Defendants exerted undue influence on Pennsylvania government officials to approve the permits for ME2.  Defendants' pressure on the Wolf administration resulted in the ouster of former DEP Secretary Quigley.  *E.g.*, ¶¶ 8, 78.

When Energy Transfer and Sunoco first applied to the DEP for the permits to construct ME2, the application was rife with errors and deficiencies to such an extent that former DEP Secretary Quigley believed that Sunoco "wasn't even close to submitting a complete application" and told Defendant Hennigan that Sunoco was going to have to start over because the application was "woefully inadequate."  ¶¶ 9, 79-82.  Recognizing Quigley's reluctance to allow Energy Transfer to obtain the ME2 permits on an expedited timetable with minimal disclosure of risk, Defendants pressured the Wolf administration to remove Quigley from his position.  ¶¶ 79, 83-84.

Quigley's termination, however, did not cure the deficiencies Defendants knew plagued their permit applications.   Indeed, while the DEP had prepared an approximately 70-page deficiency letter between Quigley's departure and the issuance of the ME2 permits (which was pulled just before the permits were issued) in September 2016 the DEP did issue 20 technical deficiency letters outlining hundreds of substantive problems with the permit applications for ME2.  ¶¶ 13, 87, 92.  On January 27, January 30, and February 1, 2017, the DEP also provided

---

[16] Bringing Revolution into service was dependent on bringing the ME2 pipeline into service, and as such any statements referencing ME2 during the Class Period similarly impacted investors' views of Revolution. ¶¶ 211, 333, 335.

further technical deficiency letters to the Energy Transfer Companies, outlining a long list of continuing problems with the ME2 proposal. ¶ 115. But Energy Transfer and Sunoco had stopped working on the permit applications two months earlier in December 2016 and started mobilizing for work when, after meeting and coordinating with the Governor's office, they realized that their pressure campaign would result in DEP approval of the permits notwithstanding all of their deficiencies. ¶¶ 102-115.

On February 13, 2017, the DEP approved the permits for ME2, only two weeks after issuing the January and February technical deficiency letters and two months after Energy Transfer and Sunoco concluded any meaningful work on the applications. ¶ 116. The speed at which the DEP approved the permits, considering the seriousness and volume of issues in the technical deficiency letters, served as the impetus for the FBI's investigation into the Wolf administration's approval of the permits. ¶¶ 25, 116-124, 326.

All of Defendants' alleged false and misleading statements with respect to the construction of ME2 and Revolution were made with Defendants' knowledge that the overwhelming number of deficiencies from the permitting process had gone unaddressed. Less than two weeks after permit approval, Defendants would begin giving Energy Transfer investors specific, hard deadlines for successful completion of ME2 and Revolution. On February 24, 2017, Defendants told investors that ME2 would be in service a mere six months later, and that it would have a "total takeaway capacity" of 345,000 barrels per day. ¶ 332. On May 4, 2017, Defendants told Energy Transfer investors that Revolution was on schedule to follow ME2 and be in service in the fourth quarter of 2017. ¶ 334. Defendants continued to make similar representations throughout the Class Period. ¶¶ 336-365; *see generally* Def. App. A at 1-7, Statements 1-26. All such representations were materially false or misleading because, undisclosed to investors, Energy

Transfer had obtained the ME2 permits without proper scrutiny and had failed to conduct the planning and studies necessary to construct the ME2 and Revolution pipelines and bring them into service at the claimed times and with the claimed throughput.

> **2.** **Defendants Concealed Extensive Other Evidence During the Class Period Reinforcing That Successful Completion of ME2 and Revolution Was Impossible**

After obtaining the permits for the Pipeline Projects and commencing construction, Defendants concealed information throughout the balance of 2017 and 2018 that successful completion of ME2 and Revolution was impossible. Defendants' actions in bullying through regulatory approval without a proper evaluation and correcting the multitude of deficiencies noted in the planning process directly resulted in Energy Transfer committing hundreds of DEP and PUC violations during construction, as well as landslides, sinkholes, LOCs (losses of circulation) and frac-outs. The DEP issued at least 36 notices of violation in connection with the Partnership's construction activities in 2017, and a further 55 notices throughout 2018. ¶ 128. Moreover, Energy Transfer engaged in widespread misconduct that caused significant delays in the construction of the ME2 and Revolution pipelines. ¶ 278.

For example, during the construction of ME2 at the Raystown Lake HDD Site between April 9, 2017 and October 30, 2017, Sunoco caused LOCs to occur on 39 separate days, comprising a total of two million gallons of Drilling Pollutants lost (including hundreds of thousands of gallons in April 2017 alone). While Sunoco was obligated to immediately report 30 of the 39 LOCs to the DEP, Sunoco only timely provided the DEP with notification of one of the 30 LOCs, and reported the remainder in February 2019 – nearly two years late and well after all of Defendants' representations to investors concerning the successful completion of ME2. ¶¶ 291-293, 332-365.

Similarly, in constructing Revolution, as early as May 2017, DEP inspections identified

numerous violations, including over one dozen violations of the Clean Streams Law.   ¶ 231.
Energy Transfer's misconduct resulted in the June 2018 Order, and in total 39 different sections
of the pipeline experienced significant soil stability issues, including landslides, slope failures, and
ground cracks.   ¶ 232.  A subsequent report would confirm that at least 18 sections of the pipeline
exhibited signs of historic, deep-seated landsliding, several of which were crossing the pipeline
alignment.  *Id.*  While Energy Transfer disclosed the June 2018 Order to investors, the Partnership
did not reveal its specific findings.   ¶ 233.  Instead, from November 2017 through June 2018,
Energy Transfer falsely represented to investors either that there were no delays with Revolution
or that construction on Revolution was mechanically complete.  ¶¶ 233, 345-346, 350.

Defendants falsely attributed the delays in the Pipeline Projects' construction to DEP
bureaucracy, failing to tell investors that the "unprecedented" or "operational challenges" referred
to by Defendants in their public statements stemmed from hundreds of deficiencies that Energy
Transfer knew about during the planning, permitting and construction phases of ME2.  *See, e.g.,* ¶
346.  They similarly knew of many risks and deficiencies during the planning, construction and
commissioning stages of the Revolution Pipeline which materialized in terrifying fashion with the
September 2018 explosion during that pipeline's commissioning phase.  These deficiencies and
risks that were known to Defendants made their statements of expected completion dates and
throughput impossible to achieve, and, therefore, false and materially misleading when made.
Furthermore, the deficiencies and risks made Defendants' representations about their relationship
with the DEP and the true reasons for the construction delays materially false and misleading when
made.

In addition to the undisclosed obstacles Defendants faced in constructing ME2 and
Revolution as a direct result of the Partnership's reckless disregard for safety and responsibility in

obtaining permits for, and in constructing, these pipelines, Plaintiffs' allegations show that internal reports <u>known only to Defendants</u> warned the Partnership in explicit terms that its planning and construction of these projects was fraught with danger.  These internal reports revealed that if the pipelines could be constructed at all, they would require far more time, cost and work-arounds than Defendants publicly represented was necessary.

For example, Energy Transfer contracted with Groundwater & Environmental Services, Inc. ("GES") to conduct an HDD Hydrogeologic Re-Evaluation Report on a site near Lisa Drive while constructing ME2.  ¶ 145.  GES issued its report on October 16, 2017.  *Id.*  In that report, GES warned that the locations where Energy Transfer intended to use HDD were prone to sinkhole development and solution openings, requiring thorough investigation before construction.  ¶¶ 144-147.  Similarly, contractor Tetra Tech alerted Energy Transfer to the severe risk of sinkholes.  ¶ 146.  Energy Transfer had also received a July 17, 2017 warning from public water utility company Aqua's Chief Environmental Officer to "avoid the use of horizontal direction drilling (HDD) near our Hillside Drive wells in Exton, PA," due to the damage that HDD operations could cause in the area.  ¶ 155.  Defendants recklessly disregarded and failed to inform investors of these warnings, with the result that just days later, Energy Transfer's continued HDD drilling caused a 500-gallon frac-out and sinkholes to appear near Lisa Drive.  ¶ 148.  Contrary to its obligations under the DEP's permits, Energy Transfer did not inform the DEP of the incident, or provide DEP with a full disclosure of the event.  ¶ 152.  Meanwhile, Aqua was forced to perform emergency remediations at multiple points on the ME2 pipeline path to prepare for a potential collapse of their water lines, after warning Energy Transfer against drilling in sensitive areas.  ¶ 155.

A similar scenario played out with respect to Energy Transfer's planning and construction of Revolution.  Specifically, a geological engineering consultant that Energy Transfer hired in

January 2016, Terracon, issued a Geohazard Evaluation Report that notified Energy Transfer of significant risks associated with building Revolution along its projected path, including that the proposed path would primarily encounter extremely hazardous shale bedrock that had a high frequency of "steep slopes, deeply weathered rock, and remnants from both surface and underground mining activities." ¶¶ 222-223.  Energy Transfer was also aware that the area of the Revolution Explosion had been described as "<u>dangerous and unstable</u>" by the U.S. Army Corps of Engineers and that the U.S. Geological Survey designates the area in Western Pennsylvania where the Revolution Explosion occurred as one of the areas in the United States with a <u>high incidence of landslides</u>.  ¶ 241.  Indeed, Energy Transfer's permitting documents confirm that Energy Transfer knew, since 2015, that the area near the Revolution Explosion "included a 'slip' landslide area" with "<u>dangerous and unstable hillslope terrain</u>." ¶ 252.

Despite its knowledge of Terracon's warnings, its own permitting documents, and prior findings of the U.S. Army Corps of Engineers and the U.S. Geological Survey, Energy Transfer nevertheless built the Revolution pipeline according to its originally projected path along steep terrain that was prone to landslides, committing hundreds of violations of its construction permits and causing immeasurable damage.  ¶¶ 230-242.  Meanwhile, Defendants continued to falsely represent to investors that both ME2 and Revolution would be successfully completed by the dates and with the throughput the Partnership promised to its customers.  ¶¶ 215-219, 332-365.[17]

---

[17] Defendants argue Lead Plaintiffs have failed to adequately allege the falsity of their statement on May 10, 2018, that ME2 would enter service in the "mid to late" third quarter of 2018 because Plaintiffs never allege when ME2 did enter service. Def. Br. at 8.  But Plaintiffs do allege that "[a]s of the date of this Complaint, the Revolution pipeline is still not in service, the full ME2 pipeline remains under construction, and the Partnership brought parts of ME2 in-service only at a reduced throughput of approximately 100,000 barrels per day by combining sections of the planned 20-inch ME2 pipe with the small pipe of another, almost 100-year old pipeline." ¶ 16; *see also* ¶ 52 ("the true 20-inch 'ME2' – as Energy Transfer had repeated presented it to investors – remains under construction."); ¶¶ 327-330 (allegations detailing how, despite Energy Transfer's prior claims of purported pipeline completion, the intended ME2 pipeline remains unfinished to this day).  Plaintiffs not only explain in detail why ME2 was never completed, but

In addition to issuing false and misleading deadlines for completion of ME2 and Revolution, Energy Transfer misled investors about the width of the pipe in the ME2 pipeline and its capacity through its failure to timely disclose: (1) the multitude of pipeline construction issues set forth in the Complaint; (2) its inability to conduct HDD in Exton, PA, as GES and others' warnings foretold; and (3) the true risk posed by the Lisa Drive sinkholes.  ¶ 168.  Thus, Energy Transfer knew that it could not complete ME2 on schedule with 20-inch pipe.  ¶ 170.  Instead, in order to meet its 2018 in-service agreements, Energy Transfer determined that ME2 would enter service by cobbling together the new ME2 20-inch pipe with 12-inch pipe from another, much older pipeline.  ¶¶ 20, 170.

As noted above, Energy Transfer filed a Notification on June 15, 2018, informing the PHMSA that June 15, 2018 was the "[a]nticipated start date of field work activities" that would tie the 20-inch pipe into the 12-inch pipe.  Golan Decl., Pl. Ex. 1.  Despite Defendants' knowledge that Energy Transfer could not complete ME2 on schedule with 20-inch pipe, Defendants falsely told investors during numerous earnings calls and investor presentations from May 31, 2017 up until August 14, 2018 that ME2's initial capacity would be 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day.  *E.g.*, ¶¶ 169, 336, 338, 340. Energy Transfer hid from investors the true impact of using the 12-inch pipe with ME2 until August 2018, when it disclosed the need to delay full ME2 completion and repurposing of the old pipeline on its earnings call.  Only after being pressed by analysts, however, did the market learn, on August 10, 2018, that Energy Transfer's ad-hoc cobbling together of the old and new pipelines would result in a 65% reduction in ME2's initial throughput when brought online.  This revelation

---

also adequately allege that Defendants' statements concerning the purported completion of ME2 were materially false and misleading because Defendants misrepresented the extensive work that still remained to be done on ME2, including work on 46 HDD locations across Pennsylvania.  ¶¶ 327-329.  Thus, Defendants' argument is without merit.

prompted a 5.6% drop in the price of Energy Transfer units from August 9 to August 13, 2018.  ¶¶ 181, 401-409, 432.[18]

### 3. Courts Have Upheld Similar Allegations

Cases considering remarkably similar allegations demonstrate that Defendants' false and misleading statements about successful completion of the Pipeline Projects are actionable, while also rejecting arguments for dismissal identical to Defendants' arguments here.  For example, in *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *1 (D. Nev. Sept. 26, 2013), which involved the design and construction of Las Vegas's massive CityCenter project, defendants represented that CityCenter's construction was proceeding both on-budget and on-schedule despite their knowledge that the design of the project was constantly changing and construction was plagued with defects and failed inspections, which ultimately resulted in a significant scaled back design and completion date for a major component of the project.  Similar to the changing timelines with respect to completion of ME2 and Revolution here, defendants in *MGM Mirage* revised the

---

[18] Defendants argue that their statements regarding the reduction in ME2's capacity, wherein Defendants concealed a 65% reduction in ME2's initial throughput when brought online, are not actionable because Section 10(b) only imposes liability for statements that are misleading or untrue rather than "simply incomplete."  Def. Br. at 14.  But "[t]he law does not permit corporate executives to mislead investors through half-truths."  *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018); *see also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018) (finding actionable misstatements when defendants "painted a favorable picture without including the details that would have presented a complete and less favorable one").  Contrary to Defendants' assertions, because Defendants had spent the prior 16 months touting to investors that ME2's initial capacity would be 275,000 barrels of NGLs per day, with an "upside" capacity of up to 450,000 barrels of NGLs per day, they had a duty to disclose the significant negative impact of using the 12-inch pipe to try to complete ME2.  Their failure to do so made their statements regarding use of the 12-inch pipe materially false and materially misleading.  Defendants' statements about the 16 HDDs Energy Transfer needed to complete in order to bring ME2 into service, Def. Br. at 15, were materially false and misleading for the same reason, which includes that the statements omitted to tell investors that Energy Transfer had not submitted HDD re-evaluation reports for nine other sites and that ME2 was not close to completion.  ¶¶ 360-361.  As the Complaint asserts, FE-1 stated the ME2 project was never close to complete while he was at the Company, based on the number of drills.  ¶ 330.  The Partnership also acknowledged as recently as March 2020 that there remained significant work left to be done on the ME2 and ME2X pipelines, as evidenced by the laundry list of drilling and construction projects that the Energy Transfer Companies still needed to complete.  ¶¶ 328-329.

CityCenter budget multiple times during the Class Period, raising it from $7.4 billion to $7.8 billion and then finally to $8.1-$8.4 billion.  *Id.* at *6.

    Defendants in *MGM Mirage*, like Defendants here, contended that their statements regarding the budget for CityCenter may have been inaccurate, but were not fraudulent, that their statements concerning both the budget and schedule for the CityCenter project were estimates or predictions, and that certain of the statements plaintiffs alleged to be false and misleading were technically accurate.  *Id.* at *6-*7; *see also* Def. Br. at 8-9, 17 (regarding completion of ME2/Revolution and "estimates"), 12-13 (contending statements were not fraudulent), 14-15 (contending that statements were technically accurate).  The court in *MGM Mirage* rejected Defendants' arguments and held that statements concerning the budget for the project, including the publicly announced budget at the beginning of the class period and each subsequent upward revision, were actionable because, <u>at the time the statements were made, defendants knew the estimates were not accurate and actual costs were reasonably expected to exceed the stated budget</u>. *Id*. at *6-7.[19]  The defendants' statements in *MGM Mirage* concerning the construction schedule were also actionable because "[d]efendants knew of the unfinished design, failed inspections, and construction defects that the project…was facing."  *Id*. at *7.

