**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALLEGHENY COUNTY | : | |
| EMPLOYEES' RETIREMENT | : | |
| SYSTEM ET AL. | : | |
| v. | : | CIVIL ACTION NO. 20-200 |
| | : | |
| ENERGY TRANSFER LP ET AL | : | |

McHugh, J.                                                        April 6, 2021

## <u>MEMORANDUM</u>

## Table of Contents

I.   INTRODUCTION ................................................................................................................ 2

II.  FALSITY AND MATERIALITY OF STATEMENTS .................................................... 4

    A.   STATEMENTS REGARDING TIMELINE OF PIPELINE CONSTRUCTION ........................................ 5
        i.    *Factual Background* ...................................................................................................... 5
        ii.   *Standard* ........................................................................................................................ 6
        iii.  *Mixed Present/ Future Statements* ............................................................................. 7
        iv.   *Forward-looking statements identified by Defendants as such and accompanied by cautionary language.* ........................................................................................................... 9
        v.    *Forward-Looking Statements Not Accompanied by Cautionary Language* ...................... 11
        vi.   *Forward-Looking Statements Plausibly Alleged to be Knowingly False When Made* ........ 14
        vii.  *Materiality.* .................................................................................................................. 17
    B.   STATEMENTS REGARDING PIPELINE CAPACITY ............................................................... 18
        i.    *Factual background* ..................................................................................................... 18
        ii.   *Standard* ...................................................................................................................... 19
        iii.  *Statements in SEC Filings accompanied by meaningful cautionary language.* .............. 20
        iv.   *Other forward-looking statements* ............................................................................... 20
        v.    *Materiality.* .................................................................................................................. 23
    C.   STATEMENTS ABOUT SAFETY AND COMPLIANCE WITH ORDERS ..................................... 24
        i.    *Factual background* ..................................................................................................... 24
        ii.   *Standard* ...................................................................................................................... 26
        iii.  *Statements about Commitment to Safety* .................................................................... 27
        iv.   *Statements about Regulatory Compliance* .................................................................. 32
    D.   STATEMENTS ABOUT THE CODE OF ETHICS .................................................................... 33
        i.    *Factual background* ..................................................................................................... 33
        ii.   *Standard* ...................................................................................................................... 35
        iii.  *The Unwritten Policy rendered Parts of the Code Materially Misleading* ...................... 37
        iv.   *Other Statements in the Code* ..................................................................................... 39

|  |  | *v.* | *Materiality* | 39 |
|  | E. | | STATEMENTS REGARDING CRIMINAL INVESTIGATIONS AND CASES | 39 |
|  |  | *i.* | *Factual Background* | 39 |
|  |  | *ii.* | *Standard* | 40 |
|  |  | *iii.* | *Statements of Opinion* | 40 |
|  |  | *iv.* | *Statements of Fact* | 41 |
|  |  | *v.* | *Materiality* | 43 |
| III. | | | SCIENTER | 43 |
|  | A. | | INDIVIDUAL DEFENDANTS | 44 |
|  |  | *i.* | *Warren* | 45 |
|  |  | *ii.* | *McCrea* | 47 |
|  |  | *iii.* | *Long* | 48 |
|  |  | *iv.* | *Ramsey* | 50 |
|  |  | *v.* | *John W. McReynolds* | 51 |
|  |  | *vi.* | *McGinn and Hennigan* | 52 |
|  |  | *vii.* | *Core Operations Doctrine* | 53 |
|  |  | *viii.* | *Content and Context* | 54 |
|  | B. | | CORPORATE DEFENDANT | 56 |
| IV. | | | LOSS CAUSATION | 64 |
|  | A. | | Disclosure relating to Pipeline Capacity | 66 |
|  | B. | | Disclosures Relating to Timeline | 66 |
|  | C. | | Disclosures regarding Government Investigations | 68 |
| V. | | | 20(A) CLAIM | 71 |
| VI. | | | CONCLUSION | 72 |

# I.    Introduction

This is a putative class action brought by shareholders of Defendant Energy Transfer.  Lead Plaintiffs are the retirement systems for public employees of various cities, and the case is brought on behalf of all shareholders who purchased or owned stock in Energy Transfer between February 25, 2017 and December 2, 2019.  Defendants are Energy Transfer LP (the Corporate Defendant), and certain executives of Energy Transfer or its subsidiary Sunoco (the Individual Defendants).

More detailed factual analysis will be provided below, but in sum, Plaintiffs allege that Defendants issued a series of false or misleading statements during the class period related to Defendants' construction of three natural gas pipelines across Pennsylvania.  They contend that the truth was revealed to investors only slowly and through numerous corrective disclosures, and

that the value of Defendants' stock fell as a result.  Plaintiffs further maintain that Energy Transfer stock was kept at an artificially high price during the class period because of Defendants' false statements, and bring this securities fraud claim under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a).  Defendants have moved to dismiss.

It is a violation of the Exchange Act and the rules promulgated thereunder "[t]o make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5 ("Rule 10b-5").  To establish a claim of securities fraud under Rule 10b-5, plaintiffs must show: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (citations omitted).  Defendants here argue that Plaintiffs have not met their burden as to the first, second, and sixth elements.

Like all complaints at the motion to dismiss stage, the allegations in Plaintiffs' Complaint must be assumed to be true.  *Id.*  However, under both Federal Rule of Civil Procedure 9(b) and under the Private Securities Litigation Reform Act (PSLRA), Plaintiffs must meet a heightened pleading standard for certain elements of the securities claim.  First, "the complaint must specify each allegedly misleading statement, why the statement was misleading, and if an allegation is made on information and belief, all facts supporting that belief with particularity."  *Williams v. Globus Medical Inc.*, 869 F.3d 235, 240 (3d Cir. 2017).  *See also In re Rockefeller Center Prop. Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (holding that where "the requisite factual information is peculiarly within the defendant's knowledge or control" plaintiffs must still

"accompany their legal theory with factual allegations that make their theoretically viable claim plausible."). Second, for each act or omission alleged, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [scienter]." *Williams*, 869 F.3d at 241. In addition, there are separate substantive standards for different categories of statements.

Because of these heightened standards of pleading, it has become the norm that defendants move to dismiss some or all of the allegations in securities fraud cases, microscopically examining each allegation. This in turn requires rigorous analysis by the court.

Having performed that exercise, I find that Plaintiffs have met their burden regarding some, but not all, of the allegedly misleading statements. Accordingly, Defendants' Motion to Dismiss is granted in part and denied in part.[1]

## II.    Falsity and Materiality of Statements

As noted above, complaints alleging securities fraud must "specify each allegedly misleading statement, [explain] why the statement was misleading, and if an allegation is made on information and belief, all facts supporting that belief with particularity." *Inst. Invr's Grp v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009). Plaintiff's Amended Complaint spans 191 pages and 491 paragraphs, with approximately fifty-seven allegedly actionable misstatements. For the sake of clarity, I have divided the statements into five categories.[2]

---

[1] I exercise subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

[2] In their Motion to Dismiss, Defendants created a table of the statements, dividing them into categories and assigning them numbers that did not correspond to the order in which they were pled. Some complaint paragraphs were separated into multiple parts, and some were omitted from the table. This complicated the work of the Court and had the potential to mislead. Defendants are

### a. Statements Regarding Timeline of Pipeline Construction

#### i. Factual Background

The class period begins on February 25, 2017, the day after Defendants filed their 2016 10-K form with the SEC, in which they announced the construction of three natural gas pipelines through Pennsylvania. Am. Compl. ¶ 332. The pipelines at issue in this case are the Revolution, the Mariner East 2 ("ME2") and Mariner East 2X ("ME2X"). *Id.* ¶ 3. When fully completed, the pipelines "will carry highly-explosive natural-gas liquids ('NGLs')— compressed ethane, butane, and propane." *Id.* ¶ 7. ME2 and ME2X will carry NGLs "350 miles, from the Marcellus shale gas fields in western Pennsylvania all the way to the Marcus Hook port approximately 20 miles southwest of Philadelphia." *Id.*

In that filing, on investor phone calls, and at investor presentations throughout 2017, Defendants stated that the ME2 pipeline "would be in service in the third quarter of 2017" and that the Revolution pipeline, which depended on ME2's completion beforehand, would be "in service in the fourth quarter of 2017." *See, e.g., Id.* ¶¶ 332, 334. Throughout the class period, that timeline was repeatedly pushed back, although Plaintiffs allege not at a rate commensurate with actual changes on the ground. *See, e.g.*, *Id.* ¶¶ 345, 348. As of June 15, 2020, when the Amended Complaint was filed, Plaintiffs assert that the Revolution pipeline is not in service and that the full ME2 pipeline remains under construction. *Id.* ¶¶ 16, 277.

Plaintiffs allege that all statements related to the timing of pipeline completion were materially misleading. They contend both that the permits to begin construction were obtained through illegal means and that significant geological risks were ignored, such that either

---

instructed to adhere to the numbering system used in the Complaint in all future filings. I will refer to the statements at issue here by their paragraph numbering in the Amended Complaint.

Defendants knew, or were reckless in not knowing, that the timelines provided were impossible to achieve. *See, e.g.*, *Id.*¶ 333. As construction progressed, Plaintiffs also allege that Defendants knew or were reckless in not knowing that the proffered timeline was impossible to achieve due to accidents, significant changes to the construction necessitated by geological problems, and orders issued by the Pennsylvania government requiring reports and approvals before continuing ahead. *See, e.g.*, *Id.* ¶ 344.

### ii.  Standard

Defendants argue that statements related to timeline are covered by the PSLRA safe harbor. The PSLRA contains a "safe harbor" provision that renders "inactionable"[3] certain forward-looking statements made by companies. *See* 15 U.S.C. § 78u-5(c). Forward-looking statements are defined to include projections of financial information, "a statement of the plans and objectives of management for future operations," and "a statement of future economic performance." § 78u-5(i)(1)(A)-(C).

Under the safe harbor, forward-looking statements are not actionable if "the statement is identified as such and accompanied by meaningful cautionary language." *Avaya*, 564 F.3d at 254; § 78u-5(c)(1)(A)(i). And even for statements not accompanied by cautionary language, forward-looking statements are inactionable if "the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. The standards for oral forward-looking statements are similar. § 78u-5(c)(2).

---

[3] The term "inactionable" does not appear in any standard dictionary. It is, however, used frequently by courts when categorizing allegations under federal securities law. *See, e.g., Avaya*, 564 F.3d at 255; *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004).

Accordingly, Plaintiffs must show that forward-looking statements were not accompanied by cautionary language and must plausibly allege that the statements were made with actual knowledge of their falsehood.  In demonstrating knowledge of falsity, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [scienter]."  15 U.S.C. § 78u-4(b)(2).  "[A]n inference of scienter must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  *See also Williams*, 869 F.3d at 245 (applying this standard to forward-looking statements).  Further, plaintiffs must also show that any misleading statements or omissions were also material.  15 U.S.C. § 78u-4(b)(1).

### iii.  Mixed Present/ Future Statements

As a threshold matter, I find that several statements or portions of statements related to the timeline of pipeline construction were not forward-looking statements and are therefore not shielded by the safe harbor provision.  "A mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."  *Avaya*, 564 F.3d at 255 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (*"Tellabs II"*).  Several statements regarding in-service dates were connected to assertions about work that had already been completed — assertions Plaintiffs allege were false.  For example, on February 22, 2018, Defendant Long stated that "[w]e continue to make progress on the construction of this project, with 94% of mainline construction complete and 83% of HDDs completed or underway.  At this time, we continue to target placing ME2 into service by the end of the second quarter of

2018." [4]  Am. Compl. ¶ 348.  Plaintiffs allege that, according to a former employee of Defendant

("FE-1"), [5] "the ME2 project was never close to 90% complete prior to March 2018, and

considering the drills left on the 20-inch line, the pipeline could not have been over 80% complete."

Am. Compl. ¶ 352.  The portions of these statements that make false assertions of *present* facts are

therefore not protected by the Safe Harbor.  *Avaya*, 564 F.3d at 255. [6]  *See also In re Urban*

*Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649-50 (E.D. Pa. 2015) ("Any characterizations

of past events or current conditions, or prefacing otherwise non-forward-looking statements with

words of futurity or belief does not bring the statements within the protection of the safe harbor.")

(quotations and citations omitted).  Plaintiffs have also shown that these statements were material,

---

[4] HDD, or Horizontal Directional Drilling, "is a method for laying underground pipelines by drilling an underground channel for the pipeline."  Am. Compl. ¶ 75.  HDD "creates certain unique risks" including that "the pressurized drilling fluids used in HDD can seep through the ground, rising to the surface or contaminating underground water supplies — a phenomenon known as 'inadvertent return' or a 'frac-out.'"  *Id.* ¶ 76.

[5] Plaintiffs state that FE-1 "was a corrosion specialist at Natural Energy Field Services, LLC from March 2017 until March 2018."  Am. Compl. ¶ 124, n.6.  FE-1 allegedly "worked on the ME2 project at OPP, PPP1 West and East, and PPP2" and "attended meetings" with "project managers and construction managers" *Id.* at ¶ 124, and had knowledge of the permitting process and construction of the pipelines.  *Id.;* ¶ 135.  This suffices to make FE-1 a reliable source of "information and belief" as required by the PSLRA.  *See California Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (instructing courts to consider "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.").

[6] Even if the entire statements could properly be classified as forward-looking statements, Plaintiffs have alleged actual knowledge of the statements' falsity at the time they were made, and the statements were not identified as forward-looking statements and accompanied by cautionary language.  Consequently, these statements would therefore still survive dismissal in any case.  *See section v, infra.*

*see section vii, infra*, and as discussed below, have properly alleged scienter.  The portions of these statements that make false assertions of present facts therefore survive dismissal.[7]

### iv.  Forward-looking statements identified by Defendants as such and accompanied by cautionary language.

In their 10-K filings, Defendants provided timeline estimates that Plaintiffs challenge as materially misleading.  *See, e.g.*, Am. Compl. ¶ 332 (statement within 2016 10-K filing that ME2 "is expected to commence operations in the third quarter of 2017.").  These statements, included within SEC filings, were identified as forward-looking statements and accompanied by meaningful cautionary language.  They are therefore inactionable and will be dismissed.

