**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br> v.<br><br>ENERGY TRANSFER LP, KELCY L. WARREN, THOMAS E. LONG, MARSHALL MCCREA, and MATTHEW S. RAMSEY.<br><br>      Defendants. | Case No. 2:20-cv-00200-GAM |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**<u>CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ..................................................................... 2

    A.    Summary of the Allegations ................................................ 2

    B.    The Proposed Class Representatives ................................... 8

ARGUMENT ...................................................................................... 8

I.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a) .......... 9

    A.    The Class is Sufficiently Numerous ................................... 10

    B.    Many Questions of Law and Fact Are Common to the Class ............ 11

    C.    The Proposed Class Representatives' Claims Are Typical ............... 12

    D.    The Proposed Class Representatives Will Fairly and Adequately Protect the Class's Interests ................................................. 13

II.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3) ......................................................................... 15

    A.    Common Factual and Legal Questions Predominate ................... 15

        1.    Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption of Reliance Under *Basic v. Levinson* ........................ 16

            a.    First *Cammer* Factor: High Average Trading Volume ............... 17

            b.    Second *Cammer* Factor: Securities Analyst Coverage ................ 17

            c.    Third *Cammer* Factor: Listing and Market Makers ..................... 18

            d.    Fourth *Cammer* Factor: Eligibility to File Form S-3 ................... 18

            e.    Fifth *Cammer* Factor: The Cause and Effect Relationship between Energy Transfer-Specific News and Energy Transfer's Stock Price ................................................. 19

            f.    First *Krogman* Factor: Large Market Capitalization ................... 21

            g.    Second *Krogman* Factor: Narrow Bid-Ask Spread ..................... 21

h.    Third *Krogman* Factor: Large Public Float ................................... 22

2.    Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption of Reliance Under *Affiliated Ute* ................................................................. 22

B.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action ................................................................. 23

III.    THE PROPOSED CLASS IS ASCERTAINABLE ........................................................ 24

IV.    BLB&G AND BARRACK RODOS SHOULD BE APPOINTED CLASS COUNSEL ....................................................................................................................... 24

CONCLUSION ........................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

<small>CASES</small>

*In re Advance Auto Parts Sec. Litig.*,
  2020 WL 6544637 (D. Del. Nov. 6, 2020) ...............................................9, 16, 17

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)..................................................................................16, 22, 23

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP et al.*,
  2021 WL 1264027 (E.D. Pa. Apr. 6, 2021) ........................................................23

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..............................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)....................................................................................9, 15, 16

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................20

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..............................................................................................16

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015)....................................................................................9

*Byrd v. Aaron's Inc.*,
  784 F.3d 154 (3d Cir. 2015)..................................................................................24

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .......................................................16, 17, 18, 19

*In re Celgene Corp. Sec. Litig.*,
  2020 WL 8870665 (D.N.J. Nov. 29, 2020) ...........................................................9

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003)...........................................................................22

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
  2015 WL 5097883 (D.N.J. Aug. 31, 2015) ....................................................10, 19

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
  795 F.3d 380 (3d Cir. 2015)..................................................................................24

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009)....................................................................................9

*In re DaimlerChrysler AG Sec. Litig.*,
 216 F.R.D. 291 (D. Del. 2003) ......................................................................1

*Dewey v. Volkswagen Aktiengesellschaft*,
 681 F.3d 170 (3d Cir. 2012).........................................................................14

*In re DVI Inc. Sec. Litig.*,
 249 F.R.D. 196 (E.D. Pa. 2008) .............................................................. *passim*

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011).....................................................................................15

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
 141 S. Ct. 1951 (2021) ...................................................................................9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014).....................................................................................16

*In re Heckmann Corp. Sec. Litig.*,
 2013 WL 2456104 (D. Del. June 6, 2013)...................................................23

*In re K-Dur Antitrust Litig.*,
 2008 WL 2699390 (D.N.J. Apr. 14, 2008) ..................................................14

*Krogman v. Sterritt*,
 202 F.R.D. 467 (N.D. Tex. 2001) ......................................................17, 21, 22

*Marcus v. BMW of N. Am., LLC*,
 687 F.3d 583 (3d Cir. 2012).....................................................................10, 11

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .............................................13

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
 2013 WL 396117 (D.N.J. Jan. 30, 2013) .....................................................13

*In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*,
 2012 WL 4482041 (D.N.J. Sept. 25, 2012) .............................................12, 19

*In re Modafinil Antitrust Litig.*,
 837 F.3d 238 (3d Cir. 2016)..........................................................................10

*Neale v. Volvo Cars of N. Am., LLC*,
 794 F.3d 353 (3d Cir. 2015)..........................................................................15

*New Directions Treatment Servs. v. City of Reading*,
 490 F.3d 293 (3d Cir. 2007)..........................................................................14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)..........................................................................14

*In re NFL Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)..........................................................................13

*In re NII Holdings, Inc. Sec. Litig.*,
    311 F.R.D. 401 (E.D. Va. 2015) ....................................................................20

*Norman v. Trans Union, LLC*,
    479 F. Supp. 3d 98 (E.D. Pa. 2020) .......................................................10, 11

*Reyes v. Netdeposit, LLC*,
    802 F.3d 469 (3d Cir. 2015)..........................................................................11

*Roofer's Pension Fund v. Papa*,
    333 F.R.D. 66 (D.N.J. 2019) .............................................................11, 16, 18

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009)..........................................................................13

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001)..........................................................................12

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)..........................................................................12

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)..........................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................8

*Todd v. STAAR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ...................................................18

*United States v. Schiff*,
    602 F.3d 152 (3d Cir. 2010)..........................................................................19

*Utesch v. Lannett Co., Inc. et al.*,
    2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) .......................................10, 11, 24

