**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:20-cv-00200-GAM |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| ENERGY TRANSFER LP, KELCY L. WARREN, JOHN W. MCREYNOLDS, THOMAS E. LONG, MARSHALL MCCREA, MATTHEW S. RAMSEY, MICHAEL J. HENNIGAN, and JOSEPH MCGINN, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................. 1

II.     BACKGROUND ................................................................. 5

    1.   The Alleged Misstatements.................................................... 5

    2.   The Alleged Corrective Disclosures ................................... 6

III.    ARGUMENT ..................................................................... 7

    1.   *Basic* does not apply. ....................................................... 8

        (a)   There was no price impact associated with any of the alleged
        corrective disclosures. ............................................... 12

            (1)   August 9-13, 2018.............................................. 12

            (2)   October 27-29, 2018 .......................................... 16

            (3)   December 19-21, 2018 ....................................... 18

            (4)   August 8-12, 2019............................................. 19

            (5)   November 12-13, 2019 ...................................... 20

            (6)   December 3, 2019 .............................................. 23

        (b)   The market's reaction at the time of the alleged misstatements also
        confirms that there was no price impact. ................................... 23

            (1)   August 9, 2017 .................................................. 26

            (2)   August 8, 2019 .................................................. 27

    2.   The *Affiliated Ute* presumption does not apply. .................. 29

IV.     CONCLUSION................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

<b><u>Page</u></b>

**Cases**

*Aeterna Zentaris Inc.*,
  324 F.R.D 331 (D.N.J. 2018*), aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*,
  775 F. App'x 51 (3d Cir. 2019) ......................................................................... 26

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ............................................................................... passim

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018) ......................................................................... 11, 13

*Basic Inc*. v. *Levinson*,
  485 U.S. 224 (1988) ............................................................................... passim

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*,
  2015 WL 5097883 (D.N.J. Aug. 31, 2015) ............................................................ 26

*Cosby et al. v. KPMG et al.*,
  Case No.: 3:16-cv-00121 (E.D. Tenn.) .............................................................. 16

*Crago v. Charles Schwab & Co., Inc.*,
  2021 WL 4990234 (N.D. Cal. Oct. 27, 2021) ...................................................... 35, 36

*Electrical Workers IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ................................................................ 11, 26, 28, 30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ..................................................................... passim

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ..................................................................................... 9

*FindWhat Investor Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ....................................................................... 26

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ......................................................................... 25

*Goldman Sachs Group, Inc. v. Arkansas Tchr. Ret. Sys.*,
  141 S. Ct. 1951 (2021) .............................................................................. passim

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ......................................................................... 11

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ..................................... passim

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010)
*vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012) ............................................. 36

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................................. 11, 22

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ......................................................... 27

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) ............................................. 22, 25, 26

*In re Interbank Funding Corp. Sec. Litig.*,
668 F. Supp. 2d 44 (D.D.C. 2009), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010) .............................. 32

*In re Intuitive Surgical Secs. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .................................................... passim

*In re Moody's Corp. Securities Litigation*,
274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................... passim

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ........................................................................ 11

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
975 F. Supp. 584 (D.N.J. 1996) ..................................................................... 5

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ............................................................... 32, 35

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001) ........................................................... 31, 32, 35

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) ..................................................................... 35

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
2020 WL 5026553 (D. Del. Aug. 25, 2020) ..................................... 32, 33, 34, 35

*Pelletier v. Endo Int'l PLC*,
338 F.R.D. 446 (E.D. Pa. 2021) ..................................................................... 16

*Schwab v. E*TRADE Fin. Corp.*,
752 Fed. App'x. 56 (2d Cir. 2018) .................................................................. 32

*Schwartzman v. Morningstar, Inc.*,
    2014 WL 3843875 (E.D. Pa. Aug. 5, 2014) .......................................................... 32

*W. Palm Beach Pol. Pens. Fund v. DFC Glob. Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .......................................................... 26

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)..................................................................................... 32

*Wilson v. Comtech Telecom. Corp.*,
    648 F.2d 88 (2d Cir. 1981)..................................................................................... 32

**Rules**

17 C.F.R. § 240.10b ........................................................................................................ 31

17 C.F.R. § 240.10b-5 .......................................................................................... 1, 7, 8, 9

Fed. R. Civ. P. 23(b)(3)..................................................................................... 1, 7, 8, 33

## I.    PRELIMINARY STATEMENT

The Court should deny class certification because Plaintiffs are not entitled to either of the two presumptions of reliance that they invoke, and "without [a] presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014) ("*Halliburton II*").  To prevail on a Rule 10b-5 claim, a plaintiff must establish that it relied on the alleged misrepresentation giving rise to the claim.  Traditionally, this doomed efforts to certify securities fraud claims for class treatment because individual proof of reliance would predominate over questions common to the class members, preventing plaintiffs from satisfying Rule 23(b)(3)'s predominance requirement.  And, as *Halliburton II* makes clear, it continues to doom efforts to certify Rule 10b-5 actions for class treatment, unless the plaintiffs can successfully invoke—and avoid rebuttal of—one of the two "presumptions" of reliance established by the Supreme Court.  Here, Plaintiffs are entitled to neither presumption.  Their motion for class certification should, accordingly, be denied.

First, the *Basic* presumption does not apply.  The most common way Rule 10b-5 plaintiffs attempt to overcome this reliance problem is by seeking to invoke the fraud-on-the-market presumption announced by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and clarified in numerous subsequent Supreme Court opinions, including most recently *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021) ("*Goldman (S. Ct.)*").  *Basic* and its progeny hold that where a plaintiff can establish that the market for a security is "efficient"—*i.e.*, where the security's price incorporates publicly available information sufficiently rapidly that it is impossible to earn excess returns by trading on that information—a court can presume that investors have relied on any statement *that had an impact on the security's trading price.*

1

However, the *Basic* presumption is "rebuttable rather than conclusive." *Basic*, 485 U.S. at 268. "So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price . . . then the presumption of reliance would not apply." *Halliburton II*, 573 U.S. at 269 ; *see also id.* at 281 ("[E]vidence at the certification stage [that] shows an efficient market, on which the alleged misrepresentation had no price impact [establishes that the] fraud-on-the-market theory does not apply and common reliance thus cannot be presumed.").

This is precisely the state of the evidence here: the alleged misstatements on which Plaintiffs base their securities fraud claims did not have a "price impact" on Energy Transfer common units. This is evident when examining both the "front end" of Plaintiffs' securities fraud claims (*i.e.*, any price increase on the trading day where the misrepresentation reached the market) and the "back end" (*i.e.*, any price decrease on the trading day where the corrective disclosure reached the market).

With respect to the "front end," there is no price impact attributable to the alleged misrepresentations. Plaintiffs' expert and Defendants' expert agree that, on 24 of the 26 trading days on which the alleged misrepresentations reached the market, any increase in Energy Transfer's unit price was statistically *in*significant—and thus cannot be distinguished from random variation. And there is no price impact on the two remaining front-end dates either:

- On the first of these dates, the purported misstatements were pipeline project completion estimates that were consistent with—or more pessimistic than—Energy Transfer's previously disclosed estimates. As each side's expert has testified, such "old news" does not introduce inflation into a security's price in an efficient market. Rather, market analysts attributed that day's price increase to newly disclosed information not at issue in this case.

- On the sole remaining date, Energy Transfer units reacted positively to an analyst conference call that took place in the morning. But the conference call contained no alleged misstatements. Rather, the only alleged misstatement on that date occurred when a news

article was released at 2:01 p.m.  And there was no significant movement in Energy Transfer's unit price following the release of the article.

Similarly, there is no price impact on the "back end" of Plaintiffs' claims.  Plaintiffs argue that the truth about Defendants' purported misrepresentations was revealed through six purported "corrective disclosure events."[1]   But the parties' experts agree that on five of these alleged corrective disclosure dates, there was no statistically significant decrease in Energy Transfer's unit price.  As a result, Plaintiffs have resorted to pointing to price movements on days *following* the trading dates on which the alleged "corrective disclosures" first reached the market.  But "[a]n efficient market is said to digest or impound news into the stock price in a matter of minutes." *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015) ("*Halliburton II Remand*").  Indeed, Plaintiffs' expert (who was the plaintiffs' expert in *Halliburton II*) seeks to establish that Energy Transfer units traded in an efficient market by showing that any price impact from an Energy Transfer disclosure occurred on the same trading day as the disclosure.  This leaves Plaintiffs with only one "back end" date on which there was a statistically significant price decrease.  But on that date, the only Energy Transfer news concerned statements that were dismissed from the case at the pleadings stage; thus, it cannot serve as a "corrective disclosure" in this matter, and the price movement on this date is irrelevant to whether any of the remaining claims can be certified.

In short, there was neither "back-end" nor "front-end" price impact that may be attributed to any of Plaintiffs' alleged misstatements.  Accordingly, the *Basic* presumption has been rebutted.

