**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, DENVER EMPLOYEES RETIREMENT PLAN, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS NATIONAL PENSION FUND, and IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| ENERGY TRANSFER LP, KELCY L. WARREN, THOMAS E. LONG, MARSHALL MCCREA, and MATTHEW S. RAMSEY, | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Case No. 2:20-cv-00200-GAM

**LEAD PLAINTIFFS' SUR-SURREPLY IN FURTHER SUPPORT
OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page(s)**

I.  ARGUMENT ...................................................................................................1

    A.  Defendants Ignore Plaintiffs' Expert's Opinion on Front-End Price Impact ..........1

    B.  Plaintiffs Have Not "Distorted" Defendants' Burden, Which Is to Prove a Complete Lack of Price Impact by a Preponderance of the Evidence ...................3

    C.  Defendants Cannot Ignore Price Impacts Below the 95% Confidence Level........................................................................................................4

    D.  Defendants Improperly Disregard Multi-Day Price Impacts .................................8

    E.  Defendants Still Fail to Disprove Back-End Price Impact....................................9

        1.  August 9-13, 2018 .....................................................................................9

        2.  November 12-13, 2019 ...........................................................................11

    F.  There Is No Basis to Divide the Case by Category of Misstatement ...................13

II.  CONCLUSION ............................................................................................14

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ..................................................................... 10

*In re Allergan PLC Sec. Litig.*,
  2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ......................................... 3, 4, 8, 9

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010) .......................................................................... 14

*In re Apple Inc. Sec. Litig.*,
  2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ..................................................... 4, 12

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018) .................................................................................. 5

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020) ........................................................................ 3, 4, 9

*Brokop v. Farmland Partners Inc.*,
  2021 WL 4916240 (D. Colo. July 23, 2021) ....................................................... 12

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................... 6, 8

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ................................................... 6, 7

*City of Sterling Heights Gen. Emps. Ret. Syst. v. Prudential Fin., Inc.*,
  2015 WL 5097883 (D.N.J. Aug. 31, 2015) ............................................................ 7

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  2017 WL 2608243 (S.D. Tex. June 15, 2017) ....................................................... 9

*Di Donato v. Insys Therapeutics, Inc.*,
  333 F.R.D. 427 (D. Ariz. 2019) ............................................................................ 5

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ....................................................................... 14

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ......................................................... 7

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018) ....................................................... 8

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) ..................................................................4, 12

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021) ..........................................................................................*passim*

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ........................................................13

*Li v. Aeterna Zentaris, Inc.*,
    324 F.R.D. 331 (D.N.J. 2018)..................................................................................7

*Martinek v. AmTrust Fin. Servs., Inc.*,
    2022 WL 326320 (S.D.N.Y. Feb. 3, 2022)............................................................12

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 4704578 (C.D. Cal. Oct. 6, 2021)..........................................................12

*Monroe Cnty. Emps' Ret. Sys. v. Southern Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019) .................................................................5, 6, 7, 13

*Pelletier v. Endo Int'l PLC*,
    338 F.R.D. 446 (E.D. Pa. 2021) ......................................................................3, 8, 9

*Pirnik v. Fiat Chrysler Autos. N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ..............................................................................7

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019) ..........................................................................5

*Utesch v. Lannett Co., Inc.*,
    2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) ........................................................13

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
    775 F. App'x 51 (3d Cir. 2019) ..............................................................................7

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ..........................................................7

## OTHER AUTHORITIES

Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in
    Securities Fraud Cases: Applications at the Securities and Exchange
    Commission*, 49 Bus. Law. 545, 564 (1994)...........................................................5

Lead Plaintiffs respectfully submit this brief in further support of Plaintiffs' Motion for Class Certification in order to correct and respond to specific assertions in Defendants' Sur-Reply. This brief is not intended as a complete response to all of the points Defendants raise in their Sur-Reply and is instead limited to responding to some of the most significant matters in need of correction.   Lead Plaintiffs respectfully submit that oral argument on the motion would be appropriate in order to fully present the parties' respective positions.

## I.   ARGUMENT

### A.   Defendants Ignore Plaintiffs' Expert's Opinion on Front-End Price Impact

Defendants' Sur-Reply ignores Plaintiffs' expert's opinion regarding front-end price impact on August 9, 2017.  According to Defendants, Mr. Coffman "admits that <u>he has found no evidence</u> to support an assertion that <u>any</u> of the alleged misstatements caused a front-end price impact." Sur-Reply at 1.[1]  Mr. Coffman makes no such concession.

