UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
                              .
Allegheny County Employees'   .    Docket #CV-20-200 (GAM)
Retirement System,            .
                              .
         Plaintiff,           .
                              .    United States Courthouse
                              .    Philadelphia, PA
         vs.                  .    July 8, 2022
                              .    10:00 a.m.
Energy Transfer, LP, et al.,  .    Via Videoconference
                              .
         Defendants.          .
.........................................................
```

TRANSCRIPT OF ORAL ARGUMENT HEARING
BEFORE THE HONORABLE GERALD A. MCHUGH
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:              John Browne, Esq.
                                Bernstein Litowitz Berger
                                & Grossmann, LLP
                                1251 Ave. of the Americas
                                New York, NY 10020

                                Adam H. Wierzbowski, Esq.
                                Bernstein Litowitz Berger
                                & Grossmann, LLP
                                1251 Ave. of the Americas
                                New York, NY 10020

                                Michael M. Mathai, Esq.
                                Bernstein Litowitz Berger
                                & Grossmann, LLP
                                1251 Ave. of the Americas
                                New York, NY 10020

Chad A. Carder, Esq.
Barrack Rodos & Bacine
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA 19103

Jeffrey W. Golan, Esq.
Barrack Rodos & Bacine
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA 19103

Robert A. Hoffman, Esq.
Barrack Rodos & Bacine
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA 19103

For The Defendants:                Laura H. McNally, Esq.
                                   Morgan Lewis & Brockius, LLP
                                   1701 Market St.
                                   Philadelphia, PA 19103

                                   Marc J. Sonnenfeld, Esq.
                                   Morgan Lewis & Brockius, LLP
                                   1701 Market St.
                                   Philadelphia, PA 19103

                                   Robert P. Ritchie, Esq.
                                   Vinson & Elkins, LLP
                                   2001 Ross Ave.-Ste. 3900
                                   Dallas, TX 75201

                                   Michael C. Holmes, Esq.
                                   Vinson & Elkins, LLP
                                   2001 Ross Ave.-Ste. 3900
                                   Dallas, TX 75201

Audio Operator                     Michael Cosgrove

```
Transcribing Firm:              Writer's Cramp, Inc.
                                1027 Betty Lane
                                Ewing, NJ 08628
                                609-588-8043
```

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

1          THE COURT:  This is the Allegheny County Employees'

2     Retirement System, et al. versus Energy Transfer, LP, et al.,

3     Civil Action 20-200.  And would the counsel for Plaintiffs

4     please identify themselves?

5          MR. BROWNE:  Good morning, Your Honor.  This is John

6     Browne from Bernstein, Litowitz, Berger, and Grossmann on

7     behalf of the Plaintiffs.  I'll be doing the argument today.

8     And I would just -- I don't want to interrupt everyone's

9     introductions, but I do want to extend a very sincere thank

10    you to Your Honor, the court personnel, and defense counsel

11    for accommodating me.  After two years of dodging it, I got

12    COVID at the end of last week and was not supposed to be

13    around people and was still testing positive.  So I was

14    greatly looking forward to being in a courtroom.  But I do

15    thank everyone for that accommodation.

16          THE COURT:  You're welcome.  And I'll note for the

17    record that the parties have agreed that we can proceed by

18    Zoom argument today.  And with that, I'll turn to counsel for

19    defense to identify themselves, please.

20          MS. MCNALLY:  Good afternoon, Your Honor.  This is

21    Laura McNally from Morgan, Lewis, and Bockius, counsel for

22    Defendants.  I'm joined by my colleagues Mark Sonnenfeld, and

23    one of our summery associates, Maria Cosmo's, on the line as

24    well to observe these proceedings.  And then our colleagues

25    from Vinson and Elkins will be handling the argument today.

1    Vinson and Elkins, your video's not on so I don't know if

2    you're experiencing some technical difficulties you guys have

3    -- oh, now you're on, okay, good.  So I'll let them introduce

4    themselves.

5              MR. RITCHIE:  Okay, good.  Yeah, I hope everyone can

6    see me.  This is Robert Ritchie from Vinson and Elkins for the

7    Defendants.  And I'm joined here by my partner Michael Holmes.

8              MR. HOLMES:  Hello, Your Honor.  It's nice to see

9    you.

10             THE COURT:  Good morning.  It appears you're

11   standing at a podium in a very formal courtroom setting.

12             MR. RITCHIE:  That's right.

13             MR. HOLMES:  Yeah.  Not quite --

14             THE COURT:  You --

15             MR. HOLMES:  -- the same as being there but you

16   know.

17             THE COURT:  All right.  Well, you get points then

18   for production today.

19             All right.  So this is Plaintiffs' motion, so that

20   would say to me that, Mr. Browne, you would have the laboring

21   oar if you want to get underway.

22             MR. BROWNE:  Yes, I will.  Thank you very much, Your

23   Honor.  As you noted, we're here on Plaintiffs' motion to

24   certify the securities case as a class action.  And this is

25   somewhat of an unusual class certification motion because

1  Defendants have conceded almost all of the requirements of

2  Rule 23(a) and 23(b)(3) that plaintiffs normally bear the

3  burden of having to prove, you know, elements such as

4  numerosity, common questions of law, typicality, and adequacy.

5     So the only issue in dispute on this motion is whether

6  the Defendants have come forward with sufficient evidence to

7  carry their burden of showing that none of the alleged

8  misrepresentations that have been sustained in the case had

9  any impact on the price of Energy Transfer common units during

10  the class period.  I do believe that just by force of habit,

11  at times during the argument I may say stock price.  If I do,

12  I'm referring to the Energy Transfer common unit price which

13  is a security and it did trade on the New York Stock Exchange

14  during the class period.

15     So to carry their burden in this case, as Your Honor

16  knows, the Defendants have to show by a preponderance of the

17  evidence, both that there's no front end price impact

18  associated with any sustained alleged misrepresentation at the

19  time it was made and there was no backend price impact when

20  the truth was allegedly revealed on what Plaintiffs claim were

21  six separate alleged corrective disclosures dates.  This is a

22  difficult burden for the Defendants to carry, and I

23  respectfully submit they have fallen well short of doing so

24  here.  And I am going to address everything or most things in

25  some detail.  But at the outset, Your Honor, I would like to

1    just take a quick step back and sort of make three broad

2    points that I believe highlight just how high the mountain is

3    that Defendants have to climb in this case.  And the first

4    point I want to make in that regard, and in a general matter,

5    is this is a rare case where the Plaintiffs have strong

6    evidence of frontend price impact, at least for some

7    statements.

8        While we are proceeding on a price maintenance theory,

9    for many of the statements in the case there is particularly

10   strong evidence that there was frontend price impact for the

11   statements made during Energy Transfer's third quarter 2017

12   conference call on August 9th, 2017 where both parties'

13   experts agree that following that conference call there was a

14   statistically significant increase in the price of Energy

15   Transfer common units.

16       And under Defendants' own logic, this statistically

17   significant and immediate price increase is very powerful

18   evidence of price impact.  They have some arguments against it

19   which I will address in detail.  But just the fact that that

20   exists here makes -- is unusual, honestly, in my experience,

21   and really bolsters Plaintiffs' arguments for showing price

22   impact.  That's one.

23       And then, second, the backend price impact here in many

24   ways is strong as well.  There are six alleged corrective

25   disclosures.  Each one resulted, all six of them resulted, in

1    substantial price declines.  Every single one of them are

2    associated with a negative excess return, which means that the

3    negative decline following the disclosure cannot be explained

4    by independent -- or is not explained by independent market or

5    industry factors as those were excluded.  Out of those six,

6    two of them showed a statistically significant decline to the

7    confidence level of 95 percent and 99 percent, respectively,

8    within one day, which is very strong prima facie evidence of

9    price impact.  With the remaining disclosures, Your Honor,

10   three of the remaining four showed statistically significance

11   price declines within two or -- in one or two cases within

12   three days of the alleged corrective disclosure.

13        In the instances where it took more than one or two days

14   to reflect the statistically significant price decline, we

15   believe there are very plausible, common sense, and compelling

16   explanations for why that happened.  And Defendants have

17   failed to rebut the backend price impact.

18        Finally, again at a very high level, when you think about

19   this motion and the arguments at stake here from a real world

20   perspective, when you take a step back from the "T"

21   statistics, the two or three-day event window, whether what

22   caused an excess or abnormal return, and you sort of put the

23   parties' competing paid experts and their scientific evidence

24   aside for a second, what the Court is really tasked with doing

25   is applying what the Supreme Court recently referred to as a

1    good dose of common sense to the questions on this motion.

2    And in doing so, the Supreme Court made clear that the Court

3    should be open to all probative evidence on the question,

4    qualitative as well as quantitative, and evaluate that

5    evidence with common sense in mind.  And I do believe and

6    submit that when you think about this motion from a common

7    sense perspective, it really highlights how difficult the

8    burden is that Defendants have to surmount.

9        Because what Defendants are trying to say and what they

10   have to say and they have to prove by a preponderance of the

11   evidence to win, to defeat class certification here, is they

12   have to show that the market didn't care when Energy Transfer

13   repeatedly made statements on conference calls and in SEC

14   filings and in response to analysts' questions about a

15   critically important pipeline project that the company talked

16   about during almost every single one of its conference calls

17   during the class period; where the CEO, Kelcy Warren, talked

18   about it; where the other high-ranking executives directly

19   talked about it; or analysts repeatedly asked questions about

20   it during conference calls, and analysts repeatedly

21   specifically wrote about the pipeline in the reports during

22   the class period.

23       Defendants are trying to say that none of those

24   statements had any impact.  Even if they're false, right,

25   Defendants have to show that now that none of those statements

1    had any impact on the price of Energy Transfer common units.

2    Defendants also have to show, you know, in comporting with

3    common sense that the market didn't care either when some

4    really astonishing disclosures were made during the class

5    period, disclosures such as:  this very important pipeline

6    project would be delayed; it would have 65 percent less

7    capacity initially than when the market had been told; that

8    the Pennsylvania Department of Environmental Protection had

9    identified dozens and perhaps hundreds of environmental and

10   permitting issues, leading it to issue a stop work order on

11   the pipeline; that the FBI and the Chester County District

12   Attorney had initiated criminal investigations into ET's

13   conduct in connection with the pipeline; and that ET employees

14   and related contractors had actually been arrested in

15   connection with their conduct to the pipeline.

16        So Defendants have to -- to win here, Defendants have to

17   say none of that mattered.  It happened, sure, we lied about

18   it, sure, but the price just didn't -- it was never -- none of

19   those things really ever impacted the price of Energy Transfer

20   common units.  And that I don't think really starts off from a

21   common sense perspective.  And, again, illustrates how hard it

22   is for Defendants to win on this motion.  And I want to just

23   draw another contrast, you know, between this case and some

24   cases that I've certainly been a part of litigating in the

25   past, Your Honor.  And I think, you know, it's another reason

1    that you'd expect me to say, that I think price impact is

2    demonstrated more easily here than in some cases.  The backend

3    disclosures that we're relying on really all -- in addition to

4    being, as I said, sort of astonishing disclosures in some

5    ways, they all almost much more relate -- they much more

6    directly relate to the core allegations of Plaintiffs' case

7    than in some cases that we see.

8         And, for instance, I'll just draw a comparison.  This

9    isn't a case where we're saying there wasn't an earnings

10   announcement and they said that they didn't hit their earnings

11   per share guide, and we find out two months later that that's

12   because a channel stuffing (indiscern.) had stopped but the

13   earnings announcement itself didn't mention the channel

14   stuffing.  That actually would be sufficient, and that would

15   prevail.  But that's a little bit more attenuated than the

16   disclosures that we have alleged in this case which time and

17   time again relate directly to our core allegations of

18   environmental violations, permitting improprieties, code of

19   conduct violations, and timeline and throughput statements

20   about the pipeline.

21        They really do square up quite nicely which, again, you

22   know, I wouldn't say in that -- in such an instance it's

23   impossible for Defendants to establish a lack of price impact,

24   but it shows how difficult it is to do here.  And in response

25   to all this, Defendants -- and this is really notable as well

1   at a high level.  Defendants, in almost very case, they don't

2   points to another reason why the Energy Transfer common units

3   declined in price in response to the -- there's a couple areas

4   of disagreement on this.

5        But as a general matter, they don't say, for instance,

6   well, the reason why it fell by a statistically significant

7   amount two days after your alleged corrective disclosure was

8   because another pipeline of ours was shut down, or the

9   cryptocurrency market had collapsed and -- or Ukraine and

10  Russia had gone to war.  They don't say that.  They don't --

11  they sort of -- their answer to most of the Plaintiffs'

12  evidence is to short of shrug and say, well, who knows.  It

13  wasn't what you say, Plaintiffs.  But, yeah, statistically

14  significant, I don't know.  But who knows and a shrug isn't

15  sufficient to carry the burden they face on this motion.

16       So with those frontend, backend, and sort of common sense

17  principles in mind, Your Honor, I would turn, if you would

18  like me to, to some of the specific disclosures and arguments

19  in the motions.

20            THE COURT:  Proceed.

21            MR. BROWNE:  Okay.  Thank you, Your Honor.  So

22  generally pervading this entire dispute between the parties

23  are some sort of disagreements I think about some important

24  concepts and statistics and how the law applies statistics to

25  these cases.  And we do have statistically significant drops.

