# Exhibit E

1           UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF PENNSYLVANIA

3   ALLEGHENY COUNTY EMPLOYEES'          )
    RETIREMENT SYSTEM, EMPLOYEES'        )
4   RETIREMENT SYSTEM OF THE CITY        )
    OF BATON ROUGE AND PARISH OF         )
5   EAST BATON ROUGE, DENVER             )
    EMPLOYEES RETIREMENT PLAN,           )
6   INTERNATIONAL ASSOCIATION OF         )
    MACHINISTS AND AEROSPACE             )
7   WORKERS NATIONAL PENSION FUND,       ) C.A. NO.
    AND IOWA PUBLIC EMPLOYEES'           ) 2:20-cv-00200-GAM
8   RETIREMENT SYSTEM, Individually      )
    and on behalf of all others         )
9   similarly situated,                  )
                                         )
10        Plaintiffs,                    )
                                         )
11  v.                                   )
                                         )
12  ENERGY TRANSFER LP, KELCY L.         )
    WARREN, THOMAS E. LONG,              )
13  MARSHALL McCREA AND MATTHEW S.       )
    RAMSEY,                              )
14                                       )
          Defendants.                    )
15  _____     )

16

17              Monday, May 15, 2023

18

19

20      Video-Recorded Oral Deposition of FRANK
    THEODORE GARDNER III held at the offices of
21  Greenberg Traurig LLP, 1000 Louisiana Street, Suite
    6700, Houston, Texas, commencing at 9:02 a.m. CDT on
22  the above date, before Michael E. Miller, Fellow of
    the Academy of Professional Reporters, Certified
23  Court Reporter, Registered Diplomate Reporter,
    Certified Realtime Reporter and Notary Public.

24
                      ___ ___ ___
25

1    Q.    And do you continue to work for Westwood

2  now?

3    A.    Yes.

4    Q.    Does Westwood have a similar -- do you do

5  a similar type of investing now with --

6    A.    Yes, same thing, just different name.

7  Different name on the company.

8    Q.    Got it.

9          MR. DIAL:  Let him finish his

10     question before you start your answer.

11          THE WITNESS:  I'm sorry.

12          MR. LUTZ:  It will happen today.

13     It's okay.  We'll figure it out.

14  BY MR. LUTZ:

15    Q.    Tell me what your role was during the

16  time that you worked for Salient.

17    A.    My title was managing director.  My, I

18  guess, operational role, if you will, was portfolio

19  manager for the strategies that we managed.

20    Q.    You mentioned that the focus of the

21  investing -- strike that.

22          Was the focus of the investment

23  activities while you were at Salient on energy

24  infrastructure or midstream companies?

25    A.    Yes.

```
 1              THE WITNESS:  Got it.

 2   BY MR. LUTZ:

 3        Q.    And did Salient have, during the entire

 4   time of its relationship with ACERS, discretion --

 5   investment discretion with respect to the

 6   17.5 million or whatever amount that ACERS entrusted

 7   Salient to invest?

 8        A.    To my knowledge, yes.

 9              MR. MATHAI:  Objection.

10              THE WITNESS:  Shoot.  Sorry.

11   BY MR. LUTZ:

12        Q.    Okay.  Were you involved in making

13   investment decisions with respect to the money that

14   ACERS entrusted Salient Capital Advisors to invest?

15              MR. MATHAI:  Objection.

16        A.    Yes.

17   BY MR. LUTZ:

18        Q.    Okay.  And that included the decision to

19   buy or sell units of Energy Transfer?

20              MR. MATHAI:  Objection.

21        A.    Yes.

22   BY MR. LUTZ:

23        Q.    Okay.  All right.

24              Were all of the investments that Salient

25   made on behalf of ACERS in the MLP space?
```

1    is that fair?

2              MR. MATHAI:  Objection.

3         A.    Sure.  Yes.

4    BY MR. LUTZ:

5         Q.    What about Mr. Matt Ramsey?  During the

6    period in which Salient was investing ACERS's money,

7    did you have exposure to Mr. Ramsey?

