**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALLEGHENY COUNTY EMPLOYEES'** | : | |
| **RETIREMENT SYSTEM et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 20-200** |
| | : | |
| **ENERGY TRANSFER LP et al.,** | : | |
| **Defendants.** | : | |

**McHUGH, J.**                                                          **August 8, 2024**

## MEMORANDUM

| | | |
|---|---|---|
| **I.** | **Background** | **3** |
| **II.** | **Standard** | **4** |
| **III.** | **Discussion** | **4** |
| A. | Loss Causation | 4 |
| 1. | Standard | 5 |
| 2. | August 2018 | 6 |
| 3. | October 2018 | 15 |
| 4. | November 2019 | 24 |
| B. | Material Misrepresentation | 29 |
| 1. | Pipeline Capacity | 29 |
| a. | Investor Conferences | 31 |
| b. | Q2 2018 Earnings Call | 43 |
| 2. | Construction Timeline | 46 |
| C. | Scienter | 52 |
| 1. | Standard | 52 |
| 2. | Pipeline Capacity | 53 |
| a. | Investor Conferences | 53 |
| b. | Q2 2018 Earnings Call | 56 |
| 3. | Construction Timeline | 56 |
| **IV.** | **Conclusion** | **57** |

This case arises out of the construction of the Mariner East pipeline in Pennsylvania. Plaintiffs are retirement systems and pension plans bringing this action on behalf of a class of shareholders in Energy Transfer LP against Energy Transfer, its subsidiary, and certain executives. They allege securities fraud in the form of false and misleading public statements affecting the price of Energy Transfer stock.   The case survived dismissal and Plaintiffs obtained class certification.  Before me are now the parties' cross-motions for summary judgment.

Defendants move for summary judgment as to whether the remaining statements are false, as well as scienter and loss causation.  Plaintiffs move for partial summary judgment as to falsity and scienter for some of the statements relating to pipeline capacity.  As was the case at the dismissal and class certification stages, the parties have submitted extensive briefing on their motions,[1] and oral argument was heard.  They have raised a plethora of arguments, with many nuances and subplots.  Not every argument will be addressed here, but care has been taken to identify and address the controlling issues.

At this juncture, after several changes in approach, Plaintiffs' case focuses on three public disclosures that they contend corrected earlier misrepresentations by Energy Transfer and its executives.  With discovery complete, the evidence is sufficient to prove loss causation only as to misrepresentations about the pipeline's capacity and timeline.  Consequently, only Plaintiffs' claims grounded in the corrective disclosure that occurred in August 2018 may proceed.  Indeed, as to that issue, the record is strong enough to grant, in part, Plaintiffs' cross-motion for summary judgment.  But as to the remaining two corrective disclosures alleged, in October 2018 and November 2019, no reasonable jury could find loss causation.  The Defense's motion for summary judgment as to those dates will therefore be granted.

---

[1] The parties' briefing spanned more than 600 pages, supplemented by thousands of documents filling fourteen binders.

## I.      Background

This case has already generated two lengthy opinions, one on a motion to dismiss and one on a motion for class certification.[2]  In sum, Plaintiffs' case is premised on Defendants' issuance of a series of purportedly false or misleading statements relating to Mariner East 2 (ME2), a natural gas pipeline across Pennsylvania.  Defendants' alleged misstatements and omissions relating to ME2's pipeline can be grouped into four categories: capacity, construction timeline, regulatory compliance, and safety priorities.  Plaintiffs contend that these misrepresentations artificially inflated the trading price of Energy Transfer's common units, after which the price fell sharply and caused financial harm to investors once the truth became known through a series of partial corrective disclosures in August 2018, October 2018, and November 2019.  Besides Energy Transfer LP, four executives of Energy Transfer's general partner remain as Individual Defendants: Kelcy Warren, Chairman and CEO; Thomas Long, CFO; Marshall McCrea, President and CCO; and Matthew Ramsey, COO.

---

[2] After Defendants moved to dismiss, I issued a memorandum and order that reviewed in detail the various misrepresentations and omissions alleged by Plaintiffs to determine whether they were actionable.  I dismissed statements from twenty-two paragraphs of the Complaint for various reasons, finding that the remaining statements were actionable.  532 F. Supp. 3d 189 (E.D. Pa. 2021) (ECF 64-65).  In denying the motion to dismiss, I rejected Defendants' arguments that the corrective disclosures regarding the project timeline, the pipeline capacity, and government investigations were legally insufficient to establish loss causation for the misrepresentations alleged.  At the class certification stage, I defined the class as all persons who purchased or otherwise acquired common units of Energy Transfer LP between February 25, 2017, and November 11, 2019, and certified it as to claims deriving from misrepresentations linked to corrective disclosures made in August 2018, October 2018, December 2018, and November 2019.  623 F.Supp.3d 470 (E.D. Pa. 2022) (ECF 113-14).

## II.       Standard

These Motions are governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56, as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

To prevail in a Rule 10b-5 securities fraud claim, Plaintiffs must establish: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (citation omitted).  Only the first, second, and sixth elements are at issue in this opinion.

## III.      Discussion[3]

Because Plaintiffs' case stands or falls on the existence of loss causation, I first address this element, followed by the falsity or misleadingness of the statements and their corresponding scienter.

### A.  Loss Causation

There are three remaining corrective disclosure dates at issue: August 9-13, 2018; October 22, 2018; and November 12-13, 2019.[4]  I find enough genuine issues of material fact only as to August 2018, with the result that only claims related to this this date survive summary judgment.

---

[3] The parties collectively submitted 580 exhibits in support of their cross-motions briefing.  Because most of them were filed under seal, they appear scattered across the docket and are not easily referenced therein. References to the record thus appear as "Defs.' Ex." and "Pls.' Ex." throughout this opinion.

[4] Plaintiffs' Amended Complaint alleged six corrective disclosure dates: August 9-13, 2018; October 27-29, 2018; December 19-21, 2018; August 8-12, 2019; November 12-13, 2019; and December 3, 2019.  Pls.' Amend. Compl. 149-68 (ECF 43).  At the class certification stage, I dismissed the August 2019 and December 2019 corrective disclosures.  Class Certification Order ¶ 3 (ECF 114).  Plaintiffs' loss causation

### 1. Standard

"The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). To establish loss causation, Plaintiffs must "show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing [their] economic loss." *Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 114 (3d Cir. 2018), *reh'g granted, judgment vacated on other grounds*, 925 F.3d 605 (3d Cir. 2019), *and on reh'g*, 962 F.3d 701 (3d Cir. 2020) (citing *McCabe*, 494 F.3d at 426).

Defendants emphasize the Second Circuit's opinion in *In re Omnicom Group Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), as establishing a requirement that Plaintiffs exactly match a misrepresentation with a subsequent correction. *Omnicom* is of course not controlling here, and in any case, I do not read it as establishing such a rigid test. *See* 597 F.3d at 511 (holding the plaintiffs could prevail on loss causation by showing that "negative investor inferences drawn from [the corporation's audit director's] resignation and from the [accompanying] news stories . . . caused the loss"). Indeed, recently the Second Circuit observed: "To be sure, with respect to the loss causation element of securities fraud – that is, the causal link between the alleged misconduct and the loss ultimately suffered by plaintiff – the basic calculus remains the same whether the truth is revealed in a corrective disclosure describing the precise fraud or through events constructively disclosing the fraud." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) (cleaned up).

---

expert, Chad Coffman, also rejected two corrective disclosure dates. First, Coffman rejected the December 2018 disclosure date on the basis that it was not associated with a statistically significant price decline. Pls.' Expert Rep. of Chad Coffman ¶ 12 n.13 (Defs.' Ex. 115). Second, Coffman rejected the October 27-29, 2018, date because the October 27 news article at issue had already been published on October 21, and so he analyzed the disclosure as of October 22, instead. *Id.* ¶ 12 n.15.

I remain of the view that corrective disclosures can take many forms, and at summary judgment the issue is the quality and sufficiency of the evidence. *See Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 425 (E.D. Pa. 2019) (listing examples). Plaintiffs need not prove that corrective disclosures explicitly or exhaustively revealed the fraud, so long as fair inferences of fraud that would affect investors can be drawn from the disclosures.

### 2. *August 2018*

Since its early planning stages, Sunoco, Energy Transfer's predecessor, expected the ME2 pipeline would have a capacity of approximately 275,000 barrels per day of natural gas liquids, with the potential to expand to 450,000 barrels per day. Press Release, Sunoco Logistics, Mariner East 2 Key to Further Economic Development in Pennsylvania (Mar. 10, 2016) (Pls.' Ex. 12). Throughout 2017 and 2018, Defendants asserted the same capacity numerous times in SEC filings and at analyst conferences. *See, e.g.*, RBC Capital Markets Midstream Conference Presentation at 19 (Nov. 15-16, 2017) (Pls.' Ex. 40) ("Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day[.]"). At these same conferences and during quarterly earnings calls, Defendants made several statements concerning ME2's construction timeline. Unlike their unchanged capacity assertions, Defendants stated different timelines as to when they expected ME2 would be in-service, including Q4 2017, Q2 2018, and later Q3 2018.[5] Pls.' Exs. 40-43, 50-53 (analyst conference presentations); Pl. Exs. 70, 210, 218, 221, 250 (earnings call transcripts).

On Thursday, August 9, 2018, Energy Transfer held its second quarter 2018 earnings call. The call commenced at 9:00 am Eastern Time and concluded within the hour. Q2 2018 Earnings Call Transcript (Defs.' Ex. 75) (showing time markers throughout); Pls.' Expert Rep. of Chad Coffman ¶ 88 (Defs.' Ex. 115). During that call, Long, Ramsey, and McCrea made several

---

[5] ME2 was ultimately placed "in service" on December 29, 2018. Press Release, Energy Transfer, LP, Energy Transfer Announces Mariner East 2 Pipeline Is in Service (Defs' Ex. 88).

statements relating to ME2's pipeline capacity and timeline. In particular, the Individual Defendants shared with investors that ME2 would be in-service by the end of the third quarter in 2018 using a 12-inch pipeline, the 12-inch pipeline's capacity would meet "contractual commitments," and ME2's completion date would be in the third quarter of 2019.[6]

After the call, Defendants' public relations and investor relations teams received inquiries seeking to clarify the information shared about ME2. Email from Jeremy Rakes, Argus Media Rep., to Lisa Coleman, Pub. Rels. & Commc'n Supervisor (Aug. 9, 2018) (Pls.' Ex. 232); Email from Bob Coble, OFI Global investment firm, to Brent Ratliff and Lyndsay Hannah, investor relations team (Aug. 9, 2018) (Pls.' Ex. 233). Defendants' investor relations team was by no means surprised about the confusion. In a text message thread a few hours after the call, Brent Ratliff and Lyndsay Hannah discussed their own confusion and need to clarify the statements about timeline and capacity.

| | |
|---|---|
| [Hannah]: | Should we clarify with MICHAEL after this call? |
| [Ratliff]: | As best we can. I think several folks will be confused. |
| [Hannah]: | Agreed. Including me if I was listening. I think what he was trying to say was end of Q318 for ME2 with 12" line, rest of ME2 in Q319 and then we stick to mid-19 for 2X? Or did he just move 2X back . . . . |
| [Ratliff]: | Am I wrong? I think volumes of ME2 and 2X has been in the slide deck for at least a year. |
| [Hannah]: | They have been. |

Energy Transfer Personnel Text Records at ET-ACERS-01061169 (Pls.' Ex. 121).

The following day, before the market opened, Wells Fargo and Wolfe Research published two reports addressing the earnings call's discussion of ME2 since, as the analysts put it, it "was

---

[6] When asked about completion date, McCrea shared two conflicting dates: third quarter of 2019 and third quarter of 2020. *Compare* Q2 2018 Earnings Call Transcript 14 (Defs.' Ex. 75), *with id.* at 16.

confusing" and "seemed to confuse the market."[7]   Keith Stanley & Steve Fleishman, Energy Transfer Equity: Monkey See, Monkey Dough 1, Wolfe Research (Aug. 10, 2018) (Defs.' Ex. 77); Michael Blum, et al., ETE/ETP: Q2 Beat – Remain Positive 2, Wells Fargo (Aug. 10, 2018) (Defs.' Ex. 76).  A summary chart of the earnings call statements and the analyst's subsequent reporting is found below.

| ME2 Topic | August 9<br>Earnings Call | August 10<br>Analyst Reports |
|---|---|---|
| **Use of 12-inch Pipeline** | "To avoid any delays in the ME2 project schedule, *we will utilize a section of an existing pipeline in the affected area for initial in-service*." -Long | "Energy Transfer plans to initially utilize different diameter pipelines in various segments of Mariner East 2's pipeline route in order to bring capacity into service as quickly as possible." -Wells Fargo Report |
| **Pipeline Capacity** | "This will allow us to bring *sufficient capacity online to meet all of our initial contractual commitments*." -Long<br><br>"We've secured pretty significant volumes for these projects: ME1, ME2, and ME2X. However, those projects ramp up over time, so the *utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted* . . . ." -McCrea | "Energy Transfer plans to initially utilize different diameter pipelines in various segments of Mariner East 2's pipeline route in order to bring capacity into service as quickly as possible. Based on our understanding, partial ME 2 service will begin in Q3'18 (we estimate roughly 100 MBbls/d of capacity), almost full ME 2 / ME 2X service will begin in late Q3'19 (we estimate roughly 475 MBbls/d of capacity), and full ME 2 / ME 2X service will begin Q3'20 (full 525 MBbls/d of capacity)." -Wells Fargo Report |

---

[7] In their briefing, Defendants attempt to discredit the Wells Fargo and Wolfe Research reports, arguing that there is no evidence that the analyst authors spoke to Energy Transfer after the earnings call, in preparation of their reports.  I find that there is enough evidence for a reasonable factfinder to conclude that the analysts did, in fact, speak with Energy Transfer personnel, including Ramsey.  *See* Energy Transfer Personnel Text Records at ET-ACERS-01061159 (Pls.' Ex. 121) (showing investor relations personnel encouraging Ramsey to jump on a call with the Wolfe Research and Wells Fargo analysts); *id.* at ET-ACERS-01061165 (sharing that the investor relations personnel were on a call with the Wolfe Research analyst); Wells Fargo Report (Defs.' Ex. 76) ("We followed up with the company post the earnings call to gain clarity and present our understanding below."); Wolfe Research Report (Defs.' Ex. 77) ("Mariner East is messier than expected but consistent with our conservative modeling.  Discussion of ME 2 on the call was confusing. We talked to the company afterward.") (emphasis removed).  At oral argument, Defendants asserted, contrary to their briefing, that they were not claiming the conversations did not happen.  Oral Arg. Tr. 47:5-11 (ECF 212).