---

[19] Defendants' contention that Energy Transfer's May 10, 2018 statement was somehow corrective of prior deadlines issued regarding completion of ME2 is without merit because it disregards Plaintiffs' allegations of Defendants' knowledge that (1) the Energy Transfer  had obtained the ME2 permits impermissibly, and Energy Transfer had failed to conduct the planning and study necessary to construct, and bring in service, the ME2 and Revolution pipelines at the claimed times and with the stated throughput; and (2) the significant construction issues caused by Energy Transfer's reckless disregard for safety in constructing ME2, which were another cause for delays and only served to reinforce that successful completion of ME2 was impossible.  As such, the link between Defendants' false and misleading statements and Plaintiffs' losses was not severed by this statement because Defendants still concealed from investors what they knew to be true – that reaching their stated deadlines and throughput levels was impossible due to Energy Transfer's repeated regulatory violations and reckless construction practices.  Just as defendants' statements in *MGM Mirage* concerning the initial budget for CityCenter and all of the subject revisions were actionable, so too are Defendants' statements here concerning the deadlines for completion of ME2 and Revolution.

As the court in *MGM Mirage* repeatedly found, it was the contradictory information defendants possessed at the time they made their statements that made those statements false and misleading and, thus, actionable. 2013 WL 5435832, at *7 ("[E]ven though an estimate is a future projection, Defendants' statements were misleading because, at the time the statement was made, Defendants knew the estimate was not accurate and that actual costs were reasonably expected to exceed the stated budget"; "the omission of plan changes to the Harmon [building] would make any on-schedule statement misleading"; and "Plaintiffs have alleged that at the time the statements were made, Defendants knew of the unfinished design, failed inspections, and construction defects that the project…was facing"). Defendants' statements here are actionable for the same reason. They knew that successful completion of ME2 and Revolution on their stated timelines and with their stated throughput was impossible given their knowledge of the serious risks posed by the Partnership's approach to constructing the Pipeline Projects, their misconduct in obtaining the pipeline permits, and the significant obstacles Energy Transfer faced in constructing the Pipeline Projects that were a direct result of its misconduct.

Similarly, in *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443 (D.S.C. Mar. 29, 2019), the court denied a motion to dismiss in a case involving a construction project to build two nuclear reactors that was immediately beset by cost overruns and delays and was eventually abandoned. The court held that defendants' statements that they were acting in a transparent and responsible manner and that the initial risks and challenges of construction had been overcome were actionable where plaintiffs alleged that defendants knew from consultant reports and internal communications that these representations were untrue and that defendants were not going to be able to complete the project in the allotted timeframe. *Id*. at *1-4, 7-9. The court in *SCANA* found that defendants' statements concerning SCANA's ability to complete the project by the projected date were

contradicted by the investigation of an outside consultant, recurring problems in construction, management, and scheduling, and the lead contractor's failure to make timely progress. *Id*. at *7.

Here, Defendants similarly disregarded numerous warnings from Energy Transfer's own consultants, contractors and others contradicting their public statements concerning successful completion of ME2 and Revolution.  With respect to Energy Transfer's construction of ME2, these included, the HDD Report on the site near Lisa Drive provided by GES (¶¶ 144-147), the sinkhole warning from Tetra Tech received in connection with the GES evaluation (¶ 146), and the July 17, 2017 warning from public water utility company Aqua to avoid the use of HDD (¶ 155).  With respect to Revolution, the warnings included Terracon's Geohazard Evaluation Report that notified Energy Transfer of significant risks associated with building Revolution along its projected path (¶¶ 222-223), the U.S. Army Corps of Engineer's description of the area of the Revolution explosion as "dangerous and unstable" and data published by the U.S. Geological Survey designating the area in Western Pennsylvania where the Revolution Explosion occurred as one of the areas in the United States with a high incidence of landslides (¶ 241), and Energy Transfer's own permitting documents from 2015 showing that the area near the Revolution Explosion "included a 'slip' landslide area" with "dangerous and unstable hillslope terrain" (¶ 252).  These reports confirmed what Defendants already knew from the ME2 permitting process – that successful completion of ME2 and Revolution was impossible on the publicly reported timelines and with the publicly touted throughput along the planned paths of the pipelines.  As such, Defendants' statements regarding successful completion of the pipelines were false and misleading when made.  *See SCANA*, 2019 WL 1427443, at *7.

### 4.     Defendants' Challenges to Allegations of Material Falsity Fail

Defendants do not challenge that the Complaint adequately specifies each false or

misleading statement, including its time, place and content.  Instead, Defendants claim they are insulated from liability on the grounds that: (1) certain of Defendants' alleged misrepresentations and omissions were inactionable opinions and Defendants had no duty to disclose facts rendering those opinions untrue; (2) the "bespeaks caution" doctrine renders any forward-looking statements immaterial; (3) certain statements constitute immaterial "puffery;" and (4) Plaintiffs have alleged no more than inactionable corporate mismanagement.  These arguments all lack merit.

### a.    The Challenged Statements Are Not Inactionable Opinions

Defendants argue that many of their alleged misstatements and omissions are inactionable opinions.  Def. Br. at 8-10, 12-14, 17.  The Court should reject this.  First, none of the alleged misstatements are purely opinions.  Second, to the extent any of the misstatements could be construed as opinions, they are actionable because Defendants either did not believe these opinions or omitted material facts showing that Defendants "lacked the basis for making those statements that a reasonable investor would expect."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194-96 (2015); *see also In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017) (omission of facts about the inquiry the issuer did or did not conduct, or the knowledge it did or did not have, which made the statements at issue misleading, was actionable).

Each statement and omission Defendants challenge as an inactionable opinion under *Omnicare* was not an opinion but was a concrete representation made to investors about in-service dates and capacities for ME2 and Revolution.  *E.g.*, ¶¶ 212, 332-365.  As the Supreme Court observed in *Omnicare*, "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot')" "conveys only an uncertain view as to that thing."  575 U.S. at 176, 183.  Here, the challenged statements relating to in-service dates for

ME2 and Revolution describe and rely on existing facts or express certainty about the Pipeline Projects without any opinion qualifiers. *E.g.*, ¶ 334 ("Our Revolution project is still on schedule to be in service in the fourth quarter of 2017"); ¶¶ 336, 338 (touting the Company's "strong distributable cash flow expected from growth projects [including ME2 and Revolution] coming online in 2017"); ¶ 343 ([Revolution] "will be up and ready for service in the fourth quarter [of 2017]"). Defendants' statements concerning the capacities for ME2 and Revolution were similarly unqualified. *E.g.*, ¶ 332 (ME2 "will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service…."); ¶¶ 340, 357 ("Initial capacity [for ME2] of 275,000 barrels per day with upside of up to 450,000 barrels per day"); ¶ 353 (ME2 "will expand the total takeaway capacity to 345 MBbls/d for interstate and intrastate propane, ethane and butane service…."). Simply put, these are not uncertain statements, and therefore do not constitute opinion statements under *Omnicare*.

Further, even if the Court were to accept some of the statements as opinions, the Complaint sufficiently alleges that any of the opinions could not have been sincerely held given Defendants' knowledge of both the extensive deficiencies identified in the permitting process and the massive problems encountered during construction of ME2 and Revolution due to Energy Transfer's recklessness. Additionally, even if Defendants sincerely held any of the opinions, their material omissions rendered these opinions materially misleading and actionable. No matter how the statements are characterized, courts regularly sustain securities law claims concerning statements that a company expects to meet milestones when it possesses contrary facts showing defendants' statements do not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189. As the *SCANA* court observed in rejecting defendants' *Omnicare* argument in that case:

Plaintiffs plausibly allege that the identified misstatements expressed certainty rather than an uncertain view of a fact, and thus cannot be described as opinions or puffery.  For example, Plaintiffs contend statements regarding the status of the Project, the scope and sequencing of the schedule, and the reasonableness of the completion deadlines constituted objectively verifiable statements of fact. Plaintiffs plausibly allege that any statements that could be construed as opinions are actionable because (1) Defendants could not have sincerely believed these opinions, given the Bechtel reports, monthly progress reports, and other internal correspondence that described deficiencies in the progress of the Project; and (2) Defendants omitted material facts showing that they lacked the basis for making those statements that a reasonable person would expect.  Further, Plaintiffs plausibly allege that Defendants omitted material facts that would have been viewed by the reasonable investor as having significant altered the total mix of information made available during the period prior to abandonment of the Project.

2019 WL 1427443 at *9.  The same reasoning applies here to reach the same result.

### b.     Defendants' Statements Are Not Protected Forward-Looking Statements

Defendants next contend that certain of their challenged statements are shielded under the "bespeaks caution" doctrine because they were both forward-looking and accompanied by meaningful cautionary language. Def. Br. at 10-12.  Defendants are wrong on both points.

First, the challenged statements are not subject to protection because Defendants misrepresented present, known facts when making the statements.  *See City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. California v. Toll Bros., Inc.,* 2008 WL 4058690, at *2-4 (E.D. Pa. Aug. 29, 2008) ("bespeaks caution" doctrine inapplicable where statements at issue also contain misrepresentations about then-existing facts, or facts and circumstances having already transpired); *see also W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at *18 (E.D. Pa. June 16, 2015) (the "law provides no safe harbor for … false statements" where defendants lied to investors about present known facts); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649-50 (E.D. Pa. 2015) (safe harbor does not protect statements characterizing past or current events, or statements that make reference to both future events and

present events).   Defendants here repeatedly issued statements with concrete in-service dates for ME2, assured investors that Energy Transfer was "continu[ing] to make progress on the construction of [the] project," and made representations about the initial capacity of ME2.  *E.g.*, ¶¶ 338, 340, 348, 349, 356.  These statements were based on facts that existed at the time the statements were made, and as such are not forward-looking.  *See AES v. Dow Chem. Co.*, 2001 WL 34367296, at *4 (D. Del. Jan. 19, 2001) (rejecting argument that challenged statements relating to the completion date and profitability of a project were forward-looking because the statements were of then-present fact and based on information known to defendants at the time) (citing cases).

Second, even if some of the statements arguably were purely forward-looking, those statements would still be actionable because Plaintiffs "have alleged sufficient facts that if accepted as true, establish knowledge on the part of the Defendants that [the forward-looking] statements … were false or misleading or omitted a material fact." *Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007); *see also MGM Mirage*, 2013 WL 5435832, at *8 ("to the extent that some statements alleged in the Complaint were expressed in terms of future expectations or estimations, the Complaint also alleges that those statements were misleading because of the omission of material facts presently known to the speaker").

Third, the challenged statements were also not accompanied by meaningful cautionary language.  The boilerplate cautionary language identified by Defendants in their brief (Def. Br. at 10-11) fails to meet the law's requirement for "extensive [and] specific" language to trigger safe harbor protection.  *See*, *e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).  To name but a few examples, Defendants' purported cautionary language did not include: (i) any explanation about the facts known to Defendants about the manner in which they pressured the

DEP to provide permits for the Pipeline Projects; (ii) the problems with the construction of ME2; (iii) the HDD work that remained to be done even as of March 2020; (iv) the destruction of lakes, streams and water wells across Pennsylvania; or (v) the many specific warnings that Energy Transfer had received from its own consultants and stakeholders like Aqua.   As a result, Defendants' purported cautionary language is insufficient to shield any of their statements about ME2's or Revolution's construction, in-service dates or capacities.   *MGM Mirage*, 2013 WL 5435832, at *8 ("MGM's cautionary language accompanying any forward-looking statements was not sufficient to qualify for the safe harbor because it did not include an explanation of the facts known to the speaker about the various problems with the CityCenter construction costs and schedule"); *see also SCANA*, 2019 WL 1427443, at *9 ("Plaintiffs plausibly allege cautionary language relied on by SCANA fails to convey any substantive warning to investors regarding the specific deficiencies facing the Project…. Instead, Defendants allegedly continued to inform SCANA's investors, the PSC, and the public that great progress was being made on the Project.").[20]

### c.    Defendants' Misstatements and Omissions Were Material

The Complaint pleads in detail each of the statements made by Defendants concerning the completion dates and throughput of the ME2 and Revolution pipelines, and the reasons why each such statement was false and/or materially misleading when made.   *See* ¶¶ 332-365.   Given the centrality of these statements (and related omissions) concerning the Pipeline Projects to the

---

[20] Because Defendants' statements misrepresented then-existing facts, were knowingly false and misleading when made, and were not accompanied by meaningful cautionary language, Defendants' citations to *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (involving "general representations of better business ahead" that were accompanied by "cautionary statements relat[ing] directly to the claim on which plaintiffs allegedly relied"), and *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716-17 (3d Cir. 2019) (involving claim based on information that, rather than being obscured, was in actuality "readily and consistently disclosed by" the company), are inapposite.

Partnership's bottom line, including its revenues, earnings and the capital expenditures, Defendants do not question the materiality of these statements on the whole or argue that they constituted immaterial corporate puffery.  Rather, Defendants question only a few of the many identified statements on these grounds.  Def. Br. at 14 n.19, 15-16.

First, Defendants argue that an excerpt of a longer July 3, 2018 statement by Energy Transfer Partners spokesperson Vicki Granado that "[a] minimum amount of work will be required to change this line [referring to the older 12-inch pipe] from a refined products line to a NGL pipeline … can be done quickly and safely" (¶ 358) constitutes immaterial puffery.  Defendants are wrong for two reasons.  First, the law is clear: "a determinate, verifiable statement" of fact, like Granado's, "is not mere puffery."  *Omnicare*, 575 U.S. at 184; *see also SCANA*, 2019 WL 1427443, at *9 ("Plaintiffs plausibly allege that the identified misstatements expressed certainty rather than an uncertain view of a fact, and thus cannot be described as opinions or puffery").  Second, while Defendants assert that "Plaintiffs do not allege any facts suggesting [Granado's statement] was untrue" (Def. Br. at 14 n.19), they ignore that the statement was made in a much wider context involving a seminal change to construction of ME2, which was critical to Energy Transfer's business.  That wider context is set forth at ¶¶ 168-181, which also includes a concurrent statement that Granado made claiming that the older pipe would allow the Partnership to meet its "customer obligations" but which misleadingly omitted that the Partnership would <u>not</u> be able to meet the initial throughput figure Energy Transfer had touted and would continue to represent.  As such, the statement as a whole was materially misleading and not the kind of vague and optimistic statement that could be dismissed as corporate puffery.  *See DFC Global Corp.*, 2015 WL 3755218, at *13 (fraudulent comments about a fundamental aspect of a company's business are of vital importance to investors and are far from vague statements of intention or optimism).

Defendants argue that another portion of a statement from Defendant McCrea on Energy Transfer's November 8, 2017 earnings call is "too vague to be either actionable or material" when he said, "[W]ith Matt Ramsey and his team we're doing everything we can to work with PA DEP and to get all the HDDs completed and on time."  Def. Br. at 15-16 (citing ¶ 346).  Yet, the Complaint alleges that Defendant McCrea's statement was directly contradicted by Energy Transfer's knowledge of significant permit violations related to HDD during the planning for and construction of the Pipeline Projects that resulted in extensive property damage and significant delays.  *E.g.*, ¶¶ 125-161.  Thus, McCrea's statement is actionable because it omitted material facts "that would have been viewed by the reasonable investor as having significantly altered the total mix of information made available during the period prior to abandonment of the [p]roject."  *SCANA*, 2019 WL 1427443, at *9 (upholding similar allegations while rejecting argument that statements concerning construction project were immaterial to investors).

### d.   Plaintiffs' Allegations Do Not Rely on Inactionable Corporate Mismanagement

Defendants also argue that their decision to construct the Revolution pipeline "in landslide-prone areas and without adequate best practices or safety measures, despite repeated warnings to the contrary," constitutes inactionable corporate mismanagement.  Def. Br. at 17 (citing ¶ 352).  To the contrary, Plaintiffs allege claims of securities fraud based on statements made by Defendants and material information that was omitted from them.  As the Third Circuit explained in *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992), even in a case where underlying mismanagement might exist, a complaint pleads "an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred <u>and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement</u>."

Accordingly, Defendants' statements here are actionable because they failed to disclose material facts that directly contradicted their representations concerning successful completion of ME2 and Revolution.  *See In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 950 (E.D. Pa. 1999) ("a complaint is not subject to dismissal if plaintiffs 'plead specific facts permitting the inference that defendants were intentionally concealing [mismanagement.]'") (citation omitted).