Forward-looking statements are protected under the safe harbor if they were "identified as forward-looking statements" and if they were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A)(i).  "A vague or blanket (boilerplate) disclaimer" will not suffice as cautionary language; the language "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  *Avaya*, 564 F.3d at 256 (citations omitted).

Defendants' cautionary language in their SEC filings meets this standard.  In the 2016 10-K, Defendants warn that "[a]lthough the Partnership and its General Partner believe . . . forward-looking statements are based on reasonable assumptions and current expectations and projections about future events, no assurance can be given that such assumptions, expectations or projections

---

[7] These statements are identified in paragraphs 348 ("We continue to make progress on the construction of this project, with 94% of mainline construction complete and 83% of HDDs completed or underway"), 350 ("On our Revolution project, construction is mechanically complete"), 351, and 360 of the Amended Complaint.  The forward-looking portions of these statements are addressed below.

will prove to be correct. Forward-looking statements are subject to a variety of risks, uncertainties

and assumptions."  Def. Mot. to Dismiss Ex. 7, Form 10-K for fiscal year ended Dec. 31, 2016,

ECF 44-10; *Id.* Ex. 1, Form 10-K for fiscal year ended Dec. 31, 2017, ECF 44-4.[8]  The filings then

go on to identify specific risks.  In both the 2016 and 2017 10-K filings, Defendants warned that

"[e]xpanding [Energy Transfer Partnership's] business by constructing new pipelines and related

facilities subjects ETP to risks."  *Id.*  They warn that "[t]he construction of new pipeline and related

facilities . . . involves numerous regulatory, environmental, political and legal uncertainties beyond

ETP's control . . . [i]f ETP undertakes these projects, they may not be completed on schedule or at

all or at the budgeted costs."  *Id.*  Another section states that "[i]f one or more facilities that are

owned by ETP . . . are damaged by severe weather or any other disaster, accident, catastrophe or

event, ETP's operations could be significantly interrupted . . . [t]hese interruptions might involve

significant damage to people, property, or the environment, and repairs might take a week or less

for a minor incident to six months or more for a major interruption."  *Id.* at 9.  This language is

substantive and specifically tailored, and therefore protects forward-looking statements in the 10-

K filings under the safe harbor.  *Avaya*, 564 F.3d at 257-58.[9]

---

[8] Defendants included portions of the 10-K filings as exhibits in their Motion to Dismiss. Complete
filings can be found at https://sec.report/Ticker/ETP.  These documents are incorporated by
reference into the Amended Complaint and may be considered. *See In re Burlington Coat Factory
Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997*)* ("[D]ocument[s] integral to or explicitly relied
upon in the complaint may be considered without converting the motion to dismiss into one for
summary judgment.").

[9] Defendants argue primarily that projections are inactionable under the "bespeaks caution"
doctrine, which was developed by courts and later codified in the statutory safe harbor.  The
doctrine holds that when a document's projections "are accompanied by meaningful cautionary
statements, the forward-looking statements will not form the basis for a securities fraud claim if
those statements did not affect the 'total mix' of information the document provided investors."
*In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993).
Because the doctrine is document-specific, does not apply to statements that are knowingly false
when made, and the only meaningful cautionary language here was contained in the 10-Ks, my

Plaintiffs argue that these statements were knowingly false when made, and therefore are not protected under the safe harbor.  Pl. Opp. Mot. to Dismiss at 44, ECF 49.  However, the "disjunctive statutory test provides two distinct entrances to the safe harbor," and cautionary language by itself suffices.  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016).  Because Defendants' statements were identified as forward-looking statements and accompanied by meaningful cautionary language, their statements are protected.  Therefore, these statements will be dismissed.[10]

### v. Forward-Looking Statements Not Accompanied by Cautionary Language

Other statements regarding the timeline were "forward-looking" within the definition of 15 § 78u-5(i)(1)(A)-(C), but were not "identified as forward-looking and accompanied by cautionary language" so as to qualify Defendants for the same safe harbor protection as the 10-K statements.[11]  Therefore, these statements are only protected by the safe harbor if they were "made without actual knowledge that the statement was false or misleading."  *In re Aetna*, 617 F.3d at 278-79.  When alleging knowledge of falsity, the statement "must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).  Plaintiffs must scienter "with particularity,"

---

analysis remains the same under either the statutory safe harbor or the "bespeaks caution" doctrine.

[10] These statements are identified in paragraphs 332, and 353 of the Amended Complaint.

[11] Plaintiffs allege that "[m]any of the specific statements were not identified as 'forward-looking' when made" and that the statutory safe harbor is thus inapplicable. Am. Compl. ¶ 475.

showing "facts giving rise to a strong inference" that the defendant spoke with knowing falsity. 15 U.S.C. § 78u-4(b)(2); § 78u-5(c)(1)(B).

Plaintiffs have made that showing as to some, but not all, of the remaining forward-looking statements.

Plaintiffs argue that from the very first time Defendants spoke of a timeline for the pipeline, this timeline was knowingly false because Defendants had procured licenses from the Pennsylvania government through improper means. Plaintiffs point to the ongoing FBI investigation of the Wolf Administration's permitting process. Am Compl. ¶ 326. They also plead extensive facts showing that the permitting process was rushed and received political protection from the typical regulatory scrutiny. *Id.* ¶¶ 73-124. This includes statements from former Department of Environmental Protection (DEP) Secretary Mike Quigley, who asserts that the pipeline permits were "riddled with deficiencies" throughout 2015 and 2016, and that he was "ushered out" of his position due to his refusal to comply with the rushed process. *Id.* ¶¶ 78-88. Plaintiffs also point to emails, text messages, and scheduled meetings between Energy Transfer's senior leadership and members of the Wolf Administration to show that the administration "exerted undue pressure on the DEP to approve the permits, which sailed through despite the deficiencies." *Id.* ¶¶ 102-124.

Even accepting all of Plaintiffs' allegations about malfeasance in the permitting process as true, Plaintiffs have not shown a strong inference that the timeline provided at the beginning of the class period was knowingly false when made. Plaintiffs have not alleged that Defendants knew the pipeline could not be completed within the timeline provided; to the contrary, the fact that Defendants rushed the permitting process implies that Defendants intended to act as quickly as possible with construction and perhaps assumed that regulations would not interfere with their

process.  Plaintiffs aver that "multiple customer contracts had 'drop-dead' dates such that Energy

Transfer needed to place ME2 and the Revolution pipeline in service by the end of 2018 to prevent

its customers from terminating their contracts without penalty."  *Id.* ¶ 443.  *See also id.* ¶ 212

(alleging that due to customer contracts "timing was of the utmost importance for Energy Transfer,

and motivated Energy Transfer to cut corners and engage in unsafe construction tactics.").  These

deadlines likewise undermine Plaintiffs' assertion that Defendants knew they could not place the

pipelines in-service by 2018; in fact, they had strong economic incentives to do so.

It certainly is possible that Defendants knew that their proposed timeline was doomed, and

that without having taken the time to correct the relevant regulatory issues, they were inevitably

going to encounter catastrophe in the construction.  But an inference of scienter "must be more

than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Plaintiffs have not alleged an

inference of knowing falsity from the very beginning of the class period that can compete with an

opposing inference such as negligence or even recklessness.[12]  *See Avaya*, 564 F.3d at 274 ("In the

case of the forward-looking statements, however, an inference of recklessness does not avail

plaintiffs — that is, it must be placed on the nonculpable-explanation side of the balance when we

weigh competing inferences.").  If that were true, it means that Defendants embraced failure from

the outset.  But to what end?  Plaintiffs do not plead that insiders sold stock at inflated prices soon

---

[12] For example, Plaintiffs allege that Energy Transfer commissioned a report in January 2016 that warned the Revolution pipeline would "encounter primarily shale bedrock," which ranks as a ten out of ten on Terracon's hazard scale due to its 'high potential for geological hazards" and "anticipated that identification and mitigation of both landslide and subsidence geohazards will be challenging and require careful observation and mitigation."  Am. Compl. ¶¶ 222-23.  It may have been reckless or negligent to assure investors of a rapid timeline given these hazards, but Plaintiffs have not alleged facts with particularity giving rise to a strong inference that Defendants knew they could not do so.

after the announcement of the project or point to any other way in which the Defendants profited from the project's difficulties.[13]  Because Plaintiffs have not adequately alleged that Defendants' initial statements of the timeline were knowingly false when made, these statements are inactionable.[14]  They will therefore not survive Defendants' Motion to Dismiss.

### vi.  Forward-Looking Statements Plausibly Alleged to be Knowingly False When Made

Plaintiffs have effectively shown that serious problems beset construction of the pipelines almost immediately, however, and that within a short period of time, it was apparent that the pipelines could not be constructed within the timeline provided.  After that point in time, Plaintiffs have shown a strong inference that timeline statements were knowingly false when made.  *Tellabs*, 551 U.S. at 314.

For example, on July 25, 2017, the Environmental Hearing Board "temporarily enjoined Sunoco from conducting HDD operations at 55 different work sites across Pennsylvania."  Am. Compl. ¶ 134.  A subsequent consent order required Sunoco "to perform a 're-evaluation' of the safety of constructing HDD operations" at 63 work sites as well as "to submit a report for each of the HDD Re-evaluation Sites that detailed the findings and presented the results of its studies on

---

[13] Plaintiffs submitted a Notice of Supplemental Authority (ECF 62) regarding a recent decision in a case pending in New York state court involving this same project.  In that case, the appellate court reversed the lower court's granting of a motion to dismiss regarding fraud claims against Energy Transfer brought by clients of ET.  The court found that the plaintiffs plausibly alleged that due to environmental reports stemming back to 2015, defendants knew that they were constructing on unstable terrain, neglected to inform engineers of that fact, and therefore committed fraud when proffering timelines to clients in 2017 and 2018.  Defendants object to consideration of this opinion (ECF 63), noting that the New York civil procedure rules and the PSLRA have different pleading standards, especially for scienter.  The minimal weight to which that decision is entitled to has not changed my analysis herein.

[14] These statements are identified in paragraphs 334, 336, and 338 of the Amended Complaint.

each of these sites." *Id.* ¶¶ 138-140.  The re-evaluation of these sites eventually resulted in multiple sites "posing a 'high risk' or 'an increased risk,' or 'as susceptible to the inadvertent return of drilling fluids' and 'required a redesign and new DEP approvals." *Id.* ¶ 143.  In October 2017, Defendants contracted with an organization to conduct the required reports and was warned that one area targeted for HDD was "locally known for karst development"[15] and was "prone to sinkhole development and solution openings, and should be thoroughly investigated before construction." *Id.* ¶ 145.  Despite this report, "almost half of the HDD path" at one site (the "Lisa Drive" site) traveled through the types of rock prone to sinkholes. *Id.* ¶ 147.  Energy Transfer's COO, Individual Defendant Mr. McCrea, spoke to investors regarding the ongoing process with the PA DEP and efforts "to get all the HDDs completed and on time" on November 8, 2017. *Id.* ¶ 148.  A few days later, on November 11, 2017, sinkholes did indeed appear at Lisa Drive after a 500-gallon frac-out, causing "geysers of drilling fluids to be released in the area," leading to a Notice of Violation from the DEP that required additional studies and reporting procedures. *Id.* ¶¶ 148-153.  On May 21, 2018 Administrative Law Judge Barnes found that "Sunoco has made deliberate managerial decisions to proceed in what appears to be a rushed manner in an apparent prioritization of profit over the best engineering practices available in our time that might best ensure public safety." *Id.* ¶ 322.  Judge Barnes consequently ordered a halt to construction in certain areas. *Id.* ¶ 319.

---

[15] Karst is "a rock structure that contains limestone."  Am. Compl. ¶ 156 (quoting spokesperson Jeff Shields).  Limestone, in turn is "a porous structure that is prone to sinkholes."  Def. Mot to Dismiss, Exh. 9, 44-12.  "[L]imestone is slowly dissolved over time by rainwater (which is slightly acidic) and that erosion can be exacerbated by any process that increases the flow of groundwater— like HDD.  For this reason, HDD is typically not recommended in areas dense with limestone— or near fault or fracture systems, for that matter." *Id.* (quoting Dr. Marie J. Kurz, "a senior scientist at Drexel University's department of biodiversity, earth and environmental science.").

Amidst the mounting litigation, regulatory scrutiny, and environmental difficulties, Plaintiffs allege that Defendants continued to proffer impossible timelines. Based on the above facts, Plaintiffs have shown a strong inference that beginning in July or August of 2017, when the litigation and additional requirements from the Pennsylvania government began, Defendants' unrealistic, and ultimately impossible, timeline statements were knowingly false when made, and therefore survive dismissal.[16] *See In re MGM Mirage Sec. Litig.,* No. 09-1558, 2013 WL 5435832, at *7 (D. Nev. Sep. 26, 2013) ("[E]ven though an estimate is a future projection, Defendants' statements were misleading because, at the time the statement was made, Defendants knew that the estimate was not accurate and that actual costs were reasonably expected to exceed the stated budget.").

Beyond arguing that these statements are protected by the safe harbor, Defendants further argue that timeline projections are opinions, and thus are inactionable under the Supreme Court's decision in *Omnicare*. *See Omnicare, Inc. v. Laborers Dist. Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1328 (2015) (holding that expressions of opinion are not actionable as misleading statements of fact "just because external facts show the opinion to be incorrect."). But *Omnicare* does not establish the blanket rule that Defendants would have the Court embrace. Statements using opinion-like expressions, such as "we believe" or "we expect" can still be actionable in certain circumstances. *Id.* at 1330 ("[W]hether an omission makes an expression of opinion misleading always depends on context."). *See also id.* at 1331 ("But those magic words ['we believe' or 'we think'] can preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors."). For example, if plaintiffs allege with

---

[16] These statements are identified in paragraphs 343, 345, 348, 349, 350, 356, 357, 360 and 364 of the Amended Complaint and were made between August 29, 2017 and August 9, 2018.

particularity that the speaker of an opinion statement does not sincerely hold the opinion at issue, the statement is actionable. *Id.* at 1326. And opinion statements can implicate statements of fact, in that "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Id.* at 1328. An investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* at 1329.