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .............................................11, 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................9, 11

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................................17

**OTHER AUTHORITIES**

17 C.F.R. § 239.13 ............................................................................19

Fed. R. Civ. P. 23 ............................................................................ *passim*

Plaintiffs[1] respectfully submit this memorandum of law in support of their motion to: (i) certify this case as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3); (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Co-Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Barrack Rodos & Bacine ("Barrack Rodos") as Class Counsel under Fed. R. Civ. P. 23(g).[2]

## PRELIMINARY STATEMENT

Courts in the Third Circuit have long "observed that class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device." *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 200 (E.D. Pa. 2008); *see also, e.g., In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003) ("Class actions are favored in securities fraud cases in this Circuit."). This case is no exception, as Defendants' federal

---

[1] Plaintiffs are the Court-appointed Lead Plaintiffs Allegheny County Employees' Retirement System ("Allegheny County"), the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge"), the Denver Public Employees Retirement Plan ("DERP"), the International Association of Machinists and Aerospace Workers National Pension Fund ("IAMNPF"), and the Iowa Public Employees' Retirement System ("IPERS"). In this brief, emphasis in quotations is added and internal citations and quotation marks are omitted, except when otherwise noted. References to "Ex. __" are to the accompanying Declaration of Jeffrey W. Golan and John C. Browne in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Joint Declaration"). References to "¶__" are to the operative Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint"), ECF No. 43. References to "Coffman Rpt." are to the accompanying Report on Market Efficiency by Chad Coffman, CFA, filed contemporaneously herewith.

[2] The Class consists of all persons who purchased or otherwise acquired common units of Energy Transfer LP ("Energy Transfer" or the "Partnership") between February 25, 2017 and December 2, 2019, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are (i) Energy Transfer; (ii) any directors and officers of Energy Transfer during the Class Period and members of their immediate families, (iii) the subsidiaries, parents and affiliates of Energy Transfer; (iv) any firm, trust, corporation or other entity in which Energy Transfer has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party. ¶476.

securities law violations injured Plaintiffs and many thousands of Class members in the same

manner.  Thus, Fed. R. Civ. P. 23(a)'s requirements are easily satisfied here:

1. **Numerosity**: At least thousands of investors acquired millions of nationally-traded Energy Transfer common units during the Class Period.

2. **Commonality and Typicality**: Defendants made the same materially false and misleading statements and omitted the same material facts when speaking to all of Energy Transfer's investors.

3. **Adequacy**: Plaintiffs are institutional investors that have retained highly-qualified counsel. Moreover, they have zealously advocated on behalf of the Class in this action to date, and will continue to do so.

Fed. R. Civ. P.'s 23(b)(3)'s requirements are likewise satisfied:

1. **Predominance**: The core elements of the claims here, including falsity and materiality, are entirely susceptible to common proof.  Further, reliance may be presumed for Plaintiffs' Section 10(b) claim and the related Section 20(a) claim.

2. **Superiority**: Defendants' conduct damaged thousands of geographically-dispersed investors, making a class action the superior method for adjudicating the claims and defenses here in a judicially efficient manner.

Accordingly, Plaintiffs' motion for class certification should be granted.

## STATEMENT OF FACTS

### A.  <u>Summary of the Allegations</u>

This securities class action concerns Energy Transfer's scheme to construct some of the

most dangerous pipelines in the United States – the Revolution, Mariner East 2 ("ME2") and

ME2X (the "Pipeline Projects") – while hiding from investors the serious safety risks that

threatened local citizens and construction setbacks that jeopardized the pipelines' completion

timelines and throughput.  ¶3.  Energy Transfer designed the Pipeline Projects to carry large

amounts of natural gas liquids ("NGLs") – highly explosive, odorless and colorless gases – from

the Marcellus shale gas fields in western Pennsylvania to the Marcus Hook port near Philadelphia,

for export overseas.  ¶7.  The ME2 pipeline itself traverses 350 miles, 17 Pennsylvania counties, 570 wetlands, 1,200 streams, and 2,700 properties.  ¶72.

In order to obtain the permits for the highly dangerous Pipeline Projects, the Partnership exerted undue pressure on regulators and government officials, including on Pennsylvania Governor Tom Wolf's office and the Pennsylvania Department of Environmental Protection ("DEP").  ¶¶87, 102-15, 121-22.  This undue pressure resulted in, among other things, Energy Transfer obtaining the permits despite hundreds of known deficiencies in the Partnership's permit applications.  ¶¶110, 118-19.  Underscoring the atypical, suspicious nature of this permit approval process, on November 12, 2019, the *Associated Press* reported that the FBI was interviewing current and former state employees about the issuance of permits for Mariner East.  ¶25.

With permits in hand and construction underway, Energy Transfer repeatedly told investors that the ME2 project was on track to finish construction by specific deadlines and attain specific throughput of 275,000 to 450,000 barrels/day.  ¶¶15-16.  However, to transport the NGLs across Pennsylvania's varied geography, with its known rock and soil formations that are prone to sinkholes and other disasters, and through densely-populated areas, Energy Transfer was required to use horizontal directional drilling ("HDD"), which – combined with the co-location of the Pipeline Projects alongside one another and an earlier laid Mariner East 1 pipeline ("ME1") – created substantial risks that Energy Transfer ignored.  ¶¶10-12, 51-53, 55, 59.  Once Energy Transfer began constructing the Pipeline Projects, it ran into serious delays caused by landslides, sinkholes and frac-outs that prevented it from completing the Pipeline Projects on time and with the promised throughput.  ¶¶11, 12, 16, 127, 170, 332-365.  Energy Transfer concealed from investors that its construction efforts were running into intractable problems and even necessitated the use of a large-scale "workaround" – connecting ME2 to an already-constructed smaller pipeline

– in order to meet deadlines in Energy Transfer's customer contracts.  ¶¶18, 128, 133, 144-61, 168-71, 243-48, 278-325.