Second, the *Affiliated Ute* presumption does not apply.  In 1972, the Supreme Court permitted a narrow presumption of reliance in a unique Rule 10b-5 matter that was premised

---

[1] As detailed below, certain of these events involve more than one alleged corrective disclosure.  This brief adopts Plaintiffs' grouping/categorization of these disclosures into six events.

entirely on an omission claim.  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Since then, courts have occasionally permitted a presumption of reliance under *Affiliated Ute*, but only if the securities fraud claim is primarily based on strict omissions—not misrepresentations *or statements that are rendered misleading due to omissions*.  Plaintiffs' claims do not fall within the narrow *Affiliated Ute* exception, and they only half-heartedly suggest otherwise.  Indeed, Plaintiffs allege (according to the Court) "approximately fifty-seven allegedly actionable misstatements," and their complaint is a veritable kitchen-sink of Defendants' public statements during the class period.  In an effort to invoke *Affiliate Ute*, Plaintiffs are careful to assert that Defendants engaged in "misrepresentations *and omissions*," but such rote references to "omissions" cannot mask the fact that this lawsuit is predominantly based on alleged misrepresentations, particularly where—as here—the "omission" allegations are simply Plaintiffs' way of explaining why the alleged misrepresentations are false or misleading.  As Plaintiffs explained at the motion to dismiss phase, "Plaintiffs allege claims of securities fraud based on **statements** made by Defendants and material information that was *omitted **from them**.*"  Pl.'s Opp. to Defs.' Mot. to Dismiss at 47.[2]  Courts have "repeatedly rejected plaintiffs' attempts to bring their claims under the presumption of reliance set forth in [*Affiliated Ute*], by alleging omissions that were really only the converse of affirmative misrepresentations."  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 606 n.18 (D.N.J. 1996).  That is exactly what Plaintiffs are doing here.  Thus, the *Affiliated Ute* presumption is not applicable here, and class certification should be denied.

---

[2]  Emphases added throughout except where noted.

## II.   BACKGROUND

### 1.   The Alleged Misstatements

This is a putative securities fraud class action brought by alleged holders of common units of Defendant Energy Transfer L.P.  *See* ECF 79-1, Mem. of Law in Supp. of Pls.' Mot. for Class Certification ("Pls.' Br.") at 1.  Plaintiffs allege that they bought Energy Transfer units at prices inflated by various allegedly false or misleading statements relating to Energy Transfer's construction of its Mariner East 2 ("ME2") and Revolution pipeline projects during the proposed class period of February 25, 2017 through December 3, 2019 (the proposed "Class Period").  *See id.* at 2, 13.

On April 6, 2021, the Court granted Defendants' Motion to Dismiss in part, dismissing several of the misstatements alleged in the Operative Complaint.  *See* ECF 65, Order on Defs.' Mot. to Dismiss; ECF 43, Operative Class Action Complaint For Violation of the Federal Securities Laws ("Operative Complaint" or "Op. Compl.").  Following this Order, there are 26 dates throughout the proposed Class Period on which Defendants made allegedly false or misleading statements, ranging from February 24, 2017 to August 8, 2019.  The Court grouped these statements into five categories: (1) statements regarding the timeline of pipeline construction; (2) statements regarding pipeline capacity; (3) statements about safety and compliance with orders; (4) statements about the Defendants' Code of Ethics; and (5) statements regarding criminal investigations and cases.  *See* ECF 64, Mem. Op. on Defs.' Mot. to Dismiss at 1.  For instance, Plaintiffs allege that:

- "Energy Transfer touted ME2's 'initial capacity' as being 275,000 barrels of NGLs per day, with an 'upside' capacity of up to 450,000 barrels of NGLs per day," and these estimates supposedly "lacked any reasonable basis in fact," Op. Compl. ¶¶ 126-27;

- Energy Transfer professed a "commitment to the highest levels of construction expertise and [] dedication to preserving and protecting the environment" that was supposedly false or misleading in light of construction issues faced by the projects, *id.* ¶ 367; and

5

- Energy Transfer maintained a code of conduct with statements regarding the company's policy for payments to government officials that were at odds with the company's supposed "'unwritten policy' to bribe Pennsylvania State Constables to act as private security for the Pipeline Projects," *id.* ¶¶ 163-64.

### 2.    The Alleged Corrective Disclosures

Plaintiffs allege that the "truth" regarding these issues "emerged to the market . . . beginning on August 9, 2018." *Id.* ¶ 400.  The six corrective disclosure windows Plaintiffs allege are:

1. August 9-13, 2018: Plaintiffs allege that Energy Transfer stated on an August 9, 2018 earnings call that it would utilize an existing 12-inch pipeline to bring Mariner East 2 in service.  *Id.* ¶ 401.  Plaintiffs further allege that analyst reports issued the next day "provided further clarification of Energy Transfer's disclosure[.]" *Id.* ¶¶ 405-06.

2. October 27-29, 2018: Plaintiffs allege that the *Associated Press* revealed various issues related to Energy Transfer's pipeline construction by *republishing* a previously-published *Pittsburgh Post-Gazette* article.  *Id.* ¶ 410.  Plaintiffs further allege that a Pennsylvania Department of Environmental Protection Order requiring Energy Transfer to pause construction on the Revolution Pipeline revealed similar issues.  *Id.* ¶¶ 411-12.

3. December 19-21, 2018: Plaintiffs allege that the Chester County District Attorney announced that his office was launching an investigation into previously revealed issues about Energy Transfer's construction of the pipelines.  *Id.* ¶¶ 413-16.

4. August 8-12, 2019: Plaintiffs allege that, on August 8, 2019, news broke that the Chester County District Attorney had arrested and charged two Pennsylvania Constables in connection with their work as private security guards on the Mariner East pipeline project in West Whiteland Township, Pennsylvania.  *Id.* ¶¶ 418-21.

5. November 12-13, 2019: Plaintiffs allege that, near the end of the trading day on November 12, 2019, the *Associated Press* published an article regarding an FBI investigation into the approval and permitting process for Mariner East 2.  *Id.* ¶¶ 423-25.

6. December 3, 2019: Plaintiffs allege that the filing of criminal bribery and conspiracy charges against Energy Transfer's security manager for the Mariner East pipelines further revealed Energy Transfer's use of constables for security.  *Id.* ¶¶ 427-31.[3]

Energy Transfer was closely followed by the media during the proposed Class Period.  As Plaintiffs' expert, Chad Coffman, has testified, "[a] search for articles classified as related to

---

[3] Plaintiffs reiterate these dates in their briefing.  *See* Pls.' Br. at 5-8.

Energy Transfer by Factiva over the Class Period resulted in 4,054 unique articles"—more than four articles per day of the proposed Class Period.  ECF 79-9, Expert Report of Chad Coffman, CFA ("Coffman Report") ¶ 36.  Much of this coverage was devoted to the pipeline projects at issue here.  For example, a Westlaw News search reveals that, during the portion of the proposed Class Period prior to any alleged corrective disclosure (February 25, 2017 through August 8, 2018), there were 788 articles discussing either the Mariner East or Revolution projects.  The *Philadelphia Inquirer* alone published 37 such articles, and the *Pittsburgh-Post Gazette* published another 35.[4] Further, "[d]uring the Class Period, there was an abundance of analyst coverage for Energy Transfer."  ECF 79-9, Coffman Report ¶ 34.  "[T]here were at least 224 reports issued during the Class Period and 16 separate firms that had equity analysts issue reports on Energy Transfer, including major firms such as Jefferies, UBS, and Credit Suisse."  *Id.*  And according to Plaintiffs, there are "122 market makers for Energy Transfer," who "would react ***swiftly*** to company news and reported financial results by buying or selling stock and driving it to a changed price level."[5]

## III.    ARGUMENT

Class certification is improper here because individual issues will predominate.  "In securities class action cases, the crucial requirement for class certification will usually be the

---

[4] *See, e.g.,* Ex. 3, Frank Kummer, *Pa. judge temporarily halts Mariner East 2 pipeline drilling construction*, Philadelphia Inquirer (July 25, 2017); Ex. 4, Anya Litvak, P*ennsylvania shuts down construction on Sunoco gas pipeline*, Pittsburgh Post-Gazette (Jan. 3, 2018); Ex. 5, Andrew Maykuth, *How Sunoco's drilling methods may be causing Mariner East 2's problems*, Philadelphia Inquirer (Apr. 6, 2018); Ex. 6, Andrew Maykuth, *How Sunoco's Mariner East pipeline is affecting real estate prices in Pa.'s Chester and Delaware Counties*, Philadelphia Inquirer (June 1, 2018).  Exhibits noted in this brief in the form "Ex. __" are exhibits to the Declaration of James Hopper, which is filed as an attachment to this brief.

[5] Pls.' Br. at 18 (quoting *Cammer*, 711 F. Supp. at 1286-87).  "Market makers are typically large banks or financial institutions. They . . . are always ready to buy and sell as long as the investor is willing to pay a specific price. Market makers essentially act as wholesalers by buying and selling securities to satisfy the market—the prices they set reflect market supply and demand….Market makers establish quotes for the bid          and          ask          prices,          or          buy          and          sell          prices." https://www.investopedia.com/ask/answers/06/brokerandmarketmaker.asp.

predominance requirement of Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 276.  Rule 23(b)(3) requires "questions of law or fact common to class members [to] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Plaintiffs' motion for class certification founders on the reliance element of their claim.  In a Rule 10b-5 action, a plaintiff "must prove, among other things, [1] a material misrepresentation or omission by the defendant and [2] the plaintiff's reliance on that misrepresentation or omission." *Goldman (S. Ct.)*, 141 S. Ct. at 1963.  "Without [a] presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action:  Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)". *Halliburton II*, 573 U.S. at 281-82.  Two potential presumptions are available to securities fraud plaintiffs.  In *Basic*, the Supreme Court allowed plaintiffs to "invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory" where the misrepresentation affected the market price of a security in an efficient market. *Goldman*, 141 S. Ct. at 1958.  And in *Affiliated Ute*, the Supreme Court allowed a presumption of reliance in a suit that alleged only an omission claim. *Affiliated Ute*, 406 U.S. at 153-54.  Neither presumption of reliance is available to Plaintiffs here, and thus, class certification is inappropriate.