Mr. Coffman's report begins with his rebuttal of Ms. Allen's front-end price impact analysis.  In that portion of the report, he discusses how Ms. Allen failed to rebut the existence of price impact for the August 9, 2017 alleged false statements, which Defendants made on the date of a statistically significant unit price increase.  In Mr. Coffman's words, Ms. Allen attempts to dismiss this statistically significant price increase as "driven by information unrelated [to] Plaintiffs' claims," but her "assertions are fundamentally flawed and incorrect."  Coffman Rebuttal ¶13.  As Mr. Coffman opined, "contrary to Ms. Allen's suggestion that analysts did not pay

---

[1] Unless otherwise noted: references to "¶" are to the Amended Complaint, ECF No. 78; references to "Opposition" are to Defendants' Opposition to Plaintiffs' Motion for Class Certification, ECF No. 93; references to "Reply" are to Lead Plaintiffs' Reply Memorandum in Further Support of their Motion for Class Certification, ECF No. 97; references to "Ex." are to the Declaration of Adam H. Wierzbowski, ECF No. 97-1; and references to "Sur-Reply" are to Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification, ECF No. 102. Unless otherwise noted, <u>emphasis</u> in quotations is added and internal citations are omitted.

attention to the allegedly false and misleading completion timelines and in-service dates for the ME2 and Revolution projects that Defendants provided on August 9, 2017, <u>there is, in fact, analyst commentary consistent with the completion timelines and in-service dates having had a positive impact on the stock</u>." *Id*.

Indeed, Mr. Coffman devoted several paragraphs of his report to discussing how the specific Energy Transfer price reaction on August 9, 2017 reflected the importance of the alleged misrepresentations to investors, and discussing the price impact of those misrepresentations. *Id.* ¶¶58-63. Mr. Coffman wrote that Ms. Allen's "analysis of the August 9, 2017 misrepresentations is severely flawed" because "the analyst commentary she [Ms. Allen] herself cites *supports* Plaintiffs' view that the market understood that statements made by Defendants regarding the timelines for Revolution and ME2 contributed to a positive stock reaction." *Id.* ¶59 (emphasis in original). After detailing the analyst commentary discussing the ME2 and Revolution pipelines, Mr. Coffman wrote that "Ms. Allen's claim that analysts were not reporting on the Revolution and ME2 completion timelines is simply incorrect, and her dismissal of the statistically price increase on August 9, 2017 as being unrelated to Plaintiffs' claims is unreliable." *Id.* ¶63. Thus, far from conceding that there is no evidence of front-end price impact, as Defendants assert, Mr. Coffman specifically demonstrated that it exists.[2]

---

[2] Defendants assert that the August 9, 2017 price increase is irrelevant because, during the earnings call, Energy Transfer "reiterated previously-disclosed timelines (or provided a more <u>pessimistic</u> timeline)." Sur-Reply at 10. This does not disprove the statistically significant price impact on August 9, 2017. <u>First</u>, even if Energy Transfer simply reiterated a pipeline's timeline, it was new information to the market that, as of August 9, 2017, Energy Transfer would still supposedly meet that timeline. <u>Second</u>, the modified timeline for the ME2 pipeline of being in-service by the fourth quarter of 2017 instead of an "end of the third quarter completion" deadline was not significantly different, as the end of the third quarter and the fourth quarter are separated by only a single day. And, compared to the truth, whether the stated timelines were the same as, or more pessimistic than, prior timelines, they were still materially false and misleading and had the effect of artificially inflating the price of Energy Transfer common units. <u>Third</u>, Ms. Allen did "not even attempt to

**B.      Plaintiffs Have Not "Distorted" Defendants' Burden, Which Is to Prove a Complete Lack of Price Impact by a Preponderance of the Evidence**

Defendants assert that Plaintiffs rely on "outdated, pre-*Goldman (S. Ct.)*" standards now that the Supreme Court has "clarified the standard and applicable burdens for evaluating price-impact." Sur-Reply at 2-3. However, the Supreme Court's statement that a defendant's burden will have "bite" when the evidence is "in equipoise" does not change the underlying substantive requirement of what a defendant must prove, which is daunting—the lack of <u>any</u> price impact. *Id.* at 2. The Supreme Court's decision in *Goldman*, and subsequent precedent, have upheld that significant substantive burden.