```
 1    As I said, in two instances on the same day.  And in three of
 2    the other five instances within two or three days.  But even
 3    if we didn't have those, the -- it -- we could still prove --
 4    you know, it doesn't mean that we could not prove price
 5    impact.  There's no support really in the law for the notion
 6    that you have to have a statistically significant price
 7    impact, you know, either immediately or within two or three
 8    days.  We could have none at all and we could have evidence of
 9    price impact that would include things like, you know,
10    abnormal excess returns, which we have here, you know, the
11    absence of any other news to explain the decline.
12         This isn't a case where the price stayed the same after
13    corrective disclosures or rose and we're trying to say, you
14    know, would have -- it would have risen less or it would have
15    dropped if, you know, but for the news.  We actually have
16    drops on each stock.
17         So even if we didn't have to -- even if we couldn't show
18    statistical significance it would be impossible for us to
19    prove price impact.  And --
20              THE COURT:  But you agree that it's meaningful
21    evidence and you would agree that in most cases like this
22    there is evidence of that statistically significant impact,
23    correct?
24              MR. BROWNE:  I would agree with that, Your Honor.
25    And as I noticed, we do have it here, so part of my argument,
```

1    you know, I'm just making a broader point.  But I would agree
2    with your statements absolutely.  But there is a reason why
3    statistical significance isn't the be-all and end-all of
4    everything that the Court or the parties have to look at,
5    setting aside the fact that the Supreme Court has said you
6    have to look at other things.  Just because a stock price drop
7    cannot be ascribed to like a 95 or 99 percent degree of
8    confidence of statistical competence to a disclosure, that
9    does not rule out -- it's a basic truism of statistics.  That
10   does not rule out that the stock drop could have been caused
11   by that disclosure.  It doesn't.  And I think the Monroe
12   County case or the Southern Company case we cited both ways in
13   our papers from Georgia really got into these issues in a
14   sophisticated way.
15          An example in that case that I found helpful to me in
16   understanding some of these issues was they said -- the Monroe
17   County court was quoting the plaintiffs' expert in that case
18   said, well, if you're trying to determine whether a lake or a
19   pond has fish in it, you can go to the pond and fish.  If you
20   catch a fish, yes, the lake definitely has fish in it.  If you
21   don't catch a fish, you haven't proved that the lake doesn't
22   have fish.  And while that's simple, it's actually a pretty
23   consistent analogy with what statistical significance means.
24          All the statistical significance means is that if you can
25   show it, then it must be due to disclosure.  But if you can't

1    show it, that doesn't rule out that it was due to disclosure.

2    Okay.  So --

3              THE COURT:  I recall a footnote in the defense brief

4    saying that particular example is fishy.  But I'm sure they'll

5    get to that in rebuttal.

6              MR. BROWNE:  Yeah, well, I -- that -- I'm sure they

7    believe that.  But it is -- but there really can be no good

8    faith dispute about the (indiscern.) statistical concepts that

9    the Monroe County court discussed and what I said here.  They

10   -- that is the reality.  And I think no expert would disagree

11   with it.

12        So when you look at thee excess random returns, negative

13   returns -- I'm setting aside statistical significance again --

14   but that we have for each of the six corrective backend

15   disclosures, you know, another footnote or maybe a major

16   argument in Defendants' briefs on these points was, well,

17   because it's not statistically significant, you can't rule out

18   randomness, right?

19        And that's true, you can't rule out randomness.  But you

20   can't rule out -- you also can't rule conclusively that it

21   wasn't caused by the drop.  So I'm not -- at best, that gets

22   everyone to 50, 50 I think because no one can rule out

23   anything.  And someone has to rule out something to win this

24   motion.  And by that someone I mean the Defendants.  So --

25             THE COURT:  So you'll settle for equipoise.

1       MR. BROWNE:  I would settle for equipoise, but I

2   think I could do a lot better, I hope.  But I would settle for

3   that because that would -- Defendants wouldn't have carried

4   their burden.  And I will make one larger point on this

5   randomness argument, too, again stepping away from the

6   statistics.  If it was random, Your Honor, it was random six

7   times negatively, okay?  It wasn't random three times positive

8   and three times negative, and random one time didn't move.

9   You know -- and, again, I apologize, my calendar (indiscern.).

10  And, you know, it was random every single time in a downward

11  motion (indiscern.).  I'm really sorry for that.  Give me one

12  second.  I'm going to snooze for eight hours because I think

13  we'll probably be done with it.

14      So that's the randomness, you know, point.  When you

15  think about that, maybe it was random.  But it was random in

16  Plaintiffs' favor six straight times and never in Defendants'

17  favor.  So that's another large point.  And then again, Your

18  Honor, and I don't want to belabor this, though I'm happy to

19  talk about it, but just a fundamental failing of Defendants'

20  arguments, you know, is this notion that it absolutely as a

21  matter of law has to be -- statistical significance has to be

22  tested with a one-day window, that a one-day event window is

23  the only thing that Plaintiffs get, and if they don't get that

24  they lose.  Now, we have that for two of them, as I said, and

25  we have them for the frontend price impact disclosure.

1        But, you know, as we lay out in our briefs, and I won't

2   really repeat it unless you want to but, you know, multiple

3   courts, including courts in the Third Circuit, have recognized

4   the propriety of looking at least in certain instances at two

5   or three-day event windows.  And the academic literature that

6   is cited, you know, by courts, and even by the parties

7   experts', also recognize that two, three, and sometimes even

8   five-day event windows can be appropriate.

9        So this sort of fictional constraint of, oh, you can't

10  show statistical significance in one day, you lose, isn't the

11  law.  The Defendants have -- their best case on it is

12  Halliburton II on remand, which is in Texas, which may be why

13  they wanted to go to Texas in the beginning.  But that case

14  has not been widely followed.  And there's many, many more

15  cases, including all the cases in the Third Circuit, which

16  recognize that you can look beyond a one-day window and should

17  look beyond a one-day window.

18             THE COURT:  Each side relies heavily on one district

19  court case, you on Monroe County and them on the Halliburton

20  II remand.

21             MR. BROWNE:  That --

22             THE COURT:  Let me ask you this, though.  Would you

23  agree that as you get further out from the one-day window, it

24  becomes important, not even just as a matter of law but as a

25  matter of common sense and evidence, that there needs to be

 1    some explanation as to why an effect would not have been shown
 2    immediately?

 3            MR. BROWNE:  Absolutely I would agree with that,
 4    Your Honor.  And what I was going to say when you started
 5    asking the question was that you -- exactly that.  You -- if
 6    it -- the farther away you get, I think Plaintiffs do need to
 7    point to some reasons why.  You know, and we do here, and I
 8    want to go through those.

 9        I think we have some very clear explanations for why,
10    including, in some instances, Defendants' own intentional
11    obfuscation and confusion of the facts.  But I think we can
12    point to plausible and compelling reasons why in those couple
13    instances where it took a few days that it did so.  So, yes, I
14    would agree with your statement.  I think we could satisfy
15    that.

16            THE COURT:  All right.

17            MR. BROWNE:  So -- I'm sorry.

18            THE COURT:  No, continue.

19            MR. BROWNE:  Oh, okay.  So, Your Honor, I mean, with
20    that I think I might turn a little bit -- in a little bit more
21    detail to the -- to addressing directly the arguments on both
22    sides of the front impact --

23            THE COURT:  All right.

24            MR. BROWNE:  -- piece of the case, the August 9th,
25    2017, I think it's third quarter, conference call.  Several --

1    the Court sustained several false statements, you know, as
2    correctly alleged at least arising out of that conference
3    call.   There are false statements such as a revolution project
4    construction is scheduled to be complete.  And there were
5    really -- there were statements about the revolution project
6    and when it would be up and running for the most part.

7         So Defendants agree, and our expert agrees, and everyone
8    agrees here that there was an immediate 5.69 percent
9    statistically significant excess increase in the price of
10   Energy Transfer common units following that conference call.
11   Normally game over really for frontend price impact.
12   But what Defendants say is, well, no, it's not game over
13   because we're going to tell you, we've read some analyst
14   reports with our expert and the reason why the stock rose that
15   day, a hundred percent of the reason, Defendants made no
16   effort to disaggregate anything, they just say a hundred
17   percent of the reason was because the company had better than
18   expected earnings and had announced that it wasn't going to
19   engage in a continuing course of mergers and acquisitions
20   which it had been doing for several years.

21        And the market rejoiced about those things, Plaintiffs,
22   the market, it didn't care about the timeline of the pipeline.
23   I'm telling you that's all that mattered.  But it -- as a
24   threshold matter, without any economic analysis to
25   disaggregate the impact of the statements the Defendants claim

1  were false and inflated the price of Energy Transfer common

2  units on that day, Defendants can't carry their burden by just

3  saying that, by just having their expert read some analyst

4  reports.

5      And when you look at the analyst reports, that becomes

6  clear because that -- their reading (indiscern.) reports is

7  too cribbed.  And, for instance, when their expert, Dr. Allen,

8  says that the market was only concerned about the lack of M

9  and A projects, we point in our briefs to multiple analyst

10  reports that came out afterwards that connected that lack of M

11  and A activity with a rejoicing of the fact that the company

12  was going to focus on the pipelines and organic growth

13  projects.

14      So when those analyst reports -- and in one instance

15  Ms. Allen actually omitted a sentence from a block quote that

16  talked about the growth projects.  But when you look at that,

17  when you look at the analyst reports, for instance on August

18  11th, 2017, Wells Fargo issued a report that said another

19  change, talking about a conference call, with management's

20  posture and corporate M and A because:  "Management noted that

21  its focus is currently on project execution and guiding Energy

22  Transfer's sizeable project backlog to completion rather than

23  M and A."

24      So Plaintiffs have certainly plausibly alleged that that

25  lack of M and A activity was definitely, you know, as

1    perceived by the market contemporaneously to be associated

2    with the pipeline.  And, therefore, Plaintiffs at this stage

3    have certainly adequately alleged frontend price impact with

4    those alleged misstatements -- with respect to those alleged

5    misstatements relating to the pipeline.

6         So one other argument that Defendants make, and it really

7    is a bit of a hail Mary, they kind of claim in their sur reply

8    that our expert conceded that there was no frontend price

9    impact on that date.  He didn't concede that.  What he

10   actually said was that, you know, Dr. Allen, their expert's

11   own analysis shown a statistically significant price increase

12   strongly supports Plaintiffs' arguments.  And (indiscern.)

13   Plaintiffs are not conceding it.  We believe the price impact

14   for those statements.

15        Now, a couple of the backend corrective disclosures, for

16   lack of a better word, that I think might benefit from being

17   addressed a little bit directly by me here in this argument,

18   Your Honor.  I want to -- and maybe I won't do all of them but

19   let me just do a couple at least.  And I'm going to focus --

20   well, let me just go for it.

21        So I want to start with, you know, the August 10th August

22   -- through August 13th, 2018 statements which we have

23   characterized as corrected disclosures.  The disclosure about

24   the Franken pipe where the 20-inch pipe was going to be

25   combined with a 12-inch pipe in certain areas as a workaround

1    because of environmental and permitting problems that the

2    company had come up with.

3         So the basic facts around this are on August 9th, there

4    was a disclosure at a conference call that the company was

5    going to do a 12-inch pipe.  Defendants make an argument that

6    might have been disclosed earlier, too.  It's irrelevant for

7    my points here.  It was either disclosed on August 9th that

8    there's a 12-inch pipe or vaguely at some point earlier.

9    What the market -- okay.  There was no price drop on August

10   9th.  Okay.

11        On August 10th, analysts issued reports, new reports,

12   after analysts had contacted the company and said we have

13   internal documents already where the company -- where the

14   analyst said, I'm confused by your statement about the 12-inch

15   pipe, what did it really mean.  I'm paraphrasing obviously.

16   So after some conversations, private conversations, with the

17   company, analysts issued new reports on August 10th which we

18   contend for the first time made clear to the market or started

19   to make clear to the market that this Franken pipe workaround

20   was actually going to cause a substantial reduction in the

21   initial capacity of the pipeline.

22        And, in fact, the Defendants soon admitted that it would

23   be 65 percent less than they had represented before because

24   you can't fit 20 inches of natural gas through a 12-inch pipe,

25   so it was going to be reduced.  The market just didn't

1    understand that based on Defendants' statement on August 9th.

2    It didn't understand that based on any other statement

3    Defendants could point to earlier in the class period because

4    it was confusing.  And it's not me or my expert looking at

5    this and just telling you it was confusing.  We have analysts

6    themselves who came out and said that -- and by the way, Your

7    Honor, I just -- I should note, August 10th is a Friday.

8         So when we go to August 13th, which to complete the

9    timeline there's a statistically significant drop, no dispute

10   by anyone on August 13th, it's not five days.  It's at best

11   three trading days under Defendants' argument, the 9th, the

12   10th, and the 13th.  But really it's two trading days because

13   we say the true disclosures came out on the 10th when the

14   analysts clarified the August 9th drops.  And, Your Honor, so

15   two things happened on the August 9th disclosure.  It confused

16   the market, which multiple analysts directly said in their

17   reports on August 10th, that they were confused, and it had to

18   be clarified.  The law -- there's strong support in the law

19   for instances where the market was initially confused by a

20   statement that later had to be clarified that the -- that it

21   can take longer to see a statistically significant price

22   reaction.