8              MR. MATHAI:  Objection.

9         A.    I believe I only met him once.

10   BY MR. LUTZ:

11        Q.    Okay.  Did you have, through your work

12   and experience in the industry -- get the

13   opportunity to become familiar with his reputation

14   and skill as a manager?

15             MR. MATHAI:  Objection.

16        A.    I did not interact with him that often,

17   so I don't -- yeah, maybe -- yeah, I don't know that

18   I could say that with a definitive answer.

19   BY MR. LUTZ:

20        Q.    During the time when Salient was making

21   investment decisions on ACERS to invest in Energy

22   Transfer units, you never thought that Energy

23   Transfer senior officers were liars, did you?

24             MR. MATHAI:  Objection.

25        A.    I have no reason to believe that they

1    were, no.

2    BY MR. LUTZ:

3        Q.    During the period when Salient was making

4    investment decisions on behalf of ACERS to invest in

5    Energy Transfer units, you never thought that Energy

6    Transfer's senior officers didn't tell the truth,

7    did you?

8                    MR. MATHAI:   Objection.

9        A.    Not that I recall, no.

10   BY MR. LUTZ:

11       Q.    During the period when Salient was making

12   investment decisions on behalf of ACERS to invest in

13   Energy Transfer units, you never thought that Energy

14   Transfer's senior officers made or caused the

15   company to make false or misleading statements to

16   the market, did you?

17                   MR. MATHAI:   Objection.

18       A.    I'm not aware of any.

19   BY MR. LUTZ:

20       Q.    Salient has a -- strike that.

21              During the period when Salient was making

22   investment decisions on behalf of ACERS, you always

23   made investment decisions that you believed and

24   others at Salient believed were in the best interest

25   of ACERS, correct?

1   BY MR. LUTZ:

2       Q.    Any reason to think that Energy Transfer

3   or any of its senior officers were violating the

4   company's code of business conduct and ethics?

5               MR. MATHAI:  Objection.

6       A.    No.

7   BY MR. LUTZ:

8       Q.    And that -- your answer is the same

9   during the period in which Salient was investing

10  ACERS's money in Energy Transfer, correct?

11              MR. MATHAI:  Objection.

12      A.    To my knowledge, yes.

13  BY MR. LUTZ:

14      Q.    To the best of your knowledge, did

15  Salient decide to buy or sell Energy Transfer units

16  based on the information contained in that paragraph

17  under Code of Business Conduct and Ethics?

18              MR. MATHAI:  Objection.

19      A.    No.

20  BY MR. LUTZ:

21      Q.    Did Energy -- I'm sorry.

22              Did Salient, during the time when it was

23  investing ACERS's money in Energy Transfer, make

24  investment decisions in Energy Transfer units based

25  on that paragraph?

1    fourth quarter of 2017, did Salient view that as a

2    promise that the Revolution Project would, in fact,

3    be completed in the fourth quarter of 2017?

4                    MR. MATHAI:   Objection.

5        A.    Likely not a promise.

6    BY MR. LUTZ:

7        Q.    Would you have viewed that as a guarantee

8    that the Revolution Project would be completed in

9    the fourth quarter of 2017?

10                    MR. MATHAI:   Objection.

11       A.    No.

12   BY MR. LUTZ:

13       Q.    When you -- well, any reason to believe

14   that that statement was false or misleading at the

15   time it was made?

16                    MR. MATHAI:   Objection.

17       A.    No.

18   BY MR. LUTZ:

19       Q.    Did Salient make an investment decision

20   regarding Energy Transfer units based on that

21   statement?

22                    MR. MATHAI:   Objection.

23       A.    No.

24   BY MR. LUTZ:

25       Q.    Can I direct your attention to page 13 of

1          A.    Not based on what I see, no.

2    BY MR. LUTZ:

3          Q.    Okay.  Did the company -- I'm sorry.

4          Did Salient make investment decisions

5    regarding Energy Transfer based on this particular

6    slide?

7          A.    No.

8                MR. MATHAI:  Objection.

9    BY MR. LUTZ:

10         Q.    Okay.  Can we do Tab 24A.

11               (Whereupon, Defendants' Deposition

12               Exhibit 1515, 11/29/17 Energy Transfer

13               Presentation, ET-ACERS-00730522 -

14               ET-ACERS-00730543, was marked for

15               identification.)