| | | |
|---|---|---|
| | "We really **haven't shared capacities**. We can look at maybe doing that in the future. But the most important aspect of the question is **we have sufficient capacity to handle what we contracted**." -McCrea | "ME 2 may not reach full capacity (previously disclosed as 275 mbd) until 4Q19 (one year delay). Due to construction / regulatory issues, the company is using a hodgepodge of different sized pipes that will then be re-worked / upsized over time.  A final connection involving a small amount of ME 2 / ME 2x capacity won't be completed until 4Q20." -Wolfe Research Report |
| **In-Service Date** | "As a result, **we continue to expect to place ME2 in service by the end of this quarter**." -Long<br><br>"[T]he utilization of the 12-inch . . . also **allows us to bring ME2 online hopefully by the end of this year**. -McCrea<br><br>"So we feel confident that **we'll be finished with ME2 in-service by the end of the third quarter of this year**." -Ramsey | "Based on our understanding, partial ME 2 service will begin in Q3'18 (we estimate roughly 100 MBbls/d of capacity) . . . ." -Wells Fargo Report |
| **Completion Date** | "For Mariner 2, well, for the next segment, the **last segment through what we call the GRE area, we expect that to be completed by the third quarter or in the third quarter of 2019**. . . . [T]he **last segment of Mariner 2 will be completed in October of 2019**." -McCrea (responding to the inquiry: "When would you expect the full pipeline at the 275,000 barrels a day to be completed with the remaining HDDs[8] complete?")<br><br>"***The next tranche will be by the end of third quarter or first part of the fourth quarter for Mariner 2*** and Mariner 2X. And then the **final pipeline completion will be** | "Near full service of ME 2 / ME 2X is now scheduled to occur in late Q3'19 (versus our prior estimate of ME 2 in Q4'18 and ME 2X in Q3'19)." -Wells Fargo Report<br><br>"[A]lmost full ME 2 / ME 2X service will begin in late Q3'19 (we estimate roughly 475 MBbls/d of capacity), and full ME2 / ME 2X service will begin Q3'20 (full 525 MBbls/d of capacity)." -Wells Fargo Report<br><br>"ME 2 may not reach full capacity (previously disclosed as 275 mbd) until 4Q2019 (one year delay). . . . A final connection involving a small amount of ME2 / ME 2x capacity won't be |

---

[8] HDD, or Horizontal Directional Drilling, is a steerable trenchless method of installing underground pipe by using a surface-launched drilling rig.  It is the method Energy Transfer used for ME2's construction.

| | | |
|---|---|---|
| | ***completed about a year later in the third quarter of 2020***." -**McCrea** (responding to the inquiry: "And then just to clarify from an earlier question, the full capacity on ME2, when will that be available? And then the ME2X will be - I think you said the end of Q3 2019?"). | completed until 4Q20." -Wolfe Research Report |

Plaintiffs' loss causation expert, Chad Coffman, analyzed the market impact over the course of three trading days: August 9 (Thursday), 10 (Friday), and 13 (Monday).  Pls.' Expert Rep. of Chad Coffman ¶¶ 86-104 (Defs.' Ex. 115).  Coffman found that, on these three days, Energy Transfer experienced heavier-than-average trading volume.  *Id.* ¶ 100.  He also found that Energy Transfer's common units declined by 0.54%, 0.96%, and 3.27%, respectively.  *Id.* Coffman thereby concluded that the abnormal decline of 3.27% on August 13, was statistically significant, and attributed "$0.87 per share of the abnormal dollar decline to the corrective information released on August 9 and 10."[9]  *Id.* ¶¶ 100, 104.

The parties disagree about whether: (i) the earnings call and analyst reports disclosed new information; (ii) a three-day event window is possible; and (iii) the corrective disclosure can be evaluated over a three-day event window as proposed by Plaintiffs' expert.  Plaintiffs have the stronger argument as to each question.

---

[9] The Defense concedes that its unit price fell by a statistically significant amount by market close on August 13.  Defs.' Mot. Summ. J. at 27 (ECF 181).  At oral argument, however, the Defense framed ME2's initial in-service with the smaller 12-inch pipeline as "good news" for the market.  Energy Transfer portrayed this same positive spin back in 2018, and this was adopted by some analysts.  Although it could be true in relative terms that, by that point, ME2 with a smaller pipeline was better than no ME2 at all, this positivity was not shared across the market, and there were continued concerns about "transparency and disclosure." *See* Wolfe Research Report (Defs.' Ex. 77). Moreover, loss causation requires only a showing of market impact subsequent to the correction of a false or misleading statement.  To discount such price drops as meaningful because a stock later rose would immunize fraudulent statements in a way not contemplated by the statute.

First, Defendants argue that the earnings call and accompanying analyst reports cannot serve as corrective disclosures because they did not reveal any new information. Instead, according to Defendants, the call merely summarized prior disclosures and the reports summarized the call and publicly available data. I disagree, especially given the clear confusion created by the Individual Defendants' statements.

It is true that there were prior disclosures of ME2's *use* of a 12-inch pipeline. For example, on July 3, 2018, a StateImpact article reported that Sunoco planned to use an existing "12-inch pipeline in some sections . . . where the new Mariner East pipelines are still under construction." Jon Hurdle, *Sunoco Wants to Use Older Pipeline to Pump NGLs Over Unfinished Sections of ME2* (Defs.' Ex. 68). The article, however, did not address the impact, if any, to ME2's capacity. As to the construction timeline, it only vaguely addressed that this move would relieve some of the pressure to get ME2 online, but it did not state anything else about ME2's completion date, even though the project was already significantly delayed.[10]

A few days later, on July 12, 2018, Bank of America Merrill Lynch also reported on ME2's use of the 12-inch pipeline. Coleman, et al., 2Q Earnings Preview: News on Rover In-Service Delays, ME2 and the Satellite JV (Defs.' Ex. 70). That report did identify the potential impact that the reduced pipeline could have on ME2's capacity and "in-service" date. *Id.* ("We view the potential for expediting the project positively as it could alleviate investor concerns and allow ETP to achieve its current 3Q18 in-service target, albeit perhaps not all full volume given the capacity difference on ME2 and the existing pipe.").

---

[10] By then, the article reported the project was "at least 18 months behind." Jon Hurdle, *Sunoco Wants to Use Older Pipeline to Pump NGLs Over Unfinished Sections of ME2* (Defs.' Ex. 68).

But a juror could regard the Merrill Lynch report as speculative opinion, and not view the facts as favorably as Merrill.[11] This is supported by analysts' questions during the earnings call – the same analysts who authored the Wells Fargo and Wolfe Research reports the following day – asking for clarification as to when ME2's full, 275,000-barrel capacity would be met. Q2 2018 Earnings Call Tr. 14, 16 (Defs.' Ex. 75). In fact, as McCrea stated: "***We really haven't shared capacities***. We can look at maybe doing that in the future. But the most important aspect of the question is we have sufficient capacity to handle what we contracted." *Id.* at 14 (emphasis added). And, as Defendants' loss causation expert Kenneth Lehn conceded, because ME2's 20-inch pipeline was estimated to carry between 275,000 and 450,000 barrels per day, it is possible to interpret that a 12-inch pipeline could carry 275,000, the bottom of that range. Dep. Kenneth Lehn 49-50, 56 (Pls.' Ex. 249).

As to timeline, neither the StateImpact article nor the Merrill Lynch report address ME2's final completion date. There is some evidence that, prior to the August 8 earnings call, the latest estimate placed ME2 near full service in the fourth quarter in 2018, and this timeline was considerably pushed back by almost a year to the third quarter in 2019. Wells Fargo Report (Defs.' Ex. 76) ("Near full service of ME 2 / ME 2X is now scheduled to occur in late Q3'19 (versus our prior estimate of ME 2 in Q4'18 . . . .").[12]

I conclude that the evidence of record creates genuine issues of material fact, and that a reasonable juror could determine that the August 9 earnings call and August 10 analyst reports revealed new information.

---

[11] It is also unclear whether the Merrill Lynch report was accessible only to its investors, versus the general public.

[12] Defendants concede that there had not been a prior disclosure of the final estimated timeline of 3Q or 4Q 2020. *See* Defs.' Reply (ECF 202) (charting the information allegedly disclosed during earnings call and as part of the analyst reports but failing to include a corresponding July disclosure).

Second, Defendants argue that August 13 cannot serve as the corrective disclosure date based on how efficient markets work, presumptively incorporating information within 24 hours. Plaintiffs respond that scholarly literature allows for disclosure windows of more than one day and argue that a longer window is consistent with Supreme Court and circuit precedent, including the Third Circuit.  Plaintiffs also premise their theory for a longer event window on Defendants' lack of transparency, their attempts to cast the capacity and timeline information in a positive light, and the obvious market confusion.

> At the class certification stage, similar arguments were considered:
>
> Although I agree that temporal proximity is an important factor in analyzing price impact under an efficient market presumption, that one factor cannot be as rigidly applied as the Defendants argue for throughout their papers in light of the actual mechanisms of market clearing required to establish the "true" price of a security. At the same time, where Plaintiffs seek to extend the window, they must show a sound conceptual and evidentiary basis for that extension.  The scholarly literature allows for such variability.

623 F. Supp. 3d 470, 485 (E.D. Pa. 2022) (ECF 113).  Based on the evidence already addressed, I find that Plaintiffs have sufficient evidentiary support for extending the event window beyond one day.[13]

Third, Defendants argue that Plaintiff's own loss causation expert, Coffman, forecloses a three-day event window.  Defendants' arguments include that Coffman has not previously testified that a multi-day event window is warranted in other cases, he failed to cite an academic basis for

---

[13] Plaintiffs assert they are asking for a 2-day, not a 3-day event window, Pls.' Resp. 7, 217 (ECF 193), but it appears that their expert analyzed the price and volume of common units of a three-day trading window, Pls.' Expert Rep. of Chad Coffman ¶ 102 (Defs.' Ex. 115).  At oral argument, Plaintiffs conceded Coffman conducted his analysis over the course of three trading days, but it is their position that the analyst reports – published before the market opened on August 10 – corrected the information, and so the window could be only August 10 and August 13, the next trading day.  Oral Arg. Tr. 37:20-38:13 (ECF 212) (noting Plaintiffs would not "plant a stake on the ground" on a "purely two days" corrective disclosure but explaining nonetheless their position on having a two-day window).  In any event, I find there is enough evidence of market confusion which could allow for the extended window through August 13.

using this type of window, and when he did cite to an academic article, he did not extend the window in line with the article's own methodology.[14]  I view Defendants' attacks on Coffman's methodology as matters for cross-examination, rather than a basis for summary judgment.

At the class certification stage, I cited other cases where a three-day window was deemed appropriate.  632 F. Supp. 3d at 486.  As reviewed above, there is enough evidence on the record where a reasonable juror could find that the August 9 earnings call, although it disclosed some information, resulted in market confusion.  And it took several inquiries by analysts before investors had enough information to assess those and prior statements.

Defendants finally argue there is no basis to support a three-day window because there was no remaining confusion after the publication of the August 10 analyst reports.  But Plaintiffs point to an August 13 email from Viking Global Investor, sent shortly after the market opened, inquiring about when ME2 would reach its 275,000 barrels capacity.  Email from Jeffrey Butler, Viking Global Investor, to Brent Ratliff and Lyndsay Hannah, among others (Aug. 13, 2018, 8:52 a.m. C.T.) (Pls.' Ex. 234).  Given the substantial confusion caused by the earnings call, there is an evidentiary basis for a reasonable juror to conclude that it took more than one full trading day (August 10) for the market to absorb the corrective disclosures.[15]

---

[14] The referenced article is Dmitry Krivin, Robert Patton, Erica Rose, & David Tabak, *Determination of the Appropriate Event Window Length in Individual Stock Event Studies*, NERA (Nov. 4, 2003) (Defs.' Ex. 1). Defendants also rely on a second article later published by Tabak, where he revisits the use of multi-day windows.  David Tabak, *p-Hacking and Event Studies in Securities Litigation*, NERA (April 12, 2023) (Defs.' Ex. 106).  Based on these articles, the parties disagree as to methodology that Tabak advances, as well as the methodology that Coffman in turn employed.

[15] Defendants oppose Plaintiffs' reliance on the Viking Global Investor email, noting that whatever confusion may have existed was fully corrected by the August 9 earnings call and August 10 reports.  Oral Arg. Tr. 47:12-48:10 (ECF 212); Defs.' Reply at 13 n.10 (ECF 202).  Genuine issues remain as to whether reasonable investors' confusion persisted, more so given that Energy Transfer had not itself clarified the confusion publicly, but rather independent analysts reported on the issue.