## B.     Defendants' Statements Regarding Safety and Legal Compliance Are Actionable

Energy Transfer's statements touting its commitments to safety and associated legal requirements were false and misleading when made because they were contradicted by then-existing facts.  *See* Def. App. A at 8-9, Statements 27-37 (Safety and Legal Compliance); at 12-13, Statements 42-44 ("Paraphrases About Safety"); at 13-14, Statements 45-47 ("Legal Compliance / Permits"); and at 15, Statements 56-58 ("Other Statements About Legal Compliance").  Courts have repeatedly recognized that statements emphasizing the strength of particular business operations may be actionable as securities fraud, where those operations are in reality deficient.  *See Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (collecting cases).  By placing Energy Transfer's compliance and safety protocols "in play," Defendants were also required to disclose "certain facts contradicting th[ose] representations." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).  The undisclosed facts undermining Defendants' representations relating to safety and compliance had particular significance to investors here.  Not only did they misrepresent matters pertaining to Energy Transfer's potential liability to abutting landowners and others whose lives and property were put in jeopardy, they also meant that Energy Transfer would be unable to complete the Pipeline Projects by the end of 2018 with the stated initial carrying capacity and pipeline specifications.  ¶ 129.

All of Energy Transfer's claims relating to safety and compliance were made in the context of its ongoing failure to disclose its conscious disregard of known safety concerns, skirting of regulatory processes, and violations of DEP requirements. *See* ¶¶ 370-381, Section B.1, *infra*. Far from "aspirational puffery," Energy Transfer's statements contained concrete examples of their purported compliance and focus on safety: the permitting process (Section B.2); compliance with DEP-issued permit requirements (Section B.3); and purported prioritization of impacted communities (Section B.4). Finally, none of Defendants' purported risk disclosures shield them from liability (Section B.5).

### 1. Statements Touting Purported Commitments to Safety and Compliance Are Actionable

Defendants assert that "Plaintiffs do not—and cannot—allege that Energy Transfer did not have the commitments or priorities expressed by Statements 27 through 37 [relating to Energy Transfer's purported commitment to safety]. Instead, Plaintiffs take issue with Energy Transfer's execution on living up to these high ideals." Def. Br. at 19. This mischaracterizes Lead Plaintiffs' claims because the Complaint includes allegations about Defendants' lack of safety-related commitments and priorities. Energy Transfer's "execution" failures, its cavalier approach to planning and the coercion it applied to obtain its construction permits, and the subsequent catastrophic consequences thereof, were <u>manifestations</u> of its failure to prioritize safety.

Where a company's record demonstrates that production, not safety, is its first priority, statements regarding "commitment to safety" are actionable. *See, e.g.*, *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D.W. Va. 2012). In *Massey*, the court analyzed statements regarding "commitment" to safety made by a company with an abysmal safety record. *Id.* The court held that, rather than "immaterial puffery," these statements were capable of being proven false given the empirically unsafe conditions at defendants' mines. *Id.* The court further found

that the statements were "not stated in a context of a future prediction" but, rather, "recognize the company's past achievements and current goals" and "closely aligned their statements of commitment to safety to their productivity and success as a company." *Id.*

Like the defendants' statements in *Massey*, each of Energy Transfer's statements regarding its purported "commitment" to safety constituted an actionable statement, because Energy Transfer's "commitment to safety" is demonstrably absent. Its statements misrepresent achievements and current goals. For example, on January 3, 2018, the DEP ordered the Partnership to shut down construction on the ME2 and ME2X, based upon its "<u>unlawful conduct</u>" and "<u>egregious and willful</u>" violations of Pennsylvania environmental laws and the terms of the DEP permits issued for the ME2 project. ¶¶ 309-312; *see also* ¶¶ 315-322. That same day, in a statement published in numerous media outlets, Energy Transfer stated: "We … reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work." ¶¶ 312, 367. But just a few months later, Judge Barnes found in the May 2018 Order that "Sunoco has made deliberate managerial decisions to proceed in what appears to be a rushed manner in <u>an apparent prioritization of profit over the best engineering practices available in our time that might best ensure public safety</u>." ¶ 322. Moreover, Energy Transfer's construction activities (as well as its repeated failures to even report the environmental harms that its construction activities caused) remained consistently poor throughout 2017 and 2018, leading to the largest fines ever imposed by the DEP in Pennsylvania history. ¶¶ 232, 271 ($30.6 million), 287, 294-295, 313 ($12.6 million), 323-325.[21] But even in

---

[21] Even since the end of the Class Period, Energy Transfer has continued to rack up notices of violations and DEP fines (at least $2.5 million of which had remained unpaid). ¶¶ 275-276. Indeed, less than a month ago, on September 11, 2020, the DEP issued an Order that requires Energy Transfer to re-route a portion of the ME2 pipeline being dug in Upper Uwchlan Township, Chester County, after an August 10, 2020 spill of 8,000 gallons of drilling fluid flowed into Marsh Creek Lake, a 535-acre lake that serves as a reservoir within the Marsh Creek State Park, one of the most heavily visited parks in the Commonwealth,

the midst of all of these incidents, on September 25, 2018, Energy Transfer spokesperson Dillinger said that since Sunoco Pipeline's integration with Energy Transfer Partners on May 1, 2017, accidents had been "drastically reduced," when in reality there has been virtually no change in the number of permit violations.  *See* ¶¶ 369 (chart of violations), 376.  Moreover, as in *Massey*, and as described in Section A above, these statements were closely aligned with Energy Transfer's promises to its investors regarding ME2's expected completion dates and throughput, as well as the Partnership's productivity and success as a company.  *See, e.g.*, ¶ 376 ("It is our priority to maintain and operate our assets to the highest safety standards, <u>not just because it makes good business sense</u>, but because it is the right thing to do.") (Statement 34).

   None of the Third Circuit cases cited by Defendants undermine this conclusion.  *In re Advanta* and *In re Aetna* do not address concealment of the type of wrongdoing at issue in this case.  For example, in *In re Advanta*, cited in Def. Br. at 17 n.29, the Court of Appeals held that positive statements were not actionable merely because they were issued when a company "relax[ed] its underwriting and monitoring procedures," "changed its methodology," or "lacked [an] adequate collection capability" to support its operations.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).  In *In re Aetna*, cited in Def. Br. at 18, the Court of Appeals similarly addressed defendants' statements asserting that a pricing policy was "disciplined," when plaintiffs had alleged that defendants did not, in fact, adhere to a conservative underwriting practice.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 274 (3d Cir. 2010).  Neither *In re Advanta* nor *In re Aetna*

---

with more than a million visitors a year.  *See* Golan Decl., Pl. Ex. 3 (Frank Kummer, *Pennsylvania DEP orders Sunoco to reroute Mariner East 2 pipeline after spill into Marsh Creek Lake*, <u>Philadelphia Inquirer</u> (Sept. 11, 2020) (accessible at: <u>https://www.inquirer.com/science/climate/mariner-east-pipeline-sunoco-energy-transfer-pennsylvania-dep-chester-county-20200911.html</u>)).   In announcing the Order, DEP Secretary McDonnell stated: "These incidents are <u>yet another instance</u> where Sunoco has <u>blatantly disregarded the citizens and resources of Chester County with careless actions while installing the Mariner East 2 pipeline</u>. … An alternate route must be used."  *Id.*

dealt with unlawful and improper conduct by defendants like in this case.  Here, Defendants'
statements were not merely "general optimistic statements about the Company's future growth,"
such as those in *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007), cited at
Def. Br. at 18 n.29 & 25 n.49.  Indeed, Defendants' specific statements here concerning Energy
Transfer's *present and past* safety practices were made, in many instances, in the direct context of
the Partnership's actions causing massive sinkholes, hundreds of frac-outs, the destruction of many
lakes and streams, contamination of reservoirs and private fresh water sources, and express
findings by the DEP that the Partnership had engaged in "egregious and willful" misconduct.

Defendants' cited authority from other jurisdictions is equally inapposite.  For example, in
*Whole Foods*, cited at Def. Br. at 19 n.31, the Court of Appeals for the Ninth Circuit held that
general statements about "transparency, integrity, and quality" were nonactionable puffery.
*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 899 (5th Cir. 2018).  But, the *Whole
Foods* plaintiffs did not allege the type of wrongdoing alleged here.  Similarly, in *ECA, Local 134
IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 205 (2d Cir. 2009),
cited in Def. Br. at 19 n.32, the court found that the statements regarding the bank's "'highly
disciplined' risk management and its standard-setting reputation for integrity" were not actionable.
But these general statements were not specifically tied, as they are here, to the operations at the
heart of Defendants' wrongdoing – in this case, the Pipeline Projects.

### 2. Misrepresentations and Omissions Relating to Permitting Process Are Actionable

Energy Transfer obtained the ME2 permits through intimidation of government officials
despite the permit applications being facially deficient.  *See* Section II, at 3-6.  Defendants' failure
to disclose its improper conduct to investors, while at the same time making statements regarding
the permitting process, constituted an actionable omission.

According to former DEP Secretary Quigley, Energy Transfer's permit applications were "woefully inadequate" as of March 2016.   ¶¶ 9, 82.   Despite continuing deficiencies, the Governor's office ordered Quigley's predecessor to issue the permits notwithstanding that (a) the DEP had prepared an approximately 70-page deficiency letter to the Energy Transfer Companies that simply disappeared right before the DEP issued the permits and (b) instead of issuing the deficiency letter that would have led to further delay, the DEP took an unprecedented (and improper) action of issuing the permits subject to various "special conditions"  *See* page 5, above; *see also* ¶¶ 78-87.   The special conditions contained substantial lists of terms and construction methods the Energy Transfer Companies agreed to abide by throughout their construction of ME2. ¶ 118.   But, even after receiving this highly preferential treatment with respect to the issuance of the permits, Energy Transfer did not abide by the agreements in the special conditions, leading to hundreds of frac-outs and ground water contaminations, and forcing the DEP to issue at least 36 notices of violation in connection with the Company's construction activities in 2017, and a further 55 notices throughout 2018.  ¶¶ 86, 128.

On February 24, 2017, the first day of the Class Period, Energy Transfer issued its Form 10-K for the year ended December 31, 2016 (the "2016 10-K").  ¶ 63.  The 2016 10-K was signed by Defendants Warren, McCrea, McReynolds, Ramsey and Long, among others.  It stated in pertinent part: "[In addition, we believe that] we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business."  ¶ 389 (Statements 45 and 46).  Similar statements were made in the 10-K issued for the year ended December 31, 2017 (¶ 390) and for the year ended

December 31, 2018.  However, Energy Transfer had not made "all required material registrations, qualifications and filings" with the DEP; rather, it obtained the permits for the ME2 pipeline through its coercion of government officials, as set forth at pages 3-6, above.  And, as investors would learn from the *Associated Press* on November 12, 2019, the FBI launched a corruption investigation into the Wolf administration's decision to issue the permits for the construction of the ME2 pipeline.  ¶ 25.

Defendants assert that their statements are not misleading "because they do not suggest that the undisclosed improper activity alleged by Plaintiff[s] was not occurring."  Def. Br. at 25. To the contrary, this is *exactly* what these statements suggest: that Defendants were obtaining all required approvals and were making necessary disclosures – and were doing so in a lawful manner. This interpretation is only enhanced by spokesperson Lisa Dillinger's later statement regarding the permitting process: "*From the outset,* Sunoco has maintained that the permits were *properly and lawfully issued* by [the DEP] [and fully protective of the environment]."  ¶¶ 373, 391 (Statement 47).  Defendants also claim that companies do not have a duty to disclose "uncharged, adjudicated wrongdoing."  Def. Br. at 25.  But disclosure is required when necessary "to make … statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)).  Thus, for example, the court held in *Richman v. Goldman Sachs Grp., Inc.*, that plaintiffs plausibly alleged that the defendant's material omissions concerning fraudulent conduct in transactions made its disclosures concerning its business practices materially misleading, and conflicted with its shareholders' interests because fraudulent conduct hurts a company's share price and concealing such conduct caused the stock to trade at artificially high prices.  868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012).  Similar claims were upheld in *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *7 (D.N.J. June

5, 2020), in which a company falsely touted the benefits of certain licenses and the court found the statements were materially misleading because those benefits were obtained by way of a bribery scheme. Recently, in *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020), the court found that statements regarding AbbVie's sales and marketing of its blockbuster drug Humira were false and misleading because they omitted the details of AbbVie's alleged unlawful kickback scheme.

After inaccurately summarizing the plethora of facts alleged in the Complaint, Defendants further argue that Energy Transfer's improper conduct is not pleaded with sufficient particularity. *Compare* Def. Br. at 26-28 *with* ¶¶ 63-124 and pages 3-6, above. However, far from being "vague concerns," these allegations are premised upon: (i) information provided by the former Secretary of the DEP who was removed from his position when he would not turn a blind eye to the deficiencies in Energy Transfer's application for ME2; (ii) information and sworn testimony of former and current employees of the DEP; (iii) private text messages sent between and among Energy Transfer's McGinn, Governor Wolf's special assistant Bane, and the DEP Secretary McDonnell; and (iv) investigative reports citing to the unprecedented use of "special conditions" as the basis for issuing the ME2 permits. Without question, Defendants were in specific positions to know about Energy Transfer's improper conduct on its most important capital expenditure projects in 2017 and 2018, the ME2, ME2X and Revolution pipelines.

Defendants also argue that these statements are nonactionable statements of belief. Def. Br. at 26. Defendants are wrong, because Energy Transfer engaged in "bribery, coercion, or other improper means" to obtain the permits, failed to disclose its actions to investors, and continued to commit violations of its existing permit requirements. Opinions, even if sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information

thereby making statement misleading to a reasonable investor.  *See Omnicare*, 575 U.S. at 187-88 (statement that "we believe our conduct is lawful" may be actionable if the defendant knows that the government takes a contrary view).  But even if this Court were to find that these statements were opinions, the Complaint identifies numerous "particular (and material) facts" that were not disclosed and "that cannot be squared" with the statements.  *Id.* at 192-94.  Energy Transfer "must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law … as mere puffery or statements of opinion."  *Goldman*, 868 F. Supp. 2d at 279-80.

### 3.    Statements Relating to Compliance with DEP Permit Requirements Are Actionable

After the DEP issued permits for ME2, Energy Transfer demonstrated its lack of commitment to compliance, even while putting the topic of compliance with permit requirements "in play."  Defendants' repeated, blatant violations of DEP's permit requirements continued unabated after it received its permits.  *See* pages 8-11, above.  On January 3, 2018, faced with continued violations, as well as disregard of the many prior agreements Sunoco and the DEP had reached concerning those violations, the DEP was forced to halt entirely all of the construction on ME2 and ME2X.  As DEP Secretary McDonnell stated: "[u]ntil Sunoco can demonstrate that the permit conditions can and will be followed, DEP has no alternative but to suspend the permits."  ¶ 309.  In the January 2018 Order, the DEP admonished Sunoco for its blatant disregard of Pennsylvania laws and the DEP permits that had been issued:

> Sunoco's ***unlawful conduct*** . . . demonstrates ***a lack of ability or intention on the part of Sunoco to comply*** with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder.  ***Suspension of the permits … is necessary to correct the egregious and willful violations described herein***. Other enforcement procedures, penalties and remedies available to the Department under the Clean Streams Law and the Dam Safety and Encroachments Act ***would not be adequate to effect prompt or effective correction of the conditions or violations demonstrated by Sunoco's lack of ability or intention to comply***.

¶ 310.  The suspension was "one of the most significant penalties DEP can levy."  ¶ 311.  On

February 8, 2018, Sunoco agreed to pay a $12.6 million fine to continue construction on ME2, one of the largest in DEP history, and to continued monitoring of ME2 and ME2X.  ¶ 313.

In a February 8, 2018 *StateImpact* article, Energy Transfer's spokesperson Jeff Shields was quoted as stating: "[We are] ***committed to fully complying with the DEP order, which includes following all permit requirements*.**"  ¶ 368 (Statement 29).  However, Energy Transfer's actions both before and after this statement show that the statement was false when made, as even after this monumental fine, the Partnership's willful and reckless violations of its permit requirements continued unabated.  Just over *two months* after its $12.6 million fine, on April 27, 2018, the DEP fined Energy Transfer a further $355,000 for multiple violations of Pennsylvania law and the special conditions in the ME2 permits stemming from 69 separate occasions of frac-outs caused by Energy Transfer's HDD activities throughout the state.  ¶ 314.

On October 21, 2018, an article in the *Pittsburgh Post-Gazette* quoted Energy Transfer spokesperson Lisa Dillinger as stating: "We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work."  ¶ 377 (Statement 35).  But as illustrated in the Complaint at ¶ 369, Energy Transfer's destructive pipeline practices continued to cause frac-outs at approximately the same rate in 2018 as they had in 2017.

"A repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance."  *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012) (citing *Reese v. BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011)).  In *In re BP*, the court addressed whether BP's repeated assertions and promises related to "safety" were actionable statements, when viewed in light of "a string of prior safety failures in BP's operations."  The court specifically considered BP's repeated representations of

57

safety after the issuance of a panel recommendation providing a roadmap for improvement of safety-related processes, and found that plaintiffs alleged sufficient facts to call into question whether the BP defendants were, in fact, implementing the safety reforms as they represented.  *Id.* at 758-59.  Here, as in *In re BP*, Energy Transfer repeatedly asserted its commitments to comply with all DEP orders and all permit requirements, and to follow the "strict guidelines" therein.  And, like in *In re BP*, Plaintiffs have sufficiently asserted facts undermining Energy Transfer's assertions of compliance.