Plaintiffs contend that the speakers did not sincerely believe the timelines they proffered; as discussed above, I find that they have alleged with particularity that the speakers spoke with knowing falsity of the statements. Further, Plaintiffs have plausibly alleged that the statements did not "fairly align with the information in the issuer's possession at the time." *Id.* Plaintiffs are not, as Defendants argue, merely alleging that the speakers offered opinions which later turned out to be wrong. They present numerous facts on the ground that directly contradicted the statements— facts they contend were known to the speakers and could not be reconciled with the assurances offered to investors. I therefore will not dismiss these statements pursuant to *Omnicare*.

### vii. Materiality.

Finally, both forward-looking and present statements must be material in order to be actionable. *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii); 17 C.F.R. § 240.10b–5 (prohibiting "any untrue statement of a material fact").

The materiality requirement of section 10(b) is satisfied if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49

(1976)).  "Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal."  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004).  *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings.").  Dismissal should be granted on the basis of materiality "[o]nly if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality."  *Adams Golf*, 381 F.3d at 275 (emphasis in original) (quoting *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992)).

Plaintiffs allege that statements regarding the "in service" dates for the pipelines were highly material to investors, as the projected dates "would determine when Energy Transfer could reduce its billions of dollars in capital spending devoted to constructing the pipelines, [and] when Energy Transfer could begin transporting NGLs through the pipelines."  Am. Compl. ¶ 16.  Given the fact-specific nature of materiality, Plaintiffs have met their burden, and I will not dismiss the statements on this basis.

### b. Statements Regarding Pipeline Capacity

#### i. Factual background

In announcements throughout 2017 and 2018, Defendants touted that the ME2 pipeline would have "initial capacity to transport approximately 275,000 barrels per day" with an "upside of up to 450,000 barrels per day."  Am. Compl. ¶ 338.  The pipeline was planned to have a 20-inch diameter.  *Id.* ¶ 52.

 In July 2018, due to sinkholes caused by drilling near Lisa Drive the year before (discussed above), Energy Transfer announced that they had "identified an existing pipeline" that they would use for a portion of the pipeline's path.  *Id.* ¶ 358.  On an earnings call in August 2018, Defendants

disclosed the "existing pipeline" was just 12-inches wide, whereas the original plan had called for a 20-inch pipeline. *Id.* ¶ 364. Plaintiffs call this cobbled-together pipeline the "frankenpipe." *Id.* ¶ 20. Due to the section of pipeline that would now only be 12 inches wide, instead of 20, Defendants admitted, when pressed by analysts in the days after the earnings call, that the anticipated initial capacity of the pipeline was reduced by 65%, to 100,000 barrels per day. *Id.* ¶ 181. This announcement caused Energy Transfer stock to fall five percent. *Id.*

Plaintiffs allege that, beginning in June 2017, statements regarding the pipeline capacity were materially false or misleading.[17] In particular, Plaintiffs contend that Defendants knew that they would need to create the "frankenpipe" with diminished throughput capacity long before the August 2018 announcement, and intentionally withheld this information from investors.

### ii. Standard

Like the statements about the timeline, many of Defendants' statements about pipeline capacity are forward-looking statements. Accordingly, they are protected if they are either identified as such and accompanied by cautionary language or if they are not alleged to be made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c).

As a threshold matter, Plaintiffs argue that initial statements about the pipeline capacity were not "forward-looking" and therefore do not implicate the safe harbor. Tr. Oral Arg. at 36, ECF 60. I disagree. Forward-looking statements are defined by the statute to include "a statement of the plans and objectives of management for future operations." 15 U.S.C. § 78u-5(i)(1)(B).

---

[17] In their Opposition to Defendant's Motion to Dismiss, Plaintiffs state that they only challenge misstatements made after June 2017. Pl. Opp. Mot. Dismiss at 90, ECF 49. In their Amended Complaint, however, Plaintiffs underline a statement about pipeline capacity that was included in the 2016 10-K. Am. Compl. ¶ 332. For the same reasons discussed regarding pipeline in-service dates, the forward-looking statements of Defendants in the 10-K filing are inactionable under the PSLRA safe harbor. Thus, to the extent there is any confusion, this statement from paragraph 332 is dismissed.

Defendants' statement about capacity, which notably were largely made together with statements about the timeline, were phrased as future statements and are classically "forward-looking."  *See Avaya*, 564 F.3d at 254.

### iii.  Statements in SEC Filings accompanied by meaningful cautionary language.

In their 2016 and 2017 10-K filings, Defendants claimed that the ME2 pipeline "will expand the total takeaway capacity to 345 MBbls/d."  Am. Compl. ¶¶ 332, 353.  For the same reasons discussed above, the safe harbor provision renders these statements inactionable, because they were identified as forward-looking and were accompanied by meaningfully cautionary language.  *See* 78 U.S.C. §78u-5(c).  These statements are therefore dismissed.

### iv.  Other forward-looking statements

The other statements regarding pipeline capacity, such as those regarding in-service dates, were forward-looking, although not identified as such and not accompanied by cautionary language.  Although such statements are not automatically protected, plaintiffs must again show a strong inference that they were knowingly false when made.  15 U.S.C. § 78u-5(c)(1)(B); *Tellabs* 551 U.S. at 314.

The earliest facts alleged relating specifically to the capacity of ME2 are from July 2017 when the Chief Environmental Officer of Aqua, a public water utility company, emailed the Senior Director of ME2 and warned that "[b]ased on aquifer testing jointly performed by [Energy Transfer Partnership] and Aqua, it appears that HDD will have adverse impacts on our public water supply

wells at this location, resulting in permanent loss of these wells." Am. Compl. ¶ 155.  Accordingly, Aqua "request[ed] that Energy Transfer Partners (ETP) . . . avoid the use of horizontal direction drilling (HDD) near [Aqua's] Hillside Drive wells in Exton, PA.  *Id.*

In October 2017, a contracted report warned Energy Transfer that "alignment of one HDD (in Exton) passes through formations locally known for karst development and these rocks are prone to sinkhole development and solution openings and should be thoroughly investigated before construction." *Id.* ¶ 145.  That caution proved to be prescient.  On November 11, 2017, "the Energy Transfer Companies' drilling of the ME2 pipeline . . . caused a 500-gallon frac-out and sinkholes to appear at the Lisa Drive site."  *Id.* ¶ 148.  "Shortly after the initial five sinkholes appeared, multiple additional sinkholes appeared." *Id.* ¶ 154.

After the appearance of the sinkholes in November 2017, Defendants sought alternatives to HDD in order to proceed. *Id.* ¶ 341.  In June 2018, Defendants submitted a notification to the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA), seeking to make use of the old, existing pipe with a smaller diameter in order to construct what Plaintiffs refer to as the "frankenpipe." *Id.* ¶ 171, 359, 447.[18]  Specifically, rather than continue construction of the 20-inch ME2 pipeline through HDD, Defendants would utilize an existing 12-inch pipeline to connect the ME2 pipeline through geographies that had experienced sinkholes and frac-outs. *Id.*

---

[18] Although the application was not submitted as an exhibit with the Complaint, Plaintiffs rely on this application and I may consider it at this stage.  *See Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *In re Burlington Coat Factory*, 114 F.3d at 1426.

Exactly when Defendants decided to pursue this course of action, which they knew would have the result of reducing throughput, is hotly contested by the parties.  Plaintiffs argue that "because the decision to use the 12-inch pipeline necessarily entailed considerable internal planning, deliberation and approval, the notification to PHMSA constitutes strong additional evidence that Energy Transfer made the decision well before it actually notified PHMSA."  Pl. Sur-Reply at 2, ECF 52; Am. Compl. ¶ 447.  They believe this is especially so, given that the permit application states that the "anticipated start date of field work activities" is the same day as the application submission, June 15, 2018.  *See* PHMSA Application, ECF 49-3.  Plaintiffs argue this coalescence of dates proves that Defendants were preparing for such a pipeline switch for an extended period of time and that statements regarding pipeline capacity were knowingly false for months before the corrective disclosure in August 2018.  *Id.* ¶ 447.

Taking all of Plaintiffs' allegations as true, I cannot find that they have shown a strong inference that statements made between June and October 2017 were made with knowing falsity. During those months, Defendants received reports about the challenges of HDD in certain areas, but, as with the timelines, it has not been plausibly alleged that they knew they could not complete the drilling as planned.  Indeed, the fact that they forged ahead with the eventual disastrous result of the sinkholes shows this.  Defendants may have been reckless in their disregard for the truth regarding the HDD operations and the consequent changes to the pipeline, but because these are forward-looking statements, Plaintiffs need to show more than recklessness.  15 U.S.C. § 78u-5(c)(1)(B).  Plaintiffs have shown that it is possible that statements during this time were made with knowing falsity but have not alleged a strong inference.  Because that is the standard under the PSLRA, these statements must be dismissed.

Plaintiffs have, however, plausibly alleged that after the sinkholes appeared at Lisa Drive, Defendants knew that they could not complete the pipeline with the capacity touted to investors, since it was issues in this location that led to the use of the 12-inch pipeline. *See, e.g.*, Am. Compl. ¶ 359. Exactly when Defendants prepared the PHMSA application is a question of fact and will be properly addressed after discovery. Accordingly, the statements regarding pipeline capacity issued before November 2017 will be dismissed,[19] and the statements issued after the sinkholes appeared will survive.[20]

### v.  Materiality

Regarding pipeline capacity, Plaintiffs have shown "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32. In fact, Plaintiffs allege that when the truth did become known, the day after the existence of the "frankenpipe" was revealed on an investor phone call in August 2018, "the price of ME2 units fell sharply." Am. Compl. ¶ 365. Plaintiffs also assert that claims regarding capacity were "highly material to investors" as it would determine "when Energy Transfer could reduce billions of dollars in capital spending devoted to constructing the pipelines, and at what throughputs." *Id.* ¶ 16. As

---

[19] These statements are identified in paragraphs 338, 340 (statements dated August 16, 2017 and September 6, 2017).

[20] These statements are identified in paragraphs 340 (statements dated November 15, 2017 and forward), 353, 357 and 364. I note that Paragraph 340 appears to have a typographical error and assume, as a matter of common sense, that "January 9, 2017" should read "January 9, 2018" since the dates are listed in chronological order. While the statement paragraph 364 did not tout a specific capacity, Plaintiffs have plausibly alleged that the statement "the utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted" was made misleading by omitting the key change in capacity. "Once a company has chosen to speak on an issue— even an issue it had no independent obligation to address— it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams*, 869 F.3d at 241.

discussed below, Plaintiffs have adequately alleged scienter for these statements.  Accordingly, the statements will not be dismissed.

### c.  Statements about Safety and Compliance with Orders

#### i.  Factual background

Throughout the class period, Defendants made numerous statements touting their commitment to safety.  In a similar vein, Defendants repeatedly announced their commitment to complying with the various regulatory orders put in place by the Pennsylvania government in response to the many problems.

Plaintiffs allege that before, during, and after the issuance of these statements, Defendants were repeatedly and knowingly violating DEP orders, with numerous consequent disasters. Accordingly, Plaintiffs argue that Defendants' professed commitment to safety and to regulatory compliance was materially misleading.

Plaintiffs present in great detail the extensive findings of Pennsylvania governmental entities related to Defendants' repeated permit violations.  *See* Am. Compl. ¶ 231 ("From November 2017 to March 2018, the DEP inspected a single section of the pipeline at least ten times, resulting in over a dozen violations of the Clean Streams Law and ultimately resulting in a Consent Order and Agreement, issued in June 2018"); *id.* ¶ 232 ("As detailed in the June 2018 Order, Energy Transfer had violated Pennsylvania's Dam Safety and Encroachments Act, Clean Streams Law, dam safety and water management regulations and erosion and sediment control . . . "); *id.* ¶¶ 237-38 (describing a "slip" in 2018 that occurred after defendants allegedly "install[ed]

underdrains without a permit"); *id.* ¶ 257 ("On October 30, 2018, the DEP issued a press release . . . which stated . . . that the DEP's 'inspections discovered violations including unreported landslides, impacts to aquatic resources, [and] construction activities occurring in unpermitted areas"); *id.* ¶ 263 ("On January 9, 2019, the DEP notified Energy Transfer that it had 'failed to comply with the [October] 2018 Order . . . [and] 'failed to install flagging markers, or signs at the site,' failed to 'cease sediment laden discharged into Commonwealth waters' and failed to 'temporarily stabilize disturbed areas.'"); *id.* ¶¶ 264-65 (stating that in February 2019 the DEP issued a "Hold on All Energy Transfer Clean Water Permit Approvals and Modifications due to Non-Compliance" and finding that Energy Transfer "had not fulfilled the terms of the order and was not progressing toward compliance"); *id.* ¶ 381 (describing DEP's finding that the order to have professional licensed geologists present at each HDD site was "not working as intended" because on at least two occasions "the geologists reported they were instructed not to talk to the drillers.").

On September 10, 2018, Plaintiffs allege that Defendants' reckless construction of the Revolution pipeline in violation of DEP orders and permits led to a "massive explosion in connection with a landslide that occurred near Ivy Lane in Center Township, approximately 25 miles outside of Pittsburgh." *Id.* ¶ 244. The explosion "narrowly avoided killing a family as they slept, forced townspeople to flee their homes before dawn, downed six high-voltage electricity towers, knocking the power out for 1,500 residents, and scorched approximately 3 acres of land." *Id.* ¶ 246. "Energy Transfer's permitting documents confirm that Energy Transfer knew, since 2015, that the area near the Revolution Explosion 'included a 'slip' landslide area' with 'dangerous and unstable hillslope terrain.'" *Id.* ¶ 252. The explosion led the DEP to shut down the in-service placement of the Revolution, and to "submit a detailed plan of how Energy Transfer would repair

the damage caused by the Revolution Explosion." *Id.* ¶ 255.  The DEP stated in a press release that "inspections discovered violations including unreported landslides, impacts to aquatic resources, [and] construction activities occurring in unpermitted areas." *Id.* ¶ 257.