Throughout the permitting and construction processes for the Pipeline Projects, Defendants assured investors that the Partnership's business activities complied with Energy Transfer's Code of Conduct (the "Code"), which asserted that "the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner."  ¶¶63-64.  The Code also prohibited Partnership executives and employees from providing anything of value to government officials, specifically by banning "sensitive" payments to "secure special treatment for the Partnership Group" as well as attempts to "disguise" sensitive payments in "any . . . manner." ¶¶65-66; *see also* ¶68.

In violation of the Code's provisions requiring Partnership business to be "conducted in a lawful and ethical manner" (¶¶63-64), Energy Transfer had used coercion to gain approval for the ME2 construction permits and then violated those permits by using prohibited construction techniques and ignoring serious safety risks.  ¶¶14, 399.  When those reckless tactics resulted in construction delays that pushed back the Pipeline Projects' in-service dates and resulted in their decreased throughput, Defendants misled investors by assuring them that construction of the Pipeline Projects remained on schedule, when in reality it was falling behind.  ¶¶14, 399.

In addition, in contravention of the Code's provisions prohibiting "sensitive" payments to government officials and "disguis[ing]" such payments (¶¶65-66, 163-64), Energy Transfer hired Pennsylvania Constables, pursuant to an "unwritten policy" at the Partnership, to provide security for ME2 construction, including in a residential neighborhood in West Whiteland Township, PA ("Lisa Drive").  ¶165-66.  Energy Transfer disguised its payments to the Pennsylvania Constables using a maze of transactions with a series of its contractors and subcontractors.  ¶¶204, 209.  In

connection with these practices, on August 8 and December 3, 2019, the Chester County District Attorney announced criminal charges for bribery and conspiracy against the Constables hired to work at Lisa Drive and against the Energy Transfer security chief for the Pipeline Projects.  ¶¶186-209.

Defendants' materially false and misleading statements to investors included their (1) misstatements concerning the status of the Pipeline Projects' completion timelines and ME2's throughput, as well as their failure to disclose myriad technical mishaps and safety violations delaying construction; (2) false assurances that the Partnership was constructing the pipelines safely and in an environmentally conscious manner; and (3) concealment of their violations of Pennsylvania criminal law and misstatements about their compliance with the Partnership's Code of Conduct.  The relevant truth was revealed to the market through a series of corrective disclosure events.  ¶¶400-408, 410-21, 423-32.

*First*, on August 9, 2018, on a pre-market conference call with investors, Energy Transfer disclosed that it would only be able to meet its prior projections of having ME2 in-service by the end of September 2018 if it routed the NGLs through an already-constructed 12-inch diameter pipeline in areas where the authorities had halted construction, rather than waiting to complete construction of the new 20-inch diameter line.  ¶ 401.  Energy Transfer claimed this jury-rigged solution would "avoid any delays in the ME2 project schedule" and, on the earnings call, Defendant Ramsey admitted the pipeline remained unfinished, but assured investors that there was only "1%" of construction remaining to be completed.  ¶ 401-402.  News of the makeshift pipe solution and the delayed completion of the actual ME2 pipeline caused analysts to deem the disclosure "confusing."  *See* ¶¶404-07.  For example, Wolfe Research noted that "ME2 may not reach full capacity" "until 4Q20" due to "using a hodgepodge of different sized pipes that will then

be re-worked / upsized over time." ¶405.  Similarly, Wells Fargo published a report noting that ME2 would only have an initial capacity of 100 million barrels per day, a nearly 65% reduction in capacity compared to what Defendants had claimed ME2's throughput would be only two months earlier.  ¶406.  Wells Fargo also noted that ME2's reduced throughput and delayed completion would have a material negative impact on Energy Transfer's quarterly earnings, and that construction would likely cost approximately $6 billion – twice as much as the $3 billion figure Defendants had previously quoted.  ¶¶406-07.  Disclosure of ME2's reduced throughput and delayed completion caused Energy Transfer's per unit price to plummet 5.6%, from $18.45 per unit at closing on August 8, 2018 to $17.41 per unit at closing on August 13, 2018.  ¶408.

**Second**, on October 29, 2018, the Pennsylvania DEP ordered construction of Energy Transfer's Revolution Pipeline to cease, after inspections the prior week revealed "unreported landslides and erosion off the [Revolution] pipeline's construction sites into nearby streams." ¶411.[3]  In response to these disclosures, Energy Transfer's per unit price fell from a closing price of $15.46 per unit on Friday, October 26, 2018, to a closing price of $14.84 per unit on Monday, October 29, 2018.  ¶412.

**Third**, on December 19, 2018, Tom Hogan, District Attorney for Chester County, announced his office would "bring into play all of the tools of the criminal justice system" against Energy Transfer, following numerous incidents of sinkholes appearing within feet of residential dwellings.  ¶413.  Hogan said that his office had been observing "these pipelines rip through the heart of Chester County" and received reports of "not-so-subtle bullying of Chester County

---

[3] In addition, on Saturday, October 27, 2018, the *Associated Press* reprinted an exposé from the *Pittsburgh Post-Gazette* detailing Energy Transfer's failure to disclose the risks Pennsylvania's geology posed to the Pipeline Projects.  ¶410.  Specifically, the article highlighted how Energy Transfer's rush to construct pipelines resulted in numerous tragedies and setbacks for Pennsylvania residents.  *Id.*

citizens by big corporate interests." *Id.* Hogan said he expected the state government and Governor Wolf "to step in and assure the safety of Pennsylvanians" but "[t]hey have not." *Id.* *Reuters* disseminated news of Hogan's investigation just before the market close on December 20, 2018. News of the DA's investigation caused Energy Transfer's per unit price to fall from a closing price of $12.94 on December 18, 2018, to a closing price of $12.24 per unit on December 21, 2018. ¶416.