### 1. *Basic* does not apply.

Plaintiffs may not rely on the *Basic* presumption because the alleged misrepresentations had no statistically significant effect on Energy Transfer's unit price. *See Goldman (S. Ct.)*, 141 S. Ct. at 1959 (defendants can "rebut the *Basic* presumption at class certification by showing 'that an alleged misrepresentation did not actually affect the market price of the stock'").  The "fundamental premise" underlying the *Basic* presumption is "that an investor presumptively relies on a misrepresentation" that "was reflected in the market price at the time of his transaction."

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*").  Thus, if a defendant is able to "sever[] the link" between the misrepresentation and the market price by showing that "the misrepresentation in fact did not lead to a distortion of price," then "[t]he basis for finding that the fraud had been transmitted through market price would be gone," and plaintiffs would no longer be entitled to the presumption.  *Basic*, 485 U.S. at 248; *see also Goldman (S. Ct.)*, 141 S. Ct. at 1959 (ruling that if a misrepresentation "did not actually affect the market price of the stock," then *Basic*'s fundamental premise "completely collapses, rendering class certification inappropriate.").  "Price impact is thus an essential precondition for any Rule 10b-5" claims to be certified.  *Halliburton II*, 573 U.S. at 281-82.

"In assessing price impact at class certification, 'courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'"  *Goldman (S. Ct.)*, 141 S. Ct. at 1960 (emphasis in original).  Defendants successfully rebut the presumption if they show a lack of price impact by a bare preponderance of the evidence.  *Id.* at 1963.  As the Supreme Court has emphasized, this "burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise."  *Id.*[6]  There are various methods by which defendants may show a lack of price impact:

- Where a plaintiff alleges that a misstatement introduced an inflationary perception of the security to the market, a defendant can show a lack of price impact by establishing that "the alleged misrepresentation had no statistically positive, 'front-end' impact on stock."  *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020).[7]

---

[6] *See also Goldman (S. Ct.)*, 141 S. Ct. at 1963 ("In most securities-fraud class actions, as in this one, the plaintiffs and defendants submit competing expert evidence on price impact.  The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."); *id.* at 1958 ("We emphasize . . . that the burden of persuasion should rarely be outcome determinative.").

[7] *See also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (denying class certification because "there is no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant

- Where a purported misrepresentation is alleged to have caused a stock price "to remain inflated by preventing preexisting inflation from dissipating from the stock price," *Goldman (S. Ct.)*, 141 S. Ct. at 1959, "a defendant can rebut the *Basic* presumption with evidence that the alleged misrepresentation was not associated with 'negative price stock-returns,' *i.e.*, there was no statistically negative, 'back-end' impact on stock following a corrective disclosure." *Chicago Bridge & Iron*, 2020 WL 1329354, at *3.

- In either case, even where there is a statistically significant price effect, a defendant can sever the link by showing that the alleged misstatement was not the cause of the observed price movement, such as by:

  o (1) identifying "a mismatch between the contents of the misrepresentation and the corrective disclosure," *Goldman (S. Ct.)*, 141 S. Ct. at 1961;

  o (2) showing that the corrective disclosure contained previously disclosed information and thus could not, in an efficient market, have caused any change in the stock's price, *e.g., Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485-86 (2d Cir. 2018) ("*Goldman 2018*") (holding that the district court erred by failing to consider such evidence); *Halliburton II Remand*, 309 F.R.D. at 272-73 (finding no price impact despite stock price decline because any news related to the alleged misrepresentation had "already impounded in the market price of the stock" prior to the purported "corrective disclosure");[8] or

  o (3) establishing by a preponderance of evidence that something else caused the stock price movement.  *See Best Buy*, 818 F.3d at 782 (finding no relevant price impact because the only statements that impacted the stock's price on a certain day were not the alleged misstatements); *Goldman (S. Ct.)*, 141 S. Ct. at 1960 ("[A] court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." (emphasis in original)).

---

decline in the price," which rebutted *Basic*); *Electrical Workers IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (declining to certify class based on lack of front end price impact).

[8] *See also Chicago Bridge & Iron*, 2020 WL 1329354, at *6 ("an inquiry into correctiveness, like newness, is appropriate at the class certification stage"); *Best Buy*, 818 F.3d at 782 ("common sense" that "statements add[ing] nothing to what was already public" had no price impact); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (alleged corrective disclosure could not be attributed to alleged misrepresentation because disclosed information relating to the misrepresentation "was the subject of continuing media reports" before corrective disclosure date and thus did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint"); *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004) (explaining the "market reality" that "a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market"); Ex. 7, *In re Banco Bradesco S.A. Sec. Litig.*, Case No. 1:16-cv-04155-GHW (S.D.N.Y.), ECF 165-2, Expert Rebuttal Report of Chad Coffman, CFA (Dec. 14, 2018) ("Coffman *Banco Bradesco* Rebuttal Report") ¶ 19 ("[S]tatements that repeat information already disclosed to investors are not expected to impact the price of a security trading in an efficient market."); Ex. 1, Expert Report of Lucy P. Allen, Mar. 1, 2022 ("Allen Report") ¶ 21 (similar).

To determine whether a statistically significant price movement occurred, parties generally engage expert witnesses to perform an analysis known as an "event study." *Halliburton II*, 573 U.S. at 281. Event studies use a regression model to predict a security's expected return on any given day based on market and industry factors. *See* Ex. 1, Allen Report ¶¶ 23-25; ECF 79-9, Coffman Report ¶¶ 48-51. However, "[b]ecause of the inherent randomness observed in [stock] price returns," an event study will not "predict returns exactly." ECF 79-9, Coffman Report ¶ 53; *see also* Ex. 1, Allen Report ¶ 24. Thus, in order to attribute price movement to company-specific information, the expert must determine whether the difference between the actual return and the predicted return (known as the "abnormal return" or "excess return") "is more extreme than would be expected due to inherent randomness alone." ECF 79-9, Coffman Report ¶ 53; *see also* Ex. 1, Allen Report ¶ 24.

Financial economists, including each side's expert here, typically conclude that returns within 1.96 standard deviations of the predicted return—sometimes called the "95% confidence interval"—are within the range expected due to inherent randomness alone.[9] Abnormal returns that fall outside this range are deemed "statistically significant," while abnormal returns within the range are attributed to random variation. ECF 79-9, Coffman Report ¶ 56; *see also* Ex. 1, Allen Report ¶ 24. Thus, if a security's price movement on a given date is not statistically significant, it "is indistinguishable from random price fluctuations, [and] cannot be attributed to company-specific information announced on the event date" for purposes of a price impact analysis.[10]

---

[9] *See* ECF 79-9, Coffman Report ¶ 55; *see also* Ex. 1, Allen Report ¶ 24; Ex. 8, Coffman Dep. at 70:23-71:18 ("[T]he most often used approach is to look at 95 percent significance."). Plaintiffs' expert also suggests that assessing whether abnormal returns fell outside of 1.645 standard deviations of the predicted return—sometimes called the "90% confidence interval"—may also be "a relevant boundary for significance as well." ECF 79-9, Coffman Report ¶ 55 n.59. While the 95% interval is more appropriate here, this is a moot point: there are no dates on which a corrective disclosure first reached the market in which there is statistical significance at the 90% but not the 95% interval.

[10] *Goldman 2018*, 879 F.3d at 481 n.5; *see also Halliburton II Remand*, 309 F.R.D. at 262 (absence of price

To evaluate whether any of the purported misstatements alleged in the Operative Complaint made a price impact under these standards, Defendants retained Dr. Lucy P. Allen to statistically and economically analyze the purported misstatements and corrective disclosures. As explained below, Dr. Allen's analysis shows a lack of price impact as to each of the alleged misstatements and corrective disclosures alleged in the Operative Complaint. Accordingly, Defendants have rebutted the *Basic* presumption as to each alleged misstatement.

> (a)   **There was no price impact associated with any of the alleged corrective disclosures.**

Because the alleged corrective disclosures did not cause a statistically significant price decline, the *Basic* presumption does not apply. The crux of Plaintiffs' case is a "price maintenance" securities fraud claim—that is, Plaintiffs allege that Defendants' made misrepresentations that maintained inflation in Energy Transfer's unit price until a series of corrective disclosures caused the price to drop.[11] Defendants thus focus first on whether there is price impact associated with any of the alleged corrective disclosures that can be attributed to any of the alleged misstatements. *Halliburton II Remand*, 309 F.R.D. at 262. As shown below, there is not, rebutting the *Basic* presumption as to each corrective disclosure.

> (1)   **August 9-13, 2018**

The first alleged corrective disclosure occurred on August 9, 2018. *See* Pls.' Br. at 5. Plaintiffs allege that, that morning, "Energy Transfer disclosed that it would only be able to meet

---

impact found where abnormal return was not statistically significant); *In re Intuitive Surgical Secs. Litig.*, 2016 WL 7425926, at *15-16 (N.D. Cal. Dec. 22, 2016) (same); *Moody's*, 274 F.R.D. at 493 (same); *see also* Ex. 1, Allen Report ¶ 24.