<u>First</u>, as the Supreme Court held in *Goldman Sachs*, a defendant "bears the burden of persuasion to <u>prove a lack</u> of price impact," and "<u>must carry that burden</u> by a preponderance of the evidence." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021) ("*Goldman (S. Ct.)*"). The Supreme Court held that the Second Circuit "correctly placed the burden of proving a lack of price impact on Defendants." *Id.* The Supreme Court thus did not disturb the Second Circuit's holding that Defendants "must show by a preponderance of the evidence that <u>the entire price decline</u> on the corrective-disclosure dates was <u>due to something other than</u> the corrective disclosures." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc*., 955 F.3d 254, 271 (2d Cir. 2020) ("*Goldman (2nd Cir.)*") *vacated on other grounds by Goldman (S. Ct.)*. The Second Circuit, this Court, and courts around the country were already applying this standard,

---

evaluate the extent to which the positive statements about ME2 and Revolution [on August 9, 2017] may have contributed to the stock price increase." Coffman Rebuttal ¶63. Defendants' Sur-Reply remains silent on this point and Defendants have failed to provide an alternative explanation for the stock price movement. As the court held in *In re Allergan PLC Securities Litigation*, "merely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." 2021 WL 4077942, *10 (S.D.N.Y. Sept. 8, 2021). But Defendants here have not even made a valid suggestion of an alternative contributing factor unrelated to the completion timelines.

which the pre-*Goldman (S. Ct.)* decisions described as "daunting."  *E.g., Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 469 (E.D. Pa. 2021).

Second, the cases that follow *Goldman (S. Ct.)* still rely on *Goldman (2nd Cir.)* for a defendant's burden to disprove price impact.  On remand, the Southern District of New York confirmed that "Defendants must show a complete lack of price impact by a preponderance of the evidence."  *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at *4 (S.D.N.Y.  Dec. 8, 2021) (citing *Goldman (S. Ct.)*).  Courts also continue to apply the Second Circuit's pre-*Goldman (S. Ct.)* description of a defendant's burden.  As the court stated in *Allergan*:

> "[F]or a defendant to erase the inference that the corrective disclosure had price impact – *i.e.*, that it played some role in the price decline – it must demonstrate under the preponderance-of-the-evidence standard, using event studies or other means, that the other events explain the entire price drop." *Ark. Tchr. Ret. Sys.* [*v.*] *Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n.18 (2d Cir. [2020])[,] *vacated on other grounds by Goldman Sachs*, 141 S. Ct. at 1963. . . . Instead, 'it is Defendants' burden to show the absence of price impact – not merely to challenge Plaintiff on the persuasiveness of its own price impact claim – once *Basic*'s presumption of reliance attaches.' (citation omitted). In short, a defendant must demonstrate that the materialization of the concealed risks had no impact on the price of its stock.

2021 WL 4077942, at *10; *accord In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *10 (N.D. Cal. Feb. 4, 2022).

Defendants have not carried that burden because they have still not pointed to any alternative explanation for the entire price declines following the corrective disclosures by referring to anything other than the alleged corrective disclosures.  That is fatal to their opposition to Lead Plaintiffs' motion.

## C. Defendants Cannot Ignore Price Impacts Below the 95% Confidence Level

In Defendants' Opposition, they cited the *Goldman (S. Ct.)* decision and asserted that the *Basic* presumption does not apply where "alleged misrepresentations had no statistically significant effect on Energy Transfer's unit price."  Opposition at 8 (citing *Goldman (S. Ct.)*).

4

Defendants now concede that *Goldman (S. Ct.)* does not support that argument and wrongly suggest that their Opposition was only citing to the Second Circuit's 2018 decision in *Goldman Sachs* for that principle (when it was not).  *See* Sur-Reply at 4.

Defendants go on to quote a portion of a footnote in the Second Circuit's 2018 *Goldman Sachs* decision stating that if the stock return (after controlling for market and industry factors) is not statistically significant, then that price movement cannot be attributed to company-specific information announced on the event date for purposes of a price impact analysis.  Sur-Reply at 4 (quoting *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018)). However, that portion of the Second Circuit's holding is directly contrary to the Supreme Court's holding in *Goldman (S. Ct.)* that, "[i]n assessing price impact at class certification, courts 'should be open to <u>all</u> probative evidence on that question—<u>qualitative as well as quantitative</u>—aided by a good dose of common sense.'"  141 S. Ct. at 1960.