23        So this is one of those instances we're going back to the

24   beginning of the argument, Your Honor, where there was a

25   longer delay between the alleged disclosure and statistical

1    significance, but we have an explanation for that that is

2    really quite plausible because it's not even us saying it,

3    it's analysts saying it, okay?  And then another thing that

4    supports this is we think the Defendants themselves, and we

5    think we'll be able to show it, continued to mislead the

6    market on -- about the true meaningful impact, the capacity

7       And we point in our brief to some documents that we've

8    obtained during discovery where Lisa Dillinger, who's the

9    spokesperson for Energy Transfer, on August 9th, she got a

10   call from a reporter who said, I want some -- I want to

11   clarify your remarks about the pipeline today.  You said that

12   you expect the full 275,000 capacity on ME2 to be up in the

13   third quarter of 2019; is that correct?  And the spokesperson

14   for Energy Transfer responded, we will have it in service

15   using a combination of pipes by the third quarter, and added,

16   this will allow us to flow the majority of the capacity.

17   That's simply misleading.  A 65 percent reduction is not the

18   majority of the capacity.

19       So that happened on August 9th and contributed to the

20   confusion that the market had.  And this is reflected in the

21   August 10th research reports which directly criticize -- the

22   Wolf (phonetic) report directly criticized Energy Transfer for

23   its confusing discussion the prior day, noting that its

24   transparency and disclosure on this project was very low.

25   And a Wells Fargo report on the same day came out and said the

 1    earlier statements:   "confused the market."

 2         So we have evidence, we have explanations for why this

 3    happened.  And then the final point I want to make on this --

 4    and, you know, I find myself making this point on a lot of

 5    Defendants' -- in response to many of Defendants' arguments

 6    about our backend corrective disclosures, this is the shrug

 7    situation again.  You know, they'll throw their hands up.

 8    The Defendants, they don't even analyze August 13th.  They

 9    told -- they clearly told their expert, don't look at August

10    13th.  Their expert didn't look at it.  They say they have no

11    explanation for why things did go down on August 13th to a

12    statistically significant degree if, as they say, it wasn't

13    the news that we claim that came out on the Friday, August

14         So a shrug, and I'll throw my hands up in the air, and

15    say, "Who knows?"  If not -- you know, not in all -- I'm not

16    standing here saying in all instances, Defendants have to

17    explain exactly why everything happened.  But it sure would

18    help their case when you're weighing -- you're weighing the

19    parties' competing arguments here.  If Defendants could say,

20    "Well, no.  No one cared about the (indiscern.) August 10th

21    because it was (indiscern.) August 13th, what happened was X."

22    But instead they just said, "No.  Don't look at August 13th.

23    We have to stop."  And if they really had a winning argument

24    or an argument that was right, in my view, they would have

25    looked at August 13th and explained it.  But that sort of

1   willful blindness doesn't help them carry their burden here.

2   One other back-end disclosure that I want to talk about, Your

3   Honor, is the -- and this is a little bit of an odd one -- the

4   October 29th disclosure, from the Pennsylvania Department of

5   the Environment, issuing a stop-work order on the pipe

6   project.

7       So there's a statistically significant decline again --

8   no dispute between the parties -- on October 29th.  The

9   dispute here is kind of -- is very factual, a little bit

10  unusual.  The Defendants claim, "Well, again, I don't know why

11  the stock dropped on October 29th, but it couldn't have been

12  this stop-work order because that wasn't issued until October

13  30th, and the market didn't know about it until October 30th."

14      And they point to like a Freedom of Records request that

15  they made, from Pennsylvania, that said, "Can you -- do you

16  have any evidence of an October 30th press release

17  distributing the DEP order being distributed earlier than

18  October 30th?"  Well, by definition, no.  You don't have an

19  October 30th press release distributed earlier.  So they got

20  no response to that.  And then they also rely on the Westlaw

21  search that they've constructed to claim that -- to claim that

22  the order was first put on Westlaw on October 30th.

23      But, you know, maybe -- maybe Defendants have raised some

24  questions about that.  But they -- they're not very

25  convincing.  Because what Defendants fail to admit is the

1    order is -- the order itself is dated October 29th.  And if

2    you look at -- you don't have to look at it now.  But just for

3    the record, I'll note Exhibit 17 to our reply brief, "Internal

4    documents from the VEP show the order being sent to

5    Defendants, at approximately 1:00 o'clock in the afternoon, on

6    October 29th."  So the order was absolutely sent outside of

7    Pennsylvania Government circles on October 29th because it was

8    sent to the Defendants.

9         So there's two different versions of the press release

10   that's in dispute on Westlaw.  One says, "October 30th."  You

11   know, one says, "October 29th," according -- you know,

12   according to us.  That version is from State Street News

13   Service.  It's Exhibit 19 to our brief.  So there's a fact

14   dispute here about when that order came out.  Well, not

15   really.  The order definitely came out on the 29th.  There was

16   a fact dispute about when the market started to learn about

17   it.  And I would say in all candor, there's some evidence on

18   both sides, but certainly not enough evidence for Defendants

19   to cut off the plausible and reasonable inference from the

20   fact that this astonishing software order was issue, which is

21   that the marked did learn about it on October 29th.

22             THE COURT:  They also put some emphasis on a

23   Post-Gazette article that was published in advance of the

24   29th.  And at least as I look at the tea leaves, there might

25   have been some impact from that.  But it doesn't seem to be

```
 1   where you're grounding your claim.  How does that fit into the
 2   mix in your view?
 3            MR. BROWNE:  My view, Your Honor, that fits into the
 4   mix as either way, we win.  And here's why.  So that
 5   Post-Gazette article that you're talking about was first
 6   published, according to Defendants -- and I'm not even
 7   disputing it.  But I don't -- Defendants raise that it was
 8   first published, I think, on October 21st, okay?  And then it
 9   was re --
10            THE COURT:  (Inaudible).
11            MR. BROWNE:  -- republished -- no.  But you were
12   right as well.  Then it was republished on October 27th.  And
13   we did point to the October 27th republication in our -- in
14   our complaint.  But Defendants say, "Well, just a
15   republication of something a week later couldn't possibly have
16   -- have moved the stock price," you know, according to all of
17   the other arguments that they make in the case.
18         But the way that I would -- and we're relying really on
19   the DEP order to prove this -- to prove this drop here.
20   Although, if the -- the way the -- to answer Your Honor's
21   question directly, I hope -- the way that I would characterize
22   how that October 27th republication of the article fits into
23   the case is that, if that caused the stock price drop on the
24   29th, that relates to our claims as well.  You know, it's all
25   about environmental and permitting disasters and issues of the
```

1    company.  So if that caused stock price drop on October 29th,

2    then we also have price impact.

3              THE COURT:  I also, in this subchapter or our drama,

4    recall a subplot.  And the subplot was a possibility of the

5    leak of the DEP memo.  And but it --

6              MR. BROWNE:  Yes.  Well, but --

7              THE COURT:  Hold that thought.  Because so you say,

8    well, the Courts -- it's always possible, quote, unquote, that

9    there was a leak.  And Courts have recognized that leaking is

10   a way that things can get to the market.  But how does

11   possibility fit in the burden shifting framework that I'm

12   implying here, right?  I mean, you say, "Okay, could have been

13   leaked."

14             MR. BROWNE:  Yeah.

15             THE COURT:  Do you say, "Well, because they have the

16   burden of persuasion at this point, it's on them to rule that

17   out"?  I'm just -- I'm not 100 percent sure, from Plaintiffs'

18   side of the table, how their putting that leak theory out

19   there.

20             MR. BROWNE:  Yeah.  No.  That's a very good

21   question.  So here's how I would put it out there.  We're not

22   just saying, "It could have been leaked."  We're saying that

23   there is a version of it on my cell, located October 29th.  We

24   are saying there was a statistically significant stock drop on

25   that day that no one has any explanation for other than what

1   we've pointed to.  You know, I guess -- suppose it could be

2   the Post-Gazette article.  But even then, we win.  And we're

3   saying that we know that the order -- leak is a -- leak

4   implies -- I know we use "leak" in our brief.  But leak

5   implies something nefarious.  The market could have just

6   learned it.

7       We know that the order was sent to individuals at Energy

8   Transfer, at 1:00 p.m., on October 29th.  It is certainly --

9   given the Westlaw evidence, the statistical significance of

10  the price drop, the fact that the -- that the work order

11  itself was disseminated outside of Pennsylvania Government

12  circles, on October 29th, we think that at this -- at this

13  juncture, it's very much more plausible that the news of it --

14      And it's big news, right?  It's big.  It's big, big news.

15  You know, we did get into the market earlier than October

16  30th.  So that's what I would say.  I'm not saying I'm 100

17  percent right.  But I think I'm 51 percent right, easily, with

18  that evidence now.  So do you have any further questions about

19  that, Your Honor?  Did that help or --

20          THE COURT:  No, no.  Just following the thread;

21  that's all.

22          MR. BROWNE:  Yeah, yeah, okay.  What else, Your

23  Honor?  Let me -- you know, I don't -- let me talk about the

24  December 19th announcement about -- and I'm going to talk

25  about this because Your Honor specifically asked for an

1    exhibit -- a chart that was in our reply brief on this one.

2    And my colleague, Adam Weirzbowski, is going to do my

3    share-screen for me in a minute here.  I do want to put

4    something up briefly.  I didn't prepare a long presentation,

5    but I do have something short.  But the December 19th

6    investigation, by the Chester County District Attorney, I

7    think Tom Hogan -- yeah.  Actually, Adam, you can just put it

8    down for one second.  Sorry.  Thanks so much.

9         So the announcement on that day -- and it was a --

10   Defendants' expert points to a Twitter post, at 11:36.  She

11   said she didn't look at Twitter, but then this is what she

12   points to.  At 11:36 a.m., that day, that the District

13   Attorney for Chester County was investigating ETE, following

14   reports of numerous sinkholes and environmental issues.

15        Now, the stock price, or the common unit price, for

16   Energy Transfer had risen in the day, until 11:36.  And you

17   can put up the exhibit now, Adam.  I'm sorry.  I should have

18   let you leave it up.  So and this -- it went up.  And then

19   when the -- when the -- in the time -- in the next 24 hours,

20   after the 11:36 alleged disclosure of the announcement, the

21   stock dropped -- or I'm sorry -- the Energy Transfer common

22   unit price stock dropped a quite -- quite significantly over

23   the -- over that next period.

24        And this announcement -- and this is what I want to show

25   Your Honor.  This announcement --  Adam if you could --

1    there are multiple news articles throughout the day that

2    reported on this.  So you see, at 1:09, "StateImpact."  This

3    wasn't in the brief, Your Honor, because we looked at it at

4    first.  But it's -- at 1:00 p.m. -- 1:09 p.m., StateImpact

5    reported on the investigation, and said that Sunoco was

6    surprised to hear -- you know, they basically denied that they

7    did anything wrong.  And then there's another one.  At 2:47

8    p.m., the Philadelphia Business Journal picks up on the news,

9    and reports on the Chester County D.A.; and then, at 2:48,

10   almost at the same time, the Philadelphia Magazine reports

11   that.

12        So the downward trend of the -- of the stock price, in

13   response to that disclosure, we believe is, you know,

14   explained, not only by the announcement of the -- you know, of

15   the investigation itself, but the way that the news picked up

16   on it throughout the rest of the day.  And, in fact, inside

17   Energy Transfer, they were acknowledging -- the executives

18   were -- that this -- that this story was gaining traction and

19   becoming an issue.  In Exhibit 22 of our reply, there's at

20   least -- Energy Transfer executives received a summary on the

21   21st that listed at least eight separate news articles, that

22   came out on December 20th, about this -- about this

23   investigation.  And, in fact, that Exhibit 20, that internal

24   Energy Transfer document, notes expressly that, on the 21st,

25   it says, "Social media activity was slightly lightly today,

1    the 21st, than it was yesterday, the 20th, but remained

2    focused on circulating news of D.A. Hogan's investigation."

3         So when we get to the statistical significant price

4    decline on the 21st -- this is, again, another one of those

5    instances where it did take more than one day to decline.  It

6    only took two.  But we think there are reasons for it that are

7    reflected in the record that established price impact.

8              THE COURT:  What do you make of the rise in the

9    stock as -- toward of the end of the day, on the 20th, and

10   then the beginning of the day, the 21st?

11             MR. BROWNE:  Yeah.  You know, Your Honor, I don't --

12   I don't know.  You know, I don't know whether that lake has

13   fish or not.  But I don't -- what I do know is that, at 3:35

14   p.m., Reuters published another story about it.  There was

15   some rise in the beginning.  But over the course of the day,

16   on the 21st, there was a statistically significant decline.

17   And, again, the Defendants don't point to any other reason why

18   that would have been.  But I think Your Honor's point that

19   some of these things I would submit later in the case, at the

20   loss causation stage, probably will need some more in-depth

21   examination.

22        But the weight of the evidence and the statistical

23   significance decline the next day does -- you know, when

24   coupled with the fact that there were multiple news articles

25   coming out, and they were acknowledging that internally that

1   Energy Transfer does give a higher degree of plausibility, I
2   would submit, to the notion that it was somehow related to
3   this instead of the shoulder shrug or in the hands up or
4   whatever that the Defendants point to.