16   BY MR. LUTZ:

17         Q.    Sir, this is a document that's been

18   labeled as Exhibit 1515.  It's another presentation

19   by Energy Transfer at something called the Jefferies

20   2017 Energy Conference dated November 29th, 2017.

21               Do you see that?

22         A.    Yes.

23         Q.    I know this wasn't among the conferences

24   that you identified as having likely attended, but

25   do you recall whether you attended this conference?

1    every year, so --

2         Q.    Sure.

3         A.    But more than likely, one of our people

4    would have been there.

5         Q.    Okay.  I think we can short-circuit some

6    of this.  Can you flip to little 19.

7              This is a slide that has a header

8    reading:  NGL & Refined Projects Segment:  Mariner

9    East System.

10             Do you see that?

11        A.    Yes.

12        Q.    And the content of that slide then

13   appears to be the same or similar to what we saw on

14   earlier slides; is that fair?

15        A.    Yes.

16             MR. MATHAI:  Objection.

17   BY MR. LUTZ:

18        Q.    Did Salient make any investment decisions

19   with regard to Energy Transfer based on this

20   particular slide?

21             MR. MATHAI:  Objection.

22        A.    No.

23   BY MR. LUTZ:

24        Q.    Any reason to think that there are false

25   or misleading -- there's false or misleading

Deposition of Frank Theodore Gardner III          Allegheny County Employees' Retirement System v. Energy Transfer LP

1    consider that statement important when making an

2    investment decision with regard to Energy Transfer

3    on behalf of ACERS?

4              MR. MATHAI:  Objection.

5        A.    What was the date of this?  I don't -- I

6    don't recall it being -- yeah, I don't recall the

7    conversations we would have had internally, but

8    certainly we would have talked about it.

9    BY MR. LUTZ:

10       Q.    I want to focus on this statement in

11   particular.  I want to know whether --

12       A.    Oh, that statement.

13       Q.    -- this statement in particular, did

14   Salient make an investment decision with respect to

15   Energy Transfer units based on that statement?

16             MR. MATHAI:  Objection.

17       A.    No.

18   BY MR. LUTZ:

19       Q.    So Salient didn't buy or sell Energy

20   Transfer units on behalf of ACERS based on that

21   statement, correct?

22             MR. MATHAI:  Objection.

23       A.    Correct.

24   BY MR. LUTZ:

25       Q.    Did Salient consider this statement,

1  quote:  We also reiterate our commitment to the

2  highest levels of construction expertise and our

3  dedication to preserving and protecting the

4  environment in which we conduct our work, did

5  they -- did Salient consider that important when

6  making investment decisions with regard to Energy

7  Transfer?

8            MR. MATHAI:  Objection.

9       A.    No.

10  BY MR. LUTZ:

11      Q.    Do you have any reason to believe that

12  Mr. Shields' statement that I just read was not

13  true?

14            MR. MATHAI:  Objection.

15      A.    No.

16  BY MR. LUTZ:

17      Q.    Any reason to think that Mr. Shields knew

18  or was deliberately reckless in not knowing that

19  when he made that statement on behalf of Energy

20  Transfer, that it wasn't true?

21            MR. MATHAI:  Objection.

22      A.    No.

23  BY MR. LUTZ:

24      Q.    Any reason to think that any investors of

25  Energy Transfer were misled by that statement by

 1    Mr. Shields?

 2                   MR. MATHAI:   Objection.

 3         A.    No.

 4    BY MR. LUTZ:

 5         Q.    All right.  Let's go to Tab 27.

 6                   (Whereupon, Defendants' Deposition

 7               Exhibit 1518, 1/9-10/18 Energy Transfer

 8               Presentation, ET-ACERS-00733557 -

 9               ET-ACERS-00733594, was marked for

10               identification.)

11    BY MR. LUTZ:

12         Q.    The court reporter has handed you

13    Exhibit 1518.  This is another Energy Transfer

14    investor presentation at the UBS Midstream & MLP

15    conference dated January 9th and 10th, 2018.