### 3.   October 2018

Plaintiffs present a theory as to the October 2018 corrective disclosure that is markedly different from their earlier position.  According to Plaintiffs, over the life of the project, Energy Transfer executives and personnel made several statements related to its commitment to and prioritization of regulatory compliance and safety.  These statements, Plaintiffs argue, were later partially corrected through news articles published on October 21, 2018.  Defendants Long, McCrea, and Ramsey made some of the statements during earnings calls, while public relations personnel, including Jeff Shields, Lisa Coleman (formerly Dillinger), and Alexis Daniel made the remaining statements to reporters.  A summary chart of the statements at issue organized by date is found below.[16]

| Regulatory Compliance and Safety Statements | |
|---|---|
| *Date* | *Statement* |
| 11/8/2017 | "Additionally, we continue to work with the Pennsylvania Department of Environmental Protection to secure approvals in order to move our remaining HDDs forward." -**Long** <br><br> "But with Matt Ramsey and his team, we're doing everything we can to work with PADEP and to get all the HDDs completed and on time." -**McCrea** <br><br> "We're working closely with [regulatory agencies] and most of the holdup has come with regard to HDD drills out there. But we're working through that process. It's – it went through a court process, so we had certain time guidelines under the order and sometimes the PADEP uses their full time allotment to respond back to us that slows us down."-**Ramsey**[17] |

---

[16] In their briefing, Plaintiffs did not point to any specific statement which they alleged was later corrected in October 2018 and November 2019.  *See* Pls.' Resp. 69-71, 225-45 (ECF 193).  Instead, they generally argued the articles published on these two dates corrected prior regulatory compliance and safety statements.  At oral argument, Plaintiffs did recite a handful of statements, but persisted in their overall position, treating the remaining statements aside from capacity and timeline as related to these two corrective disclosures.  Oral Arg. Tr. 27-29, 35 (ECF 212) (citing to Appendix C of Chad Coffman's expert report, which lists all regulatory and safety statements).  As such, I have analyzed all the remaining regulatory and safety statements which predated the purported corrective disclosures in October 2018 and November 2019.

[17] Q3 2017 Earnings Call Tr. 4, 12, 13 (Nov. 8, 2017) (Pls.' Ex. 253).

| 1/3/2018 | "We intend to expeditiously submit these reports and we are confident that we will be reauthorized to commence work on this project promptly," [Jeff] **Shields** said in a statement.  "We also reiterate our commitment to the highest levels of construction expertise and our dedication to preserving and protecting the environment in which we conduct our work."[18] |
|---|---|
| 2/8/2018 | Jeff **Shields**, a spokesman for the Mariner East project, said in an email that ETP is "committed to fully complying with the DEP order, which includes following all permit requirements."[19]<br><br>"We are committed to fully complying with the DEP order, which includes following all permit requirements," **Shields** wrote in an email. "Safety is paramount for any energy infrastructure project we do — the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment."[20] |
| 2/22/2018 | "I think we have a good working relationship with PADEP. We have a weekly meeting with them where we look at the gating items. We are still under court order deadlines that, that we have to adhere to and they have to adhere to. But I think our progress is good." -**Ramsey**[21] |
| 3/22/2018 | "Professional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception," **Shields** wrote. "Construction through this area is safe.<br><br>"There is some karst [a rock structure that contains limestone] north of this area, but it does not impact this area. It is important to note that we have successfully conducted many drills in karst geology and many pipelines have been operating safely in karst areas for decades."[22] |
| 9/25/2018 | In the last three years, ETP has reduced its accident rate per 1,000 miles by 30 percent, aligning it with an industry average, **Dillinger** said. She added that since Sunoco Pipeline's integration with ETP on May 1, 2017, accidents have been "drastically reduced," and that the company spent $429 million on assets in 2017. |

---

[18] Andrew Maykuth, *DEP Halts Construction of Sunoco's $2.5B Mariner East 2 Pipeline*, Philadelphia Inquirer (Pls.' Ex. 126).

[19] Scott DiSavino & Tom Brown, *Pennsylvania Allows Sunoco to Resume Work on Mariner NGL Pipeline*, Reuters (Pls.' Ex. 254).

[20] Marie Cusick, *Sunoco to Resume Work, Pay $12.6 Million for Mariner East 2 Pipeline Violations*, StateImpact Pennsylvania (Pls.' Ex. 127).

[21] Q4 2017 Earnings Call Tr. 15 (Feb. 22, 2018) (Pls.' Ex. 221).

[22] Claire Sasko, *"I'm Terrified": Life on the Front Lines of the Sunoco Pipeline*, PhillyMag (Pls.' Ex. 123).

| | |
|---|---|
| | "It is our priority to maintain and operate our assets to the highest safety standards, not just because it makes good business sense, but because it is the right thing to do," she said.[23] |
| 10/21/2018 | When asked about noncompliance last week, Ms. **Dillinger** noted only one instance, when Sunoco initiated a horizontal underground drilling operation on a site that was permitted for trenching.<br><br>"That was rectified about eight months ago," she said. "We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work."[24] |
| 11/1/2018 | Energy Transfer spokeswoman Alexis **Daniel** said in an email the company remains in "continued communication" with DEP. "We have been and will continue to comply with their orders," she wrote, adding that the safety of the surrounding area is "our first priority."[25] |
| 12/19/2018 | Energy Transfer has released a statement saying they were surprised to learn the DA's office thinks there is a legal basis for conducting a criminal investigation.<br><br>"We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines.  We vehemently deny any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release.  We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is readily available on the PUC and DEP websites.  We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania and we are committed to aggressively defending ourselves against these baseless allegations.  We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.  The safety of all those who live |

---

[23] Jon Hurdle, *Mariner East 2: Sunoco's Incidents, Fines and Shutdowns Fuel Residents' Safety Concerns*, StateImpact Pennsylvania (Pls.' Ex. 282).

[24] Anya Litvak & Laura Legere, *A Massive Pipeline Boring Through Pennsylvania Sunoco's Mariner East 2 Projects Has Had Spills, Fines and Court-Ordered Halts.  Is This the New Normal?*, Pittsburgh Post-Gazette (Pls.' Ex. 237).

[25] *DEP Orders Halt to Pipeline Work After Explosion*, Observer-Reporter (Pls.' Ex. 255).  The parties also disagree as to whether this statement is still viable given that Plaintiffs are no longer pursuing claims related to the Revolution pipeline, the primary coverage of the Observer-Reporter article.  Even assuming this specific statement transcended the topic of Revolution, my analysis remains the same as to the later disclosures' lack of correction.

| | and work along our pipeline is our first priority and this project was planned and implemented based on that fact."[26] |
|---|---|

The alleged partial disclosure took place on Sunday, October 21, 2018, when the Pittsburgh Post-Gazette, a regional publication in Western Pennsylvania, published two articles relating to Energy Transfer's construction of ME2: *As New Pipelines Cut into Appalachia, Rain, Slides, Coal Mines Bedevil Projects Subsidence Proves Disruptive Force* (Litvak article) and *A Massive Pipeline Boring Through Pennsylvania Sunoco's Mariner East 2 Projects Has Had Spills, Fines and Court-Ordered Halts.  Is This the New Normal?* (Litvak and Legere article).  Defs.' Exs. 81, 82.

Among other issues, the Litvak article reported on the experiences of a Washington County couple impacted by ME2's construction.  According to Litvak, the homeowners had seen drilling mud and spills at or close to their property since ME2's first week of construction.  Litvak went on to report that a contractor that "had prepared the original spill response plan" and "was asked to reevaluate the design of drills in the area . . . determined the risk of further spills was inherent to drilling in that spot [an area that sits on top of the old Pittsburgh's Co's Cincinnati Mine].  It was bound to happen."[27]

---

[26] Jim Melwert, *Chester County DA Announces Mariner East Pipeline Criminal Investigation*, KYW News Radio (Pls.' Ex. 293).  This is the only statement from Energy Transfer, not ascribed to any one executive or personnel.  The relevant safety statement concludes the paragraph, but I have provided more language from the article here for context.  The investigation at issue here is the Chester County District Attorney's investigation into Energy Transfer regarding their involvement in causing sinkholes in Pennsylvania.

[27] The article and Plaintiffs' expert identified Tetra Tech as having conducted the reevaluation and made these findings.  Litvak Article (Pls.' Ex. 81); Pls.' Expert Rep. of Chad Coffman ¶ 109 (Defs.' Ex. 115).  The Defense clarified the entity that performed the reevaluation was Groundwater & Environmental Services, Inc. (GES), not Tetra Tech.  Defs' Mot. Summ. J. at 37 (ECF 181).  Plaintiffs do not contest this in their response.  The GES report was conducted in May 2018 and concluded as follows:

> Based on this hydrogeologic evaluation the HDD profile would pass through bedrock of variable degrees of fracturing and strength due to the response of the bedrock to mine roof collapse within the abandoned Cincinnati (Pittsburgh Coal) Mine.  A previous attempt to install the ME-II 20-inch pipe using HDD technology resulted in multiple IRS and

The Litvak and Legere article provided the perspective of Domenic Rocco, the DEP's former waterways manager and then acting program manager.   According to Rocco, "[t]he expectations from [DEP] were that there (were) not going to be inadvertent returns."  Litvak and Legere went on to note:

> [Mr. Rocco] said that while the DEP made Sunoco draft a plan for cleaning up spills should they occur – and the mere existence of such a plan was already an improvement over Sunoco's work on Mariner East 1, one DEP official testified at an administrative hearing earlier this year – Mr. Rocco stressed they weren't expecting anything close to the number of spills that materialized.

On October 22, the first trading day after the articles' publication, the price of Energy Transfer common units declined by a statistically significant amount of 3.02%.  Pls.' Expert Rep. of Chad Coffman ¶ 111 (Def. Ex. 115).  Defendants do not contest this statistical decline.  Instead, the parties disagree as to whether: (i) this Court previously rejected the October 21 articles as corrective disclosures and (ii) the articles corrected the prior regulatory and safety statements.  Although I find that my prior opinion did not foreclose Plaintiffs' ability to rely on the October 21 articles, Plaintiffs have nonetheless failed to establish that a reasonable jury could consider these articles to be corrective of prior misrepresentations.  I must therefore grant summary judgment.

---

geotechnical studies show that all possible HDD pathways above the Cincinnati Mine have an inherent risk of LOCs [loss of circulation] and IR [inadvertent returns].

The FlexBor/road bore/open trench alternative eliminates the risk of LOCs and IRs from drilling fluids and appears to a preferred approach for installation of the ME-II 20-inch line at the location of HDD S1B-0120.

*HDD Hydrogeologic Reevaluation Report: Mariner East II Spread 1 HDD S1B-0120 Wheeling and Lake Eerie Railroad Union Township, Washington County, Pennsylvania*, GES (May 2018), available at https://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/HDD_Reevaluation_Reports/SR88%20-%20Wheeling%20and%20Lake%20Erie%20Railroad%20Crossing%20-%20PA-WA-0171.0000-RR.pdf (noting the report was prepared by GES for Sunoco, but nonetheless citing Tetra Tech's work); *see also* HDD Reevaluation Reports from DEP Website at 4 row 1 (Defs.' Ex. 128) (linking the report).

First, the parties disagree about whether, in analyzing the different arguments then before me, I necessarily excluded October 21 as a corrective disclosure date.[28]

At the class certification stage, Plaintiffs' allegations turned on a different theory. There, Plaintiffs, for the most part, focused on the Litvak article's coverage of a September 10 explosion. As for the corrective disclosures, Plaintiffs relied on the republication of Litvak's article in the Associated Press on Saturday, October 27, 2018, ECF 93 Ex. 16, and the subsequent issuance of a stop work order by DEP on Monday, October 29, 2018. Defendants contend that the effect of my earlier opinion was to rule out October 21 articles as corrective disclosures in their own right. Plaintiffs respond that the focus of my prior analysis was the October 27 and 29 disclosures, and no definitive ruling was issued as to the October 21 articles.

At class certification, my analysis of Litvak's October 21 article centered on its coverage of a gas line explosion which had destroyed a house:

> *Most significantly, the article addressed a September 10th underground earth movement that ruptured a newly activated gas line, caused an explosion, and destroyed a house.* ECF 93-16. Homeowners near the pipeline expressed their concern that the pipeline was proceeding through unstable areas subject to subsidence, while Defendants spokespersons and consultants replied with assurance that all risks were being competently evaluated and addressed. The article did not purport to resolve the disagreement but concluded with a nearby family's resolve to sell their home and move away from the pipeline.

623 F. Supp. 3d at 498-99 (emphasis added). I then concluded that the republication and subsequent stop work order established the presumption of market reliance, which Defendants failed to rebut.

> The Defense further argues that neither of the October articles represented "news" to the market, because the explosion at the center of the stories occurred on September 10th. That is also true to some extent, except the initial stories set forth both sides of the controversy – homeowners and pipeline company – and concluded without attributing blame. The issuance of the stop work order broke that stalemate

---

[28] Although the Defense points out this corrective disclosure date is different from the one originally alleged, they do not otherwise suggest that it is improper to consider it.

on the side of homeowners, prohibiting further work based upon the DEP's investigation, and, as such, *linked the explosion to regulatory non-compliance with potential consequences for future construction and the ability to meet timelines*. In effect, the DEP rejected Energy Transfer's explanations to the press: the articles had alerted the market to there being smoke; the stop work order confirmed the existence of fire.

*Id.* at 36 (emphasis added).

My prior conclusion that the article did not "resolve the disagreement" as to those specific issues does not foreclose Plaintiffs' further reliance on the October 21 articles, because the issue as then framed by the parties did not require me to analyze the elements that Plaintiffs now highlight as new corrective information. Previously, the dispute centered on one of the article's reporting of the September 10 explosion, contrasting how landowners reacted with Energy Transfer's responses. Plaintiffs now focus on the reporting of positions taken by a contractor regarding the predictability and occurrence of spills caused by ME2's construction in a specific area of Washington County and, more generally, DEP's expectations of spills. My observation, that the DEP "stop work" order confirmed the problem was real, does not rule out potential impacts from other comments by the DEP and the contractor. The factual record has been more fully developed since class certification. The issue now is what a jury could reasonably conclude based on the current record. I will therefore consider Plaintiffs' revised theory.

The question then becomes whether the specific revelations Plaintiffs cite in the October 21 articles can reasonably be viewed as correcting the prior regulatory and safety statements. Having reviewed the statements from November 8, 2017, through September 25, 2018, I conclude that a reasonable jury could not find the purportedly new information in the October 21 articles corrective of earlier misrepresentations.[29]

---

[29] Plaintiffs also ascribe specific significance to the articles' "highlighting the perspective of multiple parties in the same context, such as the Pennsylvania residents' concerns." Pls.' Resp. at 69-70 (ECF 193) (citing Pls.' Expert Rep. of Chad Coffman ¶ 109 (Defs.' Ex. 115)). But the October 21 articles, by themselves,

As an initial matter, it bears emphasis that in focusing on what was newly disclosed in the article, Plaintiffs use a very narrow lens. That is undoubtedly because, well before this article was published, the market was aware of multiple problems with the pipeline, including spills, citations, and prior work stoppages.[30] Consequently, there is comparatively little in the October 2018 articles that Plaintiffs can claim as new, with the result that the disclosures they identify as new bear a tenuous relation to prior representations made by Energy Transfer.