Other courts have similarly found that assertions of compliance and safety are actionable when there exists a factual record supporting the plaintiffs' contentions that the assertions are false or materially misleading, taking all reasonable inferences in plaintiff's favor.  *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1219 (N.D. Ga. 2019) ("Plaintiff has pleaded a multitude of specific, detailed factual allegations demonstrating that Equifax's cybersecurity systems were grossly deficient and outdated, despite the Defendants' various assurances to the contrary"); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (defendants' alleged representations that it "conducted 'extensive' training and safety programs" were materially misleading where the plaintiff alleged facts suggesting that "the measures were insufficient to address applicable legal requirements and created a high risk of legal exposure"); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1477 (N.D. Ga. 1997) (defendants' assertions on safety were false in light of numerous safety-related incidents and the FAA's heightened scrutiny of ValuJet's operations).

### 4.    Statements Regarding Purported Commitments to Homeowners Are Actionable

Energy Transfer repeatedly expressed its purported commitment to homeowners impacted by the Pipeline Projects, even in the immediate aftermath of incidents factually demonstrating its

abject lack of commitment to the surrounding communities.  Two examples suffice to demonstrate the falsity of these statements: the destruction of Lisa Drive; and the catastrophic explosion of the Revolution pipeline.[22]

*Lisa Drive sinkholes:*  On November 11, 2017, the Energy Transfer Companies' drilling of the ME2 pipeline in the sinkhole-prone karst topography of Chester County caused a 500-gallon frac-out and sinkholes to appear at the Lisa Drive Site in West Whiteland Township.   ¶ 148. Energy Transfer's HDD operations caused "geysers of drilling fluids" to be released in the area. Shortly after the initial five sinkholes appeared, multiple additional sinkholes appeared that caused damage to other structures, such as "cracking in the walls, chimneys and driveways" of nearby residents' homes.  ¶ 154.

Energy Transfer first characterizes its spokesperson's statement regarding Lisa Drive, *see* ¶¶ 355, 371 (Statement 44), as "opinion" (*see* section heading, Def. Br. at 23), but then apparently abandons this claim and instead argues that the statement was "accurate."  Def. Br. at 24.  The statement was neither "opinion" nor "accurate."  Spokesperson Shields stated that the karst north of the area under Lisa Drive "**does not impact this area**."  The Complaint alleges the opposite, which is that Defendants knew about the risks relating to drilling through limestone and dolomites, which are locally known for karst development, and that Defendants knew about the severe risk of sinkholes in the site vicinity.  *See* ¶ 145 (citing to GES report) and ¶ 146 (citing to Tetra Tech

---

[22]  The Complaint includes dozens of other examples undercutting Energy Transfer's claims about its commitment to the safety of persons and businesses abutting the Pipeline Projects, including: the record number of frac-outs that contaminated well water and other natural resources in counties across Pennsylvania; the many sinkholes that Energy Transfer pipeline construction caused in addition to the ones at Lisa Drive; and the destruction and contamination of the Loyalhanna Lake and the Raystown Lake.  *See* pages 6-21, above.  Moreover, as shown in n. 21, above, Energy Transfer continues to this day to cause frac-outs and spills, including the 8,000 gallon spill that DEP Secretary McDonnell described as "yet another instance where Sunoco has ***blatantly disregarded the citizens and resources of Chester County with careless actions while installing the Mariner East 2 pipeline***."  Golan Decl., Pl. Ex. 3.

report).  But, in an attempt to support their argument that the statement was "accurate," Defendants misconstrue Plaintiffs' allegations regarding the geology impacting the Lisa Drive site.  Plaintiffs do not allege that known limestone existed directly under Lisa Drive, but rather that the first third of the HDD path at the Lisa Drive Site traversed known limestone formations, which dramatically increased the risk of causing frac-outs and sinkholes.  ¶ 355.

This conclusion is bolstered where, as here, internal documents demonstrated that Energy Transfer's approach to drilling was unsafe, making their repeated assertions of "safety" actionable. In *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 661 (6th Cir. 2005), consumers filed lawsuits alleging that tire tread separation caused accidents and fatalities.  In response, the company made public statements that "the objective data clearly reinforces our belief that these are high-quality, safe tires." *Id.*  However, internal data showed that Firestone knew for years that its tires were failing at unprecedented rates. *Id.*  The Sixth Circuit reversed the District Court's holding on this statement, finding that it was not immaterial puffery. *Id.* at 672.  The Court of Appeals noted that the statement was "an assertion of a relationship between data and a conclusion, one that a finder of fact could test against record evidence" and that, even if it was classified as an opinion, "it was still specific enough to form the basis of an actionable securities fraud claim." *Id.* at 674.  Similarly here, Energy Transfer's internal documents showed that drilling though areas like the Lisa Drive site was not safe and, in fact, that Energy Transfer had been specifically warned of the danger not only by the Partnership's own consultants but also by the water company Aqua.  *See* pages 12-13, above.

Defendants also argue that the portion of Statement 44 in which Shields states that "[c]onstruction through this area is safe" is immaterial as a matter of law, because, *inter alia*, "it describes the safety of construction of one 400-foot stretch of pipeline, among 12,500 miles of

60

pipeline owned and operated by Energy Transfer." Def. Br. at 24. A misrepresentation or omission is material if there is a "'substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted). Materiality is ordinarily a jury question, requiring "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." *Matrixx*, 563 U.S. at 36 (quoting *Basic*, 485 U.S. at 236). "'[O]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.'" *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) (quoting *Shapiro*, 964 F.2d at 281 n.11).

Defendants' argument that the statement is immaterial because it merely relates to "one 400-foot stretch of pipeline" is absurd. This argument would be akin to a tire manufacturer arguing that since only *some* tires caused fatalities, out of hundreds of thousands of tires sold, statements regarding the safety of those tires would be immaterial as a matter of law. Defendants point to precisely zero cases supporting this line of argument, and cannot articulate why a high-profile safety failure of its largest CapEx project at the time, particularly when viewed in the context of its overall lack of commitment to safety, would be "obviously unimportant" to an average investor. And, as a factual matter in this case, as shown above at pages 12-15, and in the Complaint (¶¶ 168-181), the problems with the placement of the 20-inch ME2 pipeline through the area northwest and southeast of Lisa Drive required the Partnership to establish a "Frankenpipe" work-around that further delayed the in-service date and drastically reduced the throughput capacity of the cobbled-together pipeline that was placed in service.

**Revolution explosion:**  On September 10, 2018, a portion of Energy Transfer's Revolution pipeline exploded in Beaver County, Pennsylvania – destroying one home, scorching three acres of land, forcing residents to flee, and knocking out power for over 1,500 people.  ¶ 21.  The explosion occurred in an area that Energy Transfer knew was prone to landslides.  ¶ 21.  Indeed, in the days before the explosion, a resident closest to the explosion site, whose house was engulfed in flames minutes after the explosion, had notified Energy Transfer that the hillside at the Explosion Site had a slip that was still moving but he was told it had been fixed.  ¶ 381.

Astoundingly, Defendants argue that "there are no allegations that residents faced 'environmental health risks' in the "aftermath of the [Revolution] explosion," and therefore that Statement 42 (Granado statement to newspaper that there were no environmental health risks to residents) cannot be false.  Def. Br. at 22.  Notwithstanding Defendants' callous and conclusory assertion to the contrary, an explosion that results in the destruction of a home, scorches three acres of land, forces residents to flee, and knocks out power for over 1,500 people, constitutes an environmental health risk.[23]

On the same day, Energy Transfer spokesperson Granado was quoted as stating "[o]ur obligation to homeowners is 100 percent — that people continue to be safe and secure," and a

---

[23] Defendants also argue that because this statement is purportedly "paraphrased," and is not presented as a direct quotation, it is therefore not actionable.  Def. Br. at 22.  This argument appears to rely primarily upon an unpublished opinion in *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015).  The court's opinion addressed whether a statement could be properly attributed to an individual defendant, where the author of the article "had control over which portions of the interview to use and how to present any information received from [defendant]."  *Id.*  Taken to its logical conclusion, this reasoning would prohibit a plaintiff from relying on any third party source to demonstrate a false or misleading statement, merely because the defendant did not have final editorial control over the source's contents.  For this reason, courts routinely find that statements reported by third parties are actionable.  As the court stated in *Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100, 1112 n. 5 (D. Nev. 2014): "That these statements are not directly quoted and instead may be paraphrased *is of no import. The content of the representations is clearly and specifically alleged*."  Because the contents and source of all the statements are clearly alleged, Defendants' arguments regarding "paraphrased" statements must fail.  *See* Def. App. A at 12, Statements 42-43 ("Paraphrases about Safety").

letter to local residents stated "our first priority continues to be the safety of those who live in this community." ¶¶ 377-378 (Statements 32-22). These statements regurgitated other misrepresentations regarding Energy Transfer's commitment to homeowners: *see* February 8, 2018 statement that "Safety is paramount for any energy infrastructure project that we do – the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment." ¶ 368 (Statement 29); "At Energy Transfer and Sunoco Pipeline, we pledge to the communities we cross and the customers we serve that we will operate our pipeline with the highest level of safety at all times." ¶ 372 (Def. App. A at 8, Statement 31). As discussed above, these statements of purported commitment to homeowners are actionable misrepresentations, *In re Massey*, 883 F. Supp. 2d at 618, and their repetition became a misleading representation of an ongoing commitment. *In re BP*, 843 F. Supp. 2d at 759.

### 5. Energy Transfer's Disclaimers Relating to Safety Risks Do Not Shield Defendants from Liability

In a further attempt to immunize their statements concerning safety and compliance, Defendants assert that the risk of safety incidents was "well-known, and expressly disclosed to, investors." Def. Br. at 19. However, cautionary words about future risk "cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Further, as the court stated in *McMahan & Co. v. Wherehouse Ent., Inc*., 900 F.2d 576, 579 (2d Cir. 1990): "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."

The purported "disclosure" to which Defendants point states, in full, that "[s]ome of ETP's operations involve risks of personal injury, property damage and environmental damage, which could curtail its operations and otherwise materially adversely affect its cash flow." Def. Br. at 19

n.33.  This is precisely the type of boilerplate "disclosure" that is routinely rejected.  *See, e.g.*, *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (holding that a plaintiff can overcome risk disclosure statements and cautionary language if "the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss"); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (same).

Moreover, Energy Transfer's risk "disclosure" is phrased as relating to future risk, and therefore cannot apply to already-transpired risks.  As several courts have noted, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) (citations omitted).  Here, where Energy Transfer repeatedly offered statements of its commitment to safety and compliance with legal and regulatory requirements, and further took issue specifically with assertions that it had caused any safety and health risks to abutting landowners, the Partnership's boilerplate cautionary language – which only warned that "*[s]ome* of ETP's operations involve risks of personal injury, property damage and environmental damage, *which could* curtail its operations and otherwise materially adversely affect its cash flow" – is not sufficient to immunize its false and materially misleading statements.  *Accord*, *Westinghouse*, 90 F.3d at 710 (cautionary language did not render alleged misrepresentations immaterial as a matter of law).

### C.    Energy Transfer's Statements Regarding Its Code of Conduct and the Chester County DA's Prosecution Are Actionable

#### 1.    Energy Transfer's Use of Pennsylvania Constables to Intimidate Concerned Citizens Violated Its Code of Conduct and Gives Rise to Actionable Misrepresentations

In the face of opposition to the Pipeline Projects by Chester County residents who lived in sinkhole-prone neighborhoods, Energy Transfer recruited Pennsylvania constables to act as guards

at construction sites while armed and in uniform in order to intimidate residents. Energy Transfer sought to conceal its "buy-a-badge" scheme by paying the constables through numerous Partnership subcontractors that had no operational control over the constables' activities.

On December 19, 2018, the Chester County DA announced that it had opened a criminal investigation into the construction of the Mariner East pipelines and its owners in light of "sinkholes created by the pipeline drilling, contaminated well water," and "subtle and not-so-subtle bullying of Chester County citizens." ¶ 182. Energy Transfer dispatched the Pennsylvania constables it hired to Lisa Drive and other locations, where residents complained about sinkholes and the release of HDD drilling fluids. One Lisa Drive resident told Detective Martin from the Chester County DA's office that he had seen armed individuals on his property, at least one of whom was identified as a Pennsylvania constable. ¶ 195. State Senator Andy Dinniman told Detective Martin that constituents had reported Energy Transfer employed armed security guards who displayed their badges and identified themselves as Pennsylvania constables. The residents reported being intimidated by armed men showing their badges while restricting residents' movements on their own properties. ¶ 196.

On January 21, 2019, Detective Martin went to Lisa Drive, parked legally, and was approached by an individual, who identified himself as a Pennsylvania state constable, wore a "patrol style duty belt with a firearm," and displayed a visible Pennsylvania constable badge. The constable identified himself as Mike Robel and told Martin that his vehicle would need to move. Robel told Martin that he was employed by Sunoco. ¶ 197. Later that day, Martin again encountered Robel on Lisa Drive. Robel told the detective that he worked as a subcontractor for Sunoco known as Raven Knights[24] and that he was being paid by Sunoco, not the state courts,

---

[24] Raven Knights LLC is a Harrisburg, PA-based security firm. ¶ 188.

because "Sunoco wanted certified constables in uniform as private security for the project." ¶ 198.

During the course of his investigation, Detective Martin interviewed several other constables who worked for Energy Transfer along the ME2 pipeline route in Chester County. One constable who worked for Energy Transfer told Detective Martin that James Murphy of Raven Knights recruited him for the Pipeline Projects and that he reported to Mike Boffo from TigerSwan.[25] ¶¶ 200-201. A second constable, Kareem Johnson, stated that he had met with Boffo to discuss the opportunity to do security work for the Mariner East project. While meeting with Boffo, Johnson was told to do wear his uniform when he was working security on the Mariner East project. ¶ 202.

On August 8, 2019, the Chester County DA charged two Pennsylvania constables, Robel and Johnson, with Bribery, Official Oppression and Ethics Act violations. ¶ 203. As the Chester County DA said at the time: "We cannot have elected law enforcement officials hiring themselves out and using their official positions for personal profit." ¶ 24. In response, Energy Transfer spokesperson Lisa Coleman claimed in an email statement (¶ 203; Def. App. A at 12, Statement 41 (quoted partially)):

> Constables Johnson and Robel were not Sunoco or Energy Transfer employees. They were employed by Raven Knights, who provided security services and personnel. ***We have a code of conduct for all of [our] contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that***.

The misleading nature of this statement was revealed on December 3, 2019, when the Chester County DA filed criminal bribery and conspiracy charges against Energy Transfer's security manager for the Mariner East pipeline, Frank Recknagel. ¶¶ 186-188. Four other individuals affiliated with either Raven Knights or TigerSwan were also charged, including Boffo.

---

[25] TigerSwan LLC is an international security firm. ¶ 188.

¶ 188.   The criminal indictment charged that Recknagel schemed to have armed, uniformed government officials providing security at Energy Transfer locations while attempting to hide the Partnership's hiring of constables.   A press release issued by the Chester County DA summarized the charges as follows:

> … State constables sold their badges and official authority.  <u>Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens.   And the defendants attempted to conceal their activity through a maze of companies and payments</u>…
>
> Energy Transfer decided that they needed security for the pipeline.  However, <u>rather than simply hiring a private security firm, Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline</u>.  Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties…  Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.

¶¶ 186-187.

Recknagel carried out Energy Transfer's "unwritten policy" (*see* ¶ 166) of hiring, armed, uniformed off-duty law enforcement personnel on the Pipeline Projects.   When Lisa Drive residents expressed concerns about the presence of armed security personnel near their homes and children, <u>an executive-level supervisor from Energy Transfer instructed Recknagel</u>, on April 12, 2018, to make security personnel available to meet with residents.  ¶ 166.