Plaintiffs allege that "[b]etween the explosion and the first week of January 2019, the DEP performed 46 inspections of the pipeline.  All of them noted continuing violations." *Id.* ¶ 261.  *See also id.* ¶ 128 ("All told, the DEP issued at least 36 notices of violation in connection with the Company's construction activities in 2017, and a further 55 notices throughout 2018."); *Id.* ¶¶ 264-65 (quoting a DEP letter from February 2019 which stated that Energy Transfer "had not fulfilled the terms of the order and was not progressing toward compliance.").  Notably, in January 2020, the DEP "admonished Energy Transfer for willful and egregious violations of Pennsylvania law during its planning for and construction of the Revolution" and ordered Energy Transfer to pay a $30.6 million fine, the larges the DEP has ever issued." *Id.* ¶ 271.

Beyond these larger regulatory violations, Plaintiffs also point to numerous other smaller regulatory violations that resulted in litigation and settlements, including polluting of water supply for a Township and destruction of lakes and rivers. *Id.* ¶¶ 279-325.  These violations resulted in fines and in further delays for pipeline construction. *Id.*

Defendants argue that all statements related to safety and compliance are immaterial puffery and thus inactionable.  I find that some of the statements are immaterial as a matter of law, but that others are not and therefore survive dismissal.

### ii.  Standard

Vague and optimistic statements are viewed by courts as "puffery" and are generally deemed immaterial as a matter of law. *Burlington Coat Factory*, 114 F.3d at 1427.  This is because no reasonable investor would rely on these statements. *Id.*; *Fan v. StoneMor Partners LP*, 927

F.3d 710, 716 (3d Cir. 2019) ("'[V]ague and general statements of optimism' are non-actionable precisely because they are not material— a reasonable investor would not base decisions on such statements.") (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538-39 (3d Cir. 1999)). *See also City of Monroe Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (holding that vague statements of progress lack "a standard against which a reasonable investor could expect them to be pegged.").

In some contexts, however, when a company repeatedly addresses a certain subject, the company "declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Shapiro*, 964 F.2d at 282.  For example, "where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject 'is in play.'" *Id.  See also Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) (holding if a defendant "was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement" then the statement is actionable).

Courts have held statements regarding safety to be material in industries carrying high safety risks, and where the safety of the business is therefore related to the success of the business. *See, e.g. In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D. W.Va. 2012) (holding that where a mining company "closely aligned their statements of commitment to safety to their productivity and success as a company, thereby lending credence to the materiality of their statements.").

### iii.  Statements about Commitment to Safety

Natural Gas Pipelines, like the pipelines here, are highly volatile and potentially dangerous projects.  The pipelines ran through ordinary Pennsylvanians' backyards and close to their water

sources; during construction, issues like frac-outs caused by drilling had immediate effects, and once operational, a leak in the pipeline could have fatal consequences.  The ME2 pipeline "principally carries ethane" which is "a colorless odorless gas."  Am. Compl. ¶ 56. When there is a leak, "ringing a doorbell, making a phone call, opening a garage door, turning lights on, or running an engine could ignite a fatal explosion" within the blast zone.  *Id.* ¶ 57.

Due to these safety concerns, in order to secure community approval for purposes of efficiently completing the project, Defendants affirmatively touted their commitment to and prioritization of safety.  Defendants themselves therefore made the subject of safety material.  *Shapiro*, 964 F.2d at 282; *In re Massey Energy*, 883 F. Supp. 2d at 618.  The materiality of safety concerns is further borne out by the number or community leaders who have intervened in, and sometimes delayed, the pipeline's construction due to safety concerns.  *See, e.g.*, Am. Compl. ¶ 182 (quoting the Chester County District Attorney when announcing an investigation as saying they will "demand that every aspect of the pipelines be constructed safely, or we will bring into play all of the tools of the criminal justice system."); *id.* ¶ 134 ("[T]he EHB . . . temporarily enjoined Sunoco from conducting HDD operations at 55 different work sites across Pennsylvania.").  Most significantly, after the Revolution explosion, the DEP ordered that Energy Transfer completely halt construction on that pipeline and the Revolution remains "out of service."  *Id.* ¶¶ 255-277.

Notwithstanding the materiality of the overall subject, Plaintiffs have not adequately alleged that all statements regarding safety were materially misleading.  Some statements will therefore be dismissed.

### 1.  Material and Misleading Statements about Safety

28

Defendants repeatedly touted their commitment to safety in investor phone calls and through press releases. Often, these statements followed recent accidents, such that the statements were purportedly intended to calm investors' worries. Although Defendants object that terms like "commitment" and "safety" are conclusory, such that no reasonable investor would rely on them, "the objection ignores the fact that *such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justified them as accurate, the absence of which renders them misleading*." *Shapiro*, 964 F.2d at 283 (emphasis in original). Defendants' statements about safety implied an underlying prioritization of resources and attention. *See, e.g.*, Am. Compl. ¶ 367 ("We… reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work"); ¶ 376 ("It is our priority to maintain and operate our assets to the highest safety standards, not just because it makes good business sense, but because it is the right thing to do."). Plaintiffs plausibly allege that this stated prioritization was false based on the flouting of regulations and consequent environmental disasters. *See, e.g.* Am. Compl. ¶ 322 (quoting Judge Barnes's finding that "Sunoco has made deliberate managerial decisions to proceed in what appears to be a rushed manner in an apparent prioritization of profit over the best engineering practices available in our time that might best ensure public safety.").

These statements were material based on the nature of these projects and on Defendants' repeated and specific assertions of the priority of safety; they have been plausibly alleged to be misleading based on the facts on the ground. *See In re Massey*, 883 F. Supp. at 618 ("[T]he truth or falsity of Defendants' statements can be determined. They are not stated in a context of future prediction, but generally recognize the company's past achievements and current goals."); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012) ("A repeated utterance, even on a

promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance.") (citing *Reese v. BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011)). Accordingly, these statements survive dismissal.[21]

### 2. Statements immaterial as a matter of law or not plausibly alleged to be misleading

Other statements, however, are so vague that they could not possibly be measured by a reasonable investor and are immaterial as a matter of law. These statements do not imply a prioritization or indeed any measure by which an investor could judge their veracity. *See, e.g.* Am. Compl. ¶ 366 ("[Our construction and engineering groups remain] very focused on safely and responsibly bringing our projects into service.").

Another statement is alleged to have only been sent to residents of a street impacted by the explosion; there is no allegation that investors were aware of this letter, and thus no allegation that it could have influenced investment decisions. *See id.* ¶ 375.

The materiality and falsity of these statements is connected; they are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *In re BP*, 843 F. Supp. 2d at 757 (quoting *City of Monroe*, 399 F.3d at 671). Because these statements are not plausibly alleged to have been material, they will be dismissed.[22]

---

[21] These statements are identified in the Amended Complaint at paragraphs 355, 367, 368, 376, 377, 378 and 380.

[22] These statements are identified in the Amended Complaint at paragraphs 366, 370, 374 and 375. The remaining underlined portions of paragraph 374 are also dismissed: one statement is paraphrased by the author of an article, and thus cannot be attributed to any Individual Defendant. *See In re Fisker Auto. Holdings, Inc. Shareholder Litig.*, No. 13-2100, 2015 WL 6039690, at *17 (D. Del. Oct. 15, 2015). Plaintiffs have not alleged facts with particularity showing that the other statement, that landslides are "definitely something that is being actively managed" is false or

Although the statement in paragraph 372, allegedly published in a full newspaper ad, contains numerous specific promises related to safety, such as "[w]e employ heavier pipe wall thickness than required by the U.S. Department of Transportation" and "[w]e inspect 100% of pipeline welds by X-ray, rather than the 10% required," Plaintiffs do not allege that any of these specific promises were false.  Rather, they focus on the statements that Defendants pledged to "operate our pipeline with the highest level of safety at all times" and "we're paying extra attention to safety."  Am. Compl. ¶ 372.  In a footnote, Plaintiffs note that a contractor struck a pipeline at 6.2 feet below ground, where Defendants had informed the contractors it was buried 9 feet below ground, but this is not purported to be a statement issued to investors, and it also comports with the substance of the newspaper ad, which states that "[w]e bury the pipeline . . . at least 4 feet and up to 200 feet [underground].")  The context of the newspaper ad shows that the above, specific details, were intended as examples of how Defendant was focusing on safety.  Because none of the examples are alleged to be false, I cannot find that the statement about safety preceding them is plausibly alleged to be false.

Relatedly, albeit in a different section of the Complaint, is a statement from the 10-K that "we have, or are in the process of obtaining, all required material approvals, authorizations, orders . . . and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities."  *Id.* ¶ 389.  Plaintiffs do not plausibly allege that this statement was misleading, however.  Although Plaintiffs maintain that the permits were not properly issued, they do not allege that the permits did not even exist.  And although early into construction Defendants were faced with new permit and filing requirements,

---

misleading.

there was no such requirement at the time of the 2016 10-K filing.  Plaintiffs do not allege that a

similar statement was made in the 2017 10-K filing.  This statement is therefore dismissed.[23]

### iv.  Statements about Regulatory Compliance

In this same category are statements about complying with regulatory orders.  For example,

in February 2018 Defendants, through a media spokesperson, stated that Sunoco was "committed

to fully complying with the DEP order, which includes following all permit requirements."  Am

Compl. ¶ 368.  In November 2018, Defendants stated through a spokesperson that "[w]e have been

and will continue to comply with [the DEP's] orders."  *Id.* ¶ 378.  These DEP orders mandated

specific, measurable procedures for Defendants to follow.  *See, e.g.*, *id.* ¶ 371 (stating that the DEP

ordered professional licensed geologists to be present at each HDD site).

As detailed above, Plaintiffs have plausibly alleged that Defendants were not complying

with the DEP orders at the time they issued statements assuring the public of their compliance, and

that they were not prioritizing safety above production efficiency or speed.  Plaintiffs have

therefore shown that these statements were false or misleading.  *See Omnicare*, 135 S. Ct. at 1326,

("determinate, verifiable statement" of fact is not puffery); *Cf. Retail Wholesale & Department

Store Union Local 338 Ret. Fund v. Hewlett-Packard*, 845 F.3d 1268, 1278 (9th Cir. 2017) (noting

that if the company "had continued the conduct that gave rise to the [previous] scandal while

---

[23] It is unclear from the Amended Complaint whether Plaintiffs allege that statements in paragraph 358, which discusses use of the 12-inch pipeline from a media spokesperson Vicki Granado on July 3, 2018, are materially misleading.  Ms. Granado stated that that the conversion of the pipeline could be done "quickly and safely" with "a minimum amount of work."  Am. Compl. ¶ 358. Plaintiffs allege that on June 19, 2018, "a resident of Darby County reported that this same line spilled over 33,500 gallons of gasoline into a Darby Creek" but do not allege to whom this was reported, or that Ms. Granado (or the executives ultimately responsible for press statements) knew about this spill, or even that the spill prevented conversion of the pipeline "quickly and safely." Moreover, the quickly and safely language is generalized puffery, and so this statement will be dismissed.

claiming it had learned a valuable lesson in ethics" and if statements had "create[d] an impression of full compliance," those statements would likely be actionable). And, as discussed below, Plaintiffs have alleged facts leading to a strong inference of, at the very least, extreme recklessness on the part of the Defendants who made these statements. The statements therefore survive dismissal.[24]

Plaintiffs have also plausibly alleged that these misrepresentations were material in that the omitted information would have been viewed by the reasonable investor as altering the total mix of information available. *See Basic Inc.*, 485 U.S. at 231-32. As discussed above, the Revolution pipeline has been shut down since the explosion in September 2018, significantly delaying the gains expected by investors from the pipeline being placed in service and carrying natural gas. Am. Compl. ¶16. Plaintiffs further allege that because Defendants were aware they had broken numerous laws and regulations, "even if the Revolution were somehow placed in-service by the third quarter of 2018, Energy Transfer would likely have had to pay massive civil penalties, and even be prevented from operating the Revolution, once the DEP discovered Energy Transfer's egregious misconduct." *Id.* ¶ 217.

### d. Statements about the Code of Ethics

#### i. Factual background

Defendants published a Code of Ethics on their website and touted the Code of Ethics in their SEC filings. Am. Compl. ¶ 382. The Code outlined a detailed policy regarding "sensitive payments," defined to include "receipts from or payments to government officials or employees." *Id.* ¶ 384; Def. Mot. to Dismiss, Ex. 8, ECF 44-11. According to the Code, "it is against the policy

---

[24] These statements are identified in paragraphs 346, 368, 371, 377, and 378 of the Amended Complaint.

of the Partnership Group to authorize payment of or to use Partnership Group funds . . . for Sensitive Payments or other similar payment, *whether lawful or unlawful*, designed to secure special treatment for the Partnership group." *Id.* ¶ 383 (emphasis added).

Plaintiffs allege that this code was a "false statement of Energy Transfer's actual policy" because Energy Transfer in fact had an "unwritten policy to hire armed, uniformed constables to create an appearance that they were acting in their official capacity." *Id.* ¶ 399; Pl. Reply. Opp. Mot. Dismiss at 69.

Plaintiffs point to an email between Energy Transfer's Security Manager for the Mariner East project, Frank Recknagel, and other employees, where Mr. Recknagel is asked about hiring off-duty police officers and responds that "Energy Transfer has an unwritten policy" of hiring "On Duty" uniformed officers, such as Constables. Am. Compl. ¶ 166. *See also id.* ¶ 165 (quoting a text message from Mr. Recknagel stating that he was "working on a plan to have licensed armed/ uniformed PA state Constable provide coverage at this specific area."). Energy Transfer did in fact hire uniformed officers, through a subcontractor, who served as security near pipeline sites. *See id.* ¶ 192 (quoting a witness who "described Constables working at ME2 construction sites in Chester County as wearing their official attire, while armed and displaying their Constable badges."); *id.* ¶ 197 (describing how a Chester County detective went to a Mariner East construction site, and was approached by "a security guard who identified himself as [a] Pennsylvania state constable" and was wearing "'a patrol style duty belt with a firearm' and a visible Pennsylvania State Constable badge").