**Fourth**, on August 8, 2019, following his office's months-long investigation, DA Hogan arrested and charged two Pennsylvania Constables for their work as private security guards at Lisa Drive. ¶418. News of the arrests broke on local Philadelphia outlets just before the market closed that day and Energy Transfer misleadingly claimed that the two men "were not Sunoco or Energy Transfer employees." ¶¶418, 422. In response to news of the Constables' arrests, on Friday, August 9, 2019, the price of Energy Transfer units fell $0.13 to close at $13.90 per unit, continuing their downward slide on Monday, August 12, 2019, to close at $13.38 per unit, for a total overall decline of 4.6%. ¶421.

**Fifth**, near the end of trading on November 12, 2019, the *Associated Press* published an article titled "FBI eyes how Pennsylvania approved pipeline," which reported that "the focus of agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return." ¶423. That same day, the *Philadelphia Inquirer* published an article on the FBI investigation and wrote that "[t]he federal probe has been running for at least six months." ¶424. News of the FBI probe stunned the market, as the price of Energy Transfer units fell 2.6% to close at $11.66 per unit on November 12, 2019, and continued to fall a further 4.3% on November 13, 2019 to close at $11.16 per unit. ¶425.

**Sixth**, on December 3, 2019, Chester County DA Hogan filed criminal charges against the Energy Transfer employee in charge of security for the Mariner East pipeline, as well as four other individuals involved in what was termed a "buy-a-badge" program.  ¶¶427, 429.  Calling it a "simple case," Hogan stated in a press release, "State Constables sold their badges and official authority.  Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens."  *Id.*  In response to those charges, the price of Energy Transfer units fell 2.0% from a closing price of $11.63 on December 2, 2019 to closing price of $11.40 on December 3, 2019.  ¶431.

To recover the significant financial harm to the Class, Plaintiffs brought this action, and in April 2021, following extensive briefing and oral argument, this Court denied in part and granted in part Defendants' motion to dismiss.

### B.     The Proposed Class Representatives

On February 17, 2020, the Court appointed Allegheny County, Baton Rouge, DERP, IAMNPF, and IPERS as Lead Plaintiffs.  ECF No. 17.  The proposed Class Representatives are all defined benefit pension plans that provide retirement income benefits to their participants. Collectively, they purchased or otherwise acquired more than 8.772 million shares of Energy Transfer units during the Class Period and suffered more than $24 million in losses.  *See* ECF Nos. 4-1, 11.

## ARGUMENT

The Supreme Court has repeatedly emphasized the importance of private class actions in redressing violations of the federal securities laws, and courts in this Circuit overwhelmingly find securities fraud actions appropriate for class treatment.  *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 320 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal

prosecutions and civil enforcement actions[.]"); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 778 (3d Cir. 2009); *In re Celgene Corp. Sec. Litig.*, 2020 WL 8870665, at *1 (D.N.J. Nov. 29, 2020); *In re Advance Auto Parts Sec. Litig.*, 2020 WL 6544637, at *1 (D. Del. Nov. 6, 2020).  Rule 23 allows for effective enforcement of the securities laws for large numbers of injured investors, and a class action conserves judicial resources by providing a single forum to litigate investors' claims.  By this motion, Plaintiffs "affirmatively demonstrate" that Rule 23's requirements are satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), by a preponderance of the evidence, *see In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015), and the Class should be certified.

While the Court's analysis in deciding whether to grant a class certification motion frequently overlaps with "the merits of the plaintiff's underlying claim," *Dukes*, 564 U.S. at 351, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021) ("materiality should be left to the merits stage because it does not bear on Rule 23's predominance requirement").  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## I.   THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a)

Under Rule 23(a), plaintiffs must show that (1) the class is so numerous that joinder of all the members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) plaintiffs' claims are typical of the class ("typicality"); and (4) the representative parties fairly and adequately protect the class's interests ("adequacy").  *See, e.g.*, *Constar*, 585 F.3d at 780.  The proposed class satisfies all four requirements.

A.      **The Class Is Sufficiently Numerous**

To establish numerosity, a plaintiff is not required to "offer direct evidence of the exact number and identities of the class members." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012). Instead, "circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition" is sufficient. *Id.* Moreover, "[a]lthough [n]o minimum number of plaintiffs is required to maintain a suit as a class action, if the potential number of plaintiffs is more than forty, the first prong of Rule 23(a) has been met." *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 135 (E.D. Pa. 2020) (McHugh, J.) (citing *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016)); *see also Utesch v. Lannett Co., Inc. et al.*, 2021 WL 3560949, at *3 (E.D. Pa. Aug. 12, 2021) (same).

The proposed Class readily satisfies the numerosity requirement. *First*, throughout the Class Period, Energy Transfer's units traded on the New York Stock Exchange ("NYSE"). The numerosity requirement "is readily met in securities cases involving an issuer whose stock trades publicly on the [NYSE]." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *8 (D.N.J. Aug. 31, 2015). Here, an average of 5 million units of Energy Transfer traded on days without any news, SEC filings, or analyst reports about Energy Transfer. Coffman Rpt. ¶65. On the eleven days surrounding earnings announcements for Energy Transfer during the Class Period, the average daily trading volume skyrocketed to 12.2 million units. *Id. Second*, during the Class Period, there was a minimum of 1.079 billion Energy Transfer units outstanding. *Id.* ¶69. *Third*, more than 1,220 institutional investors purchased or otherwise acquired Energy Transfer units during the Class Period. *Id.* ¶74. Based on this trading volume, shares outstanding, and number of institutional investors, it can be credibly inferred that many thousands of investors owned and traded Energy Transfer units during the Class Period, and these facts establish numerosity. *See Utesch*, 2021 WL 3560949, at *3 (finding numerosity established

by preponderance of evidence where stock traded on NYSE, a minimum of 35.6 million shares were outstanding, and 12% of outstanding shares traded on a weekly average); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *7 (E.D. Pa. Aug. 4, 2016) (numerosity satisfied where millions of shares were outstanding).