[11] This is the typical style of securities fraud claim. *See Goldman (S. Ct.)*, 141 S. Ct. at 1961 ("Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation."); *see also, infra,* n.24 and associated text.

its prior projections of having ME2 in-service by the end of September 2018 if it routed the NGLs through an already-constructed 12-inch diameter pipeline in areas where the authorities had halted construction, rather than waiting to complete construction of the new 20-inch diameter line." *Id.*

Neither Defendants' expert (Dr. Allen) nor Plaintiffs' expert (Mr. Coffman) found a statistically significant price movement in Energy Transfer's unit price on August 9, 2018. *See* Ex. 1, Allen Report ¶ 56; Ex. 2, Results of Coffman Event Study ("Coffman Model") at 6. This is sufficient to rebut the *Basic* presumption as to this corrective disclosure date. *See Halliburton II Remand*, 309 F.R.D. at 262 (holding that the *Basic* presumption was rebutted where price reactions were not statistically significant); *Intuitive Surgical*, 2016 WL 7425926, at *15-16 (*Basic* presumption rebutted for two corrective disclosure dates because neither expert "found a statistically significant price impact at the 95% confidence level"); *Moody's*, 274 F.R.D. at 493 (similar); *see also* Ex. 1, Allen Report ¶ 56.[12]

The second alleged corrective disclosure occurred on the following day. *See* Op. Compl. ¶¶ 405-06. Specifically, on August 10, 2018, prior to the start of trading hours, analysts from Wolfe Research, LLC and Wells Fargo Securities, LLC published research reports. *See id.*; Ex. 1, Allen Report ¶ 58.[13] Plaintiffs allege that these reports revealed that the use of the smaller pipeline would reduce the capacity of Mariner East 2. *See* Op. Compl. ¶¶ 405-06. Again, however, neither

---

[12] In addition, the alleged corrective disclosure—that Energy Transfer would use the 12-inch pipeline for portions of Mariner East—had previously been disclosed (on July 3, 2018) to no price reaction. *See* Ex. 1, Allen Report ¶ 57. This lack of "newness" provides an additional, and independent, reason for finding a lack of price impact. *Id.*; *see also Halliburton II Remand*, 309 F.R.D. at 272-73 ("[Defendant] has met its burden of showing a lack of price impact, if only because the [plaintiff] has not shown that [defendant] disclosed any information . . . that was not already impounded in the market price of the stock [before the disclosure], and therefore, there can be no price reaction.").

[13] *See* Ex. 9, *Energy Transfer Equity: Monkey see, monkey dough*, Wolfe Research (Aug. 10, 2018) at 1 (reporting that its analysis was "consistent with" its prior models for Mariner East 2 (before the allegedly new information was revealed) and that its overall "[i]investment thesis [remained] solidly on track"); Ex. 10, *ETE/ETP: Q2 Beat – Remain Positive*, Wells Fargo Securities (Aug. 10, 2018) ("By and large, our pro forma ETE estimates do not materially change post the release of Q2 earnings.").

Dr. Allen nor Mr. Coffman found a statistically significant price movement in Energy Transfer's unit price on August 10, 2018.  *See* Ex. 1, Allen Report ¶ 59; Ex. 2, Coffman Model at 6.  This rebuts the *Basic* presumption as to this corrective disclosure date.  Ex. 1, Allen Report ¶ 59.

Finally, Plaintiffs also mention the price movement in Energy Transfer units on the following trading day, Monday, August 13, 2018.  *See* Op. Compl. ¶ 408.  But Plaintiffs do not allege that any corrective information was disclosed after the publication of the analyst reports on the morning of Friday, August 10, 2018, and before the close of trading on August 13, 2018.  *See id.*  As a result, August 13, 2018, is not a "corrective disclosure" date, and any price movement on that date is irrelevant to the question of price impact.  *See Halliburton II Remand*, 309 F.R.D. at 269; Ex. 1, Allen Report ¶¶ 62-63.

This is because, "[a]n efficient market"—which Plaintiffs must establish applies to the market for Energy Transfer units in order to invoke the *Basic* presumption in the first place—"is said to digest or impound news into the stock price in a matter of minutes." *Halliburton II Remand*, 309 F.R.D. at 269; *see also* Ex. 1, Allen Report ¶¶ 22, 62-63.[14]  "[T]herefore, an alleged corrective disclosure released to the market at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged corrective disclosure." *Halliburton II Remand*, 309 F.R.D. at 269; *see also* Ex. 1, Allen Report ¶ 22.  Indeed, throughout its motion for class certification, Plaintiffs and Mr. Coffman repeatedly focus on Energy Transfer price impacts that occurred on the day of the relevant disclosure.  For instance, Mr. Coffman analyzed Energy Transfer price movements on *the day in which Energy*

---

[14] *See also, e.g.*, Stephen A. Ross, Randolph Westerfield, and Jeffrey F. Jaffe, Corporate Finance (McGraw-Hill/Irwin: Boston, MA, 6th ed., 2002) at 342 ("The efficient-market hypothesis predicts that the price…on Wednesday afternoon will already reflect the information contained in [a] Wednesday morning press release.").

*Transfer announced its quarterly earnings*—not the day *after* such announcements.  Pls.' Br. at

21; Ex. 8, Coffman Dep. at 74:13-17 ("Q. Okay.  So in analyzing the Energy Transfer's price

reaction to earnings announcements, you used a one day event window, correct?  A. That's correct,

yes.").[15]

Similarly, in a prior case, Mr. Coffman analyzed an article *Bloomberg* released prior to the

opening of trading on March 5, 2013.  *See* Ex. 11, *In re Intuitive Surgical Sec. Litig.*, No. 5:13-

CV-01920-EJD (N.D. Cal.), Expert Rebuttal Report of Chad Coffman, CFA (Nov. 16, 2015) ¶¶

55-56.  Mr. Coffman stated that "the unequivocally appropriate day to evaluate" price impact was

"March 5, 2013"—and *not* the following trading day, as the opposing expert had suggested.[16]  Mr.

Coffman has confirmed this principle here, through his testimony.  *See* Ex. 8, Coffman Dep. at

95:11-21 ("I think if you're going to look beyond one day, you would certainly want to provide

some justification for doing that, yes."); *id.* at 81:2-16 (for widely available material information,

"I would expect an initial price reaction to begin on that first day, yes").

Accordingly, August 13, 2018, was not a "corrective disclosure" date.  Ex. 1, Allen Report

¶¶ 62-63.  The *Basic* presumption is thus rebutted as to that date.  *See Halliburton II Remand*, 309

F.R.D. at 269 (disconnection from the first trading day on which a purported corrective disclosure

reached the market "negates the Fund's allegation of price impact").

---

[15] Courts have looked to price movements over two-day windows only when a "compelling explanation" exists to do so.  *Halliburton II Remand*, 309 F.R.D. at 270; *see also Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 486 (E.D. Pa. 2021) (employing two-day window where "second day provided new information as context" to the information disclosed on the first day).

[16] *Id.*  Mr. Coffman has provided similar testimony in other prior cases as well.  *See* Ex. 12, *Cosby et al. v. KPMG et al.*, No. 3:16-cv-00121 (E.D. Tenn.), Deposition of Chad Coffman (April 12, 2019) (ECF 189-3) at 63:6-64:2 ("[P]utting aside those, you know, sort of very unique examples [such as where news is solely released in a foreign language], generally in an efficient market, you expect to see a reaction on the first day [that news is available]."); *id.* at 62:11-63:5 ("[G]enerally speaking, when I've seen multiple-day windows applied, there is at least evidence of some reaction on the first day, yes.").

**(2)**     **October 27-29, 2018**

Next, Plaintiffs assert that two alleged corrective disclosures caused a statistically significant price drop on October 29, 2018, but this assertion is without merit.

First, Plaintiffs allege that "on Saturday, October 27, 2018, the *Associated Press* reprinted an exposé from the *Pittsburgh Post-Gazette* detailing Energy Transfer's failure to disclose the risks Pennsylvania's geology posed to the Pipeline Projects" and "highlight[ing] how Energy Transfer's rush to construct pipelines resulted in numerous tragedies and setbacks for Pennsylvania residents." Pls.' Br. at 6 n.3. As Plaintiffs' allegation itself notes, however, this was merely a re-publication of an article that was previously published by the *Pittsburgh Post-Gazette* on October 21, 2018. *See* Ex. 13, Anya Litvak, *Unstable ground,* Pittsburgh Post-Gazette (Oct. 21, 2018).[17]

Moreover, the October 27, 2018 publication was not even the *Associated Press*'s first republication of this article. To the contrary, on October 23, 2018, at 12:11 p.m. the *Associated Press* disseminated the exact same article. *See* Ex. 14, Anya Litvak, *Pipeline ruptures bring new scrutiny to Pennsylvania geology*, Associated Press (Oct. 23, 2018).[18] And, as each side's expert agrees, "statements that repeat information already disclosed to investors are not expected to

---

[17] Plaintiffs do not allege that the original publication of the article in the Pittsburgh Post-Gazette on October 21, 2018, was a corrective disclosure date and never mention this original publication of the article in their class certification brief. *See* Op. Compl. ¶ 432. The Court thus need not decide whether price impact was associated with the publication of the October 21 article. Even if it did, however, no price impact could be attributed to the publication of the October 21 article because, among other reasons, the October 21 article did not contain any "new news" that was corrective of an alleged misstatement. *See* Ex. 1, Allen Report ¶¶ 47-54 (summarizing 13 prior articles with similar news); *id.* at ¶ 81 n.126. Indeed, none of the many analysts covering Energy Transfer ever mentioned the October 21 article. *Id.* ¶ 81, n.131. And even the October 21 article—let alone the October 28 article—was published a month after the Revolution pipeline explosion itself, which (according to Plaintiffs) revealed "the real threat the Pipeline Projects posed to Pennsylvania citizens after Energy Transfer had failed to act in compliance with state environmental, safety and criminal laws…." Op. Compl. ¶ 218. Energy Transfer's unit price did not decline in a statistically significant manner on *any* of the days following the publication of the 13 articles Dr. Allen identified or in the wake of the Revolution pipeline explosion. *See* Ex. 1, Allen Report ¶¶ 47-54.