Indeed, Defendants seek a ruling from this Court that would rely on <u>only</u> one specific form of quantitative evidence.  That is an invalid approach after the *Goldman (S. Ct.)* decision. Moreover, the quantitative evidence on which Defendants focus—a lack of a statistically significant return on only the first day of certain of the alleged corrective disclosures—is insufficient to disprove price impact as a statistical matter.[3]  *See Monroe Cnty. Emps' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("A non-statistically significant decline simply does not 'sever the link' between the alleged misrepresentations and corrective disclosures.");

---

[3]  In fact, the academic paper cited in the Second Circuit's 2018 *Goldman Sachs* decision discussed that when a result is statistically significant, one can reject the null hypothesis.  *See Goldman Sachs*, 879 F.3d at 481 n.5 (citing Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 564 (1994)).  However, that same paper does not acknowledge the contrary outcome—that when a result is not statistically significant, that does not mean the null hypothesis is true.  *See* Reply at 9.

*Rooney v. EZCORP, Inc.,* 330 F.R.D. 439, 449-50 (W.D. Tex. 2019) (same); *Di Donato v. Insys Therapeutics, Inc*., 333 F.R.D. 427, 444 (D. Ariz. 2019) (same); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) (same).

The Supreme Court held in *Goldman (S. Ct.)* that courts also need to examine the same type of qualitative evidence that Plaintiffs introduced in their Reply and which Defendants' Sur-Reply ignores. This includes evidence of the materiality of the given information. *Goldman (S. Ct.)* at 1960-61. Here, such quantitative <u>and</u> qualitative information includes: (i) analyst commentary about the materiality of the misstatements and corrective disclosures (*e.g.*, Reply at 21-22); (ii) internal Company recognition that the market was continuing to digest the new information over a series of days (*e.g.*, Reply at 23-26); and (iii) the <u>statistically significant</u> negative price returns after each corrective disclosure that are still within a customary one- to two-day event window (*e.g.*, Reply at 35-36). Defendants' Sur-Reply nevertheless doubles down on Defendants' reliance on the proposition that a price impact is entirely irrelevant unless it is statistically significant on day one at the 95% confidence interval. That, however, is a statistical fallacy. *See Southern Co*., 332 F.R.D. at 393-94 (finding that "[c]ourts err" if they decide price impact based on a "mistaken premise that statistical insignificance indicates the probable absence of a price impact"); *see also* Reply at 6.

Here, each of the parties' experts determined that there were "excess" or "abnormal" price movements for each alleged price decline, which is the "company-specific movement in [a] stock price <u>after controlling for market and industry movements</u>." Reply at 9. While not all of the price declines were at a 95% confidence level, that does not mean, as Defendants contend, that such price movements can be treated as "statistically equivalent to zero." Sur-Reply at 12. A price decline that is below the 95% confidence level—after removing market and industry movements—

is still relevant to price impact. *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *4 (S.D.N.Y. Mar. 23, 2020) ("No hard and fast rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one."); *see also Pirnik v. Fiat Chrysler Autos. N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) (holding that a price impact at a statistically significant level below 95% "does not prove the [absence] of price impact"); *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 345 (D.N.J. 2018) (same), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019).

Defendants correctly point out that the Third Circuit's decision in *Aeterna Zentaris*—which held that a finding that is not statistically significant at the 95% confidence interval is not necessarily a finding of a lack of price impact—is non-precedential. Sur-Reply at 5. However, that holding was based on the holdings of at least two district courts within the Third Circuit. *Aeterna Zentaris*, 775 F. App'x at 53 (citing *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016); *City of Sterling Heights Gen. Emps. Ret. Syst. v. Prudential Fin., Inc*., 2015 WL 5097883, *12 (D.N.J. Aug. 31, 2015)). District courts have also cited the Third Circuit *Aeterna Zentaris* decision approvingly for its persuasive value on this point. *See, e.g.*, *Southern Co*., 332 F.R.D. at 395 ("[T]he Third Circuit Court of Appeals recently held that although a non-statistically significant price decline, without more, may not 'demonstrate a price impact,' neither is it 'necessarily proof of the opposite.'"); *Chicago Bridge*, 2020 WL 1329354, at *4.[4]