5           THE COURT:  All right.
6           MR. BROWNE:  I'm sorry, Your Honor.
7           THE COURT:  No.  Go ahead.
8           MR. BROWNE:  Yeah, okay.  Let me see, Your Honor.  I
9   don't -- you know, I feel like I don't -- you know, let me --
10  let me do one more.  The arrest of the Constables, on August
11  8th, which was a Thursday -- you know, the Defendants, again,
12  they kind of rely on the idea that we don't show statistical
13  significance until the following Monday, and that's just
14  enough -- not enough for us to win.  Just, as a matter of law,
15  I would say, constraining the event window to that narrow time
16  is inappropriate, and particularly so here.
17      And, again, going back to the start of our conversation
18  today, there are reasons that we have pointed to, to explain
19  the lengthier decline in connection with this drop.  And
20  that's because the Defendants themselves caused some confusion
21  about whether these Constables were related to the company or
22  not.  And in particular, when news of the arrests came out, we
23  show, in Exhibit 21, the Defendants issued statements that
24  stressed that the Constables were not Sunoco or Energy
25  Transfer employees.  Technically true, but it was causing some

1    confuse -- they were -- they were employed by them as

2    subcontractors that -- in the Code of Conduct, that we allege

3    in the case, Energy Transfer acknowledges applied to their

4    subcontractors.

5         And on August 8th, in Exhibit 21, we show that the

6    Defendants, Your Honor, in response to a press inquiry about

7    -- about the Constables' arrests, an ET spokesperson said, "We

8    have a code of conduct for our contractors and third-party

9    vendors.  And we expect our contractors and employees to

10   adhere to that."  So we would submit, Your Honor, that, again,

11   the Defendants were -- were making further false statements

12   that dampened the immediate negative decline of the Energy

13   Transfer common units in response to that news.  Because as it

14   turned out, or in as we allege and as we believe we will prove

15   ultimately, these contractors weren't abiding by the code of

16   conduct, which, by the way, prohibit a lot more than just the

17   Defendants say, "Well, they weren't -- none of those

18   Constables are in jail now."  The code of conduct was broader,

19   as we all know, than criminal behavior.  And then again, Your

20   Honor, there were news items that we point to that circulated

21   on August 10th, which was a Saturday, about this.

22        And these news articles, Exhibit 22 in our brief, start

23   to make this further connection between the Constables and

24   directly to Energy Transfer as the market began to understand

25   that, and then the final statistical significant drop on

1    August 12th.  So the last disclosure that I'm going to address

2    affirmatively, Your Honor -- obviously, address with

3    responsive questions -- but is the FBI disclosure.  And here,

4    again, this is on November 12, 2019.  A pretty astonishing

5    revelation, the FBI is conducting a criminal investigation in

6    the company.  There's no dispute on that day -- on the next --

7    on the very next day.  The article came out at 3:29, on

8    November 20 -- November 12th.  The stock immediately climbed

9    by 2.6 percent.  The next day, it declined by 4.3 percent,

10   which is statistically significant to the 99th percentile.

11        And I'm always uncomfortable.  Defendants' argument is

12   that the Court has dismissed this from the case.  And it can't

13   -- it therefore can't -- can't be a part of the price impact

14   analysis.  And I'm always sort of uncomfortable arguing to

15   Judges what they have done in their prior orders.  But I do

16   think, Your Honor, that, you know, we point -- we point to the

17   section and the opinion in the loss causation analysis where

18   we believe that it's much -- that the Court did not intend to

19   say that the FBI investigation, which caused a statistically

20   significant impact -- negative price impact, is out of the

21   case for purposes of evaluating whether it revealed, you know,

22   alleged hidden and misrepresented truths regarding

23   environmental regulatory issues and the timelines in the

24   construction process.

25        So we think that's pretty clear, from our brief.  But,

1    again, Your Honor can be the Judge of that, I think, better
2    than me.

3        So with that, Your Honor, you know, the only other thing
4    I will say, and consistent with what we believe is a -- is a
5    more accurate reading of Your Honor's order, Government
6    investigations and Government criminal investigations are
7    particularly strong evidence often of loss causation, even at
8    the loss causation stage.  They are powerful disclosures.  And
9    to discount them and say it couldn't have revealed -- market
10   couldn't possibly have learned anything new.  But FBI -- upon
11   learning the fact that the FBI was conducting a criminal
12   investigation of the company, in my mind, it does -- it's not
13   common sense.  There is a big difference, you know, in common
14   sense and in logic; between kind of knowing that a company had
15   some permitting issues -- which they're largely denying --
16   knowing that there's some environmental issues on a -- you
17   know, on a complicated project -- which the company says it's
18   getting straightened out -- and the FBI opening a criminal
19   investigation, the market cared about this -- it revealed that
20   there were much bigger and deeper -- no pun intended -- deeper
21   problems on this pipeline than people fully appreciated prior
22   to that disclosure.  And it certainly is powerful evidence of
23   price impact.

24       So with that, Your Honor, I will pause.  And I'm happy to
25   answer any questions.  And I would, you know, like some

1   opportunity, if possible, to respond after Defendants have a
2   chance to go.
3           THE COURT:  All right.  No.  I think I've
4   interspersed some of my questions as we've proceeded.  How
5   about we take a five-minute break before we hear from our
6   friends in Texas.  All right?
7           MR. BROWNE:  Okay.  That sounds great.  Thank you,
8   Your Honor.
9       (Recess)
10          THE COURT:  All right.  Plaintiffs, are you lurking
11  there?  I can only see the PowerPoint.
12          MR. BROWNE:  Okay, yes.  John Browne is here.  And,
13  you know, I -- you know, Jeff Golan, from Barrack Rodos, is
14  also here; and Adam Weirzbowski, my colleague -- I neglected
15  to introduce them in the beginning.
16          THE COURT:  Oh, I can see them on the Zoom --
17          MR. GOLAN:  Good morning.
18          THE COURT:  -- in the participate list.  I was
19  certainly aware of their presence.
20          MR. GOLAN:  Thank you.  Good morning, Your Honor.
21          THE COURT:  Good morning.  All right.  We'll go back
22  to Texas, and hear from Energy Transfer.
23          MR. RITCHIE:  Thank you, Your Honor.  Robert Ritchie
24  for the Defendants.  And may it please the Court.   In
25  Halliburton II, the Supreme Court stated that Defendants, in

1   Rule 10b-5 actions may rebut the presumption of class-wide
2   reliance, which is essential to class certification, by
3   offering an event study showing that the misstatements cause
4   no price impact.   Defendants have done exactly that here.
5   We've offered an event study as well as additional
6   corroborating evidence that shows that, on the days on which a
7   correction of the statements at issue first reached the
8   market, there was no statistically significant impact of
9   Energy Transfer's price.   That's sufficient to carry
10  Defendants' burden of persuasion here based on three
11  principles, which I'd like to go over at the beginning of the
12  presentation this morning.

13       So the first principle is that, in an efficient market,
14  price impact on the company stock, if one occurs at all, will
15  occur rapidly, within a few hours of the release of
16  information or a single trading date at the most.  The second
17  principle is that, in an efficient market, price impacts can
18  only be caused by new news; not by the eradiation of old news
19  that's already been impounded into a stock's price.  And the
20  third principle is that an absence of return that can be
21  statistically distinguished from zero is evidence of the lack
22  of price impact.

23       And there's one other point that I didn't have on the
24  PowerPoint, but I wanted to respond to what Mr. Browne said
25  about common sense here.  And he suggests that, just taking a

1   commonsense perspective of what this case is about, the Court

2   could infer price impact.  But I think that really fails to

3   take into account the real context of this case and what this

4   case is about.  And it's important to remember -- as we

5   pointed out at the Motion to Dismiss stage and with, I think,

6   discussion your opinion -- that the prior claims at issue here

7   accounted for about 2.5 percent of Energy Transfer's overall

8   land -- land print of pipelines.

9        And when these disclosures came out, on four of the six

10  days, analysts said nothing at all about the disclosures.  On

11  one of the other days, analysts explicitly suggested that the

12  disclosure would not impact their valuation of this stock.

13  And so, on only one date -- and it's the November 12th date --

14  was there substantial analyst coverage about that event.  And

15  we'll discuss that in detail why we don't think that shows

16  price impact either.

17       And so we think that actually contrasts this case with

18  other cases.  Mr. Browne said he felt this was different than

19  a lot of cases he's worked on.  We felt the same thing.

20  Because in most securities fraud cases we've worked on, the

21  corrective disclosures show a huge downward movement in the

22  stock that's clearly related to the alleged fraud at issue

23  here.  And we've talked about a disclosure that you had an

24  earnings miss and a 30 percent drop.

25       Here, we're talking about very small statistically

1    insignificant drops.  And, in fact, I think that's why you see

2    in a lot of the cases -- which we'll go over in a minute --

3    that Defendants are often trying to focus only on front-end

4    price impact, even in price maintenance cases, as Plaintiffs

5    allege here, because, there, they can try to get away with

6    showing a lack of statistically significant impact.  We don't

7    do that here.  We'll argue the front-end as necessary -- and I

8    think has a small role in this case.  They've only argued one

9    date that has front-end impact, despite a fact that it's

10   extremely similar disclosures to all of their other front-end

11   statements.

12          But we welcome the idea that we need to look at the

13   back-end.  As many cases have held, when a Plaintiff alleges a

14   price maintenance case, the best place to look for price

15   impact is at the back-end.  And, here, Plaintiffs can't do

16   that either.  And so I actually think this case is very unique

17   and distinct from a lot of the price impact cases you see and

18   why Defendants have a strong argument that there's no price

19   impact here.

20          THE COURT:  As to your first principle -- which

21   obviously is wildly accepted by economists -- does it depend

22   on the type of disclosure; in other words, the speed with

23   which the market absorbs it and reacts?  And, by that, I mean,

24   is there a difference between quantitative news and

25   qualitative news?  Quantitative, for the sake of discussion,

1   we'll call "earnings."  And qualitative, "developmental news,"
2   that will talk about a project.  Is there just logically more
3   of a reason that there would be a delay when the disclosure in
4   question is not strictly quantitative?

5         MR. RITCHIE:  So, Jimmy, you go ahead and turn the
6   slide.  So I'm going to go into each of these three principles
7   in a lot greater detail.  And the answer to your question, I
8   think, is that, yes, in some instances, there could be a
9   distinction between the type of disclosure and how long it
10  takes to be impounded into a stock's price.

11      So Plaintiffs' expert points out -- you know, there are
12  some unique situations, such as, for example, if the
13  disclosure is made on day one, in Hungarian only, and it's not
14  translated into English until day two, well, maybe you'd look
15  at day two.  And that's -- I think we could have an
16  interactive debate on that perhaps.  Luckily, we don't have to
17  go into that, because we don't think that there are any such
18  disclosures here.  And I think simply drawing a
19  qualitative-quantitative distinction is too simple.  And the
20  reason is that, in order to invoke Basic in the first place --
21  and it's both -- both a theoretical matter and a factual
22  matter as far as what Plaintiffs have alleged on Energy
23  Transfer's stock.

24      And so in order to invoke Basic, in the first place,
25  Plaintiffs pointed out that Energy Transfer was closely

1    followed by analysts, market makers, traders, arbitrageurs,

2    during the class period.  And that as a result of that intense

3    trading -- intense coverage and trading competition, Energy

4    Transfer's stock would react so rapidly to new information

5    that it would be impossible to our nexus returns by trading on

6    that information.  And that argument is essential to

7    Plaintiffs' request for class certification.  Because if a

8    market does not react to new news within minutes, one cannot

9    presume that each statement at issue would be reflected in

10   every trade made by class.

11        First, there's trades going on at all times.  And so if

12   it's possible for investors to beat the market by trading on

13   information before it's reflected in the stock price,

14   individual analyses or reliance would be required, and

15   individual issues would predominate over class ones.

16        So what we would argue is that, unless it's something

17   where the news is so complicated -- such as the Hungarian

18   example -- that it's not reasonable to think it would be

19   possible for investors to trade on that information before

20   it's reflected in the stock's price, that you must assume that

21   at all times that material information is reflected in the

22   stock's price in order to invoke Basic in the first place.

23            THE COURT:  Well, Ms. Allen concedes it's an

24   efficient market.  I mean, it didn't seem to be in dispute.

25            MR. RITCHIE:  Absolutely.

1          THE COURT:  But now I see you sort of almost

2     advancing a legal principle, which is that if at any point a

3     disclosure is not something that was rapidly and automatically

4     absorbed, then that undercuts the existence of the efficient

5     marketplace, and I'm not sure that the two are necessarily

6     mutually exclusive.  So --

7          MR. RITCHIE:  You know, during (indiscern.), I think

8     what our argument is is that plaintiffs can't have it both

9     ways.  In order to invoke an efficient market and invoke Basic

10    in the first place, they had to argue that Energy Transfer's

11    stock incorporated new news so rapidly that it would be

12    impossible for investors to trade on that information before

13    it was reflected in the stock price, and that's because Basic

14    holds that on well developed markets, a stock reflects all

15    publicly available information at all times.  That's I think

16    the essence of the presumption.  Because if that's true,

17    everybody who trades on the stock is trading in reliance

18    implicitly, if not explicitly, on the statements.  They're in

19    the stock price.  There's not a gap of time where people can

20    trade on the stock knowing the news but it not being reflected

21    in the market, or vice versa.  If there were that gap of time,

22    basic wouldn't hold.  The presumption would fall apart.  And

23    we don't disagree with that principle.  We don't disagree with

24    how Mr. Kaufmann got there, his arguments about how many

25    market makers there were and how rapidly Energy Transfer would

1    absorb new information.  But what we are pointing out is that,

2    as the 11th circuit holds in the court on the screen, that a

3    plaintiff that invokes the petition markets and presents

4    evidence like this, and it's true in this case, cannot -- you

5    know, must take the bitter with the sweet, as the 11th circuit

6    said.  You can't turn around and deny the rapidity with which

7    that information would be reflected in the market for the

8    purpose of avoiding other issues, such as price impact.