16               Do you see that?

17         A.    I do.

18         Q.    Do you recall whether you would have

19    attended -- you attended this conference?

20         A.    I do not believe I did, but we could have

21    had somebody there.

22         Q.    Okay.  Do you know whether you reviewed

23    this presentation on the company's website?

24         A.    I do not recall.

25         Q.    Safe to assume that somebody from Salient

Deposition of Frank Theodore Gardner III          Allegheny County Employees' Retirement System v. Energy Transfer LP

1  either saw this live or looked at it on the

2  company's website?

3       A.    Probably didn't see it live unless they

4  were there because I don't -- I don't believe that

5  they webcast this one because they were all

6  one-on-one meetings, but it's possible that they

7  reviewed the document.

8       Q.    Okay.  Let's jump again to little 19.

9  This is, I believe, the same or at least similar

10 slide that we've seen before that says at the top

11 NGL & Refined Projects Segment:  Mariner East

12 System.

13            Do you see that?

14      A.    Yes.

15      Q.    And it goes on to describe the Mariner

16 East 1, Mariner East 2 and Mariner East 2x lines.

17            Do you see that?

18      A.    Yes.

19      Q.    Did -- any reason to think that anything

20 on this slide was false or misleading?

21            MR. MATHAI:  Objection.

22      A.    No.

23 BY MR. LUTZ:

24      Q.    Did Salient make an investment decision

25 based on the contents of this slide in particular

1   with regard to Energy Transfer?

2                   MR. MATHAI:  Objection.

3       A.    No.

4   BY MR. LUTZ:

5       Q.    I want to jump to -- two slides forward,

6   slide 21.  This slide says Midstream Segment:

7   Revolution System Project.

8                   Do you see that?

9       A.    Yes.

10      Q.    And it says in the very bottom left, in

11  describing the Revolution system, quote:  Expected

12  to be complete in Q1 2018, and will be waiting to go

13  into full service once Rover and ME2 are in service.

14                  Do you see that?

15      A.    Yes.

16      Q.    Any reason to think that was a false or

17  misleading statement, sir?

18                  MR. MATHAI:  Objection.

19      A.    No.

20  BY MR. LUTZ:

21      Q.    Did Salient, when making investment

22  decisions regarding Energy Transfer on behalf of

23  ACERS, consider anything on this slide in making

24  that investment decision?

25                  MR. MATHAI:  Objection.

1  egregious, unquote, but has decided against

2  continued litigation.

3          Do you see that?

4      A.    Yes.

5      Q.    And it goes on, and this is going to be

6  the focus of my question.

7          It goes on to say, quote:  We are

8  committed to fully complying with the DEP order,

9  which includes following all permit requirements.

10 Safety is paramount for any energy infrastructure

11 project we do, the safety of the communities in

12 which we work and operate, the safety of our

13 employees, and the safety of the environment.

14         Do you see that?

15     A.    Yes.

16     Q.    Any reason to think that the quote I just

17 read from Mr. Shields was false or misleading?

18             MR. MATHAI:  Objection.

19     A.    No.

20 BY MR. LUTZ:

21     Q.    Any reason to think that Mr. Shields,

22 speaking on behalf of Energy Transfer, knew or was

23 deliberately reckless in not knowing that that

24 statement was false or misleading?

25             MR. MATHAI:  Objection.

1      A.      No.

2  BY MR. LUTZ:

3      Q.      Did Salient, as the investment advisor

4  for ACERS at this time, make an investment decision

5  with respect to Energy Transfer based on this

6  statement?

7                  MR. MATHAI:   Objection.

8      A.      No.

9  BY MR. LUTZ:

10     Q.      Did Salient, as the decision-maker over

11  ACERS's funds, pursuant to the terms of the

12  agreement with ACERS, consider this particular

13  statement important in the value of Energy Transfer

14  units?