As to the Litvak article, Plaintiffs provide no argument as to how a contractor's reevaluation that spills were "inherent" and "bound to happen" in a specific area in Washington

---

did not disclose newly corrective information related to homeowners' concerns. As I previously held at the class certification stage, "the initial stories set forth both sides of the controversy – homeowners and the pipeline company – and concluded without attributing blame." 623 F. Supp. 3d at 501.

[30] Defendants persuasively cite to several news articles from July 2017 to March 2018, covering several other issues related to the ME2 pipeline but not specifically the positions of the contractor (GES) and DEP (Domenic Rocco) reported on in the October 21 articles. *See, e.g.*, *Pennsylvania Issues Violation Notices for Sunoco Mariner East 2 Pipeline Project*, Reuters (July 21, 2017) (Defs.' Ex. 17) (reporting on four notices of violations issued for ME2 and DEP Secretary Patrick McDonnell's position that DEP was "taking its oversight and regulatory enforcement role seriously"); Scott DiSavino & Tom Brown, *Judge Halts Work on ETP Mariner East NGL Pipe in Pennsylvania Town*, Reuters (July 25, 2017) (Defs.' Ex. 20) (reporting on the Pennsylvania Public Utility Commission's order temporarily halting ME2 construction "due to a dispute over the location of a valve and other equipment" and DEP's fine for a construction citation "that affected a wetland in Cumberland County"); Laura Legere, *Settlement Reached Over Natural Gas Pipeline Judge to Review Plan for Sunoco Project*, Pittsburgh Post-Gazette (Aug. 9, 2017) (Defs.' Ex. 26) (reporting on the settlement agreement state regulators, Sunoco, and environmental groups reached to protect against "the kinds of spills that have bedeviled the construction project so far"); *Pennsylvania Regulators Cite Sunoco for Pipeline Work Leaks*, Associated Press (Nov. 21, 2017) (Defs.' Ex. 33) (relating to leaks of drilling fluid on November 11 in Chester and Berks Counties and a November 10 leak in a Dauphin County wetland); Michael Rubinkam, *Pennsylvania Shuts Down Construction on Sunoco Gas Pipeline*, Associated Press (Jan. 3, 2018) (Defs.' Ex. 38) ("Pennsylvania environmental officials ordered Sunoco on Wednesday to halt construction of a natural gas pipeline across the southern part of the state, citing a series of spills and leaks of drilling fluid and other 'egregious and willful violations' . . . ."); Susan Phillips & Jon Hurdle, *Mariner East 2: Texts Raise Questions About Wolfe Administration Role in Permitting Process*, StateImpact Pennsylvania (Jan. 26, 2018) (Defs.' Ex. 41) (reporting on the Governor Wolf administration's communications related to the issuance of permits and noting DEP's recent shutdown of all construction); *ETP Mariner East Liquids Pipe Spills More Fluid in Pennsylvania*, Reuters (Mar. 27, 2018) (Defs.' Ex. 53) (relating to a notice of violation resulting from drilling fluids released into a wetland in Shirley Township, Huntingdon County).

County corrected any of the prior statements.[31]  The prior statements ranged from Energy Transfer working to get ME2's HDDs online (November 8, 2017, Long, McCrea, and Ramsey), to having a good working relationship with DEP (February 22, 2018, Ramsey), including professional geologists in construction and operations (March 22, 2018, Shields), and reducing their accident rates (September 25, 2018, Coleman).  Even if Defendants exaggerated such commitments or relationships, none of these statements can be viewed as corrected by subsequent findings that drilling in the area above the Cincinnati mine in Washington County posed an inherent risk of spills.  Similarly, as to statements about Energy Transfer's prioritization of the safety of the community, its employees, and the environment (January 3, February 8, and March 22, 2018, Shields; September 25, 2018, Coleman), the contractor's later assessment of this specific drilling site can hardly be deemed corrective of such general statements.[32]

As to the Litvak and Legere article, which revealed DEP's expectations that there would be no spills involved in ME2's construction, Plaintiffs also struggle to establish what prior misrepresentations were corrected.  At oral argument, Plaintiffs' counsel argued that this article confirms that Energy Transfer under-reported and cultivated wrong expectations to the DEP, and reveals the falsity of Energy Transfer's statements about their good working relationship with DEP and their environmental safety commitment and priorities.  Oral Arg. Tr. 35:12-25 (ECF 212).  By

---

[31] The Defense also points out that problems at this site were previously identified and disclosed by the DEP itself.  The May 11, 2018 report relating to Washington County is available at https://files.dep.state.pa.us/ProgramIntegration/PA%20Pipeline%20Portal/MarinerEastII/HDD_Reevaluation_Reports/SR88%20-%20Wheeling%20and%20Lake%20Erie%20Railroad%20Crossing%20-%20PA-WA-0171.0000-RR.pdf [https://perma.cc/8KQ2-NE4V, row 23] ("A previous attempt to install the ME-II 20-inch pipe using HDD technology resulted in multiple IRS and geotechnical studies show that *all possible HDD pathways above the Cincinnati Mine have an inherent risk of LOCs and IRs*.") (emphasis added).

[32] Based on my review of the record, Plaintiffs certainly have evidence that not all of Energy Transfer's representations to DEP were entirely accurate.  But further proof of falsity does not cure the problem of whether the purported disclosure would have addressed any misrepresentation in a way that would affect the market.

any measure, this explanation for how the article is corrective would require a reader to draw numerous subtle inferences and then relate whatever conclusion the reader reached back to earlier statements by Energy Transfer which were, in themselves, general in nature.  And the significance of this revelation at a later point in time – of DEP's initial expectations – must be considered against a backdrop of earlier articles disclosing a plethora of leaks and spills.  Plaintiffs' characterization of the Litvak and Legere article is also aggressive, in that the authors reached no conclusion as to whether Energy Transfer misled DEP: "Whether that was a failure of communication or foresight isn't clear."

The issue here is causation, and whether these articles can reasonably be said to have corrected misrepresentations, the disclosure of which resulted in losses to investors.  The nebulous contours of Plaintiffs' arguments are reminiscent of Chief Judge Cardozo's maxim about proximate cause, that "negligence in the air, so to speak, will not do."  *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 99 (1928).[33]  Because Plaintiffs have failed to establish that a jury could reasonably find the October 21 articles corrected prior statements or omissions, I must grant summary judgment as to the October 21-22, 2018, date.

### 4. November 2019

As to November 2019, Plaintiffs seek to extend the theory they advanced with respect to the October 2018 disclosure.  According to Plaintiffs, the same regulatory compliance and safety statements which they contend were partially corrected in October 2018 were also partially, if not fully, corrected in November 2019.[34]

---

[33] In fairness, Judge Cardozo did not coin this phrase, but quoted Pollock on Torts, p. 455 (11th Edition).

[34] For these purposes, I have analyzed all the statements listed from November 8, 2017, through December 19, 2018, on the summary chart set forth above in Section III.A.3., discussing October 2018.

The alleged disclosure took place toward the end of trading on Tuesday, November 12, 2019, when national and Pennsylvania-based news outlets reported that the FBI had opened a corruption investigation into then Pennsylvania Governor Wolf administration's issuance of ME2 permits. *See, e.g.*, Marc Levy, *AP Exclusive: FBI Eyes How Pennsylvania Approved Pipeline*, Associated Press (Defs.' Exs. 97); Andrew Maykuth & Jeremy Roebuck, *FBI Now Investigating the Way in Which Pennsylvania Approved Mariner East Pipeline*, Philadelphia Inquirer (Defs.' Ex. 98); Marc Levy, *FBI Eyes How Pennsylvania Approved Pipeline*, The Philadelphia Tribune (Defs.' Ex. 99).[35]   The Levy article reported on those interviewed and the focus of the investigation:

> FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning.
>
> All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.
>
> The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say.

Defs.' Ex. 97.

The Maykuth and Roebuck article went on to describe:

> The federal probe has been running for at least six months and started in response to similar inquiries launched in the last year by the district attorneys of Delaware and Chester Counties as well as state Attorney General Josh Shapiro, according to three sources who spoke on the condition of anonymity because they were not authorized to publicly discuss the case.

---

[35] Plaintiffs' loss causation expert also cites to several news outlets that picked up the story, including the Canadian Press, SNL Financial Extra, Pittsburgh Business Times Online, Tribune Review, and The Patriot-News.  *See* Pls.' Ex. 115, Chad Coffman Report ¶ 117 (listing and citing to additional articles).

Defs.' Ex. 98.  From market close on November 12 to market close on November 13, Energy Transfer's common unit price declined by 4.02%.[36]  Pls.' Expert Rep. of Chad Coffman ¶ 128 (ECF 115).

As with the October 2018 disclosures, there are multiple points of contention.  First, the Defense contends that the mere revelation of a regulatory investigation without an accompanying newly revealed fact is not enough for loss causation as a matter of law.  Defs.' Mot. Summ. J. at 19 (ECF 181) (citing *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013); *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014)).  Plaintiffs assert that this is not the law in the Third Circuit, citing cases that allow parties to rely on investigations, news articles, and other unproven allegations as loss causation events. Pls.' Resp. at 212-13 (ECF 193) (citing *Utesch*, 385 F. Supp. 3d at 245).

In my view, the controlling test is simply whether a reasonable jury could find causation based on the factual record.  Four years after *Loos*, the case on which Defendants place great emphasis, the Ninth Circuit returned to loss causation in *Mineworkers' Pension Scheme v. First Solar Inc.*, recognizing that it can be proved by underlying conduct not revealed to the market. 881 F.3d 750, 753-54 (9th Cir. 2018).  It observed that "a more restrictive test should be understood as fact-specific variants of the basic proximate cause test . . . . Revelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause."  881 F.3d at 753-54.  In short, the question of loss causation must be answered factually, not formulaically.

Plaintiffs argue that my ruling at class certification determined as a matter of law that the November 2019 disclosures relate to statements that remain in the case.  Oral Arg. Tr. 27 (ECF

---

[36] According to Plaintiffs' loss causation expert, this decline was statistically significant.  Pls.' Expert Rep. of Chad Coffman ¶ 128 (Defs.' Ex. 115).  The Defense does not contest this.

212).  But Plaintiffs fail to recognize that the class certification and summary judgment stages present different standards of proof as to loss causation.  Notably, at the certification stage, "plaintiffs do not need to prove loss causation."  623 F. Supp. 3d at 490 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 815 (2011)).

Furthermore, Plaintiffs have once again changed their theory.  At the dismissal stage, "Plaintiffs allege[d] that the rushing of the permit process meant that Defendants knowingly passed over serious environmental and regulatory issues when proffering timelines and beginning construction."  532 F. Supp. 3d at 242.  At class certification, in addressing the November 2019 corrective disclosure, I similarly cited several statements which remained in the case relating to Defendants' timeline and their commitment to safety and following permit regulations.  623 F. Supp. 3d at 507-08.  I then concluded: "Media reports that state regulators were pressured 'to ignore shortcomings' represent stories that would directly relate back to the misrepresentations alleged.  The November 2019 disclosures are therefore relevant to allegations that remain in the case."  *Id.*  Plaintiffs' focus now is not on the timeline and commencement of construction but instead on Defendant's previous statements about regulatory compliance and safety.  Oral Arg. Tr. 27-31 (ECF 212).

As discussed above, the prior statements involved a range of topics, including Energy Transfer working to get ME2's HDDs online; having a good working relationship with DEP; consulting with professional geologists in construction and operations; reducing their accident rate; and committing to and prioritizing the safety of the community, its employees, and the environment.  The November 12, 2019, reporting revealed allegations that the FBI was investigating "whether [former Governor] Wolf and his administration forced environmental protection staff to approve construction permits and . . . received anything in return."  Levy Article

(Defs.' Ex. 97).  As with the October disclosures, it is not clear how revelations about the existence of an FBI investigation corrects earlier misrepresentations by the Defendants.

The fact that political pressure may have been brought to bear to expedite approval does not by itself intrinsically support an inference that safety was compromised as a result.  Adopting a benign interpretation, it may represent the frustration of an elected official with the pace of governmental bureaucracy and demanding that the project be given priority.  Nothing in the accounts of the investigation explicitly relates the pressure to safety or environmental compromises.  The use of the word "forced" in the November 12 article may imply some abnegation of professional judgment on the part of DEP staff, but by itself it does not convey sufficient information to serve as a global correction of a wide variety of statements by Energy Transfer.  Moreover, the article reports only on the existence of an investigation, not its outcome. Once again, a reader would have to make a series of inferences and then relate any conclusion back to the panoply of statements that Plaintiffs cite as misrepresentations.

And the articles themselves note that there was opposition to the project from the start, as well as accusations of political pressure.  The Levy article reported that "[w]hen construction permits were approved in 2017, environmental advocacy groups accused Wolf's administration of pushing through incomplete permits that violated the law."  Defs.' Ex. 97.  The Maykuth and Roebuck article quoted a Chester County public official: "'From the very beginning, and at many times along the way, we have raised serious questions about the permitting process of the Mariner East pipeline project,' State Sen. Andy Dinniman (D., Chester) said in a statement."  Defs.' Ex. 98.  Against that background, as a matter of *factual* analysis, news of the mere existence of an investigation, in the absence of any findings or charges, does not serve as a corrective disclosure. It may echo and therefore lend additional credence to earlier criticisms, but it does not constitute

a new revelation that Energy Transfer's earlier statements about safety and regulatory compliance were necessarily false.

Finally, at oral argument, Plaintiffs argued that "[w]hen one learns that the permitting process was so severely deficient that it triggers an FBI investigation," that relates back to Coleman's October 21, 2018, statement reciting a commitment to protecting the environment, as well as Energy Transfer's December 19, 2018, assertion that the safety of all those who live and work along the pipeline was their "first priority." Oral Arg. Tr. 28:6-29:1 (ECF 212). For support, Plaintiffs directed my attention to their briefs where they allege Energy Transfer did not disclose adequate information to the DEP in its permit applications. *Id.* at 28:13-15 (referring to Pls.' Resp. 132-36 (ECF 193)). [37] But that evidence goes to falsity and does not solve the Plaintiffs' problems with the limited significance of the November 2019 disclosures in light of the multiple attacks on the permitting process from the inception of the pipeline.