In addition, the extreme measures undertaken to manufacture a complex chain of shell entities to shuffle and obscure payments to the constables further underscore the buy-a-badge scheme's imprimatur from the Partnership's executives.  As described in the Chester County DA's press release:  <u>Energy Transfer "used a shell game to hide payments to the Constables….  Every step of the payments was hidden and cloaked….  Recknagel and Energy Transfer wanted the power of the badge to enforce their corporate will and engaged in illegal activity to make it happen, then</u>

hid the payments in a byzantine process to avoid detection of their role."  ¶ 440.[26]

Energy Transfer's unwritten policy with respect to its use of Pennsylvania constables clearly conflicted with and violated its written Code of Conduct, which stated:

> It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.  It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

¶ 383.  The Code defines "Sensitive Payment" as "both receipt and disbursements whether or not illegal," and includes, among other things:

a) receipts from or payments to governmental officials or employees;
b) commercial bribes or kickbacks;
c) …
d) …
e) payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

¶ 384.  The Code also bars "gifts or anything of value" from being provided to government officials "without written approval from the Company's Chief Compliance Officer or the Company's Legal

---

[26] Energy Transfer's conduct here mirrors action undertaken by the Partnership in connection with its controversial Dakota Access pipeline project in North Dakota.  Energy Transfer also used TigerSwan to provide security for the Dakota Access pipeline, where it engaged in invasive surveillance practices and close collaboration with local law enforcement to thwart lawful protests near the Standing Rock reservation. The two TigerSwan contractors charged by the Chester County DA, McKinnon and Boffo, were also engaged for the Dakota Access pipeline.  The North Dakota Private Investigation and Security Board has alleged that the firm engaged in unlicensed security work in that state.  Similarly, the Louisiana security board accused TigerSwan of registering a new security company in the state in an attempt to circumvent a previous license denial for security work related to Energy Transfer's Bayou Bridge oil pipeline.  ¶ 206.

Department." ¶ 385; *see also* Def. App. A at 9-12, Statement 38.

These statements, and others identified in ¶163, were false or misleading because they failed to disclose that Energy Transfer: (i) had an "<u>unwritten policy</u>" to pay and bribe Pennsylvania constables to act as private security for the Pipeline Projects while displaying their badges and firearms to create an appearance that they were acting in their capacity as governmental officials; and (ii) created a series of shell corporations to hide its payments to the constables.  ¶ 164. Defendants nevertheless seek dismissal of the claims based on Energy Transfer's Code of Conduct on the ground that such statements are "inherently aspirational."  Def. Br. at 20.  Defendants' argument is wrong for at least three reasons.

*First*, regardless of whether the Code can be fairly characterized as "aspirational" (it cannot), the Code was a false statement of Energy Transfer's actual policy.  Instead, in Recknagel's own words, Energy Transfer had an "<u>unwritten policy</u>" to hire armed, uniformed constables to create an appearance that they were acting in their official capacity and to pay such individuals through an elaborate web of shell companies to conceal the Partnership's involvement.  Thus, the Code of Conduct falsely described Energy Transfer's policy as prohibiting payments to government officials.

*Second*, Energy Transfer's Code of Conduct was not aspirational.  It set forth conditions that directors, officers and employees were <u>required</u> to follow <u>in all instances</u> under penalty of disciplinary action or dismissal.  The Code provided:

> In all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner.  Every employee [elsewhere defined to include the directors and officers of the Company] must adhere to these policies …  Employees who violate the policies will be subject to disciplinary action and/or discharge*.*

Def. Exh. 8 at 3 (footnote omitted); *see also* ¶ 64.

In similar circumstances, where codes of conduct have been presented as requirements and where defendants' alleged misconduct is at odds with the code, courts have rejected assertions that codes of conduct are merely aspirational statements that can never be actionable. *See Holwill v. AbbVie, Inc.*, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (code of conduct statements, "viewed in the light most favorable to Plaintiffs, are not inherently aspirational but are unqualified statements regarding [defendant's] conduct"); *In re CenturyLink Sales Practices and Sec. Litig.*, 403 F. Supp. 3d 712, 728 (D. Minn. 2019) ("[w]hile a code of conduct may generally be aspirational, in this case, CenturyLink presented [it] as fact" and "'required'" directors, officers and employees to abide by it); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. 2018) ("While generalized, open-ended or aspirational statements do not give rise to securities fraud (as mere puffery), statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint."); *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 n. 6 (S.D.N.Y. 2017) (statements in code "purported to reflect the Company's current state of affairs" that rules "are observed"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y. 2009) (code of conduct statements about independence are actionable where plaintiffs "provide sufficient facts to suggest that the statements … were false").

*Third*, defendants' characterization of the Code of Conduct as aspirational is simply another way of asserting that the Code constitutes immaterial "puffery," a proposition that is unsupported by the case law. As the Third Circuit has stated, "[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial, either because it is so exaggerated ('You cannot lose.') or so vague (This bond is marvelous.') that a reasonable investor would not rely on it in considering the total mix of [available] information." *Hoxworth v. Blinder, Robinson & Co. Inc.*, 903 F. 2d 186, 200-01 (3d Cir. 1990). Here, the statements in Energy Transfer's Code are neither

exaggerated nor vague.  Rather, the Code sets forth a detailed list of prohibited conduct that Partnership employees are **_required_** to follow or else automatically face "**_disciplinary action and/or discharge_**," and further specifically provides that in order to take an action in contravention of the Code an employee must obtain "written approval from the Company's Chief Compliance Officer or the Company's Legal Department" (¶ 385), meaning that they must be an internal paper trail that reaches the highest echelon of the Partnership's management and compliance personnel.

In considering whether a code of conduct may be deemed inactionable puffery, courts have recognized that "context matters."  *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019).  Here, Energy Transfer's code of conduct statements were made against the backdrop of intense scrutiny and public opposition to pipeline projects such as the Mariner East pipeline system, the Revolution pipeline and the Dakota Access pipeline.  They concern a business that is highly dependent on receiving approvals and permits from federal and state regulators.  And, in part, they were made while the Chester County DA was conducting a criminal investigation of the Partnership.  In this context, the code of conduct statements did not represent vague aspirations; rather, they represented concrete assurances to investors and other stakeholders that the Partnership operated within strict legal and ethical standards that were necessary to maintain and expand the Partnership's business.  Violations of this policy, including Energy Transfer's unwritten policy of paying and bribing Pennsylvania constables (as well as the use of bribery and/or coercion to obtain the DEP permits initially), were therefore highly material to investors.

Numerous courts have rejected similar arguments seeking to dismiss code of conduct statements as puffery.  *See e.g.*, *CenturyLink*, 403 F. Supp. 3d at 728 ("In this context, Plaintiffs' allegations are not inactionable puffery."); *Electrobras*, 245 F. Supp. 3d at 463-64 ("there was a substantial likelihood that these [Code of Ethics] statements, made to reassure investors, would be

important to a reasonable person" in making an investment decision); *In re Petrobras Sec. Litig.*,

116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("when (as alleged here) the statements were made

repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable

investor could rely on them as reflective of the true state of affairs at the Company"); *Moody's*,

599 F. Supp. 2d at 508-09 (rejecting statements concerning Moody's purported independence as

puffery where "Moody's steadfastly maintained independence as a cornerstone of its business");

*Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239-40 (S.D.N.Y. 2006) ("it defies logic

to suggest that … an investor would not reasonably rely on a statement, contained in what

Defendants concede was a list of Goldman's business principles, that recognized Goldman's

dedication to complying with the letter and spirit of the laws").[27]

---

[27] The court's finding in *AbbVie*, 2020 WL 5235005, at *4 ("The non-binding caselaw that Defendants cite does not support blindly applying a *per se* rule that statements in a business's ethics code can never be actionable under § 10(b).") is equally applicable to the cases cited in Def. Br. at 20-21, none of which mandate the dismissal of Lead Plaintiffs' claims.  For example, in *Retail Wholesale & Dep't. Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017), the alleged misconduct was limited to an improper relationship between the CEO and a subordinate (*id.* at 1271), in contrast to the corporate "unwritten policy" that involved creating an elaborate structure of shell companies to hide payments to government employees.  Moreover, the court found that statements such as "We want to be a company known for its ethical leadership" were not objectively verifiable (*id.* at 1276), in contrast here to the concrete prohibitions on payments to and bribery of government officials that were a part of Energy Transfer's Code.  Similarly, in *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017), the court held that the "statements at issue about the company's culture, reputation, and compliance were all pitched at a general and an aspirational level" and "do not address any concrete policy or practice with sufficient specificity."  *Id.* at 756.  In another case cited by Defendants, *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019), the court did not hold that code of conduct statements can never be actionable; it simply held that the statements there were "corporate cheerleading" that reflected generalized positive goals rather than specific promises.  And in *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009), the court held that it was "untenable" to expose a defendant to liability for failure to disclose "all" violations.  Lead Plaintiffs do not contend that any violation of a code of conduct automatically gives rise to liability.  But, once Energy Transfer published its Code of Conduct, the dismissal of code of conduct statements would be appropriate ***only if*** the violations of the Code – and questions of whether the Code even accurately described the Partnership's policies – were so obviously unimportant that reasonable minds could not differ on their materiality.  *See Shapiro v. UJB Fin. Corp.*, 964 F.2d at 281 n.11; *In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *5 (D. Del. Feb. 7, 2020).

## 2.   Defendants' Statements in Response to the Chester County DA's Investigation Are Actionable

Following the December 19, 2018 announcement that the Chester County DA had opened a criminal investigation of Energy Transfer, the Partnership responded with a spate of false denials of misconduct.[28]   Immediately following the announcement, Energy Transfer, through a spokesperson, issued statements that "[w]e vehemently deny any such wrongdoing" and "are confident that we have not acted to violate any criminal laws of the Commonwealth of Pennsylvania." ¶ 392.   Another denial was issued on January 4, 2019, when an Energy Transfer spokesperson was quoted as stating that the investigation was "meritless" and that "Energy Transfer has not engaged in any form of criminal activity." ¶ 393.   And on August 8, 2019, after the Chester County DA's indictment of two Pennsylvania constables, Energy Transfer claimed the constables "were not Sunoco or Energy Transfer employees.   They were employed by Raven Knights … We have a code of conduct for all of [our] contractors …, and we expect them to follow that." ¶ 398.   These statements were false because, among other reasons, they failed to disclose Energy Transfer's unwritten policy of paying and bribing Pennsylvania constables and using a maze of shell corporations to hide the payments. ¶ 399.

Defendants contend that disclosure is not a "rite of confession" and that companies are not required to disclose unproven allegations. Def. Br. at 28-29.   The law is absolutely clear, however, that "a duty to disclose may arise <u>when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring</u>." *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 441 (S.D.N.Y. 2018) (emphasis added) (internal quotation omitted).   Here, Energy Transfer flatly denied that it engaged in any criminal conduct and referenced its Code of Conduct as part of those denials.   To the extent that those denials are

---

[28] *See generally* ¶¶ 392-394, 396-398 (also identified as Statements 48-54 in Def. App. A).

false, they are actionable.  The indictments of seven individuals – two constables, two principals of Raven Knights, two employees of TigerSwan and Energy Transfer's Recknagel – along with the information obtained by the Chester County DA's investigator constitute significant detailed evidence of falsity.

Defendants counter that these statements cannot be actionable because the charges against Recknagel have been dismissed.  But this does not relieve Defendants of liability.  ***First***, Recknagel may not be free of criminal charges.  The Chester County DA has explicitly stated that no decision has yet been made as to whether to refile charges.[29]  ***Second***, the dismissal of charges against Recknagel, which the Chester County DA would have been required to prove beyond a reasonable doubt, does not mean that there is not a significant factual basis for pleading a securities fraud claim based on the alleged falsity of the Partnership's spokesperson's statements.  The indictment of Recknagel and six other individuals, along with the information gathered as part of the Chester County DA's investigation, provides an extensive factual basis for pleading that Energy Transfer paid and/or bribed Pennsylvania constables and engaged in an elaborate scheme to cover it up.  This is sufficient at the pleading stage to allege that Defendants falsely denied that they engaged in criminal activity and, at the least, it is certainly sufficient to support the pleading that their statement that the investigation itself was "meritless" was false and materially misleading.[30]

---

[29] *See* Golan Decl., Pl. Ex. 2, at 5.

[30] In addition to adequately pleading claims based on the false denials of criminal misconduct, the Complaint also adequately pleads that Defendants offered a <u>false explanation</u> for the presence of security personnel at its construction site on Lisa Drive.  An Energy Transfer spokesperson told *NBC Philadelphia*: "We have engaged security on Lisa Drive <u>at the request of the impacted homeowners</u> to restrict access to their property as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property."  ¶ 394.  The Complaint, however, cites numerous credible sources showing that the presence of the constables did not occur at the request of the homeowners, but instead was undertaken for the purpose of intimidating residents who were concerned about construction of the ME2 pipeline.  *See, e.g.,* ¶¶ 196, 203-204.  These facts are more than sufficient at the pleading stage to create a genuine issue as to whether Energy Transfer's explanation for the presence of the constables was false.  *See Okla. Firefighters Pension and Ret. Sys. v. Lexmark, Int'l, Inc.*, 367 F. Supp. 3d 16, 30-35 (S.D.N.Y. 2019)

### D.    Defendants' Motion Ignores the Principles for Construing the Scienter Allegations of the Complaint

At the pleading stage, a plaintiff is required to allege facts supporting a strong inference of scienter; however, the inference need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences….'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  A complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.  Courts must examine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard," after accepting all factual allegations as true. *Id*. at 322-23, 326.

Defendants disregard this standard by dismembering and analyzing Lead Plaintiffs' scienter allegations independently.  This strategy of "focus[ing] on particular types of allegations and argu[ing] for the insufficiency of each" has been rejected by the Third Circuit.  *Avaya*, 564 F.3d at 272.  "[I]t is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Id.*  Lead Plaintiffs' substantial allegations, when viewed holistically, give rise to a strong inference of scienter.

### 1.    The Complaint Properly Pleads Scienter Against the Individual Defendants and the Company

Defendants cite the Fifth Circuit's decision in *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004), to argue that Plaintiffs are required to separately establish the scienter of each person involved with a given challenged statement in order to sustain the claim against the Partnership.  Def. Br. at 31.  While the Third Circuit has held that corporate scienter

---

(finding alleged misstatements and omissions actionable where defendants misattributed company's revenue increase to greater end-user demand rather than inflated channel inventory).

cannot be sustained if scienter cannot be shown as to *any* individual, *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53, 57 (3d Cir. 2005), Defendants have overreached in suggesting that the doctrine of corporate or collective scienter has been rejected in this Circuit.[31]  Rather, following *Tyson*, the Third Circuit has repeatedly declined to decide whether collective corporate scienter may be maintained in this Circuit.  *See In re Hertz Global Holdings Inc*., 905 F.3d 106, 121 n.6 (3d Cir. 2018); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013); *see also In re Cognizant Tech. Sols. Corp. Sec. Litig*., 2020 WL 3026564, *24 (D.N.J. June 5, 2020).  Indeed, the court in *Cognizant* found that the Third Circuit has suggested that, under certain circumstances, the corporate scienter doctrine can be predicated upon more than simply the state of mind of the speaker, including:

> (a) The individual agent who uttered or issued the misrepresentation;

> (b) Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;

> (c) Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.

2020 WL 3026564, at *28-31 (citing *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014)).

*Cognizant* is entirely consistent with the allegations in the Complaint where Plaintiffs set forth the challenged misrepresentations or omissions and identified persons who (a) either made

---

[31] Defendants are also mistaken in relying upon *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 397 (D. Del. 2010), as suggesting that the involvement of multiple employees in the generation of a statement may not support corporate scienter.  In fact, as the court explained in *In re Cognizant*, 2020 WL 3026564, at *28, where an executive provided information to other, unnamed corporate employees who then drafted misleading financial statements without scienter, but that executive himself allegedly knew the statements to be false, their collective action "is sufficient to meet the corporate scienter standard" and may be imputed to the corporation.

or assisted in the preparation of the statement, (b) authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made, or (c) ratified, recklessly disregarded, or tolerated the misleading statement.  *See id.*  For instance, the Partnership had spokespersons make many statements about the <u>safety and compliance aspects</u> of the Pipeline Projects.  *E.g.,* ¶¶ 366 & 370 (Long speaking, with Warren, McCrea and Ramsey in attendance),[32] 367-368 (spokesperson Jeff Shields speaking), 372 (advertisement in Harrisburg, PA newspaper), 380 (statement on Energy Transfer blog), 374, 376-378 (statements by spokespersons Granado, Dillinger and Daniels), and 375 (letter to abutting landowners); *see also* Def. App. A at 8-9 (Statements 27-37).

The Partnership's senior executives, including Defendants Warren, McCrea, McReynolds, Ramsey and Long, signed the Forms 10-K that included false representations of what the Partnership's Code of Conduct policies were, which they also directed or allowed to be placed on the Partnership's website, while failing to disclose that the Partnership also had an "<u>unwritten policy</u>" under which Energy Transfer employees would (1) hire armed government employees to provide a private security force for the Partnership's pipeline projects while wearing their uniforms and badges, and (2) attempt to conceal the payments made to these public officers through a "maze" of entities.  *Compare* ¶¶ 332, 382, 383-388, 390 *with* ¶¶ 165-166, 186-187, 195-198, 202, 204-205, 207-209.