Eventually, the Chester County District Attorney opened an investigation into the use of these officers, and six people, including Mr. Recknagel, were charged with bribery as a result. *Id.* ¶¶ 188, 392, 427. Charges have since been dismissed against Mr. Recknagel. Def. Mot. Dismiss

at 6, ECF 44-2; Ex. 2 at 2; Ex. 3 at 1.  Charges were also dismissed against "the operator of a private security firm" that allegedly hired the state constables at the direction of Energy Transfer.  *See* Vinny Vella, *Chester County judge dismisses charges against private security firm boss in Mariner East case*, Philadelphia Inquirer (Jan. 15, 2021).[25]  To this Court's knowledge, charges remain pending against the constables and against two other members of the private security firm.

### ii.  Standard

#### 1.  The inconsistency between the Code and Energy Transfer's unwritten policy

A duty to disclose arises "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Williams,* 869 F.3d at 241 (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000)).  "Once a company has chosen to speak on an issue- even an issue it had no independent obligation to address- it cannot omit material facts related to that issue so as to make its disclosure misleading." *Id.*  A Code containing affirmative statements would therefore be misleading if it omitted material facts.  These omissions are material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32.  Plaintiffs allege that the Code was misleading not just for what it omitted, but because they allege that the code itself was inaccurate as a representation of Energy Transfer's true policy.

#### 2.  Purported Violations of the Code

Beyond alleging that the "unwritten policy" made the published Code of Conduct misleading, Plaintiffs also contend that the actions taken in violation of that Code, such as in the

---

[25]   https://www.inquirer.com/news/james-murphy-chester-county-raven-knights-mariner-east-pipeline-20210115.html

"buy a badge" scheme, rendered the Code misleading.  Defendants argue that as a matter of law, they cannot be liable under federal securities laws for violations of a Code of Ethics.

As a general proposition, Defendants are correct.  Although the Third Circuit has not spoken directly on the issue, other circuit courts have generally held that violations of codes of ethics, even by high-ranking company officers, do not render a company's code or statements "publicly touting the business's high standards for ethics and compliance" misleading.  *See Hewlett-Packard Co.*, 845 F.3d at 1276 ("[A] code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."); *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) (holding that statements in a Code of Conduct were "generalized positive goals rather than specific promises" and were not actionable); *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) ("[A] code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct. Instead, a code of conduct is a declaration of corporate aspirations.").  *See also City of Roseville Emps' Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) ("SEC regulations require a company either to (1) adopt and make publicly available a code of ethics . . . or (2) to explain its reasons for failing to do so.") (citing 17 C.F.R. § 229.406).  To hold a company accountable for its code of ethics anytime an employee allegedly violated that code means a company "would be required to disclose all violations of that code or face liability under federal securities law.  Such a result is untenable.")

However, statements within Codes have been held actionable when they go "beyond generalized expressions of commitment to high corporate standards" and "addresses concrete steps" a company is taking, since a reasonable investor "might rely upon these statements as a guarantee that such steps had, in fact, been implemented."  *City of Brockton Ret. Sys. v. Avon*

*Prod., Inc.*, No. 11-4665, 2014 WL 4832321, at *16 (S.D.N.Y. Sep. 29, 2014); *Holwill v. AbbVie Inc.*, No. 18-6790, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (finding that the statement "[w]e never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment" in a Code of Ethics was misleading given allegations of a kickback scheme).  *Cf. Hewlett-Packard,* 845 F.3d at 1277 (noting that the company's statement that it had a "zero tolerance policy" for ethics violations may have been actionable had it been made inside the class period).

I agree with Plaintiffs that the unwritten policy regarding sensitive payments rendered portions of the Code misleading, and I need not decide whether the violations themselves separately rendered the Code misleading.

### iii.   The Unwritten Policy rendered Parts of the Code Materially Misleading

Energy Transfer's Code of Ethics is quoted in the complaint and provided in full as an exhibit to Defendants' Motion to Dismiss.  The Code defines "Sensitive Payments" as "receipts from or payments to government officials or employees."  *Id.* ¶ 384.  The code states that:

> It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership group. It is also contrary to the policy . . . . to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner.

Am. Compl. ¶ 383.  If an employee becomes aware of "any situation where . . . a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable . . . it is the Employee's responsibility to report the situation immediately."  *Id.* The Code also states that:

> Compliance with the Partnership's Anti-Corruption Policy and the U.S. Foreign Corrupt Practices Act and other anti-corruption laws is required . . . you should not

37

> provide gifts or anything of value to government officials, employees and consultants . . . without written approval from the Company's Chief Compliance Officer or the Company's Legal Department.

Am. Compl. ¶ 385.  Finally, the code includes a reporting structure for violations, which states that

> Every officer and director . . . shall report violations or potential violations of this Code to another officer or director, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors . . . All reports of suspected violations will be evaluated by the Audit Committee . . .

Am. Compl. ¶ 388.  Plaintiffs allege that these statements did not reflect the true policy in place at Energy Transfer regarding sensitive payments.

The "unwritten policy" of hiring uniformed officers described above, which I must assume to be true, directly contradicts the sensitive payments policy proffered in the Code of Ethics.[26]

Defendants argue that because charges were dismissed against Mr. Recknagel, Plaintiffs cannot plausibly allege that Defendants made any misstatements or omissions related to the constables.  But Plaintiffs can, and do, allege with particularity facts showing that Defendants' "unwritten policy" contradicted their Code of Ethics without showing that this policy violated state bribery laws; indeed, the Code professed to ban sensitive payments *whether lawful or unlawful*. Am. Compl. ¶ 383.[27]

---

[26] These statements are identified in paragraphs 382, 383, 384, 385, 388 and 390 of the Amended Complaint.

[27] Although Plaintiffs passingly refer to the FBI investigation of the permitting process when alleging that the Sensitive Payment policy was misleading, they do not allege anywhere in the complaint that payments were made to government officials.  I do not rely on the FBI investigation in finding that the Code was in part misleading.

### iv.   Other Statements in the Code

One other statement within the Code, not regarding the sensitive payments policy, is not alleged with particularity to be misleading, and will therefore be dismissed.  The Code states that "[e]very Employee is expected to act with honest and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment."  Am. Compl. ¶ 386.  I agree with Defendants this no reasonable investor would rely on this statement and that it is immaterial as a matter of law. *See In re Advanta*, 180 F.3d at 538; *Hewlett-Packard Co.*, 845 F.3d at 1277.

### v.   Materiality

Plaintiffs plausibly allege that these misrepresentations were material.  Specifically, they allege that the lack of compliance with the code of conduct "increased the risk that the Partnership would be subjected to government or regulatory investigations and/ or litigation, thereby depreciating the Partnership's unit value."  Am. Compl. ¶ 399.  Indeed, Plaintiffs allege that unit prices dropped after the announcement of the Chester County Investigation and after the announcements of charges stemming from that investigation.  *Id.* ¶ 416, 421, 431.  As discussed below, although the investigation alone does not serve as the basis for loss causation, the underlying facts leading to the investigation have adequately been alleged to have been material to investors.

### e.   Statements Regarding Criminal Investigations and Cases
#### i.   Factual Background

Plaintiffs allege that Defendants issued a series of misleading statements related to the criminal investigations and charges itemized above.  *See* Am. Compl. ¶¶ 391-98.  Plaintiffs present facts showing that Defendants had in fact not been complying with the law, and therefore allege that any denials of criminal malfeasance were materially misleading.  *See, e.g.*, *Id.* ¶ 393 (quoting

an Energy Transfer spokesperson as saying "Energy Transfer has not engaged in any form of criminal activity."); *id.* ¶ 396 ("There's no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines.").

### ii.  Standard

Statements of opinion, unlike statements of fact, are generally not actionable under the PSLRA.  *See Omnicare,* 135 S. Ct. at 1327.  For example, if a defendant states that "I believe our marketing practices are lawful," the defendant "could not be liable for a false statement of fact — even if she afterward discovered a longtime violation of law" as long as her opinion was truly held when uttered.  *Id.* at 1326.  Because opinions are true, even if the underlying statements of fact may not be, the Court has held that statements of opinion are only actionable if (1) the opinion professed is not actually believed by the speaker or (2) if the opinion contains an "embedded statement of fact" that is untrue.  *Id.* at 1326-27.

### iii.  Statements of Opinion

The majority of the statements relating to legal liability are statements of opinion and are inactionable under the *Omnicare* standard.  In these statements, Defendants assert their position as to the ongoing investigations or litigation.  *See* Am. Compl. ¶ 392 ("We are confident that we have not acted to violate any criminal laws . . ."); *id.* ¶ 393 ("Energy Transfer has not engaged in any form of criminal activity"); *id.* ¶ 396 ("There's no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines . . . we are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania"); *id.* ¶ 397 ("[Energy Transfer remains] confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania."  These are the types of statements contemplated and protected

under *Omnicare*.  *See Omnicare*, 135 S. Ct. at 1327 (summarizing the statements at issue as "we believe we are obeying the law" and that even though this opinion turned out to be wrong, it was not actionable under the PSLRA).  As explained by the Court:

> The investor must identify particular (and material) facts going to the basis for the issuer's opinion — facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have — whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context . . . That is no small task for an investor.

*Id.* at 1332.  Plaintiffs do not allege with particularity facts showing that these opinions were not genuinely held.  And they do not show facts showing that there was no factual basis for the opinions; this is especially true as none of the criminal cases or investigations have led to convictions.  These statements are therefore dismissed. [28]

### iv.   Statements of Fact

Plaintiffs identify two statements, however, that are statements of fact, not of opinion, and will therefore survive.  First, in speaking about the investigation into the alleged "buy-a-badge" scheme, Defendant is quoted as stating that the company "engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property."  Am. Compl. ¶ 394.  Plaintiffs allege that this is false, citing to an interview in *Philadelphia* Magazine with a homeowner who stated that "his once quaint property has been turned upside down and plagued by sinkholes, intrusive workers, and mysterious security guards from out of state."  *Id.* ¶ 395.  *See also id.* ¶ 438 (stating that on April 12, 2018, "residents expressed concern about the presence of armed security personnel in close proximity to their homes and children."); *id.* ¶ 196 (quoting State

---

[28] These statements are identified in the Amended Complaint at paragraphs 373, 379, 391, 392, 393, 396, and 397.

Neither of these statements were opinions regarding Defendants' position as to litigation; rather, they were presentations of fact on the ground.  They are therefore actionable under the PSLRA.

### v. Materiality

For the same reasons discussed regarding the Code of Ethics, these statements are plausibly alleged to be material.  If Defendants had engaged in illegal conduct, Plaintiffs allege that "the use of such improper methods increased the risk that the Partnership would be subjected to government or regulatory investigations and/ or litigation, thereby depreciating the Partnership's unit value." Am. Compl. ¶ 399.  These statements, issued by company spokespersons in the midst of investigations, may ultimately be held to be immaterial given the "total mix of information." *Basic Inc.*, 485 U.S. at 231-32.  But at this stage I cannot say that a reasonable investor would not find such statements material as a matter of law.  The statements identified in paragraphs 394 and 398 of the Amended Complaint will therefore not be dismissed.

## III.   Scienter

The PSLRA requires that "with respect to each act or omission alleged," plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  Scienter can be shown by a "'knowing or reckless state of mind,' which in [the] securities context would be demonstrated by pleading 'an extreme departure from the standards of ordinary care.'"  *Fan*, 927 F.3d at 718 (quoting *Avaya*, 564 F.3d at 267 n.42).  *See also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (defining recklessness in this context as "[e]xtreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.").

The inference required "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (citations omitted). Rather, a strong inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* This can be "established by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund*, 368 F.3d at 237.

Scienter is judged holistically, based on all the facts presented. *See Avaya*, 564 F.3d at 267-68 ("The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). *See also Tellabs*, 551 U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). The scienter analysis "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. *See also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[T]he federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

I find that Plaintiffs have alleged a strong inference of scienter as to some, but not all, of the Individual Defendants. I further conclude that Plaintiffs have plausibly alleged scienter as to Energy Transfer.

### a. Individual Defendants

Several high-ranking Energy Transfer executives are included as individual defendants here: the Chairman and CEO of Energy Transfer, the President of Energy Transfer, the CFO of

Energy Transfer, the CCO of Energy Transfer, the COO of Energy Transfer, the President of Sunoco (which is a subsidiary of Energy Transfer), and the Senior Manager of Public Affairs for Sunoco.

It is not enough that a plaintiff alleges that an individual defendant "must have" known something solely by virtue of his or her position with a company. *In re Advanta*, 180 F.3d at 539. But plaintiffs can use circumstantial evidence to allege scienter, including the importance of a particular matter to the business, meetings and conversations the individual was alleged to be part of, and the day-to-day responsibilities of that individual. *See GSC Partners CDO Fund*, 368 F.3d at 237 (holding that scienter can be established "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.").

At the outset of the Complaint, Plaintiffs aver they have reviewed and analyzed regulatory filings, press releases, media and analyst reports, transcripts of Energy Transfer investor conference calls, communications with former employees of Energy Transfer as well as other witnesses, court and regulatory filings, communications between Energy Transfer and Pennsylvania agencies, and other information. Am. Compl. at 1.

I find that when viewing the entire picture, Plaintiffs have alleged facts leading to a strong inference of scienter on the part of Individual Defendants Warren, McCrea, Long, and Ramsey.

### i.    Warren

Mr. Warren is the Chairman and CEO of Energy Transfer's general partner and has served in these positions since 2007. Am. Compl. ¶ 40. Mr. Warren is one of the alleged speakers in the 10-K filings with the SEC, as he signed those documents. *Id.* ¶ 332; *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). (holding that the maker of a statement is the person with ultimate authority over the statement); *Steamfitters Local 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at *9 (E.D. Pa. Sep. 30, 2011) ("Courts assume that corporate

officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents.").  The 10-K filing touted the Code of Ethics.  Am. Compl. ¶¶ 382, 390.