### B.     Many Questions of Law and Fact Are Common to the Class

Establishing commonality under Rule 23(a)(2) requires plaintiffs to demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality "does not require identical claims or facts among class members." *Marcus*, 687 F.3d at 597-98. "For purposes of Rule 23(a)(2), even a single common question will do." *Dukes*, 564 U.S. at 359; *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (Rule 23(a)(2) satisfied were class representatives share "at least one question of fact or law with the grievances of the prospective class."); *Norman*, 479 F. Supp. 3d at 139-40 (finding commonality under Rule 23(a)(2) satisfied).

"Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74-75 (D.N.J. 2019). For example, to establish scienter, the inquiry "necessarily focus[es] on [Defendants'] actions" with questions raised in the inquiry answered "from an examination of what [Defendants] did and said," not "from the perspective of each prospective class member." *See Utesch*, 2021 WL 3560949, at *4 (finding "classwide answers to these questions lead inexorably to the conclusion" that commonality is satisfied). This case is no different. Here the common questions include, among others: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants' public statements during the Class Period

misrepresented or omitted material facts in order to make the statements made, in light of the circumstances under they were made, not misleading; (iii) whether Defendants acted with scienter in issuing false and misleading statements, knowingly or recklessly disregarding that their statements and omissions were false; (iv) whether the price of Energy Transfer units was artificially inflated by Defendants' statements; and (v) whether Defendants' conduct caused the members of the Class to sustain damages and total class-wide damages.  The resolution of these common questions will drive the outcome of this litigation, and class members would have to address the same issues if the claims were pursued individually.

As the Court stated in *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 299 (3d Cir. 2011), class certification is appropriate here because these common questions will "generate common answers apt to drive the resolution of the litigation."  *See also In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *4 (D.N.J. Sept. 25, 2012) ("questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact") (alteration in original).  Thus, the commonality prerequisite is satisfied.

### C.      The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3)'s typicality requirement "centers on whether the interests of the named plaintiffs align with the interests of the absent members."  *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001).  In assessing typicality, courts in the Third Circuit generally consider three factors:

(1)     The claims of the class representatives must be generally the same as those of the class in terms of both (a) the legal theory advanced, and (b) the factual circumstances underlying the theory;

(2)     The class representative must not be subject to a defense that is both inapplicable to many class members and likely to become a major focus of the litigation; and

(3)     The interests and incentives of the class representative must be sufficiently aligned with those of the class.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). "[C]lass members need not share identical claims, and cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016). "Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009).

Here, Plaintiffs' claims are typical of, if not virtually identical to, the claims of other members of the Class, as they arise from the same events, invoke the same legal theories, are subject to the same defenses, and will be proven with the same evidence. Like other members of the Class, Plaintiffs assert that they, and all other Class members, purchased Energy Transfer units at artificially inflated prices due to Defendants' fraud. *See In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *6 (D.N.J. Jan. 30, 2013) (typicality established where "[t]he class claims . . . arise out of the same conduct – transactions in Merck securities that were based on an allegedly artificially inflated stock price as a result of Defendants' misrepresentations and omissions concerning the safety profile of Vioxx"). Accordingly, Plaintiffs and Class members share common claims and identical interests in holding Defendants accountable and maximizing investors' recovery, satisfying Rule 23(a)(3).

### D. The Proposed Class Representatives Will Fairly and Adequately Protect the Class's Interests

To meet the requirement under Rule 23(a)(4) that the class representatives "fairly and adequately protect the interests of the class," the district court must find that (1) the class

representatives' interests do not "conflict with those of the class," and (2) the proposed class counsel are "capable of representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001). These criteria are readily met here.[4]

*First*, both Plaintiffs and the other Class members acquired and held Energy Transfer units during the Class Period and were damaged as a result of the same alleged false and misleading statements and omissions by Defendants.

*Second*, Plaintiffs have a meaningful financial stake in this litigation and have demonstrated their willingness and ability to vigorously litigate this matter to protect the Class. "A class representative need only possess a minimal degree of knowledge . . . to meet the adequacy standard" in the Third Circuit, and Plaintiffs clear that threshold by a wide margin. *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007). As stated in their respective Declarations, each Plaintiff (a) understands the requirements and responsibilities of serving as a Class Representative; (b) has reviewed the key pleadings to date; (c) will continue to monitor and assess the progress of this litigation; and (d) will work with counsel to maximize the Class's recovery. *See* Exs. 1-5. Plaintiffs also filed a Complaint with a comprehensive set of claims, successfully defended many of those claims against a motion to dismiss, and have vigorously pursued discovery from Defendants and relevant third parties. *See id.*

*Third*, Plaintiffs have demonstrated their adequacy by retaining well-qualified counsel with the experience and demonstrated ability to successfully litigate this action on behalf of the

---

[4] To preclude class certification, an alleged conflict of interest between the class representative and other class members "must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re K-Dur Antitrust Litig.*, 2008 WL 2699390, at *9 (D.N.J. Apr. 14, 2008). "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012). There is no such situation here.