[18] Both experts agree that there was no statistically significant movement in Energy Transfer's trading price on October 23. *See* Ex. 1, Allen Report ¶ 81; Ex. 2, Coffman Model at 7.

impact the price of a security trading in an efficient market."  Ex. 1, Allen Report ¶ 81 (quoting Ex. 7, Coffman *Banco Bradesco* Rebuttal Report ¶ 19).  Accordingly, there can be no price impact attributed to the additional re-publication of this same article on October 27, 2018.  *See Halliburton II Remand*, 309 F.R.D. at 272-73 (defendants met their burden of showing a lack of price impact where plaintiffs could not show any new information contained in the corrective disclosure "and therefore, there can be no price reaction"); Ex. 1, Allen Report ¶ 81.  The *Basic* presumption has thus been rebutted as to this alleged corrective disclosure.

Second, Plaintiffs allege that "on Monday, October 29, 2018, . . . the Pennsylvania DEP issued an Order and letter requiring ETC Northeast Pipeline to immediately cease construction of Energy Transfer's Revolution pipeline."  Op. Compl. ¶ 411.  However, this Order and letter did not become publicly available information until October 30, 2018.  As Plaintiffs acknowledge, "on October 30, 2018, the DEP issued a press release" announcing the Order and letter.  Op. Compl. ¶ 257; Ex. 15, Certified Copy of DEP Press Release.

The DEP's email disseminating this press release was sent on October 30, 2018, at 12:59 p.m.  *See* Ex. 16, DEP Correspondence Regarding Dissemination of Press Release.  Nevertheless, Plaintiffs in their Opposition to Defendants' Motion to Dismiss pointed to a Westlaw News version of the press release that bears a date of "October 29, 2018" in its heading.  *See* ECF 49-8.  However, Westlaw did not publish this article until October 30, 2018.[19]

---

[19] This can be confirmed by using the "AD" (also known as "ADDEDDATE") search function on Westlaw. This function allows users to search for documents by the date they were first made available on (i.e., "added" to) Westlaw. *Compare* Ex. 17 (results of Westlaw news search for: adv: AD(10/30/2018) & "DEP ISSUES COMPLIANCE ORDER #TO ETC", including the document in question, indicating it was added to Westlaw on Oct. 30, 2018), *with* Ex. 18 (results of Westlaw news search for: adv: AD(10/29/2018) & "DEP ISSUES COMPLIANCE ORDER #TO ETC", *not* including the document in question, indicating this document was *not* added to Westlaw on Oct. 29, 2018); Ex. 19, "Westlaw User Guide" at 37 (explaining that the "AD" search function allows users to search documents "By Date Added to Westlaw").

To further confirm whether this information reached the market prior to October 30, 2018, Defendants submitted a Pennsylvania Right-to-Know request seeking "any and all records regarding any release, dissemination, publication, or other external communication of the Press Release, including but not limited any communication of the Press Release to State News Service, prior to October 30, 2018." *See* Ex. 20, Pennsylvania Right-To-Know-Request.  In response, the DEP stated that "[t]he DEP office covered by this final response possesses no records responsive to your request . . . ." *See* Ex. 21, Response to Pennsylvania Right-to-Know Request.

It is thus clear, by more than a preponderance of the evidence, that the proper corrective disclosure date for this press release is October 30, 2018—not October 29, 2018.  And it is undisputed that there was no statistically significant movement in Energy Transfer's trading price on October 30, 2018.  *See* Ex. 1, Allen Report ¶ 80; Ex. 2, Coffman Model at 7.  Thus, there is no price impact attributable to this alleged corrective disclosure, and, the *Basic* presumption has been rebutted.  *See* Ex. 1, Allen Report ¶¶ 80, 82-83.

### (3)    December 19-21, 2018

Plaintiffs' next alleged corrective disclosure is that on December 19, 2018, the District Attorney for Chester County, Pennsylvania announced that his office would launch an investigation into Energy Transfer. Op. Compl. ¶ 413.  News outlets disseminated the story to the public beginning in the morning hours of December 19, 2018.  *See* Ex. 22, Deanna Durante (@deannadurante), Twitter (Dec. 19, 2018) (Dec. 19, 2018, 11:36 AM EST) (tweet from NBCPhiladelphia Reporter including picture of the Chester County DA's Press Release).  It is undisputed, however, that Energy Transfer units did not trade down in a statistically significant manner on December 19, 2018; in fact, they traded up.  *See* Ex. 1, Allen Report ¶ 65; Ex. 2, Coffman Model at 7.  Throughout the day, additional news outlets picked up the story, including the *Associated Press*.  *See* Ex. 23, Marc Levy, *Prosecutor opens investigation on Mariner East*

*pipeline work*, Associated Press (Dec. 19, 2018).   And, again, on December 20, 2018, it is

undisputed that Energy Transfer units did not trade down in a statistically significant manner, but

traded up.  *See* Ex. 1, Allen Report ¶¶ 68-69; Ex. 2, Coffman Model at 7.

In a flawed effort to make December 21, 2018 relevant to this analysis, the Operative

Complaint points to another version of the same story published by *Reuters* at 3:39 p.m. on

December 20, 2018.  Op. Compl. ¶ 415.  But, as discussed, the news had already broken and been

widely disseminated long before.   The *Reuters* version of this same story is thus irrelevant for

purposes of price impact.  *See Halliburton II Remand*, 309 F.R.D. at 272-73; Ex. 1, Allen Report

¶ 69.  The proper date to analyze price impact as to this alleged corrective disclosure is December

19, 2018.  Ex. 1, Allen Report ¶ 69.  Because there was no price impact on this date, the *Basic*

presumption has been rebutted as to this corrective disclosure.  *Id.*

### (4)   August 8-12, 2019

Plaintiffs' next corrective disclosure allegation is that on "August 8, 2019," the Chester

County District Attorney "arrested and charged two Pennsylvania Constables . . . in connection

with their work as private security guards in connection with the construction of the Mariner East

pipeline project."  Op. Compl. ¶ 418.  While Plaintiffs allege that this occurred "[a]fter the close

of markets" on August 8th, news outlets actually reported it in the early afternoon trading hours of

August 8th.  *See* Ex. 24, Justin Heinze, *State Constables Charged With Oppression at Mariner*

*East Pipeline*, Patch (Aug. 8, 2019) ("Posted Thu, Aug 8, 2019 at 1:12 pm ET"); Ex. 1, Allen

Report ¶ 71.  There was no corresponding negative price impact.  *See* Ex. 1, Allen Report ¶ 71.  In

fact, Energy Transfer units traded up (both during the day as a whole and during the portion of the

day after the news was released) on August 8, 2019.  *See id.*  Moreover, even if this disclosure had

been made after the markets closed on August 8, 2019, each side's expert agrees that Energy

Transfer's unit price movement the following day—August 9, 2019—was not statistically significant.  *See* Ex. 1, Allen Report ¶ 73; Ex. 2, Coffman Model at 9.

Plaintiffs are thus left to point to Energy Transfer's unit price movement on the following Monday—August 12, 2019.  Op. Compl. ¶ 421.  But, in an efficient market, a price change on August 12 cannot be attributed to an August 8 disclosure.  *Halliburton II Remand*, 309 F.R.D. at 269; *see also* Ex. 1, Allen Report ¶ 74 ("[A]ny attempt to attribute the movement in Energy Transfer's stock price on August 12 to the investigation would contradict Plaintiffs' and Mr. Coffman's claim that Energy Transfer's stock traded in an efficient market.").  Therefore, Defendants have rebutted the *Basic* presumption as to this corrective disclosure.

### (5)    November 12-13, 2019

Next, Plaintiffs allege that on November 12, 2019, news outlets reported that the "FBI ha[d] begun a corruption investigation" focused on "whether [Pennsylvania Governor Tom] Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return[.]"  Op. Compl. ¶ 423.  This news allegedly corrected a statement made by an Energy Transfer representative that "[f]rom the outset, Sunoco has maintained that the permits were properly and lawfully issued by [the DEP]," Op. Compl. ¶¶ 373, 391, and a statement that Energy Transfer had, or was "in the process of obtaining, all required . . . permits . . . which relate to ownership of our properties or the operations of our business."  Op. Compl. ¶ 389.  Both of these statements, however, have been excluded from the case by the Court's Order on Defendants' Motion to Dismiss.  *See* ECF 65, Order on Mot. to Dismiss (dismissing the statements contained in each of paragraphs 373, 389, and 391); ECF 64, Mem. Op. on Mot. to Dismiss at 31, 41.