---

[4] Defendants' reliance on *In re Finisar Corp. Securities Litigation*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), is misplaced. In that case, the court relied on the defendants' "analysis [that] show[ed] no statistically significant price increase following" the making of a statement at issue. *Id.* at *8. Here, there is indisputably a statistically significant price increase after the August 9, 2017 misstatements, and statistically significant decreases within one or two days after each alleged corrective disclosure. The *Finisar* opinion also addressed only the front-end price impact

Indeed, courts continue to hold that "an absence of price movement, in and of itself, is not sufficient to sever the link between the corrective disclosure and the subsequent stock price drop." *Allergan*, 2021 WL 4077942, at *13 (quoting *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2018 WL 3854757, at *4 (S.D.N.Y. Aug. 14, 2018)). Accordingly, "even *if* there was convincing evidence of an absence of price impact associated with the corrective disclosure (which there is not), that by itself would still be insufficient to rebut the *Basic* presumption." *Id.*

### D. Defendants Improperly Disregard Multi-Day Price Impacts

Defendants assert that in analyzing price impact, the "[u]se of a multi-day event window is inappropriate <u>here</u>" (Sur-Reply at 8) but they fail to address the academic literature and weight of authority confirming that a "two- to three-day window is <u>common</u> in event studies." *Barclays*, 310 F.R.D. at 96; *see also Pelletier*, 338 F.R.D. at 486 ("[T]he Third Circuit has held that use of a two-day window is compatible with applying *Basic*."); Coffman Rebuttal ¶49 ("the use of multi-day event windows to examine price movements is supported by academic literature and often used successfully in the class action securities context"). Instead, Defendants repeat that "trading in an efficient market <u>typically</u> incorporates news into the security's price" quickly (Sur-Reply at 8) while ignoring that "the Third Circuit and numerous other courts have explicitly held that multi-day event windows do not conflict with market efficiency." Reply at 13.

Now Defendants assert that "where there is no significant price movement on the first day a disclosure is made, <u>it is unlikely</u> . . . that there is price impact associated with the disclosure in an efficient market." Sur-Reply at 8-9 (citing Allen Report ¶¶21- 22). <u>First</u>, Defendants cite only their expert's report, and this bare assertion of "unlikelihood" does not rebut price impact by a preponderance of the evidence. <u>Second</u>, Defendants fail to address adequately the specific

---

and not the back-end price impact (*id.* at *7), and the *Finisar* plaintiff was "not proceeding on a price maintenance theory." *Id.* at *8.

circumstances here, under which a delayed price impact is expected. Coffman Rebuttal ¶10 ("There is strong empirical evidence that, in at least certain circumstances, it can take multiple days for a stock price to fully reflect information, especially when it is <u>complex or unexpected</u>."). For example, in their Sur-Reply, Defendants attempt to distinguish *Pelletier*, without addressing that court's specific finding that a "price impact may occur more slowly where <u>clarifying or contextualizing</u> information is disclosed later." *Pelletier*, 338 F.R.D. at 486 ("[V]iewing the totality of their evidence regarding the two-day window, Defendants' lack of a statistically significant finding cannot rebut the *Basic* presumption.").

### E.   Defendants Still Fail to Disprove Back-End Price Impact

Defendants' Sur-Reply confirms that they have not and cannot provide alternative explanations for Energy Transfer's stock price declines, as required to disprove price impact. *See Allergan*, 2021 WL 4077942, at *10 (defendants "must demonstrate . . . that the other events explain the entire price drop"); *Goldman (2d Cir.)*, 955 F.3d at 271 (defendants "must show by a preponderance of the evidence that the entire price decline on the corrective-disclosure dates was due to something other than the corrective disclosures"); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *6 (S.D. Tex. June 15, 2017) (without "an alternate explanation . . . Defendants have not demonstrated that there was no price impact from the challenged disclosures and have failed to rebut the fraud-on-the-market presumption"). Two specific back-end disclosures require further discussion in order to correct Defendants' erroneous assertions.