9          THE COURT:  All right, I get the proposition you're

10   advancing.

11         MR. RITCHIE:  Okay.  And we don't -- there's also no

12   general basis to do so.  I mean, I think it's textbook finance

13   as we point out on page 14, #3, that the price of a stock on

14   Wednesday afternoon will already reflect information contained

15   in a Wednesday morning press release.  It's not a novel

16   proposition we're advancing.  Mr. Kaufmann, as we said,

17   reflects it.  He uses one-day windows to evaluate whether an

18   Energy Transfer stock reacted or did not react on no news days

19   to information in his own bid study.  And in the prior case,

20   Mr. Kaufmann testified that the "unequivocally appropriate day

21   to evaluate price impact" {close quote} is the new -- is the

22   day the news is released and not the following day, which in

23   that case another expert had suggested.  And we point that out

24   at page 15 of our opposition paper.

25         Plaintiffs point to Endo, a Judge Baylson case out of

1    this district to target --

2              THE COURT:  He's my colleague, yes.

3              MR. RITCHIE:  Correct, yes.  And that case is no

4    exception.  In that case a disclosure was made on day one, and

5    a clarification was made on day two.  And the court held that

6    it was reasonable to look at day two as well as day one for

7    purposes of class certification in that instance.  The

8    defendants don't dispute that.  In fact, for example, as Mr.

9    Browne talked about, on August 9th there was a disclosure, on

10   August 10th there were endless reports that gave more details

11   to the disclosure, and in our price impact analysis,

12   consistent with Endo, we look at both dates.  And that's

13   really -- that's what all of these cases out of courts in the

14   3rd circuit are saying on this matter.  They're not saying

15   that you can just skip ahead dates to day three when there was

16   no news at all, and you would have had a whole trading day for

17   investors to look at that information.

18             THE COURT:  I think you could assume that to the

19   extent that I'm going to look past a day, it's going to have

20   to be on the basis of some facts that make it reasonable to do

21   that, and you can assume I agree with the proposition that an

22   expert can't just pick a window that proves a point.  They

23   need to pick a window that's justified by the evidence in the

24   record.

25             MR. RITCHIE:  Very good.  Then that is the gist of

1    our first point, is that you need a compelling reason, as the

2    Halliburton II remand decision said, to look beyond that day

3    one.  And I would just stress that it would have to be a

4    reason that would show that it would be impossible for

5    investors to have traded in that stock during that window,

6    during that first-day window.  So that's the first principle I

7    wanted to talk about.

8        The second principle is simply a corollary of the first.

9    It's that only new news can affect a stock's price, not the

10   reiteration of old news.  And the reason for that is because

11   an efficient market will have already impounded old news into

12   its stock price.  So and once that's done, it can't be done

13   again.  In our opposition brief, we cite numerous authorities

14   on this point, and I don't think I need to belabor them

15   because I don't think plaintiffs are disputing it.  And as you

16   see, their own expert said in another case, and they don't

17   seem to be disputing in their briefs, that statements that

18   repeat information already disclosed to investors are not

19   expected to impact the price of the security trading in an

20   efficient market.  So there are some -- again, some disputes

21   about the application of that principle and whether news is

22   new that I'll talk about in a moment.  But the mere repetition

23   of news should not affect the price of security trading in an

24   efficient market.

25       The third principle I wanted to talk about this morning

1    is that a lack of statistically significant price movement on

2    the date that a disclosure reaches the market is strong

3    evidence of a lack of price impact.  We believe this is

4    implicit in Halliburton II in which the supreme court

5    explicitly invites defendants to proffer event studies at the

6    class certification stage, and states that by doing so they

7    can show a lack of price impact.  And the cases following

8    Halliburton II, most clearly the Halliburton II remand

9    decision itself, took that for granted.  Judge Lynn denied

10   class certification as to corrective disclosures for which

11   there was no statistically significant movement on the day in

12   which the news reached the market.

13        Claimant's cases, again, are not to the contrary in our

14   view.  Plaintiffs cite three decisions within the 3rd circuit,

15   they're all district court decisions or non-binding summary

16   orders of the 3rd circuit, and they say that -- they indicate

17   a point, so the lack of statistically significant price

18   movement following a misrepresentation does not necessarily

19   show a lack of price impact.  But those cases are not

20   pronouncing on the evidentiary value of an absence of

21   statistical significance in general.  They are opining on a

22   timing issue.  What they are saying is that where a plaintiff

23   is relying, as plaintiffs here are relying, on the price

24   maintenance theory, one must look at whether there was a price

25   impact at the time this statement was allegedly corrected, not

1    right after it was made.  And most of the other cases
2    plaintiffs cite from outside of the 3rd circuit are making the
3    same point, or they're arguing, as the 3rd circuit cases also
4    argue, that merely relying on a plaintiff's event study
5    without doing the legwork yourself, as we did here, may not be
6    sufficient.  So we think all of those cases are
7    distinguishable.

8         And plaintiffs do, as Mr. Brown pointed out in his
9    presentation, rely heavily on this Northern District of
10   Georgia case that is the <u>Monroe vs. Southern Company</u> case.
11   But there are a couple factors in that case that we do think
12   make it distinguishable.  Most notably is it seems to very
13   clearly rely on a burden of proof or a burden of persuasion
14   that is not compatible with the way it was laid out in <u>Goldman</u>
15   by the supreme court which came after that decision.  So it
16   says things such as that defendants have not conclusively
17   established or proved to a scientific certainty that there is
18   no price impact.  And of course, when any party is tasked with
19   proving a negative, as we are here, those standards are going
20   to be impossible or at least I would think impossible.  To me,
21   you have -- you can't presumably do a negative to a scientific
22   certainty, and --

23            THE COURT:  Well, your burden is preponderance of
24   the evidence, right?

25            MR. RITCHIE:  That's right.  That's my point.

```
 1              THE COURT:  You've got the burden -- you agree with
 2     me that Goldman says A) you've got the burden, not just to
 3     production but of persuasion, and B) your burden is proof by a
 4     preponderance of the evidence, correct?
 5              MR. RITCHIE:  I do agree with that.  And Goldman
 6     stressed, and I think it used the word emphasized, that that
 7     burden should rarely be dispositive, and it should only come
 8     into place where the evidence is in (indiscern.), which we
 9     don't -- we think it certainly is not here, and Goldman --
10              THE COURT:  Well, wasn't that dicta to assuage
11     Justice Gorsuch?  I mean --
12              MR. RITCHIE:  Well --
13              THE COURT:  -- as I -- I understand all the emphasis
14     you're putting on that, but at the end of the day it seems to
15     me we've got a well-defined standard, and it also seems to me
16     that the other thing Goldman says that plaintiff puts more
17     emphasis on and you put less emphasis on is the need for the
18     district court to look at all of the evidence and decide those
19     issues based on all of the evidence would necessarily include
20     the statistical and the non-statistical, and then I think,
21     because we have (indiscern.) experts about what the
22     appropriate window is, and then the models, and then we've got
23     Kaufmann even saying, well, we had a type I versus type II
24     analysis.  My model is different.  As I view it, I need to
25     take all that into consideration, along with all of the
```

1    articles and the timing and the market data, and based on that

2    decide whether you've met your burden.  That's how I read

3    Goldman.

4            MR. RITCHIE:  I don't disagree that Goldman

5    certainly holds that the court must take into account all the

6    evidence and that the standard is a preponderance.  You know,

7    I take its, you know, emphasis on when that standard should

8    apply seriously, but whether it's part of the reasoning in the

9    decision of dicta is, you know, it's a hard law school test.

10   But --

11           THE COURT:  Well, when we're talking presumptions

12   and burdens, that almost restates the evidentiary standard,

13   right?

14           MR. RITCHIE:  That's right, but I think what I take

15   Justice Breyer to be doing, not only is he responding to

16   Justice Gorsuch, but responding to lower court decisions, such

17   as the Monroe decision implicitly, where it's saying things

18   like you must prove inclusively or to a scientific certainty,

19   and it's saying, lower courts, that's not actually the

20   standard.  And the reason this is -- this seems like it's such

21   a big deal where the burden is, is because that has been

22   misapplied repeatedly and it should only come into place where

23   the evidence is in (indiscern.).  But I do agree with Your

24   Honor, of course, that the case says you should take into all

25   -- take into account all of the evidence, statistical and non-

1    statistical, and we think that all supports us, as I'll

2    continue to explain.  But as far as the statistical evidence,

3    I did want to talk about the fact that -- plaintiffs' fishing

4    analogy from the Monroe case.  Plaintiffs say that a

5    statistician that says he did not find statistical

6    significance and therefore has evidence that there is no price

7    impact, it's like a fisherman who drops a line in a pond and

8    says, having caught no fish, there must be no fish.  But the

9    problem with the fisherman's statement there is he did not run

10   any sort of scientific test of the question.  If he had, if he

11   had used some radar mechanism or, you know, dozens of

12   fisherman on dozens of days, you know, to really assess the

13   question, and he had determined from that that there's no

14   evidence of price -- of fish being in the pond, that the

15   evidence is consistent with zero fish being in the pond, he

16   would have evidence that there's no fish in the pond, because

17   he'd run a powerful test and he did not come up with any

18   evidence.  So the problem with the fisherman is he's not done

19   so.  He's, you know, just --

20            THE COURT:  I think for present purposes we can

21   assume the district judges in Georgia do a lot more fishing

22   than the district judges in Florida, and that's not really

23   going to drive my analysis.

24            MR. RITCHIE:  Okay, fair enough.  That makes sense

25   to me.  Plaintiffs also pointed out at one point, although I

1    think it was down-played in Mr. Brown's presentation that

2    defendants are relying heavily on a 95% level of statistical

3    significance, and they point out that there are some cases,

4    such as the Chicago vs. Nairn case, that say yes, to be sure,

5    that is the standard that most statisticians use, most

6    academics use, and that the courts have generally required.

7    However, if you get very close to that, say above 90%

8    statistical significance, you can also look at that perhaps as

9    positive evidence of a price impact.  But the important thing

10   for us is that's academic in this case because defendants

11   aren't relying upon any date in which there is price -- or

12   there is statistical significance above 90 but less than 95 to

13   argue, that's our evidence of a lack of price impact.

14        And lastly I would point out that defendants, to your

15   point about the Goldman case and what it required, have

16   buttressed their evidence with non-statistical evidence, so

17   the surrounding analyst commentary.  As I said, for four of

18   the six corrective disclosures, there is no analyst commentary

19   commenting on these corrective disclosures at all.  On one

20   other one, the analyst commentary is suggesting that there

21   would not be an impact on the analyst evaluation from what is

22   claimed to be a corrective disclosure.  And then on many other

23   dates, an additional piece of non-statistical evidence, is

24   that there are many other dates where very similar disclosures

25   were made, as our expert points out in her report.  And

1    plaintiffs, curiously, have not chosen any of those dates as

2    corrective disclosure dates.  And the reason appears to be

3    selection bias.  They've looked at those dates; there was no

4    upward price movement and so they said, well, that won't work

5    as a corrective disclosure statement, let's see if later on

6    there's a similar date and we'll use that.  And so that runs

7    into the problem of both no new news, but it also undercuts

8    this argument Mr. Browne was making which said, well, on, you

9    know, all of these dates there was very slightly negative non-

10   statistically significant but negative movement.  Well, that's

11   not really instructive when you cherry-pick the dates on which

12   you are making that analysis.

13        So those are the three general principles, and I think

14   those really decide this entire case and that it's just an

15   application of those three principles.  And so but now I want

16   to -- do want to apply them to at least several of the key

17   dates at issue, and especially the ones that plaintiffs raised

18   in their surreply, and we haven't had a chance to respond to,

19   once again.

20        So first of all is the first corrective disclosure date,

21   the August 9th through the 13th window.  In that window,

22   plaintiffs argue that on August 9th, Energy Transfer

23   reiterated previously disclosed news that it would be using a

24   12-inch pipeline to complete certain sections of Mariner East.

25   But as the complaint itself concedes, that information had

1    been previously disclosed on July 3rd, 2018, had no
2    significant price movement.  In fact, upward movement, but not
3    statistically significant, so indistinguishable, or zero.  And
4    as a result, it's a straight application to the second
5    principle I discussed, that on that day that news had already
6    been impounded into the stock's price.  And I don't think
7    plaintiffs are really disputing that anymore.  They seem to
8    largely be focusing on August 10th, the next morning, when
9    before the market opened, two analyst reports were released
10   that gave additional details on the impact of the use of that
11   pipe and gave how that would impact the capacity and spelled
12   that out and distributed that information to investors before
13   the market opened.  Now there is reason to question, as a
14   qualitative matter, how news-worthy that was for investors to
15   the price of the stock, because those analysts reach a
16   conclusion that this would not have an effect on their overall
17   evaluation of the stock.  They certainly note it in their
18   report, they discuss it, but they don't say we're changing our
19   price targets because of this, and in fact they say the
20   opposite.  And another reason is because after the July
21   disclosure that the smaller pipeline would be used, there were
22   analyst reports at that time, or at least one analyst report
23   that we cite, it's exhibit-30 to our opposition, that
24   acknowledged that this smaller pipeline would be used and it
25   would have an effect on capacity.  Didn't have the precise

1    numbers to be sure, but there -- it was, you know, a common

2    sense acknowledgment that there would be an effect on capacity

3    and no impact on the stock (indiscern.).