15     A.      No.

16                  MR. MATHAI:   Objection.

17  BY MR. LUTZ:

18     Q.      Okay.  Let's go to Tab 29, which is

19  Plaintiff's Exhibit 195.  Sir, this is an Energy

20  Transfer earnings call dated February 22nd, 2018.

21          Do you see that?

22     A.      Yes.

23     Q.      Likely that you either listened to this

24  in real time or read a transcript of it after the

25  call occurred?

1      A.    Correct.

2  BY MR. LUTZ:

3      Q.    And that includes its investment

4  decisions it made -- Salient made on behalf of

5  ACERS, correct?

6                  MR. MATHAI:  Objection.

7      A.    Correct.

8  BY MR. LUTZ:

9      Q.    Let's go to the next slide -- I'm sorry,

10  two forward is slide little 21.  This is the slide

11  on the Revolution project.

12              Do you see that?

13      A.    Yes.

14      Q.    Same questions:  No reason to believe

15  that there's anything false or misleading in this

16  slide, correct?

17                  MR. MATHAI:  Objection.

18      A.    Correct.

19  BY MR. LUTZ:

20      Q.    And did Salient make any investment

21  decisions on behalf of ACERS to buy or sell Energy

22  Transfer units based on the information contained in

23  this slide?

24                  MR. MATHAI:  Objection.

25      A.    No.

1    A.    Probably not.

2  BY MR. LUTZ:

3    Q.    Okay.  And why do you say probably not?

4    A.    I mean, I didn't read the whole thing,

5  but sounds like it's a personal life experience kind

6  of thing, so...

7    Q.    Okay.  Can I direct your attention to

8  page 8 of the article.  So right in the middle of

9  this page, there's a quote that begins "Professional

10 geologists."

11          Do you see that?

12   A.    Yes.

13   Q.    The quote reads, quote:  "Professional

14 geologists are always a part of the planning and

15 operating of our pipelines, and ME2 and ME2X are no

16 exception," Shields wrote.  Quote, "Construction

17 through this area is safe."

18          Do you see that?

19   A.    Yes.

20   Q.    And this was March 22nd, 2018, right?

21   A.    Yes.

22   Q.    And at that time, Salient was serving as

23 the investment advisor for ACERS and investing

24 ACERS's money in Energy Transfer, correct?

25   A.    Correct.

```
1        Q.    Did Salient consider that statement that
2   I just read important when making investment
3   decisions for ACERS with regard to Energy Transfer
4   units?
5                    MR. MATHAI:  Objection.
6        A.    No.
7   BY MR. LUTZ:
8        Q.    Did ACERS -- I'm sorry.
9             Did Salient decide to buy or sell Energy
10  Transfer units for ACERS based on that statement?
11                   MR. MATHAI:  Objection.
12       A.    No.
13  BY MR. LUTZ:
14       Q.    If Salient believed that Energy Transfer
15  was constructing its pipelines in an unsafe manner,
16  that would have caused Salient to reconsider its
17  investment in Energy Transfer; is that fair?
18       A.    Yes.
19       Q.    But Salient never came to the conclusion
20  that Energy Transfer was constructing its pipelines,
21  including the Mariner East 2 pipeline, in an unsafe
22  manner, correct?
23                   MR. MATHAI:  Objection.
24       A.    Correct.
25                   ///
```

1    the slide on the Revolution system that we've seen

2    before, correct?

3        A.    Correct.

4        Q.    Any reason to believe that any of the

5    content of this slide is false or misleading?

6                    MR. MATHAI:  Objection.

7        A.    No.

8    BY MR. LUTZ:

9        Q.    Any reason -- strike that.

10             Did Salient make an investment decision

11   in Energy Transfer units on behalf of ACERS based on

12   anything in this slide 21 about Revolution?

13                   MR. MATHAI:  Objection.

14       A.    No.

15   BY MR. LUTZ:

16       Q.    Okay.  Let's go to Plaintiff's

17   Exhibit 204.  This is an Energy Transfer

18   presentation dated June 19th, 2018 at a JPMorgan

19   conference.

20             Do you see that?

21       A.    I do.

22       Q.    Did somebody from Salient either attend

23   or review this presentation around this time?