Defendant's motion for summary judgment as to the November 2019 disclosures must therefore be granted.

### B. *Material Misrepresentation*[38]

#### 1. *Pipeline Capacity*

At issue are two sets of statements relating to ME2's projected initial capacity. The parties present cross-motions for summary judgment as to statements presented at eight investor conferences from November 2017 through June 2018. Although I find these statements are

---

[37] Plaintiffs quote an environmental consulting report from Schmid & Company at length but do not appropriately cite to it or incorporate it as part of the record. Even assuming the accuracy of those citations, it does not alter my analysis as to the impact of the November 2018 articles.

[38] Since the only remaining corrective disclosure date remaining is the August 2018 date, I address only the falsity or misleadingness of the corresponding pipeline capacity and construction timeline statements, but not the remaining regulatory compliance and safety statements.

forward-looking, the accompanying cautionary language is not meaningful enough to afford them protection.[39]  Moreover, genuine issues remain as to whether Defendants had already decided to use the lesser capacity, 12-inch pipeline before February 2018.  I will therefore deny both parties' motions for summary judgment as to the November 2017 through January 2018 statements. Plaintiffs have presented clearer and sufficient evidence to prove that Defendants had reached such a decision by February 2018, making any subsequent statements that ME2 would have an initial capacity of 275,000 false and misleading.  As such, I will grant Plaintiffs' partial motion for summary judgment as to the February through June 2018 statements.

Defendants also move for summary judgment on capacity statements Defendants Long and McCrea made during the Q2 2018 earnings call.  As to these, I also find that there are genuine issues in determining whether the statements were misleading.  Consequently, I will deny Defendants' motion.

I address each set of statements in turn.

---

[39] The parties disagree as to whether the safe harbor applies to the conference slides' statements because the statutory provision excludes "partnership[s]" and "limited liability compan[ies]," 15 U.S.C. § 78u–5(b)(2)(E), and Energy Transfer is a limited partnership, Defs.' Mot. Summ. J. (ECF 181 at 4).  At least one district court has held that a limited partnership is a type of partnership, and thus, excluded from safe harbor protections.  *RYH Properties, LLC v. West*, No. 8-172, 2009 WL 10676645, at *10 (E.D. Tex. Aug. 3, 2009) (holding that a limited partnership is a type of partnership, and thus excluded from safe harbor protections); *see also In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2005 WL 2277476, at *11 (E.D.N.Y. Sept. 19, 2005) (noting the bespeaks doctrine and the safe harbor provision do not completely overlap, and citing, as an example, that the former covers partnerships, but not the latter).  This holding comports with the Private Securities Litigation Reform Act's legislative history.  *See* 141 Cong. Rec. S17933-04, S17934, 1995 WL 713530 ("The conference report safe harbor does not cover areas where there is potential for abuse.  For example, the safe harbor does not cover . . . limited partnerships."); 141 Cong. Rec. S9109-05, S9121, 1995 WL 382994 (listing limited partnerships among those excluded from the safe harbor).  In any event, even if the safe harbor does not apply to Energy Transfer, Defendants can rely on its judicially created predecessor, the bespeaks doctrine.  As the Third Circuit has recognized, the safe harbor and the bespeaks doctrine have an analogous requirement of meaningful cautionary language which, "if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) (citing *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000)); *see also In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 373 (3d Cir. 1993) (applying the bespeaks doctrine as to a limited partnership's allegedly misleading statements).

a.  *Investor Conferences*

From November 2018 through June 2018, Energy Transfer investor relations personnel, at times accompanied by Individual Defendants, attended eight investor conferences.   At these conferences, Defendants shared presentation slides which stated that ME2 would have an "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."[40]  *See* figure below (corresponding to the conference slide presented at RBC Capital Markets Midstream Conference, November 15 & 16, 2017 (Pls.' Ex. 40)).  This same capacity information was shared at each conference, with only slight updates to ME2's expected in-service date.  *See* summary chart below.

---

[40] Defendants downplay the importance of the conference slides at issue by arguing that no one presented or distributed the slides.  Defs.' Resp. at 56 (ECF 189).  Instead, as Defendant Long described it, Energy Transfer would host a conference room where attendees could ask questions, and Defendants "would lay [the printed slides] in the middle of the table and those that wanted them could take one and those that chose not to carry around the paper, didn't [] need to take one."  Dep. Thomas Long 24-25, 75 (Defs.' Ex. 148). As Brent Ratliff, part of Energy Transfer's investor relations team, described it through an email to colleagues: "nobody looks at the presentations!!!"  Email from Brent Ratliff to Def. Long and Several Others (Jan. 8, 2018) (Pls.' Ex. 43).  Still, the record before me reflects Energy Transfer periodically and meticulously updated, reviewed, and approved the slides.  *See, e.g.*, Email from Lyndsay Hannah to Defs. Long, McCrea, Ramsey, and Several Others (Dec. 4, 2017) (Pls.' Ex. 45) (describing in detail the "major updates" to the Wells Fargo investor conference presentation, requesting any comments or questions from Long, McCrea, and Ramsey, and noting Hannah still needed "to get [the slides] in front of [Defendant Warren] for his review and approval").  Defendants also submitted SEC 8-K filings in advance of the conferences – a filing which an investor would have reason to rely on – and therein referenced the slides. I am therefore not persuaded by the Defense's characterization that these were merely inconsequential reading materials.



| List of Investor Conferences Where Energy Transferred Shared ME2's: | | | |
|---|---|---|---|
| "Initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day." | | | |
| Pls.' Ex. | Date | Investor Conference | Expected in-service |
| 40 | November 15 & 16, 2017 | RBC Capital Markets Midstream Conference | Q4 2017 |
| 41 | November 29, 2017 | Jeffries 2017 Energy Conference | Q2 2018 |
| 42 | December 6 & 7, 2017 | Wells Fargo Pipeline, MLP and Utility Symposium | |
| 43 | January 9 & 10, 2018 | UBS Midstream & MLP Conference | |
| 50 | February 28, 2018 | Morgan Stanley Midstream Energy Conference | |
| 51 | April 9 & 10, 2018 | Mizuho Energy Summit | |
| 52 | May 23 & 24, 2018 | 2018 MLP & Energy Infrastructure Conference | Q3 2018 |
| 53 | June 19, 2018 | JP Morgan 2018 Energy Conference | |

Except for the November 29, 2017, Jeffries Conference slides, Defendant Long signed off on SEC 8-K forms corresponding to all the conference slides.[41]   *See, e.g.*, Form 8-K for the December 2017 Wells Fargo Pipeline, MLP and Utility Symposium (Defs.' Ex. 134) ("Prior to the meetings, interested parties will be able to view the prepared materials by visiting our website at http://www.energytransfer.com under 'Presentations'.").

Plaintiffs argue the initial capacity statements are not forward-looking, but rather mixed present-future statements.  Plaintiffs contend that, through these statements, Defendants conveyed a then-present intention to construct a 20-inch pipeline that would have an initial capacity of 275,000 barrels per day.  According to Plaintiffs, at the time they asserted this, Defendants had already planned otherwise, and intended throughout to bring ME2 into service using a reduced 12-inch pipeline with an initial capacity of about 40% relative to the 275,000 barrels.  I disagree with Plaintiffs' characterization of the statements as mixed because the statements fall squarely under the definition of forward-looking statements.[42]

---

[41] "Form 8-K is known as a 'current report' and it is the report that companies must file with the SEC to announce major events that shareholders should know about."   Form 8-K, Investor.Gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-8-k (last accessed Aug. 5, 2024).

[42] I also find the case law Plaintiffs rely on to support their mixed statement argument inapposite.  One court found several statements were "not forward-looking" because they misrepresented or omitted "*existing* material facts", including: "failure to disclose that traffic had decreased through fiscal year 2005, that demand for Toll Brothers' homes had softened and that Toll Brothers new selling communities were delayed."  *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Tr. Funds for N. California v. Toll Bros.*, No. 7-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008).  Another court similarly found statements which described a company's "conservative approach" to underwriting, distinguished it from its competitors as a "responsible" lender, and reassured investors that its approach to extending credit was designed to "get the money back" were not forward looking based on the company's practices of "loan[ing] money indiscriminately."  *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2015 WL 3755218, at *18 (E.D. Pa. June 16, 2015).  But neither of these courts analyzed projections like the ones at issue here.

Having found that the initial capacity statements are forward-looking, I turn to whether the statements' accompanying cautionary language is meaningful enough to afford protection.[43] Energy Transfer's conference slides contained an introductory slide with several pieces of cautionary language.[44]

---

[43] I address these arguments in the first instance and at this juncture with a fully developed record before me. At the dismissal stage, I found that the initial capacity statements were plausibly alleged to be false or misleading, without addressing whether the cautionary language at issue provided a "safe harbor" because the Defense did not raise that argument as to these specific statements. *See* 532 F. Supp. 3d 214-15, n.20.

[44] That slide, as excerpted from the RBC Capital Markets Midstream Conference, reads as follows:

**FORWARD-LOOKING STATEMENTS**

Management of Energy Transfer Equity. L.P. (ETE) and Energy Transfer Partners. L.P. (ETP) will provide this presentation to analysts at meetings to be held on November 15 & 16. 2017. At the meetings, members of the Partnerships- management may make statements about future events, outlook and expectations related to Panhandle Eastern Pipe Line Company. LP (PEPL) Sunoco LP (SUN). ETP and ETE (collectively, the Partnerships), and their subsidiaries and this presentation may contain statements about future events, outlook and expectations related to the Partnerships and their subsidiaries all of which statements are forward-looking statements. Any statement made by a member of management of the Partnerships at this meeting and any statement in this presentation that is not a historical fact will be deemed to be a forward-looking statement. These forward-looking statements rely on a number of assumptions concerning future events that members of management of the Partnerships believe to be reasonable but these statements are subject to a number of risks, uncertainties and other factors many of which are outside the control of the Partnerships. While the Partnerships believe that the assumptions concerning these future events are reasonable, we caution that there are inherent risks and uncertainties in predicting these future events that could cause the actual results, performance or achievements of the Partnerships and their subsidiaries to be materially different. These risks and uncertainties are discussed in more detail in the filings made by the Partnerships with the Securities and Exchange Commission, copies of which are available to the public The Partnerships expressly disclaim any intention or obligation to revise or publicly update any forward-looking statements. whether as a result of new information, future events. or otherwise.

All references in this presentation to capacity of a pipeline, processing plant or storage facility relate to maximum capacity under normal operating conditions and with respect to pipeline transportation capacity is subject to multiple factors (including natural gas injections and withdrawals at various delivery points along the pipeline and the utilization of compression) which may reduce the throughput capacity from specified capacity levels.

Pls.' Ex. 40.

This language contains three relevant sections.  The first part defines forward-looking statements as any statement "that is not a historical fact."  This definition is broad and, by itself, misconstrues even present statements as forward-looking.  The second part explains that forward-looking statements are "subject to a number of risks, uncertainties and other factors many of which are outside [Energy Transfer's] control," and references Defendants' SEC filings where the "risks and uncertainties are discussed in more detail."  By itself, this language is similarly insufficient.[45] *See In re Horsehead Holding Corp. Sec. Litig.*, No. 16-292, 2018 WL 4838234, at *16 (D. Del. Oct. 4, 2018), *R. & R. adopted*, No. 16-292, 2019 WL 1409454 (D. Del. Mar. 28, 2019) (finding insufficient cautionary language which flagged the existence of forward-looking statements, generally defined them, and noted they were "based on assumptions . . . and [] not guarantees of future performance" because the language did not "deal with any *specific* risk factor, or any *specific* subject matter").

---

[45] Defendants do not specifically identify the "risks and uncertainties" from their SEC filings which would merit protection.  Instead, they rely on my prior opinion at the dismissal stage, where I found the SEC filings' cautions were adequate to protect timeline and capacity statements (that ME2 would "expand the total takeaway capacity to 345 Mbbls/d"), also contained in those filings.  The relevant language I addressed there, however, did not relate to the pipeline's *initial* capacity:

> In both the 2016 and 2017 10-K filings, Defendants warned that "[e]xpanding [Energy Transfer Partnership's] business by constructing new pipelines and related facilities subjects ETP to risks."  They warn that "[t]he construction of new pipeline and related facilities . . . involves numerous regulatory, environmental, political and legal uncertainties beyond ETP's control . . . [i]f ETP undertakes these projects, they may not be completed on schedule or at all or at the budgeted costs."  Another section states that "[i]f one or more facilities that are owned by ETP . . . are damaged by severe weather or any other disaster, accident, catastrophe or event, ETP's operations could be significantly interrupted . . . [t]hese interruptions might involve significant damage to people, property, or the environment, and repairs might take a week or less for a minor incident to six months or more for a major interruption."

532 F. Supp. 3d at 208 (internal citations omitted).  At this stage, I am also presented with a full record as to the risks that Energy Transfer was aware of, as evidenced by what they portray as mitigation strategies.