---

[32] The completion, throughput and safety statements made by Defendants Long, Ramsey and McCrea on the February 22, 2018 earning call, which Defendant Warren also attended, are particularly troublesome, as they came in the wake of the DEP's January 3, 2018 suspension order and the $12.6 million fine imposed on February 8, 2018.  *Compare* ¶¶ 348-350, 370 (Statements 6-8 and 30 in Def. App. A) *with* ¶¶ 309, 310, 313 (finding "egregious and willful violations" and "unlawful conduct" by Energy Transfer).  This highlights the knowledge or, at the least, the recklessness with which Defendants issued their statements.

Plaintiffs similarly identified false and misleading statements made by certain of the Individual Defendants – during meetings with investors and analysts attended by other of the Individual Defendants – about the Pipeline Projects' <u>completion dates, construction and throughput</u>, notwithstanding that the planning and construction of the pipelines could not be completed by the claimed in-service dates and at the promised throughput, and that the capital expenditure budget for the Pipeline Projects constituted a huge part of the Partnership's overall CapEx budget (increasing from $3 billion to over $6 billion in 2017 and 2018), a key component of the Partnership's financial and operating well-being. *See* ¶¶ 334 (statements made on earnings call attended by Warren, Long, McCrea and Hennigan) and 343, 345-346, 348-350, 356, 360 (statements made on earnings calls attended by Warren, Long, McCrea and Ramsey); *see generally* Def. App. A at 1-7, Statements 1-26 (including other statements made at analyst conferences, by spokesperson Granado, and to the DEP).[33] Such false completion and throughput statements were also included in Forms 10-K signed by Warren, McCrea, McReynolds, Ramsey and Long. *See* ¶¶ 332 and 353; Def. App. A at 45, Statements 9 & 12.

Notwithstanding this clear record of false and misleading statements attributable to the Individual Defendants, Defendants assert that the Complaint does not plead the executives' individual scienter. For instance, Defendants seek to excuse Defendant McCrea's statements about proceeding quickly while Sunoco was simultaneously violating permits, arguing that the Complaint fails to allege that "McCrea knew anything about the violations." Def. Br. at 34. But McCrea, who served as the President and Chief Commercial Officer ("CCO") of Energy Transfer's

---

[33]  Defendants characterize Plaintiffs' allegations about Energy Transfer's decision to develop a plan in early 2018 to use an older, 12-inch pipe so that it could put a modified form of the ME2 pipeline in-service as "pure speculation" and as "mere fraud-by-hindsight."  Def. Br. at 39.  Not only do Defendants make these arguments based on a misreading of the Complaint, but the fallacy of their argument has now been shown by the Notification the Partnership submitted to the PHMSA on June 15, 2018 (Pl. Ex. 1), which stated that the work combining the 12-inch pipe with ME2's 20-inch pipe was starting that day!

general partner since October 2018, and had previously served as the Group COO and CCO for the Energy Transfer family from November 2015 (¶ 43), was personally responsible for managing construction of Revolution.  ¶¶ 213-214.  He received regular reports, had personal knowledge of Revolution failures leading to the explosion, and had final "sign off" on all matters relating to the Revolution pipeline.  ¶¶ 460, 464.  He also personally made statements that are alleged to be false and materially misleading: stressing the importance of bringing ME2 online while the Partnership was violating its permits in a mad dash to put ME2 in-service (¶¶ 299-300); misrepresenting the Partnership's "Frankenpipe" solution (¶¶ 364, 403); and misrepresenting Energy Transfer's relationship with the DEP (¶¶ 297, 346, 349).  McCrea also admitted publicly the core significance of the Pipeline Projects to Energy Transfer.  ¶ 453.  Accordingly, McCrea had personal knowledge or, at the least, can certainly be held liable for "consciously avoid[ing] any meaningful exposure to the information" concerning these violations when he had to sign off on the Revolution pipeline. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 290 (D.N.J. 2007).

Likewise, Defendant Ramsey, who served as the COO of Energy Transfer's general partner since October 2018, a Director of Energy Transfer's general partner since July 2012, and President, COO, and a Director of ETO's general partner since November 2015 (¶ 44), can scarcely plead ignorance of Sunoco's recurring permitting and construction violations, a topic which was relevant when he attended investor presentations and discussed the importance of the Pipeline Projects and reiterated the false and misleading completion and throughput data that the Partnership had many spokespersons state on earnings calls and on each of the investor presentations identified in the Complaint from early 2017 through the summer of 2018.  Among other things, Ramsey personally misrepresented Energy Transfer's relationship with the DEP (¶¶ 297, 349), falsely blamed the DEP for delays while Energy Transfer was violating its permits (¶¶ 298, 346), misrepresented ME2's

completion status (¶¶ 327, 402), and misrepresented the Frankenpipe solution (¶ 402).

The facts pleaded for Defendant Long are even more revealing.  Long, who served as the CFO of Energy Transfer's general partner since April 2019 (¶ 42), spoke frequently about the Pipeline Projects' completion dates and throughput, including when he went out of his way to dodge an analyst's question concerning the completion of the ME2 pipeline.  ¶ 448.  If anything, Long's evasion underscores his awareness of the troublesome status of the pipeline project and the perceived need within the Partnership to conceal this from investors, and supports his scienter. *Se*e *In re Sanofi-Aventis Sec. Litig*., 774 F. Supp. 2d 549, 571 n. 28 (S.D.N.Y. 2011) (where company "may have been avoiding the question and thus by implication avoiding the disclosure of the allegedly material omitted facts … the circumstances surrounding this actionable statement are sufficient to raise a strong inference of scienter" as to both the company and the speaker); *Kasper v. AAC Holdings, Inc*., 2017 WL 6353294, at *3 (M.D. Tenn. Oct. 6, 2017) ("If Defendants gave incomplete, evasive, or misleading answers to an Underwriter's inquiries, then such answers (if any) indicate Defendants' scienter").  In addition to signing the false 10-Ks, Long was also bound by the Code of Ethics for senior officers (¶ 68), spoke falsely on safety issues on the Pipeline Projects and admitted to mistakes (¶¶ 17, 125, 366, 370, 468-470), misrepresented the Pipeline Projects' completion status (¶¶ 327, 348, 350, 360, 401), misrepresented the Frankenpipe (¶¶ 364, 401, 448), and discussed details of pipeline failures and interactions with regulators (¶ 472).

Defendants also attempt to exonerate Defendant Warren, who served as the sole Chairman and CEO of Energy Transfer's general partner, and the Chairman and CEO of Energy Transfer Operating, L.P.'s ("ETO") general partner, since August 2007.  ¶ 40.  Yet, Warren held himself out as knowledgeable about the ME2 pipeline by speaking on the subject, even though he had knowledge about (1) the progress of and issues facing the Pipeline Projects, (2) the Partnership's

CapEx budget and the significant portion of that budget devoted to the ME2 and Revolution pipelines in 2017 and 2018, and (3) the Code of Conduct and Code of Ethics, which bound Warren as one of the Partnership's senior officers (¶ 68) and which Warren promoted in the Partnership's 10-Ks and on its website.  Notably, the Codes failed to include Energy Transfer's "unwritten policy" of paying public officials to provide private security forces for the Partnership's pipeline projects and concealing those payments.  Indeed, Warren delivered the Partnership's belated admissions of key mistakes in the planning and construction of the ME2 and Revolution pipelines to the market (¶¶ 266, 465-467), further bolstering Plaintiffs' allegations that he made false and misleading statements and omissions during the Class Period with scienter.  ¶¶ 465-466.

Defendants also seek to absolve Defendant McReynolds, who served as Energy Transfer's President from March 2005 to October 2018, a Special Advisor to Energy Transfer from October 2018, and an Energy Transfer Director beginning in August 2005.  Def. Br. at 33-34; *see also* ¶ 41.  However, not only did McReynolds sign false Forms 10-K (¶¶ 332, 382, 390), he also served as the Partnership's President during the entirety of the Pipeline Projects' planning and permitting as well as the construction period between May 2017 and August 2018. During this time, on earnings calls and at investor presentations, Energy Transfer executives provided pre-approved yet false statements pertaining to ME2's and Revolution's completion dates and initial throughput.[34]

Finally, despite Defendants' arguments to the contrary, that Defendants Hennigan and McGinn, who served as senior executives for Sunoco during the permitting process and during part or all of the construction of the ME2 and Revolution pipelines, acted with scienter is clear.

---

[34]  Indeed, even in the context of false and misleading certifications signed pursuant to the Sarbanes-Oxley Act ("SOX"), while courts have indicated that a defendant's signing a false or misleading SOX certification, *standing alone*, is not sufficient to plead scienter, the courts have also recognized that it can support scienter where "the complaint asserts facts indicating that, at the time of certification, defendants knew or *consciously avoided any meaningful exposure to the information* that was rendering their SOX certification erroneous."  *In re Intelligroup*, 527 F. Supp. 2d at 290 (emphasis added).

Hennigan served as Sunoco's President and CEO from 2012 to approximately April 2017, when he became Energy Transfer's President for Crude, Liquids and Refined Products, before departing the Partnership effective June 16, 2017.  ¶ 45.  McGinn served as Sunoco's Senior Manager for Public Affairs from April 2013 to April 2017, Energy Transfer's Senior Director of Public Affairs from April 2017 to October 2017, and Energy Transfer's Vice President of Public Affairs from May 2019 to the present.   ¶ 46.  The Complaint describes concrete actions that Hennigan and McGinn each took during the permitting process that violated the Partnership's Code of Conduct and that were concealed from investors, including Hennigan meeting with former DEP Secretary Quigley before taking actions to have him replaced with a DEP Secretary who would accede to the Wolf Administration's demands that the DEP approve Energy Transfer's deficient permit applications; and McGinn corresponding in private with the Governor's special assistant and pressuring her and replacement DEP Secretary McDonnell to get the permits granted by mid-February 2017, before the Partnership would be issuing its 2016 year-end results.  ¶¶ 9, 80-83, 103, 105, 109, 436-437 (Hennigan) and 103, 110, 111, 436-437 (McGinn).  In addition, McGinn, who remains at the highest levels of the Partnership's Public Affairs group, approved, authorized, ratified and/or tolerated the many misrepresentations made by Energy Transfer's spokespersons about the Pipeline Projects.  These actions support Lead Plaintiffs' scienter allegations against Hennigan and McGinn, which are also attributable to Energy Transfer.

### 2. Communications with Investors, Analysts and the Media Further Support Scienter

The fact that the Individual Defendants spoke extensively to investors and analysts about the status of the Pipeline Projects reveals they had first-hand knowledge of the subjects sufficient to satisfy the pleading standard for scienter.  *See, e.g., In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *17-18 (D.N.J. Aug. 28, 2017) (repeated statements to investors and analysts

implied executives knew subjects about which they spoke, undermining any inference that representations were inadvertent); *see also Frank v. Dana Corp.*, 646 F.3d 954, 957, 961-62 (6th Cir. 2011) (scienter adequately pleaded where defendants' statements "painted a publicly rosy picture" while "some divisions of [the company] were wilting").  Indeed, Ramsey, Long, and McCrea were the Partnership's designated speakers on issues relating to the Pipeline Projects' completion, in-service dates, and throughput; thus, Ramsey, Long, and McCrea's statements and knowledge are attributable to Energy Transfer.  Thus, unlike *Rahman v. Kid Brands*, *Inc.*, 736 F.3d 237, 247 (3d Cir. 2013), on which Defendants rely, Plaintiffs here allege far more than a general awareness of the day-to-day workings of Energy Transfer's business.

### 3. Serious Regulatory and Construction Issues and Other Red Flags, Including Alleged Criminal Violations, Also Support Scienter

Defendants also argue that allegations concerning regulatory issues, construction issues or other red flags cannot be utilized to plead scienter here because "they do not undermine any of the statements at issue."  Def. Br. at 37.  However, Defendants ignore precedent recognizing that "circumstances suggesting fraudulent intent can include the presence of 'red flags' or warning signs" that publicly-made statements and reports are fraudulent, as well as "the magnitude of the alleged fraud."  *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 608 (D.N.J. 2001); *see also Miller v. Material Sciences Corp.*, 9 F. Supp. 2d 925, 928 (N.D. Ill. 1998) ("Deliberately ignoring "red flags" such as those alleged here can constitute the sort of recklessness necessary to support 10(b) liability.").  Defendants' efforts to hide the significant problems that plagued the Pipeline Projects establish that their Class Period statements were false or materially misleading.  For instance, even when the DEP issued fines and ordered that construction be suspended, the Partnership authorized its spokespersons to explicitly represent its commitment to safety.  Next, when the Partnership was forced to admit that previously-provided completion dates

needed to be extended, the Individual Defendants and others issued new completion dates and reiterated ME2's initial throughput figure even though they knew of issues that would make their successive completion dates and throughput figure impossible to meet.[35]

Nor can Defendants argue that the pendency of an FBI investigation and the Partnership's hiring of constables to intimidate residents do not contribute to a finding of scienter. *See, e.g., In re Gentiva Sec. Litig.,* 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("while the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis"). Here, the allegations about coercive and/or criminal conduct by Defendants McGinn and Hennigan in connection with the pipeline permits, including efforts to force out the DEP Secretary who told Hennigan that Energy Transfer's permit application were "woefully deficient" and that the Partnership might have to start again at square one, and who was perceived generally as standing in the way of the pipeline's quick approval, cannot be easily discounted. Similarly, the deterrence of citizen and activist opposition to the ME2 pipeline project that Energy Transfer sought to apply through the hiring of armed public constables for private duty support scienter as well.

### 4.    The Magnitude and Importance of the Pipeline Projects Invokes the Core Operation Doctrine and Strengthens the Scienter Allegations

The size and nature of the Pipeline Projects, the detailed allegations of sweeping

---

[35]  Defendants take exception to the red flags related to the Revolution pipeline, arguing that "purported problems with the Revolution pipeline would not undermine any statement at issue" and stating that "Plaintiffs admit that the pipeline was inspected daily and that Energy Transfer believed the hillside slip was fixed." Def. Br. at 38 n.45. First, the red flags concerning the Revolution pipeline were directly contrary to the many statements that Energy Transfer and its spokespersons made about the Partnership's commitment to safety, which they said was its first priority. Second, Plaintiffs did not admit either that the Revolution Explosion was caused by a bad weld or that Energy Transfer believed a hillside slip that occurred just a few days earlier had been fixed. Rather, the Complaint alleges only that Energy Transfer told the abutting landowner that the hillside slip had been fixed, and further alleges that a report that Energy Transfer commissioned identified a bad weld as a cause, along with the fact that the pipeline should not have been placed in such a dangerous location in the first place.

operational problems, the very significant amounts of the CapEx budget devoted to the projects, and the positions of the Individual Defendants all give rise to a strong inference of scienter. As the court stated in *Aetna* in upholding allegations of defendants' scienter there:

> Plaintiffs' Amended Complaint is replete with detailed allegations concerning operational problems … that plagued Aetna as a result of its acquisition of USHC…. The Court finds that the size and nature of the USHC-Aetna merger and the positions held by [the individual defendants], in conjunction with the factual allegations … concerning the operational problems at Aetna following the merger, provide strong circumstantial evidence that [the individual defendants], and by extension Defendant Aetna, knowingly made the misrepresentations and omissions concerning the success of the integration and its financial impact on Aetna.

34 F. Supp. 2d at 953. Defendants ignore the court's analysis in *Aetna*, which held that such allegations provided strong circumstantial evidence of scienter. And here, the Complaint, <u>when properly read as a whole</u>, alleges a widespread and systemic attempt by the senior executives at Energy Transfer to (a) use coercion and pressure to have the DEP approve highly deficient permit applications notwithstanding the Partnership's shoddy planning for the pipelines' ultimate construction, on the timeline that the Partnership set for the granting of the permits, rather than on the timeline that the DEP would otherwise have taken before issuing any permits; (b) proceed with large-scale HDD efforts through areas that were fraught with dangerous geological and landscape conditions that Energy Transfer's own consultants had warned would be highly risk (but which Energy Transfer nevertheless described in their applications as low risk) and in other areas where the pipeline construction would endanger Pennsylvania lakes, streams and well water; (c) at times proceed with HDD efforts at locations for which no permits for non-trenching methods had even been issued; and, among other things, (d) put the Revolution pipeline into service notwithstanding known highly risky pipeline-placement issues and the fact that land in which the pipeline was placed was shifting just days before Energy Transfer began the commissioning process – all the while misrepresenting and seeking to conceal the pipelines' actual risks, when they would go into

service, what the throughput would be, the regulatory violations that Defendants' actions caused, and the Partnership's violations of its own Code of Conduct in carrying out an "unwritten policy" of hiring and paying public officials through a "maze" of entities in order to seek to intimidate the abutting landowners that Energy Transfer spokespersons falsely said had requested such a security force.  While a CEO or another senior executive might not know all the details of the actions that Energy Transfer and its agents took in carrying out this scheme, a senior corporate officer of the Partnership certainly would know about systemic failures that adversely impacted its biggest CapEx project in 2017 and 2018, the actions that the DEP and PUC were taking in response to Energy Transfer's massive violations of Pennsylvania environmental laws and the permits' terms and conditions (including repeated suspensions of work, fines, and findings that Energy Transfer had engaged in willful and egregious misconduct), as well as the failures from the permitting process forward that resulted in CEO Warren's eventual admission of mistakes made.