Mr. Warren held himself out to investors as knowledgeable about the construction and regulatory difficulties surrounding the pipelines.  He spoke in detail about the pipeline projects, but in ways that Plaintiffs argue were evasive and misleading.  *See, e.g.*, *id.* ¶ 465 (quoting Warren on an investor call as speaking about placement of a valve station in a Township and stating that "there are a number of different ways to resolve this issue, involving some land up there, and we feel very, very confident that we will have this issue resolved in a fairly short order.").  Plaintiffs allege that the timing proffered by Warren "was not even a possibility given the number of HDDs and other pipeline construction projects that needed to be completed at that time" and the valve station at issue in West Goshen Township was not resolved until July 2018.  *Id.*  Mr. Warren is also alleged to have attended numerous investor phone calls on which purported misstatements were made.  *See id.* ¶¶ 343, 346, 350, 356, 360, 370.  On February 21, 2019, in an earnings call with investors Mr. Warren admitted that "we made some mistakes" with regards to the Revolution and ME2 pipelines.  *Id.* ¶ 266.  He further stated that investors would see things improve and that "when we don't make those mistakes again . . . our costs are going to improve, and the predictability of those costs are likewise going to improve." *Id.*

Given Mr. Warren's professed knowledge of the pipeline process, there is a strong inference that he was closely involved with the project, and that his misleading statements were therefore made with scienter.  *See Hall v. Johnson & Johnson*, No. 18-1833, 2019 WL 720749, at *22 (D.N.J. Dec. 27, 2019) (finding scienter of CEO who had spoken as an expert about the subject at issue); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (finding

scienter where "officers were speaking as authoritative sources who possessed the information to support their statements."). *See also Tellabs II*, 513 F.3d at 711 ("Is it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives at the company? It is conceivable, yes, but it is exceedingly unlikely.").

### ii.    McCrea

Plaintiffs have also alleged a strong inference of scienter as to Defendant McCrea.  Mr. McCrea has served as the President and Chief Commercial Officer of Energy Transfer's general partner since October 2018.  Am. Compl. ¶ 43.  He has served as the Director of Energy Transfer's general partner since December 2009 and "the Group COO and CCO for the Energy Transfer family from November 2015."  *Id.*  Mr. McCrea is responsible for several of the materially misleading statements.  For example, Mr. McCrea provided timelines to investors and information about pipeline capacity that was plausibly alleged to have been knowingly false when made. *See Id.* ¶¶ 343, 348, 364.  He also signed the 10-K.  *Id.* ¶ 332.

To support a strong inference of scienter, Plaintiffs point to McCrea's deep knowledge of and involvement with the pipeline.  Mr. McCrea "was personally responsible for managing the construction of the Revolution pipeline." *Id.* ¶ 213.  He "was the actual decision maker for [ETC] and [was] the individual who had 'final sign off' of the events that ultimately led to the explosion of the Revolution." *Id.*  According to the ETC Senior Director of Business Development, "all ETC decisions were made by Mr. McCrea, including decisions relating to the construction of the Revolution." *Id.* ¶ 214.  This Director stated that "Mr. McCrea saw him as his 'right hand guy' and that [his] responsibilities were to be Mr. McCrea's eyes and ears with respect to the Revolution project and to provide Mr. McCrea frequent updates." *Id.*

When discussing the "frankenpipe," on an investor call the day before the true capacity was revealed, Mr. McCrea allegedly stated that "the utilization of the 12-inch pipe more than provides the necessary capacity to move the volumes that we've contracted" but "refused to comment on the total capacity of ME2." *Id.* ¶ 346. He likewise responded to analyst questions about the pipeline capacity, in a manner that Plaintiffs allege was purposefully evasive. *Id.* ¶ 403 ("And when asked by an analyst 'what is the capacity in the interim solution, using the 12-inch line in some areas?' McCrea responded, 'We really haven't shared capacities. We can look at maybe doing that in the future. . .'"). This interaction supports an inference of scienter, as it is extremely unlikely he did not know about the capacity limits at issue, especially since they were disclosed the next day. *See Avaya*, 564 F.3d at 270 (finding a strong inference of scienter where the executive was "specifically asked, directly and repeatedly" questions by analysts about a central issue and responded with "statements evincing certitude."); *Utesch v. Lannett Company, Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) ("Defendants statements denying any such anti-competitive conduct — made with such 'certitude'— when viewed in the 'context' of such persistent and significant underlying questions, is suggestive that they were made with the requisite scienter."). He also attended investor presentations where misleading statements were made. Am. Compl. ¶ 449.

Given Mr. McCrea's personal oversight of the Revolution project, I find there is a strong inference that his allegedly misleading statements were made with consciousness of their falsity or with recklessness to the contrary facts.

### iii.    Long

Plaintiffs have also alleged a strong inference of scienter as to Mr. Long. Long has served as the CFO of Energy Transfer since February 2016 and as a Director of Energy Transfer since April 2019. *Id.* ¶ 42.

Mr. Long made several statements found above to be misleading. For example, he proffered numerous timelines plausibly alleged to have been made with knowing falsity. *See Id.* ¶¶ 343, 345, 364. He told investors that substantial portions of the pipelines were completed when facts on the ground and information from a former employee show they were not. *Id.* ¶¶ 348, 360. He also signed the 10-K and attended investor calls and presentations where misstatements were allegedly made. *Id.* ¶ 449.

Mr. Long presented himself as being knowledgeable about issues related to the pipeline construction. *See, e.g. id.* ¶ 345 (quoting Long on a November 2017 earnings call as stating that "[r]egarding construction activity in West Goshen, the Pennsylvania [PUC] issued an order last week that resulted I suspension of our underground drilling efforts . . . we are evaluating the relocation or elimination of this valve . . . we continue to work with the [DEP] to secure approvals in order to move our remaining HDDs forward."); ¶ 401 (disclosure with extensive information about the pipe). Like Mr. Warren, Mr. Long admitted to mistakes in the pipeline process that implied personal involvement. *See Id.* ¶ 469 ("Similarly, on the February 21, 2019 earnings call, in response to a UBS analyst's question about delays, Long stated: '[W]e've learned all kinds of lessons, and we've made mistakes and we are correcting those mistakes, and we'll not make those mistakes again. So yes, we've learned a lot. Every place is not Texas and, so we're making adjustments.'").

Plaintiffs allege that on a November 2018 call, Mr. Long "dodged" an investor question about the impact of the frankenpipe on the Partnership's bottom line. *See id.* ¶ 448 ("Question: And then just on ME2, you said the line is 100% complete. So you won't be using the workaround that you've talked about? Answer: Yes. Well, what we said is that ME2 will be in service this quarter, and we're pushing hard as everybody knows. As far as go-arounds, I'm not sure what

you're referring to other than -- what? Yes, so the bottom line is what we've said is we're in service with Mariner East 2 soon, we're in service with 2X (inaudible) by the third quarter of next year, and we couldn't be more excited to bring it on soon and also to grow our business as soon as we can.").  Defendants argue that Long likely misheard the question. Def. Mot. Dismiss at 35.  But accepting Plaintiff's allegations as true, and given that analysts had to repeatedly press for information about capacity on this call and in the following days, I find that the inference of scienter is at least as compelling as Defendant's suggested inference that Long misheard the question.  *See Avaya*, 564 F.3d at 260 n.31 (noting that for scienter, courts must "consider competing *inferences* from the allegations, but [] nonetheless assume the truth of the specific facts alleged.") (citations omitted).  This statement does not, by itself , determine my finding of scienter, but it does form a part of a broader picture.  *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011) (where company was "directly nonresponsive to a question" finding that the company "may have been avoiding the question and thus by implication avoiding the disclosures of allegedly material facts" and thus "sufficient to raise a strong inference of scienter.").  Looking at the allegations holistically, I find that Plaintiffs have alleged a strong inference of scienter as to Mr. Long.

   iv.   **Ramsey**

   Defendant Ramsey "has served as the COO of Energy Transfer's general partner since October 2018, as a Director of Energy Transfer's general partner since July 2012, and as President, COO, and a Director of ETO's general partner since November 2015."  Am. Compl. ¶ 41.

   Mr. Ramsey held himself out as having personal knowledge about the pipelines and the construction project and spoke about their progress and obstacles in detail.  Am. Compl. ¶¶ 270, 298, 349, 360.

Plaintiffs allege that Mr. Ramsey made several misleading statements concerning timelines for the ME2 and Revolution pipelines. *Id.* ¶¶ 343, 349, 356. In August 2018, Ramsey stated that all HDDs left to complete had been approved by the DEP, and that the timeline remained on track— a statement Plaintiffs contend was false since Energy Transfer had yet to submit four re-evaluation reports. *Id.* ¶¶ 360, 402. Mr. Ramsey signed the 10-K and attended calls and investor presentations where other false statements were made. *Id.* ¶¶ 332, 449.

For many of the same reasons as Warren, McCrea and Long, I find that Plaintiffs have alleged a strong inference of scienter as to Mr. Ramsey.

In contrast, Plaintiffs have not alleged a strong inference of scienter as to three Individual Defendants: McReynolds, McGinn and Hennigan.

### v.        John W. McReynolds

Defendant McReynolds "served as Energy Transfer's President from March 2005 to October 2018, and has served as a Special Advisor to Energy Transfer from October and as an Energy Transfer Director from August 2005." *Id.* ¶ 41. He served "as Energy Transfer's Chief Financial Officer ("CFO") from August 2005 to June 2013, and as a Director of ETO's general partner from August 2001 through May 2010." *Id.*

Mr. McReynolds is not alleged to have made any misstatements beyond signing the 10-K. Aside from setting forth his position with Energy Transfer, Plaintiffs have not alleged with particularity any facts showing a strong inference of scienter. Titles alone will not suffice. If discovery "reveals individual culpability" by Mr. McReynolds, Plaintiffs "may seek permission to amend the complaint to assert claims" against him. *Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007). But at this stage, Plaintiffs have not shown a strong inference of scienter as to McReynolds, and he will be dismissed.

### vi.   McGinn and Hennigan

Defendants McGinn and Hennigan are similarly situated and will be dismissed for the same reasons.

These Defendants are alleged to have played a significant role in the permitting process with the Pennsylvania government, but are not alleged to have made any of the misleading statements at issue.  Although conduct can in some circumstances, be the basis of Rule 10b-5 liability, that theory of liability has not been alleged here.  And even if it had been, Mr. Hennigan and Mr. McGinn's conduct all took place before the beginning of the class period.

Mr. McGinn and Mr. Hennigan were also both absent from Energy Transfer for large portions of the class period.  Mr. Hennigan allegedly left Energy Transfer just three months into the class period, in June 2017.  Mr. McGinn is not alleged to have been an employee of Energy Transfer from October 2017 until May 2019.

Admittedly, a person with ultimate authority over a statement can be liable under Rule 10b-5, even without uttering the words of the statement.  *See Janus*, 564 U.S. at 142-43.  But Plaintiffs have not alleged with particularity facts showing that McGinn or Hennigan had ultimate authority for any of the statements at issue.  In practical terms, both Hennigan and McGinn held seemingly junior positions compared to the other individual defendants.  In their briefing, Plaintiffs argue that "McGinn, who remains at the highest levels of the Partnership's Public Affairs group, approved, authorized, ratified and/ or tolerated the many misrepresentations made by Energy Transfer's spokespersons about the Pipeline Projects." Pl. Reply at 82.  But Plaintiffs do not allege this with particularity in the Complaint, and I cannot find a strong inference of scienter given the facts alleged.  Accordingly, Mr. McGinn and Mr. Hennigan are dismissed as defendants.

vii.     **Core Operations Doctrine**

Plaintiffs also argue that a strong inference of scienter is shown through the core business doctrine.  Under this doctrine, "misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge."  *In re Urban Outfitters*, 103 F. Supp. 3d at 653-54 (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013)).  *See also Avaya*, 564 F.3d at 268.

At oral argument, Defendants argued that because the pipelines "were expected to provide about $500 million" in total revenue for "a company whose EBITDA in 2019 was $11.2 billion" the pipelines should not be considered to be a matter of core operations.  Tr. Oral Arg. at 13. Plaintiffs argue that rather than solely focusing on the EBITDA, I should also take note of the company's capital spending, and that "the Mariner East Pipeline Project was Energy Transfer's biggest CapEx project in 2017 and 2018."  *Id.* at 29.  *See also* Am. Compl. ¶ 452 ("ME2 and ME2X alone constitutes 'most' of Energy Transfer's $1 billion in capital expenditure ('CapEx') in the third quarter of 2018 and was the largest component of Energy Transfer's $5 billion CapEx spending in fiscal year 2018." ).  Further, Plaintiffs allege that "Energy Transfer listed the Pipeline Projects as 'growth projects' for Energy Transfer in all 22 investor presentations held during the Class Period, discussed ME2 and ME2X during their opening remarks on every earnings conference call during the Class Period, and analysts asked for timing and status updates of the Pipeline Projects on every call."  Am. Compl. ¶ 451.  Energy Transfer's ability to accomplish what it publicly set out to do has independent reputational value.  And beyond that, I am not willing to deem $500 million in revenue as inconsequential regardless of the size of a company.

Based on these facts, I agree with Plaintiffs that the core operations doctrine further supports an inference of scienter here.

Beyond showing that misstatements touched on a matter of core business, plaintiffs "must also allege 'some additional allegation of specific information conveyed to management and related to the fraud.'"  *Hall*, 2019 WL 7207491, at *21 (quoting *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018).  As discussed above, I have already found that to a significant extent some of the individual Defendants possessed personal knowledge giving rise to a strong inference of scienter.  The core business doctrine has relevance as an additional source of support for the inference of scienter alleged as to Warren, McCrea, Long, and Ramsey.  Conversely, it does not change the dismissal of McReynolds, McGinn and Hennigan.

viii.   **Content and Context**

"[T]he most powerful evidence of scienter is the content and context of [the] statements themselves."  *Avaya*, 564 F.3d at 269.  The context here includes what Plaintiffs describe as red flags — the multiple criminal investigations, accidents or disasters, and regulatory orders from the Pennsylvania government related to noncompliance.  Regarding the investigations in particular, Plaintiffs argue that "[g]iven the serious ramifications of these investigations, it is implausible to suggest that Defendants were not aware of the existence of, or were not intimately familiar with, the allegations pertaining to" them.  *Id.* ¶ 455.  These include the Pennsylvania Attorney General's ongoing joint investigation with the Delaware County District Attorney's Office "relating to the construction of the pipeline projects" and an ongoing investigation by the "U.S. Attorney for the Western District of Pennsylvania . . . related to the Revolution explosion."  *Id.* ¶ 454.  Defendants have "racked up" over 100 violations and have paid over $45 million in

fines. *Id.* ¶ 456.  The severity and persistence of the violations found by Pennsylvania regulators likewise support a strong inference that the issues were known by the Defendants.