Class.  Both BLB&G and Barrack Rodos are among the preeminent securities class action law firms in the country, having recovered billions of dollars in some of the largest and most complex securities class actions in history.  *See* ECF Nos. 4-13 & 4-14.  BLB&G and Barrack Rodos have also both previously been recognized as adequate Class Counsel by courts in this Circuit and throughout the country.  *See id*.  The two firms also have experience in successfully prosecuting securities class actions together.  *See* Joint Declaration ¶¶9-10.

## II.   THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)

This case also satisfies Rule 23(b)(3)'s requirements that (1) common questions of law or fact predominate over individual questions, and (2) a class action is superior to alternative methods of resolving the dispute.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

### A.   <u>Common Factual and Legal Questions Predominate</u>

Predominance under Rule 23(b)(3) "is a test readily met in certain cases alleging consumer or securities fraud."  *Amchem*, 521 U.S. at 625.  Where common questions of law or fact outnumber those affecting only individual class members, predominance is satisfied.  *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015); *see also Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (emphasis in original).  Common question may predominate even where differences between class members exist.  *Neale*, 794 F.3d at 371.

Here, the Class's claims all arise from the same course of conduct and will be proven through common evidence, and the Class's injuries are all predicated on the same artificial inflation and subsequent decline in Energy Transfer's unit price after the truth was exposed.  *See supra* § I.B.  Common questions further predominate in this action because the Class is entitled to a presumption of reliance for Plaintiffs' Section 10(b) claims.  *See Erica P. John Fund, Inc. v.*

*Halliburton Co.*, 563 U.S. 804, 810 (2011) (in federal securities fraud actions, "[w]hether common questions of law or fact predominate … often turns on the element of reliance"). The Supreme Court has identified two circumstances in which courts may employ a rebuttable presumption of reliance for securities class actions: (1) where there has been "fraud on the market," *Basic Inc. v. Levinson*, 485 U.S. 224, 241, 248 (1988); and (2) where the defendant failed to disclose facts it was under a duty to disclose, *see Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Both circumstances are present here.

### 1. Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption of Reliance Under *Basic v. Levinson*

The predominance requirement is satisfied here through the fraud-on-the-market presumption of reliance for Plaintiffs' Section 10(b) claims. *See Basic*, 485 U.S. at 241; *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 263-64, 268-69 (2014); *Amgen*, 568 U.S. at 460-62. Under the fraud-on the-market presumption, if the market for a security is efficient, reliance on material public misrepresentations may be presumed whenever an "investor buys or sells stock at the market price" because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence any material misrepresentations." *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).

In determining whether a market for a security is well-developed and efficient, courts rely principally on the five factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989): (1) the stock's average weekly trading volume; (2) coverage of the stock in securities analyst reports; (3) the number of market makers; (4) the company's eligibility to file a registration statement on Form S-3; and (5) stock price reaction to unexpected corporate events or financial releases. *See Roofer's*, 333 F.R.D. at 81; *see also DVI*, 639 F.3d at 634, n.16. These factors are an "analytical tool" and not a "checklist." *In re Advance Auto Parts, Inc. Sec. Litig.*,

2020 WL 6544637, at *3 (D. Del. Nov. 6, 2020).   Courts also frequently consider the factors

enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): (1) the company's

market capitalization; (2) the security's bid-ask spread; and (3) the size of the public float.   *See*

*Advance Auto Parts*, 2020 WL 6544637 at *2*.   Here, all of the *Cammer* factors and the *Krogman*

factors support the conclusion that the market for Energy Transfer units was efficient.

### a.   First *Cammer* Factor: High Average Trading Volume

A high weekly trading volume is indicative of market efficiency because it "implies

significant investor interest in the company" which, "in turn, implies a likelihood that many

investors are executing trades on the basis of newly available or disseminated corporate

information."  *Cammer*, 711 F. Supp. at 1286; *see also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196,

208 (E.D. Pa. 2008) (same).   An "[a]verage weekly trading volume of 2% or more of outstanding

securities justifies a 'strong presumption' of an efficient market for that security."   *In re Winstar*

*Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citing *Cammer*, 711 F. Supp. at

1286).   Throughout the Class Period, Energy Transfer units traded actively, with an average of at

least 5 million units changing hands daily and an average weekly trading volume of approximately

40.2 million units, or 2.38% of units outstanding.   Coffman Rpt. ¶¶28, 65.   Consistent with

*Cammer*, economic theory, and empirical research, this high, active trading volume is strong

evidence of the efficiency of the market for Energy Transfer units over the course of the Class

Period.  *See id.* ¶¶26-31.

### b.   Second *Cammer* Factor: Securities Analyst Coverage

"Extensive coverage by securities analysts likewise indicates market efficiency, since the

price of a company's security is often affected by analysts' reports of information learned through

their own investigation and analysis."  *DVI*, 249 F.R.D. at 209 (citing *Cammer*, 711 F. Supp. at

1286).   During the Class Period, analysts from at least 17 brokerage firms followed Energy

Transfer and issued at least 224 reports. *See* Coffman Rpt. ¶34. Energy Transfer was also the subject of at least 4,054 news articles. *See id.* ¶36. This extensive coverage also compellingly shows market efficiency. *See DVI*, 249 F.R.D. at 210 (coverage by three analysts was "sufficient to favor a finding of market efficiency").

### c.      Third *Cammer* Factor: Listing and Market Makers

The presence of market makers and arbitrageurs also supports a finding of market efficiency, as these market participants "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. A large number of market makers indicates market efficiency because it implies that many market participants are trading that particular stock and generally provides a high degree of liquidity and lower transaction costs. *See* Coffman Rpt. ¶¶39-41. Here, Energy Transfer units trade on the NYSE, and "Third Circuit courts have consistently found that the NYSE is an efficient market for stock traded thereon." *Roofer's*, 333 F.R.D. at 80 n.8 (collecting cases); *see also Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency."). Through the NYSE, Energy Transfer investors had access to a highly developed network of brokers. During the Class Period, there were at least 122 market makers for Energy Transfer units. *See* Coffman Rpt. ¶42. These facts also strongly support market efficiency.