For price movement following a corrective disclosure to be relevant to the price impact analysis, "[t]he case law is clear that [the] corrective disclosure needs to be corrective and 'linked'

20

to a specific alleged misrepresentation." *Chicago Bridge & Iron*, 2020 WL 1329354, at \*6.  Indeed, if this were not the case, Plaintiffs could show price impact by pointing to *any* statistically significant decrease in the security's trading price—even if it had no connection whatsoever with the statements at issue in the case.  This is plainly not the law.[20]   Thus, "Defendants have successfully rebutted the presumption" of reliance as to a corrective disclosure if it "corrected" alleged misrepresentations that have been dismissed.  *Intuitive Surgical*, 2016 WL 7425926, at \*16 (no price impact where purported corrective disclosure related to challenged statements dismissed from the case by court's ruling on motions to dismiss).  Here, this is the case as to the November 12, 2019, corrective disclosure.  Accordingly, the price movement seen in Energy Transfer common units on November 12 and 13, 2019, is irrelevant to an assessment of price impact.  The *Basic* presumption has been rebutted as to this alleged corrective disclosure.

Moreover, the only new information disclosed on November 12, 2019, was the report that the FBI had begun an investigation into the government's process for approving the Mariner East permits.  The underlying contentions regarding this approval process were not new.  *See* Ex. 1, Allen Report ¶ 87.  For example, on March 10, 2017, the press reported that the Pennsylvania Department of Environmental Protection "approved Mariner East 2 permits despite deficiencies" and detailed the basis for this contention.  *See* Ex. 25, *DEP approved Mariner East 2 permits despite deficiencies, documents show*, StateImpact Pennsylvania (Mar. 10, 2017).  Among other things, the article notes that a "former DEP official" said that "the permits were issued because of pressure from Gov. Tom Wolf's office to approve the documents in time to allow Sunoco to meet

---

[20] To the contrary, since the *Goldman (S. Ct.)* opinion the requirement for a "link" between alleged misstatement and corrective disclosure has only become more stringent.  *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at \*14 (S.D.N.Y. Dec. 8, 2021) ("*Goldman Remand*") ("Plaintiffs plainly err in suggesting this Court need not delve beyond its prior 'link' analysis" following the Supreme Court opinion).

its construction schedule which would start operation of the natural gas liquids pipeline by the third quarter of this year" and that "some DEP staffers were threatened with dismissal from their jobs if they did not approve the permits." *Id.* Another article, published January 26, 2018, details additional allegations purporting to support the contention that Governor "Wolf injected political pressure into a decision that should be based solely on environmental standards" and that "those standards and regulations were subverted to help Sunoco make its projected timeline on the project." *See* Ex. 26, Susan Phillips and Jon Hurdle, *Mariner East 2: Texts raise questions about Wolf administration role in permitting process*, StateImpact Pennsylvania (Jan. 26, 2018). And a third article, published on April 8, 2019, explains how "[e]mails, text messages and regulatory records show that the secretary of Pennsylvania's department of environmental protection (DEP), Patrick McDonnell, directed staff to cut short their environmental review even as numerous shortcomings remained in the project's permit application" and that these documents "raise questions about the role of Pennsylvania governor Tom Wolf in permitting [Mariner East 2]." *See* Ex. 27, Will Parrish, *Pennsylvania governor under scrutiny for role in approving pipeline*, The Guardian (Apr. 8, 2019).

In short, the November 12, 2019 article revealed only that the FBI was purportedly investigating contentions that were already public. Since no statement at issue—let alone any *remaining* statement at issue—concerns the narrow issue of whether the FBI was investigating this issue, the November 12, 2019 article did not reveal any corrective "new news." Price movement on this date, or the following date, thus cannot be attributed to any alleged misstatement, making it irrelevant for purposes of a price impact analysis. *See Halliburton II Remand*, 309 F.R.D. at 272-73; Ex. 1, Allen Report ¶¶ 84-88. The *Basic* presumption has, accordingly, been rebutted as to this alleged corrective disclosure. *Id.*

### (6)    December 3, 2019

Finally, Plaintiffs allege that "[o]n December 3, 2019, Chester County DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for the Mariner East pipeline."  Op. Compl. ¶ 427.  It is undisputed that Energy Transfer's common units did not move in a statistically significant manner on December 3, 2019.  *See* Ex. 1, Allen Report ¶ 76. This is sufficient to rebut the *Basic* presumption as to this corrective disclosure date.  *See Halliburton II Remand*, 309 F.R.D. at 262; *Intuitive Surgical*, 2016 WL 7425926, at *15-16; *Moody's*, 274 F.R.D. at 493.

Nor is this lack of price impact surprising.  The only news disclosed on December 3, 2019, was that charges were filed.  Op. Compl. ¶ 427.  The underlying conduct was not new to the market. Chester County DA Hogan had already charged two Pennsylvania Constables in connection with the same conduct.  Op. Compl. ¶ 418.  The mere bringing of charges based on already-public conduct would not be expected to cause a price impact in an efficient market.  *See* Ex. 1, Allen Report ¶ 77.[21]

### (b)    The market's reaction at the time of the alleged misstatements also confirms that there was no price impact.

To the extent that the price impact on the date of the alleged misrepresentations is relevant to Plaintiffs' securities fraud claim, the *Basic* presumption is rebutted due to the lack of price impact on these dates.  Where, as here, "Plaintiffs' claims fall within the inflation-maintenance, rather than the inflation-introduction, strain of Rule 10(b) claims, any price impact must be measured via stock price decreases occurring after the alleged misstatements were revealed to be

---

[21] Moreover, the charges that were brought against Energy Transfer's employee were subsequently dismissed.  *See* ECF 44-5, Susan Phillips, *Charges Dismissed in Alleged Mariner East Buy-a-Badge Scheme*, StateImpact Pennsylvania (July 2, 2020); *see also* ECF 44-6, Docket for *Pennsylvania v. Recknagel*, MJ-15403-CR-0000445-2019 (indicating that all counts were dismissed and the case is closed).

false." *Goldman Remand*, 2021 WL 5826285, at *5.[22]  This is because such misstatements only maintain exiting inflation in the price of a security, rather than causing a statistically significant increase in price.[23]  Here, as in most securities fraud cases in the wake of *Halliburton II*, Plaintiffs appear to be proceeding on the theory of inflation maintenance.[24]  ECF 79-9, Coffman Report ¶¶ 13, 84.  Thus, the Court need only consider "back-end" price impact (*i.e.*, the price impact at the time of the alleged corrective disclosures), and need not consider "front-end" price impact (*i.e.*, the price impact at the time of the alleged misstatements) in its analysis.  *Goldman Remand*, 2021 WL 5826285, at *5.

But if the Court does engage in a "front-end" analysis, it only confirms the lack of price impact.  For starters, the parties agree that, following 24 of the 26 alleged misstatements, there was no statistically significant increase in Energy Transfer's unit price:[25]

---

[22] *See also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect.").

[23] *See Aeterna Zentaris Inc.*, 324 F.R.D 331, 345 (D.N.J. 2018*), aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51, 53 (3d Cir. 2019) (defendants failed to negate price impact by focusing only on lack of statistically significant "front-end" movement, while ignoring "back-end" effect); *W. Palm Beach Pol. Pens. Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016) (same); *City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015) (same).

[24] Certain Courts of Appeals have approved of the inflation-maintenance theory, while others have rejected it.  *Compare FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011), *with Best Buy*, 818 F.3d at 782-83.  The viability of the theory remains an open question in the Third Circuit, and the Supreme Court explicitly declined to approve or reject the theory in *Goldman (S. Ct.)*.  *Goldman (S. Ct.)*, 141 S. Ct. at 1959, n.1 ("Although some Courts of Appeals have approved the inflation-maintenance theory, this Court has expressed no view on its validity or its contours.  We need not and do not do so in this case.").  If this Court determines that the inflation-maintenance theory is not viable, it need not consider price impact at the time of the alleged corrective disclosures, and it should hold that no price impact exists solely on the basis that there was no price impact at the time of the alleged misstatements.

[25] *See* Ex. 1, Allen Report ¶¶ 27-28.