#### 1.   August 9-13, 2018

Defendants assert that "Plaintiffs have dropped any argument that there was a price impact on August 9, 2018 itself." Sur-Reply at 11. This assertion ignores the evidence proffered by Plaintiffs that confounding information issued after the close of the market on August 8 obscured any negative reaction to the corrective disclosure regarding pipeline capacity. As Mr. Coffman

noted with respect to August 9: "Ms. Allen has not accounted for the possibility that the Company's earnings surprise represents positive confounding information that masked a negative reaction to the alleged corrective disclosure. Any negative reaction to the alleged corrective disclosure could very well have been concealed, or at least partially muted, by the Company's overwhelmingly positive results for Q2 2018." Coffman Rebuttal ¶40. Mr. Coffman then performed a valuation analysis showing that the positive change in analyst EBITDA expectations for FY 2018 or FY 2019 implied a stock price increase on August 9 of either $0.94 or $0.87, respectively. *Id.* ¶41 and Ex. 5. Mr. Coffman concluded that "Ms. Allen's finding of no statistically significant stock price decline on August 9, 2018 could simply reflect the fact that the impact of the positive earnings information masked the price impact of the alleged corrective information" and that as a result of her failure to analyze confounding information, "she has not reliably established a lack of price impact." *Id.* ¶43.[5]

Defendants also concede that they have "no other explanation" for Energy Transfer's statistically significant price decline on August 13, 2018, following disclosure of ME2's reduced throughput. Sur-Reply at 13; *see also* Reply at 20-26. Ms. Allen did not even "attempt[] to provide an alternative explanation" and Defendants' Sur-Reply does not change that. Coffman Rebuttal ¶50 ("Ms. Allen cannot simply dismiss the use of a multi-day window and her analysis of this corrective disclosure event is thus unreliable and flawed."). Defendants point to how the two

---

[5] Regardless of the price movement of Energy Transfer units on August 9, 2018, Defendants ignore that Plaintiffs' Complaint has consistently asserted that the true corrective disclosure occurred on August 9 and 10, 2018, with analysts clarifying on August 10 the Company's confusing disclosures on August 9. The Court's Opinion on the motion to dismiss reflects that understanding. *Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 239-40 (E.D. Pa. 2021) ("On August 9, 2018, investors learned that part of the ME2 pipeline would need to be completed with an almost century-old, twelve-inch pipeline. Am. Compl. ¶¶401-403. On August 10, 2018, the news was revealed to investors that the smaller pipeline would lead to a 65% reduction in pipeline capacity. *Id*. ¶¶405-40.").

analysts' reports disclosed the specific reduced throughput of the ME2 pipeline before the market opened on Friday, August 10, 2018, and that the statistically significant negative return occurred on Monday, August 13, 2018. Sur-Reply at 13 n.9. However, the analysts' reports were clarifying information after the Company's initially confusing disclosure the day before, which is a prime example of a scenario where a multi-day event window is appropriate as information enters the market through a third party to correct and clarify statements from the Company.

### 2.    November 12-13, 2019

Defendants do not dispute the price decline that was statistically significant at the 99% level on November 13, 2019, following disclosure of the FBI's investigation into the way Energy Transfer obtained the permits for ME2. *See* Reply at 35-40. Because, as Defendants concede, the disclosure of the FBI investigation was "new news" to the market (Sur-Reply at 18), and the market responded to that specific fact, price impact is established. Coffman Rebuttal ¶32 ("Based upon my analysis, there is substantial statistical evidence that Energy Transfer Common Units declined in price as a direct result of the disclosure of the FBI investigation that revealed a portion of the relevant truth allegedly concealed by the misstatements and/or omissions.").

Defendants instead assert that the investigation is irrelevant to Plaintiffs' allegations because there was already "an abundance of information available to investors" concerning the underlying conduct. Sur-Reply at 19 ("Plaintiffs make no effort to explain what the November 12th news would reveal about the remaining alleged misstatements that was not revealed by *any* of this prior news."). But the FBI's decision to investigate issues concerning the allegations in this Action provided the market with new information regarding the alleged false statements. *See* Reply at 36 ("[T]he Court expressly held that the FBI's investigation is linked to Energy Transfer's serious environmental and regulatory issues, and the alleged false statements about the pipeline timelines."); *see also* Coffman Rebuttal ¶7 ("This event, which informed the market that there was

sufficient evidence to prompt a federal criminal investigation related to the very matters that Plaintiffs allege were concealed, demonstrates that if Plaintiffs' claims are true, there is a price impact as a portion of the relevant truth came to light."). The Complaint also explicitly alleged that Energy Transfer engaged in "misconduct that violated its permits and would lead to regulatory scrutiny and delay." ¶¶344, 347, 352, 354.