4         But in any event, in addition to these qualitative

5    factors is the quantitative issue that is undisputed.  Both

6    experts on each side found no statistically significant price

7    movement on August 10th.  So plaintiffs are left to argue that

8    the court should look to the movement of Energy Transfer's

9    stock price on August 13th, but as discussed, the entire

10   purpose of plaintiff's indication, the basic presumption is

11   that Energy Transfer's stock price would react so rapidly to

12   new news that it would be impossible to trade in the stock

13   after news was released but before it was reflected in the

14   stock price, and that's entirely inconsistent with the idea

15   that news could be released before the market opened on August

16   10th, to a whole trading day after investors were given this

17   information to read and there was this competition among

18   arbitragers, investors, and market makers.  It had no effect

19   on the market that day, and it skipped until the next Monday

20   before we see an effect.

21        So in response, plaintiffs argue that defendants should

22   be required to offer an explanation for Energy Transfer's

23   stock price and the movement on August 13th and that we just

24   get -- it's the shrug argument that Mr. Browne made.  But

25   plaintiffs themselves recognize, and it's explicit in Mr.

1    Kaufmann's report, that on one of twenty {quote} "no news

2    days, Energy Transfer stock price would be expected to move

3    statistically significant based on inherent randomness alone."

4    That's Mr. Kaufmann's opening report at paragraph 62.  And so

5    it's not surprising, particularly given that plaintiffs

6    skipped over many other dates that could be corrective

7    disclosures that didn't happen to be within a couple days of a

8    statistically significant decline, that they were able to

9    locate a couple.  For example, they skip over the July 3rd

10   disclosure for exactly that reason.  So it's not surprising,

11   just given the fact of how often this would occur, that they

12   could find a random date.  So we argue based on all of those

13   factors that there should be no price impact associated with

14   August 9th through 13th, with that corrective disclosure

15   window.

16        And the second window that I want to discuss is the

17   November 12th through 13th window that's mentioned in the

18   surreply.  This is a window that's based on news that the FBI

19   was investigating not Energy Transfers, I think Mr. Browne

20   stated, but probably impacted (indiscern.), there's just no

21   statement in the article that Energy Transfer is being

22   investigated, but that Governor Wolf's administration was

23   being investigated as to -- into conduct approving

24   construction permits for Mariner East 2.

25        So plaintiffs argue that Energy Transfer's stock price

1   movement in response to this news shows price impact.  But the

2   question we've asked is as to what statements?  Price impact

3   must be shown as to particular statements at issue.  You can't

4   just pick any stock price movement at any date.  And as our

5   opposition has explained, the statements with the most direct

6   connection to this news have been dismissed from the case.

7   And the other alleged misstatements, to the extent they needed

8   any correction, had already been fully corrected long before

9   November 12th, 2019.  So for example, plaintiffs argue that

10  one of the statements that was corrected were timeline

11  completion statements regarding Mariner East.  But the most

12  recent statement on that point was made in I believe August

13  2018, predicting the completion in 2018 at the reduced

14  capacity, as at the -- around the time of the August

15  statements.  And then in December 2018, the news became public

16  that Energy Transfer had in fact put Mariner East into service

17  at its reduced capacity in December 2018.  So it strains

18  credulity to think that 11 months later, that statement from

19  August was still being corrected by the mere news that the FBI

20  was investigating the permitting process into Mariner East 2.

21  And this is especially so since there was explicit news about

22  what the FBI was investigating before November 12th.  There

23  was news about the allegations of the DEP overlooking

24  deficiencies.  There was news about Governor Wolf's

25  administration supposedly threatening people with their jobs.

1    All of this had been previously disclosed.  So the new piece

2    of news was a very small sliver that said the FBI has taken a

3    bit of interest in this news.  And plaintiffs argue that this

4    corrected essentially every segment of this case.  And we've

5    asked them, explain how.  How does that work, for based on the

6    reasons we've pointed out here?  In light of all this other

7    news, all the prior corrective disclosures, all the potential

8    corrective disclosures they've ignored that we outlined in our

9    expert report, how does that work?  And their argument is

10   essentially, look, that's a loss causation issue.  We don't

11   have to look into that.  And that, it was explicitly rejected

12   in Goldman.  Goldman says on several occasions that the fact

13   that part of the analysis of price impact overlaps with a

14   merits issue, such as loss causation, is no basis to ignore

15   that issue.  So we just think that argument just does not

16   work.  Now they have a number of cite -- pre-Goldman

17   citations, and I think they found a district court, we would

18   contend erroneously, post-Goldman that said that.  But it's

19   just slightly incompatible with statements like this in

20   Goldman.

21            THE COURT:  Well, Goldman says the evidence should

22   be considered, it doesn't say loss causation needs to be

23   decided at the certification stage.

24            MR. RITCHIE:  Loss causation doesn't need to be

25   decided, correct.  And I think we're saying --

1           THE COURT:  Right, yes, so that falls into the

2    basket of I need to look at all material evidence.

3           MR. RITCHIE:  That's right.  That's right.  We're

4    saying it's plaintiff's argument that you can't look at that

5    because it overlaps with loss causation, that fails.  That's

6    all we're saying here.

7        So next I want to point to plaintiff's front-end price

8    impact argument.  And Jimmy, if you'd bring up the chart on

9    that, on the front-end base, you know, as an initial matter,

10   we find it a little convenient that plaintiffs have plucked

11   this one date where they're going to argue this is not a price

12   maintenance date.  Because it's very similar.  The date is a

13   reiteration of previously stated timelines, right.  There are

14   other statements that are like that.  They don't claim those

15   are inflation-introducing statements.  And the reason they

16   don't do so is because if they did, up front and pricing back

17   analysis would undermine their argument.  They have no

18   statistically significant entries on any of those dates.  The

19   only other date they have is day 26, we argue about in our

20   opposition, and they dropped, and they said that's actually a

21   price maintenance statement, too.  And so it seems what

22   they're doing is while they found a positive price movement,

23   that was on the same date as an earnings call with positive

24   news, and they said, well, you know, we'll argue that this is

25   front-end price impact.  But the problem for plaintiffs in

1    doing this is that it -- their claims -- their own expert has

2    conceded, both here and elsewhere, that an analysis of front-

3    end price impact only makes sense if the statements would be

4    expected to surprise the market.  And that's because if a

5    statement reflects what the market is expecting to hear, it

6    would already be impounded into the stock's price -- this is

7    the second principal I talked about -- and not cause a price

8    impact.  And here, the August 9th, 2017 statement merely

9    reiterated already public timelines that had been publicly

10   stated just a month before -- just over a month before, on

11   June 27th, 2017.  And to be sure, some analysts noted those

12   timelines in their analyst reports.  We don't deny that; we

13   never have.  What no analysts say is, oh, this is surprising

14   and this is great positive news, because we thought that in

15   the interim from June 27th to August 9th, that five- or six-

16   week period, we expected the timelines to get much worse, and

17   in fact they didn't.  Nobody says that, they just note them,

18   which is, you know, a common thing that analysts do, they

19   note, you know, all sorts of facts whether or not they're

20   surprising or not.  And in fact -- Jimmy, if you can turn to

21   slide 10 for me -- plaintiffs' own expert -- Mr. Browne

22   disputed this, he called this a Hail Mary argument, but I

23   respectfully disagree.  Plaintiff's own expert stated that

24   there is no evidence of which he is aware that would suggest

25   that any of the alleged misstatements would contradict

1    existing market beliefs or surprise the market.  And he also
2    stated that he has not asserted that any front-end impact
3    occurred.  So he then goes on to have some criticisms of our
4    expert and her analysis of this date, but he's very careful,
5    if you read those paragraphs, he's very careful not to say
6    he's opining that there was a front-end impact.  And in fact,
7    in paragraph 57 he says exactly the opposite, said there's no
8    evidence of which he's aware that would suggest these
9    statements would contradict existing market beliefs or
10   surprise the market, which means, based on statements he has
11   elsewhere made, and makes, in fact, in the prior paragraph in
12   his report, that you cannot reliably evaluate front-end price
13   impact on those statements.  They are in fact price
14   maintenance statements and you should evaluate them solely on
15   the back end.  So we understand there's no evidence of front-
16   end price impact for this date or for any other date, and you
17   can -- the court can focus its analysis solely on the back
18   end, as many courts have done.

19        As to the back end on the other dates, if we can pull up
20   the other chart here, the other dates -- there's no other date
21   that has a statistically significant decrease.  And as I said
22   at the front of the presentation, this is really remarkable in
23   the context -- and these, of course, are the dates when the
24   news reached the market, not their dates several days on in
25   which they found those.  But that's really remarkable and I

1    think distinguishes this case from most security fraud cases.

2    Most security fraud cases come when a -- you know, plaintiffs

3    go to the market after seeing a huge decline that's clearly

4    related to something, and we just don't have that here.  What

5    we have is something that is closely tracking the market, it's

6    not statistically significant, and both experts are agreeing

7    to this.  There's no expert dispute for this court to

8    adjudicate.  There's nothing we have to adjudicate about which

9    index to use or whether the bond (indiscern.) adjustment needs

10   to be used or anything like that.

11        And so just to address a couple of these dates that Mr.

12   Browne did, the October 29th, 2018 order, you know, I think

13   the court's questions to Mr. Browne reflect largely our

14   arguments, but on that date, on October 29th, 2018, plaintiffs

15   point out that the DEP issued an order to an MD transfer, a

16   stock work order, but it was not publicized until October

17   30th, 2018.  We received -- you know, we got a certified copy

18   of the email in which the press release announcing this is

19   released.  Then we asked the DEP, "DEP, just to be sure, did

20   you release this press release to anybody before October 30th,

21   2019?"  Including state's news service, the article that Mr.

22   Browne found.  And they said no, we did not.  We have no

23   records of that.  Okay, so then let's look at this article Mr.

24   Browne found on Westlaw.  It said -- it does have a timestamp

25   of October 29th, and they said, well, that's evidence it was

1    issued on October 29th.  But they can't find, and we can't

2    find, any publication of this anywhere except Westlaw, and it

3    wouldn't make sense that they would have that press release

4    before October 30th, based on what the DEP told us.  So --

5              THE COURT:  Can I interrupt you with a nuance

6    question?  And my nuance question is when you said we asked

7    DEP and DEP said, you really did that by way of the document

8    request, right?

9              MR. RITCHIE:  Yes.

10              THE COURT:  And the information request.  And so

11   you're interpreting their lack of records as answering your

12   question the way that you're putting it forward.  But what am

13   I to make of the timestamp of the 29th on Westlaw?

14              MR. RITCHIE:  Yes, absolutely.  So we do have one

15   article, it's published only on Westlaw.  The only evidence in

16   the record is that the only place it was published is on

17   Westlaw.  But when did Westlaw publish that article?  Westlaw

18   published it on October 30th.  You can confirm that through

19   Westlaw's metadata and searches, as we point out.  So that

20   article, why it has a timestamp of October 29th, I don't know,

21   based on what the DEP told us, okay.  But we know it wasn't

22   published on Westlaw until October 30th.  So all of the

23   evidence in this case points to the first publication of that

24   news coming out on October 30th, on which there is no

25   statistically significant decline.

1          THE COURT:  I guess where I'm hung up here, and this
2     is where I think burden might potentially matter, I'm not
3     sure, is the mere fact that somehow it would come into the
4     possession of Westlaw on the 29th, regardless of when they put
5     it on its website, suggests that DEP sent it somewhere other
6     than simply to Energy Transfer, and it's just that the
7     document request -- and I'll be candid.  When I look at a
8     document request via a state agency like that, I don't think
9     its absence of documents as being strong evidence of what
10    really happened just because of the nature of the beast.  And
11    I don't say that critically to them, it's just that I don't
12    know how well they would track something like that, or
13    candidly, how seriously they would take that request, how
14    deeply they're digging, you know, just hey, is there anything
15    in the file?  So I'm just -- on both sides of the argument
16    here, I'm a little confounded.

17         MR. RITCHIE:  Well, I'm not really disputing the
18    points you're making here.  I would just say that we have put
19    forward this evidence, and it's the best way we know how to
20    come up with when this was released, asking the DEP, can you
21    give us a certified copy of when this press release was
22    distributed?  They did so, it's October 30th.  And asking
23    them, okay, well, just to be sure, because I guess it's
24    possible it could have been before, do you have any records of
25    it going out before?  They say no.  So we think that is

1    evidence -- maybe not irrefutable evidence, but evidence that
2    this was issued first on October 30th.  Plaintiffs, on the
3    other hand, don't have any evidence that it was issued on
4    October 29th.  The closest they come is this Westlaw article.
5    But we have untangled that and shown it to be consistent with
6    what the DEP said, that it was actually first published on
7    October 30th.  And so because this news wasn't public,
8    investors didn't have the opportunity to trade on it until
9    October 30th and it couldn't first hit the market.  Now you
10   can always speculate, I suppose, that any news, and that would
11   in fact evaporate the whole price impact analysis totally if
12   there was just enough to speculate that there could be another
13   -- you know, this could have come out on this date with no
14   real evidence, just speculation.  But, you know, it's I think
15   well-settled law and we cite a 3rd circuit case with this
16   principle, that speculation is not evidence.  So I think in
17   weighing the proposed --
18            THE COURT:  That was another one of those non-
19   precedential cases.  But we'll assume I agree, just as a
20   matter of general common law, this regulation is not evidence.