24       A.    I do not believe they would have

25   attended, but perhaps could have reviewed it.

```
 1        Q.    Okay.  Just same questions as before,

 2   jumping to little slide 19.

 3              MR. MATHAI:  Brian, if you don't

 4        mind, we haven't gotten it up yet, I don't

 5        think.

 6              MR. LUTZ:  I think you can predict

 7        where this one's going.

 8              MR. MATHAI:  That's probably fair.

 9              MR. LUTZ:  I'll just speak slowly.

10   BY MR. LUTZ:

11        Q.    Sir, this is the Mariner East system

12   slide that you've seen in earlier presentations; is

13   that right?

14        A.    Yes.

15        Q.    Do you have any basis to believe that

16   there is a false or misleading statement contained

17   in this slide?

18              MR. MATHAI:  Objection.

19        A.    No.

20   BY MR. LUTZ:

21        Q.    Did Salient make an investment decision

22   in Energy Transfer units based on anything in this

23   slide?

24              MR. MATHAI:  Objection.

25        A.    No.
```

1    BY MR. LUTZ:

2         Q.    Going to slide 21, this is the same slide

3    that we've seen regarding the Revolution system,

4    correct?

5         A.    Correct.

6         Q.    Is there any basis for Salient to believe

7    or you to believe, sir, that there's a false or

8    misleading statement on this page?

9                   MR. MATHAI:  Objection.

10        A.    No.

11   BY MR. LUTZ:

12        Q.    Did Salient, on behalf of ACERS, make an

13   investment decision with regard to Energy Transfer

14   based on anything contained in this slide?

15                  MR. MATHAI:  Objection.

16        A.    No.

17   BY MR. LUTZ:

18        Q.    Okay.  Let's do the next document, which

19   is Tab 51.

20                  (Whereupon, Defendants' Deposition

21                  Exhibit 1525, BoA/Merrill Lynch ETP

22                  Analyst Report, was marked for

23                  identification.)

24   BY MR. LUTZ:

25        Q.    The court reporter has handed you a

```
 1    BY MR. LUTZ:

 2         Q.    Did Salient, as the investment advisor

 3    for ACERS, make a decision to buy or sell Energy

 4    Transfer units for ACERS based on the statements

 5    from Ms. Dillinger that I just read?

 6         A.    No.

 7                   MR. MATHAI:  Objection.

 8    BY MR. LUTZ:

 9         Q.    Okay.  Let's go to Tab 41.

10                   (Whereupon, Defendants' Deposition

11                   Exhibit 1529, Article, a Massive Pipeline

12                   Boring Through Pennsylvania, Sunoco's

13                   Mariner East 2 Projects Has Had Spills,

14                   Fines and Court-Ordered Halts.  Is this

15                   the New Normal?, was marked for

16                   identification.)

17    BY MR. LUTZ:

18         Q.    The court reporter has handed you what's

19    been marked as Exhibit 1529.  This is an article

20    dated October 21st, 2018 in the Pittsburgh

21    Post-Gazette.  It says -- and the title of the

22    article is:  A Massive Pipeline Boring Through

23    Pennsylvania, Sunoco's Mariner East 2 Projects Has

24    Had Spills, Fines and Court-Ordered Halts.  Is this

25    the New Normal?
```

1      A.    Yes.

2      Q.    Do you have any reason to believe that

3  that was a false or misleading statement by

4  Ms. Dillinger?

5              MR. MATHAI:  Objection.

6      A.    No.

7  BY MR. LUTZ:

8      Q.    Do you have any reason to believe that

9  Ms. Dillinger knew or was deliberately reckless in

10 not knowing that the statement that I just read from

11 her was false or misleading at the time it was made?