Although the third part of the language squarely addresses capacity-related statements, it does not specifically warn investors of the possibility of a diminished capacity resulting from the use of smaller pipeline, dangers of which Defendants had notice. Rather, it warns investors that multiple factors could impact the pipeline's "transportation capacity" (distinguished from the "maximum capacity under normal operating conditions"). Among those factors are the "natural gas injections and withdrawals at various delivery points along the pipeline and the utilization of compression . . . which may reduce the throughput capacity from specified capacity levels." This paints a very different scenario from the one that was ultimately revealed to investors: that ME2 would have less than half of the asserted initial capacity because of a smaller pipeline. And the language is even more inadequate considering Defendants were aware of the risk and actively pursuing the 12-inch mitigation strategy for some time. Companies cannot insulate their actions through cautionary language if, at the time they assert such cautions, there are already specific and probable risks they are aware of. For practical purposes, such cautionary language is meaningless to the market.[46]

Absent meaningful cautionary language, I must now weigh whether the evidence before me supports a finding that the continuous statement that ME2 would have an initial capacity of 275,000 barrels was false or misleading. Genuine issues of material fact remain as to the November 2017 through January 2018 statements. On the one hand, it is not disputed that Defendants were working towards the usage of a 12-inch pipeline. Defendants explain such work was merely a backup strategy which they had to actively pursue parallel to their primary plan of

---

[46] Plaintiffs argue the initial capacity statements independently fall outside of the safe harbor because they failed to disclose present contrary facts and were thus misleading. Pls.' Resp. at 77 (ECF 193). This position ignores the necessary examination of relevant cautionary language, thereby obviating the safe harbor altogether. While I agree the existing contrary risks of which Defendants were aware are relevant, I am not persuaded that such an analysis can be done in a vacuum.

bringing ME2 into service with the 20-inch pipeline.   Some evidence lends support to the Defense's position.   But other evidence suggests that the decision to use the 12-inch was already confirmed.   As early as April 2017, Energy Transfer personnel from the legal, business, and engineering groups, as well as Sunoco Logistics' then-CEO Mike Hennigan, met to discuss the possibility of using the 12-inch pipeline to bring ME2 into service.   *See, e.g.*, Calendar Invite Re: "ME2 – 12" Pipeline Discussion" (April 12, 2017) (Pls.' Ex. 24); Dep. Harry J. Alexander, Sunoco Business Development Group 59:20-62:8 (Pls.' Ex. 19) (detailing the existence of the discussion and participants).   As ME2 Project Manager, Richard (Rick) Smith, explained:

> One of the key mitigation strategies to increase the probability of a 11/1/17 in-service for ME2 is the conversion of an existing 12" refined fuels pipeline to NGL service on a temporary basis.   With this strategy comes risk.   The attached document outlines those risk [sic] in which we would like to provide an updated briefing at your convenience! We are executing on our strategy but wanted to provide insight!

Email from Matt Ramsey to Richard Smith (April 25, 2017) (Pls.' Ex. 25).   Part of the mitigation strategy required temporarily taking the 12-inch pipeline out of service.[47]   One of those outages

---

[47] The Defense maintains such temporary outage was part of the pipeline's ongoing repair and maintenance. Plaintiffs disagree, noting that the pipeline underwent nitrogen purging, a necessary step for that portion of the pipeline to be able to transition from transporting refined fuels (its prior usage) to natural gas (ME2's usage).   Defendants argue nitrogen purging is not limited to the preparation of pipelines for natural gas and create a genuine issue by pointing to the fact that the 12-inch pipeline returned to refined fuels service in early 2018.   Notice from Brett Klemmer, Director of Refined Products & NGL's Scheduling to Point Breeze and Twin Oaks to Montello Shippers (Jan. 2018) (Defs.' Ex. 135) (explaining that the 12-inch pipeline would be refilled during the last cycle of January 2018).   In any event, Defendants foresaw an outage as part of its mitigation strategy timeline.   Calendar Invite from ME2 Project Manager Richard Smith, Re: Prep Call for Tuesday Discussion on 12" Alternate w/Mackie [McCrea]/Matt [Ramsey]/Mike (April 28, 2017) (Pls.' Ex. 27) (listing, as part of the 12" mitigation timeline, "Communicat[ing] 12" outage to stakeholders" by April 2017 and "Commenc[ing] ME2 line fill / movements on the 12'" by September). The pipeline underwent purging at other points throughout the year.   *See, e.g.*, Nov. 17, 2017, Weekly Flash Report at 2 (Pls.' Ex. 86); Email from Ramsey to McCrea and Warren (Nov. 29, 2017) (Pls.' Ex. 44) (listing, as part of "ME 2 Key Talking Points for Analysts", that [t]he 12" will be purged with nitrogen in mid-December"); Dec. 1, 2017, Weekly Flash Report (Pls.' Ex. 87) ("GRE [12-inch] Conversion . . . . N2 Purging Underway; anticipate line to be dry and ready for commercial operations soon!").   Another preparation required for the strategy included increasing the 12-inch's maximum operating pressure, which was approved in May 2017.   Approval Email Thread Re: 12" Glen Riddle – Elverson MOP Increase (Pls.' Ex. 74).

took place in June.  Notice from Christopher R. Stineman, Manager of Refined Products Pipeline Scheduling to Point Breeze and Twin Oaks to Montello Shippers (May 2017) (Pls.' Ex. 28).

By July 2017, Rick Smith started emailing out "Weekly Flash Reports" related to ME2/2X. July 7, 2017, Weekly Flash Report (Pls.' Ex. 2).  As Smith explained to the report's recipients, these were meant to "keep senior management updated on a weekly basis as to 'targeted' project status, progress and key risk.  [The reports were] not meant to cover normal project issues but to advise on items that affect schedule and cost balanced against risk."  The July 7 report itself maintained a targeted in-service date of November 1, 2017, listing the number of drills needed for placing the pipeline in-service with both the 12-inch and the 20-inch pipes.  It also assessed the construction completion of Spread 6, the area where the 12-inch pipeline was located, at 28%, a projection which included the use of the 12-inch.

That same summer, Energy Transfer's regulatory compliance team flagged for other personnel that use of the 12-inch required notice to several regulatory agencies.[48]  In alerting others to such a requirement, Albert Kravatz, Compliance Specialist, explained:

> During the ME2 project integration update meeting yesterday, project personnel stated the Mariner East 2 Pipeline will utilize parts of the 20" and 16" pipe lines being constructed as well as parts of the PTBR-MNTL 12" line for start up.

July 13, 2017, Calendar Invite Re: DOT-PHMSA Registry Notification for Use of 12" PTBR-MNTL Segment – Flow Reversal and Product Change (July 13, 2017) (Pls.' Ex. 3).[49]

At the same time, personnel shut down all HDDs in Spread 6 except for two drills needed for "initial in-service."  Email from Richard Smith to Ramsey, McCrea, and Several Others (July

---

[48] According to Kravatz, such notice was required 60 days before the 12-inch pipeline had to "reserve[d] flow" and changed "product commodity."  Pls.' Ex. 3.

[49] At his deposition, Kravatz maintained that he was merely trying "to promote further discussion about the regulatory notifications that would be required should that be the path [*i.e.*, use of the 12-inch] decided to be taken."  Dep. Albert Kravatz 63:19-64:25 (Defs.' Ex. 155).

22, 2017) (Pls.' Ex. 92).  As Rick Smith explained: "The other drills in Spread 6 are in the 12"

mitigation area where we have some time to continue our re-assessment and go forward

adjustments."  *Id.*

On August 2017, Kravatz once again raised concerns about the failure to timely notify

regulatory agencies since "[w]ork on parts of the use and configuration of the 12' PTBR to MNTL

as ME2 have already started."[50]  Email from Kravatz to Engineering and Regulatory Personnel

(Aug. 26, 2017) (Pls.' Ex. 37) (noting that John Legge, Senior Director of Pipeline Construction

and Engineering, had directed Kravatz to hold off on the agency notifications a while longer).  In

a separate communication, an employee of Otis Eastern, a contractor working on ME2, similarly

described his work of actively configuring valves to "jump in to the [e]xisting 12'."  Email from

Jimmy Joyce to Several Others (Aug. 10, 2017) (Pls.' Ex. 36).  By late October, with an in-service

date pushed to April 1, 2018, Rick Smith continued to assert: "We will need the 12"" to meet that

timeline.[51]  Email from Richard Smith to Construction and Engineering Personnel (Oct. 27, 2017)

(Pls.' Ex. 7).  Still, the Weekly Flash Reports up until this point continued to enlist both the HDDs

necessary for in-service with and without the 12-inch.  *See, e.g.*, Oct. 6, 2017, Weekly Flash Report

(Pls.' Ex. 379).

In sum, from the evidence presented, I am unable to definitively determine whether, during

the November 2017 through January 2018 period, Energy Transfer had a concrete plan to use the

---

[50] In internal communications, Energy Transfer personnel used several terms to refer to the portion of the
12-inch line that became part of ME2, including the "GRE," the "PTBR-MNTL 12" line," the "12" line"
or simply the "12"."

[51] In his deposition, Smith minimized  his statement as merely alerting  the company that it *may* need the
12" asset, but that the technical evaluation to determine feasibility was incomplete: "I was merely stating
if we wanted to meet 4/1/18, we would have to consider definitely moving forward with the use of the 12-
inch but there was still a line of regulatory and pipe replacement or things of that nature that would have to
be pursued in order to facilitate that.  So that was ongoing on a parallel path."  Dep. Richard Smith 171:8-
21.

12-inch pipeline.  At the same time, a reasonable juror could conclude that Defendants' aggressive pursuit of that strategy, while still promising to maintain an initial capacity of 275,00 barrels per day, was itself misleading.  For these reasons, I will deny both parties' motions.

As to Plaintiffs' affirmative motion, pertaining to the remaining capacity statements from February 2018 through June 2018, I am persuaded that the material facts are not in dispute.  During this period, Defendants were unmistakably moving full steam ahead with their 12-inch pipeline knowing that this would diminish ME2's capacity, making their repeated initial capacity statements of 275,000 false and misleading.

On January 30, 2018, about a month before the next analyst conference in February hosted by Morgan Stanley, Defendants Ramsey and McCrea, Jennifer Street (Executive Vice-President of Operations), and Chris Sonneborn (Senior Vice President of Construction) met to discuss ME2 "timelines to complete."  A summary of those timelines, as excerpted from Sonneborn's follow up correspondence from the meeting, is found below.

**Service Date Phase**

June 2018 ME2 – Initial – 20" to GRE w/ 12" and 16" into MHIC

Dec 2018 ME2 – 20" to GRE w/ 16" to MHIC – 12" returned to refined fuels/other service

July 2019 ME2 – 20" to GRE w/ 16" (20" HDDs remaining)
ME2X –16" and 12" into MHIC

Dec 2019 ME2 – 20" to MHIC
ME2X – 16" to MHIC
All remaining drills within GRE completed

| ME 2 - Capacities | | | |
|---|---|---|---|
| | Propane | Butane | Capacity Based on Contract Mix |
| Jul-18 | 163 MBPD | 152 MBPD | 161 MBPD |
| Dec-18 | 250 MBPD | 230 MBPD | 246 MBPD |
| Jul-19 | 260 MBPD | 240 MBPD | 256 MBPD |
| Dec-19 | 320 MBPD | 300 MBPD | 316 MBPD |

Email from Chris Sonneborn to Def. Ramsey and Jennifer Street (Feb. 16, 2018) (Pls.' Ex. 54) ("Attached is the working document . . . reflecting the discussion from our meeting with Mackie [McCrea] on January 30th.").  Street's notes from that same meeting confirm the use of the 12-inch pipeline, with a "155-165K" capacity, far below the promised 275,000.  *See* excerpt below.



Jennifer Street's Handwritten Notes from ME2/ME2X Meeting (Jan. 30, 2017) (Pls.' Ex. 8).

A Q&A document, used to prepare executives for earnings calls, similarly stated the use of the 12-inch pipeline as part of the ME2 in-service timeline and ramp up.  Q4 2017 Earnings Q&A Document at 20 (Feb. 20, 2018) (Pls.' Ex. 61).

57.  What are the remaining in service targets for ME2 and ME2X? How do the capacities on ME2 and ME2X ramp up?

    a.  ==June 2018: ME2 Initial – 20" to GRE w/12" and 16" into MHIC==

    b.  Dec 2018: ME2 – 20" to GRE with 16" to MHIC – ==12" returned to refined fuels/other== service

    c.  July 2019: ME2 – 20" to GRE with 16" (20" HDDs remaining); ME2X – 16" and 12" to MHIC

    d.  Dec 2019: ME2 – 20" to MHIC; ME2X – 16" to MHIC and all remaining drills within GRE completed

| ME 2 - Capacities | | | |
|---|---|---|---|
| | Propane | Butane | Capacity Based on Contract Mix |
| Jul-18 | 163 MBPD | 152 MBPD | 161 MBPD |
| Dec-18 | 250 MBPD | 230 MBPD | 246 MBPD |
| Jul-19 | 260 MBPD | 240 MBPD | 256 MBPD |
| Dec-19 | 320 MBPD | 300 MBPD | 316 MBPD |

| ME2X - Capacities | | |
|---|---|---|
| | Ethane | Propane |
| ME1 | 51 MBPD | 19 MBPD |
| Jul-19 | 82 MBPD | |
| Dec-19 | 82 MBPD | |

Moreover, Todd Nardozzi (Regulatory Compliance Officer), in discussing the regulatory compliance notification requirements in an email to Danny Nichols (Regulatory Compliance Director and Manager), admitted: "***We didn't want to advertise the use of the 12" because of the public sensitivity to the project***."  Email from Nardozzi to Nichols (Feb. 28, 2018) (Pls.' Ex. 11).

A few days before the final initial capacity statement at issue, Defendants even submitted a regulatory compliance notice explicitly identifying the use of the 12" pipeline.  U.S. Dep't of Transp. Pipeline & Hazardous Materials Admin., Operator Registry Notification (June 15, 2018) (Pls.' Ex. 69).  And yet, on June 19, 2018, Defendants asserted once again that ME2 would have an initial capacity of 275,000.  JP Morgan 2018 Energy Conference Slides at 19 (Pls.' Ex. 53).  Defendants argue this capacity reflected the pipeline's capacity as designed and not the capacity it would have through its initial placement in-service.  But nothing in their conference slides signals that investors were made aware of this caveat, let alone that they knew it would result in diminished capacity.  In any event, even if I were to find the statement was not altogether false, it was

unquestionably misleading, denying investors the opportunity to accurately weigh the information for themselves.  For these reasons, I will grant Plaintiffs' partial motion for summary judgment as to the capacity statements from February through June 2018.

> ### b. Q2 2018 Earnings Call

On August 9, 2018, Energy Transfer hosted its Q2 2018 earnings call.  At this call, Defendant Long stated: "[W]e continue to expect to place ME2 in service by the end of this quarter [Q3 2018].  This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments."  Q2 2018 Earnings Call Tr. 4 (Defs.' Ex. 75).  Defendant McCrea also asserted:

> We've secured pretty significant volumes for these projects: ME1, ME2, and ME2X.  However, those projects ramp up over time, so the utilization of the 12-inch more than provides the necessary capacity to move the volumes that we've contracted and also allows us to bring ME2 online hopefully by the end of this year. So it was necessary, but has no impact whatsoever on our contractual obligations.