The Complaint's scienter allegations are further supported by the fact that the ME2 and Revolution pipelines constituted a "core operation" of Energy Transfer and thus was of vital importance to the Company.  *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, *17 (D.N.J. Dec. 6, 2018) (in *Avaya*, "the Third Circuit … allowed the core operations doctrine to support scienter even though no CW statement or particular document showed a defendant's knowledge"); *In re Urban Outfitters,* 103 F. Supp. 3d at 653-54 ("[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge."); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (same); *see also DFC Global Corp.*, 2015 WL 3755218, at *16.  Thus, the Complaint's scienter allegations are supported by the fact that the

Mariner East Pipeline was a "core operation" of Energy Transfer, whose successful and timely completion was critical to the Company. *Cf. Rahman*, 736 F.3d at 247 (finding that anticipated liabilities of $10 million over five years "cannot be regarded as affecting the 'core operations' of a company that had hundreds of millions of dollars in annual net sales").

### E.     The Complaint Adequately Pleads Loss Causation

Loss causation is the "causal connection between the material misrepresentation [or omission] and the loss [suffered]." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Third Circuit has "adopt[ed] a 'practical approach [to loss causation], in effect applying general causation principles.'" *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *5 (E.D. Pa. Sept. 3, 2010) (citing *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007)). The loss causation element is satisfied when a plaintiff pleads that the price of a security was inflated "due to an alleged misrepresentation," and that the misrepresentation "proximately caused the decline in the security's value." *Semerenko*, 223 F.3d at 184-85.  A plaintiff must allege it "purchased a security at market price that was artificially inflated due to a fraudulent misrepresentation" and that "the artificial inflation was actually lost due to the alleged fraud ... that is, that the stock price dropped in response to disclosure of the alleged misrepresentations."  *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 424 (E.D. Pa. 2019) (quoting *Semerenko*, 223 F.3d at 184).

To be corrective, the disclosure need not precisely mirror the earlier misrepresentation. *In re Urban Outfitters,* 103 F. Supp. 3d at 655; *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020). Further, such disclosure need not be a "single, unitary disclosure." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006). The truth may be revealed by a series of partial disclosures through which the truth gradually "leak[s] out." *See Dura*, 544 U.S. 336, 342 (2005); *Vanderhoef*, 2020 WL 5105243, at *4 ("[L]oss

causation 'can be predicated on a series of partial corrective disclosures . . . each of which partially revealed the truth.'") (quoting *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *31 (D.N.J. Aug. 8, 2011)). The market also need not learn of the possible fraud from the company itself but may be informed by "whist[l]eblowers, analysts questioning financial results . . . newspapers and journals, etc." *In re Intelligroup*, 527 F. Supp. 2d at 297 n.18.

The Complaint's loss causation allegations are subject to Rule 8's notice pleading standard, which requires only a "short and plain" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47 (pleading loss causation is "not meant to impose a great burden upon a plaintiff."); *see also Bradley Pharms.*, 421 F. Supp. 2d at 829 (same). In the Third Circuit, "[t]he causation issue becomes most critical at the proof stage" and "[w]hether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) (reversing dismissal because loss causation improperly assessed at pleading stage); *see also In re Urban Outfitters*, 103 F. Supp. 3d at 655 (quoting same and sustaining plaintiffs' claims); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014) (same).

### 1.   The Complaint Pleads Investor Losses that Proximately Resulted from the Correction of Defendants' Alleged False or Misleading Statements

The Complaint meets the above standards by first identifying the Defendants' alleged false statements, which fall into the three general categories concerning: (i) the Revolution and ME2 completion timelines and ME2's throughput and related omissions; (ii) Energy Transfer's claims that it was constructing its pipelines safely and preserving and protecting the environment; and (iii) Energy Transfer's misstated compliance with its Code of Conduct.  The Complaint further alleges six specific corrective disclosures that progressively revealed the falsity of these prior misstatements as they related to (i) the disclosure of ME2's reduced throughout and delay; (ii) the

DEP ordering Energy Transfer to stop work on the Revolution pipeline because of Energy Transfer's violations of construction best practices, and threats to residents' safety and environmental well-being; (iii) the launch of Chester County's investigation into Energy Transfer based on concerns about residents' safety; (iv) Chester County charging the Constables hired by Energy Transfer with bribery, based on facts that constituted violations of Energy Transfer's Code of Conduct; (v) the disclosure of the FBI's investigation into the ME2 permitting process; and (vi) Chester County charging Energy Transfer's Security Supervisor with bribery. ¶¶ 400-433 (including summary chart at ¶ 432).   In response to each new disclosure, the price of Energy Transfer units fell, with analysts linking the decline to new information. *Id.*   Such allegations suffice, and Defendants concede that Plaintiffs have pled loss causation for Statements identified in Def. App. A as Statements 1, 13, 14, 17-20, 22-23, and 25-26. *See* Def. Br. at 48.

### 2. Defendants' Arguments Should Be Rejected

As to the other statements, Defendants argue that Plaintiffs' loss causation allegations are "replete" with supposed timing issues.  Def. Br. at 48-50.  But these arguments miss the mark and rely on mischaracterizations of the Complaint's well-pled allegations.

**ME2 in-service dates and expected throughput (Statements 2-8 and 9-12).**  Throughout the Class Period, Defendants repeatedly claimed that Energy Transfer was on track to bring in service the new, 20-inch diameter ME2 pipeline at an initial throughput of 275,000 barrels per day. On May 31 and June 27, 2017, Energy Transfer said ME2 would be in service "by the end of Q3 2017." ¶¶ 336, 338. Then, in August 2017, ME2's in-service date was still supposedly just a few months away, in the "fourth quarter" of 2017. ¶ 343. In November 2017, Energy Transfer claimed that the need to secure HDD approvals would push the "in-service timing" to the second quarter of 2018. ¶ 345. Energy Transfer then still claimed in February 2018 that "we continue to make progress on the construction" of ME2, and "our progress is good," with Energy Transfer

continuing to target "the second quarter of 2018" as ME2's in-service date. ¶¶ 348, 349. On February 22, 2018, Defendant McCrea claimed that Energy Transfer was "very close" to bringing ME2 online. ¶ 350. Energy Transfer continued to claim that the in-service date was just months away, stating on May 10, 2018 that it would occur in mid to late third quarter 2018. ¶ 356. All of these statements conveyed the same central message to investors – that, despite certain delays, Energy Transfer was continuously just on the cusp of bringing ME2 in-service.

Coupled with these claims of the supposed in-service launch of ME2, Defendants repeatedly told investors, starting in June 2017 and through June 19, 2018, that the initial throughput capacity of the ME2 pipeline would be 275,000 barrels per day. *See* ¶¶ 338, 340, 357. Defendants assert that Energy Transfer's statement on June 19, 2018 (Statement 13) – that ME2 would have an "initial capacity of 275,000 barrels per day" – somehow "superseded" the identical, prior Statements 9-12. But that makes no sense. In all of Statements 9-13,[36] Energy Transfer made the same allegedly false claim, that ME2's "[i]nitial capacity" would be "275,000 barrels per day." The June 2018 statement thus did not supplant the prior, same false statements but compounded the artificial inflation of Energy Transfer's unit price caused by such prior false statements.

The falsity of these statements was revealed to investors when, on August 9-13, 2018, the market learned for the first time that, instead of Energy Transfer bringing the ME2 pipeline online with an initial throughput of 275,000 barrels per day, the Partnership would instead be bringing online a pipeline that cobbled together old 12-inch pipe and new, 20-inch pipe (dubbed by residents as the "Frankenpipe"), whose initial throughput was far less than 275,000 barrels per day. As Wolfe Research reported on Friday, August 10, 2018, based on non-public discussions with Energy Transfer, "ME 2 may not reach full capacity (previously disclosed as 275 mbd) until 4Q19

---

[36] As Defendants note in their chart of alleged false statements, Statement 11 alone was made at nine different times between August 16, 2017 and June 19, 2018.  Def. App. A at 4 n.4.

(one year delay)"; and "[a] final connection involving a small amount of ME 2 / ME 2x capacity won't be completed until 4Q20." ¶ 405. Also on August 10, 2018, Wells Fargo reported that the Frankenpipe would only have an initial capacity of 100,000 barrels per day, a nearly 65% reduction from the 275,000 barrels Energy Transfer repeatedly claimed. ¶ 406. Wells Fargo also estimated the total cost of the ME2 project to be $6 billion (compared to Energy Transfer's earlier $3 billion representation). *Id.* Wells Fargo stated that it shared its analysis of the timing of the Mariner East projects with Energy Transfer, and Energy Transfer apparently did not challenge it. *Id.* In response to the revelations that the ME2 was not mere months away from completion, but would be replaced with the Frankenpipe with a fraction of the throughput, and that there would be a one-year delay before the ME2 might reach full capacity, the price of Energy Transfer units fell by 5.6% in a statistically significant amount. ¶ 408.

These allegations adequately plead loss causation. *See Vanderhoef*, 2020 WL 5105243, at *4 ("The amended complaint delineates company disclosures, alleges such disclosures revealed previously undisclosed information, and then cites to drops in [the company's] stock price as a result. This is sufficient to plead loss causation."). Defendants' argument that the corrective disclosures cannot support loss causation because they purportedly failed to reveal the exact facts allegedly concealed by Defendants' statements has been repeatedly rejected by courts. *See, e.g.*, *Vanderhoef*, 2020 WL 5105243, at *4 ("[T]here is no requirement that the disclosure mirror the earlier misrepresentation."); *Merck*, 2011 WL 3444199, at *32 ("*Dura* and its progeny do not demand … that corrective disclosures … be the 'mirror image' of the alleged fraud."); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (a corrective disclosure need not be "a 'mirror image' tantamount to a confession of fraud").

**Revolution in-service dates and construction progress (Statements 21-24).** Defendants

similarly conveyed to investors a perpetually almost-complete status of the Revolution pipeline. These claims hid from the market that Energy Transfer had constructed the Revolution pipeline in landslide-prone areas, and the concomitant risks of its construction.  On May 4, 2017, Defendant Long claimed that the Revolution project was "still on schedule to be <u>in service</u> in the fourth quarter of 2017" (Statement 21, ¶ 334).  On August 9, 2017, Long said that Revolution was "scheduled to be completed in the fourth quarter of 2017," and McCrea said "it will be up and ready for service in the fourth quarter."  (Statements 22 and 23, ¶ 343).  Then, on November 8, 2017, Long said that the Revolution "construction is scheduled to be completed in the first quarter of 2018."  (Statement 24, ¶ 345).  Defendants assert that the foregoing statements were "superseded" by Long's claim on February 22, 2018 that, in Revolution, "construction is mechanically complete."  (Statement 25, ¶ 350).

Plaintiffs allege that these statements were materially misleading by their omission of adverse facts that rendered the timely – and safe – completion of Revolution impossible under the circumstances.  Those facts included that "the Energy Transfer Companies had constructed the Revolution pipeline in landslide-prone areas and without adequate best practices or protective measures, despite repeated warnings to the contrary."  *E.g.*, ¶ 335.  Investors learned the truth of that withheld disclosure when, on October 29, 2018, following inspections the prior week that revealed "unreported landslides and erosion off the [Revolution] pipeline's construction sites into nearby streams," the DEP issued an Order and letter requiring Energy Transfer to immediately cease construction of the Revolution pipeline for the safety reasons stated in the Order.  ¶ 411.  In response, Energy Transfer's unit price fell by 4%, from a closing price of $15.46 on Friday, October 26, 2018 to a closing price of $14.84 on Monday, October 29, 2018, a decline that is statistically significant at the 95% confidence level.  ¶ 412.

**Statements about ME2 construction and in-service dates (Statements 15 and 16).**
Defendants also focus on certain of their statements on August 9, 2018: that all of Energy
Transfer's 16 ME2 HDDs "have been approved by PA DEP" such that "we don't have to have any
changes approved by PA DEP going forward" (Statement 15, ¶ 360); and that "100%" of the HDDs
"are completed, or in process, in line with our approved HDD plan with no more drilling re-
evaluation reports required from DEP" (Statement 16, ¶ 360).  In reality, "as of August 9, 2018,
Energy Transfer had not submitted reevaluation reports for four of the 22 HDD sites" required by
the August 2017 Order.  ¶ 361.  In other words, the ME2 pipeline was not as ready for service as
Defendants claimed on the August 9, 2018 call.

Defendants argue that the falsity of these statements was not corrected by any subsequent
alleged corrective disclosure because the specific fact that Energy Transfer had not submitted all
of its HDD re-evaluation reports did not become public until March 2020.  Def. Br. at 49.  First, a
corrective disclosure need not be a mirror image of the prior false statement.  Second, at least two
of the four sites for which Energy Transfer had not submitted reevaluation reports (Nos. S3-0290
and S3-0300) were along the drilling path that necessitated the Frankenpipe.  *See* Golan Decl., Pl.
Exs. 4 & 5.  Energy Transfer's failure to submit reevaluation reports for those sites is related to
ME2 not being ready for full-throughput service as Energy Transfer had claimed, as was first
partially revealed to investors by the August 12, 2018 disclosure of the reduced throughput and
the delay in ME2, which resulted in Energy Transfer's unit price falling 5.6%.  ¶ 408.

**Statements about Defendants' commitment to safety, including about the Revolution
Pipeline and Lisa Drive (Statements 27-37 and 42-44).**  Throughout the Class Period,
Defendants made false claims that Energy Transfer's "first priority" was the safety of the
communities surrounding its Revolution and ME2 pipelines.  ¶¶ 375, 376, 378, 380; *see also* ¶ 368

(Statement 29) ("Safety is paramount … [including] the safety of the communities in which we work and operate").  On September 10, 2018, in the wake of the Revolution pipeline explosion, Energy Transfer said that, "Our obligation to homeowners is 100 percent — that people continue to be safe and secure," and that, with respect to past landslides, "It's something definitely that is being actively managed."  ¶ 374 (Statement 32).  Then, in a September 10, 2018 letter to residents near the Revolution explosion, Energy Transfer claimed that "[o]ur first priority continues to be the safety of those who live in this community."  ¶ 375 (Statement 33).  On October 21, 2018, Energy Transfer added that "We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work."  ¶ 377 (Statement 35).

Other Energy Transfer statements claimed "there were no environmental health risks to residents in the aftermath of the [Revolution] explosion" (¶ 374, Statement 42) and that accidents in the area had been "drastically reduced" (¶ 376, Statement 43).  Energy Transfer also downplayed the risks posed by the geology in the Lisa Drive area, claiming in March 2018 that "[c]onstruction through this area is safe" and "[t]here is some karst north of this area, but it does not impact this area."  ¶¶ 355, 371 (Statement 44).  These statements misstated and omitted the serious safety and environmental risks that Energy Transfer caused through its reckless planning and construction of the Pipeline Projects (and, with respect to Statement 44, the threat to ME2's initial throughput).

The falsity of these statements was partially revealed to the market through the DEP's October 29, 2018 Order ceasing work on the Revolution pipeline.  ¶ 411.[37]  Contrary to Defendants' claims, the revelation of Energy Transfer's failures disclosed that safety was not

---

[37]  The falsity of Statement 44 was also partially revealed through the August 2018 disclosures of ME2's reduced throughput because of the problems Energy Transfer encountered in the Lisa Drive vicinity and surrounding areas.

Energy Transfer's "first priority."  In response, the price of Energy Transfer's units fell by 4%, a decline that is statistically significant at the 95% confidence level.  ¶ 412.