Considering these episodes in their entirety, they support a strong inference that defendants made the statements with scienter; which is to say knowingly or recklessly with an "extreme departure from the standards of ordinary care."  *Fan*, 927 F.3d at 718.  A criminal investigation alone cannot form the basis for a strong inference of scienter.  *See Universal Health Services,* 396 F. Supp. 3d at 469 (collecting cases).  However, an investigation can represent a "piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter."  *Utesch.*, 385 F. Supp. at 423 (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).

Likewise, the delays in the pipelines, the change in capacity, and the facts that despite claims of compliance, the Pennsylvania government has continued to issue fines and findings of violations, all count as pieces in the puzzle.  *See EP Medsystems, Inc. v. EchoCath, Inc*., 235 F.3d 865, 881 (3d Cir. 2000) ("[W]e believe that when multiple promised events fail to occur, there is a point where a strong inference of fraud can be made.").  *See also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 608 (D.N.J. 2001) ("Other circumstances suggesting fraudulent intent can include the presence of '*red flags*' or warning signs" that certain documents were fraudulent) (citations omitted).

Defendants argue that Plaintiffs have not provided evidence of a single meeting, or document, showing that the Individual Defendants had knowledge of the facts which contradicted their misleading statements.  Def. Mot. Dismiss at 32-33.  But a strong inference of scienter does not require a "smoking gun."  *Tellabs*, 551 U.S. at 324.  Both the Supreme Court and the Third Circuit have been clear that scienter relies on a "totality-of the circumstances test" in which the Court must ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference

of scienter." *Avaya*, 564 F.3d at 269 (quoting *Tellabs*, 551 U.S. at 323). *See also id.* at 268-69 (acknowledging that the shareholders there did "not point to any particular document or conversation that would have informed" the defendants, finding scienter based on circumstantial evidence).

Collectively, Plaintiffs have painted a picture in which Defendants are alleged to have made statements directly contradicted by facts on the ground; these facts led to unprecedented fines from the Pennsylvania government and criminal investigations from multiple sources. Holistically, the content of the alleged misstatements and omissions, taken together with the context in which they were issued, supports a strong inference of scienter. As expressed by the Third Circuit: "As we have taken up each allegation in turn, we have added it to the picture painted by the previously considered allegations and asked: How does this addition affect the relative strengths of the culpable and non-culpable inferences?" *Avaya*, 564 F.3d at 280.

### b. Corporate Defendant

Energy Transfer is also named as a defendant, and so Plaintiffs must show a strong inference of scienter as to the corporation. Scienter can be imputed to the corporation through basic agency principles or through the corporate scienter doctrine. As with the analysis of individual defendants, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.

#### i. Agency

An inference of scienter based upon statements made by Individual Defendants can be imputed to Energy Transfer "because 'a corporation is liable for statements by employees who have apparent authority to make them.'" *Avaya*, 564 F.3d at 252 (quoting *Tellabs II*, 513 F.3d at

708).   Although "securities fraud claims are governed by federal law, the issue of imputation is determined by state law."  *Belmont*, 708 F.3d at 494 (citations omitted).  Plaintiffs must prove that the officers acted with apparent authority for the corporation.  *Id* (quoting *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003).   The nature and extent of an agent's apparent authority is a question of fact for the fact-finder.  *See Gizzi v. Texaco, Inc.*, 437 F.2d 308, 310 (3d Cir. 1971).  Defendants concede that corporate scienter can be shown through agency and that the Individual Defendants here would be agents for that purpose.  *See* Tr. Oral Arg. at 15.   At this stage, Plaintiffs have plausibly alleged that as CEO, CFO, COO and CCO, Warren, Long, Ramsey and McCrea spoke with apparent authority and their statements can therefore be attributed to Energy Transfer.

### ii.        The Corporate Scienter Doctrine

There are several statements that cannot be connected to the corporation through the inferred scienter of their speakers because the speakers are unidentified.   These statements are, however, statements on behalf of the corporation itself, in that they were statements made in the name of Energy Transfer to investors and to the press.[29]

For example, Plaintiffs allege that at eight investor presentations, "executives" touted an "initial capacity" of 275,000 barrels per day with an "upside capacity" of 450,000 barrels per day for the ME2 pipeline.  Am. Compl. ¶ 340.  As discussed above, I find that these statements were materially misleading because they were made after the sinkholes appeared which made it clear that Defendants would not be able to proceed with HDD and pipeline construction as planned.

---

[29] These statements are identified in paragraphs 340, 355, 357, 367, 368, 371, 376, 377, 378, 380 394 and 398 of the Amended Complaint.

Particularly troubling is the touting of this capacity at an investor presentation on June 19, 2018, four days *after* Defendants had submitted the notification to the PHMSA regarding the 12-inch pipeline.  *Id.*

The statements from spokespeople to the press largely concern Energy Transfer's commitment to safety and regulatory compliance, discussed above.  *See, e.g.*, Am. Compl. ¶ 377 ("We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work."); ¶ 378 ("We have been and will continue to comply with [DEP] orders . . . the safety of the surrounding area is 'our first priority.").  These statements were materially misleading in the face of the extensive safety issues and regulatory violations identified by Plaintiffs.

Plaintiffs' first attempt to attribute these statements to the Individual Defendants fails because it represents impermissible group-pleading.  Group-pleading is a "judicial presumption that statements in group-published documents" are attributable to officers in that group.  *Winer Family Trust*, 503 F.3d. at 335.  Where it is recognized, "the group pleading doctrine allows a plaintiff to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud."  *Id.*  The Third Circuit has rejected group-pleading as inconsistent with the PSLRA, because that Act "requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions."  *Id.* at 336-37.

In *Winer*, the plaintiffs sought to connect unattributed statements to the corporation by pleading that the Individual Defendants had "access to, control over, and ability to edit and withhold dissemination of [the corporation's] press releases and SEC filings."  *Id.* at 334-35.

Similarly here, the Plaintiffs claim that the Individual Defendants "possessed the power and authority to control the contents of Energy Transfer's SEC filings, press releases, and other market communications" and that "[b]ecause of their positions . . . and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading." Am. Compl. ¶ 49. Under *Winer*, this type of blanket statement of responsibility is not sufficient. *See Winer Family Trust*, 503 F.3d at 337.

Rather, because the Individual Defendants have not been connected to those statements with sufficient particularity, the unattributed statements are only admissible insofar as scienter can be inferred as to the corporation.[30]

Circuit courts have recognized three different theories as to how and when scienter may be attributed to a corporation in the absence of agency liability, known as the doctrine of "corporate scienter." "That doctrine allows a plaintiff 'to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant.'" *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013). The Third Circuit has discussed these theories in dicta but has neither accepted nor rejected any theory outright. *See id.* ("We, however, neither have accepted nor rejected the doctrine of corporate scienter in securities fraud actions, and we do not do so now because the allegations in the [Complaint] cannot support the existence of corporate or collective scienter."); *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018) (" We have neither accepted nor rejected that doctrine and decline to do so

---

[30] "If a private securities case proceeds past the pleadings stage against a corporation and discovery reveals individual culpability, a plaintiff may seek permission to amend the complaint to assert claims against individual defendants." *Winer*, 503 F.3d at 337.

here because the [Complaint's] allegations would not give rise to corporate scienter under any recognized theory of that doctrine.").

Citing to non-precedential opinions, Defendants broadly assert that the "Third Circuit" has either rejected corporate scienter, or would strictly limit its application.  *See In re Tyson Foods, Inc.*, 155 F. App'x 53, 57 (3d Cir. 2005); *City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676-77 (3d Cir. 2011).  There is little to be gained from trying to parse such decisions.  As an initial matter, the Circuit itself will not cite them, because such opinions "are not regarded as precedents that bind the court because they do not circulate to the full court before filing".  Third Circuit Internal Operating Procedure 5.7.  Consequently, any purported guidance from such cases is illusory.  *See United States v. James*, 928 F.3d 247, 254 n.5 (3d Cir. 2019) (disregarding the district court's discussion of two nonprecedential cases because of their lack of authority); *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 212 n.1 (3d Cir. 2015) (sympathizing with district judge who "understandably relied" on three non-precedential opinions before reversing him, noting the their non-binding status).  I will therefore go no further than to state that the Third Circuit has taken no position on corporate scienter.

Judge Salas of the District of New Jersey recently discussed the three theories in great detail, and there is no need to go beyond her insightful analysis here.  *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2020 WL 3026564, at *24-32 (D.N.J. June 5, 2020).  As aptly summarized by Judge Salas, under the narrow approach adopted by the Fifth and Eleventh Circuits, scienter may be imputed to a corporation only through "the state of mind of the individual corporate official" who makes the statement "or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like."  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).  Under the broad approach adopted by

the Second and Seventh Circuits, a plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Finally, under the middle approach adopted by the Sixth Circuit, the state of mind of the speaker, the approver of the statement, or "any high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance" is probative for proving corporate scienter.  *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).

The narrow approach to corporate scienter has a significant disadvantage: it allows corporations to "evade liability through tacit encouragement and willful ignorance . . . and fails to address instances 'where widespread corporate fraud cannot be connected to individual defendants at the pleading stage." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 16-6509, 2018 WL 3772675, at *33 (D.N.J. Aug. 8, 2018) (citing *Omnicare*, 769 F.3d at 476 and *In re Marsh & McLellan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481-82 (S.D.N.Y. 2006)).  And although the PSLRA was meant to limit securities litigation, I am persuaded that the Sixth Circuit is correct in warning that care must be taken to apply its provisions in the context of the broader scope of federal securities law: "Slanting too far toward the Fifth Circuit's approach risks running counter to the goals and purposes of the 1934 Act– which includes fostering 'an attitude of full disclosure by publicly traded corporations, rather than a philosophy of *caveat emptor* for securities buyers." *Omnicare*, 769 F.3d at 475  (citations omitted)).

Applying the concept of corporate scienter is particularly appropriate where the unattributed statements are all statements made *ex cathedra,* on behalf of the corporation, and where there is ample evidence that high-ranking corporate officials were personally engaged in the

details of the project, making it highly unlikely that the unattributed statements were rogue pronouncement by employees lacking authority to speak on the corporation's behalf.

Assuming that the Court of Appeals would recognize corporate scienter on this record, I need not try to predict whether it would apply an intermediate or broad approach.  Under either, the statements from investor presentations are admissible.  Plaintiffs have shown that as of late 2017, Defendants knew that mechanical completion of the pipeline would be impossible in some areas due to sinkholes, and that as of early 2018, Defendants were working on government permits to use a 12-inch pipeline that would make the touted capacity impossible to achieve.  *See, e.g.*, Am. Compl. ¶¶ 341, 359.  The numbers being presented at large investor conferences were completely incompatible with the facts.  This is especially true of the alleged statement at the J.P. Morgan Energy Conference on June 19, 2018, where executives presented the same pipeline numbers, despite having *already* submitted an application to the PHMSA for the "frankenpipe" that would reduce capacity by sixty percent.  Am. Compl. ¶¶ 340, 357.  *See also id.* ¶¶ 173-176 (alleging that as of July 2018, Energy Transfer had already informed the West Whiteland and East Goshen Townships of the plan for the new pipeline).

At oral argument, Defendants argued that the slide included in the June 2018 presentation was likely the result of a mere copy and paste error; not the result of knowing fraud.  *See* Tr .Oral Arg. at 57-58.  I first note that a copy and paste error of this magnitude in the context of a presentation to investors could be considered recklessness.  But an inference of fraud is at least as likely given the allegations in the Complaint, especially the repeated evasiveness of Energy Transfer executives when asked explicitly about the pipeline capacity.  Although the speaker at investor presentations has not been identified, Defendants Warren, Long, Ramsey and McCrea attended these presentations.  *See* Am. Compl. ¶ 469.  An inference of scienter is therefore cogent

under either the broad or the "middle approach" because high managerial agents tolerated the misrepresentation. *See Omnicare*, 769 F.3d at 476. *See also Tellabs II*, 513 F.3d at 711 ("Because the alternate hypotheses— either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements— are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis [of corporate scienter] must be considered cogent."); *Sun v. Han*, 15-703, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (finding that the pleaded facts "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" for audit reports that were not signed by an individual auditor, "given that these Reports were presumably approved by a senior auditor and for disclosure to the public in compliance with financial reporting requirements.") (quoting *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195). Plaintiffs have thus, at least for purposes of a motion to dismiss, pleaded a strong inference of scienter for the corporation.

Under these approaches, the statements from media spokespeople are also admissible. Based on the allegations, statements that Energy Transfer was complying with regulations were blatantly false; the continuing notices of violations, fines, and orders from the DEP presented by Plaintiffs bear this out. *See, e.g.*, Am. Compl. ¶ 132 ("As detailed in the June 2018 Order, Energy Transfer had violated Pennsylvania's Dam Safety and Encroachments Act, Clean Streams Law, dam safety and water management regulations and erosion and sediment control . . ."); *id.* ¶ 261. *See also id.* ¶ 128 ("All told, the DEP issued at least 36 notices of violation in connection with the Company's construction activities in 2017, and a further 55 notices throughout 2018."); *id.* ¶ 263 ("On January 9, 2019, the DEP notified Energy Transfer that it had 'failed to comply with the [October] 2018 Order . . . [and] 'failed to install flagging markers, or signs at the site,' failed to

'cease sediment laden discharged into Commonwealth waters' and failed to 'temporarily stabilize disturbed areas.'"); *id.* ¶¶ 264-65 (stating that in February 2019 the DEP issued a "Hold on All Energy Transfer Clean Water Permit Approvals and Modifications due to Non-Compliance" and finding that Energy Transfer "had not fulfilled the terms of the order and was not progressing toward compliance").  At times, the Individual Defendants personally spoke about these issues to investors, supporting an inference that they were aware of the importance of this issue to the business.  *See, e.g.*, *Id.* ¶¶ 465, 469. This supports the inference that someone with scienter "reviewed, or approved the statement in which the misrepresentation was made" or "ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance" and that scienter can be imputed to the corporation.  *Omnicare*, 769 F.3d at 476.