### d.      Fourth *Cammer* Factor: Eligibility to File Form S-3

A company's eligibility to file a Form S-3 Registration Statement with the SEC is indicative of market efficiency because the ability to file these forms indicates that the company is easily able to issue new securities. *DVI*, 249 F.R.D. at 210 & n.23. A company is eligible to file a Form S-3 Registration Statement if it has filed SEC reports for 12 consecutive months and

has at least $75 million of float.  *See* 17 C.F.R. § 239.13.  Throughout the Class Period, Energy

Transfer met the requirements for issuing securities pursuant to a Form S-3 Registration Statement.

*See* Coffman Rpt. ¶¶43-45.  Thus, this factor also weighs in favor of finding market efficiency.

*See, e.g.*, *Merck/Vytorin*, 2012 WL 4482041, at *5 (finding market was efficient and plaintiffs

were entitled to presumption of reliance based in part on defendant company's eligibility to file

Form S-3).

<blockquote>
e.    **Fifth *Cammer* Factor: The Cause and Effect Relationship between Energy Transfer-Specific News and Energy Transfer's Stock Price**
</blockquote>

"[O]ne of the most convincing ways to demonstrate [market] efficiency [is] to illustrate,

over time, a cause and effect relationship between company disclosures and resulting movements

in stock price."  *Cammer*, 711 F. Supp. at 1291.  While "[c]ourts have rejected the idea that the

fifth *Cammer* factor is necessary to establish market efficiency," empirical evidence of a cause and

effect relationship between corporate news events and a company's share-price movements

supports a finding of market efficiency.  *DFC Global*, 2016 WL 4138613, at *12; *see also id.* at

*13 (market efficiency does not require that this factor or any other single *Cammer* factor be

satisfied).

To assess this factor, Mr. Coffman conducted an event study on Energy Transfer's daily

common unit prices.  Coffman Rpt. ¶¶49-51.  An event study provides "a statistical regression

analysis that examines the effect of an event on a dependent variable, such as a corporation's stock

price."  *DFC Global*, 2016 WL 4138613, at *13 (quoting *United States v. Schiff*, 602 F.3d 152,

173 n.29 (3d Cir. 2010)).  "[T]here is no dispute that [an event study] is widely accepted in the

academic community and in the courts" to prove the cause-and-effect relationship contemplated

by *Cammer*.  *Prudential*, 2015 WL 5097883, at *6.

Mr. Coffman's event study "demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Energy Transfer Common Units during the Class Period." Coffman Rpt. ¶67.[5]  Using a well-established methodology, Mr. Coffman first created regression models to control for market and industry wide factors that might influence the price of Energy Transfer common units. *Id.* ¶¶50-51.  These models allowed him to isolate the change in Energy Transfer's common unit price that can be attributed to Company-specific news by finding the difference between the actual price movement on a given day and the movement predicted by the regression model (which, as noted above, controls for market and industry factors). *Id.* ¶¶53-54.

With this data in hand, Mr. Coffman then examined the price changes in Energy Transfer common units on two sets of days: (1) days during the Class Period on which Energy Transfer made earnings announcements, and (2) days during the Class Period on which no news articles or analyst reports about Energy Transfer were released, and the Company did not make SEC filings or issue press releases. *Id.* ¶¶59-62.  Because it is more likely that material, new information about the Company would be released to the market on days with earnings announcements than on days with no identified news released or Company SEC filings or press releases, in an efficient market, one would expect to find a greater percentage of earnings announcement days with a statistically significant stock price movement—i.e., a movement that could not be accounted for by random chance alone. *Id.*

That is precisely what Mr. Coffman found.  His analysis shows that Energy Transfer common units exhibited a statistically significant price change at the 95% confidence level or

---

[5] Mr. Coffman's methodology has been accepted by numerous courts under the current state of the law. *See, e.g., In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104-06 (S.D.N.Y. 2016).

greater on 45.45% of earnings announcement days, but had no significant price changes on any of the days without any news, analyst reports, SEC filings, or Company press releases—a difference across those two sets of days that is itself highly statistically significant.  *Id.* ¶62 & n.66.  In addition, both the magnitude of the average change in the price of Energy Transfer common units and the daily trading volume were statistically significantly higher on earnings announcement days as compared to days without news, analyst reports, SEC filings, or press releases.  *Id.* ¶¶63-65. Based on this analysis, Mr. Coffman concluded that there was "a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Energy Transfer Common Units."  *Id.* ¶66; *see also, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008) (observing that an event study "has been considered *prima facie* evidence of existence of such a causal relationship").

### f.  First *Krogman* Factor: Large Market Capitalization

"Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *DVI*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478).  During the Class Period, Energy Transfer's market capitalization averaged $26.28 billion, greater than at least 91% of the firms listed on the NYSE and NASDAQ exchanges.  *See* Coffman Rpt. ¶69.  This large market capitalization supports a finding of market efficiency.  *Id.* ¶70; *see also DVI*, 249 F.R.D. at 212 (market capitalization ranging between $12 million to $300 million indicative of market efficiency).

### g.  Second *Krogman* Factor: Narrow Bid-Ask Spread

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares," with narrower bid-ask spreads associated with more efficient markets.  *See Krogman*, 202 F.R.D. at

478.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."  *Id.*  The bid-ask spread for Energy Transfer units throughout the Class Period was between 0.017% and 0.049%.  Coffman Rpt. ¶72.  By comparison, the average month-end bid-ask spread during the final month of the Class Period (October 2019) was 0.84%.  *See* Coffman Rpt. ¶72.  This narrow bid-ask spread further indicates market efficiency.  *See id.*; *cf. Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (finding bid-ask spread of 2.44 percent weighed in favor of market efficiency).