## Price Reactions Following the Alleged Misrepresentations

| | Event Date | Reaction Date | Event | Coffman Event Study | | Allen Event Study | |
|---|---|---|---|---|---|---|---|
| | | | | Excess Return | Stat. Sig. Increase?[1] | Excess Return | Stat. Sig. Increase?[1] |
| 1. | 2/24/17 | 2/27/17 | 2016 10-K | -0.19% | No | -0.19% | No |
| 2. | 5/31/17 | 5/31/17 | 2017 MLPA Investor Conference | -0.31% | No | -0.52% | No |
| 3. | 8/9/17 | 8/9/17 | 2Q17 Conference Call | 5.64% | Yes | 5.69% | Yes |
| 4. | 11/8/17 | 11/8/17 | 3Q17 Conference Call | -4.20% | No | -4.27% | No |
| 5. | 11/15/17 | 11/15/17 | RBC Capital Markets Conference | 0.17% | No | -0.20% | No |
| 6. | 11/29/17 | 11/29/17 | Jefferies Energy Conference | -2.22% | No | -1.24% | No |
| 7. | 12/6/17 | 12/6/17 | Wells Fargo Pipeline Symposium | -0.46% | No | 0.13% | No |
| 8. | 1/3/18 | 1/3/18 | *Philadelphia Inquirer* Article | -1.06% | No | -1.98% | No |
| 9. | 1/9/18 | 1/9/18 | UBS Midstream and MLP Conference | 0.40% | No | -0.01% | No |
| 10. | 2/8/18 | 2/8/18 | *StateImpact Pennsylvania* article | -0.57% | No | -0.28% | No |
| 11. | 2/22/18 | 2/22/18 | 4Q17 and FY17 Conference Call | 1.91% | No | 2.40% | No |
| 12. | 2/23/18 | 2/23/18 | 2017 10-K | -1.89% | No | -1.38% | No |
| 13. | 2/28/18 | 2/28/18 | Morgan Stanley Energy Conference | -0.93% | No | -0.30% | No |
| 14. | 3/22/18 | 3/22/18 | ET Spokesperson Statement | 0.61% | No | 0.22% | No |
| 15. | 4/9/18 | 4/9/18 | Mizuho Energy Summit | 0.24% | No | 0.38% | No |
| 16. | 5/10/18 | 5/10/18 | 1Q18 Conference Call | -3.26% | No | -2.68% | No |
| 17. | 5/24/18 | 5/24/18 | Energy Infrastructure Conference | -1.34% | No | -1.23% | No |
| 18. | 6/1/18 | 6/1/18 | ET Report to DEP | 0.51% | No | 0.14% | No |
| 19. | 6/19/18 | 6/19/18 | JP Morgan Energy Conference | 0.23% | No | 0.35% | No |
| 20. | 8/9/18 | 8/9/18 | 2Q18 Conference Call | -0.54% | No | -0.78% | No |
| 21. | 9/25/18 | 9/26/18 | *StateImpact Pennsylvania* Article | -1.41% | No | -1.24% | No |
| 22. | 10/21/18 | 10/22/18 | *Pittsburgh Post-Gazette* Article | -3.02% | No | -2.81% | No |
| 23. | 11/1/18 | 11/1/18 | *Observer-Reporter* Article | 0.84% | No | 0.46% | No |
| 24. | 12/19/18 | 12/19/18 | ET Press Release | 1.85% | No | 1.30% | No |
| 25. | 1/22/19 | 1/22/19 | *NBC Philadelphia* Article | -0.83% | No | -1.00% | No |
| 26. | 8/8/19 | 8/8/19 | *PhillyMag* Article | 2.92% | Yes | 3.31% | Yes |

**Notes and Sources:**

Events from Operative Complaint. Data from Factset Research Systems, Inc. and "ET_COFFMAN_0000014.XLSX."

[1] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price increase is statistically significant at the 5% level.

To the extent Plaintiffs are proceeding on an inflation-introduction theory as to any of the 24 statements not associated with a statistically significant price increase, the *Basic* presumption has been rebutted as to these statements. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017) (finding no price impact because of the lack of a statistically significant front-end price movement); *Best Buy*, 818 F.3d at 782-83.

And, as explained below, in the two instances where Energy Transfer's unit price did increase significantly on the same day that an alleged misstatement reached the market, the increases cannot be attributed to the alleged misstatements.

### (1)   August 9, 2017

Plaintiffs claim that, during an August 9, 2017 earnings call, Defendants falsely stated that the pipeline projects would be completed in the fourth quarter of 2017.  *See* Op. Compl. ¶ 343. While there was a statistically significant increase in Energy Transfer's unit price on August 9, 2017, the price increase is not attributable to the alleged misstatements.  With respect to the Revolution Pipeline, Energy Transfer did not provide new information to the market on August 9. *See* Ex. 1, Allen Report ¶¶ 33-40.  Indeed, Energy Transfer had provided the same timeline three months earlier, disclosing on May 4, 2017 that the Revolution Pipeline was "still on schedule to be in service in the fourth quarter of 2017."  Op. Compl. ¶ 334.[26]

With respect to Mariner East 2, Energy Transfer did not provide any positive information that could be linked to the increase in its unit price.  Rather, on August 9, 2017, Energy Transfer announced a *delay* in Mariner East 2's completion schedule, stating that it would be online "sometime in the fourth quarter" of 2017 (Op. Compl. ¶ 343) when, in prior public statements, Energy Transfer had stated that it "continue[d] to target an end of the third quarter completion" for Mariner East 2.  *See* Ex. 28, Energy Transfer 1Q17 earnings conference call (May 4, 2017).[27]  In an efficient market, the disclosure of a more *negative* outlook cannot cause an *increase* in the price of the security.  *See* Ex. 1, Allen Report ¶ 39.

---

[26] *See also id.* at ¶¶ 336, 338 (Energy Transfer reiterated this timeline during May 31, 2017 and June 27, 2017 investor conferences).

[27] *See also* Op. Compl. ¶¶ 336, 338 (Energy Transfer reiterated this timeline during May 31, 2017 and June 27, 2017 investor conferences).

The price increase on this date is, instead, attributable to Energy Transfer announcing better-than-expected earnings (via statements that are not alleged to have been false or misleading). *See* Ex. 1, Allen Report ¶ 34.  Analysts also cheered Energy Transfer management's announcement that it would not pursue major acquisitions in the short term.  *See* Ex. 1, Allen Report ¶¶ 34-36.  In fact, given "M&A being synonymous with Energy Transfer," Credit Suisse called the M&A announcement the "biggest takeaway" and approved of the "remov[al] of the risk associated with large transactions" given the company's cost of capital.  *See id.* ¶ 35.  Moreover, analysts covering Energy Transfer did not attribute the August 9, 2017 price increase to the stale or more pessimistic information that the alleged misstatements conveyed.  *See id.* ¶ 34.

### (2) **August 8, 2019**

Plaintiffs also identify August 8, 2019, when Energy Transfer units traded up on the same day that Energy Transfer issued an allegedly "misleading denial of any wrongdoing or connection to the constables" in an article published by *PhillyMag.com*, at 2:01 p.m.  Op. Compl. ¶ 398; *see also* Ex. 29, Claire Sasko, *Chesco DA Announces Criminal Charges Against Mariner East Security Workers*, Philadelphia Magazine (Aug. 8, 2019).  Again, however, these alleged misstatements would have been consistent with the market's pre-existing expectations, and thus cannot be the cause of any front-end price impact.  *See Moody's*, 274 F.R.D. at 492 (quoting Coffman's testimony that an analysis of front-end price impact "would only make sense if the misstatements and/or omissions would be expected to surprise the market").  Analyst reports issued after the alleged misleading statement did not mention this statement and, instead, attributed the price increase to Energy Transfer's earnings announcement.  Ex. 1, Allen Report ¶¶ 42-44.

Further, a review of the timing of the alleged misstatement and the rise in Energy Transfer's unit price on August 8, 2019 confirms that the misstatement did not cause the price increase.  *See*

Ex. 1, Allen Report ¶¶ 42-46.  As Energy Transfer's price chart reflects, the price increase occurred *before* the alleged misrepresentation:



On August 7, 2019, Energy Transfer's unit price closed at $13.33.  *See id.* ¶ 45.  Shortly after the close on August 7, Energy Transfer announced results for the second quarter of 2019 which significantly exceeded street estimates.  *See id.*  Bolstered by this good news, Energy Transfer units opened trading on August 8 at $13.83.  By 11:00 a.m., Energy Transfer units had traded up to $14.01, and they stayed essentially flat the rest of the day—closing at $14.03.  *See id.*  Thus, the *PhillyMag.com* article published at 2:01 p.m. did not cause the statistically significant increase in Energy Transfer's unit price on August 8, 2019.  *See Best Buy*, 818 F.3d at 779 (finding no price impact based on a study showing that "the price before the [alleged misstatement] was almost identical to the [] closing price [that day]").

*     *     *

Because "evidence at the certification stage shows an efficient market" and that "the alleged misrepresentation[s] had no price impact," the "fraud-on-the-market theory does not apply and common reliance thus cannot be presumed." *Basic*, 485 U.S. at 281.

### 2.    The *Affiliated Ute* presumption does not apply.

Finally, Plaintiffs alternatively claim that they are entitled to a presumption of reliance under *Affiliated Ute*. *See* Pls.' Br. at 22-23.  In *Affiliated Ute*, a unique Rule 10b-5 matter involving two bank officers who failed to disclose a conflict of interest to their customers, the Supreme Court held that reliance may be presumed in the narrow circumstance where the plaintiffs' claims are based solely on defendants' silence. *Affiliated Ute*, 406 U.S. at 153-54 ("[Defendants] possessed the affirmative duty under the Rule to disclose [the undisclosed] fact to the . . . sellers.  [Thus, it is irrelevant that] defendants may have made no positive representation or recommendation.   The defendants may not stand mute . . . ."); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001) (explaining that *Affiliated Ute* was intended "to aid plaintiffs when reliance on a negative would be practically impossible to prove").[28]  But "no presumption arises in cases of alleged misrepresentations." *Johnston*, 265 F.3d at 192.  For cases involving both omissions and misrepresentations, which *Affiliated Ute* "did not address," a court may apply the *Affiliated Ute*

---

[28] Recently, the Ninth Circuit Court of Appeals similarly explained that the *Affiliated Ute* doctrine applies only in "narrow circumstance[s]" because "the justification underlying . . . *Affiliated Ute* [was that] reliance is impossible or impractical to prove when no positive statements were made."  *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021); *see also Schwab v. E*TRADE Fin. Corp.*, 752 Fed. App'x. 56, 59 (2d Cir. 2018) ("*Affiliated Ute* applies only when the original rationale for *Affiliated Ute* is present: when there are 'no positive statements,' and 'reliance as a practical matter is impossible to prove.'") (citing *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017)); *In re Interbank Funding Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 50-51 (D.D.C. 2009), *aff'd*, 629 F.3d 213 (D.C. Cir. 2010) ("[I]n determining whether to presume reliance, '[w]hat is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist: *reliance as a practical matter is impossible to prove*.") (emphasis in original) (citing *Wilson v. Comtech Telecom. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981)).

presumption only where "the offenses can be characterized *primarily* as omissions." *Id.* In other words, the *Affiliated Ute* presumption will not apply to securities fraud lawsuits that primarily involve *statements that are rendered misleading by what they do not disclose. Id.*; *see also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2020 WL 5026553, at *5 (D. Del. Aug. 25, 2020) ("The allegations explaining why Defendants' statements were false do not turn Plaintiffs' misrepresentation claims into claims based on omissions."); *Schwartzman v. Morningstar, Inc.*, 2014 WL 3843875, at *22 (E.D. Pa. Aug. 5, 2014) ("[T]his case is a poor fit for the rationale behind the [*Affiliated Ute*] presumption of reliance—that reliance on an omission is difficult or impossible to prove. Reliance should not be difficult for the [plaintiff] to prove, if it exists, because [defendant] made several material misstatements of which investors were aware.").