Defendants then shift their focus to the "correctiveness" of the November 12, 2019 disclosure and make factual arguments on loss causation. Defendants assert that *Goldman (S. Ct.)* lowered Defendants' burden to disprove price impact. *See* Sur-Reply at 19 (Plaintiffs "cite pre-*Goldman (S. Ct.)* authorities to assert that 'arguments on which specific misstatements were corrected, and to what extent, by each particular corrective disclosure . . . may not appropriately be adjudicated at class certification.' . . . This is incorrect."). But courts applying the standard described by *Goldman (S. Ct.)* have already rejected Defendants' interpretation. *See Goldman Sachs*, 2021 WL 5826285, at *14 ("But Defendants offer no authority for the proposition—nor did the Supreme Court hold—that the *Basic* presumption can no longer withstand *any* differing levels of abstraction between misstatement and disclosure.") (italics in original); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *6 (C.D. Cal. Oct. 6, 2021) ("*Goldman* did not, as Defendants suggest, hold that any 'corrective disclosure' must fully reveal the actionable fraud to support price impact at the class certification stage."); *Brokop v. Farmland Partners Inc.*, 2021 WL 4916240, at *20 (D. Colo. July 23, 2021) (arguments on the correctiveness of corrective disclosures are "loss causation arguments . . . not appropriate at the class certification stage"); *Apple,* 2022 WL 354785, at *12 ("However, these 'attack[s on] the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement . . . [are] nothing more than [] attack[s] on loss causation,' which plaintiff need not show as a condition of class certification."); *see also Martinek v. AmTrust Fin.*

*Servs., Inc.*, 2022 WL 326320, at *19 (S.D.N.Y. Feb. 3, 2022) (arguments on confounding information are issues of loss causation "and the Supreme Court has held 'that loss causation . . . need not be adjudicated before a class is certified'"); *Utesch v. Lannett Co., Inc*., 2021 WL 3560949, at *17 (E.D. Pa. Aug. 12, 2021) ("Plaintiffs need not prove loss causation at class certification.").

### F.      There Is No Basis to Divide the Case by Category of Misstatement

Essentially conceding there was price impact for at least some of the alleged misrepresentations, Defendants finally assert that, even if there was price impact as to some alleged misrepresentations, the motion for class certification could be denied as to other misstatements. Sur-Reply at 9.  Defendants' argument is irrelevant because, as shown in Plaintiffs' Reply, there is strong affirmative evidence of price impact as to each and every category of misstatements alleged in the Complaint.  *See, e.g.*, Reply at 13-17 (front-end evidence of price impact as to timeline and construction progress misrepresentations), 20-26 (back-end evidence relating to throughput disclosures showing price impact from alleged throughput false statements), 35-40 (back-end evidence relating to disclosure of FBI investigation showing price impact of timeline and Code of Conduct statements).

And, for the same reasons as discussed above, Defendants' assertion that the Court should eliminate certain corrective disclosures raises loss causation arguments that are inappropriate for resolution now.  *See Southern Co.*, 332 F.R.D. at 395-96 ("the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage," and collecting cases).[6]

---

[6] Defendants' cases are inapposite.  In *In re Intuitive Surgical Securities Litigation,* the court dismissed two alleged corrective disclosures because the information disclosed on those dates

## II.    CONCLUSION

For the reasons set forth above and in Plaintiffs' prior submissions in support of class certification, Plaintiffs' motion should be granted and the proposed Class should be certified.

Dated:  May 27, 2022

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John C. Browne*

John C. Browne (*admitted pro hac vice*)
Adam H. Wierzbowski (*admitted pro hac vice*)
Michael M. Mathai (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
johnb@blbglaw.com
adam@blbglaw.com
michael.mathai@blbglaw.com

**BARRACK, RODOS & BACINE**

*/s/ Jeffrey W. Golan*

Jeffrey W. Golan
Robert A. Hoffman
Jeffrey A. Barrack
Chad A. Carder
Meghan J. Talbot
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600
Fax: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jbarrack@barrack.com
ccarder@barrack.com
mtalbott@barrack.com

*Counsel for Lead Plaintiffs*

---

related only to already-dismissed misrepresentations.  2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016).  There is also no suggestion in Defendants' two other out-of-Circuit cases that the question of whether corrective disclosures should be dismissed at class certification when the associated misrepresentations remained in the case was raised to or considered by the courts.  *See generally Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 186 (S.D.N.Y. 2010), *vacated and remanded,* 689 F.3d 229 (2d Cir. 2012).