21            MR. RITCHIE:  That is correct.  Actually I do
22   remember that.
23            THE COURT:  I do read the briefs.
24            MR. RITCHIE:  Good, yeah, I'm impressed.  That is a
25   very nuanced memory.  So that's great.  But if you take that

1    general principle, whether or not that's binding or not, they

2    have only speculation, non-evidence.  We have evidence, maybe

3    not irrefutable evidence, so we think the preponderance to the

4    evidence clearly shows that the appropriate date to look at is

5    October 30th, when there is no price impact.

6        Mr. Browne also looked at December 19th, 2018.  This

7    involved an announcement by the DA of Chester County of an

8    investigation into Energy Transfer.  On that day, as we

9    pointed out, Energy Transfer out-performed the market.  The

10   plaintiffs said, well, but you didn't take out those first 2½

11   hours.  And, you know, we've put in some evidence that says,

12   look, that's just not standardly how event studies are done;

13   you look at the full day, and that's why we did that.  But

14   let's take them at their word.  What happens if you do take

15   out the first two hours and just do 11:36 a.m. to close that

16   day.  Well, Mr. Browne's interest in Sharp that shows a

17   downward trend does not control for the broader market.  And

18   if you do, using the SMP oil and gas and consumable fuels

19   index, which is -- we didn't just make up, that's the index

20   that Mr. Kaufmann uses to control for market movements, Energy

21   Transfer out-performed the market.  Not only was there not a

22   statistically significant decrease, it out-performed the

23   market on that date.  So there's no evidence of a price impact

24   on that date.  And if you look at the next date, December

25   20th, you find the same thing, Energy Transfer out-performs

1    the market once again.  And they argue, well, you know, news

2    organizations continue to report on this.  But associated

3    press -- first of all, we think the initial news, distributing

4    the press release from a news reporter is sufficient.  But

5    even if you didn't, if you thought it needed to be a broader

6    outlet, numerous outlets reported on it, including the

7    Associated Press on December 19th.  So you would have to look,

8    either December 19th or perhaps December 20th, which we would

9    disagree with.  But if you look at it, Energy Transfer again

10   out-performed.  So there's just no evidence of price impact on

11   that day.

12        And the final date that I think Mr. Browne talked about

13   was the August 8th, 2019 date when the Chester County DA

14   arrested two Pennsylvania constables.  The result there is

15   similar.  The news broke at 1:12 p.m.  After that, Energy

16   Transfer traded up throughout the rest of the day, and there

17   wasn't a statistically significant price impact the next day

18   either.  Instead, plaintiffs are left to kind of their

19   standard bowback argument of, well, what about the next day

20   after that, which we think is flatly incompatible with Basic,

21   and in fact the factual arguments on which they relied to

22   invoke Basic, which we agree, which is to say that Energy

23   Transfer's stock price would react to movement so rapidly that

24   it would be impossible for traders to beat the market by

25   trading on that information before it was reflected in the

1   market price.

2       So with that, I think I've covered all the dates I wanted

3   to cover, and I'll pause in case the court has any questions.

4           THE COURT:  And I think I've interspersed some

5   questions as we've gone along, the briefing is voluminous.

6   But I'm going to give both of you a chance to go around again.

7   So we'll hear from Mr. Browne, but that will not be to the

8   exclusion of your responding.  We'll take another five-minute

9   break, okay?

10          MR. RITCHIE:  Thank you, Your Honor.

11          THE COURT:  And then we'll reconvene.

12      (Recess)

13          MR. BROWNE:  Yes, Your Honor, I am.

14          THE COURT:  All right.

15          MR. BROWNE:  Go ahead?  Okay, thank you.  Your

16  Honor, I'm going to just try to keep this focused on some of

17  the -- directly responding to some of the points that my

18  friend on the other side made, and I'll try to keep this

19  short.  So there was a discussion during defense counsel's

20  presentation about the idea of looking past a one-day event

21  window, and when or when that may not be appropriate.  You

22  know, I do believe there is case law in the 3rd circuit and

23  elsewhere, and I take Your Honor's comment about that, which

24  I'm going to address, but I do think there's case law in the

25  3rd circuit and elsewhere that far -- that makes pretty clear

1    that you don't need a compelling, life-threatening, super-
2    focused, unrefutable reason to look to a two-day window.  It's
3    not -- this idea that it's so -- you have to point to so much
4    evidence to ever look to a two-day window really isn't
5    supported by any of the law.  They have the Halliburton II
6    case, I understand that.  The Halliburton II case was decided
7    several years ago.  It certainly hasn't resulted in an
8    adoption, an overwhelming adoption in the courts of both.  You
9    have to have a one-day window only, and 2) it has to be
10   statistically significant on that day or plaintiffs lose.
11   It's just not the way the law is cut.  So all that being said,
12   and we discussed this before, as I pointed out in my
13   presentation, we do have compelling reasons, you know, for
14   each of the disclosures that took more than one day to result
15   in statistical significance.  Too we have one day, but we've
16   gone through those and those are in the briefings, so I submit
17   that when -- if Your Honor is looking for a credible and a
18   plausible basis in this case to look past one day, in many
19   instances you will find it in defendant's own statements,
20   confusing the market and obfuscating the issue, which they
21   should not be entitled to benefit from now by combining this
22   at this stage to a one-day window.  So that's one.  2) Your
23   Honor, an August 9th, 2018 dispute between the parties, the
24   defendants claim that we're assuming -- and this was the
25   Frankenpipe announcement, you know.  And our primary argument

1    certainly is that, you know, is that the market was confused

2    by the statements on August 9th, and that wasn't clarified

3    until the 10th, and we think the evidence on that is pretty

4    strong from the analysts and elsewhere.  But I want to point

5    out that on August 9th or for that day, or expert does so that

6    there was an implied stock price -- I'm sorry, common unit

7    price increase of about 94 or 87 cents, and that could be due

8    to positive news that was introduced on August 9th.  So we're

9    not conceding that August 9th didn't necessarily -- didn't

10   have a price impact.  And defendants have done nothing, again,

11   to disaggregate the impact of the positive news, which our

12   expert quantifies from the potential --

13           THE COURT:  Well, how do you respond to the July 3rd

14   argument, the idea that in -- I guess it's paragraph 171 of

15   your complaint, you affirmatively plead that there had been a

16   disclosure there about the use of the 12-inch pipeline.  They

17   say, well, that's therefore known and factored into the price,

18   and what would your response to that be?

19           MR. BROWNE:  Well, Your Honor, I had a couple of

20   responses to it.  First and most facially, July 3rd isn't

21   August 9th.  So as of August 9th, it is new news that the

22   project is still on track.  It could have gone off track

23   between August 3rd and August 9th.  As we know, it eventually

24   did go off track.  So it is new news, you know.  It is saying

25   now, today.  I understand it's a month in a little bit, but it

1    is a month later and we're still on track.  So 1) that is new

2    news.  And secondly I would say, Your Honor, the -- if you

3    look -- if you look at the _Allergan_ case from New York in 2021

4    Westlaw 4077942, we cite it in footnote 12 of our reply brief,

5    it rejects -- it calls it nonsense and, you know, you can

6    reject it without calling it nonsense.  But this case rejects

7    as nonsense the idea that because there wasn't a statistically

8    significant price increase in response to prior similar news,

9    that that undercuts -- I should have said price decrease --

10   that that undercuts the fact that there's a -- that means that

11   a later statistically significant price decrease in response

12   to news that could be characterized as similar to early news,

13   that doesn't rule that later response out as a matter of law.

14   So I would direct you to that case.  I do think it's new news

15   in many ways, and I think, again, if it had already been

16   reflected in the stock price before, defendants don't explain

17   why the stock price then dropped a month later.  And we

18   respectfully submit it's because it was new news and it wasn't

19   already in the market as of that date.

20        So I want to move on, Your Honor, to this idea that the

21   defendants have of it's very difficult for them to prove a

22   negative.  And, you know, I'm not shedding any tears over the

23   burden of proof that the defendants bear here, but I would say

24   that one easy way or much more compelling way to prove a

25   negative, i.e. in this case that the stock -- the unit price

1    has declined in the response, it's just not what plaintiffs

2    say, is again to point to something.  Like I mean how much

3    more compelling would it be to say it's not what plaintiff's

4    said, it's this.  And in almost no instances do defendants

5    take that step, which would be, you know, much more powerful

6    to say, you know, plaintiffs have an explanation, but it

7    wasn't that, it was this.  They just say plaintiffs have an

8    explanation we don't think is right, but who knows what caused

9    it.  So I do think there would have been ways here, and in

10   some cases that if there was a good argument about lack of

11   price impact, that there would be things like that to point

12   to, and the absence of them here is notable.

13         There was a discussion about the Goldman burden.  I think

14   everyone understands burdens of proof, so I'm not going to

15   address that.  On -- you know, on the Monroe case and the

16   fisherman/scientist test, I just think that the Monroe case,

17   when you read it -- and I understand it's a district court,

18   not even this district, but it didn't turn on the burden

19   thing.  It had a very sophisticated discussion of the

20   economics surrounding these issues, and I don't believe --

21   they attempt a distinction, which, you know, I understand why

22   you attempt to distinguish it, but I don't think the attempted

23   distinction there by saying, well, it was -- it cited a

24   different burden and therefore it doesn't count, undercuts any

25   of that solid legal and scientific reasoning in that case.

1        Your Honor, you know, I kind of addressed this in the

2   beginning, so I'll make it short.  You know, their expert

3   doesn't concede that there's a lack of front-end price impact

4   in the case, and if you look at the expert report, paragraph

5   57 and read like the next few paragraphs, it's very clear that

6   he says that Dr. Allen's own analysis that shows a

7   statistically significant price increase.  This is the front-

8   end point, you know, supports plaintiff's allegation.  So

9   while defendants match up a sentence in Mr. Kaufmann's report

10  that out of context looks a little bit odd, there's no overall

11  argument that our expert conceded that there's no front-end

12  price impact.  He's just saying that the statistically

13  significant price increase as identified by defendant's

14  experts supports that notion, and we certainly are contending

15  that there was a front-end price impact.

16       On the October 29th disclosure, this is the fact dispute

17  about whether it was really October 29th or October 30th,

18  defendants don't know anything about when this came out.  They

19  did some Westlaw searches and they asked a narrowly -- I'm not

20  saying it was intentionally narrowly, but they drafted a

21  narrow written question to a state agency that was answered by

22  its own terms, an October 30th press release was not

23  distributed before October 30th.  It's completely wrong to say

24  that the plaintiffs are only relying on speculation to -- for

25  their point that the news came out to the market on October

1    29th.  We're relying on a Westlaw article that's dated October

2    29th, and by the way, that Westlaw article says that pursuant

3    to a stop work order that was issued today, okay, and it's

4    indisputable that the stop work order was issued on the 29th,

5    it was issued and mailed to Energy Transfer, it was in

6    possession of individuals outside of that state agency, so

7    when you look at the article that the defendants claim was

8    published only on October 30th, it also says due to a stop

9    work order that was issued today.  Now that raises some

10   questions in my mind, because we know that's not right, right.

11   We know it was issued on the 29th.  So there's some internal

12   consistency even between the article that they point to and --

13   maybe no one knows anything about this yet, like maybe there

14   needs to be some more discovery about how this happened, but

15   we're not just speculating that it came out on the 29th.  We

16   have evidence.  And when you couple that with the statistic --

17   you know, the statistically significant one day, defendants

18   love that, one day statistically significant price decrease,

19   which is again explained by nothing else, that's certainly

20   evidence of price impact at this stage of the case.

21        So Your Honor, I think that's all.  I think everything

22   else has kind of been covered in briefs, but if you have any

23   questions -- let me see if my colleagues sent me any emails.

24   Yeah, I mean, I guess -- I suppose the only thing that I would

25   add, you know, Your Honor, with respect to the July 3rd issue

1    that you asked about, is that, you know, the July 3rd issues

2    were disclosure the defendants point to was much more vague

3    and specific than the August 9th ones that we do later.  But

4    other than that, Your Honor, if you don't -- if you have any

5    questions, I'm happy to (indiscern.).

6            THE COURT:  I have a question for both sides.  The

7    same question for both sides.  But let me hear back from

8    Energy Transfer if they have any -- what would this be,

9    surrebuttal?  Whatever it is, we'll go back to Texas.