12             MR. MATHAI:  Objection.

13     A.    No.

14 BY MR. LUTZ:

15     Q.    Did Salient, as the investment advisor

16 for ACERS, make an investment decision with respect

17 to Energy Transfer units based on the statement that

18 I just read from Ms. Dillinger?

19             MR. MATHAI:  Objection.

20     A.    No.

21 BY MR. LUTZ:

22     Q.    Okay.  Let's go to Tab 42.

23             (Whereupon, Defendants' Deposition

24             Exhibit 1530, Article, pipeline ruptures

25             bring new scrutiny to Pennsylvania

```
 1   BY MR. LUTZ:
 2        Q.    Okay.  Let's go to 47.
 3               (Whereupon, Defendants' Deposition
 4               Exhibit 1534, Daily Local Article, Chesco
 5               DA accuses Sunoco of hiring armed,
 6               out-of-county muscle, was marked for
 7               identification.)
 8   BY MR. LUTZ:
 9        Q.    The court reporter has handed you what's
10   been marked as Exhibit 1534.  This is an article
11   dated January 22nd, 2019 entitled:  Chesco DA
12   accuses Sunoco of hiring armed, out-of-county
13   muscle.
14               Do you see that?
15        A.    Yes.
16        Q.    Did you or one of your colleagues review
17   this article on or about January 2019 -- 22nd, 2019
18   when it was published?
19        A.    I do not know.
20        Q.    Looking at the second page at the very
21   bottom, beginning:  Sunoco/ETP spokeswoman.
22               Do you see that?
23        A.    Yes.
24        Q.    The article quotes Sunoco/ETP spokeswoman
25   Lisa Dillinger as issuing the following statement,
```

Deposition of Frank Theodore Gardner III          Allegheny County Employees' Retirement System v. Energy Transfer LP

1   quote:  We have engaged security on Lisa Drive at

2   the request of the impacted homeowners to restrict

3   access to their property as they were concerned not

4   only with protecting their privacy, but the

5   possibility of people trespassing on their property.

6          I will decline to discuss any further

7   details of our security efforts beyond that we do

8   use security on our projects as needed to ensure the

9   safety of our employees, our assets and those who

10  live in the area.

11         Do you see that?

12  A.    Yes.

13  Q.    Do you have any reason to believe that

14  that statement from Ms. Dillinger was false or

15  misleading at the time it was made?

16              MR. MATHAI:  Objection.

17  A.    No.

18  BY MR. LUTZ:

19  Q.    Do you have any reason to believe that it

20  was not true that Energy Transfer had engaged

21  security on Lisa Drive at the request of impacted

22  homeowners?

23              MR. MATHAI:  Objection.

24  A.    No.

25              ///

1   BY MR. LUTZ:

2       Q.    Did Energy -- excuse me.

3            Did Salient view it as important when

4   making investment decisions about Energy Transfer --

5   strike that.

6            Did Salient view this statement from

7   Ms. Dillinger as important when making investment

8   decisions with regard to Energy Transfer?

9       A.    No.

10                 MR. MATHAI:  Objection.

11  BY MR. LUTZ:

12      Q.    Did Salient base any investment decision

13  relating to Energy Transfer on the statement I just

14  read from Ms. Dillinger about security on Lisa

15  Drive?

16                 MR. MATHAI:  Objection.

17      A.    No.

18  BY MR. LUTZ:

19      Q.    It would have been -- from your

20  perspective as an investor in Energy Transfer, it

21  would have been crazy to base an investment decision

22  in Energy Transfer based on the statement I just

23  read from Ms. Dillinger, correct?

24                 MR. MATHAI:  Objection.

25      A.    It would be unusual, yes.

```
1              C E R T I F I C A T E

2

3        I, MICHAEL E. MILLER, FAPR, RDR, CRR, Notary

4   Public, do hereby certify:

5        That FRANK THEODORE GARDNER III, the witness

6   whose deposition is hereinbefore set forth, was duly

7   sworn by me and that such deposition is a true

8   record of the testimony given by such witness;

9        That pursuant to FRCP Rule 30, signature of

10  the witness was requested by the witness or other

11  party before the conclusion of the deposition;

12       I further certify that I am not related to any

13  of the parties to this action by blood or marriage,

14  and that I am in no way interested in the outcome of

15  this matter.

16       IN WITNESS WHEREOF, I have hereunto set my

17  hand on May 15, 2023.

18

19  _____

20  Michael E. Miller
    Fellow of the Academy of Professional Reporters
21  Registered Diplomate Reporter
    Certified Realtime Reporter
22  Notary Public
    My Commission Expires 7/9/2024

23

24

25
```