*Id.* at 8.  Separately, a Wolfe Research analyst in attendance asked for clarification as to ME2's capacity.  *Id.* at 14 ("[S]o Mariner, what is the capacity of the interim solution using the 12-inch line in some areas?").  To which McCrea responded: "***We really haven't shared capacities.***  We can look at maybe doing that in the future.  But the most important aspect of the question is we have sufficient capacity to handle what we contracted."[52]  *Id.* (emphasis added).

The Defense argues Long and McCrea's statements were not false or misleading because the 12-inch pipeline did, in fact, have sufficient capacity to meet Energy Transfer's *contractual* obligations.  An internal Q&A document which Energy Transfer executives used to prepare for the Q2 2018 earnings call seems to confirm this.  Q2 2018 Earnings Call Q&A Document at 21-

---

[52] Although Defendant Long provided general cautionary language as to forward-looking statements in his opening remarks, Q2 2018 Earnings Call Tr. at 3 (Defs.' Ex. 75), the Defense does not maintain that the statements at issue were accompanied by meaningful cautionary language.

22 (Defs.' Ex. 73).  In one section, the Q&A document lists ME2's initial capacity as "161 MBPD" or thousands of barrels per day.  *See* excerpt below.

61. What are the remaining in service targets for ME2 and ME2X? How do the capacities on ME2 and ME2X ramp up?
    a. Sept 2018: ME2 Initial – 20" to GRE w/12" and 16" into MHIC
    b. Nov 2019: ME2 – 20" to GRE with 16" (20 HDDs remaining); ME2X – 16" and 16"/20" to MHIC
    c. Oct 2020: ME2 – 20" to MHIC; ME2X – 16" to MHIC and all remaining drills within GRE completed

| | ME2 - Capacities | | | | ME2X - Capacities | |
|---|---|---|---|---|---|---|
| | Propane | Butane | Capacity Based on Contract Mix | | Ethane | Propane |
| Sep-18 | 163 MBPD | 152 MBPD | 161 MBPD | ME1 | 51 MBPD | 19 MBPD |
| Nov-19 | 260 MBPD | 240 MBPD | 256 MBPD | Nov-19 | 82 MBPD | |
| Oct-20 | 320 MBPD | 300 MBPD | 316 MBPD | Oct-20 | 82 MBPD | |

Separately, the Q&A Document lists ME2's shippers and their corresponding contracted amounts, reflecting approximately five shippers with commitments of 128,500 barrels of propane, butane, and ethane per day – less than half of the previously shared initial capacity of 275,000.  *See* excerpt below (denoting the information of "Who are the shippers on ME2?" as **[NOT PUBLIC – Do NOT Provide]**").  *See* excerpt below.

65. Who are the shippers on ME2? **[NOT PUBLIC – Do NOT Provide]**
    a. Largest customer is Antero and they are the only customer public about the commitment – 61,500 bbls/d (propane, butane and ethane)
    b. BP/Blue Racer (BP assumed Blue Racer's position) – 25,000 bbls/d (propane and butane)
    c. Ineos – 22,000 bbls/d (propane and butane)
    d. Markwest/MLPX – 10,000 bbls/d (propane and butane)
    e. Total – 10,000 bbls/d (propane and butane)

Plaintiffs respond that Long and McCrea's change in language, referring now to initial "contractual commitment," was itself misleading because they maintained the fiction that Energy Transfer could ship 275,000 barrels per day.  At the same time, Plaintiffs contend, Long and McCrea purposefully did not disclose ME2's contractual commitments and the reduced capacity that would results from using a 12-inch pipeline – information already in their possession before

the August 9, 2018, Earnings Call.[53]  Even Defendant's damages expert Kenneth Lehn conceded that it was possible individual investors believed that ME2's customer obligations amounted to 275,000 barrels per day.  Dep. Kenneth Lehn at 56:2-22 (Pls.' Ex. 249) (attempting to differentiate between individual investors and the "aggregation of investors").

I find that there is enough evidence for a reasonable juror to conclude that Defendant Long and McCrea's statements were false or misleading.  Even if Defendants could meet their contractual obligations, there is little evidence to corroborate that those obligations were already public or easily discernible.  At the same time, there is enough evidence from which to conclude that, without clarification from Energy Transfer, investors believed the 12-inch pipeline would continue to transport 275,000 barrels, the bottom of the projected 275,000 to 450,000 capacity range.  This is especially true given McCrea's acknowledgement that Energy Transfer had not shared capacities and the amount of confusion the statements caused, resulting in the publication of two analyst reports the following day to clarify, among other things, ME2's capacity.[54]

---

[53] The parties disagree about the reason behind and significance of Energy Transfer choosing to not disclose the contracted capacities during the August 9, 2018, earnings call.  According to Plaintiffs, Energy Transfer wanted to shield the information from public disclosure.  Defendants note their nondisclosure was benign, and merely protected information which was competitively sensitive.  While it could be true that industry practice calls for the confidentiality of a pipeline's specific shippers and their corresponding contractual commitments, the defense offers no reason why the overall updated amount of ME2's projected capacity was itself sensitive, especially as the 275,000 number was previously shared through analyst reports and investor conferences.

[54] The Defense also asserts the market already knew that Energy Transfer would be using a 12-inch pipeline and that the 12-inch pipeline would temporarily result in a lower capacity.  Defendants rely on two July 2018 news articles, but those articles merely stated ME2's *use* of a 12-inch pipeline, without reporting on the impact, if any, to the pipeline's capacity.  Jon Hurdle, *Sunoco Wants to Use Older Pipeline to Pump NGLs Over Unfinished Sections of ME2*, StateImpact Pennsylvania (July 3, 2018) (Defs.' Exs. 68); Jim Magill, *Energy Transfer Plans to Repurpose Older Pipeline to Deliver NGLs to Customers*, S&P Global Platts Energy Trader (July 9, 2018) (Defs.' Ex. 69).  In addition, Defendants cite to two Wells Fargo reports, only one of which predates the earnings call, for the proposition that the market understood ME2 had plenty of capacity available after fulfilling its contracts and that it would scale up to 275K once the "as-designed ME2 line came into service."  Michael Blum, et al., *ETE/ETP: Q1 In Line-Positive Thesis Intact*, Wells Fargo (May 11, 2018) (Defs.' Ex. 136) ("We believe ME2/ME2X has meaningful uncontracted capacity, leaving plenty of opportunity for ETP's marketing group.");  Michael Blum, et al., *ETE/ETP: Q2 Beat –*

### 2. *Construction Timeline*

From August 2017 through August 2018, Defendants provided investors several dates when ME2 was expected to be in-service, each time pushing back the projection by several months: Q4 2017, Q2 2018, then Q3 2018.  *See* summary chart below.

| Pls.' Ex. | Event | Date | Statement |
|---|---|---|---|
| *Expected in-service Q4 2017* | | | |
| 218 | Q2 2017 Earnings Call | 8/9/2017 | "We do expect to have [ME2] in service sometime in the fourth quarter [of 2017]." -**McCrea** |
| *Expected in-service Q2 2018* | | | |
| 253 | Q3 2017 Earnings Call | 11/8/2017 | "Additionally, we continue to work with the Pennsylvania Department of Environmental Protection to secure approvals in order to move our remaining HDDs forward.  As a result of these delays, we believe that this will push our in-service timing for ME-2 to the second quarter of 2018." -**Long** |

---

*Remain Positive 2*, Wells Fargo (Aug. 10, 2018) (Defs.' Ex. 76).  The May 11 report merely stated Wells Fargo's belief, and there is no other evidence to support whether Energy Transfer otherwise confirmed this belief.  It is also unclear whether this report was made available to the public, or simply a subset of investors.

Defendants also point to the deposition of Joseph Herman, one of Plaintiffs' own investment advisors, who acknowledged: "Pipelines are rarely full on the first day."  Dep. Joseph Herman 153:20-54:6 (Def. Ex. 154).  Herman's comment is similarly ambiguous in relation to Long and McCrea's statements, which referred to the pipeline's initial capacity, not its throughput – the volume actually passing through the pipeline.  Though the parties seem to disagree about the definitions of these terms, as well.  Am. Expert Rep. of Justin Clapper (Defs.' Ex. 121).  In any event, this evidence does not conclusively establish that the public knew that the 12-inch pipeline would result in reduced capacity.  Instead, genuine issues of fact remain as to the misleadingness of Long and McCrea's statements, especially as McCrea himself confirmed that Energy Transfer had *not* shared capacities.

| 221 | Q4 2017 Earnings Call | 2/22/2018 | "Now, moving on to Mariner East 2 and 2X, we continue to make progress on the construction of this project with 94% of mainline construction complete and 83% of HDDs completed are underway.  At this time, we continue to target placing ME2 into service by the end of the second quarter of 2018." -**Long** |
|---|---|---|---|
|  |  |  | "I think we have a good working relationship with PADEP.  We have a weekly meeting with them where we look at the gating items.  We are still under court order deadlines that, that we have to adhere to and they have to adhere to.  But I think our progress is good.  And so I don't see a change in the timeline from what we've given you before." -**Ramsey** |
|  |  |  | "We're very close on that soon and that sometime in the second quarter, we'll have Mariner on and ready to take barrels from Revolution." -**McCrea** |
| *Expected in-service Q3 2018* |  |  |  |
| 250 | Q1 2018 Earnings Call | 5/10/2018 | "[ME2 in service] mid to late [third quarter in 2018]." -**Ramsey** |
| 53 | J.P. Morgan Energy Conference | 6/19/2018 | "**Mariner East 2**: Expected to be in-service in Q3 2018." |

| 70 | 2Q 2018 Earnings Call | 8/9/2018 | "100% of HDDs are completed or in process, in line with our more approved HDD plan with no more drilling reevaluation reports required from DEP." -**Long** |
|----|----|----|----|
| | | | "Let me expand on that a little bit. So, at ME2, I guess it's obviously the first issue with the use of the 12-inch line through there. We're kind of repeating what we said in the earlier remarks, 99% of mainline construction is complete. The 1 % that remains on mainline construction is associated with HDDs that we are completing right now. So we have 16 HDDs to complete. All those have been approved by PADEP and they're either drilling ahead or they're in the stage where we're going back to PADEP when we have an inadvertent return that the government approves. We don't have to have any changes approved by PADEP going forward like that. All the road bores are finished. And as Tom said in the earlier remarks, 80% of the line has been hydro-tested. So we feel confident that we'll be finished with ME2 in-service by the end of the third quarter of this year." -**Ramsey** |
| | | | "As a result, we continue to expect to place ME2 in service by the end of this quarter." -**Long** |

At issue is whether McCrea, Long, and Ramsey made the timeline statements with actual knowledge that they were false or misleading, and therefore not protected.[55] I find these statements to be closely related to ME2's use of the 12-inch pipeline, with enough genuine issues of fact for a jury.

As to the August 2017 through June 2018 statements, Plaintiffs argue these were false and misleading because Defendants had already anticipated an in-service date past Q4 2017 and failed to disclose that the dates made public were based on the use of the 12-inch pipeline, with an even more delayed timeline for the 20-inch.

---

[55] Plaintiffs concede the timeline statements are forward-looking.  *See* Pls.' Resp. at 87-99 (ECF 193).

For support, Plaintiffs point to evidence that on March 23, 2017, several months before the first August 2017 statement at issue, Defendants were working with their shippers to waive a sunset provision which required ME2 to be in service by November 2017.  *See* Mariner East Phase 2 Project: Confidential Information Memorandum at 35 (Pls.' Ex. 224) (listing the sunset date). Plaintiffs contend that if ME2 were not in-service, and Defendants failed to have the provision waived, Energy Transfer would have lost those shipping commitments.  And so, Plaintiffs reason, knowing they could not fulfill their end of the construction bargain, Defendants started these negotiations early and were willing to incur millions of dollars to achieve that waiver.[56] Defendants respond that the renegotiation of the sunset waiver was merely a precaution, in case they could not meet the construction timeline, but that the evidence does not suffice to prove they knew by that meeting that the timeline was no longer possible.  I am persuaded that a reasonable juror could find these negotiations, which ultimately pushed ME2's operational date to "no sooner than April 1, 2018," and involved offers of upwards of $25 million in capital, sufficient proof of knowing falsity.  *See* Email from Michael J. Hennigan to Defendant McCrea (March 23, 2017) (Pls.' Ex. 225) ("We have 'offered' to install methanol removal (~$25 MM capital) in return for a 1 year waiver on the sunset date as an insurance policy."); Energy Transfer Partners Board of Directors Meeting (Oct. 17, 2017) (Pls.' Ex. 231) ("Successful negotiations with 6 of 7 Anchor Customers . . . Sunset Operational Date extended 1 year to November 1, 2018 . . . Operational Date shifted to no sooner than April 1, 2018.").

---

[56] Internal emails allude to Defendants McCrea and Warren participating in the negotiations.  *See* Email from Michael J. Hennigan to Defendant McCrea (March 23, 2017) (Pls.' Ex. 225) (discussing the negotiations); Email from Defendant McCrea to Harry Alexander (May 16, 2017) (Pls.' Ex. 226) (noting Defendant Warren would be positioned to have these conversations with shippers); Email from Harry Alexander to Defendant McCrea (May 30, 2017) (Pls.' Ex. 228) (confirming a verbal agreement to extend the sunset from one of the shippers).

Plaintiffs also argue that the statements failed to disclose that these announced in-service dates were based on a smaller pipeline, and that the promised 20-inch pipeline was even more delayed. Defendants respond that this argument stems from a false premise, that the timeline statements referred to ME2 in its final, as-designed configuration of a 20-inch pipeline, whereas in reality, the timeline statements merely informed investors of ME2's expected initial in-service date. The Defense further contends that, even if the statements referred to the 20-inch pipeline's completion date, Plaintiffs cannot show Defendants had actual knowledge that the projections were false because the record at most confirms personnel were implementing a contingency plan.