Defendants assert that it is "unclear" if Plaintiffs are alleging loss causation on the basis of the DEP's October 29, 2018 Order because, according to Defendants, ¶ 432 (setting forth loss causation allegations) supposedly omits mention of the October 29 Order.  Def. Br. at 50 n.85. That is incorrect.  The chart in ¶ 432 plainly refers to how, on October 29, 2018, "the Pennsylvania DEP ordered Energy Transfer to cease work on the Revolution Pipeline due to landslides and sinkholes."  ¶ 432.  Defendants also question whether the October 29 Order was publicly available during the trading day on October 29 because, according to Defendants, press on the Order first emerged "after the close of trading on October 30, 2018."  Def. Br. at 50 n.85.  This is also wrong. A search of Westlaw News shows that the Pennsylvania DEP issued its news release disclosing the October 29 Order at 12:00 a.m. on October 29, 2018.  *See* Golan Decl., Pl. Ex. 6.  The press release makes clear that the Order required Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline."  *Id*.  Plaintiffs also allege that part of the unit price decline on October 29, 2018 was due to the *Associated Press*'s wider dissemination on October 27, 2018 of the *Pittsburgh Post-Gazette*'s October 21, 2018 story about the dangers of subsidence that resulted from the construction of the Revolution and ME2 pipelines.  ¶ 410.  Defendants assert that the article – even when it was first published – did not disclose any new facts.  But the article certainly disclosed new interviews with local residents impacted by the construction of the pipeline, which contradicted Energy Transfer's prior claims that its "paramount" concern was the safety and well-being of the community members who live near its pipeline projects.  *See id*.  Moreover, Defendants' argument that any alleged truth had already been disseminated before the *Associated*

*Press* article was published is a variant of the "truth-on-the-market" affirmative defense, which courts overwhelmingly hold is inappropriately fact-specific for resolution on the pleadings. *See, e.g.*, *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018) ("[T]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (same).[38]

Defendants further assert that Plaintiffs have not pled when the *Pittsburgh Post-Gazette*'s article first appeared and how Energy Transfer's unit price responded. Def. Br. at 49. The Court may take judicial notice of the fact that the article was first published on Sunday, October 21, 2018 (Golan Decl., Pl. Ex. 7), that Energy Transfer's unit price then precipitously fell from a closing price of $17.06 on Friday, October 19, 2018, to close at $16.47 on Monday, October 22, 2018 (Golan Decl., Pl. Ex. 8). The unit price then continued to decline until the $14.84 close on October 29, 2018. Overall, that is a 13% decline in the wake of the October 21, 2018 article. But even if the *Associated Press* widely disseminating the *Post-Gazette*'s prior article did not comprise a significant cause of the price decline on October 29, that still leaves the DEP's October 29, 2018 Order as a corrective disclosure. Defendants point to no other news released on or before October 29, 2018 that explains that day's statistically significant unit price decline.

---

[38] To prevail on such an argument at this stage, Defendants "bear a heavy burden" of "'prov[ing]' that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insider's one-sided representations.'" *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) (citation omitted). Defendants' cases do not counsel otherwise. In *Meyer v. Greene*, the Eleventh Circuit held that an analyst report could not serve as a corrective disclosure insofar as it merely rehashed facts already revealed by the company's SEC filings. 710 F.3d 1189, 1198 (11th Cir. 2013). But information in a company's SEC filings is paradigmatic widely-disseminated information. As for *In re Omnicom Group, Inc. Sec. Litig.*, which was decided at the summary judgment stage, in that case there was no factual dispute that the truth about the fraud alleged in the complaint had been disclosed more than a year before the alleged corrective disclosure at issue. 597 F.3d 501, 512-13 (2d Cir. 2010). Here, by contrast, the factual record remains undeveloped; the Second Circuit's emphasis on the undisputed factual record in *Omnicom* only underscores why it would be manifestly inappropriate to credit Defendants' arguments here at the pleading stage.

**Defendants' November and December 2018 Statements Concerning Safety (Statements 36 and 37, and 55-57).**  On November 1, 2018, after the DEP halted construction on the Revolution pipeline, Energy Transfer said that the safety of the surrounding area is "our first priority."  (Statement 36, ¶ 378.)  Energy Transfer similarly claimed on December 19, 2018 that "The safety of all those who live and work along our pipeline is our first priority and this project was planned and implemented based on that fact."  (Statement 37, ¶ 380.)  Energy Transfer also stressed on November 1, 2018 that "We have been and will continue to comply with their [PADEP's] orders."  ¶ 378 (Statement 55); *see also* ¶¶ 377, 379 (Statements 56-57).

Defendants argue that the truth about the pipeline's safety risks was already disclosed in October 2018 and that the post-October 2018 statements were not corrected by any subsequent safety-related corrective disclosure.  Def. Br. at 49.  Not so.  The Chester County District Attorney premised the December 19, 2018 launch of his investigation on the need to assure "the safety of Pennsylvanians" and demand that "every aspect of the pipelines be constructed safely" and cited the Revolution explosion as "chang[ing] speculation into tangible danger and destruction."  ¶ 182; *see also* ¶ 414.  In response to the disclosure of the DA's investigation, the price of Energy Transfer's units fell 5.4%, including a statistically significant decline at the 99% confidence level on December 21, 2018.  ¶ 416.[39]

**Reports of State and FBI Investigations and Criminal Charges Plead Loss Causation**.  Next, Defendants argue that the reports of the FBI's investigation into the Pennsylvania Governor's involvement in the granting of the ME2 permits, and the filing of criminal charges

---

[39] Defendants' case cited in support of dismissal of Statements 55-57 is inapposite. In *Payne v. DeLuca*, the plaintiffs did not allege that any information was revealed to the market by one of the alleged corrective disclosures; instead, they alleged that the statements in that corrective disclosure were false and misleading, and did not reveal the truth. 433 F. Supp. 2d 547, 608 (W.D. Pa. 2006). Here, the Complaint alleges the corrective disclosures partially revealed the truth of Defendants' fraud. *See* ¶¶ 413-414, 418-422, 423-426.

against an Energy Transfer employee and contractors who worked security for the project are insufficient to sustain Plaintiffs' loss causation allegations.  Def. Br. at 51. This misapprehends the law, as courts throughout the Third Circuit have held that disclosures of investigations are sufficient to allege loss causation. *See*, *e.g.*, *Utesch*, 385 F. Supp. 3d at 424-25 (allegations of price drops following disclosure of investigation into product, revelation of receipt of grand jury subpoenas, and news of likely criminal charges against defendant adequate to allege loss causation); *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *12 (D.N.J. June 12, 2020) (New York Stock Exchange investigation); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *13-14 (D.N.J. Aug. 6, 2019) (subpoena from Department of Justice and possible criminal charges); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 384-88 (E.D.N.Y. 2013) (announcement of governmental and regulatory investigations); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230-31 (S.D.N.Y. 2009) (news that federal prosecutor and SEC were investigating); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 286-87 (S.D.N.Y. 2008) (notice of SEC "informal" investigation).

Defendants claim that the "mere announcement of an investigation cannot be used to allege loss causation" (Def. Br. at 51), but "exposure of the fraudulent representation . . . is the critical component of loss causation." *Utesch v. Lannett Co.,* 385 F. Supp. 3d at 425. As discussed above, this exposure may appear through, among other forms, a government investigation (*see, e.g., In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006)), news articles (*see, e.g., In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *21 (E.D. Pa. Sept. 3, 2010)), or other "unproven allegations" (*see, e.g., Hull v. Global Digital Sols., Inc.,* 2017 WL 6493148, at *14 (D.N.J. Dec. 19, 2017)). In this case, Plaintiffs allege that reports revealing the FBI investigation into potential misconduct by Energy Transfer in obtaining the ME2 permits caused the price of

Energy Transfer units to decrease, causing economic harm to Plaintiffs and other holders.  ¶¶ 423-426.  At the motion to dismiss stage, nothing more is required.

Defendants also assert that, since the trial court dismissed the bribery charges against Energy Transfer Security Chief Recknagel, Plaintiffs do not plead loss causation for Statements 48 through 54 because there was no "truth" disclosed to the market by the filing of charges against him and the constables.  Def. Br. at 51.  First, the criminal charges remain pending against Recknagel's co-defendants and the Chester County D.A. is "weighing its options" after the trial court dismissed the Recknagel charges.[40]  Second, Defendants ignore that Statements 48 through 54 include Defendants' materially false and misleading claims that the constables were retained at residents' requests, or not employed by Energy Transfer but by a third party called Raven Knights.  *See, e.g.*, Statement 48 (¶ 392) ("we take issue with the many factual inaccuracies contained in the District Attorney's press release"); Statement 50 (¶ 394) ("We have engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property"); Statement 53 (¶ 398) (Constables Johnson and Robel "were not Sunoco or Energy Transfer employees").

As the December 3, 2019 Chester County criminal complaint against Recknagel revealed, Defendants' claim that the Constables were not "employees" of Energy Transfer hid that the Company was behind hiring the Constables, and paid for them through a series of shell companies.  It alleged the scheme "hid[] the connection between Energy Transfer and the Constables" and that "[e]very step of the payments was hidden and cloaked." ¶ 209.[41]  Nothing in the dismissal of claims

---

[40]  *See* Golan Decl., Pl. Ex.2 (last page).
[41]  Relying on *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd,* 757 F. App'x 151 (3d Cir. 2018), Defendants argue that Plaintiffs' allegations are merely the announcement of an investigation without more, as required by certain opinions from outside the Third Circuit. *See id.* at *18 (citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013), and *Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1231 (M.D. Fla. 2014), *aff'd,* 608 F. App'x 855 (11th Cir. 2015)).  In this case, Plaintiffs plead the "more" that Defendants' own authority declares necessary. *See* ¶¶ 427-431. Accordingly, the announcement of criminal charges against

against Recknagel contradicts the factual accuracy of these allegations. The revelation of Energy

Transfer's role also demonstrated that it was not Lisa Drive residents who requested security but

Energy Transfer using the constables to intimidate residents.  As Plaintiffs allege, one resident of

Lisa Drive "says his once quaint property has been turned upside down and plagued by sinkholes,

intrusive workers, and <u>mysterious security guards from out of state</u>. He's terrified for his life and

ready to flee disaster at a moment's notice — and he's not alone." ¶ 395.

### F.  Plaintiffs Adequately Plead Control Person Claims

Defendants concede that Plaintiffs have adequately pled their Exchange Act §20(a) control

person claims against Defendants Warren, McReynolds, Long, McCrea, and Ramsey, and they

argue only that the Complaint does not plead control as to Defendants Hennigan and McGinn.

Def. Br. at 52-54.  This ignores the numerous facts alleged in the Complaint establishing Hennigan

and McGinn's "power or influence over [Energy Transfer]'s operations in addition to alleging the

executive positions they held," which is all that is required. *Cognizant*, 2020 WL 3026564, at *33.

As an initial matter, "[b]ecause control [is] a fact-intensive inquiry, it generally should not

be resolved on a motion to dismiss." *Audet v. Fraser*, 2017 WL 4542386, at *6 (D. Conn. Oct. 11,

2017); *see also In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 565 (D.N.J. 2005)

("[F]actual disputes raised by [defendants] do not defeat [Section 20(a)] allegations, because the

ultimate determination of whether the [defendants] were controlling persons involves questions of

fact to be resolved by the factfinder.").  Moreover, allegations of control need only meet the notice-

pleading standards of Rule 8.  *Audet*, 2017 WL 4542386, at *6 (control allegations "need not

---

Recknagel and Pennsylvania Constables, accompanied by the resulting drop in the price of Energy Transfer units, pleads loss causation. ¶¶ 427-431. *See Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 424 (E.D. Pa. 2019) (revelation that criminal charges would likely be filed sufficient to allege loss causation); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *2 (Aug. 6, 2019) (filing of "first criminal charges in [federal prosecutors] ongoing investigation" sufficient to allege loss causation).

satisfy the PSLRA"); *see also In re Able Labs. Sec. Litig*., 2008 WL 1967509, at *28 & n.41 (D.N.J. Mar. 24, 2008) (noting that the Third Circuit "has not disturbed the holding of a district court that concluded that the heightened pleading requirements of Rule 9(b) do not apply to claims under Section 20(a)").

Defendants argue that "all Plaintiffs allege" about Hennigan and McGinn's control is their positions (Def. Br. at 53), but that is incorrect.  The Complaint alleges that, in a March 2016 meeting, former DEP Secretary Quigley "read [Hennigan and Sunoco's contractor] the riot act" about Sunoco's unwillingness to submit a sufficient application to the DEP for the ME2 permits, and told Hennigan that Sunoco would have to start the application process over because its application was "so woefully inadequate." ¶ 82. It recounts Quigley's belief that Hennigan "then went to 'cry' to the governor, leading to Quigley's subsequent termination as DEP Secretary because he 'wouldn't roll over and issue a permit.'" The Complaint also details how, even though the DEP was statutorily required to deny inadequate permit applications (¶¶ 95-101), it instead approved them in February 2017, despite having identified voluminous insufficiencies as recently as two weeks prior. ¶¶ 115-116.  This surprisingly quick approval followed numerous meetings and other communications among Hennigan and/or McGinn, Quigley's successor McDonnell, and Yesenia Bane, Governor Wolf's special assistant. ¶¶ 102-124. These communications support that Hennigan and McGinn were pressuring Governor Wolf's office and the DEP to improperly issue the permits despite the applications' glaring problems. *See, e.g.*, ¶¶ 106-107, 109-112, 115-122, 124. These allegations of Hennigan and McGinn's direct participation in pressuring the Governor's office and the DEP to improperly issue permits are precise allegations that Hennigan and McGinn "influence[d] and direct[ed] the activities of the primary violator," which is all that is required to plead their control. *Able Labs*, 2008 WL 1967509, at *28 n.41.

These same allegations show why Defendants' arguments that Hennigan and McGinn were too junior to have controlled the Speaking Defendants (Def. Br. at 53) are irrelevant: as numerous courts have held, allegations showing control over the corporate defendant's <u>operations</u> – not just its executives or their statements – suffice at the pleading stage. *See Audet*, 2017 WL 4542386, at *7 (sustaining 20(a) claim based on allegations of defendant's role in the underlying fraudulent enterprise, not investor communications); *Katz v. Image Innovations Holdings, Inc*., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (control pleaded as to individual based on allegations that he "had an office" at the issuer's operating subsidiary and jointly "ran the operation").

Finally, Defendants' arguments that Section 20(a) claims against Hennigan and McGinn should be dismissed because the Complaint fails to plead their culpable participation (Def. Br. at 54) are also wrong. As Defendants concede, there is no requirement to allege culpable participation at the <u>pleading stage</u>, and courts in this Circuit have explicitly rejected such a requirement. *See* Def. Br. at 52 (acknowledging that the Third Circuit "has yet to rule on whether plaintiffs need plead culpable liability," citing *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 n.20 (3d Cir. 2013); *see also Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. Mar. 2, 2016) ("[T]he overwhelming trend in this circuit is that culpable participation does not have to be pled in order to survive a motion to dismiss."); *Able Labs*, 2008 WL 1967509, at *29 ("[T]he Third Circuit does not require that culpable participation be pled in order to establish controlling person liability.") In any event, the Complaint pleads Hennigan and McGinn's direct and knowing participation in the underlying fraud (*see generally* ¶¶ 102-124), which suffices to establish their culpable participation for Section 20(a) purposes. *See Cognizant*, 2020 WL 3026564, at *34 ("[B]y virtue of [defendants'] alleged participation in and implementation of the [] scheme, Plaintiffs adequately plead that both defendants had knowledge of the underlying [] scheme.").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety

and this case should be allowed to move forward for discovery and other proceedings.


Dated: October 5, 2020                                     Respectfully submitted,

                                                          **BARRACK, RODOS & RACINE**

                                                          */s/ Jeffrey W. Golan*
                                                          Jeffrey W. Golan
                                                          Robert A. Hoffman
                                                          Jeffrey A. Barrack
                                                          Meghan J. Talbot
                                                          3300 Two Commerce Square
                                                          2001 Market Street
                                                          Philadelphia, PA 19103
                                                          Telephone: (215) 963-0600
                                                          Facsimile: (215) 963-0838
                                                          jgolan@barrack.com
                                                          rhoffman@barrack.com
                                                          jbarrack@barrack.com
                                                          mtalbot@barrack.com


                                                          John C. Browne (admitted *pro hac vice*)
                                                          Adam H. Wierzbowski (admitted *pro hac vice*)
                                                          Michael M. Mathai (admitted *pro hac vice*)
                                                          James M. Fee (admitted *pro hac vice*)
                                                          **BERNSTEIN LITOWITZ BERGER**
                                                          **  & GROSSMANN LLP**
                                                          1251 Avenue of the Americas
                                                          New York, NY 10020
                                                          Telephone: (212) 554-1400
                                                          Facsimile: (212) 554-1444
                                                          johnb@blbglaw.com
                                                          adam@blbglaw.com
                                                          michael.mathai@blbglaw.com
                                                          james.fee@blbglaw.com


                                                          *Counsel for Lead Plaintiffs and*
                                                          *Lead Counsel for the Class*


                                                          John D. Zaremba

**ZAREMBA BROWN PLLC**
40 Wall Street
52nd Floor
New York, NY 10005
Telephone: (212) 380-6700
jzaremba@zarembabrown.com

*Additional Counsel for Lead Plaintiff and the Class*