At this stage, I am mindful of the risk identified by the Second Circuit, not to "improperly conflate pleading rules and liability rules." *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195.  "[T]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter" but "to survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must only state facts 'giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).  Plaintiffs have satisfied that burden here.

## IV.   Loss Causation

Beyond material misrepresentations and scienter, Plaintiffs pleading a Rule 10-b violation must also show that the sale was in connection with a security, reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'. . . economic loss; and . . .'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."  *In re Aetna*, 617 F.3d at 277 (citations omitted).  Defendants

argue that Plaintiffs have not plausibly alleged loss causation, but do not challenge the other elements.[31]

Plaintiffs allege that the economic loss they experienced was proximately caused by a series of disclosures, issued to correct Defendants' previous misleading statements.  Am. Compl. ¶ 28; 432.  Specifically, Plaintiffs allege that prices dropped after: (1) the revelation of the reduced capacity from the "frankenpipe"; (2) The DEP ordered that Energy Transfer halt construction of the Revolution pipeline and the Associated Press published an extensive article documenting Defendants' safety and compliance failures; (3) District Attorney Hogan announced an investigation into Energy Transfer; (4) Chester County charged constables hired by Energy Transfer; (5) The AP reported that the FBI had been investigating the permitting process with the Pennsylvania government; (6) District Attorney Hogan filed criminal charges against Energy Transfer's head of security.  Am. Compl. ¶ 432.

Loss causation is the "causal connection between the material misrepresentation and the loss."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Importantly, as to loss causation there is not a heightened standard of pleading.  At the Motion to Dismiss stage, the Supreme Court has been clear that Plaintiffs' complaint requires "only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Id.* at 346 (quoting Fed. R. Civ. P. 8(a)(2)).  To plead loss causation, Plaintiffs must "provide the defendants with notice of what the

---

[31] Reliance is presumed where a security "is traded in an open and efficient market" under the fraud-on the market theory.  *See Hayes*, 982 F.2d at 106.  *See also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270 n.8 (3d Cir. 2005) ("The fraud-on-the-market theory supposes that 'the price of a company's stock is determined by the available material information regarding the company and its business.'") (quoting *Basic Inc.*, 485 U.S. at 241).  Plaintiffs have established that this theory is appropriate here.  Am. Compl. ¶ 473. Plaintiffs have also properly pleaded economic loss.  *See id.* ¶ 19 (pleading that plaintiffs "collectively lost billions of dollars" through changes in stock prices).

relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation." *Id.* at 347. "Although a corrective disclosure must be related to the same subject as the misrepresentation, and not some other adverse facts about the company, there is no requirement that the disclosure mirror the earlier misrepresentation." *In re Urban Outfitters*, 103 F. Supp. 3d at 655. Rather, the truth may be revealed by a series of partial disclosures through which the truth gradually leaks out. *Dura*, 544 U.S. at 342. As a result, the issue of causation is "usually reserved for the trier of fact." *EP MedSys.*, 235 F.3d at 884.

### a. Disclosure relating to Pipeline Capacity

On August 9, 2018, investors learned that part of the ME2 pipeline would need to be completed with an almost century-old, twelve-inch pipeline. Am. Compl. ¶¶401-403. On August 10, 2018, the news was revealed to investors that the smaller pipeline would lead to a 65% reduction in pipeline capacity. *Id.* ¶¶ 405-407. Plaintiffs allege that this news caused the price of Energy Transfer's stock to fall "from a closing price of $18.45 per unit on August 8, 2018, to a closing price of $17.41 per unit on Monday, August 13, 2018, a 5.6% decline." *Id.* ¶ 408.

Defendants do not argue that Plaintiffs have failed to plead loss causation regarding the revelation of reduced pipeline capacity in August 2018.

### b. Disclosures Relating to Timeline

On October 27, 2018, the Associated Press "re-published and disseminated an expose, initially written by the *Pittsburgh Post-Gazette*, which revealed how Energy Transfer had misstated, and failed to disclose, the risks that Pennsylvania's geology and long history of sub-surface mining, posed to Energy Transfer's pipeline construction." *Id.* ¶ 410. On October 29, 2018, the DEP ordered that Energy Transfer immediately cease construction of the Revolution pipeline, due to their finding that Energy Transfer had "fail[ed] to implement or maintain effective

erosion sediment control best management practices" and failed to "provide temporary stabilization . . . upon temporary cessation of earth disturbance activities."  Am. Compl. ¶ 411. Plaintiffs allege that shares fell by 4%, from $15.46 on Friday October 26, 2018, to $14.84 on Monday, October 29, 2018, in response to this news.  *Id.* ¶ 412.

Defendants argue that Plaintiffs cannot show loss causation based on these events because of what they characterize as "timing problems."  ECF 44-2 at 48.  Defendants argue that earlier statements regarding timelines were "corrected" by later, updated timelines and the "superseding statements thus sever any causal link between the earlier statements and the alleged corrective disclosure, negating any inference of loss causation."  *Id.* at 48-49.  This mischaracterizes Plaintiffs' allegations.  Plaintiffs argue that *each* statement regarding timeline proffered by the Defendants was misleading, because due to the regulatory and environmental issues, it was impossible for the pipelines to be completed— whether by the third quarter of 2017, the first quarter of 2018, the third quarter of 2018, or beyond.  *See e.g.*, Am. Compl. ¶¶ 333, 344.  Indeed, Plaintiffs allege that the pipelines are still not operational as of their filing, in 2020, and cannot be completed soon because certain permits have still not been approved by the DEP.  What Defendants deem the "superseding statement" does not correct any of the previous statements, Plaintiffs allege, because it still failed to account for all the facts on the ground that they argue made the pipeline impossible to complete within any of the proffered timelines.

Defendants also advance factual arguments with respect to the Associated Press article and the DEP order.  First, they argue that because the article was first published by the Pittsburgh Post-Gazette, any purported loss must be shown from the date of that original publication.  Def. Mot. at 49.  Second, they argue that the DEP order halting construction was reported in a news article "after the close of trading on October 30, 2018, and Energy Transfer's stock price rose on October

31, 2018." *Id.* at 50 n.85.  Plaintiffs respond  that the information from the Pittsburgh Gazette article was not widely disseminated, and thus not seen by investors, until its distribution by the AP.  *See* Pl. Resp. at 96.  Plaintiffs also attach as an exhibit the news release from the DEP regarding its order requiring Energy Transfer to halt work, which purportedly shows that the article was published on October 29 at 12:00 a.m.  *Id.* at 95; Pl. Opp. Mot. Dismiss Ex. 6, ECF 49-8.

These are factual questions, and are not appropriate for resolution at this stage, as "whether the plaintiff has proven causation is usually reserved for the trier of fact."  *EP Medsys.*, 235 F.3d at 884.  *See also id.* (Loss causation "becomes most critical at the proof stage.").  In particular, as Plaintiffs note, Defendants' argument that information from the Associated Press article was already known for investors, is essentially a "truth-on-the-market" affirmative defense, which requires that defendants "demonstrate that any such corrective information had been conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *In re Merck & Co., Inc. Sec. Deriv. & ERISA Litig.*, No. 05-1151, 2011 WL 344199, at *35 (D.N.J. Aug. 8, 2011).  This defense "is intensively fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint."  *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018) (citations omitted).

At this stage, Plaintiffs have "provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation."  *Dura*, 544 U.S. at 347.  These claims therefore survive dismissal.

### c.  Disclosures regarding Government Investigations

Plaintiffs point to the announcement of different criminal investigations as corrective disclosures that impacted Energy Transfer's stock price.  On December 19, 2018, District Attorney

Hogan announced an investigation into Energy Transfer, citing both to regulatory non-compliance and the allegedly illegal use of the state constables.  Am. Compl. ¶¶413-414.  News of the investigation was published by Reuters on the afternoon of December 20, 2018.  *Id.* ¶ 415. Plaintiffs allege that this news caused the stock price to fall 5.4%, from $12.94 on December 18, 2018, to $12.24 on December 21, 2018.

On August 8, 2019, two Pennsylvania Constables were arrested in connection with the above investigation.  *Id.* ¶ 418.  Information regarding the Constables' alleged employment with Energy Transfer and the alleged bribery scheme was reported by several news outlets.  *Id.* ¶¶ 418-420.  Plaintiffs allege that this news caused a several-day price decrease in Energy Transfer stock, from $14.03 on August 8, 2019, to $13.90 on Friday, August 9, and to $13.38 on Monday, August 12, 2019.  *Id.* ¶ 421.

On November 12, 2019, the Associated Press and the Philadelphia Inquirer reported that the FBI had "begun a corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction [on the pipelines.]"  *Id.* ¶ 423.  Plaintiffs allege that units fell "by 2.6% to close at $11.66" on November 12, 2019, and then fell "a further 4.3% to close at $11.16" on November 13, 2019.  *Id.* ¶ 425.

Finally, on December 3, 2019, District Attorney Hogan "filed criminal bribery and conspiracy charges against Energy Transfer's head of security for the Mariner East pipeline" Mr. Recknagel, as well as against four other individuals who worked for security firms allegedly used by Energy Transfer.  *Id.* ¶427-29.  Plaintiffs allege that the stock price fell by 2%, from $11.63 on December 2, 2019, to $11.40 on December 3, 2019.  *Id.* ¶ 431.

Defendants argue that the announcement of the various criminal investigations is not sufficient to show loss causation.  *See Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("In

our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b).  The announcement of an investigation reveals just that—an investigation—and nothing more."); *Martin v. GNC Holdings, Inc.*, No. 15-01522, 2017 WL 3974002, at *18 (W.D. Pa. Sep. 8, 2017), *aff'd,* 757 F. App'x 151 (3d Cir. 2018) (holding that an Attorney General Complaint "contains allegations of unproven misconduct, thus it is not a corrective disclosure which revealed [defendant's] alleged fraudulent conduct to the market.").

But Plaintiffs allege more than simply an investigation — they allege with particularity underlying facts, which on their own would undercut the purportedly misleading statements, whether or not they were illegal.  For example, an unwritten policy of paying state constables stands in contradiction to the professed policy of not making any payments to government officials *whether or not they are illegal*. [32]  The same is true for the investigation of the permitting process — Plaintiffs allege that the rushing of the permit process meant that Defendants knowingly passed over serious environmental and regulatory issues when proffering timelines and beginning construction.  This allegation retain force even if the alleged rushing of the process was not accomplished through bribery.  *See Utesch*, 385 F. Supp. at 425 (stating that "although an announcement of an investigation standing alone does not qualify as a corrective disclosure . . . much more than simply an investigation is alleged here, including the subpoenas, the criminal charges, and reporting about suspicious pricing patterns.") (internal quotations and alterations omitted) (quoting *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1209-1210 (9th Cir. 2016)). Corrective disclosures can take many forms, as "any 'exposure of the fraudulent representation is the critical component of loss causation.'"  *Id.* (internal alterations omitted) (quoting *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 243 (S.D. N.Y. 2006)).  "[T]aken at its terms,

---

[32] As set forth above, the Court's understanding is that some of these charges remain pending.

Defendants' argument would mean that loss causation could only be proven through a criminal conviction . . . that is not the law." *Id*. (collecting cases). Given the extent of Plaintiffs' factual allegations related to the investigations at issue, I find that they have met their burden at this stage regarding loss causation.

# V.    20(a) Claim

Under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

This section "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." *Avaya*, 564 F.3d at 252. "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Id. See also In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("Under the plain language of the statute, plaintiffs must prove not only that one person controlled another person, but also that the controlled person is liable under the [Exchange] Act.") (quotations and citations omitted). Further, "in order for secondary liability to attach under § 20(a), the defendant must have been a culpable participant in the act or acts constituting the violation or cause of action." *Belmont*, 708 F.3d at 484 (quotations omitted).

"The three elements of a § 20(a), or 'control person' claim, are as follows: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, No. 05-1151, 2011 WL 3444199, at *36 (D.N.J. Aug. 8, 2011) (citing *In re Supreme Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 (3d Cir. 2006)).

Plaintiffs allege that Individual Defendants "exercised control over the general operations of Energy Transfer and possessed the power to control the specific activities, and/ or the public reporting of those specific activities, which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain."  Am. Compl. ¶ 491.

For the Individual Defendants whom I have found liable under Section 10(b) of the Exchange Act, Plaintiffs have adequately pled that those defendants were culpable participants in the act constituting the violations.

Conversely, as to three Defendants against whom liability was not adequately pled, those Defendants are not liable under Section 20(a) either.  Plaintiffs have not pleaded facts alleging that Hennigan, McGinn, or McReynolds controlled Long, McCrea, Warren, or Ramsey.  Nor have Plaintiffs pleaded facts showing that they controlled Energy Transfer insofar as the corporation committed a primary violation of the securities laws under Section 10(b).  The Third Circuit has not decided whether Section 20(a) liability must be pled with particularity.  *See Belmont*, 708 F.3d at 485 n.20.  Regardless of the applicable standard, Plaintiffs have not pled any facts showing that those Defendants controlled the makers of the misstatements or that those Defendants were culpable participants.  *See Alter*, 2011 WL 4528385, at *12 ("Plaintiff simply does not point to any other facts from which the Court can infer that [a defendant] controlled or could have controlled any of the allegedly fraudulent statements issued by the company.").  Accordingly, the Section 20(a) claims against Hennigan, McGinn and McReynolds will be dismissed.

## VI.   Conclusion

Plaintiffs have alleged with particularity facts showing that Defendants recklessly or knowingly misrepresented multiple facets of the pipeline construction, to the detriment of

investors.  The PSLRA imposes a high burden for Plaintiffs bringing securities fraud cases —

Plaintiffs have largely met that burden here.  An appropriate order will follow.


                                                        /s/ Gerald Austin McHugh
                                                        United States District Judge