### h.    Third *Krogman* Factor: Large Public Float

In determining efficiency, courts also consider public float, i.e., "the percentage of shares held by the public, rather than insiders."  *Krogman*, 202 F.R.D. at 478.  "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."  *Id.*  During the Class Period, Energy Transfer's float averaged 77.99% of shares outstanding.  *See* Coffman Rpt. ¶73.  Energy Transfer's float further indicates efficiency.  *Id*.

*       *       *       *       *

Taken together, the five *Cammer* factors and the three *Krogman* factors strongly support the conclusion that Energy Transfer units traded in an efficient market throughout the Class Period.  *See* Coffman Rpt. ¶¶24-73.  Plaintiffs and the Class are thus entitled to invoke the fraud-on-the-market presumption of reliance.

### 2.    Plaintiffs' Section 10(b) Claims Are Entitled to a Presumption of Reliance Under *Affiliated Ute*

Plaintiffs are also entitled to a presumption of reliance for their Section 10(b) claims under *Affiliated Ute*, which provides that for claims involving a failure to disclose, "positive proof of reliance is not a prerequisite to recovery."  406 U.S. at 153-54.  Instead, "[a]ll that is necessary is

that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* Plaintiffs' Section 10(b) claims allege that throughout the Class Period, Defendants' public statements omitted numerous material facts regarding Energy Transfer's construction of the Mariner East pipeline projects that were necessary to make those statements not misleading. ¶¶478-86. The Court upheld these allegations following extensive briefing. *Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP et al.*, 2021 WL 1264027 (E.D. Pa. Apr. 6, 2021). Because the Complaint alleges numerous actionable omissions, the Class is entitled to rely on the *Affiliated Ute* presumption to establish reliance.

    **B.**    **A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action**

Rule 23(b)(3) directs courts to consider four factors in evaluating whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These factors are: (i) the interest of class members in individually controlling separate actions; (ii) the extent and nature of any litigation already underway; (iii) the desirability of concentrating the litigation in the forum; and (iv) the manageability of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). Here, each factor favors certification.

Superiority "is easily satisfied in securities fraud cases where there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant." *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *8 (D. Del. June 6, 2013). First, Plaintiffs are unaware of any Class member who would prefer to prosecute his or her claims individually. Second, Plaintiffs are aware of no individual litigation seeking the same redress as the Complaint. Third, the geographical dispersion of Class members means that it is desirable for their claims to be litigated in a single forum to avoid inconsistent adjudications and promote fairness and efficiency. Finally, this case presents no unusual management difficulties. Judicial economy and

the best interests of the Class thus favor class certification, and the alternative would deprive the Class of any practical recourse.

## III.   THE PROPOSED CLASS IS ASCERTAINABLE

Where "[t]here are objective records that can readily identify . . . class members," the ascertainability requirement is satisfied. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 169 (3d Cir. 2015); *see also In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (ascertainability satisfied where class members identifiable by reference to bank records).   The Class here includes all persons and entities who purchased or otherwise acquired Energy Transfer units during the Class Period and suffered losses, a group that can be readily identified by reference to records of unit acquisitions.   Accordingly, the proposed class is ascertainable. *See Utesch*, 2021 WL 3560949, at *11 (finding ascertainability where "Plaintiffs propose[d] a definite class relying on objective criteria").

## IV.   BLB&G AND BARRACK RODOS SHOULD BE APPOINTED CLASS COUNSEL

In appointing class counsel, courts consider counsel's work "in identifying or investigating potential claims," "experience in handling class actions," "knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1).   As set forth above, these factors favor appointing BLB&G and Barrack Rodos as Class Counsel. *See supra* § I.D.   Here, BLB&G and Barrack Rodos have worked together cooperatively and seamlessly to investigate the Plaintiffs' claims, largely overcome Defendants' motion to dismiss, pursue discovery of Defendants and third parties, and prepare and file the instant motion for class certification.   Joint Declaration ¶¶9-10.   These two firms are experienced and qualified in prosecuting securities class actions and they have brought to bear significant resources on the efficient and zealous pursuit of Plaintiffs' claims (and will continue to do so).   In addition to their

individual case achievements, the two firms have worked together as co-lead counsel in achieving

the largest recovery in a securities class action in this Circuit, in the *Cendant* case ($3.32 billion

recovered for the class), as well as significant recoveries for classes of investors in *WorldCom*

(S.D.N.Y., $6.19 billion), *McKesson* (N.D. Cal., $1.05 billion), *DaimlerChrysler* (D. Del., $300

million), *Mills* (E.D. Va., $202.75 million), and *DFC Global* (E.D. Pa., $30 million), among others.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: September 17, 2021                                      Respectfully submitted,

**BARRACK, RODOS & RACINE**

*/s/ Jeffrey W. Golan*
Jeffrey W. Golan
Robert A. Hoffman
Jeffrey A. Barrack
Chad A. Carder
Meghan J. Talbot
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jbarrack@barrack.com
ccarder@barrack.com
mtalbot@barrack.com

John C. Browne (admitted *pro hac vice*)
Adam H. Wierzbowski (admitted *pro hac vice*)
Michael M. Mathai (admitted *pro hac vice*)
James M. Fee (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

johnb@blbglaw.com
adam@blbglaw.com
michael.mathai@blbglaw.com
james.fee@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and
Proposed Class Counsel*

John D. Zaremba
**ZAREMBA BROWN PLLC**
40 Wall Street
52nd Floor
New York, NY 10005
Telephone: (212) 380-6700
jzaremba@zarembabrown.com

*Additional Counsel for Lead Plaintiff and the
Class*