Plaintiffs' claims run afoul of these principles. The crux of this case is plainly one of alleged misrepresentations, not omissions. For example, when summarizing Plaintiffs' claims, the Court aptly noted that "Plaintiffs allege that Defendants issued a series of false or misleading *statements* during the class period." ECF 64 at 2; *see also id.* at 4 (Plaintiffs allege "approximately fifty-seven allegedly actionable *misstatements*"). Indeed, the Operative Complaint includes over 170 quotations of Defendants' alleged misrepresentations during the class period.

Plaintiffs' cannot salvage the *Affiliated Ute* presumption by arguing that they are also making omission allegations because (1) even in light of these allegations, this case remains *primarily* about affirmative misrepresentations and (2) Plaintiffs' omission allegations are offered in support of the notion that Defendants' affirmative statements were misleading. That is, Plaintiffs allege omissions to "explain why the affirmative misstatements satisfy the falsity

element required under the Private Securities Litigation Reform Act of 1995."  *Navient*, 2020 WL 5026553, at *5.[29]

Indeed, Plaintiffs themselves confirm this in the *Affiliated Ute* section of their Class Certification brief, which states: "Plaintiffs' Section 10(b) claims allege that throughout the Class Period, Defendants' public *statements* omitted numerous material facts regarding Energy Transfer's construction of the Mariner East pipeline projects that were necessary to make *those statements* not misleading."  Pls.' Br. at 23; *see also id.* at 11-12 (this case concerns "whether Defendants' public *statements* during the Class Period misrepresented or omitted materials facts"). Similarly, in opposing Defendants' motion to dismiss, Plaintiffs repeatedly acknowledged that their omission allegations are simply a component of their claims regarding Defendants' affirmative misrepresentations:

- "Plaintiffs allege claims of securities fraud based on **statements** made by Defendants and material information that was *omitted **from them***."  Pl.'s Opp. to Defs.' Mot. to Dismiss at 47.

- "These **statements** misstated and *omitted* the serious safety and environmental risks that Energy Transfer caused through its reckless planning and construction of the Pipeline Projects . . . ."  *Id.* at 94.

- "Given the centrality of these **statements** (and ***related omissions***) concerning the Pipeline Projects to the Partnership's bottom line . . . Defendants do not question the materiality of these **statements** . . . ."  *Id.* at 45-46.

- "Defendants' failure to disclose its improper conduct to investors, ***while at the same time making statements*** regarding the permitting process, constituted an actionable *omission*."  *Id.* at 52.

- "[T]o the extent any of the **misstatements** could be construed as opinions, ***they*** are actionable because Defendants . . . *omitted* material facts."  *Id.* at 41.[30]

---

[29] *See also, e.g.*, Op. Compl. ¶ 480 (alleging that Defendants "made various untrue statements of material facts and omitted to state material facts necessary *in order to make the statements made*, in light of the circumstances under which they were made, not misleading"); *see also id.* ¶¶ 164, 219, 267, 361, 365, 381, 399, 481 (similar).

[30] *See also, e.g.*, Pl.'s Opp. to Defs.' Mot. to Dismiss at 42 ("Defendants' *statements* about the 16 HDDs

These sort of allegations "explaining why Defendants' statements were false do not turn Plaintiffs' misrepresentation claims into claims based on omissions." *Navient*, 2020 WL 5026553, at *5.  After all, "'[a]ny fraudulent scheme requires some degree of concealment,' [and] the mere fact of this concealment cannot, and should not transform a misrepresentation into an omission." *Johnston*, 265 F.3d at 193 (citing *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000)); *In re Prudential*, 975 F. Supp. at 606 n.18 (courts have "repeatedly rejected plaintiffs' attempts to bring their claims under the presumption of reliance set forth in [*Affiliated Ute*], by alleging omissions that were really only the converse of affirmative misrepresentations.").  "To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely." *Johnston*, 265 F.3d at 193.[31]

In sum, Plaintiffs' omission allegations are similar to the allegations in cases that *refused* to apply the *Affiliated Ute* presumption.  For instance, in *Navient*, the court ruled that the only purpose of including the alleged omission—the "fail[ure] to disclose that Navient was regularly and indiscriminately placing borrowers into forbearance"—was "to explain why the affirmative misstatements satisfy the falsity element required under the Private Securities Litigation Reform

---

Energy Transfer needed to complete . . . were materially false and misleading [because] the *statements omitted* to tell investors that Energy Transfer had not submitted HDD reevaluation reports for nine other sites and that ME2 was not close to completion."); *id.* at 46 ("The *statement* that Granado made . . . misleadingly *omitted* that the Partnership would not be able to meet the initial throughput figure Energy Transfer had *touted* and would continue to *represent*."); *id.* at 47 ("McCrea's *statement* is actionable because it *omitted* material facts . . . ."); *id.* at 88 (referring to "Defendants' alleged false statements, which fall into the three general categories," including representations about "the Revolution and ME2 completion timelines and ME2's throughput and *related omissions*").

[31] Moreover, Plaintiffs claim that all class members purchased shares of Energy Transfer common units by "*relying* on the materially false and misleading statements . . . which Energy Transfer and the Speaking Defendants *made, issued or caused to be disseminated*[.]"  Op. Compl. ¶ 485.  This explicit reliance on misstatements confirms that the *Affiliated Ute* presumption is inapplicable.  *See Crago v. Charles Schwab & Co., Inc.*, 2021 WL 4990234, at *4 (N.D. Cal. Oct. 27, 2021) (holding that the plaintiffs were not entitled to the *Affiliated Ute* presumption because the plaintiff "'explicitly ple[d] reliance' on the affirmative misrepresentations") (citing *Volkswagen*, 2 F.4th at 1208).

Act of 1995[.]" *Navient*, 2020 WL 5026553, at *5. And in *Crago*, the plaintiffs alleged that the defendant "omitted material facts" as to how it was prioritizing clients' orders, but the court ruled that the *Affiliated Ute* presumption did not apply because these alleged omissions were "effectively the inverse of the misrepresentations" in which the defendant "affirmatively stated it was providing the best execution." *Crago*, 2021 WL 4990234, at *3-4. The *Affiliated Ute* presumption is thus inapplicable here.

## IV.    CONCLUSION

Because neither the *Basic* presumption nor the *Affiliate Ute* presumption is available to Plaintiffs, common questions of law or fact will not predominate over individual issues, and Plaintiffs cannot show that a class can be maintained under Rule 23(b)(3). Accordingly, Plaintiffs' Motion for Class Certification should be denied. In the alternative, if the Court were to find a lack of price impact as to only some of Plaintiffs' alleged corrective disclosures or misstatements, the Court should deny the Motion for Class Certification in part and as to those claims.[32]

---

[32] *See Goldman (S. Ct.)*, 141 S. Ct. at 1958 (noting that to invoke the *Basic* presumption a plaintiff "must prove" that "the alleged misrepresentation" satisfies its requirements); *see also, e.g., Halliburton II Remand,* 309 F.R.D. at 269-80 (on remand, district court limits class to one of numerous alleged corrective disclosures); *Intuitive Surgical*, 2016 WL 7425926, at *13-17 (limiting class to three of five alleged corrective disclosures); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 188 (S.D.N.Y. 2010) (limiting class certification to corrective disclosure dates on which there was a statistically significant decline in the price), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012).

Date:  March 1, 2022                                     Respectfully submitted,


                                                        /s/ Robert Ritchie

                                                        Michael C. Holmes*
                                                        Craig E. Zieminski*
                                                        Robert Ritchie*
                                                        VINSON & ELKINS LLP
                                                        2001 Ross Ave., Suite 3900
                                                        Dallas, TX 75201
                                                        Tel: (214) 220-7700
                                                        Fax: (214) 999-7923
                                                        mholmes@velaw.com
                                                        czieminski@velaw.com
                                                        rritchie@velaw.com
                                                        *Admitted pro hac vice

                                                        Marc J. Sonnenfeld (No. 17210)
                                                        Karen Pieslak Pohlmann (No. 60079)
                                                        Laura H. McNally (No. 310658)
                                                        Amanda F. Lashner (No. 314443)
                                                        MORGAN, LEWIS & BOCKIUS LLP
                                                        1701 Market Street
                                                        Philadelphia, PA  19103-2921
                                                        Telephone:  215.963.5000
                                                        Facsimile:  215.963.5001
                                                        marc.sonnenfeld@morganlewis.com
                                                        karen.pohlmann@morganlewis.com
                                                        laura.mcnally@morganlewis.com
                                                        amanda.lashner@morganlewis.com


                                                        Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 1, 2022, a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Robert Ritchie*

Robert Ritchie