10           MR. RITCHIE:  Okay, just very briefly.  I think we -

11   - I do want to cover a couple of the points Mr. Browne just

12   made.  So, you know, on the (indiscern.) window point, he says

13   that we don't have evidence or law in our favor.  I think that

14   that's wrong.  Obviously pointed to Halliburton II's remand

15   decision.  There has been cases that have followed that

16   decision.  So I do think there's law here.  There's also facts

17   that we showed you earlier.  The evidence in this case that

18   plaintiffs relied on to invoke Basic in the first place showed

19   that the stock would incorporate news so quickly so that it

20   would be impossible for traders to trade on that information

21   before it's reflected in the stock's price.  There was no

22   response to that principle from Mr. Browne and how that's

23   compatible with this extra day space.  And I think, frankly,

24   it just isn't.  And the reason that plaintiffs relied on that

25   principle in order to invoke Basic is because Basic requires

1    it.   The fundamental principle of <u>Basic</u> is that all publicly

2    available news, material news, will be reflected in the

3    stock's price whenever a trader or an investor trades on that

4    information.  And if you have these gaps in time, that just

5    doesn't work.  <u>Basic</u> would collapse.  And so the plaintiff

6    must, as the 11th circuit said, take the bitter with the sweet

7    when they invoke that and it's factually supportable and

8    supportable by lots of financial literature as well.

9         So on the August 9th, 2018 date, Mr. Browne said, well,

10   in between July 3rd and August 9th there was a lot of time and

11   we didn't -- you know.  So we were saying we were still using

12   the 12-inch pipe.  And there's been no suggestion in this

13   case, and it's implausible to suggest that anyone was

14   surprised that after we said we were going to use this thing

15   on July 3rd, that people had thought we had gone back to using

16   the 20-inch.  We weren't going to use it, and so this was new

17   bad news.  Because with no additional announcement, people

18   thought that Energy Transfer had changed course back again to

19   the 20-inch.  And so it's just simply not new news for the

20   purpose of evaluating price impact.  And interestingly, Mr.

21   Browne and the plaintiffs have never explained why if their

22   theory is right, why wasn't there a price impact on July 3rd?

23   They haven't done that.  He's pooh-poohed the entire concept

24   of looking at that, but I'm not sure from a statistical matter

25   and our expert has put forth a lot of analysis on this, how

1    that makes any sense.  If essentially the same corrective

2    disclosure comes out, and it comes out for the first time, why

3    would you not expect there to be a corrective -- a price

4    impact then if there truly -- if this was truly price

5    impactful news?  And I think you would, and the lack of a

6    price impact shows that there wasn't one.

7         So on the front end, same end, Mr. Browne mentioned that,

8    well, he takes issue with our contention that Mr. Kaufmann

9    denied that he had found front-end price impact or found that

10   these statements has surprised the market.  The court, of

11   course, can look at these statements for themselves and see

12   yes, you do, so I think they're fairly clear.  But putting

13   aside expert concession, or not, the statements themselves

14   were not surprising, and there's no evidence that the market

15   would have been surprised by the reiteration of the same

16   disclosures, the same timeline six weeks later.  And that

17   undercuts any front-end price impact separate and apart from

18   what any expert says.

19        And finally, on the October 29th piece that Mr. Browne

20   talked about, he suggests that, well, Westlaw didn't publish

21   it until October 30th.  We can look into that.  But perhaps

22   somebody else did.  It's dated October 29th.  Well, both sides

23   have had the opportunity to look for it.  We looked for it; I

24   assume the plaintiffs looked for it.  Nobody found that

25   evidence.  So just the mere speculative possibility that

1    somebody published it is certainly not evidence that it was
2    published, and we've both had an opportunity to identify that
3    and put it in the record if it existed.  I'm fairly certain it
4    didn't exist, based on our search, and the fact that that
5    organization is now defunct, you can't even ask them, and what
6    DEP said in their certified copy of when they released the
7    order.  So I think all of the evidence there, again, just to
8    reiterate my earlier point, supports the idea that there was
9    no price impact -- or there was no news release on 10/29 and
10   so that is not a corrective disclosure date.  And so with
11   that, I'll close, and I'm happy to take any questions.
12            THE COURT:  I have a detail question, counsel.  I
13   mean, I've obviously tried to study the record in detail, but
14   at the moment it escapes me whether the July 3rd
15   communication, whatever it was, is part of the record.  Was it
16   a press account?  How was that embodied, the transmission of
17   that information?  Is that already in the record?
18            MR. RITCHIE:  Yes, that is in the record.  It was, I
19   believe, embodied, if memory serves, in a state impact article
20   which is one of the articles plaintiffs -- one of the news
21   outlets plaintiffs routinely rely on for public statements in
22   this case, and I believe it is -- we've either just given the
23   link in our expert report, or we provided it as an exhibit,
24   I'm not sure which.  But we certainly could provide the court
25   with a link to that article, if it would like.

1            THE COURT:  Yes, just for ease of reference, I think

2      that would be helpful.

3            MR. RITCHIE:  Sure.

4            THE COURT:  And then I had said I would have a

5      question for both sides at the end.

6            MR. BROWNE:  Your Honor, could I make -- I am so

7      sorry to interrupt you, I really am.

8            THE COURT:  No, no problem.

9            MR. BROWNE:  Okay.  I just want to make one -- it

10     takes a village, and some of my colleagues have asked me to

11     make one additional point on the July 3rd article, and since

12     you were just addressing that, may I make one --

13            THE COURT:  Yes, of course.

14            MR. BROWNE:  I believe when you look at the

15     disclosure that they point to, I referenced that it's vague

16     and not as specific, but what I meant by that is it's going to

17     talk about the 12-inch pipe, the Frankenpipe concept.  It's

18     not going to capture the essential concept that was only

19     learned on August 10th at the earliest by the market that this

20     means that the capacity will be far less.

21            THE COURT:  Right, well, and the reason I want to

22     see the actual --

23            MR. BROWNE:  Yes.

24            THE COURT:  -- transmission is because, I mean, as I

25     look at the back-and-forth during that timeframe, it does

1    appear to me that there is some inquiry being made of Energy

2    Transfer.  By one reading of some of the responses, it could

3    seem that they were trying to minimize impact.  And I think to

4    the extent that we're looking at these windows and these

5    effects, the nuance matters.  And so I wanted to look at that

6    in terms of the substance of it, and precisely how information

7    is being communicated, that's all.  Because, I mean, I do

8    think it's a daunting task in cases like this to try to get

9    your arms around the subtleness.

10            MR. BROWNE:  I agree.  And Your Honor, that's all I

11   wanted to add, so I thank you for that.

12            MR. RITCHIE:  We'll email that to your clerk this

13   afternoon.

14            THE COURT:  Yes.  Both sides say this case is

15   crystal clear and our view is right.  Assume that it's not

16   always as easy for the judge to get there and further assume

17   that sometimes the famous philosopher, Mick Jagger, is right,

18   you can't always get what you want.  And if in this case the

19   ruling were one that did not give each side all that they

20   want, which means that -- and I haven't made any decisions,

21   counsel, so nobody should start assuming anything, but I

22   certainly have impressions based upon a lot of study here.

23   And some of the disclosures were deemed not relevant for

24   purposes of class certification, or not properly considered.

25   What does that mean then in terms of models for loss causation

1    downstream?  I mean, what would be the practical impact if I

2    came out there?  Let me start with plaintiffs, all right, and

3    get their version a bit more.

4         MR. BROWNE:  Yeah, Your Honor, this is something

5    that I do live with in my cases and the practical impact of it

6    can sometimes be quite unintended and quite negative for

7    plaintiff's case, depending on which particular corrective

8    disclosures are excluded at this point in time, because -- so,

9    you know, for instance, if our -- I believe like if our last

10   disclosure, the one that doesn't have statistical significance

11   on any day, is excluded, that would probably be fairly minor

12   impact on damages and sort of case coherency, for lack of a

13   better word.  But if certain disclosures are alleged to have

14   no price impact, what defendants will then say is, well, that

15   disclosure is very similar to this other disclosure and

16   therefore, even though you only lost one or two in round one,

17   it effectively means that everything is knocked out later.

18        So I guess I would sum up as succinctly as I can is it

19   will have an impact on damages and case coherency if some of

20   the statements are knocked out.  That impact could range from

21   perhaps very unintendedly negative to potentially not as

22   important, depending on which statements are in and which

23   statements are out.  And I must say, I don't know right now

24   which ones.

25        THE COURT:  And I think conceptually you say if

1   we're good for one, we're good for all, and the defense says

2   no, it doesn't work that way.

3           MR. BROWNE:  Yeah.

4           THE COURT:  So I'm -- and there's been some briefing

5   on that as well.

6           MR. BROWNE:  Yeah, I would -- there's definitely a

7   sharp disagreement between the parties on that.  I do think

8   the better practice, partly for the reason that I just

9   articulated, the law of unintended consequences, I do think

10  the better practice is if there's strong evidence of price

11  impact on many of the back-end disclosures or on the front-end

12  context, the better practice is to proceed with allowing --

13  with finding that there is price impact and not making a

14  statement-by-statement analysis of it now, both because I

15  don't think it's required by the law, and we've pointed to

16  some cases that have said that.  I mean, even defendants

17  distinguish some of our cases by saying, well, yeah, they let

18  that go through because three or four of them had statistical

19  significance that they just let it go through.  So you will

20  see in the case law that happening.  So I think it's

21  permissible, one.  I'm not going to say it would be reversible

22  error if you did cherry pick some statements, because I think

23  the law is kind of -- there would be support for that in the

24  law as well.  But I do think the better practice is you don't

25  -- sometimes you don't know what it means to strike something

1    down.

2            THE COURT:  Well, one of the reasons for answering

3    the question is we're looking at all the permutations here.

4            MR. BROWNE:  Yeah, and it could be -- you know, you

5    could -- you certainly -- and I've seen cases get close to

6    trial where like the statements got knocked out earlier that

7    really, as the evidence was amassed, should have probably

8    stayed in and it can cause -- I keep using the word unintended

9    consequences, maybe they're intended, but it can cause

10   consequences on plaintiff's case, so --

11           THE COURT:  My only intent is to get it right, so --

12           MR. BROWNE:  I know that, I --

13           THE COURT:  -- you're using your defenses.

14           MR. BROWNE:  I absolutely do know that, and I think

15   that -- I do think that in the service of getting it right now

16   is -- weighs in the balance of if there is evidence of price

17   impact Your Honor finds on many of the disclosures or

18   statements, to leave them all in.  That moves the ball more

19   towards right.  Because, remember, there's going to be a

20   second chance to knock out corrective disclosure.

21           THE COURT:  Oh, we're back on loss causation

22   (indiscern.) --

23           MR. BROWNE:  No, no ,no, I can't wait.  I can't wait

24   to get to this.  All right, but that's my answer on that, Your

25   Honor, unless you have any follow-ups.

1                    THE COURT:  That's fine.

2          MR. RITCHIE:  So, Your Honor, yeah, we do disagree

3    with that point of view, and so just to back up to the

4    conceptual point of view, we think the weight of authority,

5    just parsing the supreme court's cases as a first principle

6    and the way they talk about price impact as relating to de-

7    misrepresentation must have price impact, we don't think

8    conceptually it makes sense that just because you have

9    combined two separate types of statements into a single case

10   that you should get price impact one for all.  And I think the

11   majority of cases that have considered this issue haven't done

12   that, so we point out the Halliburton or Mann decision and

13   others that have reached that result.  Plaintiffs on their --

14   for their part point again to the Monroe County case in

15   Georgia, so the traditional dispute --

16          THE COURT:  Tastes great, less filling, you know?

17   You're too young to have seen that commercial maybe.

18          MR. RITCHIE:  No, no, I've seen it.  So the -- in

19   that case, though, it rests its ruling on this basis on an

20   argument that it can't reach items that overlap with merits

21   issues such as lost elevation, and following Goldman, that's

22   simply just not a correct statement of the law anymore.  And

23   the other cases it cites it says are holding the same thing,

24   so the only case it cites is Monroe, and they have these other

25   cases that are supposedly doing the same thing.  And so we

1   think those post-Goldman are no longer good law and that you

2   should follow what we think the supreme court has been saying

3   and do a statement-by-statement analysis of price impact -- or

4   corrective disclosure by corrective disclosure analysis, and

5   give a class certification order similar to the one that was

6   done in the Halliburton or Mann decision if you were not going

7   to go for us all the way, which of course we think you should.

8        As far as the practical implications, you know, Mr.

9   Browne said, well, there could be some complications.  I think

10  ultimately those are secondary.  I'm not sure exactly what

11  he's referring to in any event, but it's similar to what

12  happens at the motion to dismiss stage.  If you haven't

13  alleged that a statement was false or misleading or made a

14  scienter, it gets thrown out of the case.  You don't get to

15  keep every statement in a case simply because you found one

16  statement that was alleged to have been false or misleading

17  and made a scienter.  And that can, I'm sure, have

18  ramifications for how plaintiffs were planning to proceed with

19  their case if they get half of their statements thrown out.

20  And no doubt, this might, too, but I don't think those

21  practical considerations are controlling in how this decision

22  should come out.

23            THE COURT:  All right, counsel, thank you for

24  excellent advocacy on behalf of your respective clients, and

25  we'll continue pondering this.

1          MR. RITCHIE:  Thank you, Your Honor.

2          MR. BROWNE:  Thank you very much, Your Honor.

3          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

4          THE COURT:  I guess we're adjourned.

5     (Court adjourned)

6

7                    CERTIFICATION
8   I, Lewis Parham, certify that the foregoing is a correct
9   transcript from the electronic sound recording of the
10  proceedings in the above-entitled matter.
11
12
13  _Lewis Parham_                    7/19/22
14
15  _____        _____
16  Signature of Transcriber              Date