Defendants do not cite anywhere in the record where they made such a distinction between "as designed" versus "in-service" timelines to investors. In fact, there is evidence that Defendants made a concerted effort *not* to disclose the total number of HDDs completed in the project, and shared only completion percentages during earnings calls, since the precise numbers would reveal the use of the 12-inch. Q4 2017 Q&A Document at 20 (Feb. 21, 2018) (Pls.' Ex. 82). As a member of the investor relations team described it: "Reminder, they [including Ramsey] have not wanted to provide specific numbers of HDDs complete out of the total ***because the total differs based on GRE*** [the use of the 12-inch] ***vs no GRE***." Email from Lyndsay Hannah to Brent Ratliff (May 4, 2018) (Pls.' Ex. 305).

A comparison of the timelines estimated internally versus those released publicly further supports an inference that the estimates were based on Defendants' use of a 12-inch pipe. For example, at the Q4 2017 earnings call, Long, McCrea, and Ramsey estimated placing ME2 into service by Q2 2018. In that call, Long specifically pointed out that "94% of mainline construction [is] complete and 83% of HDDs completed are [sic] underway." Q4 2017 Earnings Call Tr. 3 (Feb. 22, 2018) (Pls.' Ex. 221). The Q&A Document circulated the day before the call, excerpted

below, repeated these same completion percentages.  Q4 2017 Q&A Document at 20 (Feb. 21, 2018) (Pls.' Ex. 82).

56. Can you provide an update on the HDDs? How many are complete? What is the status of the HDDs that FERC had suspended drilling on? How many are you still awaiting approval for? **Do Not provide Actual Numbers – only percentages!**
    a. 83% of HDDs are complete or underway (71 of 114 complete, 24 approved to proceed)
    b. 62% of HDDs required for initial in service are complete (71 of 114 – **Do not provide actual numbers**)
    c. Of the remaining HDDs: 24 are approved to proceed, 16 await PADEP approval and 3 require resubmittal to PADEP due to proximity to mines

A separate internal status update meant to inform Defendant Warren confirmed that the remaining HDDs not complete or underway (43 HDDs) factored in the usage of the 12-inch.  ME2 Summary Status (Jan. 11, 2018) (Pls.' Ex. 95).  This information was disseminated internally months before Energy Transfer's public announcement that it would use the smaller pipeline in July 2018.  Even after such announcement, it is possible a reasonable investor would be unaware that the use of the 12-inch pipeline would now result in two timelines, one of which would be even more delayed to obtain the 20-inch diameter.

As to Defendants Ramsey and Long's August 2018 statements, Plaintiffs argue these were false and misleading because the completion percentages Long and McCrea described were based on the use of the 12-inch pipeline and ultimately omitted the corresponding diminished capacity.  Defendants argue that since they had already explained on and before the Earnings Call that ME2 would be using the 12-inch, it was apparent in context that the statements about progress and in-service date were premised on the smaller pipeline.  Moreover, Defendants contend Plaintiffs' theory makes no sense because ME2's in-service timeline had no relation to ME2's capacity during the time in which Defendants would temporarily use the 12-inch.  I am not persuaded by the Defense's arguments as they ignore the amount of market confusion caused by Ramsey and Long's statements (discussed above) including as to ME2's timeline.

51

I conclude that these timeline statements present materiel issues of fact.[57]

## C. Scienter

### 1. Standard

As courts in this and other circuits have recognized, "scienter is often a jury call." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 617 (D.N.J. 2023) (citing *SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008)).  To prevail on scienter, a plaintiff must show the defendant made the misrepresentation either: "(1) intentionally . . . [with] a mental state embracing intent to deceive, manipulate, or defraud, or (2) recklessly . . . under circumstances showing an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (cleaned up) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 667 (3d Cir. 2002)).

A plaintiff can rely on direct or circumstantial evidence to show the defendants had (1) both a motive and opportunity to commit the fraud; or (2) conscious misbehavior or recklessness. *Id.* (citing *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *14 (D.N.J. Aug. 17, 2005)).  "To establish reckless or conscious misbehavior, a plaintiff must show that defendants either: (1) egregious[ly] refused to see the obvious, or [failed] to investigate the doubtful, or (2) had knowledge of facts or access to information contradicting their public statements such that defendants knew or should have known that they were misrepresenting material facts related to the corporation." *Id.* (cleaned up).

---

[57] Defendants also argue that these statements are non-actionable because they are opinions.  But even opinions remain actionable where the statement reasonably implies untrue facts and omits appropriate qualifying language. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin.*, 70 F.4th 668, 685 (3d Cir. 2023).  As discussed at length, the timeline statements omitted information related to ME2's usage of the 12-inch pipeline and the significant delay that would ensue for the complete 20-inch pipeline.  As such, even assuming these were opinions, they would remain actionable.

As to corporate liability, "a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Id.* (citing *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2018 WL 3772675, at *32 (D.N.J. Aug. 8, 2018)). Moreover, where the statements at issue are forward-looking and "made by a business entity," a plaintiff must prove that the alleged misstatements were "(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C.A. § 78u-5(c)(2)(B).[58]

### 2. Pipeline Capacity

#### a. Investor Conferences

Plaintiffs argue that each initial capacity statement is attributable to the Individual Defendants because one or more made or approved each of the statements. Plaintiffs have presented sufficient evidence to support this.

Defendant Long signed an SEC 8-K form[59] for each investor conference at issue, except for the November 29, 2017, Jeffries Energy Conference. Pls.' Exs. 111-13, 115-17, 120 (SEC 8-K forms). The 8-K forms referenced "prepared materials" on Energy Transfer's website for investors' review, which included the slides with the initial capacity statement. Long also received the conference slides in advance for his review and approval and attended (or prepared to attend) some of the conferences. *See* Dep. Thomas Long at 68:11-19 (Pls.' Ex. 10) (explaining a combination of Long, Ramsey, and McCrea usually attended the conferences); *see also* Pls.' Exs. 43, 45, 47, 118 (emails showing conference slides shared with Long). Defendant Ramsey and

---

[58] Plaintiffs also argue the corporate scienter doctrine should apply at this stage. But they only raise its application as to the regulatory- and safety-related statements. Thus, I do not address the doctrine here.

[59] *See supra* note 41 (defining 8-K form).

McCrea also received the slides at various points for their review and approval and attended (or prepared to attend) several conferences.  *See, e.g.*, Pls.' Ex. 45, 47, 118 (McCrea); Pls.' Ex. 44-46, 65, 80, 110 (Ramsey).

As for Defendant Warren, although the evidence is significantly less as to his attendance at conferences, internal communications allude to his own involvement in approving the slides. *See* Email from Lyndsay Hannah to Defs. Long, McCrea, Ramsey & Several Others (Dec. 4, 2017) (Pls.' Ex. 45) ("Please let us know if you have any comments or questions. We will need to finalize [the 2017 Wells Fargo conference] presentation by end of day tomorrow and will still need to get in front of Kelcy [Warren] for his review and approval."); Email from Lyndsay Hannah to Investor Relations Personnel (Dec. 5, 2017) (Pls.' Ex. 289) (stating "[w]e have received sign off from Kelcy [Warren]" as to the December 2017 Wells Fargo conference slides).  Although the witnesses were not unanimous on this point, *see* Dep. Thomas Long 27 (Pls.' Ex. 10) ("[Warren] was not required to approve any analyst presentations."), that is an issue for resolution by a jury.

As for the requisite state of mind, Plaintiffs have also raised enough genuine issues as to whether the Individual Defendants knew their November 2017 through January 2018 statements would be false or misleading.  Weekly Flash Reports detailing ME2's project status dating back to July 2017 identify the Middletown "pump station" as the "only station required for initial flow [at] ~160,000 [barrels per day]."  Pls.' Ex. 5, 31, 33, 34 (Weekly Flash Reports).  Defendants maintain this was merely a capacity tied to their contingency plan and assert that the pump station's impact to the pipeline's overall capacity is unclear.  Yet, by February 2018, the only initial capacity internally calculated was approximately the same 160,000 figure.  Email from Chris Sonneborn to Def. Ramsey and Jennifer Street (Feb. 16, 2018) (Pls.' Ex. 54); Q4 2017 Earnings Q&A Document at 21 (Feb. 21, 2018) (Pls.' Ex. 251).

As described above, the Individual Defendants were all aware, mostly through the Weekly Flash Reports, of Energy Transfer's work on the 12-inch pipeline.  *See* Pls.' Exs. 5, 85, 30, 44, 46, 92 (Warren, Ramsey, and McCrea's email receipt of work updates from July through November 2017).  There is also some evidence that several Individual Defendants pushed to keep the use of the 12-inch internal, even to the point of pushing off regulatory compliance notices.  *See* Email from Nardozzi to Nichols (Feb. 28, 2018) (Pls.' Ex. 11) ("We pushed to do the notifications a few months ago so that we would be covered but there was a hesitancy to do so by the project.  We didn't want to advertise the use of the 12" because of the public sensitivity to the project."); Email from John C. Legge, Jr. to Richard Smith (July 24, 2017) (Pls.' Ex. 29) ("[R]equesting a couple changes to the attached map so they can send to the shippers . . . . they want all references to GRE removed . . . ."); Email from Kravatz to Engineering and Regulatory Personnel (Aug. 26, 2017) (Pls.' Ex. 37) ("I checked in with you regarding this about 10 days ago, with phone call and you directed me to hold off a while longer."); Energy Transfer Personnel Text Records at ET-ACERS-01061157 (Pls.' Ex. 121) ("Remember no mentioning the 12" RP (GRE) solution.  I think we all have that engrained.  Even Tom L[ong] was all over that.").

In particular, for the February 2018 through June 2018 conferences, there is also ample evidence that Long, McCrea, and Ramsey knew that the initial capacity would be less than 275,000, making their unchanged initial capacity statements at conferences false or misleading.  For example, McCrea and Ramsey attended a January 30, 2018, meeting where the only capacity discussed was the lower capacity.  Pls.' Exs. 8, 54 (meeting notes and follow up email thread); Q4 2017 Q&A Document at 20 (Feb. 21, 2018) (Pls.' Ex. 82); Pls.' Exs. 97, 101, 290 (emails denoting the lower capacity).  Here again there is less documentation as to Warren, but I find that there are

at least genuine issues raised as to him, given his receipt of ME2 construction updates reflecting the use of the 12-inch.  Pls.' Exs. 6, 95, 99, 109 (emails and board slides).

In summary, there are genuine issues as to whether one or more of the Individual Defendants knew the falsity of the initial capacity statements provided at the November 2017 through January 2018 conferences.  Plaintiffs have also successfully shown that Long, McCrea, and Ramsey knew the falsity or misleadingness of the initial capacity by the February 2018 and subsequent conferences.

### b.  Q2 2018 Earnings Call

As to the August 2018 earnings call, Plaintiffs argue Defendants Long and McCrea similarly failed to disclose the reduced capacity information, despite having had this information in their Q&A documents.  Q2 2018 Earnings Call Q&A Document (August 8, 2018) (Pls.' Ex. 248).  Based on the evidence ruled above, there are enough genuine issues as to Long and McCrea's scienter that warrant denial of summary judgment.

### 3.  Construction Timeline

Plaintiffs' main argument as to the timeline statements is that the Individual Defendants knew all along that they would place ME2 into service using the 12-inch, but failed to disclose this, and that the full 20-inch startup was significantly delayed – a fact also unknown to investors. As with the earlier capacity statements, I find that there are enough genuine issues as to the Individual Defendants' scienter.

Prior to the August 9, 2017, earnings call, where McCrea shared an in-service timeline of Q4 2017, he received several communication updates related to the use of the 12-inch pipeline, including a Weekly Flash Report stating that ME2 with the 20-inch pipeline would not be ready until Q2 2018.  July 28, 2017, Weekly Flash Report (Pls.' Ex. 32).  Before the November 8, 2018,

earnings call, several employees understood Long was behind concealing the use of the 12-inch.[60]

Energy Transfer Personnel Text Records at ET-ACERS-01061157 (Pls.' Ex. 121).  Similarly, days

before the February 22, 2018, earnings call, where a Q2 2018 timeline was asserted, Long,

Ramsey, and McCrea received construction updates setting the final 20-inch phase of ME2 by

2019.[61]  Email from Chris Sonneborn to Def. Ramsey and Jennifer Street (Feb. 16, 2018) (Pls.'

Ex. 54) (copying Ramsey in meeting debrief thread); *see also* Q4 2017 Q&A Document (Feb. 21,

2018) (Pls.' Ex. 82) (copying Defendants' Long, Ramsey, and McCrea for the earnings call).

Ramsey and Long once more changed the timeline they shared with investors in May

through August 2018 – this time stating ME2 would be ready by Q3 2018.  Pls.' Exs. 67, 77, 80,

98, 105, 248 (reflecting construction updates to Ramsey or Long which described a Q3 2018

timeline using a 12-inch pipeline and, at times, identifying a much later 2020 timeline for the full

20-inch pipeline).

The Defense argues that they updated their timeline along with internal updates.  Even if

that were true, a reasonable juror could find that what Defendants failed to disclose – the smaller

pipeline and lower capacity – made their timelines misleading.  As with capacity, the Individual

Defendants' scienter can be easily attributed to Energy Transfer.

### IV.    Conclusion

For the reasons set forth, Defendants' motion for summary judgment will be denied in part

and granted in part.  Because I am denying Defendants' motion only as to the August 2018 loss

causation date, only the pipeline capacity and construction timeline statements and their

---

[60] There is also evidence that the company had a concerted effort not to provide the specific number of complete HDDs to investors out of the total number of HDDs, understanding that the total differed based on the use of the 12-inch.  Pls.' Ex. 305 ("Reminder, they have not wanted to provide specific numbers of HDDs complete out of the total because the total differs based on GRE vs no GRE . . . .").

[61] That timeline also assumed no inadvertent returns or loss of circulation would take place.

corresponding scienter survive.  I will also partially grant Plaintiffs' partial motion for summary judgment as to the February 2018 to June 2018 statements and the corresponding scienter as to Defendants Long, McCrea, and Ramsey, but otherwise deny the motion.  An appropriate order follows.


       /s/ Gerald Austin McHugh
United States District Judge